UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

GRAND JURY N-12-3

2013 JAN 25 PM 4 46

U.S. DISTRICT COURT
NEW HAVEN, CT.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:13CR___ (___) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | 15 U.S.C. §§ 78j(b), 78ff [Securities Fraud] |
| JESSE C. LITVAK | : | 18 U.S.C. § 1031 [TARP Fraud] |
| | : | 18 U.S.C. § 1001 [False Statements to the |
| | : | Government] |

## INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

### The Defendant

1.     Defendant JESSE C. LITVAK, a licensed securities broker, resided in the State of New York and was a senior trader and managing director at Jefferies & Co., Inc. (referred to herein as "Jefferies").  LITVAK was hired by Jefferies on or about April 14, 2008 and was terminated on or about December 21, 2011.

2.     Jefferies is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory Authority ("FINRA") member firm. Jefferies is a global securities and investment banking firm, with headquarters in New York. Jefferies also has a trading floor in Stamford, Connecticut where LITVAK and other members of its Mortgage and Asset-Backed Securities Trading group worked.

3.     LITVAK specialized in trading certain types of residential mortgage-backed securities ("RMBS"), which are securities within the meaning of the federal securities laws.

### The Victim-Customers

4.     LITVAK's victims are known by the Grand Jury to have been certain of Jefferies' customers.

5.     LITVAK's victim-customers included funds established by the United States Department of Treasury's Legacy Securities Public-Private Investment Program ("PPIP"). PPIP was, and is, a part of the United States Government's Troubled Asset Relief Program ("TARP"), the Government bailout plan created in 2009 in response to the financial crisis.

6.     In March 2009, Treasury announced the creation of PPIP, the purpose of which was to purchase certain troubled real estate-related securities, including types of RMBS, from financial institutions to allow those financial institutions to free up capital and extend new credit.

7.     Beginning in late 2009, the Government used more than $20 billion of bailout money from TARP to fund Public-Private Investment Funds ("PPIFs"), which would purchase the troubled securities. The Government matched every dollar of private investment in a PPIF with one dollar of equity and two dollars of debt. Thus, 75% of each PPIF's money consists of taxpayer funds disbursed by the Government as part of its bailout plan through TARP.

8.     Each PPIF was established and managed by a Legacy Securities PPIP fund manager (a "PPIF Manager") selected by the Department of Treasury. Each PPIF Manager owed fiduciary duties to the investors that contributed money to its PPIF, which was primarily the Government.

9.     Each PPIF received between approximately $1.4 billion to $3.7 billion of bailout money.

10.     Under the rules of PPIP, a PPIF could buy or sell only certain types of RMBS, including the types of RMBS that LITVAK specialized in.

11.     The following six PPIFs are known by the Grand Jury to have been LITVAK's victim-customers (each a "TARP-Funded Victim"):

- 2 -

    a.    AG GECC PPIF Master Fund, L.P. (PPIF Manager:  Angelo, Gordon & Co., LP);

    b.    AllianceBernstein Legacy Securities Master Fund, L.P. (PPIF Manager:  AllianceBernstein, LP);

    c.    BlackRock PPIF, L.P. (PPIF Manager:  BlackRock, Inc.);

    d.    Invesco Legacy Securities Master Fund, L.P. (PPIF Manager:  Invesco Ltd.);

    e.    RLJ Western Asset Public/Private Master Fund, L.P. (PPIF Manager:  RLJ Western Asset Management, LLC); and

    f.    Wellington Management Legacy Securities PPIF Master Fund, LP (PPIF Manager:  Wellington Management Company, LLP).

12.    In addition, the following non-PPIP entities or their affiliates, or funds or entities managed by or affiliated with them, are known by the Grand Jury to also have been LITVAK's victim-customers (each a "Privately-Funded Victim"):

    a.    DE Shaw & Co.;

    b.    DW Investment Management LP;

    c.    EBF & Associates;

    d.    Magnetar Capital;

    e.    MFA Financial, Inc.;

    f.    Monarch Alternative Capital;

    g.    Oak Hill Capital;

    h.    Pine River Capital Management;

    i.    Putnam Investments;

j.      QVT Financial;

k.      Red Top Capital Investments;

l.      Soros Fund Management LLC;

m.      Third Point LLC; and

n.      York Capital Management, LLC.

### Other Relevant Persons

13.     Supervisor #1 is known by the Grand Jury to have been one of LITVAK's supervisors at Jefferies.

### RMBS Trading

14.     RMBS are bonds comprised of large pools of residential mortgages and home equity loans.  The RMBS owners receive payments on a monthly basis based on repayments from the homeowners that took out the mortgages or loans, until the homeowners repay their debt, refinance or default.  Unlike stocks, RMBS bonds are not publicly traded on an exchange, such as the New York Stock Exchange or NASDAQ, and pricing information is not publicly-available.  Instead, buyers and sellers of bonds use broker-dealers, like Jefferies, to execute individually negotiated transactions.

15.     The unit at Jefferies that handles RMBS trading is known as the Mortgage and Asset-Backed Securities group, which employs traders and salespeople.  In general, a trader, like LITVAK, specializes in particular kinds of RMBS or "sectors," while a salesperson is responsible for certain customers or "accounts."

16.     RMBS bonds typically are sold in three ways:

a.      from a broker-dealer's inventory, in which the broker-dealer like Jefferies is selling a bond that it has owned for a period of time;

b.      as an order, in which the seller commissions the broker-dealer to seek a buyer, or the buyer commissions the broker-dealer to seek a seller, for a particular bond; or

c.      as part of a "bid list" or "BWIC" ("bids wanted in competition"), in which the seller circulates a list of specific bonds it is interested in selling so that the broker-dealer may seek a potential buyer willing to negotiate terms for the trade.

17.     Orders and bid list trades are considered "riskless" trades for broker-dealers like Jefferies because in those transactions broker-dealers merely act as match-makers, serving as a conduit for a bond to pass from a seller to a buyer.

18.     In orders and bid list trades, the buyer and the seller do not know each other's identity, but communicate exclusively through the broker-dealer's traders and salespeople.

19.     Buyers attempt to purchase bonds at the lowest price available in the market, and sellers try to sell bonds at the highest price available.  This is called "best execution."  Where a buyer does not obtain best execution, its investment will be less profitable than it would have been otherwise.

20.     A broker-dealer's profit, if any, on a set of trades is the difference or "spread" between the price it pays the seller and the price it charges the buyer.  In the bond industry, prices are measured in 1/32s of a dollar, commonly referred to as "ticks."  For instance, if a broker-dealer buys a bond for $65.25 (meaning $65.25 per $100 of current face value), the price would be expressed as "65 dollars and 8 ticks," "65 and 8" or "65-8."  If the broker-dealer then sells that bond for $65.50 (meaning $65.50 per $100 of current face value), the price would be expressed as "65 dollars and 16 ticks," "65 and 16," or "65-16."  The broker-dealer's profit on this set of trades would be $0.25 per $100 of current face value, or 8 ticks.

21.     A customer can compensate a broker-dealer for a trade in one of two ways, either on an "all-in" or an "on-top" basis.

a.     In an "all-in" trade, the buyer agrees to a price without reference to the price the broker-dealer paid to the seller; the spread between the amount paid by the buyer and the amount paid to the seller is the broker-dealer's compensation.

b.     In an "on-top" trade, the buyer and the broker-dealer agree on a specific amount that is added to the price the broker-dealer paid to the seller; in other words, the broker-dealer's compensation is a commission added to the cost of the bond.

22.     Inventory trades are usually "all-in" transactions, while bid lists are "on top" trades, and orders can be either depending on what the broker-dealer, buyer and seller negotiate.

### Jefferies' Codes of Conduct

23.     Jefferies maintained (i) a Code of Ethics, (ii) Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel, and (iii) Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel.

24.     In the section entitled "Fair Dealing," Jefferies' Code of Ethics stated that "[t]aking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice is a violation of the Code."

25.     Both the Compliance and Supervisory Policies and Procedures for Mortgage & Asset-Backed Securities Sales and Trading Personnel and the Compliance and Supervisory Policies and Procedures for Fixed Income Sales and Trading Personnel include the following statement: "Traders should bear in mind that the anti-fraud provisions of the Exchange Act and

the best execution provisions of FINRA-NASD rules continue to apply to all securities transactions, regardless of the customer's status, and that trading that is suggestive of abuse will not be permitted."

26.     Before and during the acts alleged in this Indictment, LITVAK completed acknowledgement forms certifying that he had "read, understood, complied and agree[d] to comply with" these policies.

## COUNTS ONE through ELEVEN
### Securities Fraud
### 15 U.S.C. §§ 78j(b), 78ff

### The Scheme and Artifice

27.     The allegations set forth in paragraphs 1 through 26 of this Indictment are realleged and incorporated as though fully set forth herein.

28.     Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of RMBS, would and did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (i) employing devices, schemes and artifices to defraud, (ii) making untrue statements of material facts and omitting to state material facts necessary to make the statements made not misleading in the light of the circumstances under which they were made and (iii) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit on purchasers and sellers of such RMBS.

29.     As a result of this scheme, LITVAK caused victim-customers to sustain losses of more than $2,000,000.

### Purpose of the Scheme and Artifice

30.     A purpose of LITVAK's scheme was to enrich Jefferies and himself by using materially false and fraudulent misrepresentations and omissions to take secret and unearned compensation from TARP-Funded Victims and Privately-Funded Victims on RMBS trades.

31.     LITVAK's supervisors at Jefferies, including Supervisor #1, established and communicated specific annual profit goals for the Mortgage and Asset-Backed Securities group. As LITVAK knew, his individual trading revenue was tracked by his supervisors and steadily declined each year—from a profit of more than $40,000,000 in 2009 to a loss of more than $10,000,000 in 2011.

32.     LITVAK's scheme increased the profitability of his trades.  For example, on or about June 22, 2011, LITVAK corresponded with a trader at another broker-dealer firm about a RMBS bond being offered via a bid list.  The approximate "on-top" compensation a broker-dealer can expect on a bid list transaction is between four ticks and eight ticks (between 4/32s and 8/32s per $100 of the bond's current face value).  In discussing the price that LITVAK hoped to induce a specific TARP-Funded Victim to pay for this bid list bond, LITVAK wrote "f this 4 - 8/32 sht [*sic*]," to which the other trader responded, "that doesnt feed anyone."

### Manner and Means of the Scheme and Artifice

The manner and means by which LITVAK sought to accomplish the scheme included, among others, the following:

33.     In certain order and bid list transactions:

a.      where the buying victim-customer had agreed upon a specified commission "on top" of the price that Jefferies had negotiated with the seller of a RMBS bond, LITVAK would and did misrepresent to the buyer the price Jefferies had agreed to pay the seller, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense; and

b.      where the selling victim-customer had agreed upon a specified commission to be deducted from the price at which Jefferies had negotiated to sell a RMBS bond, LITVAK would and did misrepresent to the seller the price the buyer had agreed to pay to Jefferies, providing Jefferies with an extra and unearned profit at the selling victim-customer's expense.

34.     In certain sales of bonds from Jefferies' inventory, LITVAK would and did misrepresent to the buying victim-customer that the transaction was an order or bid list trade requiring "on top" compensation, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense.

35.     LITVAK perpetrated this scheme by the use of means and instruments of interstate commerce and the mails in various ways:

a.      LITVAK used electronic communications with victim-customers, including telephone, email, instant messages and electronic group "chats," to communicate false statements and misrepresentations with the intent and purpose of soliciting and negotiating fraudulent RMBS bonds trades;

b.      LITVAK sent and caused to be sent to victim-customers trade confirmations or tickets documenting fraudulent transactions; and

c.      LITVAK caused victim-customers to wire funds to Jefferies, and Jefferies to wire funds to victim-customers, to pay for fraudulent transactions.

<u>Misrepresented Prices</u>

36.    It was part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds in bid list and order trades, where the victim-customers agreed to pay Jefferies specific amounts of compensation "on top" of the prices paid to the sellers, by misrepresenting the acquisition costs to be higher than the prices actually paid by Jefferies to the sellers, fraudulently increasing Jefferies' compensation on the transactions.

37.    For instance, on or about March 31, 2010, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. of two RMBS bonds, HVMLT 2006-10 2A1A (the "HarborView Bond") and LXS 2007-15N 2A1 (the "Lehman Bond"), as follows:

a.      On March 31, 2010 at approximately 10:32 a.m., the seller placed an order with Jefferies to sell these two bonds. The seller's offering price at that time was 58 on the HarborView Bond and 57 on the Lehman Bond.

b.      At approximately 10:49 a.m., LITVAK approached the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. about buying these bonds, writing "wanted to give you first crack on em." The PPIF Manager asked for details, and LITVAK responded by misrepresenting the seller's offering prices as 59 on the HarborView Bond (instead of the actual offering price of 58) and 58-16 on the Lehman Bond (instead of the actual offering price of 57).

c.      Between approximately 11:21 a.m. and 11:42 a.m., LITVAK and the PPIF Manager spoke by telephone.

- 10 -

d.      At approximately 11:42 a.m., LITVAK electronically communicated with

Supervisor #1 as follows:

> alliance just bid me 58 on the 06-10s [the HarborView Bond]....i
> know he will pay us 4/32s if i tell him we have to pay 58-16.... he
> also bid us 57-16 on the lxs [the Lehman Bond]....i am thinking of
> telling him that one has to be 58-8 cuz its one of the bigger ones....

[Ellipses in original.]

e.      At approximately 11:48 a.m., Supervisor #1 replied to LITVAK "boom!

tell me when to go in."  In this context, "tell me when to go in" means when Supervisor #1

should intercede to buy the bonds from the seller.

f.      At approximately 12:45 p.m., Supervisor #1 electronically communicated

with the seller to confirm Jefferies was buying the HarborView Bond for 57-16 and the Lehman

Bond for 56-16.  Supervisor #1 then described these prices to LITVAK as "layups."

g.      At approximately 12:45 p.m., LITVAK misrepresented the state of

negotiations with the seller to the PPIF Manager:

> ok big man....here is what i got from him...i beat him up pretty
> good.....but this is what he came back with:
> he will sell to me 20mm orig of hvmlt 0610 @ 58-00
> but he is being harder to knock back on the lxs bonds...said that he
> thinks that one is much cheaper yada yada yada....he told me he
> would sell them to me at 58-8 (30mm orig)......i would be fine
> working skinnier on these 2....but think you are getting good
> levels on these....let me know what you want to do big man....

[Ellipses in original.]

h.      At approximately 1:14 p.m., the PPIF Manager responded by inquiring

whether these would be "all-in" or "on-top" trades, asking "is he [the seller] paying u or am i?"

i.      At approximately 1:21 p.m., LITVAK responded with additional

misrepresentations:

> all the levels i put in this [chat]room are levels he wants to sell to
> me...i tried to beat him up so i could get these levels to
> you.......but those are the levels he wants to sell to me...i will
> work for whatever you want on these...

[Ellipses in original.]

       j.     The PPIF Manager replied back "gonna finish lunch first then re-run it all," and at approximately 1:24 p.m., LITVAK repeated and summarized his earlier misrepresentations:

> sounds good.....so to recap the levels he is offering to me:
> hvmlt 06-10 2a1a (20mm orig) @ 58-00
> lxs 40mm orig at 58-8

[Ellipsis in original.]

       k.     At approximately 1:45 p.m., LITVAK told the PPIF Manager "bot em," indicating that LITVAK had purchased the HarborView Bond and the Lehman Bond. The PPIF Manager replied by proposing Jefferies not receive any compensation on (or "wash") the smaller HarborView Bond trade and add five ticks as compensation on the Lehman Bond trade. Approximately one minute later, LITVAK responded "thats fine."

      38.     The AllianceBernstein Legacy Securities Master Fund, L.P. paid approximately $7,000,000 for the HarborView Bond and approximately $20,000,000 for the Lehman Bond.

      39.     The seller did not offer to sell the HarborView Bond for 59, as LITVAK misrepresented to the PPIF Manager for the AllianceBernstein Legacy Securities Master Fund, L.P. In truth and in fact, as LITVAK knew, the seller's offer was actually 58.

      40.     The seller did not offer to sell the Lehman Bond for 58-16, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, the seller's offer was actually 57.

- 12 -

41.     LITVAK did not communicate to the seller the PPIF Manager's bids made between approximately 11:21 a.m. and 11:42 a.m., as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, all his statements about the seller's reaction to those bids were false.

42.     When LITVAK electronically communicated with the PPIF Manager after approximately 12:50 p.m., the seller was no longer seeking 58 for the HarborView Bond or 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, the seller had already agreed to accept lower prices.

43.     Jefferies did not pay the seller 58 for the HarborView Bond, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, Jefferies paid 57-16.

44.     Jefferies did not pay the seller 58-8 for the Lehman Bond, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, Jefferies paid 56-16.

45.     Jefferies did not work without compensation on the HarborView Bond trade, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 16 ticks as compensation for Jefferies, or approximately $60,000.

46.     Jefferies did not work for five ticks of compensation on the Lehman Bond trade, or approximately $50,000, as LITVAK misrepresented to the PPIF Manager.  In truth and in fact, as LITVAK knew, on this riskless trade, LITVAK took 61 ticks as compensation for Jefferies, or approximately $650,000.

<u>Misrepresented Inventory Trades as Orders or Bid List Trades</u>

47.     It was further part of the scheme that LITVAK would defraud victim-customers buying RMBS bonds held in Jefferies' inventory by misrepresenting those as orders and bid list trades with compensation for Jefferies "on-top," taking increased and unearned profits because, on inventory transactions, broker-dealers are not entitled to extra compensation in addition to the price paid.  By doing this, LITVAK falsely portrayed himself to victim-customers as their ally in negotiations against non-existent sellers, rather than admitting that he was, in fact, negotiating directly against his victim-customers.

48.     To effect his scheme, LITVAK would invent a fictitious seller for a bond that Jefferies already had in its inventory and was seeking to sell to a victim-customer.  LITVAK would then falsely describe the fictitious seller's offering price and reaction to LITVAK's negotiating tactics.

49.     For instance, on or about December 23, 2009, LITVAK executed his scheme in connection with the purchase by the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP of the RMBS bond WFMBS 2006-AR12 1A1 (the "Wells Fargo Bond"), as follows:

        a.      On or about December 14, 2009, LITVAK paid 70 (meaning $70 per $100 of current face value) for the Wells Fargo Bond, with an original face value of $6,230,000, for Jefferies' inventory.

        b.      On or about December 18, 2009, LITVAK first offered to sell Jefferies' Wells Fargo Bond to the Wellington Management Legacy Securities PPIF Master Fund, LP. LITVAK misrepresented that he had an order from a third party seller, writing "i have a guy that has 6+mm orig of wfmbs 06-ar12 1a1…my guy would sell to me at 77…. [ellipses in original.]"

- 14 -

The PPIF Manager bid 74, and LITVAK responded by describing his communications with the fictitious seller:

> i will reflect that in big man and see what he says....
> at this point...he really wants me to work it longer (i just got the bonds this am to work)....so he actually gave me the ol "just keep working em at 77" rap.....didnt even give me any room off 77.....fck [sic]
> he appreciates it...but has some internal conversations about where he told them he can sell it and at 75 he would not be looking good internally is what he said....
> i thought i could work him over...but he is kind of being a weenie

[Ellipses in original.]

     c.     On or about December 23, 2009 at 7:46 a.m., LITVAK approached the PPIF Manager for the Wellington Management Legacy Securities PPIF Master Fund, LP again, asking for information about another trade and suggesting "maybe i can use that as leverage to go beat the guy up that owns the 06-ar12 1a1 bonds....as of last nite it sounded like he was starting to warm up to the idea of coming off his level [ellipsis in original]."

     d.     At approximately 7:48 a.m., the PPIF Manager expressed interest, asking "what's the current size and offer on the 06-ar12 1a1 again?"  Approximately one minute later, LITVAK responded "it's 3+mm current and he was offering them at 77..... [ellipsis in original.]"

     e.     At approximately 8:14 a.m., LITVAK updated the PPIF Manager by making further misrepresentations about the fictitious seller, writing "he is still red-dotted....usually rolls in around now.....so should know soon brotha..... [ellipses in original.]" ("Red-dotted" in this context means that the fictitious seller was unavailable to participate in electronic communications.)

     f.     At approximately 8:46 a.m., LITVAK misrepresented to the PPIF Manager that he had concluded negotiations with the seller at a price that would result in a four-tick profit to Jefferies, writing "winner winner chicken dinner......he is gonna sell em to me at

75-28 as i told him to not get cute and just sell the bonds so you can own them at 76….he said cool….. [ellipses in original.]"

50. The Wellington Management Legacy Securities PPIF Master Fund, LP paid approximately $2,300,000 for the Wells Fargo Bond.

51. LITVAK did not engage in any negotiations or communications with the seller of Wells Fargo Bond on December 23, 2009, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, there was no third party seller, since Jefferies already owned the Wells Fargo Bond.

52. Jefferies did not purchase the Wells Fargo Bond from a third party seller on December 23, 2009, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies purchased that bond nine days earlier, on or about December 14, 2009.

53. Jefferies did not pay the seller 75-28 for the Wells Fargo Bond, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies paid 70 or approximately $2,100,000.

54. Jefferies' profit on this set of transactions was not four ticks, or approximately $3,800, as LITVAK misrepresented to the PPIF Manager. In truth and in fact, as LITVAK knew, Jefferies's profit was 192 ticks, or approximately $185,000.

### The Securities

55. Beginning in approximately 2009 and continuing until approximately December 2011, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the mails, in connection with the purchase and sale of securities, to wit, the RMBS set forth below, would and did use and

employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of

Federal Regulations, Section 240.10b-5 by (i) employing the aforementioned devices, schemes

and artifices to defraud, (ii) making untrue statements of material facts and omitting to state

material facts necessary to make the statements made not misleading in the light of the

circumstances under which they were made and (iii) engaging in acts, practices and courses of

business that would and did operate as a fraud and deceit on purchasers and sellers of such

securities as set forth below, each constituting a separate count of this Indictment:

| Count | Trade Date | Security |
|-------|-----------|----------|
| 1 | 3/31/10 | HVMLT 2006-10 2A1A (HarborView Bond) |
| 2 | 3/31/10 | LXS 2007-15N 2A1 (Lehman Bond) |
| 3 | 6/22/11 | HVMLT 2007-7 2A1A |
| 4 | 7/1/10 | SARM 2005-21 7A1 |
| 5 | 12/23/09 | WFMBS 2006-AR12 1A1 (Wells Fargo Bond) |
| 6 | 5/28/09 | INDX 2007-AR7 2A1 |
| 7 | 12/9/09 | NYMT 2005-2 A |
| 8 | 1/7/10 | DLSA 2006-AR1 2A1A |
| 9 | 3/29/10 | CWALT 2006-OA3 1A1 |
| 10 | 4/1/10 | LXS 2007-15N 2A1 |
| 11 | 11/22/10 | FHAMS 2005-AA10 2A1 |

All in violation of Title 15, United States Code, Sections 78j(b) and 77ff, and Title 18,

United States Code, Section 2.

COUNT TWELVE
TARP Fraud
18 U.S.C. § 1031

56.     The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this

Indictment are realleged and incorporated as though fully set forth herein.

57.     Beginning in approximately December 2009 and continuing until approximately

December 2011, in the District of Connecticut and elsewhere, Defendant JESSE C. LITVAK

devised a scheme and artifice to defraud the United States and to obtain money and property by

means of false and fraudulent pretenses, representations and promises in connection with grants,

contracts, subcontracts, subsidies, loans, guarantees, insurance and other forms of Federal

assistance—including TARP, an economic stimulus, recovery or rescue plan provided by the

Government, and the Government's purchase of troubled assets as defined in the Emergency

Economic Stabilization Act of 2008—the value of such Federal assistance, or any constituent

part thereof, being in excess of $1,000,000.

58.     On or about the following dates, in the District of Connecticut and elsewhere,

defendant LITVAK knowingly executed and attempted to execute the aforementioned scheme

and artifice with the intent to defraud the United States and to obtain money and property by

means of false and fraudulent pretenses, representations and promises in connection with such

Federal assistance in the following RMBS bond transactions with a TARP-Funded Victim:

a.     the March 31, 2010 sale of the HarborView Bond to AllianceBernstein

Legacy Securities Master Fund, L.P.;

b.     the March 31, 2010 sale of the Lehman Bond to AllianceBernstein Legacy

Securities Master Fund, L.P.;

c.     the June 22, 2011 sale of the HVMLT 2007-7 2A1A bond to

AllianceBernstein Legacy Securities Master Fund, L.P.;

    d.      the July 1, 2010 sale of the SARM 2005-21 7A1 bond to Invesco Legacy Securities Master Fund, L.P.; and

    e.      the December 23, 2009 sale of the Wells Fargo Bond to Wellington Management Legacy Securities PPIF Master Fund, LP.

All in violation of Title 18, United States Code, Sections 1031 and 2.

COUNTS THIRTEEN through SIXTEEN
False Statements to the Government
18 U.S.C. § 1001

59.    The allegations set forth in paragraphs 1 through 26 and 28 through 54 of this Indictment are realleged and incorporated as though fully set forth herein.

60.    On or about the following dates, in the District of Connecticut and elsewhere, LITVAK, in a matter within the jurisdiction of the United States Department of Treasury, a department and agency of the United States, did knowingly and willfully make and cause to be made a materially false, fictitious, and fraudulent statement and representation to a PPIF Manager for a TARP-Funded Victim, each statement set forth below constituting a separate count of this Indictment:

| Count | Date of Statement | Recipient | False Statement | Correct Fact |
|-------|-------------------|-----------|-----------------|--------------|
| 13 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: hvmlt 06-10 2a1a (20mm orig) [the HarborView Bond] @ 58-00." | Jefferies had already negotiated with the seller to purchase the HarborView Bond at 57-16. |
| 14 | 3/31/10 | Trader at PPIF Manager for AllianceBernstein Legacy Securities Master Fund, L.P. | "[S]o to recap the levels he is offering to me: … lxs 40mm orig [the Lehman Bond] at 58-8." | Jefferies had already negotiated with the seller to purchase the Lehman Bond at 56-16. |
| 15 | 12/23/09 | Trader at PPIF Manager for Wellington Management Legacy Securities PPIF Master Fund, LP | "[H]e is gonna sell em to me at 75-28 as i told him to not get cute and just sell the bonds  so you can own them [the Wells Fargo Bond] at 76….he said cool." | Jefferies had actually purchased the Wells Fargo Bond in question on December 14, 2009 at 70. |
| 16 | 6/24/10 | Trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P. | In electronic chat between LITVAK and seller forwarded to trader at PPIF Manager for Invesco Legacy Securities Master Fund, L.P., LITVAK altered chat in original message to show Jefferies' purchase price of "79-26." | In original electronic chat between LITVAK and seller, chat reflected Jefferies' actual purchase price of 79-24. |

All in violation of Title 18, United States Code, Sections 1001 and 2.

A TRUE BILL

/s/

FOREPERSON

UNITED STATES OF AMERICA

/s/ David B. Fein

DAVID B. FEIN
UNITED STATES ATTORNEY

/s/ Jonathan N. Francis

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY

/s/ Eric J. Glover

ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY