**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:13CR19 (JCH) |
| v. | |
| JESSE C. LITVAK | July 29, 2013 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**JESSE C. LITVAK'S MOTION TO DISMISS THE INDICTMENT**

**TABLE OF CONTENTS**

**Page**


PRELIMINARY STATEMENT ..... 1

I. BACKGROUND ..... 2

A. The Indictment ..... 2

B. Broker-Dealers and Trading-Related Compensation ..... 3

C. Non-Agency RMBS ..... 5

D. Legacy Securities Public-Private Investment Program ..... 8

1. History & Purpose ..... 8

2. Treasury's Selection Process and Required Criteria for PPIF Managers ..... 9

3. The PPIF Structure and Fund Managers' Relationship With Treasury ..... 9

II. ARGUMENT ..... 12

A. Standard of Review ..... 12

B. Counts Thirteen Through Sixteen Must be Dismissed for Failing to Allege that Mr. Litvak Made or Caused to be Made a False Statement in Relation to a Matter Within the Jurisdiction of a Department or Agency of the United States ..... 12

C. The Indictment Fails to Allege a Violation of Title 18, United States Code, Section 1031 ..... 21

1. The Trades Between the PPIFs and Jefferies Are Outside the Scope of Title 18, United States Code, Section 1031 ..... 21

2. Count Twelve of the Indictment is Defective ..... 23

D. The Indictment Fails to Allege Sufficiently and Cannot Allege Sufficiently that the Alleged Misstatements are Material and, thus, All Counts of the Indictment Must be Dismissed ..... 24

1. The Alleged Misstatements Pertaining to Jefferies's Profits Would Not Have Mattered to Sophisticated Institutional Investors ..... 24

2. The Alleged Misstatements Pertaining to Jefferies's Profits Would Not Have Mattered to the Government ..... 27

3. Information About Jefferies's Mark-ups Is Not Material Information Under Established Industry Practice and Applicable Regulatory Guidance ..... 29

4. The Alleged Variances Between the Represented Mark-ups and the Actual Mark-ups Were Too Small to Have Mattered to Sophisticated Institutional Investors ..... 33

CONCLUSION ..... 34

# TABLE OF AUTHORITIES[1]

**Page(s)**

**CASES**

*Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*,
132 F.3d 1017 (4th Cir. 1997) ....................4

*Basic v. Levinson*,
485 U.S. 224 (1988)....................24, 25, 34

*Boyce Motor Lines v. United States*,
342 U.S. 337 (1952)....................12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)....................20

*Dep't of Enforcement v. Century Pacific Sec., Inc.*,
FINRA Order Accepting Offer of Settlement, Disciplinary Proceeding No. 20080142714-01 ....................32

*Dep't of Enforcement v. Chicago Investment Group, LLC*,
FINRA Order Accepting Offer of Settlement, Disciplinary Proceeding No. 2007007329501 (Jan. 26, 2010)....................32

*Dep't of Enforcement v. David Lerner Associates, Inc.*,
2012 WL 1906579 (N.A.S.D.R. Apr. 4, 2012)....................32

*Dep't of Enforcement v. MAXXTRADE, Inc.*, FINRA Disciplinary Proceeding No. 2008011759202 (Mar. 16, 2012) ....................32

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................25

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)....................25

*In re American Home Mortgage Holdings, Inc.*,
411 B.R. 181 (Bankr. D. Del. 2009) ....................6, 7

*In the Matter of John P. Flannery*
Administrative Proceeding File No. 3-14081, 2011 SEC LEXIS 3835 (Oct. 28, 2011).........25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
851 F. Supp. 2d 512 (S.D.N.Y. 2012)....................25

[1] All unreported authorities cited in this memorandum are attached hereto as Exhibit A.

*Lee v. AIG Cas. Co.*,
2013 WL 308963 (D. Conn. Jan. 24, 2013)....................20

*Lowe v. United States*,
141 F.2d 1005 (5th Cir. 1944)....................14, 15, 16

*Neder v. United States*,
527 U.S. 1 (1999)....................24, 28

*Rewis v. United States*,
401 U.S. 808 (1971)....................20

*Russell v. United States*,
369 U.S. 749 (1962)....................12

*Sable v. Southmark/Envicon Capital Corp.*,
819 F. Supp. 324 (S.D.N.Y. 1993)....................25

*SEC v. Rorech*,
720 F. Supp. 2d 367 (S.D.N.Y. 2010)....................25

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)....................34

*United States v. Ali*,
68 F.3d 1468 (2d Cir. 1995)....................24

*United States v. Ballistrea*,
101 F.3d 827 (2d Cir. 1996)....................28

*United States v. Binette*,
2013 WL 2138908 (D. Mass. May 15, 2013)....................13

*United States v. Blankenship*,
382 F.3d 1110 (11th Cir. 2004).................... passim

*United States v. Davis*,
8 F.3d 923 (2d Cir. 1993)....................13

*United States v. Dick*,
744 F.2d 546 (7th Cir. 1984)....................13

*United States v. Gibson*,
881 F.2d 318 (6th Cir. 1989)....................13, 18, 19

*United States v. Kramer*,
499 F. Supp. 2d 300 (E.D.N.Y. 2007)....................21

*United States v. Moore*,
612 F.3d 698 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ....................13

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000)....................12, 21

*United States v. Rodgers*,
466 U.S. 475 (1984)....................13, 17, 18, 20

*United States v. Santos*,
553 U.S. 507 (2008)....................21

*United States v. St. Clair*,
418 F. Supp. 201 (E.D.N.Y. 1976) ....................24

*United States v. Universal C.I.T. Credit Corp.*,
344 U.S. 218 (1952)....................20

**STATUTES**

15 U.S.C. § 78j(b) ....................2

15 U.S.C. § 78ff ....................2

18 U.S.C. § 666....................23

18 U.S.C. § 1001.................... passim

18 U.S.C. § 1031.................... passim

18 U.S.C. § 1341....................23

18 U.S.C. § 1957....................23

42 U.S.C. § 1320a-7b(b)(1) ....................23

Fed. R. Crim. P. 12(b)(3)(B) ....................12

Rule 144A of the Securities Act of 1933 ....................31

**REGULATIONS**

17 C.F.R. § 240.10b-10....................23

**OTHER AUTHORITIES**

NASD Rule IM-2440-1....................4, 31

NASD Rule IM-2440-2....................4, 5, 31

## PRELIMINARY STATEMENT

The Indictment in this case is fatally flawed in several respects. The government claims that the Department of Treasury's status as an investor in TARP-funded investment partnerships creates a basis to prosecute Mr. Litvak for false statements within Treasury's jurisdiction, in violation of Title 18, United States Code, Section 1001 (Counts Thirteen through Sixteen) and TARP fraud, in violation of Title 18, United States Code, Section 1031 (Count Twelve). In its haste to announce and prosecute this case as some sort of aggravated fraud against the TARP program and the American taxpayers, the government apparently failed to consider Treasury's own analysis in setting up the Public-Private Investment Partnership Program ("PPIP"). This analysis, and the structure of the program, show that Treasury expressly found that the PPIP's private investment managers were *not* government contractors or government agents and that Treasury, in fact, exerted no authority or jurisdiction over the interactions between these private parties and the private broker-dealers like Jefferies & Co., Inc. with which they transacted. The Indictment does not allege that any false statement was made to Treasury or was otherwise within Treasury's jurisdiction and thus, Counts Thirteen through Sixteen must be dismissed.

The TARP fraud charge suffers from even more obvious flaws. Count Twelve simply does not allege that Mr. Litvak committed an act that is part of the statutory definition of the crime. Section 1031 proscribes fraud "in any grant, contract, subcontract, subsidy, loan, guarantee insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program." But the Indictment alleges none of these circumstances, instead alleging only that Mr. Litvak sold bonds to counter-parties that received TARP bailout funds. Section 1031's scope falls well short of criminalizing all dealings with entities that received TARP funding. Further, in a misleading effort to expand Section 1031's scope, the government inserted the

words "in connection with" in place of the statutory term "in" in Count Twelve. The Court should rebuke this wholly improper tactic by dismissing Count Twelve.

The Indictment also exhibits a fundamental misunderstanding of what is material to the sophisticated institutional investors who are the alleged victims in this case. The government's theory of fraud is that Mr. Litvak's alleged misrepresentations caused Jefferies to receive "secret and unearned compensation." The government's case is thus not about Mr. Litvak causing his counter-parties to pay more for bonds than they were worth. It is about Mr. Litvak allegedly taking a slightly higher percentage of the deal for Jefferies. But in circumstances where institutional money managers are acting in the best interests of the funds they manage by analyzing bonds and then agreeing to fair market value prices, whether or not Jefferies received a slightly higher percentage of the overall price would not change the merits of the investment. In short, from an investment analysis perspective, the alleged misstatements were irrelevant and therefore immaterial. That the actual mark-ups charged were well within industry norms and objectively reasonable only reinforces the conclusion that the government has not adequately alleged materiality. Since materiality is an element of each offense charged in the Indictment, the Court should dismiss the Indictment in its entirety.

# I. BACKGROUND

## A. The Indictment

On January 25, 2013, a federal grand jury in the District of Connecticut indicted the defendant Jesse C. Litvak on 11 counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts One Through Eleven); one count of major fraud against the Troubled Asset Relief Program ("TARP"), in violation of 18 U.S.C. § 1031 (Count Twelve); and four counts of making a false statement in a matter within the jurisdiction of the United States Department of Treasury, in violation of 18 U.S.C. § 1001 (Counts Thirteen through Sixteen).

Mr. Litvak was a senior trader and Managing Director of Jefferies and Co., Inc.'s ("Jefferies") Mortgage Trading Group within its Fixed Income Division from April 15, 2008 to December 21, 2011. (Indictment ("Ind.") ¶ 1). Jefferies is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and a Financial Industry Regulatory ("FINRA") member firm. (Ind. ¶ 2). Mr. Litvak's responsibilities as a Jefferies trader were mainly focused on "non-agency" residential mortgage-backed securities ("RMBS"). (Ind. ¶ 3). Prior to joining Jefferies, Mr. Litvak worked at RBS Greenwich Capital ("RBS"), for approximately 11 years. Mr. Litvak left RBS to join Jefferies along with a large group of fixed income professionals led by the individual referred to in the Indictment as "Supervisor No. 1." (Ind. ¶ 13).

The Indictment alleges that, while working at Jefferies, Mr. Litvak made fraudulent misrepresentations to buyers of RMBS about Jefferies's acquisition costs in order to obtain extra undisclosed profit for Jefferies. (Ind. ¶ 33). The Indictment further alleges that on certain occasions, Mr. Litvak made misrepresentations to buyers of securities regarding the true identity of the seller in order to earn additional profit. (Ind. ¶¶ 47-48). The Indictment does not allege that Mr. Litvak caused any purchaser to pay more than fair market value for any bond.

On several of the trades alleged in the Indictment, the counter-party with whom Mr. Litvak negotiated was an investment manager for a Public-Private Investment Fund ("PPIF") in which the Department of Treasury ("Treasury"), as part of TARP, was an investor. (Ind. ¶¶ 5-7). With regard to TARP, it is alleged that 75 percent of each PPIF consisted of TARP funds (Ind. ¶ 7), and that the PPIF investment managers owed the government a fiduciary duty arising from the government's status as an investor. (Ind. ¶ 8).

**B. Broker-Dealers and Trading-Related Compensation**

Dealers in the secondary market like Jefferies assist investors in numerous ways including collecting and transmitting orders to the market, matching willing buyers and sellers,

negotiating prices, providing research and investment ideas, and executing orders.[2] A dealer profits by selling bonds at higher prices than the prices at which the dealer purchased those bonds. (Ind. ¶ 20). The difference between the price at which a dealer sells a bond and the dealer's contemporaneous cost for that bond is known, under applicable FINRA regulatory guidance and industry custom, as the "mark-up."[3] When acting as principal (*i.e.*, trading for its own account), a dealer is not required to disclose the mark-up; it is simply embedded in the price of the bond.[4]

The Indictment purports to describe a difference between what it terms "all-in" trades versus "on-top" trades. (Ind. ¶ 21). This is not terminology that is found in applicable FINRA or SEC regulations that govern dealers in the bond market. It is unclear what the government's source for this allegation might be. What is clear is that when a dealer like Jefferies acts as principal (*i.e.*, sells RMBS bonds for its own account) it earns its compensation through mark-ups. On principal trades, dealers like Jefferies do not charge fixed commissions and the term "commission" is inapplicable to the transactions between Jefferies and its counter-parties described in the Indictment.[5]

As a regulatory matter, there is no pre-determined "appropriate" mark-up. FINRA has long maintained a guideline for dealers, which provides that mark-ups on principal trades should

[2] *See* Frank J. Fabozzi, *The Handbook of Fixed Income Securities*, 41 7th ed. 2005.

[3] NASD Rule IM-2440-1, *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=3660&record_id=4337 (last visited July 26, 2013); NASD Rule IM-2440-2, *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=3660&record_id=4337 (last visited July 26, 2013).

[4] *See* 17 C.F.R. § 240.10b-10. *Compare* 17 C.F.R. § 240.10b-10(a)(2)(ii) (requiring disclosure of mark-ups on equities when dealer is acting as principal) *with* 17 C.F.R. § 240.10b-10(a)(5)-(7) (no disclosure of mark-ups on bond transactions required); *see also Banca Cremi, S.A. v. Alex Brown & Sons, Inc*., 132 F.3d 1017, 1033 (4th Cir. 1997) (no requirement for a broker-dealer to disclose its mark-ups for debt securities, even in "riskless" principal transactions).

[5] Although beyond the scope of this motion, it is worth noting that the government's allegation in paragraph 21(b) of the Indictment describing a mark-up as a "commission" is wrong and misleading.

be within five percent of contemporaneous cost. For debt securities, FINRA has more specifically determined that sales of non-investment grade bonds to "Qualified Institutional Buyers" (or "QIBs") are not covered by the five percent guideline; dealers are free to include whatever mark-up they deem appropriate. *See* NASD Rule-IM 2440-2.[6] The Indictment does not allege that the mark-ups actually charged were excessive or unreasonable.

**C. Non-Agency RMBS**

As defined by Treasury, "non-agency" RMBS are a "type of mortgage-backed security that is secured by loans on residential properties that are not issued or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae, or any other United States federal government-sponsored enterprise (GSE) or a United States federal government agency."[7] They are typically classified by underlying collateral or type of mortgage. Non-agency RMBS are essentially claims to cashflows from pools of non-agency mortgages. These securities are generally backed by mortgages that were not qualified to be securitized by the GSEs due to their large balances, lack of full documentation, low credit scores or non-standard terms such as negative amortization schedules. As a result, these assets are very sensitive to the credit performance of their underlying collateral.

Unlike stocks, non-agency RMBS are not publicly traded on an exchange and pricing information is not publicly available. In fact, for the entire period covered by the Indictment, broker-dealers like Jefferies were not required to report the prices for RMBS trades to self-regulatory organizations or government agencies. (Ind. ¶ 14). Currently, all broker-dealers who

[6] The fact that all buyers in this case were QIBs and all but one bond was non-investment grade undercuts any argument that the modest additional mark-up charged could have been material. *See infra* pp. 30-32.

[7] *See* Dep't of the Treasury, Legacy Securities Public-Private Investment Program, Program Update – Quarter Ended March 31, 2013 ("PPIP Program Update"), dated May 8, 2013, at 9, *available at* http://www.treasury.gov/initiatives/financial-stability/reports/Documents/PPIP%20Report%20033113%20Final.pdf (last visited July 26, 2013).

are FINRA members have an obligation to report these transactions to FINRA's Trade Reporting and Compliance Engine ("TRACE") that began collecting transaction information in all mortgage-backed securities in May 2011.[8] However, even today, RMBS prices in TRACE are not available to market participants.[9] Accordingly, determining the fair market value of RMBS bonds requires a great deal of analysis combined with reliance on investors' or dealers' expertise.

When "running" or analyzing bonds to determine the fair market price, sophisticated institutional investors typically determine the present value of the stream of cash flows the bond is expected to generate.[10] The three primary drivers of non-agency RMBS cash flows are the rate of voluntary prepayments or "CPR," the "constant default rate" or "CDR," and the loss severities or "SEV." These assumptions should reflect both the current collateral performance and the investor's macroeconomic views. Non-agency RMBS are typically modeled on Intex, a modeling platform, that utilizes the user's assumed CPR, CDR, and SEV inputs and outputs the expected cash flow profile of the bond.[11] Producing an accurate cash flow profile is dependent on the investor's assumptions and dealers, such as Jefferies, often aid investors in "running" bonds based on their own assumptions regarding the collateral.

---

[8] *See* Securities Exchange Act Release No. 61566 (Feb. 22, 2010), 75 FR 9262 (Mar. 1, 2010) (SEC Order Approving File No. SR-FINRA-2009-065) (TRACE ABS filing).

[9] "FINRA believes that information on Asset-Backed Securities transactions should be collected and analyzed before making any decision regarding the utility of such information for transparency purposes or the consequences of dissemination on this market. FINRA has stated that, after a period of study, it would file a proposed rule change if it determined that its study of the trading data provides a reasonable basis to seek dissemination of transaction information on Asset-Backed Securities." Fed. Reg. Vol. 75, No. 39 (Mar. 1, 2010). No such proposed rule change has been filed to date.

[10] *See, e.g.*, *In re American Home Mortgage Holdings, Inc.*, 411 B.R. 181, 194 (Bankr. D. Del. 2009) (citing Aswath Damodaran, *Investment Valuation: Tools And Techniques For Determining The Value Of Any Asset*, 997-88 (2d. ed. 2001)).

[11] Intex provides the industry's most complete library of RMBS deal models, created and maintained for accurate cashflow projections and price/yield analytics. *See Intex Overview*, INTEX.COM, *available at* http://www.intex.com/main/company.php (last visited July 26, 2013).

Sophisticated institutional investors then discount the modeled cash flows with an appropriate risk adjusted yield to arrive at a range of reasonable prices for the bond.[12] Yields generally vary with macroeconomic fluctuations, housing price uncertainty, and housing policy developments. Given the uncertainty of the collaterals' cash flows, investors and dealers typically run yields of non-agency RMBS at different cash flow scenarios ("base," "stress" and "optimistic," for example) in order to arrive at a range of potential prices. Institutional RMBS purchasers must then negotiate with dealers to arrive at the actual price. The written confirmation of a principal transaction and its counter-party will contain details on the particular RMBS bond, the price, and the amount of cash to be paid at settlement.

At the depth of the financial crisis in late 2008 and into 2009, the market for RMBS was extremely dislocated. RMBS traded at deeply distressed prices when they traded at all.[13] During the Indictment period, from 2009 through December 2011, the RMBS market remained illiquid, with bid-ask spreads in excess of two points.[14] Sophisticated institutional investors understood that (1) a fair-market-value price for an RMBS bond would fall within a range at least two points wide; and (2) that transaction costs in a dislocated, illiquid market would be significantly higher than in orderly market conditions.

---

[12] *See, e.g.*, *In re American Home Mortgage Holdings*, 411 B.R. at 194 (citing Aswath Damodaran, *Investment Valuation: Tools And Techniques For Determining The Value Of Any Asset*, 997-88 (2d. ed. 2001)).

[13] *See* Molly Stephens, *After the Financial Crisis: The Impact of RMBS Cases on Securities Litigation and the Lessons to be Learned on Protecting Investors, New Developments in Securities Litigation*, 2013 WL 2137393 at *1 (Westlaw 2013).

[14] *See, e.g.*, B. Hollifield, A. Neklyudov, and C. Spatt, *Bid Ask Spreads and the Pricing of Securitizations: 144a vs. Registered*, Appendix at Table 8b, *available at* https://wpweb2.tepper.cmu.edu/wfa2013/wfasecure/upload/2013_PA_339744_516544_222214.pdf (last visited July 26, 2013).

**D. Legacy Securities Public-Private Investment Program**

**1. History & Purpose**

On March 23, 2009, Treasury, as a part of TARP, announced the Legacy Securities Public-Private Investment Program ("PPIP"), which was designed to support market functioning and facilitate price discovery for RMBS and other real-estate related securities that had been battered during the financial crisis.[15] PPIP's purpose was to draw new private capital into the market for such securities by providing financing on attractive terms as well as a matching equity investment from Treasury. PPIP was designed to help restart the market for these illiquid and difficult-to-value securities. Public-Private Investment Funds ("PPIFs") were established by nine private sector fund managers for the purpose of purchasing eligible securities from banks, insurance companies, mutual funds, pension funds, and other eligible sellers.[16] The fund managers were responsible for raising private-sector capital and Treasury co-invested by matching the private-sector equity dollar-for-dollar and providing debt financing in the amount of the total combined equity.

PPIP was designed as an eight-year program giving PPIF managers until 2017 to sell the assets in their portfolios.[17] "[T]o reduce the likelihood that the government [would] overpay for

---

[15] *See* U.S. Dep't of the Treasury, Public-Private Investment Program ("PPIP Overview"), *available at* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/credit-market-programs/ppip/Pages/purpose-and-overview.aspx (last visited July 26, 2013).

[16] Eligible assets were defined to include non-agency RMBS issued prior to 2009 that were originally rated AAA. Application for Treasury Investment in a Legacy Securities Public-Private Investment Fund, *available at* ("PPIP Application"), Attachment I, *available at* http://www.treasury.gov/press-center/press-releases/Documents/legacy_securities_ppif_app.pdf (last visited July 26, 2013).

[17] *See* Office of the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress ("SIGTARP Quarterly Report to Congress") dated Jan. 30, 2013, at 127, *available at* http://www.sigtarp.gov/Quarterly%20Reports/January_30_2013_Report_to_Congress.pdf (last visited July 26, 2013).

these assets, private sector fund managers competing with one another established the prices that they were willing to pay for such securities purchased under the program."[18]

**2. Treasury's Selection Process and Required Criteria for PPIF Managers**

Treasury employed a rigorous selection process designed to identify the most highly qualified and experienced institutional fixed income managers to serve as PPIF managers.[19] Nine investment managers made the cut: AllianceBernstein, LP; Angelo, Gordon & Co. LP; BlackRock, Inc.; Invesco Ltd.; Marathon Asset Management, LP; Oaktree Capital Management, LP; RLJ Western Asset Management, LP; The TCW Group; and Wellington Management Company, LLP.[20] As part of the application process, these firms were evaluated based on (among other things) their qualifications and performance history, the relevant expertise of their personnel, their investment strategy, and their valuation, monitoring, and reporting capabilities.[21] After the nine companies listed above were pre-qualified, each had 12 weeks to raise the required $500 million in private funds before Treasury would match the private capital investment, provide debt financing, and allow the companies to begin purchasing distressed assets.[22]

**3. The PPIF Structure and Fund Managers' Relationship With Treasury**

Each PPIF was structured as a limited partnership under Delaware law, consisting of a general partner (namely, the fund manager or its affiliate) and two or more limited partners

[18] *See supra* note 14, PPIP Overview.

[19] *See* PPIP Application, at 1.

[20] All but three of these entities – Marathon Asset Management, LP, Oaktree Capital Management, LP, and the TCW Group – are referred to as "TARP-Funded Victims" in the government's Indictment. (Ind. ¶ 11).

[21] *See* U.S. Dep't of Treasury, Public-Private Investment Program, Frequently-Asked Questions, *available at* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/credit-market-programs/ppip/Pages/faqs.aspx (last visited July 26, 2013).

[22] *See* Selecting Fund Managers for the Legacy Securities Public-Private Investment Program, Special Inspector General for the Troubled Asset Relief Program ("SIGTARP's Selecting Fund Managers Report"), Oct. 7, 2010, at 18, *available at* http://www.sigtarp.gov/ Audit%20Reports/Selecting%20 Fund%20Managers% 20for%20the %20 Legacy%20Securities%20Public-Private%20 Investment%20Program%2009_07_10.pdf (last visited July 26, 2013).

(namely Treasury and the "private vehicles" through which private investors invested). To Treasury, the PPIP fund entities were "investment counterparties receiving equity investments and loans from the $700 billion" in TARP funds.[23] The PPIP fund entities were not contractors or financial agents being paid for goods or services. Indeed, Treasury determined that the PPIF manager selection process was not governed by the Federal Acquisition Regulation ("FAR"), which governs how executive agencies purchase goods and services. Put another way, "transactions with PPIP fund managers d[id] not constitute an acquisition of goods or services, nor d[id] they involve the delegation of sovereign functions."[24] Treasury's limited partnership interests in the PPIFs served as financial instruments, and the "services that PPIF fund managers provide[d was] incidental to, but part of, the limited partnership agreement."[25] According to Treasury then, the PPIF managers had no direct relationship with Treasury. Rather, the duties of the PPIF managers arose from their relationship to the PPIF funds; the indirect relationship to Treasury was a function of Treasury's status as an investor in the PPIFs.[26] Under this framework, Treasury did not have any identifiable right to exercise any control over the PPIF managers' interactions with their counter-parties in the securities markets from which the PPIFs would purchase eligible assets.

In its application materials, Treasury succinctly stated that "funds will be managed by fund managers, not the Treasury."[27] While managing the PPIFs, fund managers were required to comply with a set of rules established by a standard Limited Partnership Agreement ("LPA"),

[23] *See* SIGTARP's Selecting Fund Managers Report, at 29.

[24] SIGTARP's Selecting Fund Managers Report, at 29.

[25] SIGTARP's Selecting Fund Managers Report, at 30.

[26] As discussed below, Treasury's description of its relationship with the funds directly undermines the element of federal jurisdiction that the government is required to prove under Section 1001. Materials in SIGTARP's possession that show Treasury's conclusion that its jurisdiction is limited is *Brady* material and should have been produced to the defense.

[27] *See* PPIP Application, Attachment I.

which contained the same provisions for all PPIF managers. The LPA authorized fund managers to "make all decisions concerning the investigation, evaluation, selection, negotiation . . . and disposition of [i]nvestments."[28] Additionally, the LPA empowered fund managers to hire consultants, brokers, and other service providers at reasonable expense. Fund managers were responsible for all out-of-pocket fees and costs incurred in trading, monitoring, holding, and disposing of investments that were reasonable and in furtherance of the Partnership's business.[29] Income that a PPIF earned from its investments would be distributed in accordance with the PPIP legal agreements. The proceeds of a PPIF, net of fees and expenses, would be distributed to the investors, including Treasury, in proportion to their equity capital investments after satisfying the requirements with respect to Treasury's debt financing in each of the funds.[30]

Within 60 calendar days after the end of each fiscal quarter, fund managers were required to provide Treasury with financial statements, including a balance sheet, a statement of income or loss, and a statement of capital.[31] Fund managers were also required to send Treasury monthly reports containing the following (and more): a description of all holdings (including, but not limited to, date of purchase, par value, cost, and Fair Market Value), details of securities transactions of the Partnership (including purchases and sales with information sufficient to identify securities traded throughout the period), and performance data.[32] A review of all documentation associated with the PPIP available on Treasury's web site reveals that Treasury did *not* require fund managers to report a separate break-out of commissions, fees, or mark-ups

[28] Amended and Restated Limited Partnership Agreement of AllianceBernstein Legacy Securities Master Fund, L.P ("LPA of AllianceBernstein"), at 26, *available at* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/credit-market-programs/ppip/Documents/AB%20Complete%20LPA%20(redacted).pdf. (last visited July 26, 2013).

[29] *See* LPA of AllianceBernstein at 34.

[30] *See supra* note 14, PPIP Overview.

[31] *See* LPA of AllianceBernstein, Annex B.

[32] *Id.* *See* LPA of AllianceBernstein for a complete list of items required in monthly reports.

associated with the purchase or sale of eligible assets. Additionally, there is no reporting requirement for any associated communications surrounding the purchase or sale of eligible assets.

The investment period for all PPIFs is now closed and the PPIP appears to have been enormously successful. Treasury has fully recovered its original investment of $18.6 billion and earned a net profit of $2.6 billion as of March 31, 2013. Each PPIF experienced positive rates of return ranging from 18.2% to 27.2% and future debt, equity, and interest payments from the outstanding PPIFs will provide additional positive return.[33]

## II. ARGUMENT

### A. Standard of Review

A defendant may move to dismiss an indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). A charge in an indictment is insufficient and must be dismissed when the government's theory of prosecution – as established by the language of the indictment – does not describe conduct that is a violation of the criminal statute charged. *See Russell v. United States*, 369 U.S. 749, 764-65 (1962); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (dismissing count of indictment for insufficiently alleging an element of the offense). In ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).

### B. Counts Thirteen Through Sixteen Must be Dismissed for Failing to Allege that Mr. Litvak Made or Caused to be Made a False Statement in Relation to a Matter Within the Jurisdiction of a Department or Agency of the United States

Counts Thirteen through Sixteen charge Mr. Litvak with making false statements in violation of Section 1001 of Title 18. Courts repeatedly have expressed concern about the

[33] *See* PPIP Program Update, dated May 8, 2013, at 5.

potential misuse of the federal false statement statute, recently described by one judge as "the ever-metastasizing § 1001." *See United States v. Moore*, 612 F.3d 698, 702 (D.C. Cir. 2010) (Kavanaugh, J., concurring).[34] Here, the Indictment fails to state a claim against Mr. Litvak for violations of Section 1001 because it fails to allege sufficiently – and cannot allege sufficiently – that Mr. Litvak made or caused to be made a false statement with respect to a matter "within the jurisdiction of a department or agency of the United States." 18 U.S.C. § 1001. Simply put, none of the putatively false statements alleged fall within the ambit of the statute.

This Indictment does not allege that Mr. Litvak made an allegedly false statement directly to the government. Nor does it allege that Mr. Litvak made any allegedly false statement that was transmitted to the government by another. *See United States v. Dick*, 744 F.2d 546, 554 (7th Cir. 1984) (false statements made to surety insured by Small Business Administration ("SBA") and transmitted to the SBA by the surety). Furthermore, the Indictment does not allege that Mr. Litvak made an allegedly false statement to a third party concerning a matter that was subject to government oversight. *See United States v. Rodgers*, 466 U.S. 475, 479-80 (1984) (explaining that "[a] department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation. . . . [T]he phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body"); *United States v. Davis*, 8 F.3d 923, 929 (2d Cir. 1993) ("In situations in which a federal agency is overseeing a state agency, it is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction."); *cf. United States v. Gibson*, 881 F.2d 318 (6th Cir. 1989) (describing situation in which federal agency jurisdiction

[34] *See also United States v. Binette*, 2013 WL 2138908, at *3 (D. Mass. May 15, 2013) (citing to *United States v. Moore* where "[t]hen-Justice Rehnquist noted that the statute has the potential 'to criminalize the making of even the most casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function'" (quoting *United States v. Yermian*, 468 U.S. 63, 82 (1984) (Rehnquist, J., dissenting))).

may lie where government has supervisory authority). Indeed, as discussed above, Treasury went out of its way to make explicit that the funds would not be managed by Treasury and that the fund managers would "make all decisions concerning the . . . [i]nvestments."[35]

The operative allegations in the Indictment relevant to Treasury and TARP are that 75 percent of each PPIF consisted of TARP funds (Ind. ¶ 7), and that the PPIF investment managers owed the government a fiduciary duty arising from the government's status as an investor (Ind. ¶ 8). At best, the allegations in this Indictment allege that Mr. Litvak made false statements to a private party, "a PPIF Manager for a TARP-Funded Victim" (Ind. ¶ 60) and that private party managed an investment fund that received federal money (Ind. ¶ 7). The government was merely a co-investor in the investment funds managed by that private party. The PPIP fund entities were not contractors or financial agents being paid for goods or services or being controlled or supervised by Treasury.

Every appellate decision uncovered by our research makes clear that receipt of federal money by a private entity is not enough to meet the requirement of federal jurisdiction for purposes of Section 1001. While the Second Circuit has not considered whether statements made to a private entity could fall within the scope of a federal agency's jurisdiction under Section 1001, in the most analogous cases from other circuits, *Lowe v. United States*, 141 F.2d 1005 (5th Cir. 1944), and *United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), the courts *reversed* convictions under Section 1001 (or its predecessor in the *Lowe* case), finding a lack of federal jurisdiction.

In *Lowe*, the defendant was an hourly employee of a ship building company that was contracted by the United States to build ships. The defendant submitted false timesheets to the

[35] *See* LPA of AllianceBernstein at 26.

company, which paid him directly. The company was ultimately reimbursed for the time by the United States, hence Treasury supplied the money used to pay for time not actually worked. The *Lowe* court found that "[i]nsofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any governmental agency of any kind." *Lowe*, 141 F.2d at 1006. The court also noted that the "contract for reimbursement of payroll payments . . . did not designate the payroll department of the company as an agency of the United States, nor did it place that department under the control or supervision of any such agency." 141 F.2d at 1006. Accordingly, the court held that "the mere allegation of the existence of the contract providing for reimbursement . . . was not sufficient to make [the defendant's] alleged fraudulent misrepresentations to his employer an offense against the United States." 141 F.2d at 1006. The facts in *Lowe* are, in all pertinent respects, strikingly similar to those here. So too are the following observations about *Lowe* by the 11th Circuit's 2004 decision in *Blankenship*:

> The clear, indisputable holding of *Lowe* is that a misrepresentation to a private company concerning a project that is the subject of a contract between the company and the federal government does ***not*** constitute a misrepresentation about a matter within the jurisdiction of the federal government. . . . Neither the fact that the shipyard may have been paying [the defrauding employee defendant] with funds it received under its contract with the federal government, nor the fact that the misrepresentations concerned a federal project, nor the fact that the defendant's lies may have formed the basis of progress reports or work utilization summaries sent to the government were sufficient to bring the matter within the federal government's jurisdiction.

*Blankenship*, 382 F.3d at 1139-40 (original emphasis).

Here, the allegations are that investment funds managed by the PPIFs paid Jefferies directly (Ind. ¶¶ 38, 50) and, insofar as Mr. Litvak was concerned, every aspect of Mr. Litvak's interactions with the PPIFs were the same as they would have been had the government not been

an investor in the funds. The PPIF relationship with Treasury did not even require, nor did the PPIFs in fact provide, reports on the mark-ups embedded in the price paid for purchased bonds. Moreover, nothing about the government's investment in these funds "designate[d] the [PPIF] as an agency of the United States" [or] "place[d] that [PPIF] under the control or supervision of any such agency." *Lowe*, 141 F.2d at 1006. The mere fact that a given PPIF "may have been paying [Jefferies in part] with funds it received under its contract with the federal government" and the fact that in some sense the alleged misrepresentations "concerned a federal project," are not "sufficient to bring the matter within the federal government's jurisdiction." *Blankenship*, 382 F.3d at 1140 (discussing *Lowe*). The mere allegation that the government invested in the funds managed by the PPIFs is simply not enough to make Mr. Litvak's alleged false statements to the PPIFs "an offense against the United States." *Lowe*, 141 F.2d at 1006.

The Eleventh Circuit's decision in *Blankenship* is equally fatal to the Indictment's expansive theory of agency jurisdiction. In *Blankenship*, the defendants conspired to fraudulently obtain road construction contracts that were federally mandated to be awarded to "disadvantaged business enterprises" ("DBEs"), small companies owned by women or minorities. The U.S. Department of Transportation ("USDOT") gave a grant to the Florida Department of Transportation ("FDOT") for road construction that required that a percentage of the funds be awarded to DBEs. The FDOT, in turn, contracted with a large construction company (Granite Construction), which subcontracted with an authorized DBE to perform some of the work. The owner of that DBE, who actually had no employees, then conspired with the owners of a non-DBE company to do the work and receive payments from the primary contractor. To deceive the primary contractor "and, ultimately the USDOT," the defendants created numerous false documents and records that they submitted to FDOT, all giving the

impression that employees of the DBE were performing the work. 382 F.3d at 1117-18. These documents included falsified "certified payroll records" – which had been signed by one of the defendants just above a warning that falsification of the documents would subject the sub-contractor to prosecution under Section 1001. *See* Brief of Plaintiff-Appellee the United States in *United States v. Blankenship*, No. 01-17064-FF (11th Cir. July 22, 2002), 2002 WL 32813168, at *14-15. Relying on *Lowe*, the court held that those "false statements [were not] matters within the jurisdiction of the federal government." *Blankenship*, 382 F.3d at 1136.

The reasoning of the Eleventh Circuit in *Blankenship* is instructive, as it resoundingly rejected precisely the theory that underpins the pending Indictment. There, as here, the government argued that "because the funds with which Granite [the primary contractor] was paid had originated with the federal government, any matters pertaining to the construction project necessarily fall under federal jurisdiction." The Eleventh Circuit rejected this argument as "unacceptable for several reasons." 382 F.3d at 1137. Relying on the Supreme Court's decision in *Rodger*s, which we discuss above, the court held that "the key issue" was whether the federal agency had power to act against the offending party, a question of authority and control. In *Blankenship*, the USDOT had no direct control over the defendants, and all the agency could do once it learned of the false documents was "to pressure the FDOT, under the terms of the FDOT's contract . . . into pressuring [the primary contractor] into taking some sort of action." 382 F.3d at 1137. According to the court, "[t]his embarrassingly weak and indirect avenue of recourse demonstrate[d] the USDOT's lack of authority, and hence lack of jurisdiction, over . . . the defendants." 382 F.3d at 1137. Speaking more generally, the court held that "a federal agency only has the authority to take action against the recipient of the funds – that is, the party with whom it has contracted." 382 F.3d at 1137. As the court observed:

> The fact that the FDOT may have contracted with private firms such as Granite, or that Granite in turn may have subcontracted with the defendants, does not somehow give the USDOT power over agreements between Granite and the defendants. . . . We also note that if § 1001 were interpreted to prohibit any false statement to any private entity whose funds, in whole or in part, happened to originate with the federal government, the results would be shocking.

382 F.3d at 1137.

Likewise, here, there is no allegation that the government had direct control over Mr. Litvak; it plainly did not. The best that the government could have done once it learned of the alleged false statements would be to react like any other investor in the funds and pressure the PPIFs into taking some sort of action. "This embarrassingly weak and indirect avenue of recourse demonstrates the [government's] lack of authority, and hence lack of jurisdiction, over" Mr. Litvak. *Blankenship*, 382 F.3d at 1137. Notwithstanding the fact that the government wishes it were so, "[u]nder *Rodgers*, jurisdiction does not simply follow federal money wherever it may lead." 382 F.3d at 1138. Despite its desire to be seen as vigorously policing an unpopular program, the government's over-zealous application of Section 1001 must be rejected to forestall an "otherwise unbridled reach of Section 1001" that would be "deeply troubling" and lead to truly "shocking" results. 382 F.3d at 1137, 1141. The jurisdiction of the federal government for purposes of Section 1001 is broad and expansive. But even that has limits. The Indictment pushes well past those limits and thus these counts must be dismissed.

The government has cited *United States v. Gibson*, 881 F.2d 318 (6th Cir. 1989), to defense counsel as the support for its charging decision in this case. However, that case is easily distinguishable – and in fact establishes how this case differs markedly from a case where jurisdiction actually exists. In *Gibson*, the defendant, a gas station owner, overcharged Peabody Coal Company – which mined for coal under a cost-plus government contract on land owned by

the Tennessee Valley Authority ("TVA"), an agency of the U.S. government – for tires used on trucks in the mining operation. *Gibson*, 881 F.2d at 320. The invoices submitted by the defendant to Peabody used purchase order numbers assigned by TVA. "TVA's contract with Peabody required Peabody to submit to TVA audits, required that Peabody's subcontractors agree to obey certain federal laws and regulations, and required advance TVA approval for any Peabody subcontracts exceeding $100,000." 881 F.2d at 320. The defendant's gas station "was required to sign a document agreeing to comply with a three page litany of federal requirements and to 'file reports with the TVA Contracting Officer' if requested." That document clearly identified Peabody as a TVA contractor and specifically called attention to the prohibition in Section 1001 against making false statements in matters within the jurisdiction of a government agency. 881 F.2d at 320. The Sixth Circuit concluded that, given the facts summarized above, the TVA had jurisdiction "to investigate and prevent fraud in the performance of its contracts" and that "[p]rotecting itself against being wrongfully overcharged [was] clearly an 'official, authorized function[ ]' of TVA, not a 'matter [ ] peripheral to the business of that body.'" 881 F.2d at 323 (quoting *Rodgers*, 466 U.S. at 479).

In stark contrast, the PPIP framework provides for nothing like the direct assertion of jurisdiction by TVA over a downstream subcontractor. Whereas the facts of *Gibson* clearly establish that the TVA had reached through the relationship with its contractor and required the gas station subcontractor to comply with specific regulations and to file reports with the TVA, the Indictment's allegations establish the opposite in this case. The PPIFs received TARP money to manage and Treasury received limited partnership interests and notes in return. The Indictment does not allege that Treasury sought to retain and assert supervision over the private commercial relationship between the PPIF managers and the dealers like Jefferies that would be

selling the PPIFs bonds, dealers who in any event were not akin to downstream subcontractors but were counter-parties in arm's length transactions with highly sophisticated investors. Treasury itself devised the PPIP framework and determined that it was investing in the PPIFs by purchasing a troubled asset from a "counter-party" and that the PPIF managers were not contractors or financial agents being paid for goods or services.[36] Nothing about the government's status as an investor in these funds gave the government control or supervision over the PPIFs' interactions with broker-dealers' funds, any more than the private investments by private investors would have done. Rather, Treasury's co-investment in the funds was not just "peripheral to the business of that body," *Rodgers*, 466 U.S. at 479, it was separate, distinct and outside the scope of the relationship between Treasury and the PPIF managers, as determined by Treasury itself. This Court should give deference to Treasury's determination to limit its own jurisdiction over the PPIF managers. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *see also Lee v. AIG Cas. Co.*, 2013 WL 308963, at *5 (D. Conn. Jan. 24, 2013) (quoting *Chevron*, 467 U.S. at 844).

Thus, the Indictment fails to allege that Mr. Litvak made or caused to be made a false statement regarding a *matter within the jurisdiction of the United States.* As a result, Counts Thirteen through Sixteen must be dismissed.[37]

---

[36] *See* SIGTARP's Selecting Fund Managers Report *supra* note 20 at 29.

[37] Assuming arguendo the Court finds that the statutory language "within the jurisdiction of a department or agency of the United States," is susceptible to a reading broad enough to encompass matters in which, like here, the government is a mere investor in a fund managed by a third party and without significant oversight over that third party receiving the allegedly false statement, the Court nonetheless should dismiss Counts Thirteen through Sixteen because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971). And "when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before [the Court] choose[s] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952). The rule of lenity "vindicates the fundamental principle that no citizen should be held

**C. The Indictment Fails to Allege a Violation of Title 18, United States Code, Section 1031**

**1. The Trades Between the PPIFs and Jefferies Are Outside the Scope of Title 18, United States Code, Section 1031**

Count Twelve of the Indictment charges Mr. Litvak with TARP Fraud, in violation of Title 18, United States Code, Section 1031. The text of Section 1031 provides, in relevant part:

> a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent— . . .
>
> (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,
>
> in any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program, an economic stimulus, recovery or rescue plan provided by the Government, or the Government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008, or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

18 U.S.C. § 1031(a)(2) (emphasis added). The Indictment is fatally deficient in that it does not allege a necessary element of the statute. *Pirro*, 212 F.3d at 95 (indictment failed to allege a crime because it omitted an essential element of the offense) (citing *United States v. Berlin*, 472 F.2d 1002, 1007-08 (2d Cir. 1973)); *United States v. Kramer*, 499 F. Supp. 2d 300, 305-06 (E.D.N.Y. 2007) (dismissing indictment because facts alleged did not satisfy elements of the offense under relevant statute). The Indictment does not allege that Mr. Litvak knowingly executed (or attempted to execute) a scheme or artifice with the intent to obtain money or

---

accountable for a violation of a statute whose commands are uncertain," *United States v. Santos*, 553 U.S. 507, 514 (2008), and must be applied here.

property by means of false or fraudulent pretenses, representations, or promises "*in* any grant, contract, subcontract, subsidy, loan, guarantee insurance, or other form of Federal assistance, including through the Troubled Asset Relief Program." The government cannot allege that Mr. Litvak's actions fit into any of the categories of "Federal assistance" listed under Section 1031(a)(2). That is because the RMBS bond sale transactions between Jefferies and the PPIFs do not fall into any of the listed categories, including "any other form of Federal assistance, including through the Troubled Asset Relief Program."

As discussed above, PPIP fund entities were "investment *counterparties* receiving equity investments and loans from the $700 billion" in TARP funds. *See supra* p. 10. Treasury's investment in the PPIFs took two forms: equity, for which Treasury received limited partnership interests, and loans, for which Treasury received notes. Private funds invested *alongside* Treasury. After the PPIFs were funded, the PPIF managers used available cash in the PPIFs from both public and private sources to purchase eligible bonds. The government was not the purchaser of the troubled assets. The various PPIF private-sector managers with which Jefferies and Mr. Litvak traded caused the PPIF entities to purchase the bonds with available funds, in commercial arm's length transactions, characteristic of the RMBS market. The fact that some of the money in the PPIFs originated with TARP is not, given the narrowly drawn list of circumstances that define the reach of Section 1031, within the statute's scope. It is not alleged that Jefferies and Mr. Litvak had anything to do with Treasury's decision to invest in the PPIFs, or otherwise received any TARP funds from Treasury. The subsequent bond purchases are simply not prohibited acts under Section 1031. In alleging that they are, the prosecution plainly overreaches.

Congress certainly knows how to use broader language when it wishes to extend the reach of a criminal proscription. *See, e.g.*, 18 U.S.C. § 666 (proscribing thefts, fraud and bribery by agents of any organization receiving in excess of $10,000 of federal assistance in one year); 18 U.S.C. § 1341 (mail fraud schemes "affecting a financial institution"); 18 U.S.C. § 1957 (defining criminally derived property to include "any property constituting, or derived from, proceeds obtained from a criminal offense"); 42 U.S.C. § 1320a-7b(b)(1) ("Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) *directly or indirectly*, overtly or covertly, in cash or in kind") (emphasis added).

Congress clearly could have reached subsequent bond purchase transactions in which a portion of the purchasing funds originated with TARP. But Congress chose to limit the scope of Section 1031 to those persons or entities that dealt directly with the government in one of the enumerated types of interactions ("in any grant, contract . . . or other form of Federal assistance"). Given the wholly private nature of the transactions between Jefferies and the PPIFs – transactions in which the government is not alleged to have been a party – the Indictment fails to allege sufficiently that Mr. Litvak violated Section 1031 by knowingly executing a scheme to defraud the United States, and thus, Count Twelve of the Indictment must be dismissed.

**2. Count Twelve of the Indictment is Defective**

In a clumsy effort to cure this problem (while at the same time acknowledging it), the government impermissibly broadened the scope of Section 1031's reach by inserting the phrase "in connection with" in the place of the statutory term "in" in Count Twelve. (Ind. ¶ 57) (alleging that Mr. Litvak "devised a scheme and artifice to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises *in connection with* grants, contracts, subcontracts, subsidies, loans, guarantees, insurance and other form of Federal assistance – including TARP") (emphasis added). That is

not what the statute says. This sleight-of-hand renders Count Twelve defective and provides an independent basis for it to be dismissed. *See United States v. St. Clair*, 418 F. Supp. 201, 205 (E.D.N.Y. 1976) (dismissing a count of the indictment because "it rested upon the government's broadened interpretation of the statute").

**D. The Indictment Fails to Allege Sufficiently and Cannot Allege Sufficiently that the Alleged Misstatements are Material and, thus, All Counts of the Indictment Must be Dismissed**

Mr. Litvak is charged with securities fraud, TARP fraud, and making false statements to the government. Materiality is an element of each of these offenses.[38] The Indictment's materiality allegations fail for several reasons. First, the alleged misstatements are not alleged to have been a factor in the investment decision-making by the alleged victims and are therefore immaterial. More generally, the embedded mark-up information at issue in this case has long been recognized as immaterial under applicable law and industry practice. Finally, the difference between the actual mark-ups and the allegedly misrepresented mark-ups is too small to have mattered to sophisticated investors in the market for RMBS. The government's failure to allege this necessary element warrants dismissal of every count of the Indictment.

**1. The Alleged Misstatements Pertaining to Jefferies's Profits Would Not Have Mattered to Sophisticated Institutional Investors**

In the securities fraud context, a fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Basic v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)

[38] *See Basic v. Levinson*, 485 U.S. 224, 238 (1988) ("in order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact"); *Neder v. United States*, 527 U.S. 1, 22-23, 25 (1999) (materiality is an element of mail and wire fraud because at the time of the statutes' enactment, the word "defraud" [as also contained in 18 U.S.C. § 1031] was understood to "require[] a misrepresentation or concealment of [a] material fact"); *United States v. Ali*, 68 F.3d 1468, 1475 (2d Cir. 1995) on reh'g, 86 F.3d 275 (2d Cir. 1996) (overruling prior Second Circuit precedent and holding that materiality is indeed an element of a Section 1001 charge).

(internal quotations omitted)). Materiality exists only when there is a "substantial likelihood" that disclosure of the omitted fact would have significantly altered the "total mix" of information made available to the reasonable investor. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 535 (S.D.N.Y. 2012) (internal citations omitted). It is not "enough that a statement is false or incomplete if the misrepresented fact is otherwise insignificant." *Basic*, 485 U.S. at 238. Thus, misrepresentations about peripheral facts and characteristics extraneous to the quality or risk of investors' purchases are not "material." The Second Circuit has also emphasized that "[i]t is not sufficient to allege that the investor *might have* considered the misrepresentation or omission important." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (emphasis added). Instead, the standard is an objective one that depends on all relevant circumstances. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Where particularly sophisticated market participants or complex financial products are involved, as is the case here, the reasonable investor standard warrants a showing of materiality commensurate with the specific marketplace and transactions at issue. *See In the Matter of John P. Flannery*, Administrative Proceeding File No. 3-14081, 2011 SEC LEXIS 3835, at *102-49 (Oct. 28, 2011) (rejecting SEC staff's allegations of material misrepresentations in various statements regarding fixed-income portfolio, given information that sophisticated investors customarily would rely upon in making particular types of fixed income investments); *SEC v. Rorech*, 720 F. Supp. 2d 367, 372 (S.D.N.Y. 2010) (finding that the SEC failed to prove materiality of statements concerning customer's indication of interest because the demand for deliverable bonds was known in the market – particularly to sophisticated high yield bond buyers); *Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 334-35 (S.D.N.Y. 1993)

(finding that plaintiffs – sophisticated investors – were provided with sufficient information as to material facts in a format from which a reasonable investor could reach his own conclusions as to the risks of the transaction).

The theory of fraud alleged in the Indictment excludes the possibility that any "reasonable sophisticated investor" would have considered the allegedly misrepresented mark-up information to be important. The Indictment alleges that Mr. Litvak's fraudulent misrepresentations resulted in Jefferies earning "secret and unearned compensation." (Ind. ¶ 30). There are no allegations in this Indictment that any trade took place at something other than a fair market price. Rather, the allegation is that Mr. Litvak's alleged tactics caused a slightly higher percentage of the sale price to go to Jefferies than the investor was led to believe – this is the alleged "secret and unearned compensation."

The Indictment also alleges that buyers seek to buy bonds at the lowest available price. (Ind. ¶ 19). When the sophisticated institutional money managers identified in the Indictment (Ind. ¶¶ 11-12), who owed fiduciary duties to their clients (Ind. ¶ 8), would agree upon a price with Mr. Litvak, it was at a level that, by definition, these managers believed was appropriate and in the best interests of the funds they managed. There is no allegation to the contrary. The Indictment reflects that these money managers had sophisticated tools to analyze an RMBS bond and make such investment decisions. (Ind. ¶ 37(j)).[39] In short, these investors were willing buyers at the agreed-upon price based upon their own analyses.

Of course these investors would have liked the bond somewhat better at a slightly lower price but whether or not they did is an irrelevant question in this case. The contention is not that Mr. Litvak's alleged tactics induced investors into transacting at prices that were higher than fair

[39] "[G]onna finish lunch first then re-run it all" (Ind. ¶ 37(j)) is a reference to the analytics that this PPIF manager would employ to determine for himself whether the trade was appropriate at the price offered.

market value. Instead, it is that Mr. Litvak lied about Jefferies's actual profit on the trade. But a slightly larger embedded mark-up for Jefferies does not alter any of the economics of the trade for the investor. Investors got the same bond, with the same risk/reward profile, at the very same price the investors demonstrated they were willing to pay. Because the Indictment does not allege that Mr. Litvak's conduct caused the alleged victim-investors to over-pay for bonds, the mere fact that Jefferies made a slightly larger profit on these trades was a matter of complete indifference to investors who cared principally about price and yield.

In the discovery provided by the government to date, we have found substantial support for the proposition that Jefferies's counter-parties on the trades at issue did not consider modest variances in transaction costs to be material. For example, a contemporaneous investment analysis produced to the government by Invesco Ltd., the alleged victim in Counts Four, 12, and 16 of the Indictment, shows that the yield analysis, based upon one point variations in price, was used to determine the price that Invesco should agree to pay for a particular bond. Notably, the Invesco approach does not take into account what component of the price might be embedded mark-up. The Invesco analysis shows that Invesco was indifferent to the amount of mark-up that its dealer counter-party (in this case, Jefferies) was embedding in the price. All that ultimately mattered to Invesco – and all that matters to similarly situated institutional investors – is the price and yield. Because the allegedly misrepresented mark-up information, under the government's theory of fraud, is not alleged to have significantly altered the total mix of information, materiality has not been alleged as to the securities fraud counts.

**2. The Alleged Misstatements Pertaining to Jefferies's Profits Would Not Have Mattered to the Government**

In both the Section 1001 and Section 1031 contexts, a false statement is "material" if it has the natural tendency to influence the decision of the decision-making body or if it is capable

of affecting the government's action. *Neder v. United States*, 527 U.S. 1, 16 (1999) (section 1031 context); *United States v. Ballistrea*, 101 F.3d 827, 835 n.5 (2d Cir. 1996) (section 1001 context). For purposes of both Sections 1031 and 1001, the government here is the Treasury. In setting up the PPIP, Treasury itself determined that its role was that of investor in the PPIFs, and that the relationship to PPIFs and their managers would be controlled by limited partnership agreements. Furthermore, Treasury satisfied itself that the terms of its investment in the PPIFs should provide only that transaction costs incurred by managers be "reasonable" and did not otherwise require any reporting of the mark-ups or other transaction costs that the PPIF managers would necessarily incur when they bought bonds for the PPIFs.[40] Treasury elected not to insert itself into the transactions between the PPIFs and the dealers from which the PPIF managers would buy bonds. Surely if the government thought transaction costs were important, Treasury would have required PPIF managers to submit this information in their monthly and quarterly reports.[41]

Under the PPIP as implemented, Mr. Litvak's alleged misstatements did not have "a natural tendency to influence the decision of the decision-making body." *Neder*, 527 U.S. at 16; *Ballistrea*, 101 F.3d at 835 n.5. Treasury was completely removed from the private interactions between the PPIF managers and Mr. Litvak. With regard to decision-making in selecting

[40] *See* LPA of AllianceBernstein at 34.

[41] "Treasury has committed to publish on a quarterly basis certain high-level information about aggregated purchases by the PPIFs. . . . Treasury has not committed to providing full transparency to show where public dollars are invested by requiring periodic disclosure of every trade in the PPIFs." *See* SIGTARP Quarterly Report to Congress dated Jan. 30, 2013, at 189. SIGTARP's "Recommendation" to the Treasury that the Treasury should require PPIF managers to disclose to SIGTARP, within seven days of the close of the quarter, all trading activity, holdings, and valuations so that SIGTARP may then disclose such information in its quarterly reports was never implemented. SIGTARP Quarterly Report to Congress, dated Jan. 30, 2013, at 189.

securities and negotiating price, Treasury intentionally and explicitly ceded that role to the PPIF managers.[42] There is no possibility that Treasury's actions were affected or influenced.

Under the PPIP structure, for the reasons argued above relating to the scope of agency jurisdiction under Section 1001, there is no basis to treat the PPIF managers as the relevant "decision-making body." They were private actors working for the funds with no actual relationship with Treasury. But even if the PPIF managers were the relevant decision-maker, for the reasons discussed above, the embedded mark-up information was immaterial to their investment decisions. There was thus no "natural tendency to influence their decisions" in this case where the claim is simply that Jefferies earned slightly more profit than represented.

**3. Information About Jefferies's Mark-ups Is Not Material Information Under Established Industry Practice and Applicable Regulatory Guidance**

The apparent theory behind the Indictment is at odds with a substantial body of regulatory authority and industry practice that show that embedded mark-up information is not material to institutional bond investors. At several points during the past 30 years, both the SEC and self-regulatory organizations have proposed regulations that would have required dealers to disclose the full mark-ups embedded in the prices of bonds sold to customers. Specifically, in 1976, 1977, and 1978, the SEC proposed rules that would have required bond dealers to disclose the full extent of their mark-ups for so-called "riskless principal" trades. *See* Securities Exchange Act Release No. 12806, 41 Fed. Reg. 41432 (Sept. 16, 1976) (proposing mark-up disclosures for riskless principal trades of municipal securities); Securities Exchange Act Release No. 13661, 42 Fed. Reg. 33348 (June 23, 1977) (proposing mark-up disclosures by non-market makers for riskless principal transactions involving equity and debt securities, but not municipal securities); Securities Exchange Act Release No. 15220, 43 Fed. Reg. 47538 (Oct. 16, 1978)

[42] *See* LPA of AllianceBernstein at 26.

(proposing mark-up disclosures by non-market makers in riskless principal transactions involving equity and debt securities). In the face of widespread opposition, these efforts were abandoned.

In 1994, the SEC again proposed a rule requiring mark-up disclosures for riskless principal trades in various types of debt securities, and the fixed income industry once again adamantly challenged the proposed rules. *See* Confirmation of Transactions, Securities Exchange Act Release No. 34962, 57 S.E.C. Docket 2674, at 2 (Nov. 10, 1994). This proposed regulation was also abandoned. Finally, in 2005 the National Association of Securities Dealers filed a proposed rule with the SEC that would have required dealers in debt security transactions to provide their customers with enhanced disclosures regarding applicable charges and fees. After the time period for SEC action on this rule was extended 28 times, it too was withdrawn. *See* Securities Exchange Act Release No. 34-67588, 77 Fed. Reg. 47470 (Aug. 8, 2012).

On each of these occasions, market participants and industry groups enthusiastically opposed the regulations – on the basis that the dealer's mark-up is immaterial to sophisticated investors. *See, e.g.*, Confirmation of Transactions, Securities Exchange Release No. 33743, 56 S.E.C. Docket 558, at 3 (Mar. 9, 1994) (noting that "[c]ommentators argued against adoption of mark-up disclosure for riskless principal debt" because, among other reasons, "*the amount of a mark-up was not material* to investors") (emphasis added); *see also* Robert A. Fippinger, *The Dealer's Duty to Disclose Markups*, Sec. L. Pub. Fin § 14:12.3, 14-215 (Practicing Law Institute 2012) (noting that "[i]n each case the proposals were rescinded in light of comment from the industry that, among other factors, *the markup was not material*; material information is the yield") (emphasis added). Thus, the very types of sophisticated investors at issue here have clearly and repeatedly expressed the view that the amount of the mark-up is simply *not* material.

FINRA's regulations and guidance controlling how much mark-up a dealer may charge are also instructive. The Indictment ignores these regulations and the substantial body of FINRA decisions involving excessive mark-ups. FINRA rules and guidance generally establish a five percent guideline on mark-ups, meaning that in most transactions, FINRA considers mark-ups of five percent or less to be fair and reasonable.[43] For transactions in debt securities, however, FINRA has issued particular guidance. *See* NASD Rule IM-2440-2. Importantly, where the buyer is a QIB as defined in Rule 144A of the Securities Act of 1933 (as all the alleged victim funds in this case were) and the debt security at issue is non-investment grade (as all but one of the bonds at issue were) FINRA has determined that the five percent limit on mark-ups is inapplicable. A QIB is a sophisticated investor that "has the capacity to evaluate independently the investment risk and in fact is exercising independent judgment in deciding to enter into the transaction." *See* NASD Rule IM-2440-2(b)(9). A QIB is able to analyze for itself whether the purchase of a non-investment grade debt security (including non-agency RMBS) at a particular price level is advisable. FINRA treats the extent of mark-ups as to a QIB as unreviewable. Coupled with the industry's oft-expressed view that the mark-up is immaterial, FINRA's hands-off approach to regulation in this area shows that QIBs, like the alleged victims in this case, are not concerned with the extent of mark-ups because they evaluate the merits of a non-investment grade bond purchase based upon their own analytics.

Further demonstrating the absence of materiality is the complete lack of enforcement actions in FINRA/SEC mark-up cases where the mark-up was not excessive, or cases in which a very modest sanction was imposed where mark-ups were wildly excessive. For example, in a recent FINRA disciplinary proceeding, respondent broker-dealer was censured, fined $35,000,

---

[43] NASD Rule IM-2440-1, *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=3660&record_id=4337 (last visited July 26, 2013).

and ordered to disgorge amounts charged over five percent in partial restitution to certain customers for charging mark-ups ranging from 5.07% to 10.45% on 107 collateralized mortgage obligation ("CMO") riskless principal transactions in violation of NASD Conduct Rules 2110 and 2440.[44] In another case, a privately held broker-dealer and its employee received modest industry suspensions and exceptionally low fines for charging an excessive mark-up of 18.89% on a CMO transaction.[45] There, after receiving the customer's order, respondent negotiated a lower price for the CMO and then sold the CMO to the customer at the price it originally agreed to pay.[46] As a result of its conduct, the broker-dealer was censured and fined $4,000, and the employee received a 20-day suspension and $16,000 fine.[47] Enforcement actions involving excessive mark-ups (which are absent here) resulting in minimal fines and industry suspensions are plentiful.[48] FINRA's approach to these cases shows that only egregiously excessive mark-ups are sanctioned, and even those sanctions are mild.

The mark-ups in this case would not even merit scrutiny by FINRA. Bearing in mind that Jefferies would not be limited by the five percent guideline because of the QIB status of the

---

[44] *Dep't of Enforcement v. Chicago Investment Group, LLC*, FINRA Order Accepting Offer of Settlement, Disciplinary Proceeding No. 2007007329501 (Jan. 26, 2010).

[45] *Dep't of Enforcement v. Century Pac. Sec., Inc.*, FINRA Order Accepting Offer of Settlement, Disciplinary Proceeding No. 20080142714-01 (July 8, 2011).

[46] *Century Pac. Sec., Inc.*, Disciplinary Proceeding No. 20080142714-01, at 5.

[47] *Century Pac. Sec., Inc.*, Disciplinary Proceeding No. 20080142714-01, at 16. The respondent broker dealer and employee were also fined $4,000 joint and severally. The broker-dealer was also ordered to pay restitution of $44,082.58. However, it is unclear from the order whether this sanction was related to the CMO transaction or another cause of action included in the settlement order.

[48] *See also Dep't of Enforcement v. David Lerner Assocs., Inc.*, 2012 WL 1906579 (N.A.S.D.R. Apr. 4, 2012) (respondent was fined $2.3 million for charging excessive mark-ups in more than 1,500 municipal bond and 1,700 CMO transactions after the firm caused retail customers to pay unfairly high prices, with mark-ups on the municipal bonds ranging from 3.01% to 5.78% and mark-ups on the CMOs ranging from 4.02% to 12.39%); D.A. Davidson & Co., FINRA Settlement No. 20090174176-01 (June 1, 2012) (respondent broker-dealer violated (among others) NASD Rules 2440 and IM-2440-1 and received $30,000 fine for failing to sell bonds at fair prices, with mark-ups ranging from 3.36% to 16.22%; out of the 14 transactions at issue, only three were below five percent); *Dep't of Enforcement v. MAXXTRADE, Inc.*, FINRA Disciplinary Proceeding No. 2008011759202 (Mar. 16, 2012) (respondent received a 10-day industry suspension after charging excessive mark-ups and mark-downs on corporate bond transactions ranging from 3.06% to 12.66% in violation of NASD Conduct Rules 2110 and 2440).

investors, the mark-ups here were nonetheless well within this basic measure of reasonableness. Set forth in the following chart are the mark-ups associated with the same-day trades alleged in the Indictment.[49]

**Fig. 1 Mark-ups of Same-day Trades Charged in the Indictment**

| Count | Bond | Mark-up |
|---|---|---|
| 2, 12, 14 | LXS 07-15N 2A1 | 3.37% |
| 1, 12, 13 | HVMLT 2006-10 2A1A | 0.87% |
| 3, 12 | HVMLT 07-7 2A1A | 0.46% |
| 4, 12 | SARM 05-21 7A1 | 0.55% |
| 6 | INDX 07-AR7 2A1 | 2.74% |
| 8 | DSLA 06-AR1 2A1A | 2.25% |
| 9 | CWALT 06-OA3 1A1 | 1.36% |
| 10 | LXS 07-15N 2A1 | 1.88% |
| 16 | FHASI 07-AR1 1A1 | 0.31% |

As far we have been able to ascertain, this case is the first securities enforcement case involving allegedly fraudulent mark-ups in the bond market ever brought – civilly or criminally – where all of the mark-ups charged were well within the five percent guideline and thus demonstrably reasonable.

**4. The Alleged Variances Between the Represented Mark-ups and the Actual Mark-ups Were Too Small to Have Mattered to Sophisticated Institutional Investors**

Sophisticated institutional investors in the RMBS market during the relevant timeframe expected to pay transaction costs that reflected the illiquidity of RMBS bonds and the commensurately wide spreads: namely, transaction costs that were typically in the one to two point range. Recent academic studies of the transaction costs since May 2011, when FINRA began to require dealers to report transaction data to TRACE, show that typical bid-ask spreads

49 The reasonableness of mark-ups on trades where Jefferies had maintained a bond in inventory and was at risk for more than one day requires an analysis of prevailing market conditions on the day of the sale.

for trading in non-agency, non-investment grade RMBS were in excess of two points.[50] As the chart in Figure 1, above, shows, the transaction costs at issue here were within the range of what sophisticated institutional market participants considered reasonable. Thus, the differences between the actual (and reasonable) mark-ups charged and the allegedly misrepresented mark-ups are, by definition, within the range of reasonableness. These variances are too small to have mattered to sophisticated market participants because the variance in price was immaterial given the nature of the bonds and the illiquidity of the market at the time. Put another way, sophisticated institutional investors applying investment criteria based mainly upon the yield of bonds across a range of potential market prices would not have – and did not – care that the amount of embedded mark-up might have been somewhat higher. In considering this issue, it is important to bear in mind that RMBS bonds, unlike stocks and liquid bonds, do not trade at a particular price on a given day. Rather, in a dislocated, illiquid market sophisticated institutional investors would approach RMBS as an asset whose fair market value is best expressed as a range of prices. Any price within the range was a fair market value price for the bond. Minor variances in price were unimportant so long as the ultimate price fell with the fair market value range. Misrepresentations about small variances in mark-ups are therefore peripheral facts and characteristics extraneous to the quality or risk of investors' purchases that do not significantly alter the total mix of information. *See Basic*, 485 U.S. at 238; *TSC Indus.*, *Inc.* 426 U.S. at 449.

## CONCLUSION

For the reasons set forth above, Mr. Litvak respectfully requests that the Court grant his motion to: (1) dismiss Counts Thirteen through Sixteen, which charge violations of Title 18, United States Code, Section 1001, because the Indictment fails to allege sufficiently that Mr.

[50] *See, e.g.*, B. Hollifield, A. Neklyudov, and C. Spatt, *Bid Ask Spreads and the Pricing of Securitizations: 144a vs. Registered*, 20-21, 84, *available at* https://wpweb2.tepper.cmu.edu/wfa2013/wfasecure/upload/2013_ PA_339744_ 516544_222214.pdf (last visited July 26, 2013).

Litvak made or caused to be made a false statement with respect to a matter within the jurisdiction of a department or agency of the United States; (2) dismiss Count Twelve of the Indictment, which charges a violation of Title 18, United States Code, Section 1031, because the Indictment fails to allege conduct that violates the statute; and (3) dismiss the Indictment in its entirety for failing to allege materiality, an essential element of each and every crime alleged.

Respectfully submitted,

**THE DEFENDANT,**
**JESSE C. LITVAK**

By: /s/ Ross H. Garber
Ross H. Garber (ct17689)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: 860-251-5901
Fax: 860-251-5219
E-mail: rgarber@goodwin.com

Patrick J. Smith (admitted *pro hac vice*)
Sarah B. Zimmer (admitted *pro hac vice*)
DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Tel.: (212) 335-4500
Fax: (212) 884-8509
E-mail: patrick.smith@dlapiper.com
E-mail: sarah.zimmer@dlapiper.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Ross H. Garber
Ross H. Garber