UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | August 2, 2013 |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR DISCOVERY AND HEARING
CONCERNING ALLEGED CONSTITUTIONAL VIOLATIONS**

Defendant Jesse C. Litvak has filed a motion [Doc. #50, 7/12/13] and corresponding

supporting memorandum (hereinafter "Litvak Mem.") [Doc. #50-1, 7/12/13] seeking discovery

from the Government and Litvak's former employer, Jefferies LLC ("Jefferies") and an

evidentiary hearing on alleged Fifth and Sixth Amendment violations.  Litvak speculates this

discovery will reveal that the United States Attorney's Office defied the unambiguous policy set

forth in the *United States Attorneys' Manual* and secretly compelled Jefferies to refuse Litvak's

request for advancement of attorney fees.  But Litvak has nothing to substantiate his allegations

other than outdated prosecutorial guidance and out-of-context quotes by the Government's

counsel.

To be clear, there is no basis for Litvak's claim:

- The *United States Attorneys' Manual* prohibits prosecutors from factoring
  Jefferies's decision on whether to advance Litvak's legal expenses into their
  assessment of corporate cooperation or culpability.

- The Government has never indicated to Jefferies in any way that advancement of
  Litvak's fees would factor into any charging decision.

- The Government has neither formed nor expressed any preference as to the
  winner of Litvak's and Jefferies's on-going fee dispute.

The Government is interested in the fee dispute between Litvak and Jefferies only insofar

as defense counsel has repeatedly raised it as relevant to scheduling in this case.  The source of

the Government's information about the status of the Delaware litigation and FINRA arbitration

between Litvak and Jefferies has been Litvak's own attorneys, including their statements outside

the courtroom just before the March 13 hearing.  Jefferies has now affirmatively declared that its

decision "was made completely free from any influence by the Government."  Affidavit of Boyd

M. Johnson III, dated July 31, 2013, ¶ 6 (attached hereto as Exhibit 1).  Under these

circumstances, the Court should not countenance a fishing expedition for non-existent

constitutional violations and should deny Litvak's motion.

## FACTS

### I.     Litvak Points To Obsolete Guidance, Rather Than The Government's Current Binding Charging Policy

Litvak's motion relies on speculation to allege that the Government threatened to

withhold cooperation credit from Jefferies if it advanced Litvak's legal fees.  *See, e.g.*, Litvak

Mem. at 3 ("government action has induced Jefferies to abrogate Mr. Litvak's right to

advancement").  In *United States v. Stein*, a case that Litvak cites repeatedly, the court held that

federal prosecutors had been influenced by the so-called "Thompson Memorandum" to take

"into account, in deciding whether to indict KPMG, whether KPMG would advance attorneys'

fees to present or former employees in the event they were indicted[, and thereby] interfered with

the rights of such employees to a fair trial and to the effective assistance of counsel and therefore

violated the Fifth and Sixth Amendments to the Constitution."  *United States v. Stein*, 435 F.

Supp. 2d 330, 382 (S.D.N.Y. 2006) (*"Stein I"*); *United States v. Stein*, 541 F.3d 130, 136 (2d

Cir. 2008) (affirming on Sixth Amendment grounds).  Presumably trying to make this case seem

like another *Stein*, Litvak's memorandum focuses on the Thompson Memorandum (Litvak Mem.

- 2 -

at 9-10, 12-14), which, *inter alia*, provided prosecutors with guidance[1] on charging corporations and stated, in relevant part, "a corporation's promise of support to culpable employees and agents, [including] through the advancing of attorneys fees . . . may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation."  Thompson Mem. at 8-9 of 16.

But the Thompson Memorandum was expressly superseded in December 2006 by the "McNulty Memorandum," which was issued after the first three *Stein* decisions but before *Stein IV* dismissed the indictment.  Mem. from Paul J. McNulty, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution of Business Organizations* (Dec. 12, 2006) [hereinafter "McNulty Mem."] at 2 of 21 ("This memorandum supersedes and replaces guidance contained in the . . . 'Thompson Memorandum' . . . ."), *available at* http://www.justice.gov/dag/ speeches/2006/mcnulty_memo.pdf (last visited August 2, 2013).  As the Second Circuit noted in its *Stein* opinion, the McNulty Memorandum amended the very guidance in the Thompson Memorandum that Litvak's memorandum dwells on, which the Court summarized as "prosecutors may consider a company's fee advancement policy only where the circumstances indicate that it is 'intended to impede a criminal investigation,' and even then only with the approval of the Deputy Attorney General."  *United States v. Stein*, 541 F.3d 130, 136-37 (2d Cir.

---

[1] By its express terms, the Thompson Memorandum was only a "guide" to prosecutors. Mem. from Larry D. Thompson, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution of Business Organizations* (Jan. 20, 2003) [hereinafter "Thompson Mem."] at 1 of 16, *available at* http://www.albany.edu/acc/courses/acc695spring2008/thompson%20memo.pdf (last visited August 2, 2013).  It listed nine "factors" prosecutors "should" (rather than must) consider in evaluating the "authenticity of a corporation's cooperation."  *Id.* at 1, 4 of 16.  "As with the factors relevant to charging natural persons, the foregoing factors are intended to provide guidance rather than mandate a particular result."  *Id.* at 5 of 16.  "Some or all of these factors may or may not apply to specific cases, and in some cases one factor may override all others."  *Id.*

2008) (quoting McNulty Mem. at 13 of 21 n.3).

Moreover, the McNulty Memorandum was itself superseded in 2008.  Mem. from Mark Filip, Deputy Att'y Gen., U.S. Dep't of Justice, *Principles of Federal Prosecution of Business Organizations* (Aug. 28, 2008) (attached hereto as Exhibit 2).  The Filip Memorandum announced that a revised corporate charging policy had been "set forth for the first time in the *United States Attorneys' Manual*" and was "binding on all prosecutors within the Department of Justice."  Ex. 2 at 1 of 24.  This new policy was unequivocal:

> In evaluating cooperation, however, **prosecutors should not take into account whether a corporation is advancing or reimbursing attorneys' fees** or providing counsel to employees, officers, or directors under investigation or indictment.  Likewise, **prosecutors may not request that a corporation refrain from taking such action**.  This prohibition is not meant to prevent a prosecutor from asking questions about an attorney's representation of a corporation or its employees, officers, or directors, where otherwise appropriate under the law.

USAM 9-28.730 (Ex. 2 at 16 of 24) (footnote omitted, emphasis added).  This provision has not been modified since 2008 and was in place during the investigation that led to Litvak's indictment.

Thus, Litvak's arguments concerning the Thompson Memorandum are moot.  Although the Government's current policy is nearly five years old, Litvak memorandum neither cites nor quotes the *United States Attorneys' Manual* 9-28.730 and does not acknowledge even the existence of the Filip Memorandum until page 13 of his 19-page memorandum.  But the Government's current corporate charging policy is fatal to Litvak's motion because it unambiguously forbids federal prosecutors from considering whether Jefferies advanced Litvak's legal fees.  The Government has adhered scrupulously to the policy set forth in the *United States Attorneys' Manual* in this case, and Litvak has no evidence to show otherwise, because there is none.

- 4 -

**II.      Litvak Misrepresents Statements Made By Government's Counsel In Court**

Litvak's memorandum relies on selective, out-of-context quotations from the March 13, 2013 hearing to create the false appearance that the Government has closely monitored or interfered in Litvak and Jefferies's fee dispute.

In February 2013, Litvak's attorneys raised the ongoing Delaware litigation while negotiating dates for a proposed pretrial schedule [Doc. #26, 2/13/13], arguing that the ongoing fee dispute made later pretrial deadlines desirable for the defense.  Before the hearing on March 13, 2013, in the hallway outside the courtroom, Litvak's counsel gave the Government's counsel an update on the ongoing dispute, presumably because the defense anticipated arguing that it justified a trial date after the previously agreed-upon November 2013.

A.      Government's Counsel Did Not Demonstrate Independent Knowledge Concerning the Fee Dispute Litigation or Arbitration

Litvak leans heavily on an observation by Government's counsel that a future appeal of an arbitral award would be "doomed to failure," arguing that comment "displayed comprehensive knowledge of the status of the Delaware action and even expressed [an] opinion" about Litvak's chances of appealing an unfavorable decision.  Litvak Mem. at 8.  The actual statement by Government's counsel to the Court—rather than a three word excerpt—shows that Litvak is wrong.

At the March 13 hearing, the Court explained that there were no longer any November 2013 trial dates available, but proposed scheduling jury selection for September 30, 2013, noting that the alternative was February 2014.  Ex. 10 to Litvak Mot. at 4 [Doc. #50-2 at 74 of 99].  The Government agreed with the Court's September 2013 proposal, but Litvak's attorney argued there were a number of reasons why the defense preferred a February trial, including the need to review more than 400,000 pages of discovery.  *Id.* at 4-8 [Doc. #50-2 at 74-78 of 99].  When the

Court mentioned the unusual number of attorneys that had filed notices of appearance for the defense, Litvak's counsel explained that all of his lawyers could not be put to work because, due to his ongoing fee dispute against Jefferies, "[t]he defense is self-funded.  The approach has to be measured given the limited resources[,] due to the fact Mr. Litvak has to defend himself."  *Id.* at 8 [Doc. #50-2 at 78 of 99].  The Court asked when the fee issue was likely to be resolved, and Litvak's counsel answered by summarizing the dispute's procedural posture, concluding:

> MR. SMITH:  . . . The advancement benefits are not forthcoming. That's not to say we're not going to do the work.  We're in the case. We will do the work.  We have to take a measured approach until the advancement proceedings are decided.  That influences our judgment on what we need in terms of the speed with which we can get through the materials and how quickly prepare for trial.  The related issue is there [are] some pretty complicated issues in terms of the securities at issue in the indictment.  They are the subject of expert testimony.  We want to be able to frame the issues, to retain experts, to get them up to speed and get them through the materials.  That's a very expensive process.  I can't go out and retain experts with the budget.

*Id.* at 8-10 [Doc. #50-2 at 78-80 of 99].

With this backdrop, the Court engaged the Government in the following colloquy (underlined portions omitted by Litvak's memorandum):

> THE COURT:  <u>Does the government have a response now that you understand what he [Mr. Smith] was alluding to why he preferred the late February date?</u>
>
> MR. FRANCIS:  <u>I do.  A date in February is not completely unreasonable.  I don't want you to think I'm going to [the mattresses] on this one.  It seems what Mr. Smith is proposing effectively we're going to have to wait on Delaware.  The original action for advancement of fees was filed months ago.  Although I agree with your Honor, normally Delaware [Chancery C]ourt moves very briskly.  It was a referred to a master[,] which is effectively a magistrate judge[,] who apparently took awhile with it, then was ordered to arbitration.  If that arbitration decision does not go in Mr. Litvak's favor, I suspect there will be more litigation over the result of that.  We know that's</u> doomed to failure.

> THE COURT:  <u>He has his appeal if that's what it is called.  His appeal from the initial decision.  That's where he'll win or lose.</u>
>
> MR. FRANCIS:  <u>My fear is that with February, we'll be back here in the summer and Delaware won't resolve.  The arbitration will be ongoing.  That's my first response.</u>

*Id.* at 10-11 [Doc. #50-2 at 80-81 of 99].  Thus, the statement by the Government's counsel was part of a response to Litvak's argument that the timeline of the fee dispute should impact scheduling the criminal trial.

It was appropriate for the Government to be concerned that the defense might wait for the fee dispute to conclude before beginning to prepare for trial in earnest.[2]  The point of the Government's argument was that it is impossible to predict when the fee dispute will be resolved due to the likelihood that Litvak (or Jefferies, for that matter) will appeal the result of the FINRA arbitration.  In this context, stating the inarguable and widely-known proposition that, although time-consuming, it is extremely difficult to overturn an arbitral award (*i.e.*, that "more litigation over the result of that [the arbitral decision] . . . is doomed to failure") is neither a commentary on nor a display of "comprehensive knowledge" about the substance of the arbitration.[3]

---

[2] Indeed, the Government's "fear" that the arbitration might not be resolved by the summer has proved accurate:  the exhibits attached to Litvak's motion indicate that the Delaware litigation is over but that the FINRA arbitration has barely even started, much less been resolved.  Exs. 5, 6 to Litvak Mot. [Doc. #50-2].

[3] As many courts have said, in so many words, under the Federal Arbitration Act, "[a] party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."  *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).  A court must confirm an arbitral award so long as there is even a "barely colorable justification for the outcome reached," *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004) (internal quotes and citation omitted), even where it is convinced that the arbitrators' decision was legal incorrect, *id.*, or it disagrees with them on the merits, *Banco de Seguros del Estado v. Mut. Marine Office. Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) (quotes and citation omitted).

      **B.**      Government Counsel Did Not Reveal the Fact of Communication with Jefferies Regarding Its Decision Not to Advance Litvak's Fees

Litvak also argues that a second comment by the Government's counsel, excerpted from the same line of argument, "clearly evinces governmental communication with Jefferies regarding Jefferies's plan to deny Mr. Litvak his right to advancement, and the government's belief that the termination of Mr. Litvak's advance rights is a *fait accompli*." Here, Litvak once again uses a partial quotation to twist the facts.

Immediately after the previously quoted potion of the March 13 transcript (the Government's "first response"), counsel for the Government continued to argue that the fee dispute should not impact the trial date at all (underlined portions omitted by Litvak's memorandum):

> <u>My second response is</u> I can't believe what Mr. Smith is intending to argue here is poverty.  Mr. Litvak was extraordinarily well compensated over the last few years.  His compensation was [more than] eight million dollars over three years.[4]  Although I'm not aware of the details of his liquid finances, it seems like he has more than enough resources to fund a defense.  Although it will not be unlimited resources available by fees advanced by Jefferies<u>[, i]t appears that work can begin in this case.  I propose we schedule the September/October date.  If that becomes too much of a hardship for the defense, we can revisit it in a month or two when we know more about the arbitration.</u>

Ex. 10 to Litvak Mot. at 11 [Doc.#50-2 at 81 of 99].  Counsel's statement is self-evidently far different from what appears in Litvak's memorandum.

As the full quote shows, the Government was merely arguing that the defense could at least begin the trial preparation process, even before resolution of the fee dispute (*i.e.*, that although "unlimited resources available by fees advanced by Jefferies" may not yet be available,

---

[4] According to Jefferies's arbitration filing, it actually paid Litvak more than $17.5 million over three-plus years.  Ex. 7 to Litvak's Mot. at 2 [Doc. #50-2 at 45 of 99].

"it appears that work can begin in this case"), and that therefore the Court should not tie the trial

schedule to the issue of fees.  Tellingly, after Litvak's counsel twice committed not to "seek any

continuance of the February trial," counsel for the Government stated that "the government

recedes from all of its arguments[s,] would much rather have the certainty of the date in February

with no further continuances."  *Id.* at 11, 13 [Doc. #50-2 at 81, 83 of 99].  In other words, once

the issue of the trial schedule was resolved, the Government was no longer interested in the fee

issue.

Rather than believing the outcome of the fee dispute is "a *fait accompli*," the Government

believes it is an irrelevancy.  Counsel for the Government has not even taken steps to educate

themselves enough to form a view of the merits of the issue or determine, as a matter of fact or

law, which party has the better of the argument.  Counsel did not even know the grounds for

Jefferies's refusal to pay Litvak's fees until it read the arbitration filings attached to Litvak's

memorandum.  The Government did none of these things because it does not care who wins

there.  Its only interest in Litvak's fee dispute is that it not affect this case.

## ARGUMENT

### I.   Litvak Has Not Alleged A Constitutional Violation

Unless Litvak can plausibly allege that Jefferies's decision to deny advancement of fees

was the product of state action, he cannot establish a constitutional violation under the Fifth or

Sixth Amendment.  His allegations, however, fall well short of establishing the requisite nexus

between federal prosecutors and Jefferies required under existing Supreme Court and Second

Circuit precedent to warrant a finding of state action.

#### A.   Legal Principles

A private entity, such as Jefferies, may be held to constitutional standards only where

their actions are "fairly attributable" to the State.  *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,

191 F.3d 198, 206 (2d Cir. 1999) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982)).  That finding requires "a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself."  *United States v. Stein,* 541 F.3d 130, 146 (2d Cir. 2008) (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351 (1974)); *Booth v. Hartford Life & Acc. Ins. Co. of Am.*, CIV.A. 3:08-CV-0013 (JCH), 2009 WL 652198, at *4 (D. Conn. Feb. 3, 2009).  "The purpose of the [close-nexus requirement] is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Stein*, 541 F.3d at 146-47 (quoting *Blum,* 457 U.S. at 1004); *Booth*, 2009 WL 652198, at *4.  Courts find such responsibility where the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Stein*, 541 F.3d at 146-47 (citing principles emerging from *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005) and *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989)); *Booth*, 2009 WL 652198, at *4.

      B.      Litvak's Allegations Are Insufficient to Establish State Action

      As a threshold matter, Litvak has not set forth plausible allegations to satisfy the necessary prerequisite of state action.  In his motion, Litvak provides no evidence, beyond mere conjecture, that the Government had any involvement in Jefferies's decision to refuse to advance his legal fees.  Rather, Litvak deduces state action from the prior existence of the Thompson Memorandum and a few misquoted statements by Government counsel, as addressed above.  Based on these, Litvak cannot established that the actions of Jefferies were "fairly attributable" to the Government.  *Desiderio*, 191 F.3d at 206 (citing *Lugar,* 457 U.S. at 937).

      Litvak's state action argument comes down to the *ipse dixit* that the Government *must have* had some involvement in Jefferies's decision not to advance his fees.  But Jefferies's

affidavit shows that is simply not the case.  While Jefferies's counsel has communicated with prosecutors about the bare fact that it was party to a dispute with Litvak in Delaware over advancement of fees,[5] the Government was not involved in Jefferies's decision regarding advancement.  Johnson Aff. (Ex. 1) ¶ 6 ("Jefferies' decision to decline Mr. Litvak's requests for advancement of legal fees was made completely free from any influence by the Government.").[6] Indeed, Jefferies's counsel goes further:

> Specifically, at no time has the Government or any representative of the Government indicated or suggested, directly or indirectly, that Jefferies should not advance legal fees to Mr. Litvak.  Nor has the Government or any representative of the Government ever indicated or suggested, directly or indirectly, that Jefferies' decision regarding the advancement of legal fees to Mr. Litvak was in any way relevant to assessing any cooperation by Jefferies with the Investigations.

*Id.* ¶ 7.

As Jefferies's counsel points out, this is entirely consistent with Jefferies's arguments in the fee arbitration that (i) Litvak released his right to advancement of fees in a Termination Agreement, in consideration for which he received approximately $2 million, (ii) in undertaking fraudulent conduct, Litvak was not acting as Jefferies's "authorized representative" and so is not entitled to advancement of fees under Jefferies's corporate bylaws and (iii) Jefferies' bylaws require advancement of fees only to present, rather than former, employees.  Johnson Aff. ¶ 8 (referring to Ex. 7 to Litvak Mot. at 4-5, 9-12 [Doc. #50-2 at 47-48, 52-55 of 99]).  Accordingly, far from being precipitated by the conduct of the Government, the decision not to advance

---

[5] "Of course, mere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor.'"  *Missere v. Gross*, 826 F. Supp. 2d 542, 569 (S.D.N.Y. 2011) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)).

[6] Mr. Johnson's affidavit was delivered to counsel for the Government and Litvak at the same time.  Ex. 1 at 1.  Although counsel for the Government was told to expect such an affidavit, the Government did not review a draft and did not know its contents beforehand.

Litvak's attorney fees was an independent act of Jefferies's corporate freewill rooted in its interpretation of Litvak's Termination Agreement and its own corporate by-laws.

Litvak is then left only with the Thompson Memorandum to show that Jefferies's decision was the product of state action, notwithstanding its counsel's affidavit to the contrary. But the Thompson Memorandum was superseded in 2006 by the McNulty Memorandum, which itself was superseded by the Filip Memorandum in 2008.  Although Litvak asserts that "the coercive framework of the Thompson Memorandum" still causes corporations to "surrender to any perceived government pressure to cut off advancement of employees' defense costs" (Litvak Mem. at 13-14), the only authority he cites for that bold proposition is a 2009 law student note that merely expressed an opinion that "for the same reasons that the McNulty Memorandum's changes to DOJ policy were *probably* ineffectual in reducing pressure on corporations, the Filip Memorandum will also *probably* not solve the problem."  Sarah Ribstein, *A Question of Costs: Considering Pressure on White-Collar Criminal Defendants*, 58 Duke L.J. 857, 871 (2009) (citing nothing, emphasis added).  It cannot logically be that the Thompson Memorandum has forever rendered any action of a private corporation under investigation "fairly attributable" to the Government, and it is in fact not the case here.

Even if the Thompson Memorandum were still in effect, its mere existence would not have made Jefferies a state actor.  The Supreme Court and the Second Circuit courts have refused to find state action in the context of binding state regulation.[7]  By its own terms, the

---

[7] *See, e.g.*, *Jackson v. Metropolitan Edison, Co.,* 419 U.S. 345 (1974) (electric utility not state actor, despite heavily government-regulated industry and procedures for terminating services set forth in filing with Public Utility Commission); *Blum v. Yaretsky,* 457 U.S. 991, 1009-10 (1982) (nursing home not state actor, despite state regulations encouraging discharge and transfer of patients to lower levels of care and conditioning payment of Medicaid benefits on those decisions); *D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.,* 279 F.3d 155, 162-63 (2d

Thompson Memorandum's guidance was not binding on federal prosecutors, much less on private corporations. Even the district court in *Stein* did not rely exclusively on the mere existence of the Thompson Memorandum to find state action. *United States v. Stein*, 440 F. Supp. 2d 315, 337 (S.D.N.Y. 2006) (*"Stein II"*) ("This Court finds that the government, both through the Thompson Memorandum *and the actions of the USAO*, quite deliberately coerced, and in any case significantly encouraged, KPMG to pressure its employees to surrender their Fifth Amendment rights.") (emphasis added); Litvak Mem. at 15. *See also United States v. Brooks*, 681 F.3d 678, 690 (5th Cir. 2012) ("[T]he mere existence of the [Thompson] memorandum could not have compelled El Paso [Corporation]" to cut off former employees' legal fees).

Litvak cites only two cases in support of his state actor argument. Litvak Mem. at 10-12 (citing *United States v. Rosen*, 487 F. Supp. 2d 721, 730, 734 (E.D. Va. 2007) and *Stein*). Both are distinguishable on the basis that the relevant events in those cases occurred before the Thompson Memorandum was first superseded in December 2006. *Rosen*, 487 F. Supp. 2d at 723 ("the Thompson Memorandum was in force during the period of time relevant here"); *Stein*, 541 F.3d at 136 ("In December 2006—after the events in this prosecution had transpired—the

_____

Cir. 2002) (NASD not state actor, despite coordination of parallel investigations with U.S. Attorney's Office and NASD regulation compelling stockbrokers to submit to on-the-record interviews or be barred from profession); *United States v. Solomon*, 509 F.2d 863, 867-71 (2d Cir. 1975) (NYSE not state actor, despite using threat of employment action against member to coerce testimony in disciplinary investigation); *United States v. Int'l Brotherhood of Teamsters,* 156 F.3d 354 (2d Cir. 1998) (Election Officer (EO) disqualifying former union president from election not state actor, despite government creating EO position by consent decree with union, paying EO's salary and providing disqualification evidence); *Albert v. Carovano*, 851 F.2d 561, 568-71 (2d Cir. 1988) (Hamilton College not state actor, despite state statute requiring adoption of code of conduct meeting certain requirements); *but see Brentwood Academy,* 531 U.S. 288, 299-302 (2001) (state interscholastic athletic regulatory body composed of all "public school administrators" a state actor).

- 13 -

Department of Justice replaced the Thompson Memorandum . . .").  Indeed, the District Court in *Stein* invited the Government to make the exact change to its corporate charging policy that it made in 2008:  "If the government means to take the payment of legal fees into account in making charging decisions only where the payments are part of an obstruction scheme—and thereby narrowly tailor its means to its ends—it would be easy enough to say so."  *Stein I*, 435 F. Supp. 2d at 364.  Cases decided under the Thompson Memorandum are not factually applicable.

Moreover, *Stein* is also distinguishable based on the conduct of prosecutors in that case. The Second Circuit and District Court found state action based on prosecutors' explicit threat that KPMG must cease payment of attorneys' fees for non-cooperating employees or have it weighed adversely in their corporate charging decision.  *See Stein*, 541 F.3d at 148; *Stein II*, 440 F. Supp. 2d at 336, 347-48.  Specifically, prosecutors demonstrated "close involvement in KPMG's decision making process by, among other things, pointedly reminding KPMG that it would consider the Thompson Memorandum in deciding whether to indict, saying that payment of employee legal fees would be viewed 'under a microscope,' and reporting to KPMG the identities of employees who refused to make statements in circumstances in which the USAO knew full well that KPMG would pressure them to talk to prosecutors."  *Stein II,* 440 F. Supp. 2d at 336; *Stein*, 541 F.3d at 147-48.  Even before the *Stein* court allowed discovery, correspondence between prosecutors and KPMG's counsel showed that the Government demanded a revision to KPMG's memoranda to its employees about retaining counsel, and had KPMG encourage its employees to cooperate with the investigation and threaten to cut off legal fees for employees who refused to be interviewed.  *Stein*, 541 F.3d at 138-39.  Litvak's

allegations do not remotely approach this level of alleged governmental influence on Jefferies.[8]

Under these facts, a more apt comparison is *S.E.C. v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008).  In that case, one of the defendants made a similar request for discovery and a hearing into the circumstances under which her former employer, Nortel, decided to terminate payment of her legal fees.  *Id.* at 512.  Giving the defendant the benefit of the doubt and assuming facts with "the same effect as the Thompson Memorandum," the court found it was fatal to her motion that "there is no allegation that the SEC itself 'significantly encouraged' Nortel to do anything or that SEC personnel became 'entwined in the control' of Nortel regarding Nortel's decision to terminate payment of legal fees for certain former employees."  *Id.* at 513.  Contrasting that absence of allegations with KPMG's affidavit in *Stein*—which stated "categorically that the Thompson memorandum[,] in conjunction with the government's statements relating to payment of legal fees[,] affected KPMG's determination(s) with respect to the advancement of legal fees and other defense costs to present or former partners and employees," *Stein*, 541 F.3d at 140 (quoting *United States v. Stein*, 495 F. Supp. 2d 390,405 (S.D.N.Y. 2007) ("*Stein IV*"))—the *Dunn* court held that the defendant had not alleged facts sufficient to constitute state action and denied her motion for discovery and a hearing.  *Dunn*,

---

[8] Similarly, there are factual distinctions between this case and *United States v. Daugerdas*, from which Litvak cites a hearing transcript (relevant excerpts attached hereto as Exhibit 3) as an example of a court applying a "permissive standard" to a motion such as his.  Litvak Mem. at 16. There, the defendant was armed with specific factual allegations , including that (1) the Thompson Memorandum was still in effect, (2) his former employer, BDO, paid his fees for more than two years before cutting him off and withdrawing from their joint defense agreement, (3) BDO conditioned payment of another employee's fees on cooperation and (4) a prosecutor admitted to defense counsel that she was "quite familiar" with BDO's fee indemnification policy. Ex. 3 at 76-80.  Although BDO's counsel submitted an affidavit, he was not retained until years after the relevant events and thus lacked personal knowledge.  *United States v. Daugerdas*, 09-cr-00581(WHP), Def.'s Reply Mem. (Doc. #161) at 12.  Litvak can point to no such facts, and thus fails to meet even a "permissive standard."

587 F. Supp. 2d at 513.  Here, the facts are even worse for Litvak than in *Dunn*, since rather than remaining silent, Jefferies's counsel has affirmatively denied that the Government had "any influence" on its decision.

At bottom, Litvak cannot convincingly claim that the Government had any involvement in Jefferies's decision to deny advancement of his attorney fees, much less involvement of such a magnitude that "it can be said that the State is *responsible* for the *specific conduct* at issue." *Stein*, 541 F.3d at 146-47 (quoting *Blum*, 457 U.S. at 1004).  Accordingly, as in *Dunn*, the Court should find that Litvak has failed to plausibly allege state action and deny his motion on the papers.

## CONCLUSION

Litvak seeks permission to commence a fishing expedition for constitutional violations based on a hunch.  Litvak speculates that the Government followed the Thompson Memorandum's guidance and compelled Jefferies not to advance his legal fees.  In service to this conjecture, Litvak ignores the inconvenient truth that the Thompson Memorandum was replaced seven years ago and twists statements by Government's counsel beyond any reasonable interpretation.  The facts are that (i) Jefferies's counsel has flatly denied, under oath, federal prosecutors' involvement in its decision to cut off an extremely well-compensated former employee that it fired for cause before the Government began its investigation and (ii) for the last five years, the Government's binding policy has prohibited interference with corporations' decisions about paying former employees' legal fees.  Under these circumstances, since Litvak cannot plausibly allege that Jefferies's decision was state action, there were no possible constitution violations.

For the reasons set forth above, the Court should deny Litvak's motion for discovery and a hearing.

Respectfully submitted,

DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov

ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT23923
eric.glover@usdoj.gov

157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2013, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY