1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    _____
     United States of America   )September 9, 2013
4              Government   )10:00 a.m.
     v.                      )
5    Jesse Litvak            )3:13cr19(JCH)
              Defendant.     )
6    _____)

7
                              141 Church Street
8                             New Haven, Connecticut

9              HEARING

10   B E F O R E:
                THE HONORABLE JANET C. HALL, U.S.D.J.
11
     A P P E A R A N C E S:
12

13   For The Government  :   Jonathan N Francis
                             Eric Glover
14                           U.S. Attorney's Office-NH
                             157 Church St., 23rd floor
15                           New Haven, CT 06510

16
     For the Defendant        Ross H. Garber
17                            Shipman & Goodwin
                              One Constitution Plaza
18                            Hartford, CT 06103-1919

19                            Patrick Joseph Smith
                              Sarah P. Zimmer
20                            DLA Piper US LLP-NY
                              1251 Avenue of the Americas,
21                            27th Floor
                              New York, NY 10020-1104
22

23

24

25

1          THE COURT:  Good morning.  We're here this morning

2    in matter of United States versus Jesse Litvak, Case Number

3    313CR19.  If I can have appearances please.

4          MR. FRANCIS:  For the government, Jonathan Francis.

5    With me at counsel table is Eric Glover.

6          MR. SMITH:  Patrick Smith, Sarah Zimmer and Ross

7    Garber who is present in court for Mr. Litvak.

8          THE COURT:  We're here on the defendant's motion

9    number 50 seeking discovery and hearing concerning

10   government's interference with the Sixth Amendment right to

11   counsel and Fifth Amendment right to due process.  Attorney

12   Smith, has the arbitration proceeding been resolved?

13         MR. SMITH:  It has not, your Honor.  There's

14   hearings scheduled for September 19 and 20, a two-day

15   hearing, and I understand from counsel who is handling that

16   for Mr. Litvak, following that hearing, the panel will have

17   30 days to decide that arbitration proceeding.

18         THE COURT:  Would I be correct in stating by review

19   of all of the papers that you filed, revealed no direct

20   evidence of any efforts by the government, affirmative

21   efforts to interfere with reimbursement or payment of legal

22   fees by your client's former employer?

23         MR. SMITH:  I don't have any e-mail or statement,

24   your Honor, so I would have to say direct evidence.  I don't

25   have direct evidence prediscovery to offer to you in terms of

1    interference.

2         THE COURT:  What is your best circumstantial

3    evidence argument?  What does it rest on other than

4    speculation?

5         MR. SMITH:  Well, circumstantial evidence I think

6    first flows from the coercive nature of the posture that

7    Jefferies finds themselves in in attempting to cooperate with

8    the government in a matter that's still unresolved from

9    Jefferies' perspective.  As a matter of organizational

10   criminal liability, the acts that Mr. Litvak allegedly

11   undertook are attributable to Jefferies.  Jefferies faces the

12   very same criminal exposure that Mr. Litvak faces.  Only as a

13   matter of discretion on the part of the government will

14   Jefferies avoid a criminal charge in this case.  We note when

15   Judge Kaplan had the discovery matter before him in the Stein

16   matter, the fact that KPMG was seeking to avoid a criminal

17   charge was among the factors he relied on, the circumstantial

18   evidence that he relied on in ordering discovery.

19        THE COURT:  He had more direct evidence, didn't he?

20        MR. SMITH:  I think he had very little direct

21   evidence, your Honor.  He had admissions there had been

22   communications.  He had some indication there had been

23   pressure.  If you get down to what actually came out about

24   the conduct of the prosecutors in that matter, it all came

25   out after discovery.  On this issue, your Honor, I think what

1  the government is arguing here in terms of what Judge Kaplan

2  had before him is flatly incorrect.  If you take a look at

3  page 14 of their memorandum at the bottom, what they argue

4  that even before Stein, it had come out that the government

5  had pressured KPMG to adopting the fees policy and had

6  coerced KPMG in threatening to cut off legal fees.  Those

7  were all facts that came out after discovery.  When the

8  government cites to the Stein appellate decision, there's no

9  discussion in the Second Circuit about the facts that were

10 before Judge Kaplan before he ordered discovery.  Judge

11 Kaplan applied a very permissive standard based upon

12 circumstantial evidence that we think is at least as strong

13 here.  The coercive framework on the government's policies on

14 prosecuting corporations is the same it was under the

15 Thompson memo.  The only issue is that the Thompson memo

16 doesn't have the advancement of fees proceeding.  Even under

17 the Thompson memo, these facts wouldn't apply.  Here

18 Jefferies had a legal obligation to advance Mr. Litvak's

19 attorney fees under its bylaws under Delaware law.  Under the

20 Thompson memo, that circumstance was accepted.  I think we

21 need to look here to what coercion is working in the

22 background here.  What's Jefferies' doing to avoid a criminal

23 indictment, and here we have Jefferies doing things that are

24 not required by policy to achieve full cooperation.  We have

25 Jefferies voluntarily waiving attorney/client privilege as

```
 1    part of its full cooperation with the government, and the

 2    government not disabusing them of that.  We know they waived

 3    the attorney/client privilege because in discovery materials,

 4    we see e-mail communications internally at Jefferies that

 5    bear on Mr. Litvak's termination.  We also, your Honor --

 6              THE COURT:  Can I ask you what my last question was?

 7    Can you tell me?

 8              MR. SMITH:  The last question.

 9              THE COURT:  My last question to you.

10              MR. SMITH:  You asked me about what the direct

11    evidence was of.

12              THE COURT:  Is that what we're talking about now?

13              MR. SMITH:  What's my best circumstantial

14    argument.

15              THE COURT:  Evidence I asked, not argument.  What

16    evidence?

17              MR. SMITH:  The direct evidence I think I conceded

18    we don't have direct evidence prediscovery.

19              THE COURT:  My last question was what is your best

20    circumstantial evidence and please don't repeat what you

21    said.  I would like you to limit yourself to that question

22    and not give me some other argument that I didn't ask for.

23              MR. SMITH:  Well, there's several points here so

24    best is the coercive framework.

25              THE COURT:  So under that analysis, every time the
```

1   government indicts, seeks an indictment of an individual who

2   is in a business setting, where there's a contractual

3   obligation to pay fees and whose activities of that

4   individual are chargeable to the company and thus, the

5   company could be indicted, in every one of those cases, the

6   Court should dismiss the indictment under the Stein theory.

7   Is that the argument?

8          MR. SMITH:  I think we reached the remedy phase yet,

9   your Honor.  I think there's more to the framework in the

10  facts than what your Honor put to me.

11         THE COURT:  What remedy do you want?  Let's say I

12  get to give you discovery.  Then what I do?  I will not order

13  discovery just for the sake of it.  I assume you have planned

14  ahead.  If you found X, you would argue Y.  If you found Z,

15  you would argue A.

16         MR. SMITH:  There's some potential for cure.  In

17  other words, if there's prejudice to Mr. Litvak from the

18  government's misconduct if the facts show that, that can't be

19  reset in terms of the fees flowing and appropriate resources

20  being made to Mr. Litvak to make himself prepared for trial.

21  It is possible that we could be put back into the position we

22  were, but for the alleged misconduct, I'm not saying we're

23  there yet.

24         THE COURT:  How am I going to do that?  I'm going to

25  order an entity that's not in front of me to get the

1    checkbook out?   I don't think I can do that.

2            MR. SMITH:   Those are some of the problems that

3    faced Judge Kaplan.

4            THE COURT:   Did he dismiss the charges?

5            MR. SMITH:   Ultimately.

6            THE COURT:   Where am I going to go with this?

7            MR. SMITH:   The ultimate remedy if there's no cure

8    and prejudice to Mr. Litvak will be a dismissal of the

9    indictment.   That will be the application.

10            THE COURT:   Let's assume I gave you the discovery,

11    sir.   When we did all of this discovery in the world that you

12    wanted, at the end of the day, what we have is a company

13    that's worried it is going to get indicted.   Its lawyer has

14    taken out its playbook.   He's been to seminars.   He knows all

15    the things he can do to make the government happy, you know.

16    He calls them every Monday morning and says he hopes they had

17    a good weekend.   He delivers all of the documents completely

18    indexed, separated by topic.   They are on disks.   They are in

19    paper, they are in binders.   An idiot can find everything

20    they wanted to find if it was produced this way, and he says

21    to himself after conferring with his lawyer, I'm going to

22    represent that under some particular reading of the

23    employment arrangement with Mr. Litvak, we're not going to

24    help Mr. Litvak with his fees because we don't think we have

25    to.   He never speaks about that with the government's lawyer.

1    The government's lawyer never says anything to him about it.

2    He just "he" meaning on behalf of the company that Mr. Litvak

3    used to work for, decides that it is in their best interest

4    to do that.  Just like it is in their best interest to

5    produce all the documents, to do it in a nice manner, just

6    like they have decided it is a good thing to be pleasant to

7    the prosecutors, just like they decided a lot of other

8    things.  At the end of the day, your client isn't getting

9    reimbursed for the expenses unless he wins the arbitration

10   which I don't control and the U.S. Attorney doesn't control.

11   I understand you would argue that we may find a lot more in

12   discovery than what I have just laid out, but if that's what

13   we found, if we found a person whose company is a target of

14   an investigation, bending over backwards to do things the

15   general counsel thinks the government will like, not the

16   government asked for it, not the government ordered it, not

17   the government threatened it, not that the government ever

18   mentioned it, but the company thinks they will look good if

19   they do this, okay, where does that get you in a best case

20   scenario?

21          MR. SMITH:  If those are the facts, Judge, after

22   discovery, I don't think we'll be back with a motion.  I

23   think it will die right there.  I think we're a long way from

24   knowing those are going to be the facts.  If you look at what

25   Judge Kaplan did back in Stein, it was the Thompson memo and

```
 1   the coercive framework, plus what the government did to

 2   achieve an objective that crossed over the state action line.

 3   What you sketched out right there were not circumstances that

 4   would constitute state action.  I think this inquiry would be

 5   done.  I think on the circumstances we have here and you have

 6   the government --

 7            THE COURT:  Can we go back to those circumstances?

 8   What are the circumstances that would cause a reasonable

 9   person to have some concern that my hypothetical is a false

10   one?

11            MR. SMITH:  We have an admission there were

12   communications between the government and Jefferies on the

13   advancement issue.  We know there were communications.  We

14   have the government --

15            THE COURT:  How do we know that?

16            MR. SMITH:  It is stated in their memorandum.  I can

17   give you a page cite.

18            THE COURT:  Yes, please.

19            MR. SMITH:  But they admit their were

20   communications.

21            THE COURT:  I would like you to tell me where that

22   is.

23            MR. SMITH:  Bear with me one second, your Honor.

24   The top of page 11 of the government's memorandum, your

25   Honor.  They state while Jefferies' counsel has communicated
```

 1   with the prosecutors about the bare fact it was a party to

 2   the dispute with Litvak in Delaware over advancement of fees.

 3   There's a footnote seeks to put communications into context.

 4   First I would note, Judge Kaplan noted that simply asking the

 5   question about what you are doing is arguably problematic.

 6   We have no idea what the actual communication was here

 7   because there's argument imbedded in that sentence I just

 8   read to you.  It is called a bare fact.  I don't know what

 9   was said.  I don't know where, I don't know how, were there

10   e-mails, were there communications.  What we also have here

11   this is an argument that we made in our opening memo.  We

12   have prosecutors who were pretty well educated in what the

13   nature of the dispute was, what the status of Mr. Litvak's

14   finances were.  They have said we're solely concerned with

15   scheduling issues, but I think the level of knowledge and

16   familiarity with the fee dispute --

17             THE COURT:  What was the level of knowledge?  I find

18   that hyperbole in your part in the brief.  What level of

19   knowledge did what you quote show?

20             MR. SMITH:  He understood the dynamic of how much

21   Mr. Litvak had available to him for the purpose of defending

22   himself.

23             THE COURT:  How do you think the government learned

24   what the defendant Mr. Litvak made in the last three years?

25             MR. SMITH:  They made a specific request to

1    Jefferies at or about the time in May of 2012 that Jefferies

2    was deciding not to advance Mr. Litvak's fees.  Those

3    requests were virtually contemporaneous.  I think were

4    April/May 2012.

5         THE COURT:  Requests plural?  What requests?  I

6    heard you say they made inquiry about how much he made.  What

7    was the second request?

8         MR. SMITH:  There was a request and then a

9    follow-up.  There's correspondence back and forth between the

10   government, numerous cover letters from Wilmer Heil producing

11   materials including a reference back to the prior request.

12   There was certainly an ask by the government about what Mr.

13   Litvak's financial resources were long before the case was

14   indicted.  Is it motive proof?  Are they looking for motive

15   proof?  That's possible.  Given the closely linkage in time

16   between Jefferies' decision not to advance which wasn't

17   communicated until later, but the request from Mr. Litvak's

18   then lawyer came in at the end of March of 2012 which was

19   right after SIGTARP agents sought to interview Mr. Litvak at

20   his home.  In the discovery that's been produced back to us,

21   there's an e-mail from Mr. Wexler, Mr. Litvak's then counsel

22   to the general counsel of Jefferies asking for advancement

23   and that was not formally denied until Boyd Johnson from

24   Wilmer Heil sent over a letter the end of August 2012.  Again

25   that's another circumstance, Judge, that bears probing in to.

1    What I would like to know not just what's admitted here at

2    the top of page 11, is what were the communications back

3    throughout the early part of 2012 when Jefferies was actually

4    making the decision.  The issue is fresh with Jefferies and

5    Jefferies is finding the footing on how best to cooperate

6    with the government.  So the communications and the admission

7    of communications are key, so we don't have a summary of what

8    those communications were.  We have a blanket denial.  Judge

9    Kaplan had in front of him a declaration from the government

10   that laid out all the communications and made the argument

11   later found not to be fully factual.  There had no untoward

12   conduct.  In the case in front of Judge Pauly, in BDO

13   similarly the government put in a sworn declaration here are

14   the facts, your Honor.  Here it is.  It is all laid out for

15   you.  There should be no discovery because there's potential

16   for a violation.  We have no idea what the communications

17   were between Jefferies and the government because, the

18   government hasn't described them so I think that fairly asks

19   the question what could possibly be hidden here.  Is anyone

20   trying to hide anything?  The downside is what harm could

21   possibly arise from causing the government to go back and

22   review the emails and notes, causing Jefferies and Wilmer

23   Heil to do the same.  We know there were communications.  We

24   know there's circumstantial background of coercion.  Let's

25   take a look at the evidence.  If it fits your Honor facts

1    hypothetically, we won't be back.

2            THE COURT:  Is this one of the cases where you have

3    no defense so you want to try the prosecutor?  Isn't this a

4    case about whether Mr. Litvak violated the law, and he's

5    certainly not a man without means to represent himself, is

6    that fair to say?  We're not talking about someone who is on

7    the verge of applying for CJA status.

8            MR. SMITH:  That's not fair to say.  That's not the

9    standard that the Second Circuit found here.  He had a legal

10   entitlement to advancement from Jefferies.

11           THE COURT:  He's litigating that now.

12           MR. SMITH:  The question is not whether he's

13   successful or not in arbitration.  If he's successful, that

14   will take a lot of pressure off the preparation of the

15   defense but if the government engaged in misconduct --

16           THE COURT:  What would the misconduct be?  Tell me

17   what it would be.

18           MR. SMITH:  Pressuring Jefferies.

19           THE COURT:  What would pressure be?  Sitting in

20   their office having a private thought that well, the trial

21   would go better if Jefferies doesn't have an endless pot of

22   money.  I'd feel real good about that but never saying a word

23   to anyone.  Never uttering a sound about it.  Would that be

24   pressuring?

25           MR. SMITH:  Judge, against the background of the

1    coercive framework, if there's no actual evidence of

2    pressure.

3              THE COURT:  I want to know what is the evidence of

4    pressure?

5              MR. SMITH:  A statement.

6              THE COURT:  Words.  Words by the government?

7              MR. SMITH:  Words by the government.

8              THE COURT:  To Jefferies?

9              MR. SMITH:  To Jefferies or its counsel, suggesting

10   directly or indirectly that Mr. Litvak's fees should not be

11   advanced.

12             THE COURT:  Okay.  Anything else?

13             MR. SMITH: Directly or indirectly that pretty much

14   sums it up.  There has to be some act.  The government has to

15   engage in some act.  I will not be back ever arguing that

16   government policies as they now exist, and I don't think

17   anybody would have come in just on the Thompson memo as it

18   existed saying that's enough for a violation.  There always

19   has to be more.  In Stein, there was more.  In the BDO case

20   ultimately in front of Judge Pauly, there was not.  That

21   motion failed.  They had discovery.  Didn't cause anybody too

22   much fuss or muss.  I know a little bit about that case.  I

23   represented BDO on that.  I know exactly what was asked.  I

24   know what was produced and ultimately there was an

25   unsuccessful motion.  It was pressed but it was denied.

1          THE COURT:  Let me put it a different way.  If the

2     government says or does nothing, but Jefferies, let's say we

3     somehow could say open sesame to Mr. Boyd and his general

4     counsel at the company and CEO's files, and they all reflect

5     much, much angst over, oh, my God, if we give money to Litvak

6     for fees, we're going to get slammed by the government.

7     There's no question in my mind.  They don't have to say it.

8     I know it.  So we have go to figure out some defense in the

9     arbitration and chancery court.  We have to stop this

10    advancement effort by Litvak.  Otherwise the company is going

11    to be in big trouble.  If that's what we found, where does

12    that get you?

13         MR. SMITH:  I think I'm coming back to you with a

14    motion on that one.  Here's why.  Against the background of

15    coercive framework, we now have the indirect result

16    achieved.

17         THE COURT:  I just told you to assume that the

18    government did not suggest directly or indirectly, uttered no

19    words, took no action at all, but what happened on the other

20    side of the fence outside of the vision of the government,

21    nothing was conveyed back to the government to say look at

22    what good boys we are.  Look what we have done to Mr. Litvak.

23    We ought to get points for this.  Nothing has been

24    communicated.  I thought you told me that in that

25    circumstance, that would be the end of it.  Now you have just

1    told me, no, you will be back.

2          MR. SMITH:  If the facts are that there was an

3    indirect result and there's clear evidence out of Jefferies,

4    I think we have to make that motion.  Here's why --

5          THE COURT:  Even if the government has said or done

6    nothing directly or indirectly or engaged in any actions to

7    cause Jefferies to have those thoughts, to take those steps,

8    to do those actions?

9          MR. SMITH:  The way you are phrasing it now the

10   framework is the indirect action and the result that's

11   achieved is cutting off of fees.

12         THE COURT:  I didn't understand that.  I want you to

13   assume the following: The government has done nothing.  They

14   were apparently told at some point that there was an

15   arbitration proceeding with Litvak and they dealt with it.

16   They were told that fact.  They said have a nice day and hung

17   up.  They said nothing else.  They didn't ask the question.

18   That's all that happened, okay?  On the other side of the

19   fence, totally outside the presence and awareness and

20   knowledge of anyone operating in connection with this case,

21   U.S. Attorney for the District of Connecticut or anyone.  On

22   the other side over in the Jefferies' playground, everyone,

23   everybody is in high gear over the fact of we're just not

24   paying these people including Litvak for fees because we know

25   that's going to earn us points when we go down to the map

1    with the U.S. Attorney in the District of Connecticut, and so

2    we're going to do whatever we have to do, take whatever steps

3    we have to take.  We know they are going to love it.  We know

4    it is going to help us, so we're going to do it.

5              MR. SMITH:  I think that would be a byproduct of the

6    coercive framework.

7              THE COURT:  What coercive framework do I have in

8    that hypothetical?

9              MR. SMITH:  The fact that in order to avoid a

10   criminal charge under the government's policies, Jefferies is

11   undertaking an act to please the government and you know --

12             THE COURT:  What's the government policy right now

13   that's coercive?

14             MR. SMITH:  Well, the only way to avoid a criminal

15   charge is through a declination.  They are seeking to avoid

16   that charge through cooperation.

17             THE COURT:  But I thought the policies now provide

18   that this isn't an issue that should considered or will be

19   considered.

20             MR. SMITH:  Advancement of fees is not a policy to

21   be considered expressly but how to cooperate with the

22   government and what factors the government takes into

23   account, and as you put it, doing everything they can to

24   please the government, where they want to be Jefferies at the

25   end of the day, they want to be --

THE COURT:  Sir, that's going to get us right back
to where I started.  That is we can never prosecute a Mr.
Litvak or any Mr. Litvaks in this country because they are in
positions of power in companies in which they have apparently
rights to have their defense paid for them in your view, and
I assume you are going to win in the arbitration, but they
should have had that right from day one.  To the extent the
company where they work is a target, they are as you say, he
acted for them.  They are just as guilty as he is if he's
guilty.  That they will always work to protect their
self-interest, right?  They know from a historical point of
view that U.S. Attorneys and officers of the Attorney General
like this idea of squeezing individual defendants or shutting
off their spigot of fees so they will always act that way.
Therefore, if I'm hearing you tell me you are going to be
back here and move to dismiss Judge Kaplan's case and what
that tells me is we can never again prosecute in this
country, people who are in positions high enough in
corporations and wealthy enough companies that promise to pay
for fees, then figure out it is not in their interest to do
that.

MR. SMITH:  Carry forward in those unusual
circumstances where corporations that have a state law and
contractual obligation to advance fees, renege on that up
against the background of government coercion.

1          THE COURT:  Where is the background of government

2    coercion?

3          MR. SMITH:  Your Honor, there's no readily

4    identifiable reason why Jefferies has cut off fees here.

5          THE COURT:  I told you in my hypothetical they want

6    to look good.  It is like Eddie Haskell, you know, wants to

7    tell the Beaver's mother her dress is nice.  People want to

8    look good.  Mrs. Haskell, not Mrs. Haskell, Beaver's mother

9    she doesn't ask him to tell her you like my dress.  She

10   doesn't do anything to encourage this behavior.  In fact, I

11   suggest she doesn't even like it.  Nonetheless Eddie Haskell

12   comes in every day and says I love you dress.  I think we can

13   expect in the future that every company in the country who is

14   under the microscope for a criminal investigation by the

15   Department of Justice is going to try to do whatever dance

16   they have to do to be liked, i.e., not prosecuted, and if

17   they think not paying their executives is going to earn them

18   points, I suspect that's what they are going to do.  I don't

19   know how that gets us around to, well, then we shouldn't be

20   able to prosecute the poor executive who didn't get his fees.

21          MR. SMITH:  Well, Judge, I'm not saying that the --

22   I can't tell you I wouldn't come back here with an

23   application if we found evidence like that in Jefferies'

24   records.  I would have to take a look at it, and see how we

25   can tie it back to the government policy but while I'm

1   standing here now that decision would be a byproduct of

2   something the government did in a setting where Jefferies de

3   facto, if not already the government's agent, it is seeking

4   to be the government's agent.  That's where we may cross the

5   state action line.  So if Jefferies cut off Mr. Litvak's fees

6   as part of its cooperation with the government, I don't think

7   that's a stretch to get the state action.  So I think --

8           THE COURT:  That begs the question, quote, as a

9   result of cooperation with the government, is that a solo or

10  is that a dance?  Is that cooperation meaning government,

11  here's my hand, take me on a waltz or is it I'm a wall flower

12  on the side of the room?  I will try to look as pretty as I

13  can in the hopes that you won't favor me with an indictment.

14          MR. SMITH:  Your Honor, Jefferies is not exactly

15  like many other American corporations.  Registered broker

16  dealer, highly regulated industry, history has shown an

17  entity like that that's charged criminally in a federal

18  criminal indictment goes out of business quite quickly.  It

19  is really a binary, either on or off.  They have more

20  pressure on them than the average corporation.

21          THE COURT:  That doesn't tell me anything.

22          MR. SMITH:  The government knows that.  So the

23  government in seeking Jefferies cooperation knows that by

24  following the government's stated policies even --

25          THE COURT:  Where did they seek its cooperation?

1           MR. SMITH:  They have been seeking Jefferies'

2    cooperation since the investigation started.  Your Honor, I

3    can provide you with -- I don't have it here today -- the

4    numerous letters we did quote.  One from Mr. Johnson when we

5    waived attorney/client privilege.  The language was in the

6    interest of full cooperation, so it is fair to conclude at

7    some prior meeting or discussion, it was stated we're fully

8    cooperating with your investigation.  It was accepted by the

9    government.  When they waived attorney/client privilege,

10   something else that wasn't required from the government

11   policies and also not supposed to be a factor in determining

12   whether there's full cooperation or not.  The government

13   willingly accepted the formally privileged materials and

14   produced them to us in discovery.  We know that a waiver took

15   place.  It is very similar to the advancement issue.

16           THE COURT:  What's wrong with the company doing

17   that?  Especially a company as you are suggesting, this is a

18   life or death decision what the government does with them,

19   and let's assume they think that they look pretty good when

20   everything is on the table.  If I were their lawyer, I would

21   tell them to do what they did.  If I'm a target of an

22   investigation by the United States Attorney's Office, and I

23   think I've got a pretty good shot that I didn't do anything

24   wrong or what I did wrong they wouldn't probably prosecute me

25   for, somebody else did it.  It is really more somebody else

1    is more culpable, and I can make a case for why they should

2    exercise their discretion.  I'm going to call U-Haul.  I'm

3    going to be at their back door unloading trucks.  They are

4    going to be so sick of me and everything I offer to give

5    them.  This is not abnormal behavior.  Perfectly normal.  If

6    you represented Jefferies, I would be shocked if you didn't

7    do the same thing.  It is in Jefferies' interest.

8            MR. SMITH:  I don't think it is in Jefferies'

9    interest to have cut off advancement.  I frankly don't

10   understand it.

11           THE COURT:  I don't understand it.  What's the

12   answer in the arbitration?  What do they give as a reason for

13   doing that?

14           MR. SMITH:  They believe there was a waiver.

15           THE COURT:  What kind of waiver?

16           MR. SMITH:  It is in Mr. Litvak's termination

17   agreement, there's a release.  He waived his right to

18   advancement.  There's a carve out for indemnification.

19   Jefferies has paid other employees.  I think we noted there

20   was a case U. S. versus Conterino (ph.).  They paid other

21   employees that got caught.  My understanding is he had

22   virtually the same carve out language for the

23   indemnification.

24           THE COURT:  How long ago was that case?

25           MR. SMITH:  Three, four years.

```
1              THE COURT:  How about currently are they resisting

2    reimbursement or funding defenses generally or just Mr.

3    Litvak?

4              MR. SMITH:  Just Mr. Litvak is my understanding.  My

5    understanding is there's probably 15 or 20 law firms that are

6    representing various subjects and witnesses in this

7    investigation, and Jefferies is paying every dime of those

8    costs.

9              THE COURT:  Is Mr. Litvak the only who has been

10   indicted?

11             MR. SMITH:  The only one indicted and singled out on

12   the advancement.  There's other identified as subjects of

13   identification.  There's a person supervisor number one in

14   the indictment.  My understanding is he's a Jefferies current

15   employee.  They are paying his fees.  He's functionally the

16   equivalent of an unindicted coconspirator in the indictment.

17   So we're clear, this is not the economic issue.  They are

18   paying millions and millions in fees to Wilmer Heil and other

19   law firms.  The fees that would be advanced to Mr. Litvak

20   would be covered my understanding by an insurance policy.  It

21   is not a question of money.  It is a question of something

22   else.  And that something else is maybe, you know, the facts

23   are as your Honor sketched them out.  That's what they were

24   thinking back at Jefferies how to please the government.  It

25   may turn out there's no untoward communication on behalf of
```

1    the government.  That's a hard argument to make.  I hear loud

2    and clear that motion doesn't have a prospect for success if

3    we don't find any communications out of the government that

4    can not be fairly characterized as pressure.  I get that.  I

5    do think if the facts are as you sketched them out, I would

6    have to treat that as a byproduct of the government's

7    policies and fairly attributable to the state.

8              THE COURT:  Attorney Francis or Attorney Glover.

9              MR. FRANCIS:  It is me, your Honor, Attorney

10   Francis.

11             THE COURT:  How did the government get the affidavit

12   from the Jefferies' lawyer that you submitted?

13             MR. FRANCIS:  It was delivered by e-mail to us at

14   the same time it was delivered to defense counsel.

15             THE COURT:  Did you request it?

16             MR. FRANCIS:  I did not.  No, the government did

17   not.  We had had communications with counsel for Jefferies to

18   let them know this motion had been filed because it

19   implicated them.  They said they were aware.  They plan to

20   make a filing.  They called us later, rather than make a

21   filing directly, they asked us to deliver to Mr. Smith at the

22   same time.  They did that.  I expected something different.

23   What I got it with the affidavit, we filed as Exhibit 1 to

24   the opposition.

25             THE COURT:  Why did you expect something different?

1          MR. FRANCIS:  I had hoped that Jefferies was going

2   to explain some of the questions that, put on the record some

3   facts about why they made their decisions.  I don't know why

4   Jefferies made its decisions.  I don't think it is

5   unreasonable to suspect as your Honor said they were a wall

6   flower trying to look pretty for the government.  They chose

7   not to divulge any of their corporate decisionmaking.  That's

8   fine.  I don't have any basis to ask them to do that.

9          THE COURT:  Has the government ever told

10  Jefferies -- let's start with told them that the government

11  will not consider in any way, will not affect any decision

12  made by the government with respect to Jefferies whether or

13  not Jefferies pays Mr. Litvak's fees?

14          MR. FRANCIS:  No, your Honor.  Just never came up.

15          THE COURT:  Have you ever asked -- have you or

16  anybody for the government ever asked Jefferies' counsel or

17  representatives of Jefferies whether they were going to pay

18  his fees?

19          MR. FRANCIS:  No, your Honor, not in prospect.  I

20  should make it clear.  All my information about whether or

21  not Jefferies was paying fees has all been after the fact.

22  So I was told by Jefferies' counsel, the same way I was told

23  by Mr. Litvak's counsel, that they were involved in a dispute

24  over advancement of fees.  To both of them, my response was

25  okay.  I have no --

1           THE COURT:  Up until that time, you knew absolutely

2      nothing about Jefferies, Litvak and fees?

3           MR. FRANCIS:  I knew nothing, your Honor.  And all

4      the communication with Jefferies, I have been present for or

5      been me with Jefferies' counsel, so I can speak with a fair

6      degree of confidence on this.  All the government's

7      information has come after the fact.  Jefferies either had

8      made a decision or in some instances, Mr. Litvak's counsel

9      called me saying we asked for advancement of fees or we're

10     waiting for a response back.  In every instance, the

11     government's response has been fine.  It is a point of

12     information.

13          THE COURT:  What was your response to Jefferies?

14     Why did Jefferies tell you they weren't going to pay the

15     fees?

16          MR. FRANCIS:  Jefferies never told me why.  All they

17     said they had been sued in Delaware, and I didn't know

18     Jefferies rationale for denying the fees until Mr. Litvak's

19     counsel attached to this motion the filing Jefferies put in

20     the arbitration.  In that they explain there's three reasons

21     why they don't think they should have to pay fees.  The

22     government hasn't known the reason before that.  We had never

23     seen that document before.  I have no idea.  The government

24     has no position whether or not they have a better argument.

25     We could research it.  We don't care.  The government has no

1   dog in this fight.  From our perspective, the only reason

2   fees ever entered into the analysis or ever entered into the

3   conversation, I should say, Mr. Smith raised it in March

4   before your Honor as a factor that should play into

5   scheduling the trial.

6        THE COURT:  How is it that the waiver of the

7   attorney/client privilege and work product came up?  Did the

8   government request that?

9        MR. FRANCIS:  No.  It is the government's policy not

10  to request waivers.  We don't take into account for purposes

11  of evaluating cooperation.  Jefferies has information they

12  want us to know.  They apparently thought it was privileged,

13  but they did their own analysis.  They chose to waive

14  privilege so they can give us the documents.  That's the

15  extent of the waiver, not across the board waiver.  It is

16  limited with respect to the documents they turned over. Some

17  of the information in the documents have to do with the

18  things Mr. Litvak said to the general counsel when he was

19  terminated or just prior to being termination.  I suppose

20  that's information Jefferies wanted us to have.  I don't know

21  why they choose to waive the privilege.  That's a decision

22  they took with their counsel.

23       THE COURT:  When Jefferies told you that they were

24  sued in Delaware, what did you respond?

25       MR. FRANCIS:  I said okay, and they said the

1    complaint has been verified. I said who verified it?  They

2    said Mr. Litvak.  I said I would like to see a copy of that.

3    That's a statement an admission so I want to see it.  I saw

4    it and that was it.

5         THE COURT:  If I directed you to produce everything

6    in the file of the government either letters, memos, notes,

7    summaries, whatever, anything that would reflect or relate to

8    the government's view towards Jefferies resisting payment of

9    fees for Mr. Litvak, what would you have to give me?

10        MR. FRANCIS:  I hesitate to speak categorically just

11   off the cuff, anything I say I suspect Mr. Smith will then

12   shoot at that in the discovery your Honor granted, that would

13   be the issue in discovery whether or not the government

14   actually interfered.  The short answer is nothing.  The

15   government has no opinion as to whether or not Jefferies

16   should or should not advance fees.  Everything we know about

17   it has been communicated by Jefferies' counsel.  I should

18   clarify we said in our papers and bears repeating many times.

19   The majority of my information about what's going on with the

20   fee dispute comes from Mr. Smith and Ms. Zimmer.  They gave

21   me that information, most of it, in fact, a large portion of

22   the stuff that was discussed in the March hearing, they point

23   to indirect circumstantial evidence, they told me in the hall

24   just before we came in.  You can imagine how surprising it

25   was four months later to get a motion pointing to my comments

1    repeating things they told me as circumstantial evidence as

2    the government interfering with someone's constitutional

3    rights.  That was a little bit of a shock.

4         However, your Honor's question was what's in our

5    files.  There's nothing.  We have done no analysis.  We're

6    not going to take into account.  The USAM says we're not

7    entitled to take into account.  We're bound by the USAM not

8    to take into account whether or not Jefferies is advancing

9    legal fees.

10        THE COURT:  Is it fair to say that nothing has

11   happened from the government's side of this case that could

12   be understood by Jefferies to be an encouragement of them to

13   take the steps they have taken in Delaware?

14        MR. FRANCIS:  I'm not --

15        THE COURT:  By encouragement, well, this can help

16   you down the line, that might be a good thing to do.

17        MR. FRANCIS:  Absolutely not.  Absolutely not.  We

18   have never discussed the issue of fees with counsel.  We have

19   only been recipient of reports about a dispute between Mr.

20   Litvak and Jefferies.

21        THE COURT:  Jefferies keeps telling you things and

22   so does defense as he does to.  He says Judge, why are they

23   telling him these things?  They are telling him because they

24   want to make nice.  They want to be the Eddie Haskell.  They

25   want to be liked so I guess, you know, his argument is why

1    don't we take a peek.  What's the harm if there's nothing

2    there?  Then we'll know, in fact, the government has done

3    nothing to encourage this ridiculous behavior by Jefferies.

4         MR. FRANCIS:  Well, I think Mr. Smith conceded that

5    regardless of whether or not the government has done anything

6    to concede or encourage this behavior, he's going to be back

7    with a motion seeking to dismiss the indictment either way.

8         THE COURT:  That was a little unclear.  I thought at

9    first I got a really nice unequivocal answer that made me

10   feel comfortable.  Then the next answer came, then I began to

11   wonder no matter what you found when you looked or if you

12   found nothing whether they still might be back here with a

13   motion.

14        MR. FRANCIS:  My understanding where he ended up on

15   that was it doesn't matter what the government did.  If

16   Jefferies thought it was in its interest for any reason to

17   deny advancement of fees to Mr. Litvak then that would be

18   enough.  What Mr. Smith's analysis left out is the necessity

19   for state action.  State action comes from the government.

20   The government has to do something to interfere.

21        THE COURT:  Look at the history.  If you go back to

22   the Thompson memo, can it be argued it is like you let this

23   concept escape, when they had that old policy and while you

24   took the eraser and you scrubbed it off the board, you know,

25   every defense lawyer, all those Wall Street guys and the

1    Washington big shots, they all know how you think.  They know

2    you love this.  They know you love it, so it doesn't matter

3    that it is not up there anymore.  We all know what was on

4    that board, right?  So aren't you -- I mean we could still be

5    here when my successor and his assistant who wasn't born yet

6    when Thompson wrote the memo, but that shadow from his words

7    on the policy will be influencing general counsel because

8    they will do anything they can do to help their client, just

9    like any defense lawyer would.  I guess what I'm asking is

10   could the defendant argue that even if you are not presently

11   doing anything, the history of this issue is such that we

12   can't erase it.  It is always going to motivate defense

13   people even unilaterally and without regard to the reality

14   you won't give them any credit for it, therefore, we should

15   dismiss the indictment because you can't prosecute someone

16   who didn't get the fees reimbursed because the company

17   thought it might help them.

18            MR. FRANCIS:  I think defense counsel can argue

19   that.  In fact, I think they have, but just let's play that

20   out.  What that means forever in any case where someone

21   doesn't get their fees advanced, then we have this issue.

22   That can't be the law.  The Department of Justice changed its

23   policy for a reason and although I wasn't in the Department

24   of Justice at the time, I'm not senior enough to know what

25   the reasons are.  We have to give affect to those reasons.

1    When the government follows the policy that says do not take

2    into account the advancement of fees, what more can the

3    government do here?  The fact that Jefferies chooses to

4    communicate information or chooses to make a decision on

5    whether or not to advance fees, that's on Jefferies.  Just

6    the same Mr. Smith or Ms. Zimmer, anyone at defense counsel

7    table who decides to convey information to the government,

8    that that's their decision, doesn't mean we have done

9    anything to pressure them.  I don't know anybody from the

10   defense table would argue we did anything to pressure them to

11   keep us updated on the fee dispute.  It is information they

12   want us to have.  Just the same way, Jefferies' wall flower

13   wants to look pretty.  They have all kinds of information

14   they want us to have.  They call us all the time.  Sometimes

15   it is interesting.  Sometimes it is not.  It is one of those

16   cases where it is not.  The Thompson memorandum was put in

17   effect years ago.  It's been -- it was superseded in 2006,

18   and then again in 2008 and in 2008, the binding USAM

19   provision was put in place.  It's been five years USAM being

20   in place.  I'm not aware of any case post Thompson memorandum

21   and the defense hasn't pointed to any case post Thompson

22   memorandum, where the events that happened, the decision by

23   the government was not taken at the time the Thompson

24   memorandum was in effect, where a court has ever found the

25   government has interfered or further discovery is warranted.

1   All these cases they point to during the pendency of the

2   Thompson memorandum.  I also point out because I think it is

3   important that there are no cases where a judge has ever

4   granted discovery like this in the absence of any fact that

5   the government prediscovery fact the government did something

6   wrong.  Mr. Smith I think he may have misspoken with respect

7   to what was on the table before Judge Kaplan prediscovery in

8   the Stein case.  In that case, there was a memorandum written

9   by current and former members of the board of KPMG and

10  described to newspapers to in which they said the CEO

11  announced we were going to reimburse fees or advance fees,

12  then afterwards the KPMG bylaws were changed to permit

13  capping and cutting off fees and make any fee payment subject

14  to cooperation.  Judge Kaplan had this before him during the

15  time he was asked to consider whether or not to permit

16  discovery.  The fact there also KPMG chose to advance fees

17  and then chose to cut them off.  Here my understanding is, I

18  don't know this other than through reading the defendant's

19  papers, but Jefferies has never advanced any fees to Mr.

20  Litvak and whatever change in their policy, my understanding

21  they are interpreting their policy.  They didn't change the

22  bylaws so they can cut off Mr. Litvak's fees and in addition,

23  there's no -- in the Stein case, KPMG had nothing to say,

24  right, in prediscovery.  Eventually after discovery, they

25  said oh, yeah, we decided to cut off fees because we felt

```
 1    pressure from the government and the Thompson memorandum.

 2    Here it is sort of the photo negative.  We have an affidavit

 3    from Jefferies' counsel who said whose counsel during the

 4    entire time it is relevant that said we chose to cut off fees

 5    for our own reasons.  The government had nothing to do with

 6    that.  And he even goes and does the whole directly or

 7    indirectly, implicitly or explicitly which frankly it goes to

 8    show sort of how sensitive everyone is to this.  If the

 9    government hasn't winked or nodded or done anything to

10    indicate to Jefferies, this is what we want from them.  They

11    decide in the exercise of their corporate judgment this is

12    what they want to do.  The government shouldn't bear the

13    burden of that.

14        THE COURT:  One, I think counsel's answer we don't

15    know whether you winked or nodded.  We don't know that and

16    two, I mean is the course that might be called for.  I'm not

17    suggesting this.  This is a hypothetical I guess.  We'll put

18    quotes around it so nobody quotes me about it later.  Given

19    the Mark Filip, you know, Version Three in 2008, where he

20    affirmatively says prosecutors shall not take into account,

21    should that be communicated to someone like a Jefferies?  I'm

22    pretty sure they know about.

23        MR. FRANCIS:  To answer the second one first.  I'm

24    relatively certain that Jefferies' counsel is probably more

25    aware of the content of the USAM when it comes to charging
```

1     business organizations.  They have a real incentive to be

2     aware of that.

3             THE COURT:  How do I know you haven't winked or

4     nodded?

5             MR. FRANCIS:  I've told you that, Judge.  The

6     defense made a big deal we don't have a sworn statement.  Our

7     presentation to the court oral or in paper, we take those

8     just as seriously as a sworn affidavit.

9             THE COURT:  So Attorney Glover can prosecute you

10    under 1001 for the words that come out of your mouth today?

11            MR. FRANCIS:  Except the fact there's no falsity in

12    them, absolutely.

13            THE COURT:  If they were false, say a hypothetical.

14    If they were false.

15            MR. FRANCIS:  Counsel is well aware we have a duty

16    of candor to the Court.  We're not trying to be very

17    carefully parse our words to avoid saying the thing that's

18    going to show our interference with Mr. Litvak's right to

19    counsel.  I don't know how I can say it more explicitly.  We

20    made bullet points in our opposition on the first page.  We

21    had nothing to do with this.  We never had any communication.

22    We never communicated with them.  With respect to the USAM,

23    we're going to follow the USAM.

24            THE COURT:  You are the person responsible for this

25    investigation?

1          MR. FRANCIS:  I'm one of the people responsible.

2    I'm the one that's been communicating with the counsel for

3    Jefferies, yes.

4          THE COURT:  No one else has dealt with counsel for

5    Jefferies?

6          MR. FRANCIS:  As far as I'm aware no one has ever

7    communicated with counsel for Jefferies without me being

8    present.

9          THE COURT:  You signed the memorandum?

10          MR. FRANCIS:  I did.

11          THE COURT:  You made representations on the first

12    page?

13          MR. FRANCIS:  I did, and I repeat them today.

14          THE COURT:  Attorney Smith, do you have anything

15    further you want to add?

16          MR. SMITH:  Just one issue here came up in

17    Mr. Francis's argument about the fact of the binding policy

18    implies that it was followed.  I don't think that was the

19    experience of Stein, and I don't think it is even the

20    experience in this case which is why we brought up this

21    dialogue we're having with the prosecutors over the Brady

22    issues as they relate to jurisdiction over 1001 charges.  We

23    think they have an obligation to go find material in the

24    government's possession.  The Ogden memo puts the burden on

25    them to search the files and turn over anything material to

1    the case regardless of whether it may affect the outcome or

2    not.  This is a very broad and permissive requirement that

3    was retooled after the Spencer Stevens prosecution in

4    Washington, D.C. where there were numerous Brady violations.

5    Unfortunately it doesn't mean the prosecutors follow it.  In

6    this situation, we'll be back to you quite soon with the

7    discovery motion.  The prosecution is not following the Ogden

8    memo which the obligation under the Court's standing order

9    under Brady.  That will be pointed out to you.  I don't think

10   that in this circumstance simply saying there's a policy,

11   therefore, we followed it is not something that should be

12   credited in the case, not something that should be relied on.

13   I think that looking further here is appropriate.  These

14   rights are very important rights to Mr. Litvak.  If we have

15   the opportunity to look at discovery, we'll not be back

16   before you with a frivolous motion.  I appreciate your

17   Honor's hypothetical, if there's a way to tie it back to the

18   state action and the evidence, we'll make the motion.  If

19   not, we won't.  There's no downside to ordering discovery

20   here.

21            THE COURT:  I thought there was a deadline for

22   motions in this case and that it's past.  I'm not sure what

23   you are going to be back to me with.

24            MR. SMITH:  I think the motion would be to enforce

25   compliance with the Court's standing order.  I don't think

1    under the practice here in the district, we needed to make a

2    motion for Rule 16 and Brady materials.

3          THE COURT:  You don't unless you don't get them,

4    then you do.

5          MR. SMITH:  Now we don't have them.

6          THE COURT:  When did you get what you got which

7    doesn't have what you think you should have gotten?

8          MR. SMITH:  Some of that was discovered in the

9    course of preparing the motion to dismiss.  Frankly we have a

10   statement out of the government by letter that they haven't

11   gone to search all of SIGTARP files.  We only got that after

12   the motion cut off.

13         THE COURT:  The case has been pending since

14   February, right?

15         MR. SMITH:  Yes, your Honor.

16         THE COURT:  I delayed the filing of the motions at

17   your request in the hopes that you could have resolved this

18   arbitration business which it looks like Jefferies is not in

19   a rush to resolve unfortunately.  Hopefully you will get it

20   resolved maybe this month, I don't know.  But obviously I had

21   motions from you folks.  I don't understand.  I just think I

22   want to be clear.  I will do everything in my power to give

23   Mr. Litvak a fair trial, but I will not be ambushed by a

24   defense strategy that thinks it is going to keep filing

25   motions and filing motions and filing motions and filing

1    motions on and on and on whenever they decide that it is good

2    time for them to file them.  The last time I checked on an

3    Article 3 judges, I entered an order, I set a deadline.  I

4    don't know what else there is about that.

5         MR. SMITH:  I think the facts concerning the

6    government's lack of compliance with the Court's standing

7    order.  In other words, the minimum standard has been set

8    under Rule 16 and Brady.

9         THE COURT:  We have a standing order on top of it.

10        MR. SMITH:  I don't think prior to the cutoff, we

11   had a basis to say they were out of compliance with it.  Now

12   I believe we do.

13        THE COURT:  Why is it that you discovered since

14   September one is the deadline for motions that you couldn't

15   have discovered before then?

16        MR. SMITH:  Actually I think the deadline was back

17   in July.  And in the course of working on this issue, working

18   on the other issues, and we had a letter exchange, some of

19   which was attached to these motions.  We now have from the

20   government a statement that it's following something other

21   than the Ogden memo in terms of how it is doing its Brady

22   review.  A statement out of the government that it hasn't

23   caused SIGTARP agents to search all SIGTARP files.  That's

24   the agency for Rule 16 or Brady materials.

25        THE COURT:  Whether they have done something

1    horrible or not, it is not what interests me right now.  What

2    interests me is why that is just now known.  They have 10

3    days under the standing order to turn over certain materials.

4    I don't understand how from February until August you had no

5    idea that they hadn't turned over SIGTARP or whatever else

6    the heck it is.  Now you are all of the sudden wrote a

7    letter, wait a minute, where is this stuff?  The government

8    said we didn't look.  If you want us to, we will.

9              MR. SMITH:  They made a representation they were in

10   compliance.  They provided all the discovery they were

11   required to.  We later learned that's inaccurate.

12             THE COURT:  Follow me to the extreme, you know.  I

13   don't know.  The trial and jury selection date is sometime in

14   February.  And let's say it is February 2, just for the sake

15   of argument, and on February 1, you wake up and you say gee,

16   I don't think I saw any documents from the Department of

17   Defense.  They really have something to do with this case.

18   I'm going to write a letter.  The government says we didn't

19   search the Department of Defense for Brady.  We didn't think

20   it mattered, and you're going to bring on a motion on the

21   first day of evidence that I don't have this discovery.  That

22   isn't going to happen.  So whatever it is you think you may

23   be missing, whatever failures the government may have engaged

24   in in their obligations and whatever consequences fall from

25   their breach of any of their Brady or other obligations, I

1    need to have those brought on now, not later.

2              MR. SMITH:  We will, your Honor.

3              THE COURT:  Not in the middle of trial.  Understood?

4              MR. SMITH:  We'll get that in promptly.

5              THE COURT:  Anything further that the Court can take

6    up today on this matter?

7              MR. FRANCIS:  Nothing from the government, your

8    Honor.

9              THE COURT:  All right.  The court is going to take

10   the matter under advisement.  I hope to issue a decision

11   shortly.  We'll stand in recess.

12             (Whereupon, the above hearing adjourned at 11:00

13   a.m.)

14

15

16   COURT REPORTER'S TRANSCRIPT CERTIFICATE

17   I hereby certify that the within and foregoing is a true and

18   correct transcript taken from the proceedings in the

19   above-entitled matter.

20

21   /s/  Terri Fidanza

22   Terri Fidanza, RPR

23   Official Court Reporter

24

25