| | | |
|---|---|---|
| UNITED STATES OF AMERICA , | ) | NO. 3:13-CR-19 (JCH) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JESSE C. LITVAK, | ) | OCTOBER 21, 2013 |
| Defendant | ) | |

## RULING RE: JESSE C. LITVAK'S MOTION TO DISMISS THE INDICTMENT
### (Doc. No. 52)

### I.  INTRODUCTION

Defendant Jesse C. Litvak ("Litvak") has moved to dismiss the Indictment

against him pursuant to Fed. R. Crim. P. 12(b)(3)(B).  Defendant's Motion to Dismiss

the Indictment ("Def.'s Mot. to Dismiss") (Doc. No. 52).  For the following reasons, the

Motion is denied.

### II.  BACKGROUND

On January 25, 2013, a federal grand jury returned a sixteen-count indictment

against Litvak, charging him with Securities Fraud under sections 78j(b) and 78ff of title

15 of the United States Code (Counts 1-11); Troubled Asset Relief Program ("TARP")

Fraud under section 1031 of title 18 of the United States Code (Count 12); and, making

False Statements to the Government under section 1001 of title 18 of the United States

Code (Counts 13-16).  Indictment ("Ind.") (Doc. No. 1) at ¶¶ 27-60.  The government

alleges that Litvak, a licensed securities broker and former senior trader and managing

director at Jeffries & Co., Inc. ("Jeffries"), a global securities and investment banking

firm, defrauded six Public-Private Investment Funds ("PPIFs") and at least fourteen

privately-funded entities by making misrepresentations in the purchase and sale of residential mortgage-backed securities ("RMBS").  Id. at ¶¶ 2, 11, 12, 33, 34.

The PPIFs were established as part of the 2009 TARP government bailout plan created in response to the financial crisis.  Id. at ¶ 5; see also 12 U.S.C. § 5231a.  The Department of Treasury ("Treasury") created the Public-Private Investment Program ("PPIP") to purchase certain troubled real estate-related securities, including certain RMBS, from financial institutions.  Ind. at ¶ 6; see also 12 U.S.C. § 5231a(b). Individual PPIFs were established and managed by a Legacy Securities PPIP fund manager (a "PPIF Manager") selected by the Treasury.  Ind. at ¶ 8.  The government used more than $20 billion of TARP bailout money to fund PPIFs to purchase the troubled securities.  Id. at ¶ 7.  Because the government matched every dollar of private investment in a PPIF with one dollar of equity and two dollars of debt, 75% of each PPIF's money consisted of taxpayer funds disbursed by the government as part of the TARP bailout plan.  Id.  Each PPIF received approximately $1.4 billion to $3.7 billion of bailout money.  Id. at ¶ 9.  Each PPIF Manager owed fiduciary duties to its investors, which consisted primarily of the government.  Id. at ¶ 8.  Under PPIP rules, a PPIF could buy or sell only certain types of RMBS, including, the government claims, the types of RMBS in which Litvak specialized.  Id. at ¶ 10.

According to the Indictment, from 2009 until approximately December 2011, Litvak fraudulently misrepresented the acquisition costs of RMBS bonds to buyers to obtain extra, undisclosed profit for Jeffries.  Id. at ¶¶ 28, 33.  The Indictment also alleges that Litvak misrepresented to sellers the price at which Jeffries had negotiated to sell a RMBS bond to obtain unearned profit.  Id. at ¶ 33.  Litvak is further alleged to have

made misrepresentations regarding the true identity of the seller to buyers to earn additional profit.  Id. at ¶ 34.  On several of these trades, Litvak's misrepresentations were made to a PPIF Manager for a Treasury-created, TARP-funded entity.  Id. at ¶¶ 6, 60.  As a result, the Indictment alleges that Litvak fraudulently increased the profitability of his trades for Jeffries and himself at the expense of TARP funds.  Id. at ¶¶ 57-58.

Litvak argues that the Indictment fails to sufficiently allege that his misrepresentations were false statements with respect to a matter within the jurisdiction of a department or agency of the United States, thus requiring the dismissal of Counts Thirteen through Sixteen of the Indictment alleging violations of section 1001.  Def.'s Mot. to Dismiss at 1.  He further asserts that the Indictment fails to sufficiently allege, and cannot sufficiently allege, that Litvak committed an act within the scope of section 1031, thus requiring the dismissal of Count Twelve of the Indictment.  Id.  He also argues that Count Twelve is defective because the Indictment replaces the statutory word "in" with "in connection with" in its restatement of section 1031, and as a result, must be dismissed.  Finally, he claims that the Indictment fails to allege materiality and, because materiality is an essential element of every crime charged, all counts of the Indictment must be dismissed.  Id.

In response, the government argues that Litvak's challenges to the sufficiency of the Indictment's allegations regarding jurisdiction and materiality are improper on a Rule 12(b) motion because they are essentially challenges to the sufficiency of the government's evidence that Litvak's conduct satisfied certain elements of the offenses charged.  Government's Opposition to Defendant's Motion to Dismiss the Indictment ("Gov't.'s Opp.") (Doc. No. 61) at 4.  The government also argues that the Indictment's

3

failure to quote section 1031 verbatim in Count Twelve is not grounds for its dismissal. Id. at 10-12.  The government further contends that Litvak is wrong in arguing that his misrepresentations do not fall within the ambit of sections 1001 and 1031.  Id. at 12-26. Lastly, the government insists that the Indictment sufficiently alleges that Litvak's misrepresentations were material.  Id. at 26-33.

## III.    STANDARD OF REVIEW

A defendant may move to dismiss an indictment on the grounds that it "fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B).  A charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged.  See Russell v. United States, 369 U.S.  749, 764-65 (1962); United States v. Pirro, 212 F.3d 86, 93 (2d Cir.  2000) (dismissing count of indictment for failing to sufficiently allege an element of a material false statement offense where the indictment alleged nondisclosure without additionally alleging a duty to disclose).  In ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true.  See Boyce Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952).  Rule 12(b) permits only pretrial motions "that the court can determine without a trial of the general issue." Fed. R. Crim. Proc. 12(b)(2); United States v. Alfonso, 143 F.3d 772, 777 (2d Cir.1998) (stating that any defense or objection which is capable of determination without the trial of the general issue may be raised by pre-trial motion).

**IV.    DISCUSSION**

A.  <u>Facial Validity of the Indictment</u>

With the exception of his claim regarding the language in Count Twelve, Litvak does not appear to argue that the Indictment is facially invalid.  An indictment need only be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. Proc. 7(c)(1).   The Second Circuit has explained that, "an indictment must charge[ ] a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." <u>Alfonso</u>, 143 F.3d at 776 (internal quotation marks omitted).   However, even indictments that "do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime" have been consistently upheld.  <u>United States v. Walsh</u>, 194 F.3d 37, 44 (2d Cir. 1999) (internal quotation marks omitted).

Every count in Litvak's Indictment meets these pleading requirements.  All counts—with the possible exception of Count Twelve—track the language of the statute under which Litvak is charged, provide dates and places for when and where the charges are alleged to have occurred, and include a detailed statement of the allegedly criminal acts.  Ind. at ¶¶ 28-55, 57-58, 60.  Thus, the Indictment is facially valid and, as the Supreme Court has acknowledged, if an indictment is "valid on its face," it is "enough to call for trial of the charge on the merits." <u>Costello v. United States</u>, 350 U.S. 359, 363 (1956) (citations and footnote omitted).

Litvak suggests that Count Twelve's insertion of the phrase "in connection with" in place of the statutory term "in" found in section 1031 is an impermissible broadening of

the statute's scope, rendering the Count defective.   Memorandum of Law in Support of

Defendant's Motion to Dismiss the Indictment ("Def.'s Mem.") (Doc. No. 53) at 23.

Given the minimal pleading requirements for indictments, however, this difference in

wording is not a defect.   The part of section 1031 that is relevant here criminalizes the

following conduct:

> (a) Whoever knowingly executes, or attempts to execute, any scheme or
> artifice with the intent—
>
> (1) to defraud the United States; or
>
> (2) to obtain money or property by means of false or fraudulent pretenses,
> representations, or promises,
>
> in . . . [a] form of Federal assistance, including through the Troubled Asset
> Relief Program . . . or the Government's purchase of any troubled asset as
> defined in the Emergency Economic Stabilization Act of 2008 . . . . 18
> U.S.C. § 1031.

Count Twelve of the Indictment charges Litvak as follows:

> [D]efendant L ITVAK knowingly executed and attempted to execute the
> aforementioned scheme and artifice with the intent to defraud the United
> States and to obtain money and property by means of false and fraudulent
> pretenses, representations and promises in connection with such Federal
> assistance in the following RMBS bond transactions with a TARP-Funded
> Victim . . . . Ind. at ¶ 58.

Section 1031 plainly covers fraudulently obtaining monetary federal assistance, which is

what Count Twelve essentially alleges—that Litvak fraudulently obtained TARP funds

by making certain misrepresentations to the PPIFs.   The use of the phrase "in

connection with" in Count Twelve does not impede Litvak's ability to understand the

crime with which the government has charged him.   United States v. Di Pietroantonio,

289 F.2d 122, 124 (2d Cir. 1961) ("The indictment need not have been worded in the

6

precise language of the statute so long as the appellant was apprised of the offenses with which he was being charged.").

While Litvak argues that "in connection with" broadens the scope of section 1031 "by incorporating a greater range of conduct than the statute actually proscribes," he offers no examples of this "greater range of conduct" that Count Twelve covers but section 1031 would not.[1] Reply Memorandum of Law in Further Support of Jesse C. Litvak's Motion to Dismiss the Indictment ("Reply Mem.") (Doc. No. 66) at 8. His citing of United States v. St. Clair, 418 F. Supp. 201, 205 (E.D.N.Y. 1976), as an instance of a court dismissing a count of an indictment because "it rested upon the government's broadened interpretation of the statute" only reveals how unmerited a similar dismissal of Count Twelve would be. Def.'s Mem. at 24. In St. Clair, the government proposed that the meaning of "misrepresentation" in a criminal statute outlawing a defendant's misrepresentations to a witness also included misrepresentations by the witness to the government. 418 F. Supp. 201 at 203. The St. Clair court found that a fair reading of the statute and its purpose as enacted negated this interpretation. Id. at 204. Based on the Supreme Court's instruction to resolve ambiguity in criminal statutes "in favor of lenity," that court dismissed the count of the indictment that relied on the government's interpretation. Id. at 205 (quotations and citations omitted). The addition of two words to a paraphrase of a statute, as Count Twelve does, is hardly equivalent to the

---

[1] Litvak argues that the broadening of section 1031 leaves him "at risk for being convicted for conduct that is not clearly proscribed by statute," despite the Indictment's identification of the proscribed conduct Litvak allegedly undertook. Reply Mem. at 8. Notably, Litvak does not offer an example of what legal conduct, outside of the Indictment's allegations, he risks being convicted of based on the "broader" language of Count Twelve.

government's interpretation of a criminal statute to include a category of conduct that is not mentioned in the plain text of the statute, as was done in St. Clair.

As Litvak rightly observes, due process requires that a criminal statute "give fair warning of the conduct that it makes a crime." Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964). Unlike in St. Clair, however, where the defendant was not given such a warning because the conduct charged in the indictment was not clearly outlawed by the statute, Count Twelve does not charge Litvak with anything other than what section 1031 outlaws: knowingly scheming to defraud the United States and obtain TARP funds by means of misrepresentation. The paraphrasing of part of section 1031 in Count Twelve—when considered alongside the detailed allegations in the rest of the indictment Count Twelve—gives Litvak fair warning of the conduct that the government alleges is criminal under section 1031, and which conduct is covered by the statute. United States v. Hernandez, 980 F.2d 868, 871-72 (2d Cir. 1992) (reading an indictment "in its entirety" to find that it provided the defendant with adequate notice). Thus, to the extent that Litvak's argument regarding Count Twelve is a charge to the facial validity of the Indictment, the court rejects his argument and denies his Motion in that regard.

B. Consideration of Litvak's Argument That His Alleged Misrepresentations Are Not Subject to the Charging Statutes on a Rule12(b) Motion

Litvak does not argue that the Indictment fails to alert him to the crimes of which he is charged and their essential facts. Rather, he insists that the Indictment fails to sufficiently allege that Litvak's alleged misrepresentations fall within the purview of the charging statutes, that is, the "government's theories of prosecution . . . are legally insufficient" to show that he has violated the charged statutes. Reply Mem. at 1. Inasmuch as that this argument is actually an attack on the government's evidence

against Litvak, it is premature.  Challenges to the government's evidence for supporting

an element of a charged crime are not appropriate for Rule 12(b) motions to dismiss.

As the Second Circuit has noted, "[u]nless the government has made what can fairly be

described as a full proffer of the evidence it intends to present at trial to satisfy . . . [an]

element of the offense, the sufficiency of the evidence is not appropriately addressed on

a pretrial motion to dismiss an indictment."[2]  <u>Alfonso</u>, 143 F. 3d at 777.

The Second Circuit makes clear that a challenge to whether a statutory element

has been satisfied is a matter for trial.  In <u>Alfonso</u>, the Second Circuit reversed the

dismissal of a Hobbs Act robbery indictment for failure to allege, in part, how the

defendants' conspiracy to steal would have affected interstate commerce.  143 F. 3d at

776.  In its dismissal of the Hobbs Act count, the district court had held that the

government had not "adduced sufficient facts to establish a nexus between" the alleged

crime and an element of the offense.  <u>Id.</u> at 773.  In reviewing this determination, the

Second Circuit held that, "[t]o the extent that the district court . . . drew inferences as to

the proof that would be introduced by the government at trial to satisfy the Hobbs Act's

jurisdictional element . . . such an inquiry . . . was premature." 143 F. 3d at 776.   It

also held that because the requirement of an effect on interstate commerce was "itself

an element of the offense charged," "the determination of whether the jurisdictional

element has been satisfied is part and parcel of the inquiry into the 'general issue' of

whether the statute has been violated." <u>Id.</u> at 777.  Such an inquiry into the "general

issue" of the criminal case is not permissible on a Rule 12(b) motion.  <u>Id.</u>

_____

[2] While the government has pled in some detail in its Indictment, it cannot be said that it
has made a "full proffer" of its trial evidence.

Though Litvak insists that his Motion to Dismiss does not argue "that the allegations in the Indictment cannot be supported by evidence," much of his Motion does, in fact, challenge the sufficiency of the government's evidence for proving an element of a charged offense.  Reply Mem. at 1.  Having acknowledged that "materiality is an element" of each of the Indictment's charged offenses, Litvak argues that the entirety of the Indictment must be dismissed for its failure to sufficiently allege that Litvak's misstatements were material.  Def.'s Mem. at 24.  As "materiality is a classic question reserved for the jury," Litvak's challenges to the Indictment on this ground are not appropriate for this Motion to Dismiss.  Gov't.'s Opp. at 8;  see, e.g., United States v. Ali, 68 F.3d 1468, 1474 (2d Cir.1995) ("the element of materiality under § 1001 must be determined by the jury and not the court"); Washington v. Recuenco, 548 U.S. 212, 219 (2006) ("materiality is an element of the mail fraud, wire fraud, and bank fraud statutes[, on which § 1031 was based], and thus must be submitted to the jury to support conviction of those crimes"); United States v. Ferguson,06CR137(CFD), 2007 WL 4556625, at *2 (D. Conn. Dec.  20, 2007) ("materiality presents a mixed question of fact and law for the jury to resolve" (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)).

Counts One through Eleven of the Indictment allege that Litvak made "untrue statements of material facts and omit[ed] to state material facts necessary to make the statements not misleading."  Ind. at ¶ 28.  Counts Thirteen through Sixteen allege that he made a "materially false, fictitious, and fraudulent statement and representation" to a PPIF.  Id. at ¶ 60.  Thus, Litvak's Motion to Dismiss all counts of the Indictment for failure to sufficiently allege materiality is denied.

Litvak also argues for the dismissal of Count Twelve on the ground that the

RMBS transactions he managed are outside of section 1031's scope because they do

not fall within its listed categories of federal assistance.  Def.'s Mem. at 21-23.  In so

arguing, Litvak submits that the allegations in Count Twelve are insufficient to meet the

reach of section 1031.  Id. at 21-22.  He also offers evidence outside of the Indictment

for his claim that the funds used by the PPIFs, and thus earned by Litvak in his

transactions with the PPIFs, did not qualify as a "form of Federal assistance, including

through [TARP]" under section 1031.  Reply Mem. at 6-7 (citing SIGTARP, Selecting

Fund Managers for the Legacy Securities Public-Private Investment Program (2010)[3]

("SIGTARP Report")).  That is, Litvak attempts to put on his case for why his alleged

misstatements did not violate section 1031 in a pre-trial motion to dismiss.  He cites no

cases in his discussion of section 1031's inapplicability and raises no questions of law in

his argument for dismissing Count Twelve.   Based on Alfonso's instruction that an

inquiry into the sufficiency of an indictment's allegations to establish a nexus between

---

[3] The report is available at:
http://www.sigtarp.gov/Audit%20Reports/Selecting%20Fund%20Managers%20for%20the%20
Legacy%20Securities%20Public-Private%20Investment%20Program%2009_07_10.pdf.

   Though the merits of Litvak's argument here need not be addressed, it is worth noting
that his reliance on the SIGTARP Report for his argument on Count Twelve is ill-considered.
Litvak cites the SIGTARP Report's recognition that "the interests in the PPIFs itself . . . is a
'troubled asset'" as proof that bond purchases of RMBS were not purchases of "troubled assets"
under section 1031.  Reply Mem. at 7 (quoting SIGTARP Report at 30) (quotations omitted).
This citation selectively omits the context in which this statement was made, which was the
exclusion of Treasury's selection of PPIF Managers from the application of a procurement
regulation.  SIGTARP Report at 30.  It also ignores the SIGTARP Report's repeated recognition
that PPIF transactions are subject to Treasury oversight; in fact, the Report notes that Treasury
officials characterize each PPIF transaction "as a commitment to purchase a troubled asset
under [the Emergency Economic Stabilization Act ("EESA")] for the PPIF pursuant to a TARP
program and a troubled asset determination made by the Secretary pursuant to his authority
under . . . EESA . . . ." Id. at 29-30.

the alleged crime and an element of the offense is not appropriate on a Rule 12(b)

motion, Litvak's Motion to Dismiss Count Twelve is denied.

Litvak's challenge of Counts Thirteen through Sixteen appears to similarly attack

the sufficiency of the government's evidence to prove a statutory element.  Litvak

argues that the counts insufficiently allege that his allegedly false statements were

made with respect to a matter "within the jurisdiction of a department or agency of the

United States," as section 1001 requires.   Def.'s Mem. at 12-13.  He observes that the

"operative allegations" in the Indictment—that 75% of each PPIF consisted of TARP

funds and that the PPIF Managers owed a fiduciary duty to the government—"at best"

allege that Litvak made false statements to a private party that managed a fund

receiving federal money. Id. at 14.  Though Alfonso notes that resolving whether a

jurisdiction element of a criminal statute is met is a matter for trial, and not for a Rule

12(b) motion, Litvak's argument here seems to raise a question of law because he

asserts that, under the existing legal interpretation of section 1001's statutory language,

misrepresentations to PPIFs can never be proscribed by section 1001.   Thus, whether

Litvak is correct in his articulation of section 1001's limits is a matter of law that the court

will address before resolving his Motion to Dismiss on Count Twelve and Counts

Thirteen through Sixteen.[4]

C. Misstatements to PPIFs and the scope of section 1001

---

[4] It bears noting that the court is not obligated to resolve even pure questions of law on a
motion to dismiss an indictment.  See U.S. v. Piper, No. 1:12-cr-41-jgm-1, 2012 WL 4757696 at
*4 (D. Vt. Oct. 5, 2012) (noting the lack of conclusive guidance from the Second Circuit on
whether district courts may decide motions to dismiss on pure questions of law before trial and
declining, in the abstract, to address a question of law).

Litvak insists that PPIFs are private entities that simply manage an investment fund receiving federal money, making the government "merely a co-investor in the investment funds managed by that private party." Def.'s Mem. at 14. As support for this proposition, Litvak cites the Treasury's acknowledgment that it would not manage the PPIFs and that PPIF managers would "make all decisions concerning the . . . investments," and claims that the "PPIP fund entities were not contractors or financial agents being paid for goods or services or being controlled or supervised by Treasury." Id. (citation omitted). Litvak also asserts that, "insofar as [he] was concerned, every aspect of [his] interactions with the PPIFs were [sic] the same as they would have been had the government not been an investor in the funds." Id. 15-16. Due to this arms-length relationship Litvak argues the government had with the PPIFs, he claims that any alleged misrepresentations to the PPIFs are analogous to false statements made to private companies reimbursed by the government, and thus outside of section 1001's reach. Id. at 14. He rests this argument on Lowe v. United States, 141 F.2d 1005 (5th Cir. 1944) and United States v. Blankenship, 382 F.3d 1110 (11th Cir. 2004), wherein the Fifth and Eleventh Circuits determined that such false statements—made to a private company concerning a project that was the subject of a contract between the company and the federal government—were not matters within the jurisdiction of the government for the purposes of section 1001.

Litvak is wrong to rely on Lowe and Blankenship, however, as the Indictment as well as the statutes and regulations governing the PPIP make clear that PPIFs are not purely private institutions.[5] The PPIFs were established by the Treasury's PPIP, itself a

---

[5] The markedly different postures of the challenges in Lowe and Blankenship from Litvak's posture in this Motion also make these cases inapposite for Litvak's purposes. Lowe

part of the TARP bailout plan, for the purpose of purchasing trouble real estate securities from financial institutions. Ind. at ¶¶ 5, 6; see also 12 U.S.C. § 5231a (authorizing the creation of the Public-Private Interest Program); id. § 5231a(c) (defining PPIF as "a financial vehicle that is . . . established by the Federal Government to purchase pools of . . . securities . . . from a financial institution"); id. § 5211(a)(1) (authorizing the Secretary of Treasury to establish TARP to "purchase, and to make and fund commitments to purchase, troubled assets from any institution"); id. § 5211(c)(4) (authorizing the Secretary to establish "vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets"); 31 C.F.R. § 31.218 (outlining mechanisms for enforcing rules imposed on PPIFs). Treasury selected all PPIF managers and established rules for PPIP that dictated the type of securities that the PPIFs could buy or sell. Ind. at ¶¶ 8, 10; see, e.g.,12 U.S.C. § 5211(d) (requiring the Secretary to "publish program guidelines," including "mechanisms for purchasing troubled assets . . . . Methods for pricing and valuing troubled assets . . . . Procedures for selecting asset managers . . . . Criteria for identifying troubled assets for purchase"). Seventy-five percent of each PPIF's funding was taxpayer funds from TARP disbursed by Treasury. Id. at ¶ 7. Further, Title 31, Code of Federal Regulations Part 31, section 213(c) expressly subjects any information related to services under these statutes and regulations and provided by "any individual or entity" to Treasury to section 1001's jurisdiction. 31 C.F.R. § 31.213(c).

In light of this extensive statutory and regulatory framework for creation, funding, and supervision of the PPIP and PPIFs, Litvak's arguments that the PPIFs were private

---

was decided on appeal after entry of a nolo contendere plea; Blankenship was decided after trial. Lowe, 141 F.2d at 1006; Blankenship, 382 F.3d at 1116.

institutions similar to those in <u>Lowe</u> and <u>Blankenship</u> are unconvincing.[6]  <u>Lowe</u> involved

misstatements made by an employee of a private company contracting with the

government for a discrete assignment.  141 F.2d at 1006.  In <u>Blankenship</u>, the false

statements were made by a private company that had been subcontracted by another

private company; the latter company also held a contract with a state agency that

received federal funds.  382 F.3d at 1116.  Thus, the companies in <u>Lowe</u> and

<u>Blankenship</u> were not only private:  they were also at considerable remove from federal

involvement.  They were not created, funded, or supervised by any government agency.

By contrast, the PPIFs were government-created entities using mostly taxpayer money

to achieve a government program's purposes.   It simply is not the case that Litvak's

interactions with the PPIFs would have been the same had the government not been an

investor, for the PPIFs would not exist but for the government's decision to both create,

fund, and supervise them.

Litvak also suggests that, because his alleged misstatements were not made

directly to the Treasury, the misstatements do not fall within the ambit of section 1001.

Def.'s Mem. at 13.  This suggestion is mistaken.  The Second Circuit has noted that

---

[6] The divergence of numerous courts—including the Second Circuit—from <u>Lowe</u> (and
thus <u>Blankenship</u>, which draws its reasoning from <u>Lowe</u>) raises further doubt about its
applicability to Litvak's alleged misrepresentations to the PPIFs.  <u>See</u> <u>United States v. Candella</u>,
487 F.2d 1223, 1226 (2d Cir. 1973) (declining to follow <u>Lowe</u> because false statements made to
a joint enterprise between a city and the government, co-funded by both, presented a "markedly
different" fact pattern from that of <u>Lowe</u>); <u>United States v. Jackson</u>, 608 F.3d 193, 199 & n.2 (4th
Cir. 2010) (calling <u>Lowe</u> and <u>Blankenship</u> outside "the majority of circuits:" "We note that, to the
extent that <u>Lowe</u> is similar to this case, nearly every court to consider it has either distinguished
it or rejected it."); <u>Blankenship</u>, 382 F.3d at 1145-47 (Black, J., concurring in part and dissenting
in part, noting <u>Lowe</u> is inconsistently followed and often distinguished even within Fifth and
Eleventh Circuits); <u>United States v. Gibson</u>, 881 F.2d 318, 323 (6th Cir. 1989) ("<u>Lowe</u> has no
application if, as here, the private entity to which the false statement is made is required to
make regular reports to a government agency and the agency retains ultimate authority to see
that federal funds are properly spent.").

"there is no requirement that a false statement be made *to* a federal agency . . . only [that it] have been made in 'any matter *within the jurisdiction of any department or agency of the United States.*'" United States v. Davis, 8 F.3d 923, 929 (2d Cir. 1993). "Within the jurisdiction," the Supreme Court has held, merely serves to "differentiate[ ] the official, or authorized functions of an agency or department from matters peripheral to the business of that body." United States v. Rodgers, 466 U.S. 475, 479 (1984).

A false statement violates section 1001 simply if "it was contemplated that the statement was to be utilized in a manner which was within the jurisdiction of such department or agency." United States v. Candella, 487 F.2d 1223, 1227 (2d Cir. 1973). In Candella, false claims for reimbursement were made to a city agency. Id. at 1224. The agency was responsible for initially processing and paying the claims, but was entitled to reimbursement by a federal agency. Id. A federal regulation governing the reimbursement program required that claims in excess of $10,000 be approved by the federal agency, but authorized the city to pay claims under $10,000 without securing agency approval. Id. at 1227. The complete file on claims under $10,000, however, had to be kept available by the city for audit and inspection by the federal agency. Id. The court found that, though the false statements involved a payment of only $3,300, and thus the affidavits and bill associated with it were not turned over to the agency, the statements were still "within the jurisdiction" of the federal agency. Id.

Much like the program in Candella, a number of statutes require that PPIFs turn over information regarding its transactions to Treasury. Section 5231a(b)(1)(D) states that "[a]ny program established by the Federal Government to create a [PPIF] shall require each manager of a [PPIF] to retain all books, documents, and records relating to

such [PPIF], including electronic messages;" section 5231a(b)(1)(H) requires each PPIF manager to "identify for the Secretary, on a periodic basis, each investor that . . . holds equity interests equal to at least 10 percent of the equity interest for the fund . . . ." 12 U.S.C. § 5231a(b)(1)(D), (b)(1)(H). The Office of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"), created by the Emergency Economic Stabilization Act of 2008 ("EESA"), was authorized to demand certain information from the PPIFs,[7] including a list of all securities purchased by the PPIFs, a list of the securities' sellers, and the PPIFs' "profit and loss incurred on each sale of disposition." Id. § 5231(c)(1)(B), (D), (E), (F). As Candella acknowledges, the potential that misstatements would be passed on to the federal government, even if the misstatements were not actually received by the government, was sufficient to establish jurisdiction under section 1001. Such potential was undeniably present in Litvak's alleged misstatements to the PPIFs, given the existence of multiple statutes requiring PPIFs to send to Treasury information regarding the transactions in which Litvak allegedly made misrepresentations. Thus, such misstatements were clearly "contemplated . . . to be utilized in a manner which was within the jurisdiction of [Treasury]."

Additionally, following the "broad" construction of "jurisdiction" in section 1001, the Second Circuit has found such jurisdiction for false statements made to private

---

[7] Though EESA was created one year before the establishment of the PPIP, it clearly contemplates the inclusion of the PPIP in the programs it governs. See 12 U.S.C. § 5231(c)(1) (authorizing SIGTARP to supervise, among other things, the purchase, management and sale of assets by the Secretary of Treasury under "any program established by the Secretary under section 5211 of this title"); id. § 5211(c)(4) (authorizing the Secretary to establish "vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets"); id. § 5231a(c) (defining PPIF as "a financial vehicle that is . . . established by the Federal Government to purchase pools of . . . securities . . . from a financial institution").

entities or state and local actors,[8] so long as these institutions are subject to federal regulation or supervision concerning the expenditure of federal funds.  See United States v. Bilzerian, 926 F.2d 1285, 1300 (2d Cir.1991) ("The term jurisdiction in § 1001 should be broadly construed").  Federal supervision need not be total to trigger section 1001 jurisdiction:  federal delegation of supervisory authority is not a relinquishment of jurisdiction.  See, e.g., United States v. Davis, 8 F.3d 923, 929 ("[I]t is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction . . . .  Merely because the Board of Prisons chose to delegate part of its responsibility to a state facility does not remove these matters from [the Board of Prisons'] jurisdiction.").  Thus, contrary to Litvak's insistence that, because the PPIFs were managed by "private parties," the misrepresentations to them were outside of section 1001, the fact that the PPIFs were not directly managed by Treasury is not fatal to section 1001 jurisdiction.

The Candella opinion provides guidance on how to determine whether sufficient federal supervision over a non-federal program receiving federal funds exists for section 1001 purposes.  There, the Second Circuit found sufficient supervision because the city and federal government were working in, and co-funding, a joint enterprise.  Id. at 1226. This was so even though the city's expenditures in this enterprise were taken directly from its coffers and later reimbursed by the government.  Id. at 1224.  The city was responsible for administering federally funded projects, but its procedures for doing so

---

[8] Because section 1001 jurisdiction may exist for misstatements made to both public and private institutions, the court declines to determine whether the PPIFs themselves are public or private entities.

were subject to "explicit regulation, supervision, and audit" by the government.  Id. at 1226.

As in Candella, the PPIFs were responsible for administering the purchase of troubled assets:  Treasury created the PPIP for this sole purpose.  12 U.S.C. § 5231a(e).  And like the joint enterprise in Candella, the PPIFs' purchase of these assets was expressly regulated, supervised, and subject to audit by Treasury.  See, e.g., id. § 5231a(b)(1)(D) (requiring PPIF managers to retain all books, documents, and records relating to the fund, including emails), (b)(1)(H) (requiring PPIF managers to periodically identify investors holding at least 10 percent equity interest in the fund to the Treasury Secretary); id. § 5231(c)(1) (authorizing SIGTARP to supervise, among other things, the purchase, management, and sale of assets by the Secretary of Treasury under PPIP).  Further, unlike the city in Candella, the PPIFs were not purchasing troubled assets with their own funds, that would then be reimbursed by the government; they instead overwhelmingly used Treasury dollars to make their purchases.  Even if Litvak is correct in arguing that the Treasury was a mere "co-investor" in the PPIFs, Candella makes clear that the lack of a direct role in managing the PPIF investments does not void the Treasury's involvement in regulating, supervising, auditing, and funding the PPIFs.  Candella, 487 F.2d at 1227 ("[A] violation of § 1001 does not require that the false statement must actually have been submitted to a department or agency of the United States, but rather that it was contemplated that the statement was to be utilized in a matter which was within the jurisdiction of such department or agency."); see also Davis, 8 F. 3d at 929 ("[I]t is the mere existence of the federal agency's supervisory authority that is important to determining jurisdiction.").

The Sixth Circuit in Gibson provides a more explicit test for finding sufficient federal supervision of a private entity for section 1001 purposes, and the test is consistent with Candella's reasoning. In Gibson, the court held that, if "the private entity to which the false statement is made is required to make regular reports to a government agency and the agency retains ultimate authority to see that federal funds are properly spent," Lowe did not apply, and thus section 1001 jurisdiction existed. 881 F.2d at 323. The PPIFs clearly meet this test. They are statutorily required to regularly report details about their purchases of securities to Treasury. 12 U.S.C. § 5231(c)(1) (authorizing SIGTARP to supervise, among other things, the purchase, management and sale of assets by the Secretary of Treasury under PPIP); see also id. § 5231a(b)(1)(D) (requiring PPIF managers to retain all books, documents, and records relating to the fund, including emails), (b)(1)(H) (requiring PPIF managers to periodically identify investors holding at least 10 percent equity interest in the fund to the Treasury Secretary). The Sixth Circuit in Gibson suggests that an agency's "ultimate authority" to ensure the proper spending of funds includes "[p]rotecting itself against being wrongfully overcharged." 881 F.2d at 324. As Treasury provided the lion's share of funds to the PPIFs, it stood to lose the most from Litvak's alleged overcharging of the PPIFs. While Gibson does not specify what acts would qualify as such protection, it does note that the agency at issue in the case required the private company with which it contracted to submit to its audits and seek advance agency approval for any subcontracts exceeding $100,000; it also required that the private company's subcontractors agree to obey certain federal laws and regulations. Id. at 320. As discussed above, supra at 14, 16-17, and 19, Treasury imposed the same requirements on the PPIP and PPIFs.

Thus, because the Treasury's delegation of managerial and investment decisions to PPIF Managers does not render Litvak's alleged misstatements to the PPIF beyond the government's jurisdiction under section 1001, Litvak's Motion to Dismiss Counts Thirteen through Sixteen is denied.

## V.  CONCLUSION

For the aforementioned reasons, Litvak's Motion to Dismiss the Indictment (Doc. No. 52) is **DENIED.**


**SO ORDERED.**

Dated at New Haven, Connecticut this 21st day of October, 2013.


__/s/ Janet C. Hall _____
Janet C. Hall
United States District Judge