## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:13CR19 (JCH) |
| v. | |
| JESSE C. LITVAK | December 20, 2013 |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## JESSE C. LITVAK'S MOTIONS *IN LIMINE*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

    A.    Evidence of Mr. Litvak's Compensation at Jefferies Is Irrelevant and Unfairly Prejudicial, and the Government Has Failed to Demonstrate Otherwise ............................................................................................................. 1

    B.    References to Taxpayer Funds and Alleged Harm to Taxpayers Are Irrelevant, Speculative, and Unfairly Prejudicial ...................................................... 4

    C.    Evidence Pertaining to the 50 Additional Uncharged Acts Is Cumulative, Prejudicial, and the Court Should Direct the Government to Pare Down Its Rule 404(b) Notice ................................................................................................. 6

    D.    Several Inadmissible Exhibits Identified by the Government Should Be Excluded ............................................................................................................... 8

CONCLUSION ...................................................................................................................... 8

-ii-

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*United States v. Ferguson*,
   2007 WL 4240782 (D. Conn. Nov. 30, 2007) ............................................................................4

*United States v. Logan*,
   250 F.3d 350 (6th Cir. 2001) ......................................................................................................4

*United States v. Peters*,
   2013 WL 5540075 (2d Cir. Oct. 9, 2013)..................................................................................3

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006).......................................................................................................4

*United States v. Reed*,
   639 F.2d 896 (2d Cir. 1981).......................................................................................................4

*United States v. Stahl*,
   616 F.2d 30 (2d Cir. 1980).........................................................................................................4

*United States v. Stein*,
   521 F. Supp. 2d 266 (S.D.N.Y. 2007).......................................................................................7

## INTRODUCTION

Defendant Jesse C. Litvak respectfully submits this reply memorandum of law in further support of his motions *in limine* (i) to preclude the government from adducing any evidence concerning Mr. Litvak's compensation at Jefferies & Co., Inc.; (ii) to preclude the government from eliciting any evidence regarding the use of taxpayer funds in the United States Department of Treasury's Legacy Securities Public-Private Investment Program and any alleged harm to U.S. taxpayers; (iii) to appropriately limit the admission of evidence of approximately 50 uncharged RMBS trades; and (iv) to bar the admission of certain proposed government exhibits.

## ARGUMENT

**A. Evidence of Mr. Litvak's Compensation at Jefferies Is Irrelevant and Unfairly Prejudicial, and the Government Has Failed to Demonstrate Otherwise**

The government claims that Mr. Litvak's motion *in limine* to exclude evidence of his compensation at Jefferies is unfounded because such evidence is "highly probative of his motive to perpetrate his scheme." (Opp. Mem. at 1). However, rather than attempt to illustrate *how* Mr. Litvak's compensation was directly linked to his alleged motive to commit the charged crimes, and thus probative of his alleged motive, the government advances baseless and unsupported arguments that could just as easily be applied to *any* employee of *any* organization.[1]  For example, the government makes the bold assertion that "evidence of Litvak's compensation is relevant to show that what Litvak 'stood to lose' was his well-compensated position as an RMBS trader at Jefferies." (Opp. Mem. at 5). Having now reviewed the *Jencks* material produced by the government, this appears to be pure speculation. As far as we understand, there will be no evidence that Mr. Litvak's position was ever in jeopardy, even in 2011 when he experienced a

---

[1] In an unpersuasive attempt to illustrate that Mr. Litvak was somehow motivated by personal financial gain, the government inserts in its motion a partial conversation, with very limited context, between Mr. Litvak and another trader. (*See* Opp. Mem. at 3). This conversation, which, to the defense's knowledge, is not associated with any alleged fraudulent activity, is probative of nothing.

loss. To the contrary, the evidence will show that Mr. Litvak was incredibly well-liked and respected, both within Jefferies and amongst traders in the RMBS market at large. Furthermore, he received numerous accolades from Jefferies during his employment, including a position on a firm management committee made up of senior level executives.

The defense does not dispute the fact that it was part of Mr. Litvak's job to make money for Jefferies. In fact, during the Indictment period, Mr. Litvak made a substantial amount of money for Jefferies—approximately $58 million. The overwhelming majority of this $58 million is, however, not implicated by the trades charged in the Indictment. The allegedly unlawful profits, totaling approximately $2 million, were only a tiny fraction of the overall profit Mr. Litvak generated. Mr. Litvak did not profit personally from these allegedly unlawful profits, and they were certainly not enough to meaningfully increase Jefferies's bonus pool when compared to the enormous profits generated by Mr. Litvak and the other employees in his group.[2] Even Jefferies agrees that the amounts at issue would not have meaningfully impacted Mr. Litvak's bonuses. (*See* SIGTARP Mem. of Interview of Michael J. Sharp, General Counsel, Jefferies, Apr. 17, 2012 at 3) ("the trades in question would not have had a significant impact on [Mr. Litvak's] compensation package"). Mr. Litvak "work[ed] for the team," the team being Jefferies, and he unmistakably understood that Jefferies expected him to make money for "the team." *Id.* Making money for Jefferies—no matter how the government frames it—is simply not the same as making money for Jesse Litvak.

---

[2] In 2009, when Mr. Litvak generated approximately $40 million in profit, the amount of additional profit from what the government claims is fraud was just under $1 million. In 2010, the numbers are similar: Mr. Litvak generated about $36 million in profits, and the amount of alleged overcharges was slightly more than $1 million. This was certainly not enough to motivate someone with no criminal history to suddenly risk his career and his freedom to commit a crime.

Equally unavailing are the government's various calculations (Opp. Mem. at 3-4), which attempt to quantify, in a misleading and counterintuitive way, the portion of Mr. Litvak's compensation that was allegedly attributable to his "scheme."  For example, the government claims that "3% of the Litvak trading 'profits' were, in fact, the proceeds of his fraud," and thus $525,000, or three percent, of his total compensation during the relevant time period was earned fraudulently. (Opp. Mem. at 4).  This approach is flawed for the simple reason that Mr. Litvak's bonus, which represented the majority of his compensation, was completely discretionary and not directly tied to the amount of profits he generated for Jefferies. (Def. Mem. at 2).  If one applied the government's flawed logic that three percent, or $525,000, of Mr. Litvak's compensation was earned as a result of fraud, the obvious question becomes:  why would Mr. Litvak risk losing 97 percent of his compensation—$17 million—for a minute fraction of the profit allegedly earned through fraudulent means?  No rational person would—and that is precisely why the government's theory is illogical.  Even if Mr. Litvak's bonuses increased with the amount of profits he generated, there is no way to determine the direct effect of any individual transaction on Mr. Litvak's compensation.  In fact, the government concedes this point at the bottom of the very same page when it attempts to compute the profitability of individual trades in comparison to Mr. Litvak's total profits earned. (*See* Opp. Mem. at 4-5) ("it is impossible to determine what specific percentage of Litvak's 2010 compensation was due to any particular transaction").  Mr. Litvak's total compensation cannot be linked to his alleged motive to commit any of the crimes alleged in the Indictment, and none of the cases cited by the government demonstrate otherwise.[3]

---

[3] *See* Opp. Mem. at 2-3. Each case cited by the government involves a direct link between a defendant's financial position and his or her motive to engage in unlawful conduct—a direct link that simply is not present here. *United States v. Peters*, 2013 WL 5540075 at *4 (2d Cir. Oct. 9, 2013) (admitting some evidence of the defendant's personal wealth and lifestyle because it directly related to the defendant's

3

Not only is evidence of Mr. Litvak's compensation irrelevant, but such evidence is unfairly prejudicial. (Def. Mem. at 2-3). Persistent references to Mr. Litvak's wealth, shaded as an attempt to prove motive, cannot be cured by a limiting instruction. *See United States v. Stahl*, 616 F.2d 30, 31-33 (2d Cir. 1980) (finding curative jury instructions insufficient to prevent jury from drawing adverse inferences from the defendant's wealth or social status when the prosecutor persistently appealed to class prejudice). Permitting the jury to learn about Mr. Litvak's substantial discretionary bonuses will serve only to create confusion and unfair prejudice, while requiring a diversionary "mini-trial" on the compensation system at Jefferies, and the government should thus be precluded from offering such evidence at trial. *Stahl*, 616 F.2d at 31-33; *United States v. Ferguson*, 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007).

**B.    References to Taxpayer Funds and Alleged Harm to Taxpayers Are Irrelevant, Speculative, and Unfairly Prejudicial**

The government claims that use of the term "taxpayer" is not prejudicial because it "accurately describe[es] the source of funds at issue." (Opp. Mem. at 9). This blanket assertion is entirely speculative, and teasing out general references to "taxpayers" found in PPIP-related documents does not make the government's assertion true. The government attempts to legitimize the use of this unfairly prejudicial and irrelevant term by arguing that it may introduce evidence of Treasury's "creation, funding, and supervision of PPIFs" in order to demonstrate federal jurisdiction for the Section 1001 charge, and that in doing so, it will be necessary to

---

motive to commit bank fraud); *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (allowing evidence of compensation that was directly linked to the defendant's motive to obstruct justice); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981) (admitting evidence of mortgage arrears because the defendant's financial hardship was directly related to the defendant's motive to participate in a securities and wire fraud scheme); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (finding that the potential loss of business and income from the issuance of mortgage-backed securities was directly linked to the defendants' motive to conceal loan delinquencies from a government mortgage-backed securities program).

4

inform the jury that taxpayers were the source of Treasury's funds. (Opp. Mem. at 11-13). This is, of course, a complete non sequitur. Additionally, the government claims that since Mr. Litvak "has disputed that his fraud occurred 'in' TARP or PPIP," it plans to introduce evidence about the nature of those programs, including their purpose and function, in order to prove that Mr. Litvak's allegedly fraudulent transactions occurred in those programs, and that it would "make no sense to try to withhold from the jury that taxpayers are the source of Treasury's—and therefore the PPIFs'—money." (Opp. Mem. at 12-13). The government's arguments ignore the fact that it has no burden to prove that the funds at issue came from taxpayers or that taxpayers were in any way affected. The government can prove the nature of the TARP program, and the involvement of Treasury, without reference to taxpayers, and its presentation will in no way be diminished.

The government should not be permitted to appeal to the passion and prejudices of the jurors in order to prove facts that are not elements of the charged crimes. Furthermore, since it is not at all clear that any tax dollars were in fact used to fund Treasury's investments in the PPIFs, confusing the jury and wasting the Court's time with needless and irrelevant background information on the federal budget and the funding of certain government programs should be avoided. The government claims that it will not argue or imply that the jurors, as taxpayers, are victims of Mr. Litvak's alleged fraud. (Opp. Mem. at 13). This "assurance," however, does not change the fact that making repeated references to "taxpayer funds" in front of the jurors—each of whom will be a tax-paying citizen—would pose a very real risk of unfair prejudice to Mr. Litvak. This risk clearly outweighs any probative value (of which there is precisely none), and the Court should preclude the government from making such inflammatory references. The

5

government's case will in no way be prejudiced or limited if it is required to refer to the funds as "Treasury funds" rather than "taxpayer funds."

C. **Evidence Pertaining to the 50 Additional Uncharged Acts Is Cumulative, Prejudicial, and the Court Should Direct the Government to Pare Down Its Rule 404(b) Notice**

In its opposition memorandum, the government concedes that it listed in its Rule 404(b) notice dated November 1, 2013, *every* uncharged transaction or attempted transaction "which conceivably could be relevant to Litvak's scheme to defraud." (Opp. Mem. at 15). The government's bare-bones notice provided nothing more than a list of 50 alleged transactions or attempted transactions with no reference to the counterparties or any documents associated with the transactions, forcing the defense to wade through the hundreds of thousands of pages of documents produced by the government in an effort to locate relevant documents. The government refused the defense's request that it provide more specific information concerning these transactions. The government quotes the "caveat" contained in its Rule 404(b) notice to claim that it has never indicated that it will seek to introduce *all* of this evidence, and thus the premise of Mr. Litvak's motion to exclude such evidence is somehow flawed. (Opp. Mem. at 16-17). This argument entirely misses the point on trial preparation and manageability. Regardless of how many uncharged acts the government actually attempts to introduce at trial, the defense obviously must prepare for all 50 of the transactions as to which the government made the tactical decision to give notice. This is an enormous and burdensome undertaking that should be appropriately limited.

The government has also failed to show how proof of any the uncharged acts is, as it contends, actual evidence of the charged acts. There are twelve separate RMBS trades specifically identified in the Indictment: the trades referenced in Counts One through Eleven and a twelfth trade referenced in Count Sixteen. As the government well knows, the evidence that

6

could be offered to prove the charged offenses is limited to, in each instance, several Bloomberg chats or electronic messages that, with a few exceptions, typically occurred during a single day. Witnesses from the alleged victim entities appear not to add much regarding the alleged misconduct since, based upon review of the *Jencks* materials, there appears to be little actual recollection of the trades. While the government recites the right standard (Opp. Mem. at 15-16), it fails to articulate *how* any of these uncharged acts satisfy that standard. This evidence is not explanatory or background evidence necessary to tell the story of the crimes on trial; nor does any of it directly relate to charged trades. As the proponent of the purportedly relevant evidence, the government must meet its burden and show why a particular uncharged act tends to prove the elements of one of the charged offenses. *United States v. Stein*, 521 F. Supp. 2d 266, 270-71 (S.D.N.Y. 2007) (finding that the burden is on the government to demonstrate why the uncharged conduct is inextricably intertwined with the charged conduct and to explain why details of the uncharged conduct are necessary to understand the charged transactions). In particular, if the government truly believes that these additional uncharged acts prove the existence of a scheme, it should proffer *how* the additional acts advanced the alleged fraud with respect to the alleged victims of the charged offenses, and *how* the additional proof makes it more likely that Mr. Litvak's alleged misstatements were false or material, or that he acted with intent to defraud with respect to that charge.

Instead, the government argues that one or more of the permissible purposes listed in Federal Rule of Evidence 404(b) might justify the admission of this evidence. (Opp. Mem. at 17). The government is coy with respect to how much of this evidence it will actually seek to introduce, indicating that it never said it would offer it all, but not promising any reasonable limitation. Given the real risk that a disproportionate number of additional transactions will be

7

viewed as propensity evidence, coupled with the trial management and preparation issues, the Court should adopt Mr. Litvak's sensible suggestion to limit proof of uncharged transactions to 10 additional items.

### D.  Several Inadmissible Exhibits Identified by the Government Should Be Excluded

Given the limited number of proposed government exhibits at issue at this point, the defense respectfully suggests that the Court hear argument at the hearing on these motions, with the benefit of having the materials available for the Court's review.

## CONCLUSION

For the reasons set forth above, Mr. Litvak respectfully requests that the Court grant his motions *in limine* (i) to preclude the government from adducing any evidence concerning Mr. Litvak's compensation at Jefferies & Co., Inc.; (ii) to preclude the government from eliciting any evidence regarding the use of taxpayer funds in the United States Department of Treasury's Legacy Securities Public-Private Investment Program and any alleged harm to U.S. taxpayers; (iii) to appropriately limit the admission of evidence of approximately 50 uncharged RMBS trades; and (iv) to bar the admission of certain proposed government exhibits.  Mr. Litvak respectfully reserves his right to object to the admissibility of any proffered evidence at trial.

Respectfully submitted,

**THE DEFENDANT,
JESSE C. LITVAK**

By:   /s/ Ross H. Garber
    Ross H. Garber (ct17689)
    Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT 06103
    Telephone: 860-251-5901
    Fax: 860-251-5219
    Email:  rgarber@goodwin.com

    Patrick J. Smith (admitted *pro hac vice*)
    Sarah B. Zimmer (admitted *pro hac vice*)
    DLA Piper LLP (US)
    1251 Avenue of the Americas, 27th Floor
    New York, New York 10020
    Tel.: (212) 335-4500
    Fax: (212) 884-8509
    Email:  patrick.smith@dlapiper.com
    Email:  sarah.zimmer@dlapiper.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                    /s/ Ross H. Garber
                                                     Ross H. Garber