IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JESSE C. LITVAK | No. 3:13CR19 (JCH)<br><br><br><br>December 24, 2013 |

### JESSE C. LITVAK'S NOTICE OF ADDITIONAL *BRADY* AND DISCOVERY VIOLATIONS

Defendant Jesse C. Litvak files this notice to supplement his Motion to Compel Disclosure and for Sanctions that was filed on December 14, 2013 [Doc. # 111], and to advise the Court immediately of newly discovered *Brady* and discovery violations that have been revealed in connection with voluminous materials received by the defense on December 17, 2013.[1]

Among other things, Mr. Litvak's Motion to Compel Discovery filed on September 23, 2013 [Doc. # 65], requested both *Brady* and Rule 16 material in the government's possession, and argued that the "government" should be defined to include SIGTARP, the investigative arm of the government prosecution team. At the November 4, 2013, hearing on Mr. Litvak's Motion to Compel Discovery, the government indicated that more than "1.3 million" pages of material concerning the PPIP program was in SIGTARP's possession. (Mot. Comp. Tr. at 40:19-41:1). At the November 4th hearing, the government promised to produce these materials to the defense. (*Id.*). More than six weeks later, on December 17, 2013, after repeated inquiries by the defense, the defense received a hard drive from the government containing the requested

---

[1] In addition to the materials received on December 17th, just yesterday the government produced documents subject to the Protective Order entered by the Court on December 20, 2013. These documents are exculpatory in nature and have been in the government's possession since August 26, 2013.

documents. These documents were processed and uploaded to the defense's document management system by December 20, 2013, at which time the defense began to search the production for relevant material. During that initial review, the defense discovered that of the 2,867 documents produced, 1,200 were unreadable, or in an unrecognizable format.[2] Among the 1,667 documents that were accessible, the defense has in short order uncovered documents that are plainly exculpatory and highly material to preparing the defense. This newly disclosed evidence further demonstrates the government's continued and blatant violations of its *Brady* and Rule 16 discovery obligations. Despite devoting considerable resources to reviewing the documents over the weekend, given the sheer number of documents produced, the defense has not completed a thorough review of the entire universe of SIGTARP documents. Nevertheless, in light of his pending Motion to Compel Disclosure and for Sanctions, Mr. Litvak is disclosing immediately to the Court four examples of documents belatedly produced by the government on December 17th that contain evidence that is both exculpatory and material to the preparation of the defense.

First, the defense uncovered a quarterly report from Wellington Management Legacy Securities PPIF Master Fund, LP ("Wellington"), dated December 31, 2009, which contains information that is both exculpatory and material to the preparation of the defense regarding Counts Five, Twelve, and Fifteen, described in paragraphs 49 to 54 of the Indictment. (*See*

---

[2] On December 20, 2013, the defense notified the government that a significant portion of the documents were unreviewable due to the format in which they were produced. Specifically, we notified the government that two file types—txt and xml—comprising approximately 41 percent of the production and more than one million pages were problematic. On December 23, 2013, defense counsel sent the government a detailed list, containing Bates ranges, of the problematic documents. The government responded that it has no obligation to further process these documents "simply for the convenience of the defense" and that it "has no other version of these documents to produce to [the defense]." E-mail from Jonathan Francis, Ass't United States Attorney, to Sarah Zimmer (Dec. 23, 2013). Accordingly, in order to properly review the documents, the defense is manually converting more than 1,200 documents into a "readable" format.

SIGTARP_AUDIT_531694-531714.)  Those counts involve the December 23, 2009, sale to Wellington of the Wells Fargo Bond, WFMBS 2006-AR12 1A1, at a price of $76.  This document contains highly relevant valuations of the Wells Fargo bond from Wellington's pricing service, IDC, showing that Wellington's valuations of the bond both before and after the trade at issue were materially higher than $76.  Here is what this document fairly shows:  at the end of November 2009, Wellington (based upon IDC's price), "marked," or valued, the bond at $77.33.  The December 2009 month-end mark is even higher, at $78.16.  On December 23, 2009, Mr. Litvak sold Wellington the bond for $76, which was more than one full point below the market level at the beginning of the month and more than two full points below the market level at the end of the month.  This shows that during the entire month of December, the Wells Fargo bond was valued significantly higher than the price offered by Mr. Litvak.  Despite all of the allegations in the Indictment concerning fraud, the bottom line is this:  Mr. Litvak offered the bond to Wellington at a price significantly below the fair market value, which undermines the government's theory that Mr. Litvak's sales tactics frustrated the alleged victim's ability to get best execution. (Ind. ¶¶ 47-54).

In addition to the exculpatory pricing information—which has been in SIGTARP's possession since before the Indictment was returned—this document contains relevant real-time market analysis entitled "Current Market Conditions."  (*See* SIGTARP_AUDIT_531696).  Included in this commentary are two observations made by Wellington:  "RMBS rallied in price during [December 2009]," which helps to explain the profit that Jefferies made during the period it held the bond in inventory; and "bid ask spreads remain wide at 1 to 2 points and volatility is high," which supports the defense's contention that transaction costs are higher in a market with poor liquidity conditions and that institutional investors were indifferent to minor variances in

price within the bid-ask spread. As the Court may recall, the defense articulated these very same points in its motion to dismiss [Doc. # 53 at 33-34], and Wellington's report corroborates this defense theory.

A similar report dated June 30, 2011, from the AllianceBernstein Legacy Securities Master Fund, L.P. ("AllianceBernstein"), the alleged victim of three transactions, described in six counts of the Indictment, demonstrates that for the bond charged in Counts Three and Twelve—HVMLT 2007-7 2A1A—AllianceBernstein valued its entire position on this bond more than a point *higher* than the price it paid to Jefferies on June 22, 2011, only eight days before this report was generated. (SIGTARP_AUDIT_219504-219533, at 219504). Here too, this evidence is not only material to the defense but it is also exculpatory because it undermines the government's allegation that AllianceBernstein overpaid for the bond it purchased from Jefferies. (Ind. ¶ 58).

A similar report from Invesco Legacy Securities Master Fund, L.P. ("Invesco"), dated June 30, 2010, contains information that is both exculpatory and material to the preparation of the defense regarding Count Sixteen (paragraph 60) of the Indictment. (*See* SIGTARP_AUDIT_567877-567903). Commentary on the Non-Agency RMBS sector states that Invesco believes "that the deep demand and finite supply in the Non-Agency RMBS space will continue to push valuations higher over time" and that Invesco "will continue to identify and acquire securities that are priced at or below appropriate levels as dictated by [Invesco's] investment process." (SIGTARP_AUDIT_567879). Invesco purchased the FHASI 07-AR1 1A1 bond from Jefferies on June 24, 2010, at $80. At the end of the month, Invesco valued its entire position of the bond, which included prior purchases, at 80.39606, reflecting an overall net gain of 18.3 percent. (*See* SIGTARP_AUDIT_567886; SIGTARP_AUDIT_567894). These figures

further support the defense's position that Invesco paid fair market value for the bond when it purchased it from Jefferies at $80.

Two additional examples of documents containing exculpatory and material evidence were discovered in BlackRock PPIP, L.P.'s ("BlackRock") Management Discussion and Analysis reports dated October 31, 2009, and November 30, 2009.  (*See* SIGTARP_AUDIT_12582-12589; SIGTARP_AUDIT_12557-12565).  In a section entitled "Non-Agency RMBS Market Commentary, Positioning & Outlook" in the October 2009 report, BlackRock made the following observation:  "Unlevered yields on recent purchases range from 8% on the low end of expectations to 12% on the high end." (SIGTARP_AUDIT_12585).  A four percent range in yields for these assets necessarily implies a significant range in fair market value prices.  Additionally, in BlackRock's November 2009 report, BlackRock states that "[g]oing forward, the market feels range-bound with fast-money selling roughly 10% above the market and buying roughly 5% below." (SIGTARP_AUDIT_12592).  To put it another way, if a bond is valued around $60, BlackRock is expressing its opinion that "fast money," or hedge funds, wish to sell the bond at or around $66 or buy it at or around $57—a nine point wide bid-offer spread.  This commentary supports the defense's position that in a market this wide, Mr. Litvak's alleged misrepresentations were simply too small to have been material to the counterparties with whom he traded.  The recently disclosed materials are not mere evidentiary detail or minor points.  They go to core issues in this case.  The imperative of locating all such examples in the enormous haystack the government has just produced cannot be overstated.

Mr. Litvak requests the same relief sought in his Motion to Compel Disclosure and for Sanctions that was filed on December 14, 2013 [Doc. # 111].  In addition, for the foregoing reasons, and as set forth in a separate motion filed today, we are compelled to seek a continuance

of the trial date to permit the defense time to complete its review of the voluminous additional materials first produced by the government on December 17, 2013.  Reviewing with care over a million pages of highly relevant materials is a gargantuan task, but it is one that is absolutely necessary to mount a proper defense.  While we have devoted quite significant resources to reviewing the documents we just received, while juggling the many other crucial trial preparation tasks, we have only scratched the surface of the documents we can review.  As noted above, the defense is manually converting more than one million pages into a usable format due to technical issues with the files produced by the government.  Reviewing those additional pages once they are rendered comprehensible, while continuing to read and analyze the portion of this latest belated production that we can already access, will obviously consume enormous resources and take significant time.  We plan to bring to the Court's attention additional exculpatory material as we can glean it from this large tranche of documents.

Respectfully submitted,

**THE DEFENDANT,
JESSE C. LITVAK**

By: /s/ Ross H. Garber
    Ross H. Garber (ct17689)
    SHIPMAN & GOODWIN LLP
    1 Constitution Plaza
    Hartford, Connecticut 06103
    Tel: (860) 251-5000
    Fax: (860) 251-5099
    Email: rgarber@goodwin.com

    Patrick J. Smith (admitted *pro hac vice*)
    Sarah B. Zimmer (admitted *pro hac vice*)
    DLA Piper LLP (US)
    1251 Avenue of the Americas, 27th Floor
    New York, New York 10020
    Tel.: (212) 335-4500
    Fax: (212) 884-8509
    Email: patrick.smith@dlapiper.com
           sarah.zimmer@dlapiper.com

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

      /s/ Ross H. Garber
      Ross H. Garber