UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | January 6, 2014 |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL DISCLOSURE AND FOR SANCTIONS**

Defendant Jesse C. Litvak has filed a motion [Dkt. #110, 12/14/13], a supporting memorandum (hereinafter "Litvak Mem.") [Dkt. #111, 12/14/13] and an additional notice (hereinafter "Litvak Notice") [Dkt. #130, 12/24/13], which baselessly claim that the Government has engaged in "bad faith" and "egregious conduct" by disclosing purported-*Brady* material months before trial. The defendant's filing is only the most recent baseless accusation of misconduct by the defense in this case. As with Litvak's prior similar motions, the Court should deny Litvak's motion in its entirety.

**I.  INTRODUCTION**

Notwithstanding their length, the defense's papers raise only two new issues:

- Whether the Government's disclosure on November 15, 2013—the date on which the Government agreed to produce *Jencks* material three months before trial under the Scheduling Order—of 163 pages of inculpatory grand jury transcripts was a discovery violation (*see* Litvak Mem. at 9-13); and

- Whether the Government's voluntary production on December 16, 2013—six weeks after the defense's request and two months before trial—of over one million pages of inculpatory historical data collected by SIGTARP's Audit Division from Public-Private Investment Funds ("PPIFs") over the course of the Legacy Securities Public-Private Investment Program ("PPIP") was a discovery violation (*see* Litvak Notice).

The bulk of Litvak's 27-page memorandum is spent in a lengthy restatement of his previous unfounded accusations of discovery violations by the Government (Litvak Mem. at 3-9),[1] pages of quotations from the Standing Order, Rule 16 and the United States Attorney's Manual (*id.* at 14-18) and a perspective from the defense bar on the *Stevens* case and the Department of Justice's discovery policy (*id.* at 18-20). Indeed, Litvak's motion is such a generic attack on the Government's lawyers that his 28-page memorandum tracks—and in some respects directly copies—a 28-page memorandum filed more than a year ago by one of Litvak's attorneys in another case before this Court. *See* Memorandum of Law in Support of William A. Trudeau's Motion to Compel Disclosure and for Sanctions in *United States v. Trudeau*, 3:10CR234(JCH) [Dkt. #133-1, 8/31/12].

In this case, even innocuous conduct by the Government is cast by the defense as a constitutional violation. For instance, the defense has attempted to twist the voluntary production of a huge amount of documents from SIGTARP Audit Division documents—which only entered into the possession, custody, or control of the prosecution team because the defense accepted the Government's offer to collect them, in open court—into an act of bad faith requiring sanctions against the Government or a continuance of the trial date (which the Court properly denied on December 20, 2013). The Court should not countenance these sorts of baseless defense tactics.

## II. BACKGROUND

### A. Litvak's Prior Meritless Claims Claiming Government Misconduct

This motion represents the most recent spurious attempt by the defense to portray the Government as having engaged in misconduct.

---

[1] The Court should reject any tacit attempt by the defense to seek reconsideration of prior decisions on fully-briefed and argued motions.

First, in July, the defense accused the Government of committing a constitutional violation by coercing his former employer, Jefferies & Co., Inc. ("Jefferies"), not to advance Litvak's legal fees [Dkt. #50, 7/12/13]. In August, in its reply in support of that motion, the defense accused the Government's counsel of failing to review the files of the prosecution team for *Brady* materials [Dkt. #55, 8/16/13]. In September, the defense accused Government's counsel of violating the Court's Standing Order, Rule 16 and the Constitution by not searching the files of the Department of the Treasury ("Treasury") and of the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") for materials of potential interest to the defense [Dkt. #65, 9/23/13]. And in October, in its reply in support of that motion, the defense accused the Government's counsel of committing another *Brady* violation by producing interview reports more than four months before trial [Dkt. #83, 10/28/13].[2]

The Court has found every defense motion alleging governmental misconduct to be meritless [Dkt. #64, 9/17/13; Dkt. #69, 10/2/13; Dkt. #86, 11/4/13].

### B.     The Government's Production of Grand Jury Transcripts

On November 15, 2013, in compliance with the Court's Scheduling Order [Dkt. #81, 10/24/13], the Government produced 398 pages of grand jury transcripts as potential *Jencks*

---

[2] As counsel represented during the November 4, 2013 motion hearing, the Government reviewed these interview reports and determined that they did not contain *Brady* material because the statements therein are not "favorable" to the defense and are not "material either to guilt or punishment." In its October 28 filing, and again in its December 14 memorandum, the defense highlighted out-of-context excerpts from the interviews of four PPIF Managers' employees. The first was a "portfolio manager," who made clear that he did not execute trades or communicate with broker-dealers, including Litvak. All four employees' statements were made in the context of explaining the evaluation of bond fundamentals which leads to a PPIF's decision to pursue a trade, which (as discussed below) is factually distinct from the execution of the trade and is not affected by misrepresentations regarding the transaction price. Since the interview reports do not contain *Brady* material, the Government was not required to disclose them within 14 days of arraignment under paragraph (A)(10) of the Standing Order. In any event, the Government chose to disclose these documents four and half months before trial and six weeks before the Scheduling Order's deadline for production of *Jencks* and *Giglio* materials.

material. Of that total, 163 pages consisted of the testimony of three employees of PPIF Managers. (These grand jury transcripts will be submitted *in camera* for the Court's review.) One month later, Litvak filed this motion, citing five excerpts from these transcripts as supporting his arguments that his misrepresentations were not material, that he had no scheme to defraud and that he lacked the intent to defraud (Litvak Mem. at 9-10).

### C. The Government's Voluntary Collection of Documents at the Defense's Request

On August 7, 2013, in response to the defense's footnote assertion that certain SIGTARP documents—other than those in the already-disclosed investigating case agents' files—arguably bear on Treasury's jurisdiction over Litvak's alleged false statements in violation of § 1001, the Government affirmatively sought clarification: "[T]he Government would like to try to accommodate your request, to the extent reasonably possible. To that end, please formulate a specific request to which the Government may respond." Ex. 4 to Litvak's Sept. 23, 2013 Memorandum [Dkt. #65-2 at 26 of 54]. In response, the defense indicated that it was interested in, *inter alia*, documents sent by the PPIFs to Treasury or SIGTARP. Ex. 5 to Litvak's Sept. 23, 2013 Memorandum [Dkt. #65-2 at 29-30 of 54].

During the November 4, 2013 hearing, after defense counsel argued to the Court that it needed to send overbroad pre-trial subpoenas to Litvak's victims to obtain transactional information for its experts, Government's counsel informed the Court that the Government had investigated and learned that SIGTARP's Audit Division had collected over one million pages of documents from PPIFs or their custodian bank during the history of PPIP. Although not required to do so by *Brady*, Rule 16 or the Standing Order, the Government voluntarily offered to collect these documents from the Audit Division for production, and the defense accepted. Transcript of Proceedings Held on September 23, 2013 [Dkt. #68] at 40-41.

The Government immediately began collecting these documents from the Audit Division's files. In doing so, the Government found that approximately 900 of the documents had been encrypted by the submitting PPIF. This meant that the Government had to manually input the password for each document. Moreover, once collected, the entire production needed to be processed to meet the production specifications requested by the defense. On December 16, 2013, the Government produced over one million pages from the Audit Division's files.

Eight days later, on December 24, 2013, the defense filed its Notice and a Motion to Continue the Trial [Dkt. #131], arguing that the Government's voluntary collection and production of documents from outside the prosecution team was a *Brady* violation meriting sanctions and a continuance of the trial.

## III. ARGUMENT

The Government's relevant discovery obligations are established by *Brady v. Maryland*, 373 U.S. 83 (1963), Federal Rule of Criminal Procedure 16, Local Rule of Criminal Procedure 16 and the Standing Order.

The Standing Order calls for production of "[a]ll information known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963)." Standing Order ¶ (A)(11). The Government's *Brady* obligation "extends only to material evidence . . . that is known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). A prosecutor is presumed: (1) to know all information gathered by his office in connection with an investigation of the case, *Avellino*, 136 F.3d at 255, and (2) to constructively know of "evidence in the hands of investigators, who are part of the 'prosecution team.'" *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002). However, "the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [the court] to adopt

'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255 (citation omitted).

The Standing Order also closely tracks Rule 16, which requires production of documents that are "within the possession, custody or control of the government, and which are material to the preparation of the defense." Standing Order ¶ (A)(5); Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring disclosure of any item "within the government's possession, custody, or control [if] the item is material to preparing the defense"). As with *Brady*, Rule 16 requires disclosure of only those materials in the possession, custody, or control of the prosecution team.[3]

In sum, the Government is obligated to disclose only that information or evidence which is both (i) within the prosecution team's possession, custody, or control and (ii) exculpatory, impeaching, or material to preparing the defense.

---

[3] *See United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) ("[T]he Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases."); *United States v. Finnerty*, 411 F. Supp. 2d 428, 432 (S.D.N.Y. 2006) ("Courts have typically required the prosecution to disclose under Rule 16 documents material to the defense that (1) it has actually reviewed, or (2) are in the possession, custody, or control of a government agency so closely aligned with the prosecution so as to be considered part of the prosecution team."); *United States v. Giffen*, 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004) (holding, under Rule 16, "[t]he prosecutor need not, however, produce documents from agencies that did not participate in the investigation of the defendant or documents of which it is unaware."); *United States v. Holihan,* 236 F. Supp. 2d 255, 260-61 (W.D.N.Y. 2002) (finding courts "have construed the term 'government' in [Rule 16] narrowly to mean the prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the 'government' in general."); *United States v. Volpe,* 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) (holding United States Attorney's office not required by Rule 16 to disclose information from separate investigation in same office because two prosecution teams not involved in joint investigation, and so prosecution did not have access to requested material); *United States v. Upton*, 856 F. Supp. 727, 749–50 (E.D.N.Y. 1994) (holding government not required to produce material from agency outside United States Attorney's office by Rule 16 where no "joint investigation"); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219–20 (S.D.N.Y. 1987) (denying defendants' Rule 16 request for grand jury minutes from district attorney's investigation that played no role in federal prosecution, absent joint investigation between United States Attorney and District Attorney).

A.   **Grand Jury Transcripts**

The defense misleads the Court by selectively quoting from the grand jury testimony of three PPIF Managers' employees without providing the context to reveal that testimony is unrelated to Litvak's alleged crimes.  Litvak Mem. at 10-13.

The three PPIF Manager witnesses testified before the grand jury about the difference between evaluating a RMBS bond's characteristics (or its "fundamentals") versus executing a trade at the best possible price.

Each of the snippets of testimony that the defense claims are *Brady* material concerns the former.  Yet it is *undisputed* that Litvak had no role in his victims' evaluation of the fundamentals of the RMBS bonds that they purchased from or sold to him, and that—as a broker-dealer—his charged conduct occurred in the execution of trades.  Thus, these witnesses' testimony about evaluation of fundamentals is neither exculpatory nor material to Litvak's guilt or sentencing.

1.   **RMBS Fundamentals**

The fundamentals of a RMBS bond are its immutable characteristics that classify it among the different types of RMBS and distinguish it from the many different RMBS bonds traded in the market; these characteristics include the types of mortgages in the pool securitized by the RMBS bond, the location of the mortgaged properties and the issuer of the RMBS.

Thus, a broker-dealer who misrepresents the fundamentals of a RMBS bond to a purchasing customer would be like a real estate agent who misrepresents the number of bedrooms in a house to an out-of-state home buyer; in both instances, the deception would be exposed as soon as the victim observes the obvious difference between what was represented and what was delivered.

The fundamentals of the RMBS bonds that Litvak bought from and sold to his victims are not in dispute. A selling victim could hardly be defrauded into thinking they were selling a different RMBS bond than the one it intended to part with, and there is no allegation in the Indictment that any of Litvak's buying victims received a different RMBS bond than the one they intended to purchase.

Professional RMBS investors—like the PPIF Managers who employed these witnesses—perform an evaluation of whether it is in the best interest of their clients, to whom they owe fiduciary duties, to pursue a transaction in a bond at a particular time.

The ability to make accurate evaluations of this nature is one of the reasons clients are willing to pay a professional to make investment decisions on their behalf. To continue the real estate analogy, a professional RMBS investor's evaluation of whether to pursue a transaction in a particular type of RMBS is like a home buyer deciding whether a three-bedroom in Branford or a four-bedroom in East Haven is a better investment. Neither party disputes that Litvak's victims used their professional judgment to evaluate the RMBS market and on that basis decided to pursue transactions in the RMBS bonds that Litvak specialized in trading. *See* Litvak's Omnibus Opposition to Government Motions in Limine [Dkt. #109, 12/13/13] at 10 ("The defense has no knowledge of any evidence that these individuals [*i.e.*, Litvak's victims] failed to comply with professional standards or fiduciary obligations, and at this time, has no plans to advance any such arguments at trial"). Professional investors do not pursue securities trades in a market sector unless they believe there is the potential to make money for their customers.

If a professional investor decides to pursue a trade in a certain type of RMBS, it performs its own analysis as to the range of prices where it would be willing to complete a trade.

This is the equivalent of the real estate shopper analyzing such criteria as the mortgage she thinks she can qualify for, the down payment she expects to make and the property taxes she expects to pay in order to calculate the maximum amount of money she can afford to spend on a house.  There is no dispute that Litvak's victims thought that they were getting a good deal by trading RMBS bonds at the prices offered by Litvak; professional investors do not buy or sell RMBS bonds unless they believe that their fiduciary customers stand to profit.

Broker-dealers play no role in a professional investor's evaluation of an RMBS bond's fundamentals.

Similarly, the accuracy of a real estate broker's statements about the seller's position in price negotiations over a particular house has no effect on the buyer's assessment of her maximum budget.  There is no dispute in this case that Litvak's role in the RMBS market as a broker-dealer was limited to trade execution, and thus he had no role in his victims' proprietary evaluation of bond fundamentals.  As defense counsel put it in arguing Litvak's motion to dismiss, "I think the price information, [o]f the alleged misrepresentation is external to the attributes of the bond."  Transcript of Proceedings Held on September 23, 2013 [Dkt. #68] at 8.

Thus, neither the fundamentals of the RMBS bonds traded by Litvak nor his victims'

evaluation of those fundamentals are at issue in the Government's case against Litvak.

        **2.**       **Trade Execution**

Trade execution, which takes place after their fundamental analysis is complete, is simply the process of negotiating a price and finalizing a transaction.

Every professional investor's goal is to achieve best execution, which includes purchasing at the lowest price available in the market and selling at the highest price available in the market.

The role of a broker-dealer is limited to trade execution, although a broker-dealer's conduct can determine whether their customers achieve best execution on their trades.

Thus, in contrast to evaluating bond fundamentals, Litvak's role in executing trades by using misrepresentations regarding price is at the heart of the Government's case.

\*     \*     \*

[4] The defense had the complete grand jury transcripts and thus was aware, yet still chose to use, misleading excerpts when it filed its motion. The witnesses' actual testimony makes clear that the passages quoted by the defense are neither exculpatory nor material to Litvak's guilt or sentencing. Indeed, these witnesses' testimony is extremely inculpatory. Moreover, their testimony demonstrates the

---

[4] The defense has also misstated the law with respect to Count Twelve,

. Litvak Mem. at 13. Contrary to the defense's assertion that TARP fraud "requires a showing that Mr. Litvak had the intent to defraud the United States," the statute has an alternative prong under which the Government brought its § 1031 charge. Section 1031(a)(1) requires a showing that Litvak had "the intent to defraud the United States," whereas (a)(2) merely requires that Litvak had "the intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises." The Government is proceeding at trial under the second prong of § 1031. *See* Government's Memorandum in Opposition to Litvak's Motion to Dismiss [Dkt. 61, 9/9/13] at 9, 25 (setting forth statutory elements and quoting § 1031 only with respect to § 1031(a)(2)). Since intent to defraud the United States is not an element of any of the charges, the Government has no obligation to disclose

irrelevance of the defense's repeated arguments about the "fair value price" of the charged trades and its purported expert testimony regarding the historical price of bonds in the market. Litvak is charged with lying about prices—causing his victims to pay too much to buy bonds or make too little when they sold bonds—in order to generate extra and unearned compensation for the benefit of Jefferies and himself; his victims' evaluation of bond fundamentals or the RMBS market are simply not part of the charged conduct.

### B. DOCUMENTS FROM SIGTARP'S AUDIT DIVISION

After full briefing and argument, the Court denied Litvak's prior motion claiming that the Government was required under *Brady*, Rule 16, or the Standing Order to review and produce documents from the files of Treasury or SIGTARP's non-law enforcement divisions, including its Audit Division [Dkt. #86, 11/4/13]. That decision is law of the case and should not be disturbed absent a compelling showing why the Court should revisit, much less depart from, its November 4 ruling that these documents were not within the possession of the "prosecution team," and thus not part of the Government's *Brady* or Rule 16 obligations. *See El Badrawi v. United States*, 787 F. Supp. 2d 204, 215-16 (D. Conn. 2011).

Here, Litvak's Notice merely asserts that certain information—in the more than one million pages voluntarily collected and produced by the Government from SIGTARP's Audit Division—is exculpatory and material. That is not true. At best, the defense has merely identified additional evidence showing that the PPIF victims' fundamental analysis led to the conclusion that it was in the best interest of their investors to trade certain RMBS bonds with Litvak. It is not disputed, and should come as no surprise to the defense, that the PPIFs thought they were getting good deals when they completed trades with Litvak; if they thought they were getting bad deals, they would not have done those transactions. Thus, documents showing that PPIF Managers, or even third party pricing services, valued a particular RMBS bond at a price

above what a PPIF paid Litvak for it are neither exculpatory nor material to the question of whether he committed fraud and made false statements in the execution of that trade.

But even if these documents were exculpatory and material (which they are not), the defense's argument misses the critical fact that these documents were only in the possession, custody, or control of the prosecution team because the Government, at the defense's request, collected them from SIGTARP's Audit Division. The Government offered to seek document outside of the possession, custody, or control of the prosecution team if the defense could specify what it was looking for; in doing so, the Government did not permanently expand its own discovery obligations. According to the defense's logic, by virtue of its voluntary production, the Government is now obligated to disclose every document generated or collected by SIGTARP regarding Treasury's creation of PPIP, evaluation and selection of Public-Private Investment Fund ("PPIF") Managers, negotiation and execution of legal agreements regarding the PPIFs, supervision of PPIP, receipt of regular reports from PPIFs and monitoring of PPIFs' trading, as well as documents concerning any SIGTARP audits or evaluations of Treasury's conduct with respect to PPIP. As a practical matter, the Government would be hard-pressed to satisfy such expansive discovery obligations prior to trial, and there is no basis for requiring the Government to conduct such an undertaking. The defense's "gotcha" claim should be rejected.

## **CONCLUSION**

The Government has met and exceeded its discovery obligations in this case . Litvak's motion should be denied in its entirety.

                                      Respectfully submitted,

                                      DEIRDRE M. DALY
                                      UNITED STATES ATTORNEY

                                      /s/
                                      JONATHAN N. FRANCIS
                                      ASSISTANT UNITED STATES ATTORNEY
                                      Federal Bar No. phv05083
                                      jonathan.francis@usdoj.gov

                                      ERIC J. GLOVER
                                      ASSISTANT UNITED STATES ATTORNEY
                                      Federal Bar No. CT23923
                                      eric.glover@usdoj.gov

                                      157 Church Street, 25th Floor
                                      New Haven, CT  06510
                                      Tel.: (203) 821-3700

## **CERTIFICATE OF SERVICE**

      I hereby certify that on January 6, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                                               /s/
                                        JONATHAN N. FRANCIS
                                        ASSISTANT UNITED STATES ATTORNEY