UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:13CR19(JCH) |
| | : | |
| v. | : | |
| | : | |
| JESSE C. LITVAK | : | January 28, 2014 |

**GOVERNMENT'S REPLY MEMORANDUM TO DEFENDANT'S
MEMORANDUM IN OPPOSITION TO GOVERNMENT'S
MOTIONTO PRECLUDE DEFENDANT'S EXPERTS**

**I.   DEFENDANT'S EXPERT DISCLOSURES WERE LATE AND THEIR EXPERT
TESTIMONY SHOULD BE PRECLUDED.**

Recognizing the extraordinary lateness of their December 24 expert disclosure, the

defendant tries mightily to justify his deficient November 8, 2013 expert notice.  *See* Mem. in

Opp. at 2 (the "November 8, 2013, Rule 16 notice . . . complied with Rule 16") [Doc. 164,

1/24/14].  But this Court has already ruled that the November 8 disclosure was deficient:  "The

disclosure made by defendant did not satisfy Rule 16(b)(1)(C) of the Federal Rules of Criminal

Procedure."  Order Denying Defendant's Motion for Extension of Time to Amend Expert

Disclosure [Doc. #118, 12/17/13].  Indeed, in finding the November 8 disclosure deficient, the

Court noted that, at the time of its Order, the "disclosures were due almost forty days ago."  *Id.*;

*see* Order (granting defendant's request for an extension from October 17 to November 8, 2013)

[Doc. #81, 10/24/13].

Simply put, Litvak's expert disclosures are extremely late and have already prejudiced

the Government in having to litigate issues that should be litigated much earlier in a case that

was indicted in January 2013.  Likewise, the Government should not have to prepare for a

*Daubert* hearing that may occur as close to two weeks from trial.  This was easily avoided if the

defendants had simply made complete disclosures on November 8, rather than try to game their

Rule 16 obligations by seeing how little they could disclose about their experts' testimony. Indeed, as set forth below, their disclosures remain inadequate to this day.

## II. WILLNER'S EXPERT TESTIMONY SHOULD BE PRECLUDED, AND AT THE VERY LEAST LIMITED.

### A. RMBS Analysis and Trading

As to Willner's testimony about the process a fund manager undertakes to select, analyze and value a particular bond that the fund wants to purchase or sell, the Government has no doubt that by the time defense counsel is through cross-examining the Government's witnesses on this topic, additional testimony by their expert will be confusing and a waste of time. The defense has conceded that the reasonableness of the victims and their investment managers is simply not a disputed fact in this case, and thus the jury does not need an expert to repeat what percipient witnesses will already have testified about. *United States v. Kim*, 303 F. Supp.2d 150, 158 (D. Conn. 2004) (EBB) ("A trial court has the discretion over whether or not an expert witness will be helpful to the jury.") (citing *United States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993)).

### B. Fair Market Value

The defense concedes that they may not ask Willner to opine directly on whether Litvak's misrepresentations were material under the circumstances, yet that is precisely what their expert disclosure proposed he would do. Mem. in. Opp. at 13 n.2.

The remainder of Willner's testimony—essentially, that the prices the victim-investors paid for the bonds at issue "were within the range of fair value"—is irrelevant to the charges in the Indictment and thus should be excluded under Rule 702. Litvak simply has no response to the law: there is no safe harbor under the federal securities laws for fraudulent transactions that were executed at market prices. *See* 3 Sand, Instruction 57-21 (setting forth elements of

securities fraud); Government's Proposed Jury Instructions, at 19-21 [Doc. #92, 11/15/13].

Litvak is charged with lying about prices—causing his victims to pay too much to buy bonds or

make too little when they sold bonds—in order to generate undisclosed and unearned

compensation for the benefit of Jefferies and himself.  The defense's proposed expert testimony

about the "fair value price" of bonds based on historical prices in the market is utterly irrelevant

to that charged conduct.

### C.  Rate of Return and Net Profits

Willner's proposed testimony about his "analysis of rate of return and net profits" of

victims has nothing to do with Litvak's offense conduct and should be precluded.[1]  Willner's

testimony concerns the market performance of bonds after Litvak used misrepresentations to

execute trades with his victims.  Litvak is wrong when he speculates that the Government will

seek to present evidence about the post-fraud profitability of the bonds at issue.  Mem. in Opp. at

16.  Whether a victim's investment in a bond did or did not make money following a fraudulent

transaction is utterly irrelevant here, and testimony on the subject should be precluded under

Rule 401.  Moreover, purportedly expert testimony on the subject would be confusing to the jury,

as victim profitability has no bearing on whether Litvak made knowing and material

misrepresentations at the time he sold the investment to the victim, and as such it such also be

precluded under Rule 403.

To be sure, the Government does intend to put on evidence about the effect of Litvak's

misrepresentations at the point of the sale or purchase of the bond.  Litvak's misrepresentations

necessarily caused a definite monetary effect to his victims both at the time of the transactions,

as well as in the future, based on the fact that the more an investor pays for a bond, the less

---

[1] Indeed, the Government objects and will move to preclude under Rule 401 any reference by
the defense to the profitability of the victims' transactions with Litvak.

return on investment it will produce *regardless of whether it ultimately yields a net profit or net loss*.  That effect is based on an assessment of the price paid for the bond at the time the sale or purchase is agreed to.  It is not, and should not be, based on what fate held in store for the bond, which is ultimately the result of some unknowable mix of, among other things, the victims' investing acumen, luck and the performance of the bond market, the stock market, the housing market, the labor and employment market and the economy, in general.  Put another way, the misrepresentations that Litvak made in the transactions at issue could only have reduced the ultimate return on the bonds he sold, but the victims' investment in those bonds might still have yielded net profits due to other factors outside of Litvak's control and knowledge.

Litvak attempts to justify expert testimony on this topic by claiming that the Government "focuses exclusively on the mental processes of the alleged victims" and "ignores" the mental processes of "Mr. Litvak."  Mem. in Opp. at 10.  That is a remarkable claim.  Under the Federal Rules of Evidence, expert testimony by Mr. Willner is not a permissible way to introduce evidence concerning Litvak's "mental processes."  The jury is capable of inferring Litvak's mental state from his admissions and acts, but any direct testimony about the defendant's "mental processes" can be provided to the jury only by Litvak himself.  But even if the defendant testifies about his belief about the future performance of a bond that he sold using misrepresentations, that testimony would be irrelevant to his fraudulent intent or lack thereof.  As the standard jury instruction provides on this point:  "No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for everyone, or will not cause anyone harm, will not excuse fraudulent actions or false representations by him."  Government's Proposed Charge, at 23 (Proposed Instruction No. 17) [Doc. #92, 11/15/13]; *see also* 3 Sand, Instruction 57-24.  And yet the defense proposes that their expert will go even a step further and

- 4 -

offer testimony about how a bond performed *after* the charged false misrepresentations.  In a case where the defendant is alleged to have made misrepresentations about pricing and commission size at the time of sale, rather than the fundamentals of the bonds, that proposed expert testimony is unconnected to the facts or the law and should be precluded.

The defense's lengthy argument that TARP fraud under Section 1031 requires proof of a specific intent to defraud does not alter this analysis.  Intent to defraud is an issue for the jury to determine based on the evidence of *the defendant's* actions and statements.  The subsequent "profitability" of a trade, as the defense terms it, is not relevant to that jury determination, and the defendants fail to cite a single case that says otherwise.  *See, e.g., United States v. Dupree*, 339 F. Supp.2d 534, 540 (S.D.N.Y. 2004) ("Like all evidence, such expert testimony must 'make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (quoting Fed. R. Evid. 401).[2]  Moreover, testimony about post-fraud profitability would be highly prejudicial under Rule 403 given how confusing it would be for the jury to hear expert testimony about it, and for this Court to then instruct them on the black letter law stating that the defendant's hope his victims will profit "will not excuse fraudulent actions or false representations by him."

Litvak's intent to defraud is not determined by his retained expert's *post facto* analysis of how things turned out for the victims thanks to the strength of the economy, their own investing

---

[2] Litvak relies on an out-of-context language in *United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983), that has nothing to do with Litvak's claim that "profitability" based on events in the future should be admitted to show whether a victim made or lost money on an investment.  In that case, the court stated that "[w]hile technically the success or failure of a scheme to defraud is irrelevant in a mail fraud case . . . whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence."  *Id.*  But the issue there concerned a condition that existed at the time of the offense and was within the defendants' control—namely, "whether the value of the merchandise remaining in the auction houses was sufficient to satisfy outstanding creditors"—as opposed to the future performance of a mortgage bond.

skill and luck, and the defense should not be permitted to suggest otherwise by introducing irrelevant and confusing expert testimony.[3]

## III.   MENCHEL'S EXPERT TESTIMONY SHOULD BE PRECLUDED.

Litvak does not squarely address the very real issue that Menchel's only experience as a "securities regulator" was during his ten years as General Counsel for FINRA, and thus likely cannot be cross-examined about the privileged basis for his views.  Litvak's primary response is that Menchel's "experience goes well-beyond FINRA."  Mem. in Opp. at 17.  The Government does not disagree, and would not object to Menchel providing his other experience prior to FINRA as the basis for his experience.  However, under those circumstances, Menchel should not be allowed to identify himself as a "securities regulator" from FINRA.

Litvak's other response is specious:  "The defense does not intend to delve into any matters that would necessitate disclosure of privilege information."  Mem. in Opp. at 17.  Just because the defense claims that it will not be explicitly eliciting privileged information, the fact remains that Menchel's testimony as a "securities regulator" is based on his "experience"—not any tests, or experiments, or the  like—and his only relevant experience was as General Counsel of an industry regulator.  Regardless of the content of Menchel's testimony on direct, on cross-

---

[3] Litvak makes much of *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), but that case stands for the simple proposition that a defendant who defrauds his supplier does not necessarily defraud his customer.  *See, e.g., Starr*, 816 F.2d at 102 (Newman, J., concurring) ("The Government has simply indicted the defendants for defrauding the wrong party.  An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed.").  Moreover, as Litvak acknowledges, *Starr* relies largely on *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970).  Mem. in Opp. at 14.  The court in *Regent Office Supply* expressly stated that the misrepresentations at issue in that case were not directed to "the quality, adequacy or *price of the goods*, or otherwise to the *nature of the bargain*."  Here, by contrast, Litvak's misrepresentations were specifically directed to the "price of the goods" and "to the nature of the bargain."  *See also Starr*, 816 F.2d at 94 ("the harm contemplated must affect the very nature of the bargain itself").  Thus, Litvak's reliance on these cases is misplaced.

examination the Government may be prevented from inquiring about the specific basis for his opinions or from impeaching him using other matters in which FINRA was involved.

Litvak is wrong to argue that the Government's objection would preclude all expert testimony by attorneys. Menchel had one client for 10 years: FINRA. Litvak proposes to have him provide paid testimony to the jury based on his experience at that one client without the Government being able to cross-examine him effectively about his actual experience at FINRA. That is a far cry from an attorney testifying as an expert about her experience over many years with many clients, with no particular one uniquely forming a basis for her views. Moreover, Litvak does not propose to have Menchel testify simply as an "attorney," but as a "securities regulator" whose only basis for his testimony is off limits on cross-examination.

This concern is compounded by the fact that Litvak's expert disclosure as to Menchel's bases for his opinions is simply his "experience." While experience may be a proper basis for expert testimony under Rule 702, it does not excuse the proponent of such testimony from providing a detailed disclosure as to the expert's basis for his opinions. Litvak did not do this, notwithstanding this Court's admonition. *See* Order Denying Defendant's Motion for Extension of Time to Amend Expert Disclosure ("For these reasons, the court **ORDERS** the defendant to properly disclose its experts **by noon on December 24, 2013**. Failure to do so will result in experts not properly disclosed being precluded.") [Doc. #118, 12/17/13].

Litvak's disclosure does not identify what *specific* experience Menchel has had that provides the basis for his opinions about the numerous topics in his disclosure, much the less the reasoning for those opinions. *See United States v. Mahaffey,* 2007 WL 1213738, *2 (E.D.N.Y. Apr. 24, 2007) ("Even if the disclosure provides a sufficient summary of any opinions to be offered by the witness, it may be excluded if the defendant 'has made no attempt at all to

describe the bases and reasons for those opinions as required [by Rule 16].'") (quoting *United States v. Wilson*, 2006 WL 3694550, at *3 (E.D.N.Y. Dec. 13, 2006)); *see also United States v. Sturman,* 1998 WL 126066, at *1 (S.D.N.Y. Mar. 20, 1998) (holding that "general description of possible bases does not meet the requirements of Rule 16(b)(1)(C))").

Litvak fails to provide any explanation, much less a detailed one, for how Menchel's experience provides him with a basis to opine on the meaning of terminology, best execution or any of the remainder of the proposed testimony in his disclosure, including his so-called "count-oriented" opinions about certain charged transactions in the Indictment. Other than Menchel's credentials, Litvak has not offered any basis for his opinions. Such a disclosure simply does not comport with Rule 16, or for that matter, Rule 702. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting court's discretion to exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Litvak has not addressed the Government's argument that Menchel's testimony about terms and jargon is utterly inconsistent with how Litvak and his clients, the victim-investors, undertook the transactions at issue, used the terms in question during those transactions and thought of the compensation being paid to Litvak and Jefferies. Menchel's testimony about how RMBS bond transactions *ought to* happen is unconnected to the facts of *this* case. *See Daubert*, 509 U.S. at 591 (stating that the appropriate inquiry is "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). If Litvak himself were to testify and provide some kind of factual basis for *his* contemporaneous belief at the time he conducted these transactions that the terms he and others used and the agreements they reached did not mean what the other fact witnesses will say they understood them to mean, then perhaps Menchel's testimony would be tied to some relevant

disputed issue.  But absent that foundational testimony from Litvak, Menchel is just offering a paid counter-factual scenario for the jury, rather than special expertise that will be helpful to the jury determination of the matters at issue.  This case is about the way Litvak conducted the transactions at issue in this case, not about how bond traders in general conduct their transactions.

Litvak says that he plans to have Menchel testify about "how traders are trained" with respect to customary and acceptable industry practice.  That is misleading; at best, Menchel can testify as to his opinion (based on his privileged experience as General Counsel of FINRA) about how traders *should be* trained, generally.  Given that Litvak's state of mind is at issue in this case, Litvak should testify, or call another employee of Jefferies to testify, about how *Litvak actually was trained*.  Menchel cannot offer anything relevant on this point.

As to Menchel's count-specific testimony, Litvak does not dispute that, regardless of whether Litvak had a duty to disclose the price at which Jeffries acquired (or sold) the bonds at issue, he purported to disclose that price to his victims as part of his scheme.  The absence of a duty to disclose in those transactions does not provide a legal justification for Litvak's affirmative misrepresentations, and neither Litvak nor Menchel appear to contest that.  Thus, once again, Menchel's testimony would simply be untethered to the facts in this case, which under *Daubert* is not permissible.

**IV.     CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court grant its

motion to preclude Willner's and Menchel's proffered expert testimony under Rules 702 and

403.  Alternatively, the government requests that the Court hold a *Daubert* hearing on the issues

that the Court believes require it.

<div style="margin-left: 40%;">

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/_____
ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT23923
eric.glover@usdoj.gov

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov

157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 28, 2014, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF System.


/s/
ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY