**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:13CR19 (JCH) |
| v. | |
| JESSE C. LITVAK | February 4, 2014 |

**JESSE C. LITVAK'S MEMORANDUM OF LAW IN OPPOSITION TO THE**
**GOVERNMENT'S OBJECTIONS TO CERTAIN DEFENSE EXHIBITS**

Defendant Jesse C. Litvak respectfully submits this memorandum of law in opposition to the government's objections to certain of the exhibits that the defense might seek to offer during its case-in-chief (if any).  (*See* January 31, 2014, letter from the Government).  The parties had proposed deferring resolution of these objections until later.  Given the Court's direction that we proceed with a hearing this week, we thought it would be helpful to submit this memorandum, arguing to the Court some (but not necessarily all) of the evidentiary bases for the admissibility of certain *types* of documentary exhibits and attaching for the Court's review examples of some of them.  We also set forth the general legal principles demonstrating the admissibility of the proffered exhibits.

The defense exhibits can largely be placed in the following general categories (or "buckets"): (1) Emails and Bloomberg "Chats" ( the vast majority of which were produced by Mr. Litvak's former employer, Jefferies & Co. ("Jefferies")); (2) Settlement Agreements between Jefferies and certain counterparties; (3) various Jefferies compliance-related documents; (4) Trade Confirmations (sometimes referred to as "Trade Tickets") memorializing the purchase/sale of a given bond; and (5) various records of the Federal government (including specifically the Department of the Treasury).  At this point, with the exception of certain relevance objections, the government has withdrawn its objections to all of buckets Four and Five (acknowledging that the Trade Confirmations are admissible as business records and the government records as public records).  As to the remaining objections, the vast majority are to over 200 emails or Bloomberg chats.  We will therefore focus our discussion on those exhibits.

## **Background**

As set forth in the Indictment, Mr. Litvak worked as a senior trader at Jefferies and specialized in certain residential mortgage-backed securities ("RMBS").   For each trade specifically referenced in the Indictment, as well on the 16 additional trades included in the government's proffer of additional "scheme" evidence, Mr. Litvak was either buying or selling RMBS for Jefferies's own dealer account on a principal basis.  None of the trades involved an order to buy or sell that was entrusted to Jefferies.  The Indictment alleges that the relevant trades may be categorized into (a) "inventory" trades, in which Jefferies had owned a bond in its inventory for some period of time; (b) "order" trades, in which sellers asked Mr. Litvak to seek buyers, or buyers asked him to seek sellers, for a particular RMBS; and (c) "bid list" trades, in which sellers circulated lists of particular RMBS they were interested in selling and solicited bids, which would be submitted by Mr. Litvak and traders at other broker-dealers, either on behalf of a customer or for the dealer's own account.  (*See* Indictment ("Ind.") ¶ 16). Particularly with order and bid list trades, Mr. Litvak often communicated simultaneously with both buyers and sellers.

These transactions were generally arranged over emails and Bloomberg chats.  On a typical day, for example, Mr. Litvak might receive a number of bid lists at his Jefferies email address.  Mr. Litvak would then often email his supervisors, sales force, and potential counterparties to discuss bids that could be emailed back to the distributor of the bid list.  After Mr. Litvak placed his initial bids, subsequent discussions regarding price, quantity, bond fundamentals, and other issues often occurred via emails and Bloomberg chats.  Mr. Litvak generally kept the prospective buyers apprised of his discussions with the seller, and vice-versa.

A similar pattern of email and chat room traffic unfolded for a typical order transaction as well. Mr. Litvak's daily work schedule was full of this type of email and chat room correspondence. These email and chat room messages were how Jefferies employees, including Mr. Litvak and his fellow traders, their supervisors, and their support staff, conducted the business of Jefferies.

More broadly, these types of emails and chats are quintessential business records in the context of this industry. They constitute the most prevalent ways that broker-dealers, including Jefferies, conduct their business. Almost all aspects of the business – distributing bid lists, placing orders, communicating bids, negotiating prices, finalizing transactions, and coordinating sales credits within Jefferies – occur over these emails and chats. They are, quite simply, the way that broker-dealers communicate to all parties involved in a potential transaction, both internally and externally, because they are a fast and efficient way to conduct business. Because of their importance, they are archived and maintained so that they are available for future review.

Bid lists, in particular, are often communicated via email. For example, Defense Exhibit ("DX") 188 (referred to herein as Exhibit A) is an email chain that begins with price "talk" regarding bonds on a bid list distributed to Jefferies earlier in the day.[1] Mr. Litvak sent this email to various traders and salespeople within Jefferies as a way to keep his colleagues apprised about bonds on which they were bidding. Bid lists (and the subsequent negotiations, questions, and offers that follow) are often sent over email because of the large number of people who need to stay updated about potential transactions. Firms that announce a bid list need to ensure they

---

[1]   The Court has been provided with binders of the exhibits on both the government's list and the defense's list. For ease of reference, a courtesy copy of just the documents discussed in this memorandum will be delivered to Chambers and provided to government counsel tomorrow morning.

reach as many bidders as possible, and broker-dealers who receive the list need to disseminate it broadly within their offices to coordinate bidding strategies.[2]

Negotiations, offers, and agreements regarding bond transactions often take place over emails and Bloomberg chats as well.  In DX 208 and 209 (referred to herein as Exhibit C and Exhibit D), for example, a Jefferies's salesperson receives a bid from a potential buyer of a bond referred to as ARSI 2004-W11 M6 ("[b]id 8-00"), communicates a counteroffer ("8-08 to you would work"), and then memorializes the agreement ("so 8-08 to you and thank you") (DX 208 [Ex. C]).  Moreover, the actual confirmation of the transaction is also sent over email, complete with price, quantity, settlement date, and other terms of the contract.  (DX 209 [Ex. D]).  Again, emails and Bloomberg chats are the routine ways Jefferies and its counterparties efficiently negotiated, finalized, and memorialized sales in the securities industry.

The emails and chats are also routinely used to generate the trade confirmation that is part of every consummated transaction.  How this often works can be illustrated by reference to the transaction alleged in Count 10 of the Indictment.  Mr. Litvak negotiated the sale of that bond to QVT Financial via a Bloomberg chat that, among other things, reflected agreement on price and quantity.  (*See* GX 102 (referred to herein as Exhibit E) (QVT agreeing to purchase "20.868 mm orig" at a price of 57-18)).  A few minutes later, Mr. Litvak sends an email to a sales assistant at Jefferies, instructing him to "send [QVT] a ticket [*i.e.*, a trade confirmation] . . . we are selling

---

[2] Email exchanges and Bloomberg chats also routinely include questions and directions between various Jefferies's employees.  Supervisors, for example, often utilize chats and emails to stay updated on the day's transactions.  *See* DX 188 [Ex. A] (Mr. Litvak's supervisor responds to Mr. Litvak's email about bid list color with an inquiry about Jefferies's potential purchase of a certain bond on that list ("did [our salesperson] get last look?")).  Salespeople will also routinely use emails and chats to discuss their own "sales credits" with traders.  *See* DX 255 (attached hereto as Exhibit B) (the salesperson assigned to many of Mr. Litvak's accounts directs Mr. Litvak to inquire into sales credits for two trades that she "didn't get paid for").

4

him 20.868mm orig of lxs 07-15n 2a1 at 57-18."  (GX 102 [Ex. E] at JEFF SGTP 035707).

These are the same terms agreed upon by Jefferies and QVT in the chat.

A few minutes later, the sales assistant sends an email to QVT entitled "trade ticket," listing price, quantity, and other terms of the transaction agreed upon in the chat.  (*See* Exhibit F).  This trade confirmation is sent to both the QVT trader's email address and Bloomberg ID/email.  This is common for many of the emails with counterparties.

Besides serving as one of the most common means of conducting business – both internally and externally – these emails and Bloomberg chats are routinely stored, categorized, and reviewed pursuant to Jefferies's standard practices.  The business purpose of storing these communications is that it is the record of the negotiation and agreement between the parties in the event there is a dispute between the parties.  The information in these chats and emails is utilized regularly by the traders and sales personnel as part of their regular routine.  Jefferies's own policy, for example, was to store these chats in the regular course of business.  (*See* GX 213 (referred to herein as Exhibit G) (Jefferies's mortgage trading training manual states that "every email, instant message, text message, or PIN-to-PIN message, either sent or received, is archived **indefinitely** and is subject to supervisory/compliance and regulatory review/subpoena.") (emphasis in original)).  Moreover, Securities and Exchange Act Rule 17a-4 mandates that broker-dealers preserve "[o]riginals of all communications received and copies of all communications sent . . . by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such."  17 C.F.R. § 240.17a-4(b)(4).

The above-referenced emails and chats are a representative sample of the hundreds of emails and Bloomberg chats that the government has objected to as inadmissible hearsay.

## Discussion

### I.  The Emails and Chats Are Admissible Both as Non-Hearsay and as Business Records

The government acknowledges that many of the emails and chats may be admissible as non-hearsay, and has agreed not to object to a relative handful of emails and chats (while objecting on hearsay grounds to more than 200).  While the parties have not yet reached agreement on this ground as to many documents, we are hopeful that with guidance from the Court at the upcoming hearing we will be able to do so in advance of opening statements.  But the government apparently takes the position that the emails and chats are not admissible as business records, without regard to the factual foundation for such admissibility.  That position lacks merit.  It is also contrary to the position the Department of Justice has taken in other cases, when the electronic evidence at issue was deemed helpful to obtaining a conviction.

### A.  The Chats and Emails Are Admissible as Non-Hearsay to Show Knowledge, Context, State of Mind and Under Rule 803(3)

Hearsay is an out-of-court statement by a person "offer[ed] in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Of course, not every out-of-court statement is hearsay.  A statement is hearsay only if it is both made out-of-court and it is offered for the truth of the matter asserted out-of-court.  Fed. R. Evid. 801(c).  Where the out-of-court statement is not offered for its truth, but rather for some other purpose, or where the out-of-court statement is not an assertion of fact, but rather an instruction or a question (for example), the bar against hearsay does not apply.  *See, e.g.*, *United States v. Detrich*, 865 F.2d 17, 20 (2d Cir. 1988) (out-

of-court statement not hearsay since offered to prove something other than the truth of the matter asserted).

Similarly, out-of-court statements can also be admitted for their effect on their recipients, not for the truth of the matters asserted therein.  *See, e.g.*, *United States v. Gotti*, 457 F.Supp.2d 395, 397 (S.D.N.Y. 2006) ("It is well established … that statements offered for their ***effect on the listener*** are non-hearsay.").  Furthermore, if an out-of-court statement "show[s] the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed," the statement is not hearsay and is therefore admissible.  *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984) (citations omitted).  "Out-of-court statements are not hearsay if offered to show the context within which parties were acting, or to show a party's motive or intent for behavior."  *Arista Records LLC v. Lime Group LLC*, 784 F.Supp.2d 398, 420-21 (S.D.N.Y. 2011) (citing *Weinstein's Federal Evidence* § 801.11[5][b]); *see also United States v. Garcia*, 900 F.2d 571, 576 (2d Cir. 1990) (co-defendant's statement that the defendant seeking preclusion on hearsay grounds sold "good crack" was not hearsay because it "was offered not to prove the truth of the matter asserted, but to help the jury understand the context of the transaction"); *Lindsey v. Prive Corp.*, 161 F.3d 886, 895 (5th Cir. 1998) (manager's testimony referred to information he had received from other managers, but it was admissible to explain manager's motive and state of mind when he fired plaintiff).  Out-of-court statements are also not considered hearsay if used to prove notice or knowledge.  *Arista Records*, 784 F.Supp.2d at 421 (citing *Cameron v. Cmty. Aid for Retarded Children*, 335 F.3d 60, 65-66 (2d Cir. 2001)).

Here, we expect that were there to be a defense case and were we to offer any of these chats and emails, we would in all likelihood be offering the vast majority of any such exhibits *not* for the truth of any matter asserted. The chats and emails would instead be offered for, and would be admissible for, several non-hearsay purposes. Put generally, the chats and emails "may also be admitted not for the truth of the matters asserted therein, but for, inter alia, their effect on their recipients, to show the understanding and motives of [the defendant and the counterparties] as [they] entered the [bond] transactions, and to show the context of the [transactions] in question." *Leser v. U.S. Bank Nat'l Assoc.*, 2012 WL 6738402, at *6 (E.D.N.Y. 2012); *cf. id.* ("Whether these exhibits will also be admitted for their truth will be determined at trial.").

**1.** <u>**The Chats as Contract Negotiations**</u> -- As discussed above, the emails and chats are largely how these transactions are negotiated and executed. To the extent that the chats are prefatory to the agreement to sell (or buy) a given bond, they are properly understood not to be hearsay. For example, the Second Circuit has held that instructions given to an out-of-court declarant by others concerning the manner in which his company "was to conduct itself in the [charged] bidrigging operation, and with whom it was to deal, were not hearsay but rather were properly admissible as a 'verbal act' describing the making or terms of the conspiratorial agreement. 'The hearsay rule does not exclude relevant testimony as to what the contracting parties said with respect to the making or the terms of an oral agreement.' 4 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* ¶ 801(c)[01], at 801-72 (1987)." *New York v. Hendrickson Bros., Inc*., 840 F.2d 1065, 1075 (2d Cir. 1988) (internal quotation marks and citation omitted).

Of course, the Federal Rules of Evidence exclude from hearsay the entire category of "verbal acts" in which "the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting those rights."  Fed. R. Evid. 801(c) Advisory Comm. Note.  As recently explained in *Orix Public Finance LLC v. Lake County, Minnesota*:

> A verbal act is an utterance of an operative fact that gives rise to legal consequences.  Verbal acts … are not hearsay, because the statement is admitted merely to show that it was actually made, not to prove the truth of what was asserted in it.  For example, the hearsay rule does not exclude relevant evidence as to ***what the contracting parties said or wrote with respect to the making or the terms of an agreement***.

2013 WL 6328865, at *8 (D. Minn. Dec. 5, 2013) (quoting *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534, 567 n.50 (D. Md. 2007)).  *See, e.g., Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) (a contract is a form of "verbal act" and is not hearsay, and various communications relevant to the making of the contract, including letters, telegrams, and conversations, are also not hearsay); *Grace Label, Inc. v. Kliff*, 355 F. Supp. 2d 965, 972 (S.D. Iowa 2005) ("communications relevant to the making of a contract and the existence of contract terms are 'verbal acts' and not hearsay").

As these cases (and many more) make explicit, "various communications – *e.g.*, ***conversations***, letters and telegrams – relevant to the making of a contract" are not hearsay. *Fiebelkorn v. IKON Office Solutions, Inc.*, 668 F.Supp.2d 1178, 1185 n.5 (D. Minn. 2009) (quoting *Mueller v. Abdnor*, 972 F.2d 931 at 937 (emphasis added by *Fiebelkorn*)).  By this logic, the chats – real time negotiations relevant to the making of a contract – are fully admissible.  *See also Cloverland-Green Spring Dairies v. Pennsylvania Milk Marketing Bd.*, 298 F.3d 201, 218 n.20 (3d Cir. 2002) ("a statement offering to sell a product at a particular price is a

'verbal act,' not hearsay, because the statement itself has legal effect").  Such statements are admissible to show that they were made, not for whatever intrinsic "truth" they may or may not have.  *Grace Label, Inc. v. Kliff*, 355 F. Supp. 2d at 972.  Indeed, negotiations with a potential counter-party are typically devoid of any intrinsic "truth," as meant in the Rule.  It is the back-and-forth that matters, and it is that back-and-forth that largely provides the relevance of most of the chats and emails of this type on the defense list.  And that back-and-forth is not hearsay.

       **2.**  **Questions and Instructions** -- Much of the content of the chats and emails consists of questions and instructions.  Neither are hearsay.[3]  Asking at what price a given bond is available, or expressing a willingness or unwillingness to enter into a given transaction, is simply not hearsay.

       **B.  The Chats and Emails Are Admissible as Business Records Under Rule 803(6)**

       We also believe that we can lay the proper foundation for admission of virtually all of the chats and emails at issue as business records.  As pertinent here, Rule 803(6) of the Federal Rules of Evidence exempts from the exclusion of the hearsay rule certain records of "regularly conducted activity" if: (a) the record was made in a timely fashion by "someone with knowledge"; (b) the record "was kept in the course of a regularly conducted activity of a business"; (c) "making the record was a regular practice of that activity"; and (d) "neither the

---

[3]  *See United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present."); *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 330 (3d Cir. 2005) ("Courts have held that questions and inquiries are generally not hearsay because the declarant does not have the requisite assertive intent, even if the question 'convey[s] an implicit message' or provides information about the declarant's assumptions or beliefs.") (citation omitted); *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay."); *United States v. Bellome*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands … are not hearsay."); *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth…. The orders or instructions were offered to show that they occurred rather than to prove the truth of something asserted.").

source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).[4]  The "principal precondition" to admissibility is that the proffered record has sufficient indicia of trustworthiness to be considered reliable; the record must also be supported by a proper foundation under the Rule.  *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995).  "The purpose of the rule is to ensure that documents were not created for 'personal purpose[s] … or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'"  *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010); *see also United States v. Wells*, 262 F.3d 455, 462 (5th Cir. 2001) ("Whether evidence is admissible under Rule 803(6) is chiefly a matter of trustworthiness.").

The Second Circuit "has adopted 'a generous view' of the business records exception, 'construing it to favor[] the admission of evidence . . . if it has any probative value at all.'" *United States v. Strother*, 49 F.3d at 874 (quoting *United States v. Freidin*, 849 F.2d 716, 722 (2d Cir. 1988)); *accord Kaiser*, 609 F.3d at 574 ("any probative value at all"); *Penberg v. Healthbridge Mgmt.*, 823 F. Supp.2d 166, 188 (E.D.N.Y. 2011) ("the Second Circuit has taken a liberal approach to the admissibility of business records").  The Second Circuit's "generous view" is consistent with the approach taken by the Advisory Committee generally, which noted that Rule 803(6) "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present." Fed. R. Evid. 803(8), Advisory Comm. Note.

---

[4]  Until 2011, the language of the Rule was quite substantially different.  It provided: "A memorandum, report, record, or data compilation, ***in any form***, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation,. . . , unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness."  Many pre-2011 cases considering emails and similar records cite this language, and in particular the "in any form" language.  The Advisory Committee Note indicates that this rather wholesale change in the language of Rule 803(6) was "stylistic only" and not intended to alter any of the preceding case law.

As noted above, until 2011 the Rule explicitly embraced a "memorandum ... in any form" whatsoever.  Fed. R. Evid. 803(6) (pre-2011 version).  Previous cases (which are still good law) put some emphasis on that language (which was, indeed, consistent with pre-Rule law).    Thus, "Rule 803(6) focuses on the regularity of the record keeping process, not on its form" and, accordingly, the fact that the proffered records are, for example, "written in an irregular and shorthand manner" and somewhat "erratic" is "simply irrelevant."  *In re Japanese Electronics Products Antitrust Litigation*, 723 F.2d 238, 290 (3d Cir. 1983).  Even handwritten and somewhat fragmentary documents may be admitted as business records, provided that the documents are made and kept as a regular practice; exclusion of such records "on the ground that their meaning might be arguable [is] an abuse of discretion."  *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d at 290-9; *In re Blech Securities Litigation*, 2003 WL 1610775, at *6 (S.D.N.Y. March 26, 2003) ("The fact that these notes are handwritten and contained in a written notebook does not defeat the applicability of the business record exception in Rule 803(6).").[5] Although concededly "[m]emoranda and correspondence often are more informal and more sporadically generated that the 'account books' for which the exception was established," that is not fatal to the admissibility of internal memoranda and other forms of correspondence and "a diverse range of business-related correspondence has been admitted under Rule 803(6) in nearly all circuit courts."  Andrew J. Dreyer, *When the Postman Beeps Twice: The Admissibility of Electronic Mail Under the Business Records Exception of the Federal Rules of Evidence*, 64

---

[5]  *Thanongsinh v. Board of Education*, 462 F.3d 762, 775-77 (7th Cir. 2006) (handwritten notes on printed "score sheet" of interviewers admissible as business record); *Resolution Trust Corp. v. Eason*, 17 F.3d 1126, 1131-32 (8th Cir. 1994) (handwritten notes in work papers of thrift examiner admissible as business records because, regardless of their form, they had been made and kept in the course of regularly conducted business activity); *United States v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992) (handwritten notes of business calls admissible); *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1061-62 (8th Cir. 1995) (accountant's notes of meeting regarding proposed agreement for redemption of minority shareholders' shares admissible).

Fordham L. Rev. 2285, 2312-13 (April 1996). *See also In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d at 288-89 (reversing district court for "impos[ing] too stringent a burden of showing regularity of practice," one rooted in "caselaw antedating the Evidence Rules"); *United States v. Stein*, 2007 WL 3009650, at *1 (S.D.N.Y. 2007) ("The defendants erroneously argue that the government must 'show [ ] that the emails at issue were created pursuant to established company procedures for the systematic or routine making of company records'"; all that is required is that the document at issue be "part of a business routine" or part of "the regular course") (citations and additional internal quotations omitted).

This case law strongly supports the admissibility of the internal Jefferies emails and chats. The chats with counterparties are really akin to real time and verbatim phone messages or recorded calls between a broker and his or her customers. While those analogies are imperfect, they are helpful in framing the question. That is particularly so in this Circuit, because of the Second Circuit's rulings in two criminal cases, *Kaiser* and *Martha Stewart*.

*Kaiser* concerned the government's offer of handwritten notes that a fellow named Redgate kept in various business planners/calendars. The pertinent notes concerned "conversations with Kaiser regarding false confirmation letters that Kaiser asked him [Redgate] to send." (Redgate was a vendor for Kaiser's company, and he was confirming inflated rebates.) The Circuit quoted approvingly the District Court's ruling that "part of his business was to sign these confirmations, and these are records of conversations he had in connection with that part of his business. So it seems to me that these are ***unquestionably business records***." *Kaiser*, 609 F.3d at 574. The Second Circuit affirmed, rejecting the argument that these kinds of notes were selective "miscellaneous jottings" and finding that the evidence established that "Redgate's

13

contact log" "was maintained in a consistent way and was focused on a certain range of issues that were relevant to his business."  *Kaiser*, 609 F.3d at 574-75.  Thus, as long as a business planner was used with some consistency it was sufficiently similar to a calendar regularly used to create records of events – which the Second Circuit has previously approved.  *Kaiser*, 609 F.3d at 575 (citing *United States v. Ford*, 435 F.3d 204, 214-15 (2d Cir. 2006) (calendars with hand-written notes are business records where it was employee's "regular business practice … to keep a calendar in which he documented events of which he had personal knowledge at or near the time they occurred")).

In an insider trading prosecution, *United States v. Martha Stewart*, 433 F.3d 273, 316-17 (2d Cir. 2006), the Court considered the admissibility of "an entry in the computerized message log" maintained by Ms. Stewart's assistant reading, in substance, "Dump the stock."  The document was admitted without objection, but was the lynchpin of the appellate argument.  The Court of Appeals held that the government properly "laid the foundation for admitting the phone log as a business record" and that the phone log was "admissible under Rule 803(6)."  *Martha Stewart*, 433 F.3d at 317.  If what Redgate jots down in his business planner or Martha Stewart's secretary types into a message log, both simply repeating what a caller told them, is a business record, why would chats capturing the actual words of the "caller," the counterparty, be treated any differently?[6]  More to the point, as discussed above, it was plainly the regular practice of Jefferies to conduct its business through these chats and emails.

---

[6]   As the foregoing discussion makes clear, the United States Department of Justice has frequently taken the position, seemingly at odds with that taken by the prosecutors in this case, that various forms of record-keeping akin to those at issue here fall within the ambit of Rule 803(6).  *See Kaiser*, 609 F.3d at 574-75 (handwritten notes of telephone conversations offered by DOJ prosecutors were "unquestionably business records"); *Martha Stewart*, 433 F.3d at 316-17 (DOJ prosecutors properly "laid the foundation for admitting the phone log as a business record"); *Ford*, 435 F.3d at 214-15 (handwritten notes in a calendar offered by DOJ prosecutors properly admitted as business

In at least two cases, Your Honor has discussed (albeit briefly) the admissibility pursuant to Rule 803(6) of emails or other documents arguably analogous to the defense exhibits.  In *SEC v. Competitive Technologies, Inc.*, 2006 WL 3346210, at *2 (D. Conn. 2006), the Court refused to strike a declaration that relied on certain documents because "all [of the documents] present colorable bases for admission as business records . . . or as recorded recollections."  The documents at issue included not emails or chats but "the defendants' phone and brokerage records, and [company] message slips relating certain phone calls between the defendants." *Competitive Technologies*, 2006 WL 3346210, at *2.  In *Suisman Shapiro v. Suisman*, 2006 WL 387289, at *3, 3 n.3 (D. Conn. 2006), the Court discussed certain emails (without any detail), explaining that it had "allowed the emails to be submitted as business records" during an unreported preliminary injunction hearing but that, upon "reviewing the emails again," the Court had now concluded that the emails "were not themselves hearsay" and thus "need not fit a particular hearsay exception."

Other decisions from a variety of jurisdictions and in a variety of different factual situations – albeit none involving Bloomberg chats– strongly support this argument.  For example, in *Cappuccio v. Pfizer, Inc.*, the district court held that a recorded call from an employee with stock options to his employer's broker (Merrill Lynch) that was recorded and transcribed was a business record.  The basis was the evidence that all "telephone calls from Pfizer employees to Merrill Lynch pertaining to Pfizer stock options are digitally recorded and retained in the regular course of business."  2007 WL 2593704, at *3 n.5 (E.D. Penn. 2007).

---

records); *United States v. Armstrong*, 619 F.3d 380, 384-85 (5th Cir. 2010) (running "logs" kept by insurance adjusters, and that in part reflected information imparted by claimants in telephone calls to adjusters, offered by DOJ prosecutors); *United States v. Stein*, 2007 WL 3009650, at *1 (S.D.N.Y. 2007) (discussing defendants' objections to admissibility of emails pursuant to Rule 803(6).

Thus, "[i]t would appear that such recordings and transcripts … would be admissible at trial pursuant to the business records exception."  Many other cases similarly support our argument by analogy.[7]

## II. The Government's Relevance Objections Are Premature

As a preliminary matter, relevance objections to the exhibits that the defense might seek to use in its case-in-chief (if any) are incredibly difficult to resolve in advance of the government's case.  Furthermore, as discussed on February 3 (prior to jury selection), we do not believe that a fair procedure would require the defense to spell out in detail the relevance of any particular argument, or of any particular exhibit that might support such an argument, two weeks before the government begins its case.  That having been said, by way of illustration there are two general areas that have already been discussed with the Court in other contexts that establish the relevance of most of the exhibits to which the government objects – the fact that the conduct alleged against Mr. Litvak was commonplace at Jefferies and the fact that the bonds at issue

---

[7]    *See, e.g., United States v. Armstrong*, 619 F.3d 380, 384-85 (5th Cir. 2010) (insurance adjuster logs including information imparted by claimants in telephone calls to adjusters admissible under Rule 803(6)); *Tamburri v. Suntrust Mortgage*, 2013 WL 4528447, at *1 (N.D. Cal. 2013) ("Loan Notes" document, comprised in part of notes taken by bank employee of what mortgage customer told him on the telephone, is "admissible under the business records exception"); *Maples v. Vollmer*, 2013 WL 1681234, at *17 (D. N.M. 2013) (recordings and transcripts of 911 calls are admissible as business records) (citing numerous cases, including E.D.N.Y. and District of Connecticut decisions); *Alston v. Central Credit Services*, 2013 WL 4543364, at *3 n.4 (D. Md. 2013) ("account history" document reflecting in part content of recorded phone calls from customer admissible under Rule 803(6)); *Red Strokes Entertainment, Inc. v. Sanderson*, 2013 WL 5603313, at *5 (M.D. Tenn. 2013) (emails created and maintained by company's accountant and "reflect[ing] the course of transactions between" the contractual parties admissible under Rule 803(6)); *Penberg v. Healthbridge Mgmt.*, 823 F. Supp.2d 166, 186-89 (E.D.N.Y. 2011) (Pollak, Mag. J.) (email that employee sent to a client admissible under Rule 803(6) given the foundation that it was "the regular business practice" of the company to send emails containing such information to clients); *Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners*, 2008 WL 1999234, at *10-13 (S.D. Tex. May 8, 2008) (email recounting a telephone conversation with counterparty, in which counterparty relayed decision not to proceed on deal and directing recipient company to stop all work, admissible under Rule 803(6) where author stated that he "wrote the email in the routine course of his duties"); *DirecTV v. Murray*, 307 F. Supp.2d 764, 772-73 (D. S.C. 2004) (where company "regularly received orders by e-mail and systematically retained the e-mails as a record of the order" Rule 803(6) was satisfied).  *See also Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 2011 BL 148586, at *1-*2 (D. Conn. June 6, 2011) (ruling e-mail falls under the business record exception).

16

made substantial profits for the counterparties who purchased them.  Both are, among other things, defenses to the allegation that Mr. Litvak acted with fraudulent intent.

The types of sales tactics alleged in the Indictment were widespread at Jefferies and were known to, and actually encouraged by, Mr. Litvak's supervisors – some of whom had trained him in these very tactics.[8]  Mr. Litvak operated in a context in which the kind of conduct at issue was commonplace, and in a context where such conduct was openly discussed, and written about openly in chats and emails that were subject to regular review by Compliance and Mr. Litvak's supervisors.  Documentary proof that this in fact occurred with regularity at Jefferies is strong circumstantial proof that Mr. Litvak was trained that these techniques were appropriate, and tends to negate any inference that he acted with fraudulent intent.  This was especially so because the evidence will also show that Mr. Litvak and his colleagues scrupulously adhered to the rules promulgated by the Jefferies Compliance department about the magnitude of permissible mark-ups on bonds and other matters.  Evidence such as DX 248 (referred to herein as Exhibit H) (showing supervisory participation in and approval of a so-called inventory misrepresentation) is directly relevant to Mr. Litvak's understanding that his sales tactics were within proper bounds and tends to negate any inference of fraudulent intent.

For example, DX 354 (referred to herein as Exhibit I) is a chat where one Jefferies trader is discussing trying to sell a bond from Jefferies inventory -- CWHL 07-J3 A9 -- with several other Jefferies's representatives.  The trader says: "have we ever shown the CWHL 07-J3 A9 to JV? … lets show him 75+mm @ 86-8 … I guess frame it as an order," thereby instructing the Jefferies team to put the bonds out as an order, rather than disclose that Jefferies actually already

---

[8]   *See* Ind. ¶¶ 28, 33-34; Transcript of Jan. 10, 2014, Pretrial Conference at 43-45 (discussion of bias cross of Jefferies witnesses).

owns the bonds.  Similarly, DX 251 (referred to herein as Exhibit J) is a series of Bloomberg messages between Mr. Litvak and a supervisor, in which they are discussing trade negotiations. The supervisor instructs Mr. Litvak to get a "firm order" on certain bonds.  Mr. Litvak responds, "We have one.  58.  But i know they sell @ 57 so im telling [our salesperson] to tell wammy we traded bonds . . . tiny bit back of 58.  Boom!"  The supervisor condones this sales tactic, with an enthusiastic reply: "BOOM."  In another example, DX 359 (referred to herein as Exhibit K), two other Jefferies employees are speaking in a Bloomberg chat about negotiating the sale of CWHL 07-J3 A9 bonds.  The two representatives are communicating about what prices they are relaying to the third-party seller and buyer.  One says, "where are you seeing bid . . . I can make something up myself," thus signifying that he may spin the actual bidding price.  In DX 45 (referred to herein as Exhibit L), Mr. Litvak and another employee are discussing sales tactics in the context of trying to execute a trade of CWHL bonds.  During the course of this chat, they are discussing whether the better strategy is to frame the bonds as an order or to disclose that Jefferies owns the bonds in its inventory.  The colleague asks Mr. Litvak, "Want to tell 'em you own 'em or working with guy," thereby demonstrating that portraying a bond Jefferies owned in its inventory as an order was a common tactic used at Jefferies.

Similarly, as we have argued in the context of the government's motion to preclude the defense from offering critical expert testimony, the defense should be permitted to prove up the fact – which is not in dispute – that the alleged victims here did not lose any money on their investments and in fact reaped very significant profits on the bonds sold by Mr Litvak.  As explained in our briefing on the expert motion, the government has elected to charge a "scheme to defraud" and therefore "proving specific intent to defraud is necessary."  *United States v.*

*Whitman*, 904 F.Supp.2d 363, 373 (S.D.N.Y. 2012); *see also United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).  So the intent the government must prove in this case is the knowing and willful intent to defraud – "to harm the victim, by depriving him of money or property." *Whitman*, 904 F. Supp. 2d at 372 (citing *Regent Supply*, 421 F.2d at 1180).

"Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see generally* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 401.04[2][c] (2013) ("Rule 401 uses a lenient standard for relevance . . . . To be admissible, evidence need only to alter the probabilities of a proposition; it need not sway the balance to any particular degree.").  This is especially so where, as here, the proffered evidence is offered in part on the element of *intent*.  The law is clear in this Circuit that "trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind."  *United States v. Hollier*, 314 F. Supp. 2d 250, 255 (S.D.N.Y. 2004) (quoting *United States v. Colloraffi*, 876 F.2d 303, 305 (2d Cir. 1989)).

While the relevance of many of the defense exhibits is expected to crystalize as trial proceeds, there is no basis to exclude any of the proffered exhibits at this time under these liberal standards of admissibility.

## CONCLUSION

For the reasons set forth above, Mr. Litvak respectfully requests that the government's objections to defense exhibits be denied.

Respectfully submitted,

**THE DEFENDANT,**
**JESSE C. LITVAK**

By:    /s/ Ross H. Garber
       Ross H. Garber (ct17689)
       Shipman & Goodwin LLP
       One Constitution Plaza
       Hartford, CT  06103
       Telephone:  860-251-5901
       Fax:  860-251-5219
       Email:  rgarber@goodwin.com

       Patrick J. Smith (admitted *pro hac vice*)
       Sarah B. Zimmer (admitted *pro hac vice*)
       DLA Piper LLP (US)
       1251 Avenue of the Americas, 27th Floor
       New York, New York  10020
       Tel.:  (212) 335-4500
       Fax:  (212) 884-8509
       Email:  patrick.smith@dlapiper.com
       Email:  sarah.zimmer@dlapiper.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

       /s/ Ross H. Garber
       Ross H. Garber