**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:13CR19 (JCH) |
| v. | |
| JESSE C. LITVAK | February 25, 2014 |

**MEMORANDUM OF LAW OF DEFENDANT
JESSE C. LITVAK IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL
UNDER FED. R. CRIM. P. 29(A)**

Defendant Jesse C. Litvak respectfully submits this memorandum of law in support of his

motion for judgment of acquittal under Fed. R. Crim. P. 29(a).  For the foregoing reasons,

Mr. Litvak's motion should be granted.[1]

---

[1] We are filing this memorandum prior to the close of the government's case (which we understand will take place later today).  We will make our motion orally at the close of the government's case.  We expect to supplement this motion.  The inclusion or omission of specific arguments in this memorandum of law should not be construed as a waiver of any argument concerning the sufficiency of the government's evidence, or an acknowledgment or concession by Mr. Litvak that the government's evidence is sufficient with respect to any of the elements of any of the counts charged against Mr. Litvak in the Indictment.  To the extent the Court denies this motion in whole or in part, Mr. Litvak may explicitly include additional arguments concerning the sufficiency of the evidence in any motion filed following the close of all the evidence at trial, following a jury verdict or on appeal.

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................ 1

I.  BACKGROUND ........................................................................................... 1

    A.  Indictment ............................................................................................ 1

    B.  Trial ...................................................................................................... 2

II.  ARGUMENT .................................................................................................. 3

    A.  Legal Standard .................................................................................... 3

    B.  The Government Failed to Prove Mr. Litvak Acted with Intent to Defraud (Counts 1 Through 6, and 8 Through 12) ............................................. 4

    C.  The Government Failed to Prove the Materiality of Mr. Litvak's Alleged Misstatements (All Counts) ................................................................. 14

        1.  The Government's Burden in Proving Materiality ................................. 14

        2.  The Evidence Belies the Materiality of Mr. Litvak's Alleged Misrepresentations to Professional Investment Managers ..................... 15

        3.  The Evidence Negates Any Inference of the Materiality of Mr. Litvak's Alleged Misrepresentations to the Department of the Treasury ................................................................................................ 19

    D.  The Government Failed to Prove Additional Elements of Major Fraud Against the United States in Violation of 18 U.S.C. § 1031 as Charged in the Indictment (Count 12) ................................................................... 20

        1.  The Evidence Does Not Support a Finding That the Charged Trades Are Within the Scope of 18 U.S.C. § 1031 ................................. 20

        2.  The Evidence Does Not Demonstrate That Mr. Litvak Acted with Specific Intent to Defraud the Government ............................................ 24

    E.  Additional Grounds Exist for Entry of a Judgment of Acquittal on False Statements Charges Under 18 U.S.C. § 1001 (Counts 13 Through 16) ............. 25

        1.  There Is Insufficient Evidence That Charged Statements Were Made in a Matter Within the Jurisdiction of the United States Government ........................................................................................... 24

        2.  The Evidence Is Insufficient to Establish That Mr. Litvak Knowingly and Willfully Violated 18 U.S.C. § 1001 ............................ 27

CONCLUSION ....................................................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdullah ex rel. Abdullah v. Travelers Property Cas. Corp.*,
    83 F. Supp. 2d 289 (D. Conn. 1999)................................................................10, 11

*Appert v. Morgan Stanley Dean Witter, Inc.*,
    673 F.3d 609 (7th Cir. 2012) ...............................................................................18

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..............................................................................................14

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)................................................................................................5

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................15

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)............................................5

*Feinman v. Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 1996)....................................................................................17

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..................................................................................14

*Hart v. Internet Wire, Inc.*,
    145 F. Supp. 2d 360 (S.D.N.Y.2001)......................................................................5

*In the Matter of John P. Flannery*,
    Admin. Proceeding File No. 3-14081, 2011 SEC LEXIS 3835 (Oct. 28, 2011)....................15

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)...................................................................20

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003).....................................................................5

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    851 F. Supp. 2d 512 (S.D.N.Y. 2012)...................................................................14

*Jackson v. Virginia*,
    443 U.S. 307 ...........................................................................................................4

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir.2001)........................................................................5

*Neder v. United States*,
    527 U.S. 1 (1999)........................................................................14, 19

*Rewis v. United States*,
    401 U.S. 808 (1971)........................................................................27

*S.E.C. v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010)........................................................15

*United States v. Abu-Jihaad,*
    600 F. Supp. 2d 362 (D. Conn. 2009)........................................................4

*United States v. Ali*,
    68 F.3d 1468 (2d Cir. 1995) *on reh'g*, 86 F.3d 275 (2d Cir. 1996)........................................14

*United States v. Ballistrea*,
    101 F.3d 827 (2d Cir. 1996)........................................................19

*United States v. Bank of New York Mellon*,
    941 F. Supp. 2d 438 (S.D.N.Y. 2013)........................................................9, 10, 11

*United States v. Binette*,
    945 F. Supp. 2d 223 (D. Mass. 2013)........................................................25, 27

*United States v. Candella*,
    487 F.2d 1223 (2d Cir.1973)........................................................25

*United States v. Cassese*,
    290 F. Supp. 2d 443 (S.D.N.Y. 2003) *aff'd*, 428 F.3d 92 (2d Cir. 2005)........................................13

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)........................................................3, 4

*United States v. DeSantis*,
    134 F.3d 760 (6th Cir. 1998)........................................................4

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)........................................................4

*United States v. Irving*,
    452 F.3d 110 (2d Cir. 2006)........................................................3

*United States v. Johnson*,
    No. 3:06CR160, 2013 WL 3422016 (D. Conn. July 8, 2013)........................................4

*United States v. Kwan,*
No. 02 CR 241, 2003 WL 22992064 (S.D.N.Y. Dec. 17, 2003) ...............................................3

*United States v. Litvak,*
No. 3:13-cr-19, 2013 WL 5740891 (D. Conn. Oct. 21, 2013)...........................................25, 11

*United States v. Lucarelli,*
476 F. Supp. 2d 163 (D. Conn. 2007).......................................................................................3

*United States v. Martinez-Sandoval,*
01 CR. 307, 2003 WL 1442454 (S.D.N.Y. Mar. 6, 2003).......................................................13

*United States v. Moore,*
612 F.3d 698 (D.C. Cir. 2010) ................................................................................................25

*United States v. Novak,*
443 F.3d 150 (2d Cir. 2006)..................................................................................................5, 9

*United States v. Regent Office Supply Co., Inc.,*
421 F.2d 1174 (2d Cir. 1970)............................................................................................4, 8, 9

*United States v. Reyes,*
302 F.3d 48 (2d Cir. 2002)........................................................................................................3

*United States v. Santos,*
553 U.S. 507 (2008)................................................................................................................27

*United States v. Shellef,*
507 F.3d 82 (2d Cir. 2007).....................................................................................................10

*United States v. Starr,*
816 F.2d 94 (2d Cir. 1987)............................................................................................. passim

*United States v. Triumph Capital Group, Inc.,*
544 F.3d 149 (2d Cir. 2008).....................................................................................................4

*United States v. Universal C.I.T. Credit Corp.,*
344 U.S. 218 (1952)................................................................................................................27

*United States v. Whitman,*
904 F. Supp. 2d 363 (S.D.N.Y. 2012).......................................................................................5

*United States v. Yermian,*
468 U.S. 63 (1984) ..................................................................................................................25

**STATUTES**

12 U.S.C. § 5231(c)(1).............................................................................................................26

15 U.S.C. § 78ff .......................................................................................................1

15 U.S.C. § 78j(b) ...................................................................................................1

18 U.S.C. § 1001 ............................................................................................ passim

18 U.S.C. § 1031 ............................................................................................ passim

Fed. R. Crim. P. 29(a) ......................................................................................3, 29

**OTHER AUTHORITIES**

*Black's Law Dictionary* 434 (7th ed.1999) ...........................................................5

*Websters Third New International Dictionary* 593 (1968).....................................5

**Introduction**

## I.      BACKGROUND

### A.      Indictment

On January 25, 2013, a Federal grand jury in the District of Connecticut indicted the

defendant Jesse C. Litvak on 11 counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b)

and 78ff (Counts 1 through 11); one count of major fraud against the Troubled Asset Relief

Program ("TARP"), in violation of 18 U.S.C. § 1031 (Count 12); and four counts of making a

false statement in a matter within the jurisdiction of the United States Department of Treasury, in

violation of 18 U.S.C. § 1001 (Counts 13 through 16) (the "Indictment" or "Ind.").  On February

17, 2014, the government moved to dismiss Count 7, which motion was granted by the Court the

following day.

The Indictment alleges that, while working at Jefferies and Co. ("Jefferies"), Mr. Litvak

made fraudulent misrepresentations to buyers of residential-mortgage backed securities

("RMBS") about Jefferies's acquisition costs in order to obtain extra undisclosed profit for

Jefferies, at the expense of the alleged victims.  (Ind. ¶ 33).  The Indictment further alleges that,

on certain occasions, Mr. Litvak made misrepresentations to buyers of securities regarding the

true identity of the seller in order to earn additional profit, at the expense of the alleged victims.

(*Id.* ¶¶ 47-48).

In charging this case the government elected to pursue an actual economic harm theory.

To that end, the government charged in the Indictment that:

> "29.    As a result of this scheme, Mr. Litvak caused victim-customers to sustain
> losses of more than $2,000,000."  (*Id.* ¶ 29).

> "33 … a. … Mr. Litvak would and did misrepresent to the buyer the price
> Jefferies had agreed to pay the seller, providing Jefferies with an extra and
> unearned profit at the buying victim-customer's expense."  (*Id.* ¶ 33a).

"33 … b. … Mr. Litvak would and did misrepresent to the seller the price the buyer had agreed to pay to Jefferies, providing Jefferies with an extra and unearned profit at the selling victim-customer's expense."   (*Id.* ¶ 33b).

"34.   In certain sales of bonds from Jefferies' inventory, Mr. Litvak would and did misrepresent to the buying victim-customer that the transaction was an order or bid list trade requiring 'on top' compensation, providing Jefferies with an extra and unearned profit at the buying victim-customer's expense." (*Id.* ¶ 34).[2]

On several of the trades alleged in the Indictment, the counter-party with whom Mr. Litvak negotiated was an investment professional who managed a Public-Private Investment Fund ("PPIF") in which the Department of Treasury ("Treasury"), as part of TARP and the Public-Private Investment Program ("PPIP"), was an investor.  (Ind. ¶¶ 5-7).

**B.     Trial**

Trial commenced on Tuesday February 18, 2014, with opening statements and the government's initial witnesses.  The government called the following witnesses in its case-in-chief: (1) David Miller, Former Chief Investment Officer, TARP; (2) Adam Wolf, Bloomberg L.P.; (3) Thomas Carocci, Senior counsel-Criminal Prosecution Assistance Group, FINRA; (4)

---

[2] In connection with the announcement of the Indictment, consistent with the crimes actually charged therein, Special Inspector General for TARP, Christy Romero, commented that  "[t]he charges paint a picture of Litvak shamelessly lying to dupe the government into overpaying for mortgage securities with bailout funds."  Press Release, United States Attorney's Office, District of Connecticut, Connecticut RMBS Trader Charged with Securities      Fraud,      Defrauding      TARP      Program      (Jan.      28,      2013), http://www.justice.gov/usao/ct/Press2013/2013/20130128-1/html. (emphasis added).   She further remarked that "[Mr. Litvak] is alleged to have intentionally overcharged the Government in its purchase of these mortgage derivatives[.]"  Christy Romero, Special Inspector General, Office of the Special Inspector General for the Troubled Asset Relief Program, Press Briefing, Indictment of Former Jefferies & Co. Senior Trader / Managing Director (Jan. 28, 2013), www.sigtarp.gov/Statements/Statement_on_Litvak_Indictment.pdf. (emphasis added).  In its own release the government declared that:

> The indictment alleges that Litvak engaged in a scheme to defraud based on two different types of misrepresentations. In certain transactions, Litvak misrepresented the RMBS seller's asking price to the buyer or misrepresented the buyer's price to the seller, keeping the difference between the price paid by the buyer and the price paid to the seller for Jefferies. In other transactions, Litvak misrepresented to the RMBS buyer that bonds held in Jefferies' inventory were being offered for sale by a fictitious third-party seller invented by Litvak, which allowed Litvak to charge the buyer an extra commission that Jefferies was not entitled to.  Through these schemes, it is alleged that Litvak defrauded six PPIP funds and multiple private investment funds of a total of more than $2 million.

Press Release, United States Attorney's Office (emphasis added).  The then United States Attorney for the District of Connecticut David B. Fein similarly highlighted Mr. Litvak's illegal profits.

Tracy Lincoln, Jefferies & Co., Inc.;  (5) Michael Canter, Senior Vice-President and Director of Securitized Asset, AllianceBernstein Holding LP; (6) Alan Vlajinac, Wellington Management Company; (7) Brian Norris, Invesco Advisors; (8) Joseph Wollman, QVT Financial; (9) Vladimir Lemin, Magnetar Capital, LLC; (10) Katherine Corso, York Capital; and (11) Al Paradiso, Jefferies & Co, Inc.; and (12)  James O'Connor, Special Agent of the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP).

## II.    ARGUMENT

### A.    Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that: "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[3]  Thus, Rule 29 "requires a judgment of acquittal on any charge for which there is insufficient evidence to sustain a conviction."  *United States v. Lucarelli,* 476 F. Supp. 2d 163, 167, 169-70 (D. Conn. 2007) (granting judgment of acquittal on securities fraud and conspiracy charges where it was clear the jury did not find specific intent to defraud the alleged victims); *see United States v. Reyes*, 302 F.3d 48, 50 (2d Cir. 2002) ( Rule 29 "authorizes a trial court to enter a judgment of acquittal if the evidence is insufficient to support a conviction."); *United States v. Kwan,* No. 02 CR 241, 2003 WL 22992064, at *6 (S.D.N.Y. Dec. 17, 2003) (overturning jury decision where evidence of element of charge lacking).  Where, as here, the district court should conclude that "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt," the defendant's Rule 29 motion should be granted.  *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal citation and quotations omitted); *United States*

---

[3] Rule 29(a) adds that "[i]f the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so."

*v. Cassese*, 428 F.3d 92, 98, 103 (2d Cir. 2005) (affirming grant of judgment of acquittal where government failed to establish defendant acted with the requisite mens rea under SEC Rule 14e-3); *see also United States v. Johnson*, No. 3:06CR160, 2013 WL 3422016, at *1, *9-10 (D. Conn. July 8, 2013) (granting Rule 29 motion).

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (emphasis in original). "[A]t the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *Cassese*, 428 F.3d at 99 (quoting *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir. 2002)). The Second Circuit has explained that "'[w]here a fact to be proved is also an element of the offense . . . 'it is not enough that the inferences in the government's favor are permissible.'" *United States v. Abu-Jihaad,* 600 F. Supp. 2d 362, 383 (D. Conn. 2009) (quoting *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (citation omitted)).

**B.    The Government Failed to Prove Mr. Litvak Acted with Intent to Defraud (Counts 1 Through 6, and 8 Through 12)**

As we have previously argued, an essential element of the government's fraud charges against Mr. Litvak is his intent to defraud – that he acted willfully and with the specific intent to deceive his victims for the purpose of causing them financial loss. All the fraud counts charged in the Indictment thus require proof that Mr. Litvak acted with specific intent to deceive and cause economic harm. *See, e.g.*, *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) ("[b]oth [securities fraud and mail fraud] statutes require a specific intent to defraud.") (citing cases from multiple Circuits); *United States v. Regent Office Supply Co., Inc.*, 421 F.2d 1174,

1180 (2d Cir. 1970) (in mail fraud prosecution, government cannot "escape the burden of showing that some actual harm or injury was contemplated"); *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (same); *United States v. Whitman*, 904 F. Supp. 2d 363, 372-73 (S.D.N.Y. 2012) ("axiomatic" that mail fraud requires proof of "intent to harm" by depriving victim of property, and "where, as in this case, the government charges a scheme to defraud under subdivision (a) of Rule 10b–5, proving specific intent to defraud is necessary").  Proof of lies is insufficient to establish intent to defraud.  As one court has explained in the securities fraud context in language highly applicable here:

> [N]ot every knowing misrepresentation creates a legal cause of action under the securities laws.  The requisite state of mind, or scienter, in an action under Section 10(b) and Rule 10b-5, that the plaintiff must allege is a purpose to harm by intentionally deceiving, manipulating or defrauding. *Kalnit v. Eichler*, 264 F.3d 131, 137 (2d Cir. 2001); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (same). . . . Thus, an "intent to defraud" is the intent "to cause injury or loss to (a person) by deceit." *Black's Law Dictionary* 434 (7th ed.1999); *see also Websters Third New International Dictionary* 593 (1968) (defining "to defraud" as "to take or withhold from (one) some possession, right or interest by . . . deception").
>
> It is well settled that, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994) (quotation omitted). Misrepresentations with the purpose of causing loss to another deserving punishment by law and those involving acts addressed to business conscience which require the supervision of publicly appointed and elected regulators are not the same. Ethical violations in business transactions do not become legal causes if the law does not apply. While "Section 10(b) is aptly described as a catchall provision . . . what it catches must be fraud." *Id.* at 174 (quotation omitted). *See also Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 366 (S.D.N.Y.2001) ("A 10b-5 case requires intentional misconduct.").  Succinctly stated, not every action deserving the punishment of conscience invokes the punishment of law.

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003).  Mr. Litvak's alleged victims received (or sold) the RMBS they wanted to receive (or sell) at a price they negotiated and accepted.  The fraud statutes charged do not criminalize Mr. Litvak's alleged misrepresentations under these circumstances.  The fact that he may have

lied about matters not going to the nature of the bargain is insufficient under Second Circuit precedent.  *See United States v. Starr*, 816 F.2d 94 (2d Cir.1987).

As explained above, to satisfy this element, the Indictment identified actual monetary loss by Jefferies's counter-parties and the intended deprivation must be proven in the form of intended monetary harm.  The government has expressly taken on this burden by explicitly alleging loss and economic harm in the Indictment.  (*See, e.g.*, Ind. ¶ 29 (alleging "losses" of over $2 million), ¶ 33(a) ("providing Jefferies with an extra and unearned profit at the buying victim-customer's expense")).  The government's theory of the case is that Mr. Litvak sold bonds at "inflated" prices.  Put another way, the crux of the government's position is that Mr. Litvak's alleged misrepresentation caused the counter-parties to pay "inflated prices" because they were not purchasing bonds "at the lowest available price and [therefore] those investments were not as profitable as they would have been otherwise."  (Government's Memorandum in Opposition to Defendant's Motion to Dismiss the Indictment, Sept. 9, 2013 [Doc. No. 61], at 28 (citing Ind. ¶¶ 19, 34-46)).  Having expressly charged victim loss (to the tune of millions of dollars) and economic harm, the government opted to make this case about victim loss and economic harm.  Having premised its case on "lowest available price" for, and the ultimate profitability of, the bonds, the government opted to make this case about lowest available price and profitability.  It bears the burden of proving the case it chose to bring.  The government has failed to prove that Mr. Litvak specifically intended to cause this type of economic harm to anyone.

The failure of proof as to Mr. Litvak's intent to defraud – his intent to cheat others out of money – mandates acquittal, as evidenced by the Second Circuit's holding in *Starr*.  In this regard, the trial evidence shows the following:

- On each charged transaction, Jefferies's counter-party acquired or sold the RMBS at the fully disclosed negotiated price, which the counter-party had determined was in his or her funds' best interest. (*See, e.g.*, Tr. at 888:23 – 889:15 (Norris)). There is no evidence of any overpayment or overcharge. (*See, e.g.*, Tr. at 495:22 – 496:4 (Canter); Tr. at 817:13-22 (Vlajinac) (Wellington paid what it deemed "an appropriate transaction price" for the RMBS in question); Tr. at 905:13-24 (Norris) (nothing that Mr. Litvak said that day "affected the nature or quality of the bond purchased")).

- What Mr. Litvak said about Jefferies's cost did not impact the counter-party's valuations. (*See, e.g.*, Tr. at 836:8-16 (Vlajinac) (statements of seller did not "disrupt[] or "impede[] . . . thinking about appropriate price levels."; Tr. at 904:13-17 (Norris) ("[t]he investment analysis aspect of [the deal] does not change" upon discovering Mr. Litvak's misrepresentations)).

- There is no evidence that any better price was available in the market at the time the charged transactions were negotiated and consummated. Each victim witness testified that he or she exercised appropriate diligence and determined that no better price was available in the market at that time for that bond. In fact, there is no evidence that the RMBS were available anywhere else in the market at any price. (*See, e.g.*, Tr. at 529:9-23 (Canter)).

- The counter-parties were satisfied that they obtained, "best execution," in that there was no better price available. (*See, e.g.*, Tr. at 531:23 – 532:7 (Canter); Tr. at 823:15-18 (Vlajinac) (trader "did [his] job in terms of discharging . . . best execution responsibilities to the Wellington funds that were buying" from Jefferies.)). That a broker could not negotiate a better price does not mean they did not transact at best execution. (Tr. at 534:18-25 (Canter)).

- Whether Jefferies had a greater mark-up or profit on a transaction is not relevant to what the counter-party sold or acquired. Jefferies's profit has no "direct impact" on the funds "as of [the] trade date." (*See, e.g.*, Tr. at 627:9-18 (Canter); Tr. at 921:24 – 922:8 ("[f]ocusing on the economics of the trade, potential yield and profit, nothing about Jesse's tactics or what he said … changed the economics of buying that bond at 79-30 on that day") (Norris)).

- The so-called "commissions" are paid "through the actual [negotiated] price of the bonds." (*See, e.g.*, Tr. at 419:17-24 (Canter)).

Viewing the evidence most favorably to the government, the facts here still mirror those in *Starr*, and in turn the outcome in *Starr* requires Mr. Litvak's across-the-board acquittal on the fraud counts. In *Starr*, the defendants contracted to provide mailing services to their customers. 816 F.2d at 96. The customers paid the defendants the postage due, a fairly high rate for a

particular class of delivery service.  The scheme charged was that the defendants defrauded their customers by means of "burying" higher rate mailings in lower rate bulk mailings and failing either to pay the Postal Service the correct postage due or to refund the excess funds to their customers.  *Id.*  The defendants then prepared fraudulent Postal Service forms that they sent to their customers indicating falsely that the legally correct postage had in fact been paid.  *Id.*

Relying largely on *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), the Second Circuit reversed:

> Our decision in *Regent* identifies an important distinction that the government appears to lose sight of in this case.  Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim.  **Moreover, the harm contemplated must affect the very nature of the bargain itself.**  Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered or intended to deliver."  421 F.2d at 1182.
>
> * * *
>
> The jury heard the following evidence that the [defendants] practiced a deceit on their customers.  The [defendants] represented that funds deposited with them would be used only to pay for their customers' postage fees.  In fact, the [defendants] used only a portion of those funds to pay postage; the remainder was appropriated to their own use.  Moreover, the [defendants] caused fraudulent postal receipt forms to be sent to their customers in order to avoid detection of their scheme.  Clearly, their lettershoppe customers were deceived.

816 F.2d at 98-99 (emphasis added).  As the Second Circuit went on to hold, that deception of their customers and the fact that the defendants earned a greater profit than disclosed by keeping for themselves a portion of their customers' fees that they had told the customers "would be used only to pay their customers' postage fees," was not enough to make them guilty of fraud.  *Id.* at 99.  That this expectation of the customers – fostered by the defendants and backed up by falsified receipts saying so explicitly – was defeated by the defendants misappropriating postage fees to their own profit was simply not "sufficient to support a finding of fraudulent intent."  *Id.*

That "defeated expectation alone would not affect the nature or quality of the services that was the basis of the customers' bargain." *Id.* at 99-100.

That the defendants were retaining a greater profit than known to the customers, who were paying a fully disclosed price for something they actually received, is a "'harm' intended by the [defendants that was], at most, metaphysical and certainly not of the character identified in *Regent* as being sufficient to infer fraudulent intent." 816 F.2d at 100.  As *Starr* demonstrates, misrepresentations alone – even misrepresentations that conceal "inflated" profit – are insufficient to prove fraud.  *See Novak*, 443 F.3d at 156, 159 (finding "government" failed to 'prove that defendants *contemplated* some actual harm or injury to their victims' to support a mail fraud claim, and that intended harm "must affect the very nature of the bargain itself [and] . . . is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver'") (quoting *Starr*, 816 F.2d at 98) (emphasis in original)).

The Second Circuit's decision in *Starr* remains controlling.  In a recent decision, in assessing civil defendants' efforts to move to dismiss claims based on the mail and wire fraud statute, Judge Kaplan of the Southern District of New York explained that with respect to attacks on the government's allegations of "intent to harm," the defendants' "contentions to the contrary would have more force if the facts were somewhat different."[4]  The court posited that:

---

[4] The practice challenged in this lawsuit was the defendant-bank's "standing instruction service" in which the defendant-bank "automatically provides currency exchange as the needs arise . . . reliev[ing] clients from having to negotiate individual FX trades in such circumstances[.]"  *United States v. Bank of New York Mellon*, 941 F.Supp. 2d 438, 444 (S.D.N.Y. 2013). The defendant-bank "handles the trade 'from start to completion' setting the price itself [and] *[o]nly after the fact does the client learn the rate at which the exchange was executed*." *Id.* (citation omitted) (emphasis added).  The court explained that "[w]hether that service gave customers the best available market price at the time of execution or some other, less favorable price, is quite plainly a question that goes to the 'nature or quality of the service' the Bank was providing" taking it out of "*Regent Office Supply* or *Starr*, where defendants lied to their victims but the victims nevertheless received the goods or services they expected." *Id.* at 474.

> Suppose [defendant-bank] had engaged a customer in a directly negotiated transaction and quoted a price of, say, $1.31 per euro. Suppose further that the [defendant-bank] represented also that this was the 'best available price' at that time—or even that it was making no profit at that price—while in fact the [defendant bank] expected to make or made a significant profit. **If the customer agreed to the price, the essence of the bargain would be the exchange of currencies at the agreed-upon price of $1.31 per euro and there would be no showing of an intent to harm in the absence of other circumstances.** ([citing] *Starr*, 816 F.2d at 99-100 (identifying no contemplated harm where defendant mail service misrepresented to customers underlying prices it paid Postal Service for their deliveries); *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (concluding that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid" do not violate fraud statutes)). **The customer generally has no interest in what profits the [defendant-bank] actually made so long as it received what was agreed.**

*Bank of New York Mellon*, 941 F. Supp. 2d at 474 (citation omitted) (emphasis added).  Judge Kaplan's hypothetical is on all-fours with the government's evidence against Mr. Litvak, and reinforces that the evidence against Mr. Litvak falls squarely within the fact-pattern deemed insufficient to support a fraud claim in *Starr*.

Similarly, in *Abdullah ex rel. Abdullah v. Travelers Property Cas. Corp.*, 83 F. Supp. 2d 289, 291-92 (D. Conn. 1999), the plaintiffs' RICO claims predicated on mail and wire fraud violations were dismissed for failure to allege cognizable harm under the *Starr* line of cases.  The plaintiffs had entered into settlements "for a sum certain [which] consisted of a lump sum payment and an annuity" as specified in their agreement with defendants.  *Id.* at 291.  The plaintiffs claimed that:

> during settlement negotiations [defendant] falsely represented the actual cost of the annuities, claiming that the costs allegedly quoted by [defendant] did not account for the rebates. Specifically, when [defendant] purchased the financial instruments that would fund the amount specified in the agreement, [defendant] did not mention that it was getting a deal by paying less than the amount originally disclosed to the plaintiffs. Plaintiffs further allege that [defendant] continually mislead them by mailing canceled checks stating the cost of the annuities without regard to the rebates. Finally, plaintiffs assert that the difference between the actual cost to [defendant] and the represented cost belongs to them.

*Id.* at 290.  The plaintiffs did not dispute that they were to "receive the amount of money and payment stream for which they bargained in the settlement agreements, or that the value of the payment stream is anything less than bargained for."  *Id.* at 291.  The court therefore concluded that "[a]ny costs or rebates that [defendant] incurred in obtaining the amount of money bargained for in the settlement is immaterial as to the value of the settlement, and in no way injured the plaintiffs."  *Id.*  It added that "[d]espite any alleged misrepresentation, plaintiffs will receive the same settlement amounts and value of the settlements they would have received if [defendant] did not accept any rebates."  *Id.* at 292.  The Court reached the same result as *Starr*, because plaintiffs did "not allege how the alleged representations entitle[d] them to the difference between the actual cost and the rebate cost, or how they received anything less than what they were promised, or how the failure to disclose the rebates or costs of the annuities in anyway affected their settlements."  *Id.*

The absence of evidence suggesting anything other than that the alleged victims received all that they bargained for with Jefferies precludes a finding of guilt under *Starr* and its progeny.  The government charged that as a result of Mr. Litvak's alleged material misrepresentations, the sophisticated investment managers with whom he dealt were duped into paying prices higher than they otherwise would have paid.[5]  The alleged victims transacted at a fully disclosed price for a security they actually sold or received.  The only conceivable discrepancy is the amount of Jefferies's profit, which as the foregoing makes clear, is insufficient as a matter of law to support intent to defraud.  *See Bank of New York Mellon*, 941 F. Supp. 2d at 474 (opining that there would be "no showing of intent to harm" if customer received what he bargained for at

---

[5] *See, e.g.*, Transcript of Nov. 4, 2013 Hearing at 51-52, *United States v. Litvak*, No. 3:13cr19 (JCH) (D. Conn. Nov. 4, 2013) ("[i]t is not a question of would they [the counter-parties] have done a deal.  It is a question of would they have done a deal at a better price had they gotten true information….There's no argument here that the transaction would not have happened but for lies.  It is that the transactions wouldn't have happened at the price they happened at.").

negotiated price, even if defendant falsely represented it was the "best available price" or that it was "making no profit at that price" when in fact it "made a significant profit").

The record is replete with additional evidence negating any intent to defraud.  Evidence which overwhelms anything conceivably supporting the government's claims on this element. For example, on one trade, charged in Counts 1, 12, and 13, Mr. Canter acquired the bond in question from Jeffries at the very price he bid.  (Tr. at 628:21 – 629:1 (Canter)).  Similarly, Ms. Corso testified that on the sale charged in Count 8, she received a price for the bond that fulfilled her best execution duties.  (*See* Tr. at 1209:12 – 1210:4 (Corso)).

Wellington made its purchase on the transaction charged in Counts 5, 12, and 15 at a price even lower than its own valuation.  Wellington already owned the bond in question, and assigned a value to that position, as it was obligated to do.  The evidence showed that Wellington marked the bond at 78.61 on December 23, 2009 (DX 625), over two points higher than its purchase price of 76 from Jeffries on that same day.  (Tr. at 807:14 – 808:12; 823:3-14 (Vlajinac)).

Not surprisingly, the alleged victims repeatedly testified that they would do the trades again at the same price.  (*See*, *e.g.*, Tr. at 643:24 – 644:3 (Canter); Tr. at 903:12–905:3 (Norris)). Moreover, any inference that Mr. Litvak acted to purposely harm his counter-parties is belied by the undisputed evidence that sophisticated professionals would transact only at "a price that . . . analytics and judgment told you was in the best interest of the fund." (*See*, *e.g.*, Tr. at 596:11-597:3 (Canter); Tr. at 898:9-20 (Norris) ("[W]e were fairly dependent, almost exclusively dependent on what the output of our research team gave us."); Tr. at 977:9-15 (Wollman) (testifying on reliance on own fundamentals and analytics); Tr. at 1206:2-1207:2 (Corso)).

In addition, the evidence demonstrates that sophisticated investment professionals know that market participants may be untruthful when employing sales tactics. (Tr. at 985:5-13 (Wollman)). Remarkably, several of the government's own witnesses were revealed to have engaged in misleading conduct. For example, Mr. Norris testified that RMBS sellers make "intentionally inaccurate" representations as part of their sales tactics and included himself among those who have engaged in such practices. (Tr. at 925:7-9; 926:7-23 (Norris)). Mr. Canter also testified to that effect. (Tr. at 573:21 – 574:1(Canter)).[6] For this reason, everyone knows, including the people employing such tactics, that such information is "take[n] with a grain of salt." (Tr. at 928:3-19 (Norris); Tr. at 789:12-25 (Vlajinac) (acknowledging skepticism towards representations of market participants); Tr. at 1020:24-1021:7; 1028:15-19; (Wollman); Tr. at 1117:22-1118:4 (Lemin)).

"Where even when taken together, all the government's evidence of . . . culpability . . . gives at most 'equal circumstantial support' to competing explanations [of the defendant's] intent . . . the government's evidence . . . fails to establish . . . guilt beyond a reasonable doubt." *United States v. Cassese*, 290 F. Supp. 2d 443, 456 (S.D.N.Y. 2003) *aff'd*, 428 F.3d 92 (2d Cir. 2005) (granting Rule 29 motion where evidence insufficient to establish defendant acted with the requisite mens rea for liability under Exchange Act); *United States v. Martinez-Sandoval*, 01 CR. 307, 2003 WL 1442454, at *6 (S.D.N.Y. Mar. 6, 2003) (granting Rule 29 motion where "circumstantial evidence regarding Defendant's specific intent . . . equally supports competing theories of guilt or innocence"). In this case, the government's circumstantial evidence of culpability cannot begin to overcome with the exculpatory explanations of Mr. Litvak's intent.

---

[6] Mr. Canter testified that he believed it was "okay" in response to the question "your interpretation is that when you are [falsely stating that the cover price was higher than it actually was] for the benefit of AllianceBernstein and its investors in the PPIF that's okay, correct?"

13

**C.      The Government Failed to Prove the Materiality of Mr. Litvak's Alleged Misstatements (All Counts)**

1.      <u>The Government's Burden in Proving Materiality</u>

As the government acknowledges, materiality is an essential component of each of the counts charged in the Indictment, one the government has not proven beyond a reasonable doubt. (*See, e.g.*, Gov't's Proposed Jury Ins., Nov. 15, 2013, Dkt. No. 92, at 20-21 (securities fraud counts), 32 (TARP fraud), and 44 (false statements)); *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 238 (1988) ("[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact") (emphasis in original); *Neder v. United States*, 527 U.S. 1, 22-23, 25 (1999) (materiality is an element of mail and wire fraud because at the time of the statutes' enactment, the word "defraud" [as also contained in 18 U.S.C. § 1031] was understood to "require[] a misrepresentation or concealment of [a] *material* fact") (emphasis in original)); *United States v. Ali*, 68 F.3d 1468, 1475 (2d Cir. 1995) *on reh'g*, 86 F.3d 275 (2d Cir. 1996) (overruling prior Second Circuit precedent and holding that materiality is indeed an element of a Section 1001 charge) (internal quotations omitted)).   To prove materiality, the government is required to show a "substantial likelihood" that disclosure of the misrepresented facts would have <u>significantly</u> altered the "total mix" of information made available to the reasonable RMBS investor.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 535 (S.D.N.Y. 2012) (internal citations omitted).

It is not "enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant" to the buy or sell decision.  *Basic*, 485 U.S. at 238.  Misrepresentations about peripheral facts and characteristics extraneous to the quality or risk of investors' purchases are not "material."  Importantly, the Second Circuit has emphasized that "[i]t is not sufficient . . . that the investor might have considered the misrepresentation or omission important."  *Ganino v.*

*Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (reasoning that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" for the misrepresentation to be material) (citing *Basic Inc., v. Levinson*, 485 U.S. 224, 231 (1988)).  The standard is an objective one that depends on all relevant circumstances.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Where particularly sophisticated market participants or complex financial products are involved, as is the case here, the reasonable investor standard warrants a showing of materiality commensurate with the specific marketplace and transactions at issue.  *See S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 372 (S.D.N.Y. 2010) (finding that the SEC failed to prove materiality of statements concerning customer's indication of interest because the demand for deliverable bonds was known in the market – particularly to sophisticated high yield bond buyers); *In the Matter of John P. Flannery*, Admin. Proceeding File No. 3-14081, 2011 SEC LEXIS 3835, at *102-49 (Oct. 28, 2011) (rejecting SEC staff's allegations of material misrepresentations in various statements regarding fixed-income portfolio, given information that sophisticated investors customarily would rely upon in making particular types of fixed income investments).

    2.    The Evidence Belies the Materiality of Mr. Litvak's Alleged Misrepresentations to Professional Investment Managers

The government's failure to prove materiality at trial requires entry of a judgment of acquittal as to all charges.  The evidence shows that Mr. Litvak's alleged misrepresentations would not be material to a reasonable professional investment manager's decision in choosing to purchase or not purchase, sell or not sell, the RMBS bonds.  No reasonable professional investment manager would (or actually did) consider these statements so important as to alter

significantly the total mix of information available in making their investment decisions regarding the RMBS bonds at issue in this case.  Rather, the evidence shows that the sophisticated professional investment managers of the type with whom Jefferies transacted make investment decisions based on their own analysis of the fundamentals of the securities.  (*See, e.g.*, Tr. at 495:22 – 496:4 (Canter); Tr. at 842:22 – 843:36 (Vlajinac) ("well-equipped to make those judgments about price" and  would have traded "if the price was right on the bonds"); Tr. at 879:5-9 (Norris);  Tr. at 898:9-20 (Norris) ("[W]e were fairly dependent, almost exclusively dependent on what the output of our research team gave us."); Tr. at 915:25–916:1 (Norris) ("Broker/dealer's projections on yields aren't all that important to us, to be honest with you.")).

The evidence establishes that Jefferies's profits – the subject of the alleged misrepresentations – simply would not (and should not) have mattered to reasonable sophisticated institutional investors who care principally about price and yield.  (*See, e.g.*, Tr. at 648:19-22 (Canter) (Jefferies's profit not required for "investment analysis in deciding how much to pay for a bond"); Tr. at 904:13-17 (Norris) ("The investment analysis aspect of [the deal] does not change" upon discovering Mr. Litvak's misrepresentations); Tr. at 903:12-904:6 (Norris) ("bid[s] based  "in very large part on Invesco's own expertise and analysis" and offered "before anything that … Jesse Litvak told you about this bond")).  Whatever Mr. Litvak said about Jefferies's costs had no bearing, for example, on each of the deals with the government's putative star witness, Michael Canter of Alliance Bernstein.  Mr. Canter testified in substance that:

> on each of the deals, AllianceBernstein got the bond, at the price …   [he] determined was in the best interest of the funds and regardless of anything that Jesse Litvak or Beth Starr or anyone else at Jefferies did … [he] never bid on a bond at a level that … [he] thought was too high to pay for that bond on that day

… [In Mr. Canter's view he] never overpaid for a bond, in terms [of] an appropriate price.

(Tr. at 495:16-496:22 (Canter)).  This is because -- as the alleged victims consistently testified -- a marginally greater embedded mark-up does not alter any of the economics of the trades.  (*See, e.g.*, Tr. at 498:19-22 (Canter) ("The profit potential of the bond on trade date, once … [parties] agreed to the price, was not altered by any information … learned after the fact" about broker's profit)).  The immateriality of these mark-ups is reinforced by the fact that generally investment managers are not even aware of their amount, and certainly do not track them for any purpose.  (*See, e.g.*, Tr. at 893:13-22 (Norris); Tr. at 1036:12-1037:2 (Wollman)).  These sophisticated money managers received the bonds they wanted at a price they knew, and that that price included greater profit to Jefferies would not have significantly altered the total mix of information relevant to the investment decision.

Alleged misrepresentations and minor variances in a broker's costs simply would not (and did not) significantly alter the total mix of information available to the sophisticated investors here in their assessment of whether to buy or sell RMBS.  That a "larger slice of the purchase price went to Jefferies than one thought at the time" is not material to a purchase or sale decision.  (*See, e.g.*, Tr. at 598:4-8 (Canter)).  This is because such facts – if true – had "no direct impact on the fund[s] as of [the] trade date[s]."  (Tr. at 627:9-15 (Canter)).  The buyers acquired the same bonds, with the same risk/reward profile, at the very same price they were willing to pay and the government has not proven that Mr. Litvak's conduct caused any alleged victim to pay more than fair market value.  And, that is because what Mr. Litvak allegedly misrepresented is not material to professional investors.  (*See, e.g.*, Tr. at 820:16–821:8 (Vlajinac) ("misrepresentations concerning the existence of a third-party seller and the acquisition cost did not affect … thinking about the bond itself")).

There is no evidence that the RMBS at issue were available at a better price than that offered by Jefferies.  Indeed, all of the evidence is to the contrary.  Each victim got the bond he thought he was buying at the price he knew he was paying.  (*See, e.g.*, Tr. at 531:23–532:7 (Canter)).  The immateriality of the alleged misrepresentations is reinforced in that Mr. Litvak's alleged victims would execute the same trades at the same price again irrespective of Jefferies's actual profit on the trades.  (*See, e.g.*, Tr. at 628:21-629:3 (Canter) ("perfectly happy with the trade" at the "price" paid; 644:4-11 (Canter); Tr. at 822:9-12; Tr. at 823:3-14 (Vlajinac) ("I would say that I achieved best execution with the parameters that were set to me internally, whether or not I thought there was a value to it at 76, I don't know.  Would I do it again at 76, just based on price, probably.")).

The Second Circuit has found that misrepresentations concerning broker fees are certainly not necessarily material as the government contends.  In *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996), the plaintiff-customers "alleged that the firms charged hidden commissions on every transaction, mislabeling their charges as transaction fees on confirmation slips supplied to the customer."  *Id.* at 540.  In affirming dismissal, the Second Circuit found that as a matter of law "mislabeling of the fees to disguise the defendants' commission or profit is not a material misrepresentation for purposes of a securities fraud claim."  *Id.* at 542.  The Court added that "[i]f brokerage firms are slightly inflating the cost of their transaction fees, the remedy is competition among the firms in the labeling and pricing of their services, not resort to the securities fraud provisions."  *Id.* at 541; *see also Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 616-17 (7th Cir. 2012) (finding that "whether [defendant] improperly inflated the [handling, postage and insurance fees] to include a profit is not objectively material to . . .  any class members' investment decisions").

3.      The Evidence Negates Any Inference of the Materiality of Mr. Litvak's Alleged
        Misrepresentations to the Department of the Treasury

The government's proof is uniquely lacking on materiality as to Counts 12 through 16,

which are predicated on the United States Treasury's investments with certain of Jefferies's

counter-parties on charged trades.    The evidence demonstrates that Mr. Litvak's alleged

misstatements did not (and could not) have "a natural tendency to influence . . . the decision of

the decision-making body" – the United States Treasury.  *Neder*, 527 U.S. at 16 (Section 7206(1)

context); *United States v. Ballistrea*, 101 F.3d 827, 835 n.5 (2d Cir. 1996) (Section 1001

context).   These statements were without question incapable of influencing the government's

decisions or activities.   As reflected in Mr. Miller's testimony and related evidence, Treasury

was completely removed from the private interactions between the PPIF managers and

Mr. Litvak, and all investment decision-making rested with the PPIF managers.   Mr. Litvak's

misrepresentations could not have been material to Treasury because, as Mr. Miller testified,

Treasury had no authority to tell the investment managers which RMBS to purchase or sell, or

how much to pay or obtain for any RMBS.    All of the decision-making under PPIP was

delegated to the professional investment managers.  (Tr. at 178:22 – 179:12; 181:19-22 (Miller)).

In fact, the "intent of the program [was] to keep the Treasury away from making buy and sell

decisions."  (Tr. at 176:13-19 (Miller)).

As to the allegedly misrepresented facts, the periodic reports Treasury received did not

disclose the mark-ups or profits brokers earned on trades.   (Tr. at 195:24-196:6; 197:10-14

(Miller)).   The government did not ask for or receive information of any broker's mark-up or,

how much they made on a particular trade.   (Tr. at 648:13-15 (Canter) ("no report that anybody

filled out and gave to Treasury with respect to ticks")).   As noted above, nobody at any of the

funds was even  keeping track of this information, which they ordinarily had no knowledge of or

wherewithal to obtain.  (*See, e.g.*, Tr. at 893:13-22 (Norris)).  Thus, there is no possibility that Treasury's actions were impacted or influenced by information it never asked for and never received, and the government has not (and cannot) sufficiently prove anything to the contrary.

Moreover, in the overall context of the government's PPIP investment, as demonstrated at trial, the alleged misrepresentations could not possibly have mattered to the government.  *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160-61 (S.D.N.Y. 2003) (holding "inflation of $217 million in the Company's revenues for the relevant period amounts to about 0.3% of . . . total revenues for that period — an immaterial percentage as a matter of law," and citing cases where percentage impacts of 3% to 9%, 2% and 1.5% were found immaterial).  The evidence showed that $ 29.4 billion (DX 920) was invested in connection with PPIP.  (Tr. at 153:18-22 (Miller)).  Alleged (unproven) price inflation of 0.003% is immaterial to Treasury as a matter of law.  (Ind. ¶ 29).[7]

## D. The Government Failed to Prove Additional Elements of Major Fraud Against the United States in Violation of 18 U.S.C. § 1031 as Charged in the Indictment (Count 12)

### 1. The Evidence Does Not Support a Finding That the Charged Trades Are Within the Scope of 18 U.S.C. § 1031

The government charged Mr. Litvak with so-called TARP Fraud under 18 U.S.C. §1031.  To satisfy its burden under this statute, the government is required to prove that the charged scheme or artifice took place "in a form of Federal assistance."  The evidence adduced at trial, most notably from Mr. Miller, demonstrates that the government is woefully short on evidence supporting any finding that this element of Section 1031 is satisfied.  As a threshold matter, there is no allegation or proof that Jefferies received any "federal assistance" in the form of TARP

---

[7] This figure is based on the total losses alleged with respect to the PPIF charges, $934,584.

funds.   Thus, the only theoretical ground for Section 1031 is coverage via the government's purchase of "troubled assets."   This too, however, has not been proven.

In its opening statement, the government remarked that because Jefferies' counter-parties in certain of the charged transactions were PPIFs the Indictment included "a charge of TARP fraud, Troubled Asset Relief Program charge, in connection with the purchase of a troubled asset, and the troubled asset is an RMBS."   (Tr. at 106:5-9).   Contrary to the government's contention, the evidence demonstrates that the transactions charged in Count 12 did not involve the purchase by the government of any "troubled asset." A judgment of acquittal should be granted.

The evidence concerning the operation of PPIP is largely uncontested.   PPIP funds were "investment counterparties receiving equity investments and loans from the $700 billion" in TARP funds allocated by Congress.   (Tr. at 189:11-12 (Miller)).   Treasury's investment in the PPIFs took two forms: equity, for which Treasury received limited partnership interests, and loans, for which Treasury received notes.   Each PPIF consisted of 75% of TARP funds, with private funds invested alongside.   (Tr. at 155:15; 163:15 (Miller)).   The PPIFs received TARP money to manage and Treasury received limited partnership interests and notes in return.   (Tr. at 180:9-15 (Miller)).   A PPIF was designed to "look like a private fund and actually be a private fund [because otherwise] the best professional money managers in the country might not participate."   (Tr. at 174:5-17 (Miller)).   For that, as well as public relations reasons, Treasury wanted the passive role of limited partner in the PPIFs and did not have a role in or authority over investment decisions.   (Tr. at 176:13-19 (Miller) (the "intent" of Treasury was "to put the investment decision-making in the hands of the private money managers and keep the government out of a direct role")).

Treasury's investment of TARP funds with the PPIFs and its associated acquisitions of limited partnership interests in these funds was the <u>only</u> purchase of troubled assets by the government under the PPIP, and therefore the only PPIP related transactions covered by Section 1031.   As Mr. Miller explained, contrary to the government's allegations, "the subsequent purchases by the PPIF managers after the troubled asset investment had taken place … these subsequent or downstream transactions were not government acquisitions of the troubled asset." (Tr. at 192:8-13 (Miller)).   There is no evidence to the contrary.   This testimony by Mr. Miller establishes unequivocally that the government cannot prove that the alleged fraud took place in "the government's purchase of any troubled asset" under Section 1031.   The government's purchases of the relevant troubled assets – its limited partnership interest in the PPIFs – were complete prior to the alleged *actus rei* of the crimes charged against Mr. Litvak.   Accordingly, Section 1031 is inapplicable here.

After the PPIFs were funded, the PPIF managers used available cash in the PPIFs from both public and private sources to purchase eligible bonds in the market on behalf of the funds. Jefferies transacted with the private PPIF managers in ordinary commercial arm's length transactions, characteristic of the RMBS market.   The bonds were owned by the funds, <u>not</u> by Treasury.   The fact that some of the money in the PPIFs originated with TARP does not drag Jefferies's transaction within the statute's scope, given the narrowly drawn list of circumstances that define the reach of Section 1031.   It is not alleged – much less has it been proven – that Jefferies and Mr. Litvak had anything to do with Treasury's decision to invest in the PPIFs.

Any argument that the PPIF bond purchases are the functional equivalent of direct purchases of troubled assets was gutted by Mr. Miller's testimony, and Treasury and SIGTARP's own views about the operative "troubled asset" purchases for PPIP purposes.   As Mr. Miller

further explained,  Treasury did not "own a piece of any individual bond" and had "no power to tell any of these PPIF managers to sell a particular bond either."  (Tr. at 180:9-181:22 (Miller)).  SIGTARP, in reviewing Treasury's determination that PPIF managers were neither government contractors nor financial advisors subject to the Federal Acquisition Regulation (the "FAR"), found that:

> [A]ccording to Treasury, the FAR does not apply to Treasury's selection of the asset managers with whom Treasury co-invests through the PPIFs, because the interests in the PPIFs itself—the limited partnership—is a "troubled asset" of which Treasury is authorized to purchase an equity interest under EESA.

(Tr. At 191:6-12 (Miller)).  There was no delegation of sovereign authority to the PPIP fund managers.  Here, TARP extended federal assistance in the form of the investment in the PPIFs.  The PPIFs in turn are alleged to have purchased RMBS from Jefferies.  But with Treasury's purchase of the "troubled assets" complete upon its investment in the PPIFs, and the funds in the hands of the PPIFs under private management and governed by a limited partnership agreement, the subsequent bond purchases fall outside the scope of something that can be fairly characterized as a government purchase of a "troubled asset," particularly where the PPIFs and not Treasury bought the bonds.  (Tr. at 176:13-19 (Miller) ("Absolutely, that was the intent of the program, to keep the Treasury away from making buy and sell decisions.")).

All the evidence makes abundantly clear that the government's representation to the jury in its opening that certain of the charged transactions involved the purchase of a troubled asset by the government in the form of RMBS is simply not true.  The government purchased partnership interests in the PPIFs. The evidence is clear that the government did not purchase any troubled assets from Jefferies, and accordingly there is no basis for finding Mr. Litvak guilty under Section 1031.

> 2.   <u>The Evidence Does Not Demonstrate That Mr. Litvak Acted with Specific Intent to Defraud the Government</u>

As explained most recently in Jesse C. Litvak's Supplemental Memorandum Concerning the Court's Draft Jury Charges, the government must prove that Mr. Litvak acted with the specific intent to defraud the government.  (Def. Supp. Mem. at 6-9, Feb. 23, 2014, ECF No. 208).  The evidence adduced by the government belies any suggestion that Mr. Litvak's alleged misrepresentations were made for the purpose of deceiving and economically harming the United States government specifically.  There is no evidence that Mr. Litvak sought to defraud the United States.  The record is devoid of evidence that Mr. Litvak knew each of the counter-parties on each of the trades charged in Count 13 was transacting for the United States government in that trade, such that any fraud perpetrated could be purposely perpetrated on the United States government.  And in fact, as described above, these counter-parties were <u>not</u> working for the government or transacting on its behalf at all.  There was no way for Mr. Litvak to know precisely on whose behalf the person was acting, other than on behalf of the professional money manager for whom he or she worked – whether AllianceBernstein, York Capital or Wellington.  In some instances his counter-party may not have even decided for whom they were acting and to what degree until after the transaction was executed.  Mr. Vlajinac testified that for certain he had no conversations with Mr. Litvak about which fund he was purchasing for in this trade.  (Tr. at 817:13-22 (Vlajinac); 818:4-10 (Vlajinac)).  In fact, Mr. Vlajinac was not even involved in deciding which Wellington funds acquired the RMBS.  Rather, his "job [was just] to buy bonds" for various funds managed by Wellington.  (Tr. at 797:15-798:1 (Vlajinac)).

There is further no evidence that Mr. Litvak understood how the PPIF program functioned, and what impact, if any, his transactions with certain of the investment professionals he transacted  with on a regular basis might have on Treasury's bottom line.  There is similarly

no evidence Mr. Litvak ever interacted with anyone at Treasury, let alone that he lied to anyone at Treasury (or anywhere else) for the purpose of deceiving Treasury.

E.     **Additional Grounds Exist for Entry of a Judgment of Acquittal on False Statements Charges Under 18 U.S.C. § 1001 (Counts 13 Through 16)**

1.     There Is Insufficient Evidence That Charged Statements Were Made in a Matter Within the Jurisdiction of the United States Government

Counts 13 through 16 charge Mr. Litvak with making false statements in violation of Section 1001 of Title 18.  Courts repeatedly have expressed concern about the potential misuse of the federal false statement statute, described by one judge as "the ever-metastasizing § 1001." *See United States v. Moore*, 612 F.3d 698, 702 (D.C. Cir. 2010) (Kavanaugh, J., concurring).[8] Here, the government has failed to prove its claims against Mr. Litvak for violations of Section 1001 because it has not offered sufficient evidence that Mr. Litvak made or caused to be made a false statement with respect to a matter "within the jurisdiction of a department or agency of the United States."  18 U.S.C. § 1001.  Simply put, none of the putatively false statements alleged fall within the ambit of the statute.

The evidence has demonstrated that the holding in *United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973), does not support a finding of guilt beyond a reasonable double, and instead, underscores what is lacking in the government's proof.  The Court wrote in connection with the motion to dismiss that "[a]s in *Candella*, the PPIFs were responsible for administering the purchase of troubled assets: Treasury created the PPIP for this sole purpose." *United States v. Litvak*, No. 3:13-cr-19, 2013 WL 5740891, at *10 (D. Conn. Oct. 21, 2013).  The evidence has demonstrated that this is not true.  As explained above, the only purchase of troubled assets

---

[8] *See also United States v. Binette*, 945 F. Supp. 2d 223, 227 (D. Mass. 2013) (citing *United States v. Moore* and noting that "[t]hen-Justice Rehnquist noted that the statute has the potential 'to criminalize the making of even the most casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function'") (quoting *United States v. Yermian*, 468 U.S. 63, 82 (1984) (Rehnquist, J., dissenting)).

related to PPIP was Treasury's purchase of limited partnership interests in the PPIFs.   The transactions between the funds and Jefferies did <u>not</u> involve the purchase of troubled assets by the government.  (Tr. at 192:8-13 (Miller)).

There was nothing unusual about the relationship between Treasury and the PPIP funds that would qualify Mr. Litvak's allegedly false statement as falling within the jurisdiction of the government.  As the evidence at trial shows, the alleged aspects of the PPIP program relied on by the Court in denying the motion to dismiss are plainly insufficient to engender Section 1001 coverage.  Under 12 U.S.C. § 5231(c)(1), SIGTARP was authorized to supervise, among other things, the purchase, management, and sale of assets by the Secretary of Treasury under PPIP. The only assets purchased, managed, and sold by Treasury under PPIP were its interest <u>in the funds themselves</u> – the same type of investment one makes when one purchases "mutual fund" shares.  (Tr. at 170:6-8 (Miller)).  Treasury did not buy any other assets.  (Tr. at 179:19-180:11 (Miller)).  The program was not designed for Treasury to own actual securities.  (Tr. at 180:16-22 (Miller) (agreeing that Treasury "didn't own a piece of any individual bond"); Tr. at 192:8-13 (Miller)).  The requirement that PPIF managers retain all books, documents, and records relating to the fund, including email, is consistent with regular industry practice.  The purchase and sale of RMBS by registered investment managers is always regulated, regardless of who invests in the fund.  Along with that regulation comes document retention obligations.  And, investors, through limited partnership interests, regularly have rights to review and understand the investment practices of their managers.  The requirement that PPIF managers periodically identify investors holding at least 10 percent equity interest in the fund to Treasury has nothing to do with which securities were being purchased and at what prices.  (Tr. at 179:1-7 (Miller) (agreeing that "Treasury had no authority to tell the investment managers which bonds to buy" or

"to tell the general partner of each of these funds how much to pay for a bond")).  And, finally, SIGTARP's ability to obtain information on securities holdings, counter-parties, and profit and loss is unrelated to the alleged misrepresentations.  Nowhere does the evidence suggest that Mr. Litvak alleged misrepresentation's impacted the profit and losses of the PPIFs.  (Tr. at 197-199 (Miller) (agreeing that "nobody [at Treasury] thought about [markups] and nobody asked that there be any disclosure in …the[] very important periodic report[s]" to Treasury, which included only total proceeds)).

The government's theory of liability is premised on Treasury's investment in <u>private</u> funds designed to invest in the RMBS market, and Treasury's oversight thereof as an <u>investor</u> in the funds.  This limited private function, as manifested in the regulations and as reflected in the evidence, is not covered by the statute.  Thus, the government has failed to introduce sufficient evidence that Mr. Litvak made or caused to be made a false statement regarding a *matter within the jurisdiction of the United States.*  As a result, Counts 13 through 16 must be dismissed.[9]

2.    <u>The Evidence Is Insufficient to Establish That Mr. Litvak Knowingly and Willfully Violated 18 U.S.C. § 1001</u>

Out of appropriate concern with the unbridled reach of this statute, at least one court has explicitly required, under circumstances analogous to those presented here, that the defendant "knew, or reasonably should have known, that he was in fact speaking to a government agent" for any conviction under Section 1001.  *See Binette*, 945 F. Supp. 2d at 224.  As in *Binette*, the

---

[9] Assuming *arguendo* the Court finds that the statutory language "within the jurisdiction of a department or agency of the United States," is susceptible of a reading broad enough to encompass matters in which, like here, the government is a mere investor in a fund managed by a third party and without significant oversight over that third party receiving the allegedly false statement, the Court nonetheless should enter a judgment of acquittal as to Counts 13 through 16 because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971).  And "when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before [the Court] choose[s] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952).  The rule of lenity "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain," *United States v. Santos*, 553 U.S. 507, 514 (2008), and must be applied here.

false statement charges in this case would be "ill-fitting" without proof beyond a reasonable doubt on Mr. Litvak's knowledge that his alleged misrepresentations would have a natural tendency to influence the United States government.  *See id.* at 228.

A false statement violates section 1001 if "it was contemplated that the statement was to be utilized in a manner which was within the jurisdiction of such department or agency."  *Litvak*, 2013 WL 5740891, at *8 (citation omitted).  The evidence reflects that neither Mr. Litvak nor any other broker transacting in the RMBS market could reasonably contemplate any such thing, as the alleged misrepresentations involved factual matters not recorded, tracked or reported to Treasury, and were otherwise outside Treasury's reach with respect to the PPIFs.  A statement about a fact that nobody paid any attention to, or recorded, or even thought about cannot possibly be material.

Furthermore, as noted above, there is no evidence that, when Mr. Litvak made his alleged misrepresentations he contemplated, that he was speaking to someone acting as an agent of Treasury.[10]  Again, the evidence shows there was no way for him to know precisely on whose behalf the person was acting, other than on behalf of his or her employer.  And, again, in some instances Mr. Litvak's counter-party may not have even decided for whom they were acting and to what degree until after the transaction was executed.

In addition, as explained above, Jefferies's mark-up profit was not recorded by the investment managers, and not reported to Treasury.  It was widely understood that investment managers did not track this information as a general matter.  (*See, e.g.*, Tr. at 893:13-22 (Norris)).  Thus, it cannot be said that Mr. Litvak could possibly have contemplated that these types of statements would relate in any way to Treasury jurisdiction.  Under these circumstances,

---

[10] In fact, he was not.  The evidence shows merely that he was speaking to professional money managers who among other things were managing funds set up under PPIP.

Mr. Litvak cannot be found guilty under Section 1001 for knowingly and willfully making false statements in a matter within Treasury's jurisdiction.

## CONCLUSION

For the reasons set forth above, Mr. Litvak respectfully requests that the Court grant his motion for judgment of acquittal under Fed. R. Crim. P. 29(a).

Respectfully submitted,

**THE DEFENDANT,**
**JESSE C. LITVAK**

By:    /s/ Ross H. Garber
　　　　Ross H. Garber (ct17689)
　　　　Shipman & Goodwin LLP
　　　　One Constitution Plaza
　　　　Hartford, CT 06103
　　　　Telephone: 860-251-5901
　　　　Fax: 860-251-5219
　　　　E-mail:  rgarber@goodwin.com

　　　　Patrick J. Smith (admitted *pro hac vice*)
　　　　John M. Hillebrecht (admitted *pro hac vice*)
　　　　Sarah B. Zimmer (admitted *pro hac vice*)
　　　　DLA Piper LLP (US)
　　　　1251 Avenue of the Americas, 27th Floor
　　　　New York, New York 10020
　　　　Tel.: (212) 335-4500
　　　　Fax: (212) 884-8509
　　　　E-mail:  patrick.smith@dlapiper.com
　　　　E-mail:  john.hillebrecht@dlapiper.com
　　　　E-mail:  sarah.zimmer@dlapiper.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Ross H. Garber
Ross H. Garber