**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 13-CR-19 (JCH) |
| | : | |
| JESSE C. LITVAK, | : | JULY 2, 2014 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL
AND FOR NEW TRIAL (Doc. No. 237)**

**I.     INTRODUCTION**

On March 7, 2014, defendant Jesse C. Litvak was convicted of ten counts of

securities fraud, one count of Trouble Asset Relief Program ("TARP") fraud, and four

counts of making a false statement in a matter within the jurisdiction of the U.S.

government.  Litvak now moves for a judgment of acquittal pursuant to Rule 29 of the

Federal Rules of Criminal Procedure.  In the alternative, Litvak moves for a new trial

pursuant to Rule 33.

For the reasons set forth below, Litvak's Motions for a Judgment of Acquittal and

for a New Trial (Doc. No. 237) as well as his pending Motion for Directed Verdict (Doc.

No. 212) are **DENIED**.

**II.     BACKGROUND**

On January 25, 2013, a federal grand jury returned a sixteen-count indictment

against Litvak, charging him with securities fraud, in violation of 15 U.S.C. §§ 78j(b) &

78ff (Counts One through Eleven); TARP fraud, in violation of 18 U.S.C. § 1031 (Count

Twelve); and making false statements in a matter within the jurisdiction of the U.S.

government, in violation of 18 U.S.C. § 1001 (Counts Thirteen through Sixteen).

Indictment (Doc. No. 1) ¶¶ 27-60.  The Indictment alleged that Litvak, a licensed

securities broker and former senior trader and managing director at Jeffries & Co., Inc. ("Jeffries"), defrauded six Public-Private Investment Funds ("PPIFs") and at least fourteen privately funded entities by making misrepresentations in the purchase and sale of residential mortgage-backed securities ("RMBS").  Id. ¶¶ 1, 11-12 & 33-34.  In particular, the Indictment alleged that, as part of his scheme to defraud, Litvak lied about the price at which seller and buyer agreed to sell and buy a security through Jeffries in bid list and order trades, id. ¶ 36, and invented nonexistent sellers with whom Litvak would pretend to negotiate on victims' behalf in inventory trades, where Jeffries already held the security, id. ¶ 47; and that, through this scheme, Litvak increased the profitability of the charged trades, id. ¶¶ 32, 33(a), 34, 36 & 47.

On February 17, 2014, the day before trial, the government moved to dismiss Count Seven, which Motion the court granted.  The government's evidence at trial consisted of:  (1) time-stamped verbatim online chats ("Bloomberg chats") showing communications between Litvak, co-workers at Jeffries, and victims; (2) trade tickets showing the price at which Jeffries bought and sold a given security; (3) testimony by a Bloomberg employee, Adam Wolf, and a custodian at Jeffries, Tracy Lincoln, as to the nature and accuracy of the Bloomberg chats; (4) testimony by another Jeffries employee, Al Paradiso, as to the accuracy of the trade tickets; (5) testimony by Thomas Carocci of the Financial Industry Regulatory Authority ("FINRA") as to the Series 7 examination passed by Litvak; (6) testimony by victims—Michael Canter of AllianceBernstein, Alan Vlajinac of Wellington Management Company ("Wellington"), Brian Norris of Invesco, Joel Wollman of QVT Financial, Vladimir Lemin of Magnetar, and Katherine Corso of York Capital—as to their negotiations with Litvak and the impact

of his lies on trade execution; (7) testimony by David Miller, former Chief of Investment

for the Office of Financial Stability at Treasury, describing the Public-Private Investment

Program ("PPIP") through which the PPIFs were established; and (8) testimony by

Special Agent James O'Connor of the Office of the Special Inspector General for the

Troubled Asset Relief Program ("SIGTARP"), who investigated Litvak following Canter's

report to Treasury of possible fraud in connection with securities transactions between

Litvak and AllianceBernstein, one of the PPIFs.

On February 26, 2014, at the close of the government's case, Litvak moved for a

judgment of acquittal pursuant to Rule 29(a).  See Oral Motion for Directed Verdict

(Doc. No. 212); Def's Trial Mem. in Supp. of Mot. for J. of Acquittal (Doc. No. 210).  The

court reserved pursuant to Rule 29(b).  On March 5, the case was submitted to the jury.

On March 7, the jury returned a verdict of guilty on all remaining counts:  Counts One

through Six and Eight through Eleven of securities fraud; Count Twelve of TARP fraud;

and Counts Thirteen through Sixteen of making false statements.  See Verdict (Doc.

No. 229).  Following the jury's verdict, Litvak filed the instant post-trial Motions.

### III.   MOTION FOR JUDGMENT OF ACQUITTAL

A.   Legal Standard

Rule 29 requires the court, upon motion by the defendant, to "enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."

Fed. R. Crim. P. 29(a).  However, in challenging the sufficiency of the evidence

supporting his conviction, "the defendant faces an uphill battle, and bears a very heavy

burden."  United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) (citation and

internal quotation marks omitted).  In deciding such a motion, the court must view the

evidence in the light most favorable to the government, draw all inferences in favor of

3

the government, and defer to the jury's assessment of the witnesses' credibility.  United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008).  The jury verdict should stand so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Mi Sun Cho, 713 F.3d at 720 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In deciding a Rule 29 motion, "the evidence must be viewed in its totality, as each fact may gain color from others," and the court must exercise care not to substitute its determination of the weight of the evidence, and of the reasonable inferences to be drawn therefrom, for that of the jury.  United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005).

 B. Securities Fraud

 To convict Litvak of the crime of securities fraud charged in Counts One through Six and Eight through Eleven, the jury had to find that the government had proven beyond a reasonable doubt the following three elements:

(1) In connection with the purchase or sale of the security identified in that count, [ ] Litvak—

 (a) employed a device, scheme, or artifice to defraud, or

 (b) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

 (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

(2) [he] acted willfully, knowingly, and with the intent to defraud; and

(3) [he] knowingly used, or caused to be used, the mails or any means or instruments of transportation or communication in interstate commerce in furtherance of the fraudulent conduct.

Jury Charge (Doc. No. 225) at 46; see 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5 ("Rule 10b-5"); 3 Leonard B. Sand et al., Modern Federal Jury Instructions:  Criminal,

Instruction 57-20. Litvak contests the sufficiency of the evidence as to the first and second elements, specifically, the government's proof of materiality and intent to defraud.

>        1.        Materiality

To find that the government had proven beyond a reasonable doubt the first element of securities fraud, the jury had to find that Litvak's lies were material under the circumstances. In the context of securities fraud, materiality means that Litvak's lies "would have been significant to a reasonable investor in making an investment decision," that is, that his lies "significantly altered the total mix of information available." Jury Charge at 49; see United States v. Vilar, 729 F.3d 62, 88-89 (2d Cir. 2013) ("[T]he long-established law of [this] Circuit . . . is that, when the government (as opposed to a private plaintiff) brings a civil or criminal action under Section 10(b) and Rule 10b–5, it need only prove, in addition to scienter, materiality, meaning a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance."); Ganino v. Citizens Utilities Co., 228 F.3d 154, 161-62 (2d Cir. 2000) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)); 3 Sand et al., supra, Instruction 57-21. The court's full instruction on materiality was lengthy in light of the importance of this element to this case. See Jury Charge at 49-50.

In arguing that proof of materiality is lacking, Litvak claims that his lies could not have been material, given that his victims were professional investment managers and that, in the RMBS market at issue, they rarely had access to the information about which Litvak lied. See Def.'s Mem. in Supp. of Mot. for J. of Acquittal ("Def.'s Mem.") (Doc. No. 237-1) at 13-16. The government does not contest these facts, only the

conclusion that Litvak argues one must necessarily draw from them that trade execution and transaction costs are per se incidental, i.e., not material, to such investors.

Litvak has offered this argument regarding the insignificance of his lies to sophisticated investors in the RMBS market several times, including in his pretrial Motion to Dismiss the Indictment (Doc. No. 52).  However, there is no bright-line test for materiality, which is a mixed question of fact and law for the jury.  TSC Indus., 426 U.S. at 450.  Thus, the court left this determination, in the first instance, to the jury.  The same argument presented by Litvak here was presented to the jury at trial, and the jury clearly rejected it in their verdict.

Having reviewed the record, the court concludes that the trial evidence sufficiently supported a finding of materiality.  First and foremost, Litvak's victims testified that his lies mattered to them because his lies affected the price they paid for the underlying securities.  For example, Michael Canter of AllianceBernstein, one of the PPIFs, testified that Litvak's lies about cost and compensation harmed the fund's bottom line—that is, that the amount above what Litvak agreed to take as compensation should have gone to the PPIF, that a higher acquisition cost made the investment less profitable, and that, had Canter known the true acquisition price for the security and how much compensation Litvak was actually taking "on top," he would have sought to negotiate a better deal for the PPIF.  Trial Tr. at 423-29.   Other victims testified to similar effect.  Id. at 787-88 (Vlajinac), 870-78 (Norris), 1086 (Lemin), 954-55 (Wollman) & 1199-1200 (Corso).  One after the other, these victims testified that the false price information given to them by Litvak—information to which they conceded they typically did not have access in the RMBS market—became part of their calculations and

6

influenced their negotiations with Litvak; that Litvak's actual compensation (measured in 1/32s of a dollar referred to as "ticks") not only contravened their explicit agreements with him but also went, in some cases, well beyond the normal range of compensation to a broker of four to eight ticks; and that they would not knowingly have agreed to compensate such amounts "on top" for the bid list and order trades and certainly would not knowingly have agreed to additional compensation for inventory trades.  As one victim attested, "every tick counts."  Id. at 878 (Norris).

Moreover, the Bloomberg chats showed protracted negotiations over price, and a rational jury could have inferred materiality from the lengths to which Litvak went to deceive his victims.  Michael Canter testified that, upon discovering Litvak's lies and confronting him, Litvak apologized and explained that "it was a hard year and guys were doing whatever they needed to make money."  Id. at 388.  A rational jury could have inferred that Litvak himself lied in order to make money and that, absent a potential profit, he would not have provided false information to his victims.

As Litvak stresses, and as is undisputed by the government, unlike the stock market, the RMBS market is not transparent, and Litvak's victims, all finance professionals, chose which bonds to invest in based on sophisticated yield models.[1]  In Litvak's view, such facts necessarily render his lies immaterial.  The court disagrees.  While these victims had other powerful investment tools, and while buyer and seller in

---

[1] The lack of transparency in the RMBS market and the nature of LItvak's negotiations with his victims also distinguish the instant case from Feinman v. Dean Witter Reynolds, Inc., 84 F. 3d 539 (2d Cir. 1996), which dealt with the stock market.  There, while the transaction fees, as contained on the trade confirmations, were claimed not to reflect actual costs, the fees were correctly stated, and the market was not otherwise alleged to have been distorted as a result.  Id. at 541-42.  Here, in contrast, the transaction costs for bid list and order trades—as agreed-upon markups or commissions in numbers of ticks—were embedded in the price, and the evidence showed that price was a heavily negotiated term and that the markups Litvak represented himself to be taking were false.

this market ordinarily lack access to the other's price information, there was ample evidence at trial that, in misstating his acquisition price in bid list and order trades and holding himself out to be buying from a fictional seller in inventory trades, Litvak exploited the opacity of the RMBS market to his victims' detriment and to Jeffries' and his own advantage.

Taken together, this evidence was sufficient to support a finding of materiality. Thus, the court concludes that, as to the first element of securities fraud, the jury's verdict has an adequate evidentiary basis.

### 2.   Intent to Defraud

Litvak next challenges the sufficiency of the proof as to the second, or <u>mens rea</u>, element of securities fraud, arguing that the government failed to prove intent to defraud.  In the context of securities fraud, "[t]o act with 'intent to defraud' means to act willfully and with the specific intent to deceive."  Jury Charge at 52; <u>see</u> <u>United States v. Vilar</u>, 729 F.3d 62, 93 (2d Cir. 2013); <u>United States v. Kaiser</u>, 609 F.3d 556, 570 (2d Cir. 2010); <u>United States v. Schlisser</u>, 168 F. App'x 483, 486 (2d Cir. 2006); 3 Sand et al., <u>supra</u>, Instruction 57-24.

In challenging the sufficiency of the proof as to his intent to defraud, Litvak would have the court rewrite the jury charge to require proof, in addition, that he acted "<u>for the purpose of causing [his victims] some financial loss</u>."  Def.'s Mem. at 18 (emphasis added).  Litvak argued for including this language several times.[2]  In the court's view, such language misstates the requisite <u>mens rea</u>.  <u>Vilar</u>, 729 F.3d at 93 (rejecting that

---

[2] Litvak recapitulates here his argument that the government elected, in the "speaking" portions of the Indictment, to proceed exclusively on a theory of economic loss.  Def.'s Mem. at 12 (citing Indictment ¶ 29).  While the Indictment includes a loss allegation, the court does not share Litvak's view that this allegation transformed the intent element of the crime of securities fraud charged.

intent to defraud requires intent to steal in securities fraud).  However, having been directed by Litvak to a Sixth Circuit case, United States v. DeSantis, 134 F.3d 760 (6th Cir. 1998), the court inserted into the jury charge on "intent to defraud" broader language, as follows:  "The misrepresentation or omission must have had the purpose of inducing the victim of the fraud to undertake some action."  Jury Charge at 52; see DeSantis, 134 F.3d at 764 ("[T]he misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.").

The circumstantial evidence at trial adequately supported a finding of intent to defraud, as charged by this court.  The government introduced numerous Bloomberg chats demonstrating that Litvak knowingly lied and benefitted as a result.  For example, there was evidence that Litvak knew the actual price at which the seller was selling the HVMLT bond to Jeffries and yet misrepresented and inflated the price when selling the bond to Michael Canter of AllianceBernstein.  Gov't's Exs. 13A & 17.  There was evidence, including Special Agent O'Connor's testimony and Litvak's own apology to Canter, that the lies made the charged trades more profitable and that this increased profitability was a motive for Litvak's lying.  Trial Tr. 388 (Canter); 1399-1423 (O'Connor).  Further, a rational jury could have inferred from the fact that Litvak misrepresented price information characteristically unavailable in the RMBS market that his purpose in providing this information was to induce his victims to agree to the price he was representing as the actual price from the counterparty and not to engage in further negotiation, as they might otherwise have done, absent the lie.

Such evidence sufficed to support a finding that Litvak acted with the intent to defraud.  Litvak's challenge to the sufficiency of this evidence relates only to the asserted lack of proof that he intended to cause his victims a financial loss.  The intent element of securities fraud, however, requires no such proof.  Vilar, 729 F.3d at 93.[3] Evidence that Litvak's victims were satisfied with the price at the time and unaware of a better price elsewhere does not negate proof that his lies were the product of a conscious objective and had the purpose of inducing victims into accepting his made-up prices.  A rational jury could have concluded that, absent Litvak's lies, his victims could have negotiated a better deal with him.

Having reviewed the trial record, the court determines that there was sufficient evidence for a rational jury to convict Litvak of Counts One through Six and Eight through Eleven of securities fraud and that the jury's verdict on these counts must, accordingly, stand.

C.    TARP Fraud

To convict Litvak of the crime of TARP fraud charged in Count Twelve, the jury had to find that the government had proven beyond a reasonable doubt the following four elements:

> (1) There was a scheme or artifice to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises, as charged in the Indictment;

_____

[3] The trial evidence may also be sufficient to support a finding of intent to cause financial loss. However, the court did not charge the jury as to financial loss because, in the court's view, such instruction is not required for securities fraud.  Further, the concept of financial loss is ambiguous under the circumstances of this case, and an instruction as to financial loss risked confusing the jury by conflating long-term soundness of the investments with immediate injuries in connection with the process of negotiating and executing a given trade.  There is no dispute that Litvak's scheme pertained only to the latter, that is, trade execution, and not to whether the RMBS bonds were ultimately profitable.

(2) This scheme or artifice took place in a form of Federal assistance, including either through the Troubled Asset Relief Program (or "TARP"), an economic stimulus, recovery, or rescue plan provided by the government, or through the Government's purchase of a troubled asset as defined in the Emergency Economic Stabilization Act of 2008;

(3) [ ] Litvak executed or attempted to execute this scheme or artifice (as set forth in paragraphs 1 and 2 above) knowingly, willfully, and with specific intent to defraud; and

(4) The value of such form of Federal assistance, or any constituent part thereof, was at least one million dollars ($1,000,000).

Jury Charge at 59; see 18 U.S.C. § 1031(a); cf. Sand et al., supra, Instruction 18-8.[4]  As with securities fraud, Litvak challenges the proof of materiality and intent to defraud, under the first and third elements of TARP fraud, respectively.  In addition, Litvak challenges the proof of the second element—that is, that Litvak's scheme took place in a form of federal assistance.

      1.    Materiality

To find that the government had proven beyond a reasonable doubt the first element of TARP fraud, the jury had to find that Litvak's lies related to a material fact or matter, that is, "a fact or matter which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement to make an investment decision."  Jury Charge at 60.[5]

_____

[4] This court appears to be the first to have charged a jury on TARP fraud under the Major Fraud Statute, as amended in 2009.  The standard Sand charge is tailored to procurement fraud.  The court substantively modified this charge to address the circumstances of the instant case, which are specific to the PPIFs established under TARP.

[5] Although the wording of the materiality instruction here differs from the court's instructions on materiality under securities fraud and false statements, this language largely tracks the standard language in Sand and in the parties' proposed jury instructions.  See 1 Sand et al., supra, Instruction 18-10; Gov't's Proposed Jury Instructions (Doc. No. 92) at 39 ("A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision (e.g., with respect to a proposed investment)."); Def.'s Revised Proposed Jury Instructions (Doc. No. 183) at 55 ("A material fact is one which would reasonably be expected to be

The transactions alleged to constitute TARP fraud in Count Twelve are the same as those alleged to constitute securities fraud in Counts One through Five.  The same proof supporting a finding of materiality in securities fraud, see Part III.B.1, supra, suffices to support a finding of materiality under TARP fraud as well.  From such evidence—particularly, the PPIF managers' testimony—the jury could reasonably have found that Litvak's lies concerning price were capable of influencing the PPIFs' negotiations and, hence, that his lies related to facts which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement to make a decision.  Trial Tr. at 423-29 (Canter), 787-88 (Vlajinac) & 870-78 (Norris).

In challenging the proof of materiality, Litvak argues that his lies could not have mattered to Treasury because, under PPIP, decision-making authority over these investments was delegated to PPIF managers, who were not required to report to Treasury, and did not report to Treasury, brokers' markups or commissions on trades. Def.'s Mem. at 10.  Of course, in the RMBS market, such information is ordinarily inaccessible to anyone but the broker.  While Litak and the government each characterize Treasury's role relative to the PPIFs somewhat differently, this issue relates, in the court's view, not to materiality but to the second element of TARP fraud— that is, whether the trades took place in a form of federal assistance.

For purposes of TARP fraud, materiality requires only that the facts about which Litvak lied be the sort that reasonably would be expected to matter to a reasonable and

of concern to the United States Treasury in relying upon the representation or statement."). The court circulated a draft containing similar language on February 7 and this exact language on March 2.  On neither occasion did the parties object or propose other language regarding materiality under TARP fraud.

prudent person in relying upon these facts to make a decision, in this case, as to the purchase of a given security at a given price.  Taken as a whole, the trial evidence was sufficient to support the jury's finding of materiality.

> 2.    In a Form of Federal Assistance

With respect to the second element of TARP fraud, the jury had to find that Litvak's scheme took place in a form of federal assistance, including through TARP or the government's purchase of any troubled asset as defined in the Emergency Economic Stabilization Act of 2008 ("EESA").  Jury Charge at 62; see 18 U.S.C. § 1031(a); cf. 1 Sand et al., supra, Instruction 18-12.  Litvak argues that, whereas the government's investment in the PPIFs qualified as the government purchasing a troubled asset, subsequent purchases of RMBS bonds by the PPIFs did not, because such purchases were not within Treasury's control.  Litvak claims that his lies thus necessarily fell outside the scope of section 1031.  The court disagrees.

It fell to the jury to determine whether the government had proven beyond a reasonable doubt that Litvak's scheme took place in a form of federal assistance.  The court charged the jury on the law, as follows:

> [U]nder EESA, the Secretary of the Treasury may establish "vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets."  EESA defines public-private investment funds (or "PPIFs") as financial vehicles established by the Federal government and funded by a combination of funds from private investors and funds provided by the Secretary or appropriated under EESA.  These vehicles were created to purchase troubled assets.
>
> PPIF managers are required to retain all books, documents, and records relating to the PPIFs, including electronic messages.  And the Special Inspector General of the Troubled Asset Relief Program (or "SIGTARP") of the Department of Treasury may access all books and records of the PPIFs, including all records of financial transactions.  It is the duty of SIGTARP to conduct and coordinate audits and investigations of the

purchase, management, and sale of troubled assets by the Secretary of the Treasury under the TARP program.

EESA defines "troubled assets" as including residential or commercial mortgage-backed securities originated or issued on or before March 14, 2008, the purchase of which the Secretary of the Treasury determines promotes the stability of the financial markets.

Jury Charge at 62; <u>see</u> 12 U.S.C. §§ 5202, 5211, 5231 & 5231a.

David Miller testified at length about the PPIFs based on his experience as former Chief of Investment for the Office of Financial Stability at Treasury.  In particular, Miller testified that that Treasury set up the PPIFs, devised their form, selected their managers, dictated which types of assets they could buy and sell, and oversaw their performance.  Trial Tr. at 161-64 & 201-02.  In addition, PPIF managers attested to their understanding that they owed fiduciary duties to the government, that they were investing on the government's behalf, and that they were bound by rules imposed by Treasury.  <u>Id.</u> at 392 (Canter), 773 & 779 (Vlajinac).  Miller testified as well to the extent of Treasury's supervisory authority, which included the ability to get trade-level data from the PPIFs, stating that Treasury's goal in establishing such oversight was to prevent fraud, waste, and abuse.  <u>Id.</u> at 162-63.  Taken together, such evidence was sufficient to support a finding that the charged trades took place in a form of federal assistance.

In challenging the government's proof of this element of TARP fraud, Litvak relies heavily on Miller's testimony, on cross-examination, that "subsequent purchases by the PPIF managers . . . were not government acquisitions of the troubled asset."  Trial Tr. at

192. However, this testimony must be read in light of the record as a whole.[6]  While it is

arguably helpful to Litvak in isolation, in the context of the court's instruction on the law

and the weight of the other trial evidence—including the other substantial testimony by

Miller himself—the jury reasonably could have discounted this testimony, crediting those

parts of Miller's testimony with which it is arguably at odds.  United States v. O'Connor,

650 F.3d 839, 855 (2d Cir. 2011) ("'It is the province of the jury and not of the court' to

determine whether a witness who may have been 'inaccurate, contradictory and even

untruthful in some respects' was nonetheless 'entirely credible in the essentials of his

testimony.'" (quoting United States v. Tropiano, 418 F.2d 1069, 1074 (2d Cir. 1969),

cert. denied, 397 U.S. 1021 (1970))).  Furthermore, the statute does not limit in which

forms of federal assistance the scheme must be found to have taken place.  18 U.S.C. §

1031(a) ("any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other

form of Federal assistance, including [TARP] . . . or the government's purchase of any

trouble asset" (emphasis added)).  Even assuming the jury construed Miller's isolated

---

[6] Miller's testimony here came at the end of a series of questions focused on a SIGTARP audit
report that discusses the selection of PPIF managers.  Def.'s Ex. 920.  As explained in that Report,
Treasury determined that, because it established the PPIFs as limited partnerships, they were
"investment counterparties" rather than contractors or financial agents and were therefore exempt from
the Federal Acquisition Regulation ("FAR").  Id. at 29-30.
   This legal determination regarding the application of FAR to Treasury's selection of PPIF
managers is of limited relevance to Litvak's criminal case.  Nothing in the report mentions, let alone
prevents, prosecution of fraud in connection with the PPIFs' purchases of RMBS bonds.  Further, as to
whether such purchases constitute federal assistance for purposes of criminal liability under section 1031,
the language of the Major Fraud Statute—"any grant, contract, subcontract, subsidy, loan, guarantee,
insurance, or other form of Federal assistance," 18 U.S.C. § 1031(a)—is clearly meant to be broad and
inclusive.  The use of "any" undercuts the argument for imposing a narrowing construction.  Salinas v.
United States, 522 U.S. 52, 57 (1997); cf. Fischer v. Untied States, 529 U.S. 667, 678 (construing similar
language in section 666 as "reveal[ing] Congress' expansive, unambiguous intent to ensure the integrity
of organizations participating in federal assistance programs").
   Moreover, Miller, who is not a lawyer and was not qualified as an expert witness, disclaimed
having any personal knowledge of this audit report, and the court instructed the jury that, where a witness
like Miller testifies about the law, such testimony should be regarded only as his understanding and must
be disregarded if it differs from the court's detailed instructions on the law at the end of the trial.  Trial Tr.
at 145.

testimony here as credible evidence that the charged trades did not qualify as the government's purchase of troubled assets, the totality of evidence was sufficient to support a finding that these trades transpired in a form of federal assistance, whether a form enumerated in the statute or some "other form of Federal assistance." Id.

It is undisputed that Treasury left day-to-day investment decisions to the PPIF managers and that, although subject by law to more stringent oversight, the PPIFs were designed to look like private funds. Trial Tr. at 161-62, 174, 176-79 (Miller). Further, with respect to at least one transaction, there was some evidence that an RMBS bond purchased by a PPIF manager might have been allocated between the PPIF and another non-PPIF account. Id. at 1564-65. Litvak argues from these facts that construing section 1031 to reach his lies would allow trades to become crimes after the fact, depending on how the PPIF manager allocated the money. Def.'s Mem. at 27-28. While the court is mindful of the potentially broad scope of forms of federal assistance cognizable under section 1031, Congress clearly limited the reach of section 1031 by requiring both that this federal assistance have a minimum value of $1 million and that the fraudulent scheme be executed knowingly, willfully, and with specific intent to defraud. Because the issue raised here by Litvak concerns, in reality, the latter element—not whether Litvak's scheme was in a form of federal assistance but whether he knew it was—the court addresses the issue under proof of intent. See Part III.C.3, infra.

As to the second element of TARP fraud, upon review of the record, the court concludes that there was sufficient evidence, even in the face of Miller's arguably

conflicting testimony, to support a finding that Litvak's scheme took place in a form of federal assistance.

   3. <u>Mens Rea</u>

  To find that the government had proven beyond a reasonable doubt the third, or <u>mens rea</u>, element of TARP fraud, the jury had to find that Litvak acted knowingly, willfully, and with specific intent to defraud.  Jury Charge at 64.  Litvak challenges the proof of both knowledge and intent to defraud.

  As amended in 2009, the Major Fraud Statute reads, in pertinent part:

> Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—
>
> (1) to defraud the United States; or
>
> (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,
>
> in any . . . form of Federal assistance . .  shall [be guilty of a crime].

18 U.S.C. § 1031(a).   In this case, the government elected to proceed exclusively under the second of the two alternative intent prongs.

   a. Knowledge

  With respect to the knowledge required under TARP fraud, the issue is one of first impression.  The court construed "knowingly" to extend to the part of the statute that follows the two specific intents.  As the court instructed the jury, Litvak's knowledge must have encompassed the fact that the scheme took place in a form of federal assistance.  Jury Charge at 64-65.  In challenging the proof of knowledge, Litvak argues that the evidence was lacking that he knew that his counterparties were transacting for the government and that, possibly in some cases, their trading status could even have

been decided after the fact, if they allocated a bond to different PPIF and non-PPIF accounts.  Def.'s Mem. at 27-28.

There was ample evidence, however, that the execution of Litvak's <u>scheme</u> in trades involving PPIF money was not unwitting or accidental but knowing, regardless of any speculation as to the one individual trade, which might have been allocated between PPIF and non-PPIF accounts after the fact.  The Bloomberg chats showed Litvak discussing PPIP and the PPIF managers by name, <u>see, e.g.</u>, Gov't's Exs. 303, 306R, 314R & 337, and Michael Canter of AllianceBernstein testified that he had explicit conversations with Litvak about the PPIFs, Trial Tr. 360-64, 366-67.[7]

Such evidence was sufficient to support a finding that Litvak knowingly executed the scheme in a form of federal assistance.

> b.    Intent to Defraud

With respect to intent to defraud, the court instructed the jury that, in the context of TARP fraud, "to act with 'intent to defraud' means to act willfully and with the specific intent to deceive, for the purpose of depriving another of money or property, including material information necessary to make discretionary economic decisions."  Jury Charge at 64.  Based on the same circumstantial evidence supporting a finding of intent to defraud under securities fraud, <u>see</u> Part III.B.2, <u>supra</u>, the jury reasonably could have found that Litvak's lies were made for the purpose of depriving his victims of money or property, including material information necessary to make discretionary economic decisions.  In effect, Litvak challenges not proof of intent to defraud, as that element

---

[7] Indeed, Canter testified to yelling at Litvak when confronting him about his lies:  "Are you freaking crazy doing this to the United States Treasury Department.  Because of this, I'm going to have to report this."  <u>Id.</u> at 390.

was charged by this court, but the charge itself, which Litvak would rewrite to require proof that his lies "were made for the purpose of deceiving and economically harming the United States government specifically."  Def.'s Mem. at 28.  The "intent to defraud" instruction under TARP fraud was the subject of extensive discussion at the charge conference, and the court's charge on this element reflects its considered view of the law in this Circuit.[8]

As already noted, the amended Major Fraud Statute provides for two alternative specific intents:  "intent—(1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1031(a).  The government chose to proceed solely under the money or property prong.   However, the standard Sand charge reads:  "To act with intent to defraud means to act willfully and with the specific intent to deceive, for the purpose of causing some financial loss to another."  1 Sand et al., supra, Instruction 18-11.  The court modified the language regarding financial loss, over strong objections by Litvak, because, in the court's view, that language incorrectly states the law governing prosecution of major fraud under the second of the two intent prongs, 18 U.S.C. § 1031(a)(2).  In construing other criminal statutes which employ "money or property" as an alternative prong, such as the mail and wire frauds statutes, 18 U.S.C. §§ 1341 & 1343, the Second Circuit has held "property" to include a right to control one's assets and information necessary to make discretionary economic decisions, United States v. Carlo, 507 F.3d 799, 802 (2d Cir. 2007); United States v. Rossomando, 144 F.3d 197,

---

[8] Given that the closest statutory analog to the TARP fraud statute is the bank fraud statute, 18 U.S.C. § 1344, the Supreme Court's recent decision in Loughrin v. United States, No. 13–316, slip op. (U.S. June 23, 2014), would appear to support the court's charge in this regard.  See id. at 4–5, 6.

201 n.5 (2d Cir. 1998); United States v. Dinome, 86 F.3d 277, 284 (2d Cir. 1996).  The court's charge on "intent to defraud" tracks this case law.

The trial evidence sufficiently supports a finding that Litvak acted with specific intent to deceive, for the purpose of depriving his victims of money or property.  Hence, based on the trial record, a rational jury could have found each of the elements necessary to convict Litvak on Count Twelve of TARP.

D.    False Statement

To convict Litvak of the crime of false statement charged in Counts Thirteen through Sixteen, the jury had to find that the government had proven beyond a reasonable doubt five elements:

(1) On or about the date specified [in that count,] Litvak made a statement or representation;

(2) This statement or representation was material;

(3) The statement or representation was false, fictitious, or fraudulent;

(4) The false, fictitious, or fraudulent statement was made knowingly and willfully; and

(5) The statement or representation was made in a matter within the jurisdiction of the government of the United States.

Jury Charge at 70; see 18 U.S.C. § 1001; 2 Sand et al., supra, Instruction 36-9.  Litvak contests the sufficiency of the evidence as to the second, forth, and fifth elements.

1.    Materiality

Although the court's charge on materiality differed here from the related charges under securities fraud and TARP fraud, the evidence supporting a finding of materiality in those other contexts was sufficient to support a finding of materiality under section

1001 as well.  See Parts III.B.1 & C.1, supra.[9]  Indeed, Litvak's argument on materiality

is identical to the argument under section 1031—that is, that his lies did not matter to

Treasury.  Def.'s Mem. at 9-10.  In the court's view, this argument does not bear on

materiality and is properly addressed under the fifth, or jurisdictional, element.  See Part

III.D.3, infra.

        2.      Knowledge

Litvak's challenge to proof of knowledge under section 1001 is likewise identical

to his challenge under section 1031.  However, unlike TARP fraud, the crime of making

a false statement requires no proof that Litvak knew his lies were in a matter within the

jurisdiction of the U.S. government.  United States v. Yermian, 468 U.S. 63, 75 (1984)

("[P]roof of actual knowledge of federal agency jurisdiction is not required under §

1001.").   As a matter of first impression, the court construed knowledge under section

1031 to cover TARP fraud's jurisdictional analog—that the scheme was executed in a

form of federal assistance.  With respect to section 1001, however, the court does not

write on a blank slate, and it is well settled that "knowingly" in this statute comprehends

"only the making of 'false, fictitious or fraudulent statements,' and not the predicate

circumstance that those statements be made in a matter within the jurisdiction of a

federal agency."  Id. at 69.  Litvak does not challenge the proof that he knew his

statements were false, and the circumstantial evidence was clearly sufficient to support

a finding of such knowledge.

_____

[9] To be material under section 1001, Litvak's lies must have had a natural tendency to influence,
or must have been capable of influencing, the decision of a reasonable decisionmaker in a matter within
the jurisdiction of the United States government.  Jury Charge at 72; see United States v. Gaudin, 515
U.S. 506, 509 (1995); United States v. Whab, 355 F.3d 155, 163 (2d Cir. 2004); cf. 2 Sand et al., supra,
Instruction 36-11.

   3.   Jurisdiction

To find that the government had proven beyond a reasonable doubt the fifth

element, the jury had to find that "it was contemplated that the statement or

representation was to be utilized in a matter which was within the jurisdiction of an

agency or department of the United States government."  Jury Charge at 75; see United

States v. Candella, 487 F.2d 1223, 1227 (2d Cir. 1973).  The court instructed the jury:

> To be within the jurisdiction of an agency or department of the United
> States government means that the statement must concern an authorized
> function of that department or agency.  Not everything concerning an
> agency or department is within the jurisdiction of the United States.  The
> phrase "within the jurisdiction" differentiates the official, authorized
> functions of an agency or department from matters peripheral to the
> business of that body.  A federal department or agency has jurisdiction
> when it has the power to exercise authority in a particular situation,
> regardless of whether the Federal agency chooses to exercise that
> authority or not.
>
> A false statement may fall within the jurisdiction of the United States
> government even when it is not submitted to a Federal department or
> agency directly and the Federal department or agency's role is financial
> support of a program that it does not itself directly administer.  The use of
> federal funds by itself does not put the matter within the jurisdiction of the
> United States.  However, where the deception at issue is made to a
> private party receiving Federal funds, such deception may be within the
> jurisdiction of the United States government if it affected a Federal
> department or agency because of that department or agency's
> responsibility to ensure that its funds are properly spent.

Jury Charge at 75; see Candella, 487 F.2d at 1229; United States v. Davis, 8 F.3d 923,

929 (2d Cir. 1993) (citing United States v. Rodgers, 466 U.S. 475, 479 (1984)); United

States v. Ross, 77 F.3d 1525, 1544-1545 (7th Cir. 1996); United States v. Petullo, 709

F.2d 1178, 1180 (7th Cir. 1983); cf. 2 Sand et al., supra, Instruction 36-14.

   Litvak argues that the PPIFs were purely private entities, in which Treasury's role

was limited to that of an investor.  Def.'s Mem. at 31.  As a matter of law, however,

Treasury had the statutory authority under TARP to establish and fund the PPIFs as

"vehicles that are authorized, subject to supervision by the Secretary, to purchase, hold, and sell troubled assets," 12 U.S.C. § 5211(c)(4); 5231a(e), and there was ample evidence that Treasury, in fact, created the PPIFs as such vehicles, determining the types of eligible assets in which the PPIFs could invest, and exercising oversight in various forms, from conducting audits and requiring reports to holding monthly meetings, Trial Tr. at 161-64 & 201-02 (Miller). Further, Miller testified that Treasury's oversight, which included the ability to get trade-level data, was designed to prevent fraud and abuse in the program. Id. at 162-63. Finally, from Canter's testimony—in particular, his confrontation with Litvak about Litvak's lies—a rational jury could have concluded that the PPIF managers understood themselves to be acting on Treasury's behalf and to be governed by its rules. Id. at 390, 392. The fact that Treasury delegated day-to-day investment decisions to PPIF managers does not negate the evidence establishing Treasury's supervisory authority over the PPIFs. Such evidence was sufficient to support a finding that Litvak's lies were made in a matter within the jurisdiction of the U.S. government.

In sum, a rational jury could have found each of the elements necessary to convict Litvak of Counts Thirteen through Sixteen of making a false statement under section 1001. Accordingly, the jury's verdict on these counts must stand.

## IV.   MOTION FOR NEW TRIAL

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Litvak moves the court, in the alternative, for a new trial. Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Pro. 33(a). A district court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33

authority 'sparingly' and in 'the most extraordinary circumstances.'"  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.2001) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir.1992)).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  Id.  In exercising its discretion, the court may weigh the evidence and credibility of witnesses.  United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000).  However, the court may not "wholly usurp" the jury's role, id., and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated."  Ferguson, 246 F.3d at 134.

Litvak identifies no extraordinary circumstances which would warrant a new trial here.  Having examined the record, the court concludes that no such circumstances are present, that the jury's verdict is adequately supported by the record, and that the interests of justice do not require a new trial.  Accordingly, the court denies Litvak's Rule 33 Motion.

## V.    CONCLUSION

For the reasons set forth above, the court **DENIES** Litvak's Motion for a Judgment of Acquittal and for a New Trial (Doc. No. 237).  Pending before the court is also Litvak's Oral Motion for Directed Verdict (Doc. No. 212), which Motion is likewise **DENIED** for the reasons stated in Part III of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of July, 2014.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge