```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     United States of America   )February 3, 2014
4                  Government   )8:36 a.m.

5    v.                          )
     Jesse C. Litvak             )3:13cr19(JCH)
6                Defendant.      )
     _____)
7

8                                 141 Church Street
                                  New Haven, Connecticut
9
                       JURY SELECTION
10

11   B E F O R E:
                   THE HONORABLE JANET C. HALL, U.S.D.J.
12

13
     A P P E A R A N C E S:
14

15   For The Government  :    Jonathan N. Francis
                              Eric Glover
16                            U.S. Attorney's Office-NH
                              157 Church St., 23rd floor
17                            New Haven, CT 06510

18   For the Defendant   :
                              Michael Chase
19                            Shipman & Goodwin
                              One Constitution Plaza
20                            Hartford, CT 06103-1919

21                            Patrick Smith
                              Sarah B. Zimmer
22                            John Michael Hillebrecht
                              DLA Piper US LLP-NY
23                            1251 Avenue of the Americas,
                              27th Floor
24                            New York, NY 10020-1104

25
```

1          THE COURT:  Please be seated.  We're here in the

2   matter of the United States of America v. Jesse C. Litvak,

3   313CR19.  If I can have appearances please.

4          MR. GLOVER:  Eric Glover on behalf of the

5   government.  With me is Jonathan Francis and Robert Marston

6   and James O'Connor of SIGTARP.

7          MR. SMITH:  Good morning, your Honor.  Patrick Smith

8   for Mr. Litvak who is present in the courtroom.  John

9   Hillebrecht from DLA, Ellen Brickman from Doar Litigation

10  Consulting, Sarah Zimmer from DLA and Michael Chase from

11  Shipman & Goodwin.

12         THE COURT:  Good morning to all of you.  There's a

13  couple of things.  I think there's a gentleman in the public

14  area who is a member of the press.  Is that correct?  Doesn't

15  matter whether you are.  You are a member of the public.  You

16  have a right to be here.  As you can see in a minute, I will

17  squeeze in 100 people where you are sitting so the choices

18  are either sitting on the end there where the coats are.

19  We'll hang the coats up.  Sit on this side of the bar in that

20  empty seat.  I think that's probably the best place if that's

21  all right with you.  Actually you can put those in the jury

22  room for now or hang them up in the back.  Either way is fine

23  with me, but I can't have someone in the jury pool that's

24  from the public I guess is the bottom line.  Thank you.

25         I don't know yet how many folks we have here this

1    morning.  Although I'm told there's a fairly good crowd.  It

2    is hard to tell until they hit the button on the computer and

3    tally it up.  In addition, I have called in another 50 for

4    tomorrow in the event we don't finish today.  I never had to

5    do that.  Hopefully we won't have to use them either.  They

6    will be canceled.  At this point, I'm not certain I can tell

7    that.

8            THE COURT:  With respect to the defendant's request

9    which I granted, to bring computer equipment into the

10   courtroom, there's a couple of things.  As I understand it,

11   the motion and then the order on the motion, makes it clear

12   that there will be no contact with anyone who is in this

13   panel, is that correct, whether picked or not picked?

14           MR. SMITH:  That's correct.

15           THE COURT:  No one will know what if any search were

16   done about them by this expert, is that correct?

17           MR. SMITH:  That's also correct, your Honor.

18           THE COURT:  Another thing that occurred to me as I

19   was looking at the cases is I think I would like counsel to

20   agree, and I would make it a court exhibit on a list of

21   abbreviations in the case.  I don't mean concepts or what's a

22   trade look like or whatever.  I mean things like Public

23   Private Investment Funds, PPIFs.  I don't know if there are

24   any others like that, but I would ask that you agree on what

25   those abbreviations that will show up in the case and submit

1   them, and I think what I'm going to do is hand them out to

2   the jury at the beginning of the case, so they have them on

3   their seats as they come in and out so whenever anything

4   comes up, they can look at it, can remind themselves what the

5   abbreviation is.  Any objection to that?

6           MR. SMITH:  No, your Honor.

7           MR. GLOVER:  No, your Honor.

8           THE COURT:  I did take a look very quickly at the

9   objections to exhibits.  I didn't look at the defendant's

10  objections -- the government's objections to the defendant's

11  exhibits because it appeared to be they objected to every

12  single one.  Is that a fair assessment?

13          MR. GLOVER:  It is extensive.

14          THE COURT:  What was extensive?

15          MR. GLOVER:  The objections.  I don't think it was

16  every single one.  We looked at the every single one, all 350

17  in good-faith.  We got the exhibit list a couple weeks prior.

18          THE COURT:  That's an excuse.  I want an answer.

19  Are you objecting to every one?

20          MR. GLOVER:  Not every one.

21          THE COURT:  95 percent?

22          MR. GLOVER:  Probably.

23          THE COURT:  The basis?

24          MR. GLOVER:  Relevance and hearsay generally.

25          THE COURT:  Is that still the state today?  Further

1   discussions haven't advanced or changed that?

2        MR. GLOVER:  We had discussions last week with the

3   defense counsel on Wednesday which I thought were somewhat

4   constructive.  The defense can speak to this better than I.

5   I believe the defense represented that they thought they

6   would want to see the government's case.  That they

7   expected -- I believe they said that they would use a

8   fraction of those, maybe 50 or 60.  They didn't want to

9   commit to anything.  That's what they said.  Rather than go

10  through each and every document on the phone call, they

11  indicated they would well in advance of when they thought to

12  admit the documents, tell the government and the Court what

13  the documents were, then the objections could be addressed

14  then and that seemed like a wise use of the Court's time to

15  proceed that way.  Obviously we filed that with the court on

16  Friday and it is up to the court.  That's where we stood.  If

17  defense has any agreement or disagreement --

18       MR. HILLEBRECHT:  I believe that's where they stand.

19  I do agree to this extent we had what I thought was a

20  fruitful discussion following we have withdrawn a good number

21  of exhibits for a variety of reasons.

22       THE COURT:  Do I have a current list?

23       MR. HILLEBRECHT:  Yes, your Honor.  I agree with Mr.

24  Glover that I do think that a little time would be the

25  efficient way to do this.  It is our expectation, one of the

1    things we discussed, we have agreement in principle that

2    certain of the documents, which we are currently anticipating

3    in our case in chief, offering not for the truth, if we have

4    a case in chief, for various nonhearsay reasons.  One of the

5    things Mr. Glover and I discussed is discussing those soon,

6    those categories to see if we can reach agreement on some of

7    those, document by document basis.  Now that we have knocked

8    out some of the documents, I think it makes sense for us to

9    get together in the coming days to do that.

10            THE COURT:  I have set aside Thursday and Friday of

11   this week to deal with these issues.  My first question is

12   are you intending to offer any documents in the government's

13   case through cross-examination?

14            MR. HILLEBRECHT:  It is possible.  It is hard to say

15   in advance before we know what's going to occur.

16            THE COURT:  I'm not dealing with the objections on

17   documents while I have a jury sitting in the box and the

18   witness on the witness stand.  That's the whole purpose of

19   pretrying the case, so you need to identify the documents you

20   intend to offer.  If not, when you offer one in the middle of

21   the examination, even though I have given you two days to

22   discuss it, I will turn to the jury and say excuse me, ladies

23   and gentlemen of the jury.  We're going to have to waste your

24   time and send you back because counsel are only now ready to

25   put before me the issue of the admissibility of the document

despite the fact I gave them two days in which to address all

of these issues so as not to waste your time.  I don't know

how long it will take, ladies and gentlemen, but we'll get

you back as soon as we can.  I don't think you want me to do

that.

MR. HILLEBRECHT:  Don't want to do that.  We want to

try this case efficiently.

THE COURT:  It is not efficient to deal with the

document objections in the three hundreds as the document is

offered.

MR. HILLEBRECHT:  The objections that the government

have raised, your Honor, are to our exhibit list which is our

Rule 16 exhibit list as the documents we may use in our case

in chief, if there are any.  The objections that they have as

to those exhibits, I think we should defer until a little

later in the case.  Give us one additional opportunity to try

to negotiate on some of those.  We're prepared to argue

whenever your Honor desires.

THE COURT:  I will be here Thursday morning first

thing.  That's when I'm intending to do it.

MR. GLOVER:  May I clarify one thing?  I don't think

the defense has given anything they intend to introduce

during cross-examination yet.  We haven't seen that.  Your

Honor's concerns are going to be present on the

cross-examination of the government's witnesses unless we get

1    documents from the defense on that.

2         THE COURT:  I assume they are among the 360

3    documents.  I don't know.

4         MR. HILLEBRECHT:  Some are and some aren't.  It is

5    not our understanding of our obligation under Rule 16 or

6    otherwise to preview for the prosecution, the defendant's

7    cross-examination of their witnesses which as a matter of

8    course is going to develop substantially after we hear the

9    opening and after we hear from the witnesses.  I don't

10   believe we have an obligation to layout a road map through

11   our cross-examination of impeachment of the prosecution

12   witnesses.  We're sensitive to your Honor's concern.  We're

13   familiar with the Rules of Evidence.  We believe we'll have

14   an absolutely fair and appropriate basis under the rules if

15   we do use any documents on cross-examination.  To require us

16   before the case even begins to give them a road map to our

17   defense is not fair to the defendant, your Honor.

18        THE COURT:  Assuming you are correct, you run two

19   risks, just so you are aware.  If you don't disclose the

20   documents you intend to use and let's assume you are correct,

21   you don't have to in cross-examining the government's

22   witnesses, you run two risks.  One is you run the risk of the

23   scenario I just described because I have an obligation it

24   seems to me to explain to the jury why they are sitting in

25   the jury room waiting while we discuss things.  And second,

1    you run the risk that I tell you to move on.  So your very

2    brilliant, planned cross-examination will not go as you

3    brilliantly planned it.  I will say move on.  We'll take it

4    up at break.  You may eventually get to use that document.

5    We may have to call that witness back for you to use that

6    document.  That will be how it will be.  Not the way you

7    planned it to be.

8            MR. HILLEBRECHT:  One second.  We understand that,

9    your Honor.  We certainly understand that.  One thing I think

10   that's important to note is to the extent we're addressing

11   the defendant's exhibit list and their objections to that,

12   we're going to deal with categories of documents.  I believe

13   your Honor's rulings on those documents will carry over to

14   cross-examination.  And there's no, to my recollection as I

15   stand here, there's no document that we'll possibly use on

16   cross examination that will be a similar kind of document to

17   the kind that we discussed on Thursday, your Honor.

18           THE COURT:  All right.  The other issue that I need

19   to discuss is we need to take up obviously the motion to

20   preclude which I think is the only remaining -- well, that's

21   one remaining motion and then there's the SEC's motion to

22   quash, so I think I would like to plan to take those up on

23   Thursday first, then we'll move to the exhibits after that.

24   I'm assuming that the ruling on those two motions may impact

25   the exhibits that are offered.  Maybe they won't.  I will do

1   the motions first.  Diahann, you need to get a calendar out.

2   I know we have it scheduled for Thursday, but we have to get

3   notice to the SEC.  I would just suggest to the U.S.

4   Attorney's Office Attorneys, that I received a chambers copy.

5   I hope everybody else got copies of the SEC's motion to

6   quash, but at least as late as yesterday, it had not been

7   docketed.  I don't know what they are waiting for.  If they

8   think the chambers' copy, I will docket it or are they

9   waiting for me to grant the motion to seal.  I can't grant a

10  motion to seal to something that's not on the docket.  You

11  might want to give some assistance to your colleagues at the

12  executive branch.  It is hard to schedule a motion that's not

13  docketed.  You might kindly alert them to the fact that I

14  expect to see them here on Thursday.  Did we say 9 or 9:30?

15  Let's make it 9:30.  And I will take up -- probably take up

16  the motion to preclude and then the motion by the SEC, then

17  we'll go on to the other trial matters which I think are

18  principally at this point exhibit objections.  All right?

19  Just so I can be clear, Diahann, would you check the

20  calendar.  Is there a judge's meeting on the 14th of March?

21          THE CLERK:  Yes.

22          THE COURT:  I don't intend to specifically tell the

23  panel the days that we'll be off, but as of now, my

24  understanding of days we're off are February 28, March 3, and

25  then I can't sit on the 14th of March.  Barring some disaster

1    I don't intend to be here that day.  Any other days we talked
2    about that we wouldn't have court?
3            MR. GLOVER:  No.
4            THE COURT:  I don't intend to announce it now.  If
5    somebody stood up I'm going on a long weekend on March 14, I
6    would say thanks very much.  I would consider them still
7    actively available.
8            MR. SMITH:  With regard to the government's motion
9    to preclude the experts, part of that is a request for the
10   Daubert hearing.  So should we have the witnesses on standby?
11   They are obviously not from this area.
12           THE COURT:  No.  I think most of what I'm interested
13   in is really 401 and 403 issues.  That's not to say if I get
14   past those that I wouldn't want to hear from them.  But I
15   don't think you should bring them in this week.  I think in
16   your case in chief, we can get them in some other time, if I
17   need to hear from them beforehand.
18           I don't take the government's argument really to
19   be -- part of it is to whether it meets 702.  It is not in
20   the sense these people are some guy that just walked off the
21   street and he really doesn't know anything.  It is the
22   different kind of 702 argument, so I think I would like to
23   hear argument to start with.
24           Is there anything else that folks thinks are pending
25   that I haven't covered?  I did receive a notice about scheme

1    evidence which I recollect relates to most by the defendant

2    which was to limit the evidence of transactions in support of

3    a scheme theory or theme allegation to 10 transactions which

4    I think, Attorney Smith, if I recall said 50 had been

5    disclosed or more than 50.

6            The government has come back with this notice of 16.

7    I don't believe there was any response from the defense.

8    Probably isn't time for them to be a response, but I would

9    like to know what the position of the defendant is with

10   respect to their proposed use of the 16 in their case in

11   chief in proof of the scheme.

12           MR. SMITH:  We're still considering how to handle

13   that but I think 10 to 16 is not such a difference that we'll

14   make an issue out of it.

15           THE COURT:  They have put you on notice of exactly

16   which ones.  That's significant to me to trial preparation.

17   If they said 40, I can understand that number would be a

18   problem.  The 16 is close enough.  You know them.  You don't

19   have to worry about the other 38.  I think the government

20   reserved the right depending upon a need to respond to

21   whatever theories or arguments you are making to introduce

22   one or more of the others, but that's a different kind of

23   proof.

24           Can you see where they are?  You should remember

25   that I follow the law which is and don't ask you to deviate

1    which is when you go to do strikes, you have to use your 10

2    and 6, 10 and 6 strikes in the pool, that is the jury pool.

3    If we don't remember to tell you, I will have Diahann tell

4    you the number of the juror we think that's the last one in

5    the jury pool then below that will be eight people left which

6    is your alternate pool that you have two strikes on leaving

7    four alternates, but we'll try to remind you of that.

8             Also on the blue sheet, we use numbers on the

9    record.  Please put the name of the juror because that way we

10   can avoid any confusion.  Sometimes putting a number and a

11   name that doesn't correlate to the number.  We try to check

12   that.  Obviously the number would control.  We would

13   hopefully catch it for you.

14            Lastly, you folks had asked for a jury list on

15   Friday.  I believe it was given to you.  I believe you were

16   also advised that isn't necessarily the final list.  There

17   may be people who don't show up at the last minute given

18   excuses.  That's the pool we were pulling the people coming

19   today and we have for example 100.  She probably called in

20   the 115.

21            THE CLERK:  125.

22            THE COURT:  With this weather, she was smart.

23   Weather, illnesses, people forget to set the alarms.  We have

24   some no shows.  You will notice the list we're working off

25   that's one to 100, that's scrambled.  I will start at one.

1    Anything that we can take up before she brings them in?

2    She's getting them in numerical order right now.

3            MR. SMITH:  Is this random number order?

4            THE COURT:  As they come in, number one will go

5    right in the public area.  Fill up the left side, go to

6    right.  As I call in the back, they should be in order.  When

7    they come up, it might be 1, 3, 4, 7, 8, 10 will go in the

8    seats.  Is it still everybody's view we'll take to March 1

9    with three days off?

10           MR. GLOVER:  That depends on the defendant's case.

11           THE COURT:  I'm sure it is the defendant's view if

12   there was no government's case, it would be over tomorrow.  I

13   have heard this morning several times if there's a defense

14   case so I have to assume there's going to be one.  Is it

15   still as lengthy as you thought it would be?

16           MR. SMITH:  If we bring one, if we do one shorter

17   than the government's case, your Honor.

18           THE COURT:  The government right now assuming that

19   Attorney Smith and his colleagues act reasonably in their

20   length of cross-examination.

21           MR. GLOVER:  I think the initial 7 days that we gave

22   you, that's three and a half of direct and three and a half

23   of cross is probably right.

24           THE COURT:  We should finish the government's case

25   when we have that long weekend break for the wedding.

1          MR. GLOVER:  That's entirely possible.

2          THE COURT:  Well, we'll see.  Everybody is doing the

3     electronic, am I right about that?  You are all using our

4     system, putting it on screens, things like that?  Whoever is

5     ever doing that for you has been trained and spoken to

6     Diahann or IT knows what to do.  We're not going to have

7     somebody say where is the on switch for the Elmo, things like

8     that.

9          MR. SMITH:  No, your Honor.

10          MR. GLOVER:  No, your Honor.

11          THE COURT:  It is a nice little system.  I don't

12     know if you looked at the screens.  You have essentially the

13     same screens.

14          MR. GLOVER:  I found two AUSA's in Hartford that

15     live in Middlesex County.

16          THE COURT:  That's fine.  I'm not sure what's been

17     calendared about this.  Maybe we'll have to issue a calendar

18     to make it clear.  My intention would be to have the first

19     conference on the charge on the 20th.  That's Thursday, the

20     20th.  They may have kicked out a notice for the 17.  I try

21     to do it on the first day of trial.  Given the length of the

22     trial, I don't see any point in doing it this way.  We expect

23     to get a draft of the charge out to you by the end of this

24     week so you will have plenty of time to go over it and be

25     prepared on it.

1          Please remember to bring your marked up copy on the

2     20th.  What I do after the court is over at 4:00, we'll start

3     going through it.  I doubt we'll finish the charge on the

4     20th.  What it does it allows me to get a sense of where the

5     real substantive questions are, whether I have missed

6     something, I misstated it or not included something or

7     there's a disagreement about the law.  That's a tough issue

8     and give me some time to take a look at the cases and to

9     think about it, gives me plenty of time through the next week

10    to go through the issues so we can put to bed the few

11    remaining issues which we can continue to discuss.

12          MR. SMITH:  When we were here last, you indicated

13    you had some tweaks to the charge.  I think his issue was the

14    TARP fraud.  We had a couple of additional modifications.

15    Can we get a submission to you that we want to modify?

16          THE COURT:  You probably have to get them to me

17    midday Wednesday.  My goal is to wrap it up and get out

18    Friday at the latest.  But I will hold it if you have a few

19    discrete ones.  You can bring forward other changes.  Last

20    minute would not be appreciated, but if you can get them in

21    by Wednesday, that would be great.  That gives us a chance to

22    put them in the first go-around.  I'm assuming we still have

23    no TARP charge from any other judge in the country that we

24    might look at as a guide.

25          MR. GLOVER:  I don't think so.

1          THE COURT:  That's what I'm finding.  Sometimes they

2     are not reported because they haven't gone up on appeal.  You

3     are not aware of any prosecution that have gone to trial yet?

4          MR. GLOVER:  I am not.  Did we agree on the time for

5     opening statements?

6          MR. GLOVER:  Your Honor gave each side 45 minutes.

7          THE COURT:  That's a long time.

8          MR. GLOVER:  Since we have time now, how do you like

9     to handle objections to the opening?

10         THE COURT:  You stand up and say, Judge.  There's a

11    problem.

12         MR. GLOVER: There's some judges that don't like

13    interruptions.

14         THE COURT:  I don't like them.  It better be a good

15    one.  If you stand up and I'm like what's the problem with

16    that.  If it gets to the point you should be arguing up a

17    storm, I will stop someone myself.  I don't need an objection

18    unless if I'm asleep at the switch so-to-speak.  Feel free to

19    stand up say objection, your Honor.  I presume I will know

20    because you think they are arguing.  If they are stating

21    evidence you don't think they can introduce, I don't think

22    that's a problem or objection.  That's for you to hammer on

23    the closing they promised this and didn't deliver type

24    argument.  I will be very perceptive to that.

25              Do you folks want to come around to this side of the

1     table.  Most of the focus will be on the people up here.  But

2     I will be asking one question of everybody.  If you want to

3     turn your chairs around in place, that's fine.  Thank you.

4              (9:10 in the presence of the jury)

5              THE COURT:  Thank you very much, Nancy.

6              Good morning, ladies and gentlemen.  Welcome to the

7     United States District Court for the District of Connecticut.

8     My name is Janet Hall.  I'm a chief judge in the district.  I

9     would like to welcome you to jury selection.

10             Before we begin, I want to let you know that I can

11    actually read the bubbles that are over your head right now

12    like in the cartoons, you know those silent thoughts that

13    people have.  Judges are powerful.  I'm not sure about that.

14    In that regard, I do have this skill.  I know right now the

15    bubble over your head reads what am I doing here and how can

16    I get out.  I will tell you I have been a judge for about

17    well over 16 years now, and I should go back some day and

18    count the number of jury trials I presided over as a judge.

19    How many there are.  It is hard to say.  Probably at least

20    150 I would say, and every time after the jury deliberates, I

21    go back and delivered their verdict and I excuse them, I ask

22    if I can come back and speak with them.  They stay around and

23    have questions about the court system and whatever for me.

24    Never once in all the times I have gone back in with all of

25    the jurors has anyone said they wish they haven't done it.

1    Indeed a large number will volunteer to me with heads nodding

2    around the room, really glad I did this.

3          It is one of our two civic functions that we have

4    the right to engage in.  One of them is voting.  I would urge

5    you to vote, but that's not my bailiwick.  I would urge you

6    to do that.  The second one is to be a juror.  People have

7    fought a hundred years ago over the right to be on a jury.

8    Women, people of color, different religions have been

9    excluded historically. People fought among the rights to be a

10   juror.

11         Unfortunately, very few people get that opportunity

12   to serve because we don't have that many jury trials anymore.

13   Because people sometimes can't be available to fulfill this

14   civic duty that they have or opportunity, I will call it,

15   because I find that when people do take that opportunity and

16   have that opportunity that they find it very educational and

17   enriching experience.  They get a chance to see how our court

18   system works, and I don't want to be boastful.  I happen to

19   think the United States Justice System, the court system in

20   this country is the finest in the world and the finest ever

21   conceived by man.

22         In my view, the main reason for that is because we

23   rely on jurors.  We rely on a jury citizen, made up of

24   citizens from the community who come into court.  This is

25   part of the process of selecting you as jurors.  You know

1    nothing about the particular case you are being asked to sit

2    on.  Listen to the evidence, are informed and directed by the

3    judge's instructions on the law to you, what law applies,

4    then only after deliberating with your fellow jurors, coming

5    to a conclusion about what you think the facts are and what

6    does that mean in light of the laws that I told you, is the

7    defendant not guilty or is he guilty, has the government

8    proven their case beyond a reasonable doubt or not.

9         So in a moment, when I ask you all would service on

10   this jury create an extreme hardship for you that you really

11   can't avoid, I would ask you to think about whether in fact

12   you could accommodate your life and your schedule such that

13   you could be available to serve as a juror on this jury.

14        I know we are all very pressed in our lives today.

15   In this country, everyone has many burdens and obligations,

16   responsibilities and worries, but I would ask you to at least

17   give serious thought to whether you can make yourself

18   available for service on this jury, as I say, in order to

19   fulfill your obligations as a citizen under our Constitution.

20        So enough, the first thing I need to swear you in

21   because we're going to -- I'm going to ask you a number of

22   questions.  The reason I ask these questions is not to pry,

23   not to embarrass you.  It is really to determine whether in

24   fact you're a person who could sit on this jury.

25        I will give you an example.  This example has

nothing to do with this case but I think it is pretty good

example.  It will demonstrate what I'm talking about.  I had

a trial.  I used to sit in the Bridgeport courthouse.  I had

a trial.  It was a civil case where a woman had been badly

injured in an accident on 95 where she claimed a tractor

trailer changing lanes without realizing she was in the lane,

hit her and she became very injured.  In the pool of people

was a woman that eventually that I learned from my

questioning had been in a similar accident three or four

years before, who had been badly injured.  It was in almost

the exact location that was the location in the lawsuit

before me.  She was quite emotional in recounting this

accident to me.

Now I suspect she would make an excellent juror in a

different case.  There was nothing wrong, otherwise she was

perfectly qualified to be a juror on the case in front of me.

I determined no, she had a personal experience that was too

close to what was at issue in my case.  She would listen to

the evidence in my case.  She would bring back memories of

what happened to her.  That would get in the case.  So that's

one of the reasons we ask you all a number of questions.

Please understand we don't want you to check your

life's experience at the front door of this courthouse as a

juror.  You all have experiences.  They may generally touch

upon issues in the case.  We have to pick a jury for today.

1    It's when it becomes extremely close and almost identical to

2    the cause we have in front of us, then the question becomes

3    whether you would be able to be a fair and impartial juror or

4    not.  That's why I will be asking the kind of questions that

5    I will.  Will you the panel rise and raise your right hand

6    for the clerk.

7            (Whereupon, the jury is sworn)

8            THE COURT:  Thank you very much, ladies and

9    gentlemen.  You may be seated.

10           As I said, I'm going to be asking questions.  I will

11   ask a couple of questions at the beginning to every one of

12   you, just so you understand the procedure.  We'll follow at

13   that point.  I will confer with counsel at sidebar, then the

14   clerk will call up 36, I think it is, of you up into the

15   seats on my left and on my right.

16           At that point, I will begin to focus my questions on

17   these folks, so I won't be looking back at the ones remaining

18   in the back of the courtroom.  However I can assure you at

19   some point in the process of jury selection, I will say to

20   someone up here number whatever, please step out, meaning

21   leave the box, go back to your seat.  The clerk will call up

22   another number to come up and fill that spot.

23           When that persons come up, I need to go through the

24   questions again.  What I found is if I'm going to ask you to

25   be attentive in the back even though you are not really

1    answering my questions.  When those people come up, they

2    usually have on their mind, I would have answered this

3    question and this question.  Everything else is okay judge.

4    That's fine.  I probably will prompt you by the subject

5    matter or the topics of the questions.  If you need me to go

6    through every question when you come up, I will do that.

7    That's not a problem.  But as I say, if you are attentive

8    while I'm asking these folks the questions, it probably will

9    be easier if and when you are called up to fill in to be able

10   to tell me your responses.

11          I will tell you first what the case is that we have

12   before us.  We have to pick one jury today in a criminal

13   case.  I'm going to give you a very brief description of what

14   the case is about and that's so you have some idea about what

15   would be involved in this case.  Later on, when I'm asking

16   you questions -- please understand that this statement of the

17   case is not evidence and later on if you are picked to serve

18   as a juror, you will be deciding the case on what you hear in

19   the courtroom during the trial.  Not based on anything I say

20   in this statement.  This is a very general description.

21          The indictment in this case and an indictment for

22   those of you who don't know, is a piece of paper that in fact

23   sets forth the charges that are made against a person

24   alleging that there have been one or more crimes committed by

25   that person.  That's what the indictment serves to put that

1     person on notice.  This is what the government is charging

2     you with.  And the indictment in this case charges the

3     defendant Mr. Jesse Litvak with a eleven counts on the

4     securities fraud.  One count of Troubled Asset Relief Program

5     which will be referred to during the trial as TARP, Troubled

6     Asset Relief Program fraud and four counts of making false

7     statements within the matter of the jurisdiction of the

8     United States Government.

9          The government alleges or claims that Mr. Litvak, a

10    licensed securities broker and former senior trader and

11    managing director of Jefferies and Co, Inc., I will sometimes

12    call that just Jefferies, that he was a securities broker and

13    former senior trader and managing director at Jefferies, a

14    global securities and investment banking firm that Mr. Litvak

15    as such, defrauded public private investment funds, known as

16    PPIF's and privately funded entities by making material

17    misrepresentations in the purchase and sale of Residential

18    Mortgage Backed Securities which will be referred to as RMBS.

19         Specifically, the indictment alleges that Mr. Litvak

20    fraudulently increased the profitability of his trades for

21    Jefferies at the expense of customers in three ways.

22         First, it alleges that in certain kind of trades

23    known as orders and bid lists, Mr. Litvak misrepresented to

24    buyers Jeffrey's cost for a bond, causing the buyer to pay an

25    inflated price.

1          Second, the indictment alleges that in purchasing

2     bonds, Mr. Litvak misrepresented to sellers the price that

3     Jefferies was selling the bond for causing the seller to

4     accept a deflated price.

5          Third, it alleges that in the sale of bonds from

6     Jeffrey's inventory, Mr. Litvak misrepresented to the buyers

7     that the bond was being sold by the third party.  Thus, the

8     victim was required to pay additional compensation on top.

9     Thereby causing the buyer to pay an inflated price for the

10    bond.

11         Mr, Litvack denies these allegations and has pled

12    not guilty to each and every one of the charges in the

13    indictment.

14         It is the purpose of the trial for which I'm

15    selecting a jury today, the purpose of the trial is to

16    provide the government an opportunity to attempt to prove

17    those charges beyond a reasonable doubt.  If the government

18    fails to do that, then the jury would return a verdict of not

19    guilty.

20         If the government carries that burden of proof

21    beyond a reasonable doubt as to any one of the counts then,

22    the jury would return a verdict of guilty as to that count.

23    That's what the purpose of the trial will be is to give the

24    government that opportunity to attempt to carry its burden.

25         You should understand that Mr. Litvak, like any

1    defendant, begins this case with an absolutely clean slate.

2    There's no evidence against him.  Even though I just read

3    that statement, that's not evidence.

4            And so it is the purpose of the jury to sit and

5    listen to the evidence and to decide whom to believe, whom

6    not to believe, what do you think happened, what do you think

7    didn't happen.

8            Based upon those findings of fact that you make as

9    jurors, after your deliberations, to then look to the see

10   what the law is, what is the government's burden to prove.

11   If they failed to prove any one or more of the elements on

12   any one or more of the counts or charges they made against

13   Mr. Litvak, then you are to find him not guilty.

14           Now, this trial is going to begin the evidence.  In

15   other words, we'll pick the jury today, but we will not begin

16   the evidence until February 18.  That's the day after the

17   holiday.  It is a Tuesday.  Kind of like you to try to make a

18   mental calendar in your mind.  Today is Monday, the 3rd, so

19   it is two weeks and a day from today before the jury would

20   actually come back in.

21           We would start the case, the evidence would begin on

22   that date the 18th, Tuesday, and I have to tell you that you

23   might be here through Friday, March 21.  Now there will be

24   some days in that time period that we will not have trial for

25   a variety of reasons.  I won't tell you about that but that

 1    the court can't have trial on a few days.  I would tell you

 2    what those are.  And it is possible that the case will not

 3    take that long, but I have to tell you that date because it

 4    is possible it will take that long, and I need to also build

 5    in time for you to deliberate.

 6          Once the case is in the jury's hands, then I don't

 7    control the time table, but I have to make as best an

 8    estimate I can based on my experience and based upon the

 9    nature of the case and number of charges, so I have decide

10    and the parties have agreed that the matter would be

11    certainly be done by March 21, which is a Friday.  We're

12    looking to held the trial from February 18 through March 21.

13    It is a Tuesday, the 18, and ending on the 21.

14          So my first question, ladies and gentlemen, for all

15    of you is for whom would it be an extreme hardship if you

16    were called upon to serve on this jury?

17          You should roughly be seated in order.  Number one

18    is in the front.  100 should be at the aisle in the back row

19    on my right, so I'm sure there maybe a few of you switched,

20    but roughly that's the order, so I start on my left, your

21    right.  I will go by row, start at the wall, come to the

22    aisle, then go back to the wall and do that side first and

23    come over here.

24          If you have an answer to my question, the question

25    being for whom would it be an extreme hardship, you should

1    raise your hand.  I will take you one at time.  When I call

2    you, I would appreciate if you can stand.  It is a lot easier

3    to hear you.  I think you are hearing me through the mic

4    system.  I hope if you do, you should be able to hear me loud

5    and clear.  The problem when I go away, it gets very hard to

6    hear.  It is a very tall ceiling so that means you need to

7    project to me.  I find if people stand up, it makes it

8    easier.  Their brain says they are talking to someone who is

9    faraway.

10          So I ask you if you stand, if you stand and tell me

11   the number on your shirt, not your original juror number, the

12   number they gave you.  So when you stand the first thing, I'm

13   juror number 22, and then give me your response.  The reason

14   why you are standing.

15          All right so again my first question is for whom

16   would service on this jury on the dates I indicated, pose an

17   extreme hardship that you could not avoid?  We'll start in

18   the second person.

19          A PROSPECTIVE JUROR:  Number 2.  I work for a small

20   business and I know that for any time that I spend in court,

21   I will need to do my work at night.  I don't know if you

22   consider that a hardship, but it is something I like to

23   consider because during of trial, I'll have to work at night.

24          THE COURT:  How many people work at your company?

25          A PROSPECTIVE JUROR:  Less than 22.  I'm a

1    designer.

2            THE COURT:  Is there any other designers?

3            A PROSPECTIVE JUROR:  There is one, but we're very

4    busy right now.

5            THE COURT:  Have you ever had jury service?

6            A PROSPECTIVE JUROR:  No.

7            THE COURT:  Thank you very much.  Anyone else in the

8    first row?

9            A PROSPECTIVE JUROR:  Juror 6.  I'm a Window system

10   engineer on a 24,7 data system.  I'm the one state side.

11           THE COURT:  You don't work 24,7, do you?

12           A PROSPECTIVE JUROR:  No.  It is during those dates

13   we're have PV audit testing begin next week, then remediation

14   after that.  That will be during that period so.

15           THE COURT:  I'm not sure.  You will have to explain

16   what that means or why you are needed in what you do.

17           A PROSPECTIVE JUROR:  I keep the bad guys from

18   breaking into our computer systems so I have the hard

19   systems.  So whatever data they find need to be remediated.

20   That's what I do.

21           THE COURT:  What happens when you go on vacation or

22   get sick?

23           A PROSPECTIVE JUROR:  Somebody else on my team in

24   India would have to do that.  I'm the only one for this data

25   center in the location that I am at.

1          THE COURT:  Have you ever had jury service?

2          A PROSPECTIVE JUROR:  Service, no.  Coming to one of

3     these, yes.

4          THE COURT:  Jury selection you have done, but you

5     have never been selected?

6          A PROSPECTIVE JUROR:  No.

7          THE COURT:  Thank you. Anyone else?

8          A PROSPECTIVE JUROR:  Number 7.  I have a travel

9     obligation March 13 through 17.

10         THE COURT:  Okay.  That's fine for me.  We're going

11    to be only started on the 18, the day after the holiday.

12         A PROSPECTIVE JUROR:  March.

13         THE COURT:  In March, you are saying?  I

14    misunderstood.  So your travel is March 13?

15         A PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  Thanks very much.  Anyone in the

17    second row that had their hand up?  I think it is you,

18    ma'am.

19         A PROSPECTIVE JUROR:  The time frame for me is fine.

20    My only concern is setting an extended period of time.

21    Number 14.

22         THE COURT:  You mean the physical part of sitting?

23         A PROSPECTIVE JUROR:  I need to get up and move.

24         THE COURT:  I have the same problem.

25         A PROSPECTIVE JUROR:  The chairs look okay but that

1    would be my only concern because I don't sit all day.

2         THE COURT:  I will say this, not for you, but for

3    everybody, our schedule here is the start with the jury at

4    9:30.  And we go for about an hour and 45 minutes, take a 15

5    or 20 minute break, come back for about an hour and 45

6    minutes, then take a lunch of 45 minutes, then we come back

7    for an hour and 45 minutes.  We end with the jury for the day

8    at 3:45.  So I never have you sit more than two hours.  I try

9    to keep it around that hour and three-quarters.  If that's

10   too much for you, because of your back or other people have

11   other issues, what I have told people who sit on the jury is

12   just feel free to stand up, bend your knees, stretch

13   yourself, whatever.  If we know now if you were on the jury,

14   if you did that.  Sometimes somebody stands up, whoa, where

15   is this person going, but in your case, we would know she's

16   just stiff.  I actually do that sometimes at the bench.  I

17   will stand up just to get blood through my legs.  Not a

18   problem at all for us.  If you think doing that and having

19   the length of time as I said would be okay if you think.

20        A PROSPECTIVE JUROR:  I never sat for consistently

21   so I think it would be okay.  If I can get up, if it posed a

22   problem, I might need to address that.

23        THE COURT:  Very good.  Thank you.  Anyone else in

24   that row that I haven't finished, then we're at the third row

25   on my left, your right, anyone had their hands up as far as

1  service being an extreme hardship?

2       A PROSPECTIVE JUROR:   Number 23.   I have a problem,

3  I have Crohn's disease, so I have to visit the bathroom

4  frequently.   I wouldn't be able to sit for a long period of

5  time.   I might have to go like four or five times an hour

6  depends.   I have a doctor's note as well.

7       THE COURT:   Would you mind bringing it up to the

8  clerk for me.   Thanks very much.   Anyone else in that row?

9  How about the next row?   I think we're on the fourth row on

10  the left side.

11       A PROSPECTIVE JUROR:   Number 25.   I have a child

12  that has cerebral palsy.   I need to be able to get to him

13  whatever I'm needed.

14       THE COURT:   Is your child in school?

15       A PROSPECTIVE JUROR:   Half day.

16       THE COURT:   Do you work outside the home?

17       A PROSPECTIVE JUROR:   Yes.

18       THE COURT:   Does your work accommodate in terms of

19  your need to leave so you can leave work when the need

20  arises?

21       A PROSPECTIVE JUROR:   Yes.

22       THE COURT:   Thank you very much.

23       A PROSPECTIVE JUROR:   Number 26.   I'm diagnosed as

24  Manic Depressive Bipolar.   I have a large amount of

25  medication that I'm on.   And also I have many doctor

1  appointments in the near future.

2         THE COURT:  I'll converse with you sidebar if we

3  need anymore information.

4         A PROSPECTIVE JUROR:  Number 27.  I have two

5  vacations during that time.  One is the end of February,

6  that's the 27th, and the other is March 14.

7         THE COURT:  Those vacations a day each?

8         A PROSPECTIVE JUROR:  No, the first one is three

9  days, the second is five.

10        THE COURT:  Can you give me the range of the dates

11 that you're on vacation.

12        A PROSPECTIVE JUROR:  February 27 to March 1.  March

13 14 to March 18.

14        THE COURT:  Okay.  Thank you very much.  Anyone else

15 in that row?

16        A PROSPECTIVE JUROR:  Juror 32.  The time frame that

17 you said for the trial is fine.  It is the week after I have

18 a commitment of travel if it goes to that point.

19        THE COURT:  If it went past the 21 of March.  I'm

20 fairly confident it will not go past the 21.  You would have

21 to remind me. We woe would have to see what we would do about

22 it.  I think it is extremely unlikely past the 21.  I think

23 it will be shorter.  I want everyone to assume the 21.

24 You're number 32.

25        Thank you.  Anyone else in that row?

1          A PROSPECTIVE JUROR:   Number 39.  I have one issue

2    on the 28 and March 3 that I'm going to be at a wedding out

3    of state.

4          THE COURT:  Thanks very much.  Anyone else?

5          A PROSPECTIVE JUROR:   Number 41.  I have vacation

6    booked on the 20th of March.  Your call.

7          THE COURT:  So what day had you hoped to leave?

8          A PROSPECTIVE JUROR:  The 20th Thursday.

9          THE COURT:  Okay.  How long will you be away for?

10         A PROSPECTIVE JUROR: Thursday through Monday.  I

11   will be back on Monday.

12         THE COURT:  All right.  Thank you very much.

13         A PROSPECTIVE JUROR:   Number 42.  I became

14   unemployed.  I have two interviews tomorrow, one with the

15   city here so if this process goes beyond today, then if I do

16   get a job, how would that affect?  Should I tell them?

17         THE COURT:  All right.

18         A PROSPECTIVE JUROR:  Would it effect getting a job?

19         THE COURT:  How long have you been unemployed?

20         A PROSPECTIVE JUROR:  My last day was the 31.

21         THE COURT:  Thank you very much.  Anyone else on my

22   left side, your right?

23         A PROSPECTIVE JUROR:  Number 46, your Honor.  I have

24   to go to a doctor's appointment scheduled for the 18th at

25   9:30 that I learn the results of a recent biopsy I had

```
 1  taken.

 2          THE COURT:  The 18 of February you are telling me?

 3          A PROSPECTIVE JUROR:  Yes, ma'am.

 4          THE COURT:  All right.  Thank you.  Anyone else in

 5  that row?

 6          A PROSPECTIVE JUROR:  Number 47.  My husband and I

 7  run a tax business, and we're very busy.  We'll until April

 8  15.  I need to be in the business working right now.

 9          THE COURT:  Have you ever served on a jury?

10          A PROSPECTIVE JUROR:  No, I haven't.

11          THE COURT:  Thank you very much.

12          A PROSPECTIVE JUROR:  Number 53.  I work two

13  part-time jobs, one day, one evening.  I certainly could not

14  afford not to work nights through the process.

15          THE COURT:  What are your hours when you work

16  nights?

17          A PROSPECTIVE JUROR:  Six to midnight.  My roommate

18  became unemployed.  We need to move out by April 1.  At some

19  point during the next six weeks, I need to find a new place

20  to live.

21          THE COURT:  Have you ever served on a jury?

22          A PROSPECTIVE JUROR:  No, ma'am.

23          A PROSPECTIVE JUROR:  Number 52.  Single parent I

24  have a young son.  I need to get him on and off the bus.  I

25  have a scheduled vacation from the 9th to 13th of March.
```

1          THE COURT:  And do you pick your child up from the

2     bus station every day?

3          A PROSPECTIVE JUROR:  I meet him at home.

4          THE COURT:  What time do you have to be there?

5          A PROSPECTIVE JUROR:  3:30.

6          THE COURT:  Thank you very much.  Anybody else on my

7     left, your right?  Turning over to this side in the first

8     row, anyone who had their hand up?

9          A PROSPECTIVE JUROR:  Number 55.  I'm a student.  I

10     have class Monday though Thursday morning so I would have to

11     miss class.

12          THE COURT:  Where are you in school?

13          A PROSPECTIVE JUROR: Post University in Waterbury.

14          A PROSPECTIVE JUROR:  Number 56.  I start a new job

15     February 17.

16          THE COURT:  Okay.  What's that going to be?

17          A PROSPECTIVE JUROR:  Product manager at Pitney

18     Bowes.

19          A PROSPECTIVE JUROR:  Juror 63.  I'm a dental

20     hygienist within one week, I see 30 to 40 patients.  For five

21     weeks that would be a lot of patients that have to be

22     rescheduled.  My office does not have any temp staff.  They

23     most likely reschedule the patients.

24          THE COURT:  Have you ever had jury service?

25          A PROSPECTIVE JUROR:  No.

```
 1            A PROSPECTIVE JUROR:  Juror 70.  I'm assistant nurse
 2  manager and my boss just had back surgery two weeks ago.
 3  Won't be back until the beginning of March which leaves me in
 4  charge of myself of 55 nurses and nurse's aides.
 5            THE COURT:  Where do you work?
 6            A PROSPECTIVE JUROR:  Yale.
 7            THE COURT:  No other assistant nurse managers?
 8            A PROSPECTIVE JUROR:  No, it is myself when someone
 9  is on vacation and someone covers so I have been by myself
10  for the last two weeks.
11            THE COURT:  Thank you.  Anyone else?
12            A PROSPECTIVE JUROR:  Number 73.  Today I'm supposed
13  to be starting a job so it is kind of similar.
14            THE COURT:  What did you tell them?
15            A PROSPECTIVE JUROR:  I told them that I was
16  selected for jury duty.  I had the previous date and this
17  date.  They are being accommodating.
18            THE COURT:  What's your new job?
19            A PROSPECTIVE JUROR:  Instructor for IT.
20            THE COURT:  Where are you working?
21            A PROSPECTIVE JUROR:  Toluna Wilton.
22            THE COURT:  Have you had jury service?
23            A PROSPECTIVE JUROR:  I have not.
24            A PROSPECTIVE JUROR:  Number 80.  Two reasons: My
25  father has stage four pancreatic cancer.  We have been taking
```

1  him to Dana Farber.  I'm involved in that care to go to

2  Boston.  I work at a patient psychiatric clinic.  I have

3  patients.  It is very business clinic.  There are patients I

4  need to see.  Hospital of Central Connecticut, New Britain.

5          THE COURT:  Thank you very much.  Anyone else in

6  that row?  How about the next row?

7          A PROSPECTIVE JUROR:  Number 83.  I'm scheduling to

8  be out of state March 8 through the 18.

9          THE COURT:  Is that a vacation?

10          A PROSPECTIVE JUROR:  Yes, ma'am.

11          THE COURT:  Do you have reservations tickets?

12          A PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Thank you.

14          A PROSPECTIVE JUROR:  Number 85.  I have vacation

15  planned March 8 to the 17th.

16          THE COURT:  You have reservations?

17          A PROSPECTIVE JUROR: Yes.

18          THE COURT:  Thanks very much.  Anyone else in that

19  row?

20          A PROSPECTIVE JUROR:  Number 90.  I'm an in-house

21  attorney.  I will be conducting my only trial in California

22  for a patient case for Judge Selna.

23          THE COURT:  I was having trouble.

24          You are an in-house lawyer but you have a trial

25  coming up in California?

1          A PROSPECTIVE JUROR:  Yes, March 4 to March 23.

2          THE COURT:  You have a date certain from a judge out

3    there?

4          A PROSPECTIVE JUROR:  Yes.

5          THE COURT:  That's not going off?

6          A PROSPECTIVE JUROR:  No.  Settlement discussions

7    have broken down.

8          THE COURT:  You are not asking for a continuance or

9    the other side?

10          A PROSPECTIVE JUROR:  No.

11          THE COURT:  Who is the judge?

12          A PROSPECTIVE JUROR:  S-e-l-n-a.

13          THE COURT:  Thank you very much.  Anybody else in

14    that row?

15          A PROSPECTIVE JUROR:  Number 91.  I'm a caregiver

16    for my husband and my brother who have many medical issues

17    and my brother is due for surgery.  I believe it is this

18    week.  It is determined today.

19          THE COURT:  So you don't work outside the home?

20          A PROSPECTIVE JUROR:  I do work.  They agreed that

21    my hours can be reduced.  They accommodate me.  I'm flexible

22    that I can come and go.

23          THE COURT:  Thank you very much.  Anyone necessary

24    that row?

25          A PROSPECTIVE JUROR:  Number 95.  I'm self-employed.

1  I have my own securities business.  I have no other planners

2  in the office that can run day-to-day operations.  I have a

3  new assistant that was hired to start today.  At least begin

4  administrative issues.

5          THE COURT:  Have you ever had jury service?

6          A PROSPECTIVE JUROR:  I have not.

7          THE COURT:  So you are the only person in your

8  business who?

9          A PROSPECTIVE JUROR:  My small company.

10          THE COURT:  Are you a broker or advisor?

11          A PROSPECTIVE JUROR:  Advisor.

12          THE COURT:  Thank you very much.  Anyone else in

13  that row?

14          A PROSPECTIVE JUROR:  Number 99, financially it is a

15  little difficult to take off more than a few days.

16          THE COURT:  Can I interrupt you.  I have 99 has a

17  name that seems to be a female.

18          A PROSPECTIVE JUROR:  97.  Financially it will be

19  very difficult for me to take off more than a few days.  I've

20  cut my hours.  I try to get to 40 with some assigned work.

21  Two kids in daycare.  It is tough right now.

22          THE COURT:  Have you had jury service?

23          A PROSPECTIVE JUROR:  Selection, no service.

24          THE COURT:  Anyone else there?  Should be a couple

25  more people in the last row.  Any of those?  Anyone that I

1    overlooked?   No.   All right then I will ask your patience

2    while I ask counsel to come to sidebar before we proceed to

3    the next stage of the selection process.

4              (Beginning of sidebar.)

5              THE COURT:   What I have seen it is a letter on

6    Connecticut stationery from a doctor indicating the woman

7    suffers from Crohn's disease.   The woman indicated she would

8    have to use the bathroom four or five times an hour on some

9    days.   If anybody wants to look at it, they can.   Do we give

10   those back or keep them?

11             THE CLERK:   We give it back.

12             THE COURT:   I think I would give it back unless

13   somebody wants me to make it part of the record.   We have 72

14   that didn't say a word.   We have to get 36.   We have twice

15   what we need.   All right.   There are a couple, as I think I

16   explained to you, my procedure is to skip the ones that say

17   something that look colorably sound for a reason not to be

18   here.   I don't excuse anyone. I keep them if we needed a the

19   few more.   There are a few I will not skip because the days

20   they are not available are days we're okay with.   I'm talking

21   about the person who has a father with stage four cancer

22   traveling to Dana Farber.   To me that's a pretty good reason

23   to excuse.   I would intend to skip her to start with her.

24   Anybody have a problem with that?

25             MR. SMITH:   No, your Honor.

1       THE COURT:  Generally I tend to be also

2   preliminarily generous about people who have either a

3   financial pressure like the last fellow who mentioned or

4   whose business is such that service would harm the business.

5   There's nobody else to do the work.

6       MR. SMITH:  They own the business.

7       THE COURT:  The fellow who stood, the individual

8   investment advisor, number two, she would have to do her work

9   at night.  I believed her.  It is a small company.  We can go

10  through theme individually.  I can tell you which ones I'm

11  inclined.  If you want to object, that's fine.  Why don't we

12  do it that way.  I would be inclined to skip number 2, 6.  7

13  is a question mark.  We'll come back to him.  14 I would not

14  skip.  I think we can deal with her back problems.  23 I

15  would cut or skip, 25 I don't know what that means.  Check.

16      MR. SMITH:  Child care with cerebral palsy.

17      THE COURT:  I would skip her, skip number 26, number

18  27 is a question mark there.  Hold that one, 32 spoke but

19  he's fine.  39 is fine because of the wedding dates with our

20  wedding dates.  41 is okay.

21      MR. SMITH:  March 20.

22      MR. GLOVER:  Out Thursday, Friday.

23      THE COURT:  The problem is if we aren't finished,

24  the next week, I'm out.  I have to go to Washington so let's

25  keep a question mark on him.  The unemployed fellow I would

1    skip 42.  I hate to lose 46, but he's got a doctor's

2    appointment at the start of the trial.  If the news is bad,

3    we would have to delay trial a day and hope the news was

4    good.  I think we skip him.  47 tax people I don't know why

5    they never get called in September.  I would skip her.  52

6    she had two reasons.  She has to meet the kid on the bus, I

7    would skip her.  I would cut her.  53 was the man with the

8    two jobs and needing to move the roommate with unemployment.

9    Probably skip him.  Student has the right to be excused.  The

10   new job person, I would excuse.  The dental hygienist I would

11   excuse.  The assistant nurse without a head nurse, I would

12   excuse.  New job I would excuse.  Stage four cancer father, I

13   would excuse.  The out-of-state vacation week I would excuse

14   two of them.  That's 83 and 85.  I'm sorry, Diahann.  I'm not

15   giving you the numbers.  90 is the trial lawyer in California

16   I would excuse.  91 I would excuse.  95 I would excuse.  97 I

17   would excuse.

18          So the only question marks I have are number 7 who

19   is traveling the 13 to the 17.  I think that's risky.

20          This is 7 I'm going back to the ones I had

21   questioned.  He's one that we could go back to and pick up

22   later if we needed a couple more at the end.  I wouldn't

23   include to start with.  It is risky.

24          MR. GLOVER:  I think that's right.

25          THE COURT:  Now we'll skip.  The other question mark

1   was 27.  She has vacation around our wedding.  That's not a

2   problem.  Then she's out that week again.  I think I would

3   skip her for now with the question mark.  Maybe come back to

4   her.  The next question mark I had was 41.  He's out.  That's

5   the 20th.  That one is really close because if we go into

6   that week, my thought we would only barely go into it.  It

7   looks like we have the whole week before.  If your case is a

8   week, he's done before February.  We have a full another week

9   to get to jury and deliberate.  I do think deliberations

10  could take time but Thursday seems like a long time to go to

11  the 20th.  I might be inclined to keep her in.  If you want

12  to be cautious, we'll make her a skip with a question mark.

13  41 is a man.

14          MR. GLOVER:  I think that's right.  I don't see the

15  trial going through.

16          THE COURT:  We'll keep him in.  He's finance

17  accounting.  We may lose anyways.  I think those are the only

18  ones I had questions.  So Diahann, you count how far you

19  think we have to go.  I will see if I agree.

20          THE COURT:  I go to 44.

21          THE CLERK:  Yes.

22          MR. SMITH:  The only question I have is number 90,

23  the lawyer, I heard him say in-house lawyer say he's trying

24  the case.  My only question is the trial lawyer or sitting at

25  trial.

1          THE COURT:  He said I have a trial.  When somebody

2     takes it, you are trying it.  You are right.  He may be

3     sitting in a back chair.  He may need to be there.  If we get

4     to him, remind me to follow-up before we put him in the box

5     at sidebar.  Diahann's going to call 36.  That takes us to

6     44, then we'll start with the introductions and the next

7     phase, thank you.

8                    (End of sidebar.)

9          THE COURT:  Ladies and gentlemen, we're about to

10    start the next phase where Diahann is going to call up 36

11    people to fill the chairs up front.  Some of you may get

12    called up who told me about days you are unavailable so you

13    don't sit here chewing your insides thinking you will miss

14    your vacation or whatever it is.  We're not scheduled to have

15    trial on February 28 or March 3.  That's a Friday, Monday

16    which some people mentioned they were going to weddings and

17    other things, and we will not.  At this point I'm planning on

18    trial on March 14 assuming the case is still going.  I think

19    somebody else mentioned that day.  So people who mentioned

20    those dates you may get called up.  In my view it won't be a

21    problem.  We won't be here that day so you don't have to be

22    here.

23          A PROSPECTIVE JUROR: I may have misspoken.  From

24    March 14 to the night of the 17th.

25          THE COURT:  Thanks I had the 13 down.  I appreciate

1    that.  So you are gone from the night of the 14.

2          A PROSPECTIVE JUROR:  I'm not.  The Friday to Monday

3    that week.

4          THE COURT:  Thank you very much.  Everybody ready to

5    have Diahann seat folks in the box.  Thank you.

6          THE CLERK:  When I call your number, you are going

7    to sit in the order that I call you in number order.  We're

8    going to begin with this first seat closet to the judge on

9    the floor.  Number 1, 3, 4, 5, 8, 9, 10.  That's the first

10   row.  11, 12, 13, 14, 15, 16, 17.

11         THE COURT:  Just to be in the front row 1, 3, 4, 5,

12   8, 9, 10; is that right?

13         THE CLERK:  Third row will be 18, 19, 20, 21, 22,

14   24, 28, 29, 30.  Then over here beginning with this first

15   seat on the floor.  Number 31, 32, and 33.  34, 35, 36, 37,

16   and 38.  In the last row we have 39, 40, 41, 43, and 44.

17         THE COURT:  I have to tell you before we begin, that

18   this is the first time I had people on my right.  Usually

19   when you come up to the box, we have redone the courtroom, I

20   will go like this be looking at these folks.  You will be

21   over there.  There are certain people in the courtroom whose

22   sole job is to tell me Judge, look to your right.  If I

23   don't, just keep waving your hand.  Somebody will notice.

24   One of the lawyers will say something that will get me to

25   turn around and look at you.  Hopefully I will remember on my

1    own, but the habit is hard to break.  If people are having

2    trouble because I'm not using the mic, please let me know

3    that.

4            This is the part where I will be focusing my

5    questions up there.  You may have an answer you folks in the

6    back.  I don't need you to raise your hand.  What I need you

7    to do is pay as much attention as you can because when you

8    get called up to replace people up here, I will need to go

9    through the questions I asked up here to see if you have any

10   responses that we need to know.  The more you are attentive,

11   hopefully you will remember.  I would have told you about

12   this.  I would have told you about that or something like

13   that.

14           The first thing is I will give each side the

15   opportunity to introduce themselves so I will start with the

16   government first.  They will introduce who is with them and

17   who whom they practice law at least in the areas from which

18   you are from.  And finally what witnesses or names they

19   expect you will hear during the trial.  The purpose for that

20   is if you were to know a witness or you were to know one of

21   the lawyers or the person they practice with, it might affect

22   your ability to be a juror.  Not necessarily but we would

23   like to know about it.

24           For example, one of the lawyers might be your son's

25   basketball coach or grandson's basketball coach.  You may

```
1   like him or not.  You don't know what you think of him.

2   That's the sort of thing.  Once you tell me you recognize a

3   name, I will ask a few follow-up questions to see what your

4   knowledge is of that person whether it would evident you.

5            After the government had their chance to introduce

6   themselves, I will do the same with Mr. Litvak and his lawyer

7   will introduce himself and the people with him, where he

8   practices and finally if there are any other names that he

9   thinks will be witnesses or might be mentioned during the

10  trial.  He'll give you those names as well.  I may break it

11  up and stop after some names and say are any of those

12  familiar?  Sometimes I will go a long time and ask if any are

13  familiar.  Try to keep the name in mind.  We have a lot of

14  Tom Smith's in the world.  Don't sit there and say gee, I

15  don't know if that's the same Tom Smith I know.  Raise your

16  hand.  I know a Tom Smith.  We'll find out where your Tom

17  Smith is from, what he does, whether it is the same.  We'll

18  start with the government first.

19           MR. GLOVER:  Thank you, your Honor.  My name is Eric

20  Glover, I'm an Assistant United States Attorney and I work

21  here in New Haven.  I'll try to speak in the mic so everyone

22  can hear me as well.  I work for the United States Attorney's

23  whose is in the District of Connecticut, Deirdre M. Daly.

24  She and the office are responsible for the enforcing federal

25  criminal laws in Connecticut as well as representing the
```

1   United States in civil actions which the United States is a

2   party.

3           With me trying this case United States Attorney

4   Jonathan Francis, also an Assistant United States Attorney

5   who works in New Haven with Senior Investigator Robert

6   Marston from the Special Inspector General for the Troubled

7   Asset Relief Program that's called SIGTARP and Special Agent

8   James O'Connor also of SIGTARP in the courtroom assisting us.

9   From time to time you will sometimes see paralegal Joe

10  Samuels and Jennifer Costas.

11          THE COURT:  Let me stop you there.  Does anybody

12  think they know any of the people so far who have been

13  introduced who are here in front of you in the courtroom?

14  Anybody look familiar or name sound familiar?  Go ahead.

15          MR. GLOVER:  I will read you a list of AUSA's from

16  our New Haven office.  Liam Brennan, Patrick Caruso, Edward

17  Chang, William Collier, Felice Duffy, John Durham, Sandra

18  Glover, Michael Gustafson, Gordon Hall, David Huang, John

19  Hughes, Peter Jongbloed, Anthony Kaplan, Sara Karwan,

20  Anastasia King, Henry Kopel, Peter Markel, Michelle

21  McConaghy, Michael McGarry, Raymond Miller, Richard Merlow,

22  Douglas Morbido, Deedee Moses, Lauren Nash, David Nelson,

23  David Novak, Neeraj Patel, Michael Runowicz, Christopher

24  Schmeisser, Christine Sciarrino, Davis Sheldon, Marc

25  Silverman, Alan Soloway, Robert Spector, David Sullivan,

```
 1    Julie Terbert and Susan Wines.
 2            THE COURT:  Do any of those names sound familiar?
 3    Those are lawyers who are in his office.  They are not
 4    involved in the case.  Yes, ma'am.
 5            Could you tell me your number?
 6            A PROSPECTIVE JUROR:  10, Peter Jongbloed.
 7            THE COURT:  How do you know Peter Jongbloed?
 8            A PROSPECTIVE JUROR:  Socially.
 9            THE COURT:  Is it somebody you see frequently?
10            A PROSPECTIVE JUROR:  Not terribly frequently.
11            THE COURT:  Well, do you think it would be a problem
12    to sit on a jury, to be fair and open minded if you happen to
13    know a lawyer that's in the office of the lawyer pressing the
14    case?
15            A PROSPECTIVE JUROR:  No.
16            THE COURT:  Would you have any trouble if you had
17    happened to have a social occasion to see Mr. Jongbloed
18    before the case was over?  Would you have any trouble not
19    saying anything about it?
20            A PROSPECTIVE JUROR:  I would be okay.
21            THE COURT:  If I instructed you not to talk about
22    it, I ordered you not to, would you have any trouble obeying
23    my order?
24            A PROSPECTIVE JUROR:  No.
25            THE COURT:  All right.  Then anyone else with any of
```

1    those names that are the other lawyers, the Assistant U.S,

2    Attorneys but they are not involved in this case that list

3    that was just read.  If you would continue with witnesses or

4    names that might be heard even though they might not be

5    witnesses in the courtroom in this case.

6         MR. GLOVER:  I will read a list of entities who you

7    might hear during the case and then stop, read the names of

8    witnesses, other individuals, you might hear during the

9    course of the case Aberdeen Asset Management, Angelo, Gordon

10   & Company, Alliance Bernstein, Aruiga USA, Black Rock, Inc.,

11   Blumberg LP, Columbia Management Partners, DE Shaw and

12   Company, DW Investment Management, EBF and Associates, FINRA

13   or the Financial Industry Regulatory Authority, General Re

14   Corporation, Invesco Ltd, Jefferies and Company, JP Morgan

15   Securities, Libermax Capital, Navidar Capital, MFA Financial,

16   Monarch Alternative Capital, PIMCO, Pine River Capital

17   Management, Putnam Investment, QVT Financial, RBC Liberty

18   Insurance, Red Top Capital Investments, RLJ Western Asset

19   Management, Soros Fund Management, TCW, Third Point, LLC,

20   Treesdale Investments, Wayzata Investment Partners,

21   Wellington Management Company and York Capital Management.

22        THE COURT:  Anybody familiar with the names of those

23   companies or entities that he just listed?  Yes, in the

24   middle in the back.

25        A PROSPECTIVE JUROR:  22.  They happen to be some

1   investments I have in my 401K portfolio.  They are

2   investments in my 401 PIMCO, Black Rock.  I have Liberty

3   Insurance.

4          THE COURT:  Do you make your own investment

5   decisions in your 401(k) or does someone do that?

6          A PROSPECTIVE JUROR:  I make my own decisions.

7          THE COURT:  I'll follow-up with you at sidebar.  I

8   need to ask the government counsel a little bit before I can

9   follow-up with more questions.  Over on this side, Juror

10  Number 35?

11         A PROSPECTIVE JUROR:  I have a college fund with

12  Black Rock.  We have some investments through Columbia.

13         THE COURT:  Are those investments that you make the

14  decisions on?

15         A PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Anyone else?

17         A PROSPECTIVE JUROR:  29 a couple of were

18  investments in my portfolio that I do not make decisions, my

19  financial advisor.  JP Morgan in particular.  I have been in

20  the process of a trust has come to an end.  I have been

21  working with JP Morgan who held the trust.

22         THE COURT:  So the trust is winding down?

23         A PROSPECTIVE JUROR:  It is dissolved.

24         THE COURT:  They had previously been involved in

25  connection with it, but it is process of becoming over.

1      A PROSPECTIVE JUROR:  99 and three-quarters over.

2      THE COURT:  Are there any dispute with JP Morgan

3  over the wind down?

4      A PROSPECTIVE JUROR:  No.

5      THE COURT:  Thank you.  Anyone else I missed?  Can I

6  confirm your number 39?

7      A PROSPECTIVE JUROR:  Yes.

8      THE COURT:  I did do it backwards.  Attorney Glover,

9  do you have the witness name at this point?

10      MR. GLOVER:  This is the list of witnesses or

11  individuals about whom you may hear at trial.  Michael

12  Canter, Robert Schick, Beth Starr, Ben Morganstein, Bill

13  Jennings, Johan Eveland, Katherine Costanzo Corso, Al

14  Vlajinac, Brian Norris, Peter McMullen, Joe Wollman, Thomas

15  Carocci, David Miller, Robert Welch, Adam Wolf, Alvin

16  Sarabanchong, Kerry A. Finley, Kevin Blaney, Kevin Lemoine,

17  Jeffrey Katz, Sasan Soleimani, Shirley Prada, David Schwartz,

18  Ken Ziegar, Mark Plansky, Chris Bolger, Stuart Kronick, Brian

19  McKinsell, Hayward Lang, Jordan Reiger, Jordan Losting, Perry

20  Rahbar, Thomas Durkin, Christopher Heney, Chris O'neill,

21  Yvonne Stern, Brian McGrath, Greg Hamler, Jean Wilson, Stern,

22  Nicholas Emanual, Jason Speiler, Bethany Evetts, Matthew

23  Bass, Erin Bartley, Vladimir Lemin, Gary Lit, Gabriel Rivera,

24  Lisa Greco and Adam Sklara.

25      THE COURT:  Any of those names sound familiar to

1       anyone?

2               In the back on my right, number 40.

3               A PROSPECTIVE JUROR:  I do know a fellow named Bill

4       Jennings, but I don't think it is probably the same one.

5               THE COURT:  Where is it that you work?

6               A PROSPECTIVE JUROR:  I work at Progress Bookends in

7       New London.  He works for the New England.  I'm sure it's not

8       the same.

9               THE COURT:  You did exactly the right thing.  Let us

10      know if the name is familiar.  So thank you very much.

11      Anybody else think any of those names sound familiar?  In the

12      back number 22?

13              A PROSPECTIVE JUROR:  22.  So I know Bill Jennings.

14      He works at Electric Boat in Groton.  Dave Schwartz works at

15      Electric Boat.  Robert Welch who is retired from Electric

16      Boat.  David Miller also an Electric Boat employee, common

17      names.

18              THE COURT:  The ones you know are all from or

19      connected with the Electric Boat?

20              A PROSPECTIVE JUROR:  Yes, former employees or

21      current employees.

22              THE COURT:  Do you think of any of them that fit

23      that bill?

24              Mr. GLOVER:  I do not.

25              THE COURT:  Anyone else any of those names sound

1    familiar so are you done?

2         MR. GLOVER:  Thank you, your Honor.

3         THE COURT:  Attorney Smith, will you be doing the

4    introductions?

5         MR. SMITH:  Yes, your Honor.  Thank you.  Good

6    morning, everyone.  Thanks for being here on this snowy day.

7    Patrick Smith from DLA Piper.  I will be representing with

8    some colleagues, Jesse Litvak, the defendant in the case.

9    Jesse, if you stand up and turn around so everyone can see

10   you.  So with me from DLA Piper is John Hillebrecht, and our

11   colleague Sarah Zimmer.  Also in the courtroom helping out

12   the Ellen Brickman from Doar Litigation Consulting.  There's

13   also several attorneys and paralegals from the DLA Piper who

14   have worked on the case.  They may come into the courtroom

15   from time to time.  They include Kyle Degangy, Lane Earnest,

16   Dan Harkins, Carl Lawrence, and Rachel Hamilton.  And in the

17   course of the trial, we're going to have one of

18   Ms. Brickman's from Doar Litigation Consulting helping out

19   with the audio visual displays and the evidence that will be

20   on the computer monitors.  His name is Ray McCloud.  He'll be

21   sitting at counsel table throughout the trial.

22        DLA Piper is a large law firm. We have offices in

23   Boston, New York, Washington.  We don't have an office in the

24   state of Connecticut and none of the people I mentioned who

25   work at DLA live in the state of Connecticut.  Because we

1 don't have a Connecticut office, we've asked our colleagues

2 at the Connecticut law firm of Shipman & Goodwin to help out

3 with the trial.  I will turn it over briefly to Michael

4 Chase.  He'll tell you about Shipman & Goodwin.

5    MR. CHASE:  Mike Chase.  I work at the Hartford

6 office of the law firm of Shipman & Goodwin.  From time to

7 time, you will see my colleague Ross Garber who lives in

8 Glastonbury, Connecticut.

9    While we don't have offices here in New Haven, we do

10 have several attorneys who live in New London, New Haven and

11 Middlesex County.  I will list those names to see if anybody

12 knows those people:  Scott CalperplaTe, John DiMarco, Lee

13 Duval, Brenda Eckert, Sarah Fucci, Anne Littefield, Jarad

14 Lucan, Saranne Murray, Sonia Padrasa, Matt Ranelli, Jessica

15 Stein Soufer, Brian Harmond, Lisa Mehta, Christopher Smith

16 and John Wertam.

17    Now I will turn back over to Patrick Smith.

18    THE COURT:  Let's stop before you get to the next

19 phase.  Any of those names familiar to you?  Either the law

20 firm or its lawyers or Mr. Litvak?  Any of those?

21    If you would continue, if there are any other

22 additional witnesses or names you think would be mentioned if

23 you would cover those, Attorney Smith.

24    MR. SMITH:  In addition to the organizations and

25 entities that you heard about from Mr. Glover, there's a

1    couple of additional names, actually all law firms.  Morvillo

2    Abramwitz Grand Iason & Anello; Schulte Roth and Zabel; and

3    the law firm of Wilmer Heil.

4         Now I will move on to a list of potential witnesses

5    and names you might here in the trial.  I will link them to

6    organizations that may help you out.  Robert Albano

7    Jefferies; Joseph Algor, Jefferies; PK Banks, PW Investment

8    Management; Kevin Blaney, Jefferies; Barry Bohrer, Shulte

9    Roth; Michael Garrett, Wellington Management; Stephen Juris,

10   Morvillo Abramwitz, Oliver Camp, FINRA; Jeff Katz, Western

11   Asset Management and TCW Group; Craig Knutson, MFA Financial;

12   Eugene McGivney, Jefferies; Rob Morrow, Red Top Investors;

13   Chris Rice, EBF and Associates; Christy Ramero from SIGTARP,

14   Michael Sharp from Jefferies, and John Vibert from Black

15   Rock.  That's it, your Honor.

16        THE COURT:  Any of those names sound familiar to

17   anyone?  I don't see any hands so no.  All right then, thank

18   you.

19        I'm going to ask all of you as a group some general

20   questions I will call them that could relate to your ability

21   to serve as a juror or be relevant to the lawyers and the

22   parties as they decide about the jury.

23        The first is have any of you had prior jury service?

24   By that I don't mean you were called into something like this

25   jury selection but where you were actually picked as a juror

```
 1    then served and listened to a trial.  Now, this is what I

 2    would like to know.  Yes, if you did so serve, yes, you

 3    served on a jury.  Was it state or federal court?  How long

 4    ago was it?  And did you deliberate to a verdict?  Sometimes

 5    cases will settle, sometimes something happens and the case

 6    has to be stopped and started anew, so I'm just interested in

 7    those pieces of information.  Was it civil or criminal,

 8    federal or state, when did it happen and did you deliberate

 9    to a verdict?  So my first question is did anybody ever have

10    prior jury service?  So I will start in the first row on my

11    left which is Juror Number 10 and if you could tell me the

12    answers to my questions about jury service.

13             A PROSPECTIVE JUROR:  It was 22 years ago.  I

14    believe it was state situation and it was deliberated to a

15    verdict.

16             THE COURT:  Civil or criminal?

17             A PROSPECTIVE JUROR:  Criminal.

18             THE COURT:  Thank you very much.  Anybody in the

19    second row?  In the middle.

20             A PROSPECTIVE JUROR:  14.  I served on two juries. I

21    don't remember if they were state or federal.  They were both

22    civil and they were both settled before we deliberated.

23             THE COURT:  About how long ago?

24             A PROSPECTIVE JUROR:  Five to 10 years ago, both of

25    them.
```

1          A PROSPECTIVE JUROR:   28.  I did serve on two

2    criminal juries back in 1990.  It was mandatory six weeks

3    jury and yes, they were brought to verdict.

4          THE COURT:  Thank you.  Anybody else that I have

5    missed on my left, going over to the right.  Is there anyone

6    who had their arm up who had jury service?

7          A PROSPECTIVE JUROR:   Number 32.  Jury service was

8    1990, 1991, somewhere in there.  It was criminal state and we

9    went to a verdict.

10          THE COURT:  Thanks very much.  Anybody else on this

11    side that I missed?  Can we get you a glass of water?

12          A PROSPECTIVE JUROR:  Thank you.

13          THE COURT:  My next question is really.  I have had

14    a conversation with one of the jurors about this.  It is

15    really whether there's any physical reason why you couldn't

16    serve as a juror.  I start by asking if you have any problem

17    seeing or hearing, but you may have other physical conditions

18    that make it difficult for you to sit for a long time for any

19    other reasons like that, so that's really my question.  Is

20    there anything you want to bring to my attention about

21    yourself that you think would make it difficult for you to

22    service as a juror?  Anybody else?  I have 14, but how is the

23    chair, by the way?

24          A PROSPECTIVE JUROR:  It is fair.

25          THE COURT:  Anybody else have something to offer?

1           A PROSPECTIVE JUROR:  18.  I didn't bring my hearing

2   aids.  I should have.  I don't hear very well.

3           THE COURT:  Can you hear me when I use the mic?

4           A PROSPECTIVE JUROR:  Yes.  With those gentleman, it

5   was very difficult.  I can hear them, but I can't understand

6   them.

7           THE COURT:  That means you didn't hear the names,

8   right?

9           A PROSPECTIVE JUROR:  A lot of them I couldn't

10  understand the names.

11          THE COURT:  You do have hearing aids to bring for

12  the trial?

13          A PROSPECTIVE JUROR:  Yes.

14          THE COURT:  I apologize.  We have to cure that,

15  counsel.  So I would ask if you would give the names,

16  Attorney Glover, make sure you are using the mic.  You have

17  it in your hand as close as I am, then I will ask Attorney

18  Smith to do the same to run through the names.

19          They assured me it would pick it up with you

20  standing like that, so you will need to hold it in your hand.

21          MR. GLOVER:  How is that?

22          A PROSPECTIVE JUROR:  A little better.  A lot of

23  times it is loud.  I can't understand you.

24          MR. GLOVER:  I will speak more slowly.  The names of

25  the individuals in my office are Deirdre Daly is the U.S.

1    Attorney.  And the members of the trial team are Jonathan

2    Francis, Robert Marston, James O'Connor.  And others you

3    might see Josie Samuels and Jason Breen as well as Jennifer

4    Costas.

5         Individuals who work in the New Haven office of the

6    U.S. Attorney are Liam Brennan, Patrick Caruso, Edward Chang,

7    William Collier, Felice Duffy, John Durham, Sandra Glover,

8    Michael Gustafson, Gordon Hall, David Huang, John Hughes,

9    Peter Jongbloed, Anthony Kaplan, Sarah Karwin, Anastasia

10   King, Henry Kopel, Peter Markel, Michelle McConaghy, Michael

11   McGarry, Raymond Miller, Richard Merlow, Douglas Morabito,

12   Deedee Moses, Lauren Nash, David Nelson, David Novak, Neeraj

13   Patel, Michael Runowicz, Christopher Schmeisser, Christine

14   Sciarrino, David Sheldon, Marc Silverman, Alan Soloway,

15   Robert Spector, David Sullivan, Julie Turbet and Susan Wines.

16        THE COURT:  Any of those names familiar?

17        A PROSPECTIVE JUROR:  No.

18        THE COURT:  Would you go to the entities, then the

19   witness names?

20        MR. GLOVER:  The names of some of the entities you

21   might here are Aberdeen Asset Management, Angelo, Gordon  &

22   Company, Alliance Bernstein, Aruiga USA, Black Rock, Inc.,

23   Blumberg LP, Columbia Management Partners, DE Shaw and

24   Company, DW Investment Management, EBF and Associates, FINRA

25   or the Financial Industry Regulatory Authority, General Re

1   Corporation, Invesco Ltd, Jefferies and Company, JP Morgan

2   Securities, Libermax Capital, Navidar Capital, MFA Financial,

3   Monarch Alternative Capital, PIMCO, Pine River Capital

4   Management, Putnam Investment, QVT Financial, RBC Liberty

5   Insurance, Red Top Capital Investments, RLJ Western Asset

6   Management, Soros Fund Management, TCW, Third Point, LLC,

7   Treesdale Investments, Wayzata Investment Partners,

8   Wellington Management Company and York Capital Management.  A

9           THE COURT:  Any of those familiar?

10          A PROSPECTIVE JUROR:  No.

11          THE COURT:  Keep going.

12          MR. GLOVER:  The names of the individual witness

13  names you might hear at trial Michael Canter, Robert Schick,

14  Beth Starr, Ben Morganstein, Bill Jennings, Johan Eveland,

15  Katherine Costanzo Corso, Al Vlajinac, Brian Norris, Peter

16  McMullen, Joe Wollman, Thomas Carocci, David Miller, Robert

17  Welch, Adam Wolf, Alvin Sarabanchong, Kerry A. Finley, Kevin

18  Blaney, Kevin Lemoine, Jeffrey Katz, Sasan Soleimani, Shirley

19  Prada, David Schwartz, Ken Ziegar, Mark Plansky, Chris

20  Bolger, Stuart Kronick, Brian McKinsell, Hayward Lang, Jordan

21  Reiger, Jordan Losting, Perry Rahbar, Thomas Durkin,

22  Christopher Heney, Chris O'Neill, Yvonne Stern, Brian

23  McGrath, Greg Hamler, Jean Wilson, Stern, Nicholas Emanual,

24  Jason Speiler, Bethany Evetts, Matthew Bass, Erin Bartley,

25  Vladimir Lemin, Gary Lit, Gabriel Rivera, Lisa Greco and Adam

1    Sklara.

2            THE COURT:  Any of those a problem?

3            A PROSPECTIVE JUROR:  No.

4            THE COURT:  Attorney Smith.

5            MR. SMITH:  So my name is Patrick Smith and I'm from

6    DLA Piper. Also from DLA paper is John Hillebrecht, Sara

7    Zimmer, Kyle Degangy, Blane Earnest, Dan Harkins, Carl

8    Lawrence, Rachel Hamilton.  Also working with us from Doar

9    Consulting is Ellen Brickman, Ray McCloud.

10           From Shipman and Goodman, we have Michael Chase,

11   Ross Garber, Scott Cooperwait, John DiMarco, Lee Duval,

12   Brenda Eckert, Sarah Fucci, Anne Littefield, Jarad Lucan,

13   Saranne Murray, Sonia Padrasa, Matt Ranelli, Jessica Stein

14   Soufer, Brian Harmond, Lisa Mehta, Christopher Smith and John

15   Wertam.

16           A PROSPECTIVE JUROR:  No.

17           THE COURT:  Those are all set.

18           MR. SMITH:  For entities and witnesses and names you

19   might here in the trial.  There were three additional

20   entities.  Morvillo Abramwitz Grand Iason & Anello; Schulte

21   Roth and Zabel; and the law firm of Wilmer Heil.

22           A PROSPECTIVE JUROR:  No.

23           MR. SMITH:  The additional witness names are Robert

24   Albano Jefferies; Joseph Algor, Jefferies; PK Banks, PW

25   Investment Management; Kevin Blaney, Jefferies; Barry Bohrer,

```
1    Shulte Roth; Michael Garrett, Wellington Management; Stephen
2    Juris, Morvillo Abramwitz, Oliver Camp, FINRA; Jeff Katz,
3    Western Asset Management and TCW Group; Craig Knutson, MFA
4    Financial; Eugene McGivney, Jefferies; Rob Morrow, Red Top
5    Investors; Chris Rice, EBF and Associates; Christy Ramero
6    from SIGTARP, Michael Sharp from Jefferies, and John Vibert
7    from Black Rock.
8                 THE COURT:  Any of those?
9                 A PROSPECTIVE JUROR:  No.
10                THE COURT:  You are all set.  Very good.  I think
11   before we took that little detour, I was in the process of
12   asking anybody had any physical problems seeing, hearing,
13   sitting, whatever.  Was there anyone else who had their hand
14   up that I hadn't turned to yet for those issues?
15                A PROSPECTIVE JUROR:  Number 33.  I had back
16   surgery.  L5 herniated.
17                THE COURT:  So does it make it uncomfortable to sit?
18                Those seats are really bad.
19                A PROSPECTIVE JUROR:  I want to make you aware of
20   that.  A lot of days the tingling on the bottom of my feet,
21   the back of my feet.
22                THE COURT:  If you get up and move, does that help?
23                A PROSPECTIVE JUROR:  It is hard to say.  Sometimes
24   it just aggravates it.
25                THE COURT:  Do you work?
```

```
1              A PROSPECTIVE JUROR:  Yes.

2              THE COURT:  What do you do for work?

3              A PROSPECTIVE JUROR:  Right now I'm working but they

4    have accommodated me.

5              THE COURT:  Do you take medication for the pain when

6    you get it?

7              A PROSPECTIVE JUROR:  I try not to.  Otherwise I

8    just take Ibuprofen.

9              THE COURT:  Nothing that would make you sleepy?

10             A PROSPECTIVE JUROR:  Correct.

11             THE COURT:  Thank you.  Anyone else I missed?  The

12   last one of these general questions.  Anybody has trouble

13   with reading English, writing English, anything like that?

14   There will be documents.  You will have to read things.  I

15   want to be sure no one has any problem with that.

16             Now I will turn to some questions that are really

17   more focused on the case that's particularly before us.  Not

18   kinds of general questions about jury service, but that are

19   more focused on this case that I have told you is the United

20   States of America versus Jesse Litvak.

21             The first question I want to -- I have told you a

22   little bit about it the title of the case.  Do any of you

23   think that you have read or heard any reports or news

24   accounts about this case or relating in any way to matters

25   which led up to this case or this trial or about the
```

1    defendant?  Anybody think they have read anything?  No.  All

2    right.

3         Is there anything about the nature of the charges in

4    this case?  Remember I read you that statement of the case

5    and I told you how the government had charged Mr. Litvak in a

6    number of counts and the types of counts were securities

7    fraud, TARP or Troubled Asset Relief Program fraud and making

8    false statements in a matter within the jurisdiction of the

9    United States Government, so I really want to ask is there

10   anything about the nature of the these charges that you think

11   would make it difficult for you to be a fair and impartial

12   juror?

13        A PROSPECTIVE JUROR:  30.  I don't know that much

14   about financial stuff.  I don't have a credit card or

15   anything like that.  So I think that all of this is going to

16   be over my head.

17        THE COURT:  Are you willing to listen?

18        A PROSPECTIVE JUROR:  Yes.

19        THE COURT:  Well, the purpose of the trial is for

20   the government to come forward with evidence that they think

21   will persuade you one way obviously, but if that's their

22   burden, if they don't come forward and persuade you which you

23   can understand that leads you to conclude they have proven

24   their charge, then you would say not guilty.  In other words,

25   they have failed to do it.  That's the purpose of the trial

1    is to put in front of the jury evidence which you can

2    understand, which you can talk about with your fellow jurors

3    when you are deliberating.  As a result of that process, come

4    to a conclusion of whether the government has proven their

5    case or not.

6            So in my view, as long as -- you are obviously well

7    spoken, as long as you are open and you are committed to

8    listening and paying attention, then I don't think that would

9    disqualify you, but I appreciate your raising it.  There's

10   nothing wrong with you telling me that, but I will speak to

11   counsel, but I think as I say, I think that you qualify as a

12   juror.

13           Anyone else?  There are lots of cases where jurors

14   come and they don't know anything about what I call the

15   background or the context of what the case is about.  That's

16   part of the trial is to help provide that to the jury.

17   Anybody else?  Did I miss anyone?

18           I mentioned TARP.  I don't know if some of you have

19   heard that word before in the press.  It stands for Troubled

20   Asset Relief Program.  It is a program that came into

21   existence at or shortly after the time of our Great Recession

22   of the '07/'08 time period.  It's sometimes called the

23   bailout by some people.

24           Now I have mentioned that there's a count of fraud

25   under that statute, the TARP statute, so I want to ask

1    generally whether any of you think is there anything about

2    what you know about TARP, if you know anything.  You may not

3    have focused on it.  But is there anything in your mind right

4    now when you hear the phrase TARP, what those initials stand

5    for, that you think would make it difficult for you to be a

6    fair and impartial juror?  Anybody?  Okay.

7            Now I have also in the statement of the case, I have

8    told you that Mr. Litvak is a broker and a trader and a

9    managing director formerly at an investing firm.  You don't

10   know anything about it other than what I summarized.  That's

11   very little.  If just that little I told you about the

12   background in the case is there anything about the nature of

13   the bonds or securities trading that you think would make it

14   difficult for you to serve as a juror.  Again to be a juror

15   you need to be fair and impartial and have an open mind.

16   Anybody?  Okay.

17           Now as I have just said, this case involves

18   allegations of violations of federal securities laws,

19   violations alleged of laws against committing fraud against

20   the federal assistance program known as TARP, also

21   violations of the laws that prohibit making a false statement

22   in a matter within the jurisdiction of the United States.

23           Is there anything within your beliefs, your

24   affiliations, your view that you think of such things that

25   would prevent you from remaining fair and impartial to both

1    sides?  In other words, to have an open mind, that's what

2    being a good juror is.  Somebody who comes to the case with

3    an open mind, willing to listen, then decide based on what's

4    presented, what's heard, what's testified to before the jury

5    decides.  As I say, decide what the facts are, what you think

6    happened, then take that and look and see whether that has

7    proven the government's case or not.  So is there anything

8    about the nature of the violations I have told you here that

9    you think would make it difficult for you to be fair?

10   Anybody?

11         A PROSPECTIVE JUROR:  Number 33.  Our broker.  He

12   was arrested and convicted.

13         THE COURT:  Your broker?

14         A PROSPECTIVE JUROR:  So for the record.

15         THE COURT:  This was someone who made buys and sells

16   for you in the stock market?

17         A PROSPECTIVE JUROR:  And the stock market and

18   advisor of my 401(k)

19         THE COURT:  In connection with your pension?

20         A PROSPECTIVE JUROR:  Right.

21         THE COURT:  I think what I will do is speak with you

22   at the sidebar because I would like to follow-up with you on

23   that just to get a little bit more of the detail.  Thank you.

24         Anybody else in response to my question?  Is there

25   anything about your -- I will say do you have any opinions --

1   everybody has opinions so listen to the whole question before

2   you raise your hand.  Everyone has opinions about a lot of

3   things.  The question is whether you have any opinions about

4   Wall Street investment firms, the bailout, that would prevent

5   you from being fair in this case?

6         Now let me before I see any hands, let me explain a

7   little bit about what you do in this case.  As I told you, we

8   have this wonderful jury system.  We don't expect you as

9   jurors to come and wipe out your life's experience, right?

10  We expect you to decide which witness to believe and which

11  not to believe.  How are you going to do that?  You are going

12  to look at all of the evidence in the case that's going to

13  help you decide if this stuff supports that person's

14  testimony so that makes it more likely that's truthful.  You

15  will bring your life skills.  I don't know.  Some of you I'm

16  sure are parents.  You have had to decide are your children

17  lying to you when they got in by their curfew or didn't.  If

18  there's a broken cookie jar in the kitchen and the child has

19  crumbs on his face.  Do you belief they didn't break the

20  cookie jar?  There's other examples at work.  When you are

21  working with that colleague is what they say to you truthful?

22  You have to decide do I believe this person or are they

23  really kind of, you know, sliding past the truth and sounds

24  like what they are saying is truthful, but it isn't truthful.

25  You do that every day in matters of importance to you in your

1    every day life.  We want to you to bring that skill that you

2    developed.

3         Also we want jurors who have lived in our

4    communities so you may have heard things about, quote, Wall

5    Street, right?  You may have heard things about investment

6    people.  What you have to be able to do, however, is to

7    decide this case based on what you hear in this courtroom,

8    what comes out of the mouths of the witnesses who are subject

9    to examination and cross-examination by the opposite side, to

10   look at the documents that are introduced into evidence.  You

11   need to listen to all of that with an open mind.

12        You, for example, in my truck driver example that

13   accident on 95 I told you about, effectively the woman whom I

14   excused, I excused because I felt that she could never be

15   fair and open minded about an accident involving a big truck

16   on that part of 95 because no matter how much she tried, she

17   would also bring her accident into the case.

18        But there are a lot of people including someone who

19   sat on that very jury who had been in accidents before but

20   and they had seen accidents, not like they don't have

21   experience.  So the same here.  You folks have investment

22   accounts, you maybe have pension accounts, maybe your company

23   does it, maybe you do it, so it is not like you never heard

24   of Wall Street or investment companies or didn't hear about

25   the bailout.  The question you have to ask yourself in

```
 1    answering the question that I started five minutes ago, that
 2    I'm about to finish, is can you decide this case based on
 3    what you hear in the courtroom and not sort of bring in
 4    evidence, your own little truck full of evidence that you are
 5    going to put right in the middle of what you heard in the
 6    courtroom every day, that you brought in from outside the
 7    courtroom that will decide what you think the evidence shows.
 8    That's the question you have to ask yourself so that's a
 9    really long question.  I can rephrase it in a shorter manner
10    if you want but in effect, where I started do you think
11    there's anything about your life's experience as it relates
12    to Wall Street or investments or investment firms that would
13    prevent you, make it very, very difficult, if not impossible,
14    for being able to be a fair and impartial juror in the case?
15    Anybody?  No.  All right.  That's 22, 24.
16              Have you ever worked for a financial services firm
17    or investment company?  Anybody?
18              A PROSPECTIVE JUROR:  11.
19              THE COURT:  Where did you work?
20              A PROSPECTIVE JUROR:  I worked for Fiserv.  They do
21    bank statements and the financial statements.
22              THE COURT:  What was the nature of your position
23    there?  What did you do?
24              A PROSPECTIVE JUROR:  I set up like the paperwork
25    and everything for these statements that we mail out.
```

1          THE COURT:  Do you still work there?

2          A PROSPECTIVE JUROR:  Yes.

3          THE COURT:  How long have you been there?

4          A PROSPECTIVE JUROR:  About five years.

5          THE COURT:  So you are sort of what I understand to

6    be sort of backroom work.  I don't mean it in a derogatory

7    sense.  I think that's what they call it the folks who get

8    the statements out and get them accurate.  You're not

9    yourself involved in the investment decisions.  Am I right?

10          A PROSPECTIVE JUROR:  No.  I worked for a couple of

11   banks, also worked for a public accounting firm as a

12   management consultant.

13          THE COURT:  And which banks have you worked for?

14          A PROSPECTIVE JUROR:  I worked for bank called New

15   Jersey National Bank a long time ago and another bank called

16   Society for Savings.

17          THE COURT:  I know Society for Savings.  That's no

18   longer around.  What was the nature of the work you did in

19   the banking industry?

20          A PROSPECTIVE JUROR:  Well, in banking itself I was

21   a financial guy.  Accounting, management information.

22          THE COURT:  Did you do investment work?

23          A PROSPECTIVE JUROR:  No, none.

24          THE COURT:  When you worked as a consultant for the

25   public accounting firm, what was the nature of your work?

1        A PROSPECTIVE JUROR:  I did management consulting

2   for banks across a variety of disciplines but not

3   investment.

4        THE COURT:  So the public accounting company hired

5   you to be in effect on their team when they consulted with

6   banks as to how banks should do their business?

7        A PROSPECTIVE JUROR:  That's correct.

8        THE COURT:  None of that was investment oriented?

9        A PROSPECTIVE JUROR:  No.

10        THE COURT:  Anyone else.

11        A PROSPECTIVE JUROR:  8.  I used to work at a bank

12   three years ago.

13        THE COURT:  Which bank.

14        A PROSPECTIVE JUROR:  Naugatuck Valley Savings and

15   Loan in Cheshire.

16        THE COURT:  What were you doing?

17        A PROSPECTIVE JUROR:  I started as a teller and

18   became a teller supervisor.

19        THE COURT:  Are you there still?

20        A PROSPECTIVE JUROR:  Previously I worked for

21   Naugatuck Savings Bank in Naugatuck.

22        THE COURT:  Same type of work?

23        A PROSPECTIVE JUROR:  Yes.

24        THE COURT:  Anybody else?

25        A PROSPECTIVE JUROR:  17.  I worked at Hartford

1    Insurance Company Financial Services and I'm in accounting.

2             THE COURT:  You are in accounting?

3             A PROSPECTIVE JUROR:  Yes.

4             THE COURT:  Is insurance these days any different

5    than I'm used to?  Does it involve anything with the

6    investment?

7             THE COURT:  No.  That's a different side.

8             THE COURT:  Thank you.  Anybody else?  Has anybody

9    in the panel, those of you folks up here in the front, ever

10   had any specialized training or experience with how bonds and

11   securities are traded?  By specialized training, obviously if

12   you have a 401(k) you have some idea how it is bought and

13   sold in the market.  I'm talking more about you took a course

14   in school or you took a course to try to get ready for a

15   series exam in the investment area, more specialized than

16   understanding how your investment portfolio might work.

17   Anybody?  Okay.  25.

18            Now, you have to listen to this whole question

19   because I suspect we would all be able to raise our hands

20   when I get halfway through it, myself included, but I want

21   you to work all the way through.

22            Have you or a close relative ever made or lost so

23   much money on an investment of any kind that it would affect

24   your ability to be fair and impartial in this case?  In this

25   case it is bonds.  As I said, I'm sure hopeful we have made

```
1    some money.  Hopefully we haven't lost too much money.  I

2    want to know if it would affect your ability to be impartial

3    because it had such an impact on you?  Okay.  Again going

4    back to '07 and '08, there's been a lot in the newspapers, on

5    television, probably on talk shows you might listen to about

6    the financial crisis quote unquote and other matters that

7    related to that and it's continued on even until today, lots

8    of books written, lots of articles and newspapers.  Again I'm

9    assuming that some of you have read some of these.  Some may

10   have read more than others.  I don't want to know.  What I

11   really want to know whether there's things that you have read

12   or heard about the financial crisis about any alleged

13   misconduct in the financial or mortgage-backed securities

14   that you read or heard anything about those things that would

15   affect your ability to sit as a fair and impartial juror.

16   That means to have an open mind, to not bring that into the

17   case as evidence what it is you may have read of heard.

18   Anybody would have a problem with that?  No.  All right.

19          Do any of you read financial periodicals, magazines,

20   newspapers such as the Wall Street Journal, Barrons or any

21   other types of financial newspapers, names of which I'm not

22   familiar with, but you might be.  In the very back on my

23   right.  Is that Juror Number 41?  What is it that you read?

24          A PROSPECTIVE JUROR:  Fairly common to read the Wall

25   Street Journal, The Economist, Bloomberg, you name it.
```

```
 1            THE COURT:  All right.  And what is it that you do
 2    for a living?
 3            A PROSPECTIVE JUROR:  Accounting, financial
 4    professional at Pratt Whitney.
 5            THE COURT:  Effectively in-house at Pratt Whitney
 6    you do that?  You don't recall hearing about this case?
 7            A PROSPECTIVE JUROR:  No.
 8            THE COURT:  That's fine.  I'm not saying you should
 9    have.  I'm very happy you didn't.  That's fine.  But I want
10    to double check on that.  Anyone else?  Did I miss anyone
11    else who had a hand up?  No.  All right.
12            I want to take a moment to talk a little bit about
13    this process we call a trial.  As I told you at the
14    beginning, Mr. Litvak has been charged in something I called
15    an  indictment.  An indictment is nothing more than a series
16    of pieces of paper stuck together starting at page one and
17    ending wherever it ends.  Its purpose, as I think I have also
18    said, is to notify a person like Mr. Litvak, this is what,
19    we, the government, allege or claim has happened.  We claim
20    you violated the law in these ways.  The indictment is meant
21    to put a person on notice about what that claim of the
22    government is.
23            However, the indictment is not evidence of anything.
24    It is basically a notice.  It is notice to Mr. Litvak and it
25    is a notice to the court because the reason they notice the
```

1    court is then I have to schedule, as the court, a trial

2    because we need a trial because the trial is to give the

3    government the opportunity to try to prove what they claim.

4    If they can, if they have carried their burden of proof

5    beyond a reasonable doubt on a charge in the indictment, then

6    the jury would return a verdict of guilty to that charge.  If

7    they failed to carry that burden, then you must return a

8    verdict of not guilty.

9         Now, is there anyone who thinks they would have any

10   difficulty coming into this case with an open mind and with

11   the belief you have to hold this belief in your head that

12   there's absolutely no evidence against Mr. Litvak at this

13   point?  Why?  Because we haven't started the trial.  There is

14   an indictment, but that's just what the government claims.

15   It is not evidence.  It is not proof of anything.  Does

16   anybody think they will have that?  Juror 14.

17        A PROSPECTIVE JUROR:  Wouldn't you need evidence to

18   get the indictment?

19        THE COURT:  You do but the indictment is not

20   evidence of anything.  It is entirely different process and

21   it is not anything like the proof that is required to find

22   someone guilty.  So you need to -- you are not part of what

23   happened that got us here and who made that decision or why

24   they made it.  That's why it is important that you understand

25   if you are a juror in this case, that in effect Mr. Litvak's

1    slate is clean.  There's nothing against Mr. Litvak.  Yes,

2    the government makes a claim but not anyone.  I don't mean to

3    be flip.  We can all make claims.  The trial is to give him a

4    chance to prove it and it is their burden throughout the

5    trial.  The burden never goes to Mr. Litvak.  It always stay

6    with the government to prove it.  If they do not prove, it

7    then Mr. Litvak is not guilty.  Are you comfortable with what

8    I have said?

9              A PROSPECTIVE JUROR:  (Nodding head).

10             THE COURT:  Anybody else who has any questions or

11   hesitancy?  Number 41.

12             A PROSPECTIVE JUROR:  Did this go through a grand

13   jury?

14             THE COURT:  You don't need to think about that.

15   That's what I was saying it.  It is without regard to how it

16   is here.  We have an indictment which puts everyone on notice

17   that's what the trial is for.  Your job is to be the trial

18   juror.  Is there anyone else who has any questions?  All

19   right.

20             There's another principle of law that I have to

21   advise you of.  You may already know it and to be certain

22   that you could follow it.  Under our Constitution and I'm

23   sure you have heard this if you watch any TV programs about

24   the law, there's something known as your Fifth Amendment

25   Right to silence. You know all those cop shows, the cop says

1  you have a right to remain silent, you have this, you have

2  that, everything you say can be used against you.  That comes

3  out of the Fifth Amendment to our Constitution.  Effectively

4  what it means here in this trial is that you presume that Mr.

5  Litvak, in effect, did not commit any of the crimes he's

6  charged with.  That the indictment is just this notice and

7  the trial will give the government the opportunity to prove

8  the charges against Mr. Litvak.  Mr. Litvak has no burden at

9  all in this case.  He has the right to remain silent just

10 like anybody else charged with a crime.  Why?  The burden is

11 on the government.  Even if he remains silent and his lawyer

12 never stood up and never said a word, you would find him not

13 guilty if you felt and found and agreed that the government

14 didn't prove he was guilty.  It is the government's burden to

15 prove him guilty.  Not his burden to prove he's innocent.

16 That's our criminal justice system.  There are other systems

17 around the word that may be different than that.  That's the

18 bedrock, the foundation of the American justice system.  That

19 if the government charges you with a crime, it is their

20 burden to prove it.  If they don't prove it, then the person

21 is not guilty.  Is there anyone who has any concern about

22 their ability to approach this case with that type of frame

23 of mind that the burden is on the government, that there's no

24 evidence against Mr. Litvak at this point, that he's presumed

25 innocent of what he's charged with?  Anybody have a problem

1    with that?

2            Now in a trial, the jury is effectively the judges

3    of the facts.  I'm the judge of the law, but you are really

4    the judges of the facts.  I play no role in deciding what the

5    evidence shows happened or didn't happen.  That's solely for

6    the jury to decide and that's why you need to come with an

7    open mind, listen to all of the evidence, weigh all the

8    evidence, put the evidence pieces together.  What does it

9    show or doesn't show.  Once you have sort of done that

10   through listening, then your deliberations between and among

11   the jurors, you would then say all right.  What did the judge

12   tell us that the government had to prove on Count One, let's

13   say in order to decide what the verdict would be.  I will

14   tell you the government has to prove X but, for example,

15   these four elements and if the government doesn't prove all

16   four elements beyond a reasonable doubt, then you would find

17   Mr. Litvak not guilty.  And what you do is you take what you

18   found to be the facts.  In effect, what you conclude happened

19   based on the evidence, then you look at the law as I give it

20   to you and see whether the first element was met, whether the

21   second was met and so forth so really we have two different

22   jobs.  It is never my intention during the trial to tell you

23   what I think the evidence shows or what evidence is important

24   or not important.  That's for you solely to do.  However, you

25   are obliged to accept the law as I give it to you.

1          Now, you may not like what I tell you the law is.

2     You may think the law is silly, if I tell you the law says

3     you can't do something or whatever.  But it is your sworn

4     obligation should you be picked as a juror to follow the law

5     as I give it to you.  There's a couple of things I covered.

6     Let me start with the last one first.

7          Is there anyone who would have trouble following the

8     law as I give it to you even if you don't agree with the law,

9     you think the law should be different?  Is there anyone who

10    thinks they would have trouble listening to the evidence with

11    an open mind considering all the evidence, then discussing it

12    with your fellow jurors at deliberations in order to try to

13    determine what actually happened based upon the evidence?  In

14    other words, your role as judges of the facts.  Anybody have

15    any difficulty with that?

16         I have told you now several times, I apologize for

17    repeating it, that you are going to base your verdict on the

18    facts as you find them from the evidence.  What this means,

19    there's another aspect that I want to be sure you understand,

20    the law doesn't let you base your verdict on things like

21    emotion, sympathy, prejudice, vengeance, any hostility,

22    anything thing like that.  Do you have any feeling that you

23    as a person can't put those emotions out of your mind while

24    trying to reach a verdict?  Anyone who thinks that would be a

25    problem?  No.  All right.

1          Also if you are picked as a juror, I will spend a

2    lot of time and I will remind you every day that you aren't

3    supposed to try to do anything outside the courtroom to add

4    to your evidence.

5          I told you have to decide the case based on what you

6    see and hear in the courtroom, so I will tell you not to

7    listen to anything on the television or radio that relates if

8    there was to be coverage or to pick up a newspaper.  If you

9    saw a few words in a headline, you thought that's my case,

10   you have to put it down.  You can put it in a drawer.  You

11   can look at it later.  You can't read it now.

12         You can't talk to anybody about the case.  You can't

13   let anybody talk to you about the case.  The reason is I said

14   that the case has to be decided based on the evidence that

15   all the jurors hear in the courtroom that the lawyers are

16   presenting to you.  You can't go out and research on the

17   Internet or go on a blog and ask people's advice. You can't

18   find that witness.  I wonder where that witness went to

19   college or what's in the newspapers about them, on the

20   Internet, absolutely nothing like that can be done by you

21   during the trial.  When the trial is over, go for it.  Go

22   research the heck out of anybody.  The expert that was

23   involved in the case, but not before you reach a verdict.

24         Is there anyone who thinks they would have any

25   trouble refraining from doing those kinds of things?  That's

1    really very important.  If you did something like that in the

2    middle of the trial, it would mean that the trial would

3    probably have to stop and would have to start all over again.

4    I'm not saying that for sure, but I think you have to

5    understand that it is really very serious to let anyone talk

6    to you and talk to them.  When I say talk, I mean all the

7    ways, electronic ways we can do.

8         A PROSPECTIVE JUROR:  I have a question.  10.  If in

9    the explanation I guess it would be hearing from the

10   attorneys about securities stuff, if we didn't understand,

11   would we have to wait until we were in deliberations at the

12   very end to ask each other for clarification?

13        THE COURT:  That's a very good question I will

14   probably not answer.  Maybe I will discuss it with counsel --

15   I think for now my answer is going to be -- this may not be

16   satisfactory, but it is the way the system works.  We have an

17   adversary system in the United States in the courtroom.  Each

18   side is represented.  They have lawyers who are skilled and

19   able to presenting matters to jurors, whom they should

20   understand don't always know about the subjects that they

21   know so much about because they have worked on the case for a

22   while.  So a good lawyer should presumably give you the

23   information you need to understand, the evidence, by way of

24   background or whatever other explanations are needed.  At the

25   end of the day, though, if you don't -- if there's a gap in

1    your understanding and therefore, the significance of the

2    evidence hasn't been shown to you, then that goes to whether

3    the government has proven the case or not proven the case.

4    There's many times I have had jurors afterwards this includes

5    civil cases and the criminal cases.  They will make a comment

6    like we really kind of wanted to know about X.  We didn't.

7    Or there was no evidence on this, so I know what the verdict

8    is -- I don't let them tell me about their deliberations.  It

9    is clear to me it weighed in their decision of in this case

10   has the government carried its burden beyond a reasonable

11   doubt or not.  It can affect the decision in that respect,

12   but it is left to the lawyers to decide and again as I say,

13   the defense has no obligation to come forward with any

14   evidence.  It is generally left in our system to lawyers to

15   present what they think they need to present to have the jury

16   come out the way they want the jury to come out.

17          Again I repeat the defendant has no obligation to

18   present any evidence, so I guess I should limit these remarks

19   to the government in effect.  They need to present the

20   evidence that they think will be sufficient to persuade you

21   beyond a reasonable doubt.  If at the end of the day, they

22   don't and you don't understand the significance of some the

23   evidence because they didn't give you enough background or

24   something like that, then they have failed to carry their

25   burden.  All right.

        I have mentioned a couple of times how the
indictment serves as a notice to a defendant this is what the
government is charging you with, these are the particular
crimes based upon generally what's alleged in the indictment
in each count that the government thinks you have committed.

        If at the conclusion of this case and this is a
hypothetical, you had the feeling that well, maybe the
defendant did something wrong, but the government hasn't
proven any one of the crimes they charged.  In other words,
hasn't proven beyond a reasonable doubt all the evidence of
any of the counts that were charged, would you have any
hesitancy in returning a not guilty verdict?  In other words,
this is a silly example.  During the course of the evidence,
you find that Mr. Litvak sometimes maybe drives over the
speed limit, okay, so theoretically he like probably everyone
of us in this courtroom, have on occasion exceeded a speed
limit.  If you heard that, well, that's a crime, right.
Maybe you could say he was guilty of it, but that isn't
charged in our indictment.  Therefore, you would look at the
indictment and you would go through Count One, government
didn't prove its case, not guilty.  You could go through each
of them.  If the government failed to prove its case, you
would find not guilty even though you have the feeling or
belief or something maybe there was another crime.  Mr.
Litvak can only be -- you can only consider the crimes

1    charged against him in this indictment.  That's all.  And you

2    must decide whether the government's carried its burden on

3    the crimes charged in the indictment and nothing else.

4          Is anybody going to have a problem with limiting

5    yourself to what's in the indictment by way of what the

6    government has charged?  All right.

7          This has kind of come up in some questions that the

8    jurors have given to me, but it has sometimes happened in

9    other trials that I have had where the jurors afterwards will

10   say we didn't hear about this.  We thought that might be

11   useful to hear or we suspected something happened or went on

12   behind the screens.  We never hard about it.  We never saw

13   any evidence about it.  Those kinds of thoughts are really

14   irrelevant and aren't appropriate to your job as a juror.

15   Your job is to decide based on the evidence that's presented

16   or lack of evidence.  Sometimes it is the lack of evidence

17   that can be as important whether the government has proved

18   its case beyond a reasonable doubt or not.

19          Whenever you think, if you would like to have heard,

20   if that means because you didn't hear some evidence, then

21   they failed to carry their burden, that's the answer.  They

22   failed to prove to you beyond a reasonable doubt an element

23   of a crime.  Anybody have any problem or questions about

24   that?  Okay.

25          Now, in the jury process once you heard all the

1    evidence, you went to deliberate.  I will give you, I would

2    have charged you on the law and there will be a long charge

3    in this case.  It is my practice to give every member of the

4    jury a copy of my charge so you can take it into the jury

5    room with you.  I have been told that's very helpful to the

6    jury as they are going through the evidence, to keep track of

7    the elements.  I mentioned the different types of crimes.  It

8    may happen you are having difficulty wrestling with something

9    on the law.  How does the law now that you've see the facts,

10   you are realizing that charge sounded like I understood it.

11   Now I'm not sure what the judge means.  I will tell you at

12   the close of the case if you have a question for me, you can

13   ask me that question.  Some questions I don't answer.  I try

14   to be as helpful as I can.  If it is a question on my charge,

15   I would expect I would answer it or try to make it clearer or

16   something like that.

17        Does anybody have any hesitancy or think they would

18   have a hesitancy if they were in the jury room and got to

19   this type of point, any hesitate to say let's ask the judge,

20   let's write a note so we can get a better understanding so

21   that you can continue to get a better understanding.  Anyone

22   resistant if one of the jurors wanted to do it?  Okay.

23        Now I mentioned that Mr. Litvak has been charged

24   with more than one crime.  There are three types of crimes

25   he's charged with.  I believe there's 11 counts all together.

1    Some counts he has been charged with multiples of those.

2          As I mentioned, the charges aren't evidence.  They

3    prove absolutely nothing.  All they prove is the government

4    has charged them.  That's what they have to prove.  That's

5    why we're here.  I want to be sure the fact of hearing today

6    or later on during the trial in the charge that the charges

7    are more than one charge has been laid against Mr. Litvak.

8    Is there anything about the fact of the number of charges

9    that makes you have a reaction I guess that makes it

10   difficult for you to keep an open mind to keep that

11   presumption of innocence that I mentioned about?  Okay.

12         And in that regard, when you go to deliberate, I

13   recommend to you you can do what you want.  The best I find

14   is for the jury, in effect, start with the first count and to

15   go through, talk about that evidence, what do you find the

16   evidence shows as to that one, try to reach a decision on

17   that one and go to the next one.  No matter what method you

18   use, you do have to deliberate and discuss and decide whether

19   the government has carried its burden as to each one

20   separately.  In other words, once you do one, whichever you

21   found, did the government carry its burden or not, you move

22   to the next one.  How you found on the first one should have

23   no effect on how you find on the second one.

24         In other words, if you found on the first one after

25   consideration, you found not guilty, that's because the

1    government didn't carry its burden.  If you found on the next

2    count that the government did carry its burden and you said

3    guilty, that doesn't mean the next one you would find guilty.

4    You have to consider each other separately.  Anyone who would

5    have a problem with that?  All right.  I think I covered that

6    one.  All right.

7            Now, you have heard the list of witnesses. I'm not

8    sure they will all be called as witnesses.  I'm sure many of

9    them will be.  Some of them will be what we call from law

10   enforcement agencies.  They are not the type of law

11   enforcement you folks run into in your everyday life like a

12   police officer but they work for federal agencies.  Their job

13   is to do investigations to enforce the law.

14           Let me back up and give you a very silly example.

15   The only one I have ever come up with.  In a trial it is your

16   obligation, as I told you, to listen to the testimony to

17   decide whether the witness is being truthful or not truthful.

18   Sometimes people can be untruthful because they have a

19   mistake of recollection.  They don't mean to lie.  You don't

20   think what they said is what happened.  They may be you

21   decide purposely lying.  You may find they are being truthful

22   in some respects about what they say, not all respects what

23   they say.  You can accept part of their testimony or reject

24   the rest, reject all or accept all.  That's your job as

25   jurors to decide about what you think the testimony of a

1    witness has shown, what it has proven, however it is

2    important you understand that every person who comes up to

3    the witness stand, whom I tell remain standing, raise your

4    right hand and receive the oath from the clerk, to tell you

5    the truth, that you have to treat each witness the same in an

6    important respect.  I will explain how it is you have to

7    treat them the same.  You have to listen to all of them with

8    an open mind and so I will give you my silly example.  Say

9    when you were about six or seven years old, you met with

10   woman what had red hair.  Really Irish red-flaming beautiful

11   hair.  For some reason this woman maybe she hugged you too

12   hard or snapped at you at a party, whatever it was, you had a

13   negative reaction to this woman with red hair.  Now you are

14   little and so from then on every time you saw a person with

15   red hair, your first thought was I don't like that person.

16   Why?  Because you had this experience when you were younger

17   even though as an adult when you see -- my apologies to the

18   last person in the box.  I love people with red hair.  When

19   you see someone with red hair, your subconscious reaction is

20   a negative one.  You over time, you are 30, 40, 50, 60 years

21   old.  You know that the color of this person's hair or

22   anybody with red hair is irrelevant to whether you are going

23   to like them or not.  You might have a memory from your

24   childhood.  Think of that in the context of the witnesses.

25   Let's say somebody called Mrs. Jones.  Through the back door

1    walks in a woman with red hair.  You may have that initial

2    subconscious reaction.  What I need to be sure is that you

3    are going to be able to once she sits down and starts

4    testifying, treat her.  In other words, listen to her, weigh

5    what she says, compare all of the evidence in deciding

6    whether to believe or not without regard to the color of her

7    hair.  We can all agree the color of her hair doesn't have

8    something to do to with what she's talking about.  Does

9    everybody understand or not understand what my point is here?

10   So if no one has a problem with what I said so far, I will

11   make it more particular to this case.

12          There will be identified as law enforcement I

13   believe all on the federal side, federal law enforcement

14   officers are all that you're calling?

15          MR. GLOVER:  Yes.

16          THE COURT:  You may have had good experience with

17   law enforcement personnel.  You may have had bad experience

18   with law enforcement personnel.  As far as I know because we

19   have read off all the people who might come to the stand,

20   none of you know these law enforcement personnel so you never

21   had a particular experience with those people.  Just because

22   they have the label law enforcement, just because the woman

23   comes to the witness stand who has red hair, that cannot or

24   should not influence whether you believe or disbelieve them.

25   You have to make your judgment of believing or disbelieving

1    what they say on the witness stand by how they act on the

2    witness stand, how other evidence tends to support or not

3    support what they have said.  All of those things are

4    appropriate, not because they are law enforcement doesn't

5    mean you should believe them or disbelieve them.  Anybody

6    have any problem with that?  All right.

7            Now I have mentioned I know several times about the

8    burden of proof and beyond a reasonable doubt.  So I don't

9    think I need to go back over those.  There's one question

10   that I do usually ask.  There are some people.  I think it is

11   a religious belief.  I could be wrong.  It could be Jehovah

12   Witness.  There's some religious belief that teaches the

13   people who follow it that they can't sit in judgment of

14   another person which they take to mean sitting on the jury.

15   Is there anybody who holds such a belief that would make it

16   difficult, if not impossible, not to be a juror?  All right.

17           There's one other thing that sometimes jurors wonder

18   about.  If after hearing all the evidence and based upon the

19   instructions I give you as to the law, you find that the

20   government has carried its burden.  This is a big if.  I'm

21   telling you in case this were to happen.  You find Mr. Litvak

22   guilty because the government has met their burden on one of

23   the crimes charged, you can't let it enter into your

24   deliberations and your decision-making what would happen as a

25   result of a guilty verdict.

1          In other words, what, if any, punishment he would

2    suffer as a result of a guilty finding by you.  That's my

3    responsibility as a judge.  It has nothing to do with your

4    decision of whether the government has proven Mr. Litvak who

5    is presumed to be innocent right now whether the government

6    has carried its burden of proof beyond a reasonable doubt.

7          Anybody have any problem with that aspect of our

8    legal system?  We're getting there.  Please be patient, but

9    there's a lot of questions that I have to ask.

10         Is there anyone on the panel, anybody who knows

11   anybody else up here?  Sometimes people work together, went

12   to school, neighbors.  I once had a husband and wife.  That

13   was interesting question about could they decide independent

14   of everybody in the jury, et cetera.  Nobody knows anybody.

15   All of you people have never seen each other before?  Take a

16   good look.

17         A PROSPECTIVE JUROR:  11.  He works at Checkfree.

18   That's a joined company for Fiserv.

19         THE COURT:  Back there, not up here in the box.  If

20   he gets called up, remind me of that.  Right now we're

21   without.  Anybody else?  Are any of you attorneys?  I'm

22   talking about the people up here in front of the lawyers.

23   Any of you attorneys?  Any of you go to law school?  Any of

24   you work with attorneys?  You know, you work in an office for

25   an attorney as an assistant or paralegal?  Number 3.

1          A PROSPECTIVE JUROR:  Completely different.  I used

2     to be a claims adjuster and claimed adjuster supervisor in

3     the case with the motor vehicle accidents, I worked with the

4     attorney in this capacity.  Not any type of attorney like

5     this.  Never criminal, always civil.

6          THE COURT:  Anybody else?  Number 28.

7          A PROSPECTIVE JUROR:  41.  Just in the course of my

8     work, I work with a corporate attorneys at my company.  I

9     don't think it would affect anything here.

10          THE COURT:  You don't have any training yourself in

11     law?

12          A PROSPECTIVE JUROR:  No.

13          THE COURT:  Anybody have any members or close

14     members of the family?  By that I mean your spouse or

15     children who are or were lawyers trained in the law?

16     Anybody?  Down the end, that's number 10.

17          A PROSPECTIVE JUROR:  My sister is a lawyer.

18          THE COURT:  What's the nature of her practice?

19          A PROSPECTIVE JUROR:  Corporation counsel Wells

20     Fargo.

21          THE COURT:  She's at a company.  She does corporate

22     work.  Would you have any difficult not talking to her about

23     the case?

24          A PROSPECTIVE JUROR:  No.

25          A PROSPECTIVE JUROR:  41, My cousin is an attorney

1    and Judge of Probate in Shelton.

2          THE COURT:  Again as I said, you can't talk to

3    anybody.  You would not have any difficulty with that?

4          A PROSPECTIVE JUROR:  No.

5          THE COURT:  Number 28.

6          A PROSPECTIVE JUROR:  It was my husband's first

7    cousin related to the judge.

8          THE COURT:  Thanks.  Anybody else that I have

9    overlooked?  All right.  Okay.  This is my last category.  Is

10   there anyone up here in the panel who feels that after you

11   listen to the evidence and after you listen to my charge and

12   you follow it, you wouldn't be able to be fair to both the

13   defendant and the government?  Anyone who is of that frame of

14   mind right now?  You don't think you could be fair.  You

15   don't have an open mind.  Anybody?

16         Now, I have asked a lot of questions and I have

17   talked a lot.  But there's oftentimes I don't ask the right

18   question.  In other words, you are sitting there and you have

19   been sitting there for a while.  I'm waiting for her to ask

20   that question, up will go my arm and I will explain something

21   or answer something, but I never get to ask that question

22   because I'm not smart enough to think of what's that question

23   that's bothering you.  I know there might be a lot of things

24   on your mind.  I'm not trying to go through everything that's

25   going through your head.  What I'm interested in knowing is

1   there something that I haven't been smart enough to ask your

2   question that relates to the case and may have an effect upon

3   your ability to serve as a fair and impartial juror?

4   Anything that I haven't covered?

5           A PROSPECTIVE JUROR:  I'm not sure.  I have a close

6   relative that works in the FBI office here in New Haven.

7           THE COURT:  When you say "close," somebody you see

8   from time to time?

9           A PROSPECTIVE JUROR:  Yes.

10  THE COURT:  I don't believe -- maybe I will follow-up at

11  sidebar.  I don't know what, if any, involvement the FBI had.

12  It is probably best to ask you at sidebar.  Your juror

13  number?

14          A PROSPECTIVE JUROR:  16.

15          THE COURT:  Thank you.  Anybody else?  Okay.  Is

16  there anything on anyone's mind?  I'm talking about you folks

17  on either side of me up here.  Any concern, any reason you

18  can think of that would call into question your ability to be

19  a fair and impartial juror?  I thank you for your patience.

20  At this point I will speak to counsel at sidebar.  I probably

21  will call up some of the people that I mentioned that I want

22  to follow-up with, but we're probably not going to break

23  until 12:30, around there, so I know folks in the back have

24  been slipping out to the restroom.  If you don't need a

25  break, it is great if you stay.  I may call you up.  If you

```
 1    are desperate and want to make a quick dash and get yourself

 2    back, that's fine.  Right now I need counsel up at sidebar.

 3              (Beginning of sidebar)

 4              THE COURT:  Is there anything -- is there anything I

 5    haven't asked of everyone?  This is before we get to

 6    follow-up that you would want me to ask.  I think I have

 7    asked pretty much everything you asked me to ask.  I may not

 8    have asked your question.  There's a lot of overlap.  I may

 9    have paraphrased it differently because that's not the way I

10    usually put it.  If there's anything you think I have failed

11    to ask anybody, let me know now.

12              MR. GLOVER:  The only one that comes to mind is we

13    haven't heard from some people.

14              THE COURT:  We'll get to that.  That's that sheet of

15    paper on the chairs.  There are six questions plus three.

16    The three that are always asked in criminal cases will

17    include have you ever been convicted of a crime or anybody in

18    your family involved in a lawsuit and the third one is been a

19    victim of a crime.  At the end once we have a pretty stable

20    36, I will have everybody stand up and give answers to those.

21              MR. GLOVER:  15.

22              THE COURT:  You want to know what I wrote next to

23    that.  Everybody has a feeling about the government.  I'm

24    sure Mr. Litvak has a feeling about the government.  I have a

25    feeling about the executive branch of the government.  I'm
```

1    not really sure about where that's going to take me or how it

2    is helpful in deciding who should be a juror.  I guess I

3    could ask do you have a feeling about the government that

4    would prevent you from having a fair and open mind and

5    hearing the evidence in the case.  I have already asked them

6    six times.

7              MR. GLOVER:  You have.  I'm sorry.

8              THE COURT:  Anything from the defense?

9              MR. SMITH:  Not in terms of general questions, your

10   Honor.

11             THE COURT:  Let's figure out who we want to call up

12   to sidebar.  Let me make a notation of which ones I have

13   already.  I had 14.  I'm not sure why.

14             MR. SMITH:  14 she's the one with the back.  She

15   said something else.

16             MR. GLOVER:  Evidence to get an indictment.

17             THE COURT:  Anybody want me to correct what I said,

18   fix what I said, I was kind of treading water.  Her I'll

19   follow-up.  Did she literally?  That was someone else.  She's

20   the one must be evidence if he's charged.  My answer was all

21   right?

22             MR. GLOVER:  Yes.

23             THE COURT:  How would you have me approach her?

24             MR. SMITH:  She seemed like she didn't accept, her

25   language, her body language, the smirk.  She seems to tend to

1   believe since there's an indictment.

2          THE COURT:  How would you have me deal with her?

3   How could I approach on the theory she's seem intelligent,

4   not want to lose her?

5          MR. SMITH:  Does she accept the proposition?

6          THE COURT:  Is she willing to start with the clean

7   slate concept?

8          MR. SMITH:  Tied into the presumption.

9          THE COURT:  16.  Is there FBI in the case?

10         MR. GLOVER:  They are just involved to help with

11  trial stuff.

12         THE COURT:  They are local.

13         Let me follow-up with him.

14         MR. GLOVER:  Not going to be witnesses.  They are

15  not the investigators.

16         THE COURT:  So I will follow-up with him.  Anybody

17  else that you would have?  Follow-up 35, I wrote follow-up.

18  She has a college friend at Black Rock and investments with

19  Columbia.

20         MR. SMITH:  I would agree that needs follow-up the

21  nature of the friendship.

22         THE COURT:  I had 33.

23         MR. GLOVER:  33 was the broker.

24         THE COURT:  His broker with arrested so you want to

25  follow-up with that.  Those were all I noted.  If anybody has

1    other requests?  If you can tell me, I will consider bringing

2    them up.

3              MR. SMITH:  Number 10 is the one who socializes with

4    an Assistant United States Attorney in Connecticut.  I would

5    like to put more questions about the nature of the

6    relationship, the frequency of the socializing.

7              THE COURT:  Anyone else?

8              MR. SMITH:  That's it from us.

9              THE GLOVER:  That's all from us.

10             THE COURT:  Then what I do on follow-up, I know

11   there's a lot of you.  Can you sort of stand up, you can

12   swing over.  What I like for the jury member to come right

13   here so Terri catches what they said.  Bring yourself closer

14   if you want.  You have to part the waters.  Hopefully one

15   from each side will get a good shot of hearing, so I will

16   start with number 10.

17             Could I ask Juror 10 to come up for a just a moment?

18   Not to worry.  Hi.  You have to come closer.  Only the

19   reporter and the rest of us are up here.  I wanted to

20   follow-up a little bit.  You mentioned you knew Attorney

21   Jongbloed.

22             A PROSPECTIVE JUROR:  Yes.

23             THE COURT:  You said socially.

24             A PROSPECTIVE JUROR:  He went to college with my

25   husband.  He lives in the town that we now live in.  I see

1    him on the train every once in a while.

2         THE COURT:  Do you socialize with him?  Do you go to

3    parties and he's there?  Do you have dinner parties?

4         A PROSPECTIVE JUROR:  Not that inner circle

5    associates.

6         THE COURT:  You know him.  You know what he does.

7    From time to time you run into him.  I'm sure you say hello.

8    Do you exchange information with him about his family, his

9    kids?

10        A PROSPECTIVE JUROR:  My kids went to school with

11   his kids.

12        THE COURT:  As I told you, he's not involved in the

13   case.  Obviously in the office.  You knew he was an Assistant

14   United States Attorney?

15        A PROSPECTIVE JUROR:  Yeah.

16        THE COURT:  That's what these gentlemen are, but

17   there's a lot of them.  And he might be involved in many

18   cases.  This is not one he has any involvement in.  So I want

19   to be certain.  I asked you kind of asked you quickly.  I

20   want to be certain that you are comfortable in sitting on the

21   jury even though you might know a lawyer who is in their

22   office.

23        A PROSPECTIVE JUROR:  I wouldn't, no.

24        THE COURT:  Let me put this hypothetical to you.

25   Let's say you were picked, sat on the jury and the jury

1    returned not guilty verdicts down all the 11 counts.  You

2    came to the conclusion after considering the evidence.  Would

3    you have any discomfort the next time you ran into Attorney

4    Jongbloed that you had been on a jury that said, in effect,

5    no to his people in his office?

6            MR. SMITH:  I might feel bad that his colleagues

7    didn't prove their case, but that's his problem, not mine.

8            THE COURT:  It is not his personally.  I think if he

9    were the lawyer trying this case, I would have some concerns.

10   I don't know what you would have answered to me.  As I say,

11   he's not involved in the case.  You would be fine next time

12   you saw him?

13           A PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Any follow-up further with Juror 10 on

15   this issue?

16           MR. SMITH:  No.

17           THE COURT:  Thank you very much.

18           MR. GLOVER:  16 Count indictment for future

19   reference.

20           THE COURT:  Anybody has any application with respect

21   to that juror?

22           MR. SMITH:  No.

23           MR. GLOVER:  No.

24           THE COURT:  Agreed. I think she's fine.

25           Juror 14, if you can come up for a moment.  How is

1    your back doing?

2         A PROSPECTIVE JUROR:  It is okay.  It is hanging in

3    there.

4         THE COURT:  You had asked me a question about how we

5    got to be here.  I gave you an answer.  Is there anything

6    about my answer that you are troubled about?

7         A PROSPECTIVE JUROR: No.  I still being an

8    intelligent person.  I know how we got here.  I know what the

9    indictment process is here.  You said there's no evidence

10   that got us here.  There's evidence or we wouldn't be here.

11   But the true statement is can you put that aside.

12        THE COURT:  There's no evidence today in this case

13   in this courtroom.  That's what I meant.

14        A PROSPECTIVE JUROR:  I do have some opinions about

15   the legal system.  I worked for a U. S. government.  You

16   know, it is like I do have my predisposition.  Can I be fair?

17   I guess as fair as anybody could be, you know.

18        THE COURT:  Are you having any trouble with the idea

19   Mr. Litvak starts this proceeding today with a clean slate?

20        A PROSPECTIVE JUROR:  I guess not.

21        THE COURT:  When you say guess.

22        A PROSPECTIVE JUROR:  You are going to nail me

23   down.

24        THE COURT:  There's some people who use words like

25   that.  I don't like to promise something to someone unless

1    I'm going to do it and I know I can so I'm kind of hesitate.

2    It doesn't mean --

3            A PROSPECTIVE JUROR:   I will tell you where I'm

4    coming from.  My opinion is with the legal system.   If

5    everybody swore to tell the truth, we wouldn't have one-tenth

6    of the trials that we have.  The lawyer's job is the skew the

7    truth to make their case stronger than the other one.

8    Whoever can do that better is essentially who you have to go

9    with whether you believe the person is innocent or not

10   innocent.  That's what I believe about the legal system.

11   Sometimes certain defendants can buy better lawyers or they

12   can't afford as good lawyers, but the truth is if everybody

13   told the truth, there wouldn't be this muddy water that we

14   have to navigate.

15           That being said I don't know him from Adam.  He

16   could be completely innocent or horribly mistaken.   I

17   wouldn't know that until the trial started.  The reason I

18   brought the indictment is because I figure there has to be

19   something to get to this point so but yes, I would put that

20   aside and just.

21           THE COURT:  You have to because assume you are

22   correct, there was something that happened before today that

23   brought us here.  You don't know anything about that.  And

24   that's why there's a clean slate today because in this

25   courtroom in front of me on this trial, there's nothing

```
1    that's happened yet.  That's why I say there's a clean slate.

2         The other thing that's important that goes with

3    that, okay, we have a clean slate.  How do I get to the end?

4    Thank you very much.  You are discharged.  You get to it by

5    having the government, having a chance to prove, it is their

6    burden.  Not the defendant, the government's ability to

7    prove.  There's proof beyond a reasonable doubt.  If they

8    don't, it has to be not guilty, even though you think there

9    might have been something at some point.  The answer is there

10   isn't sufficient proof under our system to convict that

11   person.  That means he's not guilty.  Are you comfortable

12   with that?

13        A PROSPECTIVE JUROR:  I have to say you are

14   explaining things very well.  I appreciate that.

15        THE COURT:  I want to ask if the counsel want to

16   have any follow-up based on what you said.  I asked what I

17   want to ask.  I don't know if either counsel want to add

18   anything.

19        MR. GLOVER:  No.

20        MR. SMITH:  No follow-up.

21        THE COURT:  Thank you very much.

22        MR. SMITH:  We do have an application on that

23   perspective juror, your Honor.  I think her deep seated

24   opinions about the system make her bias against the

25   defendant.  When asked if the she could be fair said I guess
```

1    after your Honor prodded her, the view of lawyers and how the

2    lawyer's job is to skew the truth and tying that to

3    defendants who have the means to have the better lawyers,

4    skew the truth better.  I don't think she's able to put aside

5    these biases she has and give this defendant a fair trial.

6         THE COURT:  I don't think her bias suggests that she

7    favors one side or the other.  She may have strong views.

8    I'm not sure which way they are skewed.

9         MR. SMITH:  From my perspective, I think they are

10   viewed against the defendant.

11        THE COURT:  What is it that she said?

12        MR. SMITH:  The issue about being able to afford

13   lawyers that only applies to the defendant.  Everyone who can

14   pay for their defense.

15        THE COURT:  It is not going to come up.  How is it

16   going to come up?  Attorney Garber was here at the trial in

17   front of me.  He was appointed.  The jury don't who is paying

18   for Mr. Litvak's defense.

19        MR. SMITH:  She never gave your Honor a satisfactory

20   answer about the presumption of innocence.  She did not

21   credit the presumption of innocence.  Your Honor did not

22   correct that.

23        THE COURT:  I don't think that's what her answer was

24   in reference to.  I think her answer was reference after she

25   can be fully satisfied that the evidence can exonerate

1    completely.  She wasn't talking about sitting here today or

2    the presumption of innocence.  She's perfectly able to sit on

3    a jury and find the defendant not guilty if the facts warrant

4    it.  She has some views to the courtroom like everyone, but

5    clearly listening to the court and it's resonated here.

6              I will call her back and ask a few more questions

7    then I will make a decision.

8              Could I ask Juror 14 to come back again.  Sorry.

9    I'm digesting all that you said to me.  I have some questions

10   to follow-up.  That's fine.  I'm slow.  As you stand here

11   right now, if you were picked as a juror hopefully it will be

12   done soon.  I don't want to make any promises.  If you ended

13   up being one of those jurors, when you stood because that's

14   how we identify you, would your frame of mind be that you

15   favored one side or the other here?

16             A PROSPECTIVE JUROR:  Coming into it, I can

17   absolutely say I may be slightly prejudiced.

18             THE COURT:  Which way?

19             A PROSPECTIVE JUROR:  Not because he's a financial

20   person but because of the offense, because of the nature of

21   the crime, because of the way you described like buying and

22   selling.  That's like horrific just to hear that.  People do

23   that.  Sort of an attitude.  Can I put that aside?  I can

24   do.

25             THE COURT:  That's what they lawyers think.

1            If I was your case, would you want yourself?

2            A PROSPECTIVE JUROR:  Shaking head.

3            That's my personal opinion.

4            THE COURT:  Thank you very much.

5            Absent an argument from the government, the Court

6     grants the motion to strike the juror.

7            The next is 16.  If I can call you up, number 16.

8     Hi.  You mentioned -- I appreciate your raising that you have

9     a close family member that works for the FBI here in the

10    Connecticut.

11           A PROSPECTIVE JUROR:  My mom.

12           THE COURT:  Does she work in the New Haven office.

13           A PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Okay.  As was introduced, there's an FBI

15    agent here.  They weren't involved in investigating the case.

16    So they are not going to be any witnesses from the FBI.

17    Basically the FBI agent that's here or whoever is going to be

18    here from the FBI is here to help the other agents that come

19    from Washington, kind of getting witnesses and logistics.

20    They are not the investigating agency.  They are not going to

21    be witnesses.  None of the FBI.  I want you to understand

22    that.  But I want to be sure given your mom works at the FBI,

23    whether you have difficulty in treating all the witnesses the

24    same.  You might favor law enforcement and other federal

25    agents.

1      A PROSPECTIVE JUROR:  Honestly, yeah.

2      THE COURT:  Tell me why.

3      A PROSPECTIVE JUROR:  Not only my mom, I have

4  several friends that are detectives.  I don't want to saw

5  raised in a law enforcement type of home.  My family and I

6  are kind of.

7      THE COURT:  You wouldn't be able to treat each

8  witness the same?  You tend to favor the law enforcement?

9      A PROSPECTIVE JUROR:  Yes, sir.

10      THE COURT:  Any further follow-up?

11      No.  The thanks very much.

12      MR. SMITH:  Like to move to have that juror excused

13  for cause.

14      THE COURT:  Any objection?

15      MR. GLOVER:  No.

16      THE COURT:  16 is excused.

17      Next one I'm going to call up is 33.  That's the

18  person over here on the floor.  Juror 33, if I can ask you to

19  come up.  Good morning.  I think early on you made a remark

20  that your own broker was arrested for something.

21      A PROSPECTIVE JUROR:  He was indicted.  He was

22  convicted at trial.

23      THE COURT:  Was this person when you say broker, he

24  bought and sold stocks?

25      A PROSPECTIVE JUROR:  We didn't deal with him that

1    much.   Raymond James from Southbury Connecticut.

2              THE COURT:   It was somebody at Raymond James?

3              A PROSPECTIVE JUROR:   That's correct.   I know him

4    personally.   We would go out for a beer and then all the

5    sudden, he was indicted and the convicted.   I never expected

6    it from him.

7              THE COURT:   Were you involved in the criminal case?

8    Were your accounts involved in anything?

9              A PROSPECTIVE JUROR: He seemed to be targeting the

10   people that had higher income.   I just felt that, you know,

11   he could have done a little better for us.

12             THE COURT:   In terms of yield you got on your

13   investments?

14             A PROSPECTIVE JUROR:   When I talk to other people he

15   didn't seem to meet with us as frequently as he should have,

16   some of my friends.

17             THE COURT:   None of that involved you what he was

18   charged with.

19             A PROSPECTIVE JUROR:   No.

20             THE COURT:   I want to ask you in light of that

21   obviously that's your own personal experience.   Does that

22   make you think that people in securities are necessarily

23   going to be nonhonest or maybe misled?

24             A PROSPECTIVE JUROR:   I'm not sure.   There's honest

25   people.   On the flip side that thing is haunting me.   I don't

1     know if I would be completely objective.

2          THE COURT:  Are you saying you don't view Mr. Litvak

3     has, in effect, a clean slate because he's in the industry?

4     He's still entitled to the presumption of innocence.

5          A PROSPECTIVE JUROR:  I understand that.

6          THE COURT:  What you do feel about it?

7          A PROSPECTIVE JUROR:  I don't feel comfortable with

8     him.

9          THE COURT:  Anybody want to follow-up?

10         MR. SMITH:  No.

11         THE COURT:  Thank you, sir.

12         MR. SMITH:  We move to strike juror 33 for cause,

13    your Honor.

14         THE COURT:  I think he may not want to be a juror.

15    What am I going to do with him?

16         Juror 35.  Hi.  I think in the beginning we went

17    through a whole long list of companies, entities the lawyers

18    called them.  I think you indicated Black Rock.  You had a

19    friend there.

20         A PROSPECTIVE JUROR:  No.  College fund that's

21    all.

22         THE COURT:  You have your money?

23         A PROSPECTIVE JUROR:  College fund.

24         THE COURT:  You invest with Black Rook?

25         A PROSPECTIVE JUROR:  Also Putnam college fund and

1    Columbia.  We have a few funds.

2         THE COURT:  When you say you invest with these

3    people, what are you doing?  Are you meeting with people from

4    those companies?

5         A PROSPECTIVE JUROR:  Bought in the funds, yeah.

6         THE COURT:  I don't know yet the lawyers know but I

7    have no idea how Black Rock, Columbia or any of the other

8    ones what you will hear about them during the trial.  I guess

9    first as you stand here generally, can you tell me if the

10   fact you are going to hear their names is going to effect how

11   you decide this case?  Is it going to bother you they are

12   talking about things I put my money into?

13        A PROSPECTIVE JUROR:  I wouldn't know the relevancy.

14        THE COURT:  Can I ask you to step back a second.  I

15   should have asked a question so I know what to ask you.

16        How are these companies coming up?  Victims, buyers?

17        MR. GLOVER:  None of the charges counts.

18        MR. FRANCIS:  I don't think any of them come up in

19   any of the 16 charged transactions we submitted to your

20   Honor.  I can check.

21        THE COURT:  I want to know bottom line is she going

22   to hear any of these companies in the context of them having

23   suffered a lose because of Mr. Litvak allegedly and she's

24   going to say oh, my investments lost money because of what he

25   did.

1          MR. SMITH:  Not with respect to Columbia.  With

2     respect to Black Rock, there are one witness on the defense

3     list if we call some of the cross would be geared that the

4     fraud extended to Block Rock.

5          THE COURT:  Why are you calling him?

6          MR. SMITH:  He's the category of money managers who

7     have done the deal again and to whom the tactic didn't

8     matter.

9          THE COURT:  Okay.  Juror 35.  Sorry.  I should have

10    had a better idea before I brought you up.  I don't know if

11    this is going to be helpful.  Let me ask you a hypothetical.

12    Let's say you are on the jury and in the course of the

13    evidence, you heard one of these company names that you

14    invest in.  You heard somebody testifying in a way that might

15    suggest to you that that company lost money because of what

16    the government claims Mr. Litvak did that was wrong.  Do you

17    follow so far?

18          A PROSPECTIVE JUROR:  Yes.

19          THE COURT:  What I want to know is would it affect

20    you?  In other words, would you look at that evidence

21    different than what let's say -- I don't know -- pick a name

22    of the company Wellington.  You didn't indicate you knew

23    Wellington.  Say there's the same kind of testimony that

24    Wellington maybe was a victim, maybe lost money because of

25    what the government claims Mr. Litvak did that was wrong.

1    Would you receive the evidence about the Columbia or Black

2    Rock evidence different than you would Wellington because you

3    have invested in Black Rock and Columbia?

4              A PROSPECTIVE JUROR: No.

5              THE COURT:  It would or wouldn't affect you?

6              A PROSPECTIVE JUROR:  That's too far.

7              THE COURT:  Any follow-up for the juror?  No.

8    Thanks very much.  We're all set.

9              I have to replace three people I believe.  And that

10   means Diahann we need to go up to 49 by my count.  We have

11   two excuses in there.  Is that right?  I will do that

12   questionnaire once I'm fairly stable.  Usually it doesn't

13   bring up problems, but you never know.

14              (End of sidebar.)

15              THE COURT:  If I can bring you all back to order

16   here.  At this time, I'm going to ask Jurors 14, 16, and 33

17   if you would step out of the box and go back to the back of

18   the courtroom, and I would ask the Courtroom Deputy to call

19   three jurors to come up and be replaced.  Be their

20   replacement I should say.

21              THE CLERK: Number 45, number 48 and 49.

22              45 the first available seat in the second row, 48

23   take the next available seat and 49, you are going to take

24   that seat.

25              THE COURT:  They are all in place.  This is a

1    challenge.  I have got three new folks.  One is over here and

2    two over in the direction.  This is that time I mentioned to

3    you when you are going to be in the back, might very likely

4    get called up so what I will do is I'm going to quickly run

5    through by topic kind of.  I will try to cue you as to what I

6    covered.  I covered a lot.  Any time when I mention I will

7    say I instructed you on the law about treating all the

8    witnesses the same.  If you don't remember what I instructed

9    you, you were in the bathroom, just say, Judge, could you go

10   over that again before I see if I have to answer?

11   Absolutely.  No problem.

12          If you remember, we started with the lawyers and all

13   those names.  I don't know if you need the names repeated or

14   whether you can recall if any of those names sounded familiar

15   to you.  Anybody?  Anyone in those groups of names sound

16   familiar to any of the three new people, anybody of the three

17   new people would like me to reread the name or any category

18   of names, one side versus the other, lawyers versus the

19   witness or all of them?  Anybody?

20          A PROSPECTIVE JUROR:  45.  David Miller.

21          THE COURT:  The David Miller you know, sir, where he

22   is from?

23          A PROSPECTIVE JUROR:  I think he's a Yankee

24   player.

25          THE COURT:  I don't think that's the same one.  I'm

1    not a Yankee fan.  I didn't think there was anybody by that

2    name.  They buy so many players they might have bought

3    somebody.  Any other names that seem familiar?

4         Then I asked if you had prior jury service.  How

5    about the three new people ever served on a jury?  Nobody.  I

6    then asked if you had any problems like physical kind of

7    problems seeing, hearing, sitting, things like that.  Any of

8    three new folks have an answer?

9         Last but not least, I asked if you had trouble

10   reading or writing English.  Any of the three new people have

11   trouble with that?

12        I went to the questions that are more particular to

13   this case.  I started out by asking did you know anything

14   about this case?  Do you think you read about it?  Heard

15   anything about it?  Any one of the three have that?

16        I then asked I went and covered a number of

17   questions I said about the financial industry kind of

18   generally I guess.  That the case involves allegations of

19   violations of federal securities laws and TARP and things of

20   that sort and whether there was any thing about the kind of

21   allegations on the bailout or anything about your views on

22   the investment companies or investment people that would keep

23   you from being fair and impartial.  Anyone of the new three

24   have reaction to that?  I don't see any.

25        I asked a number of questions or spoke at some

1    length about the law how I'm the judge on the law.  I have to

2    give you the law.  You have to follow it even if you don't

3    like it.  You are the judges of the facts.  You would decide

4    who you believe and who you don't believe based here in the

5    courtroom.  Not based on some preconceived notion about the

6    law enforcement testifying one way or another.  I asked a

7    series of those questions.  Anything about those questions

8    you would have remembered you would have raised your hand had

9    you been up here?

10           I talked about some of the constitutional law and

11   the law generally that applies to a case like this, that the

12   burden of proof is always on the government to try to prove

13   that there's been a crime committed here as charged and that

14   that burden is beyond a reasonable doubt which is a heavy

15   burden.  That the defendant has no burden, no obligation to

16   produce any evidence.  He has a right to remain silent and

17   you would still find him not guilty if the government

18   failed to carry its burden as I described it.  Any problem

19   with those concepts that would be what govern you as a juror

20   here?  No.  Okay.

21           I talked about how you can't consider any punishment

22   when you are deciding to return a verdict of guilty or not.

23   That's not for you to think about.  Any problem with that?  I

24   asked -- now I have to ask all you folks.  Does anybody know

25   up here in the panel now that we have three new members, that

1    questions applies to all of you and the three new members.

2    Anybody know anybody?  No.

3          I asked you about lawyers, you are lawyers, any

4    close member of your family is a lawyer, ever worked in the

5    law.  I don't see any responses.

6          The record should reflect that I'm moving on to the

7    next category because I have looked at the three folks.  They

8    are sitting there.  No hands up.  Not looking to tell me

9    anything.

10         I then asked some questions do you have any

11   religious beliefs or anything like that that would keep you

12   from being a juror?  Do you think you can be fair and open

13   minded and approach the case based on what you hear in the

14   courtroom with the burden on the government and the

15   presumption of innocence with the defendant?  I asked if

16   there was anything I haven't asked that you would like to

17   share with me that's been on your mind as you sat there.  I

18   asked those kind of being fair and impartial and being the

19   kind of juror you would want if you had a case.  Any of those

20   that would cause you to respond to me in any way?

21         Anything on your mind the three new folks that I

22   haven't gone over but that's on your mind because I didn't

23   particularly refresh you on the question, but you have

24   something on your mind to tell me?  Nope.

25         Counsel, I think I have gone over all the questions

1    with the three new members.  Unless there's reason to go to

2    sidebar, I would start with the process of the nine

3    questions.  All right.  I see heads shaking.  That's fine.

4            You all should have found on your seat when you came

5    up and maybe the replacements might have got taken them.  If

6    so, we can get you a another copy.  You can share your

7    neighbors. There's a series of six questions and then three

8    more questions.  What I will do, I will start with the first

9    juror.  We're going to do down the line.  Then we'll go over

10   this side and go over the rows.  What I ask when it is your

11   turn, if you would stand, say your number then if you would

12   provide us the information that's called for by these items

13   one through six and one through three.  You don't have to

14   read the question out loud.  We all have the copy.  If you

15   provide me with the information that's responsive to what's

16   set forth in each of the numbers.  That would be great.

17           A PROSPECTIVE JUROR:  Juror one, I live in

18   Madison.  I am employed.  I'm a medical technologist Yale New

19   Haven, Smilow Cancer Care in Guilford.  I'm married.  My

20   husband is in the biotech field.  I have three grown

21   children. They are 34, 36, 38.  One is a chef, one works in

22   public real estate.  The other is golf course superintendent.

23   I have a college degree.  I like to garden, I like to sew, I

24   like to be a grandma.  No member of the families have been

25   part of or been in a crime or witness of a crime.  I have no

1   family members that are part of law enforcement.  And no

2   member that has been charged with a crime.

3        THE COURT:  Thanks very much.  Next.

4        A PROSPECTIVE JUROR:  Juror 3.  I live in the

5   northward, connecticut.  I'm not employed.  I live in

6   Northford, Connecticut.  I'm not employed as I said before.

7   I used to work in insurance liability claims.  So I've worked

8   with some attorneys and so on with civil cases.  I'm married,

9   my husband is retired.  He worked for the State of

10  Connecticut in the criminal justice in a prison.  I don't

11  have any children.  I have a bachelor's degree.  I do charity

12  work and things like that.  I read Time Magazine and watch

13  Brian Williams on TV.  I don't have any members who have been

14  witness to a crime.  And nobody served in law enforcement and

15  nothing for number three either.

16        THE COURT:  Thanks very much.

17        A PROSPECTIVE JUROR:  Number 4.  From Meriden, I am

18  employed.  I'm a teacher at a day care.  I'm married.  My

19  husband is a construction plumber.  I have two teenage boys

20  18 and 14.  They don't work.  I have a diploma.  I love

21  nature, outdoors, hiking, stuff like that.  Nobody has been

22  part of a crime.  My stepbrother is a state trooper in

23  Massachusetts.  And we have never been charged with any

24  crimes.

25        THE COURT:  Juror five.  I live in Cheshire,

1  Connecticut.  I'm a shipping clerk at a Vbrick Systems, not

2  married, I don't have any children, I have a high school

3  diploma, I like to watch TV shows, play ping pong and stuff.

4  I have not been a victim or a witness to a crime.  I don't

5  have any close family or friends in law enforcement, and I

6  have been charged with a crime failure to appear.  That was

7  like when I was 21.  But other than that.

8          THE COURT:  All right.  Thank you very much.

9          A PROSPECTIVE JUROR:  Juror 8.  I live in Naugatuck

10  I'm employee at a Waco.  I'm an accounting person.  Married.

11  I have two kids who are 24 and 20.  My daughter is a

12  bartender.  My son goes to IT.  I have a background.  I like

13  to do camping, outdoors stuff.  No one in my family has been

14  convicted or a witness of a crime.  No to law enforcement.

15  And no to other minor.

16          THE COURT:  You said you are married?

17          A PROSPECTIVE JUROR:  Yes.

18          THE COURT:  What does your husband do?

19          A PROSPECTIVE JUROR:  He's retired from the Air

20  Force.

21          A PROSPECTIVE JUROR:  Juror 9.  I live in Meriden,

22  Connecticut.  I'm currently seasonally unemployed.  I'm a

23  painter so I get laid off every winter.  I can go back to

24  work any time.  I don't know if I should have mentioned that.

25  I'm married.  I have a 7 month old daughter.  Her job is keep

1  us at night.  One year at college at Southern, big sports

2  lover.  I like being outdoors.  Never been a develop or a

3  witness.  My wife's father was a Meriden cop his whole life.

4  He's retired.  No.  No to number three.

5        THE COURT:  Does your wife work?

6        A PROSPECTIVE JUROR:  Yes. She's a dental assistant

7  and does managerial stuff there.

8        A PROSPECTIVE JUROR:  Juror 10.  I live in Madison.

9  I'm employed at the medical school.  I run a global health

10 training program for residents and the physicians.  I'm

11 married.  My husband works in New York in insurance.  I have

12 three kids.  My son is in the training program in New Jersey.

13 My middle child is in college in New London.  The other one

14 is in high school staying at home today.

15        THE COURT:  What's your oldest child do?

16        A PROSPECTIVE JUROR:  Insurance.  I have a master's.

17 I like to garden, cook and anytime when I'm not doing

18 anything else, then I read the New York Times pretty

19 regularly.  The last three questions no, no, no.

20        THE COURT:  Thanks very much.  Coming back to the

21 next row to far left.

22        A PROSPECTIVE JUROR:  Juror 11.  From Meriden,

23 Connecticut.  I work at Pfizer doing bank statements, setting

24 them up to mail out.  I'm not married, no children, I have a

25 bachelor's degree.  I enjoy hiking, bowling, other sports,

1    and no to the rest.

2            THE COURT:  Thanks very much.

3            A PROSPECTIVE JUROR:  Juror 12, Milford, I'm

4    retired.  The last job I did was a captain a private yacht.

5    I have a significant other.  She works in the reverse

6    mortgage industry as a reverse mortgage consultant.  I have

7    one child, 48-year-old son who is a taxi driver in the Boston

8    area.  I'm a college graduate with a degree in finance.

9    Leisure activities sailing.  I build wooden ship models.  I

10   watch sports and the financial news.  No to all three of the

11   last questions.

12           THE COURT:  I notice you mentioned your last

13   activity before you retired was a captain.  Have you ever

14   worked in the finance industry?

15           A PROSPECTIVE JUROR:  Yes, I was a banker, a

16   management consultant.

17           A PROSPECTIVE JUROR:  13.  I live in Waterbury.  I

18   am employed.  I just got a job at Hartford hospital as a

19   surgical technologist.  I'm married.  My husband is on

20   disability.  I have two children.  They are both school

21   children but their ages are the 16 and 12.  I recently

22   finished a program for surgical technology so I have the

23   certificate.  Watch TV for the most part, knitting,

24   crocheting, stuff like that.  No to the rest.

25           THE COURT:  Thanks very much.

```
1              A PROSPECTIVE JUROR:  45.  Waterbury.  I work in the

2     company as a machine operator.  I am married.  I have five

3     kids, older daughter married.  Four live with me.  Two do

4     job.  One is in college.  I have a high school degree and I

5     watch TV.  News and Discovery Channel and History Channel.

6              THE COURT:  So no to the three at end?  Does your

7     wife work outside.

8              A PROSPECTIVE JUROR:  No.

9              THE COURT:  She's in home.

10             Thank you.  Next is juror number 15.

11             A PROSPECTIVE JUROR:  I live in Middlefield.  I am

12    employed at an environmental consulting company.  Married.

13    My husband is a self-employed home improvement contractor.  I

14    have two children age 18, college students, I have a master's

15    degree and reading movies, that's leisure time and no to the

16    following three.

17             THE COURT:  Thank you very much.

18             A PROSPECTIVE JUROR:  48 from New Haven.  And I

19    employed as a printer.  I'm married.  I have three kids, my

20    wife is a x-ray technician.  From Cuba.

21             THE COURT:  How long have you lived in the United

22    States?

23             A PROSPECTIVE JUROR:  17 years.  I watch TV sport.

24    No to the other threes.

25             THE COURT:  17.  From Middletown and I work for the
```

1    Hartford Insurance Company.  Licensed agent.  Not married, no

2    children, and some college and I like fishing and then number

3    one, no; two, yeah.  I have a family member that is a

4    resident trooper in Stafford Springs, number three no.

5           THE COURT:  I didn't catch what you like to do.

6           A PROSPECTIVE JUROR:  Fishing.

7           THE COURT:  I missed that fish.

8           A PROSPECTIVE JUROR:  Number 18.  Juror will 18.  I

9    live in North Stonington.  I'm retired field construction

10   boiler maker.  Married, and my wife is a stay at home mom.

11   She watches the two grandchildren most of the time.  I have a

12   diploma from a two year tech school after high school and

13   favorite leisure time activities are I like to shoot skeet

14   and Longman's Sportsman Club.  Never been a victim of a crime

15   other than I had my car broken into.  I don't have any family

16   members who are in the police or the military at this time.

17   Never been charged with a major crime.

18           THE COURT:  Thank you.

19           A PROSPECTIVE JUROR:  Juror 19.  New Haven.  I

20   validate software for Fugi Medical Systems Imagining Project.

21   Some college, am married, my wife stays at home.  I enjoy

22   board games, sports, that's about it.  I'm into sports.  And

23   no on the last three.

24           A PROSPECTIVE JUROR:  20, I live in Naugatuck.  I'm

25   kind of employed temporary.

1          THE COURT:  What is it you do?

2          A PROSPECTIVE JUROR:  I work in a high school in

3    guidance.  Not married, no kids, high school diploma.  I

4    really honestly don't do much.  I read.  And no to the last

5    three.

6          THE COURT:  Thanks very much.

7          A PROSPECTIVE JUROR:  21.  I'm employed as a

8    customer service representative at AT&T.  Single, two

9    children both grown.  One works for the VA.  One works for a

10   car company.  Graduated from high school.  I don't have a lot

11   of free time.  I do read Consumer Reports.  Never been a

12   victim of a crime.  No close friends in the service, military

13   and I had a domestic charge of disturbing the peace about 10

14   years ago.

15         THE COURT:  All right.  You are Juror 21?

16         A PROSPECTIVE JUROR:  Yes.

17         A PROSPECTIVE JUROR:  Juror 22.  I live in

18   Stonington, Connecticut.  I'm employed at Electric Boat, been

19   there for 40 years.  I'm married, my wife is a director of

20   food and beverage.  Five children, 17, 19, 30, 33, and 38.

21   17 year old is in high school.  19 at UConn.  The 30 year old

22   has her own housekeeping business, 33 is homemaker, 38 is a

23   stone mason.  I have attended a little more than two years at

24   the University of New Haven.  I didn't say what I did.  I'm a

25   nuclear quality control engineering specialist.  I like to

1   sail, hike, read, play chess, fish.  I like watching Alaska,

2   The Last Frontier.  And no to last three.

3          A PROSPECTIVE JUROR:  Juror 24, from Cheshire,

4   Connecticut.  I'm a substitute teacher for the Cheshire

5   School District, not married.  No children, I have a

6   bachelor's.  My free time I like to play music with my band,

7   like to read Time Magazine and NPR, no to the last three.

8          A PROSPECTIVE JUROR:  Juror 28.  Mystic Connecticut.

9   Retired a couple of years ago.  I spent 38 years managing and

10  doing research for the Department of Defense.  I'm recently

11  widowed.  My husband was a computer scientist, electrical

12  engineer.  No children, two cats.  I like pilates.  I'm

13  currently a first responder for the Marine rescue.  My

14  parent's house was broken into years ago.  Again not related

15  by married to a judge.  Hopefully not committed any crimes.

16         THE COURT:  Not that you know of.

17         A PROSPECTIVE JUROR:  Not that I know of.

18         A PROSPECTIVE JUROR: 29.  I reside in Portland.  I'm

19  retired.  And I was a business manager and did accounting.  I

20  am married.  Been married for 46 years.  And my husband is

21  retired.  He has worked for Aetna.  I have two children ages

22  45 and 43.  One is employed as an electronic engineer and the

23  other is a teacher.  I do have an associate's degree.  I

24  enjoy gardening, traveling, enjoy going to the theater,

25  involved in charity work.

1          Number one, I did have an uncle who was murdered by

2    a health care worker, private health care worker a number of

3    years ago and no to number two and three.

4          THE COURT:  With respect to your uncle, were you

5    involved at all?  Was there a case brought after that?

6          A PROSPECTIVE JUROR: There was a case.

7          THE COURT:  Were you involved in the process at all

8    or go to court?

9          A PROSPECTIVE JUROR:  I went to the probation

10   hearing two years ago.  But no.

11         A PROSPECTIVE JUROR:  Number 30.  I'm from Branford.

12   I recently got a job as a preschool teacher in a small

13   private school in Hamden.  Not married.  I don't have any

14   kids.  I recently graduated from Southern so I'm working on

15   paying back my loans.  I like to play sports, I like to watch

16   TV, like to hang out with my friends, my car got broken into

17   and no to the last two.

18         THE COURT:  Thanks very much.  Juror number 31.

19         A PROSPECTIVE JUROR:  31.  Seymour.  Employed as a

20   tractor trailer mechanic.  I'm married.  My wife works in a

21   local bank here in New Haven.  I have two kids, 16 and 14.

22   Both in school.  I graduated tech school.  Pretty much

23   anything outside.  Do anything outside as long as it has a

24   motor on it.  No, no, no and no.

25         THE COURT:  Thank you very much.  Next 32.

1    A PROSPECTIVE JUROR: 32.  I live in the town of Old

2    Lyme.  I'm employed at Pfizer in Groton.  I'm married.  And

3    she works in a dental office.  I have two kids 22 and 24.

4    They are both in the college.  One is a senior in the music

5    program.  Does music gigs outside school.  The other is

6    graduate school math and teaches math as well.  I have a

7    bachelor's in medical microbiology and some postgraduate

8    degree.  Some postgraduate work about a year, year and a

9    half.  I do like History Channel, National Geographic Channel

10   I'm an video biker, hiker and kayaker.

11        As far as the questions, our house was broken into.

12   Two no; three, I do have a brother that's charged with a

13   crime.

14        THE COURT:  How long ago was that, sir?

15        A PROSPECTIVE JUROR:  Three years ago.

16        THE COURT:  Were you involved at all with him in the

17   process?

18        A PROSPECTIVE JUROR:  No.  He lives in a whole

19   different state.

20        THE COURT:  You don't know much about it?

21        A PROSPECTIVE JUROR:  Other than the fact he's

22   convicted.  That's all I know.

23        THE COURT:  Anything that would affect how you would

24   approach this case?

25        A PROSPECTIVE JUROR:  No.

1      A PROSPECTIVE JUROR:  49.  Juror 49.  I live in

2  Gales Ferry, Connecticut.  I'm employed by Electric Boat.

3  I'm an engineer.  I'm not married.  I have no children.  I

4  have a BS in mechanical engineering.  I like sports, video

5  games.  As far as the bottom three number one is no.  Number

6  two, I do have an, you know, uncle who is retired from the

7  Texas Department of Public Safety, number three is no.

8      A PROSPECTIVE JUROR:  34.  Juror 34 from Middlebury.

9  I am a Spanish teacher in Region 15 in Middlebury.  I'm

10 married.  My husband works at AMC.  He's an IT project

11 manager.  Two children 12 and 9, not in school today.  I have

12 a master's degree.  I like to shop.  I'm more shallow than

13 everybody else.  I like to shop and be involved in the

14 Hispanic culture.  I love to travel.

15     Number one, my family growing up our house got

16 broken into many times.  We even had a home invasion.  Two,

17 my husband's best friend is currently in the secret service

18 for the government and nothing for number three.

19     THE COURT:  In connection with the break-ins in your

20 home, particularly the home invasion, was anyone prosecuted

21 for any of those?

22     A PROSPECTIVE JUROR:  No.  Not a trial or anything.

23     A PROSPECTIVE JUROR:  35.  I live in Milford.  And

24 I'm a senior project manager with Aetna in the IT Department.

25 I have a husband and two children, 10 and 12. My husband is a

1    musician.  I have some college background.  I'm currently

2    enrolled at Cornell.  I like to hike.  I like the outdoors.

3    No to number one and two.  I have a distant cousin that was

4    charged with a crime.

5            THE COURT:  Were you involved with the case at all?

6            A PROSPECTIVE JUROR:  No.

7            A PROSPECTIVE JUROR:  36.  I live in Cromwell.  I

8    work at a floral business.  I manage it.  I'm married.  My

9    husband works for the Water Department in our town.  I have

10   two grown children.  One works at Aetna.  One works for

11   aerospace company.  I went to business school for two years.

12   I like to cook.  I like to read and no to the last three.

13           THE COURT:  I'm sorry.  You said you're a manager?

14           A PROSPECTIVE JUROR:  Florist.

15           A PROSPECTIVE JUROR:  37.  I'm from New Haven.  By

16   way of Dublin, Ireland.  I'm retired from my company.  I'm

17   retired.  We will be married 37 years.  Two children one male

18   and one female.  33 and 37 and my education background it

19   would be equivalent to the high school from the republic of

20   Ireland.  I like fishing.  I like hunting and I like walking

21   my dogs and no to one, my father-in-law was a detective in

22   the New Haven Police Department.  He's retired.  No to three.

23   And I think that's it.

24           THE COURT:  You are married.  Your wife is retired?

25           A PROSPECTIVE JUROR:  She was in management with

1   United Illuminating next door so she's retired.

2          THE COURT:  Very good.  Thanks very much.

3          A PROSPECTIVE JUROR:  38.  I live in West Haven.

4   And I work for the Department of Labor.  I'm a career

5   counselor.  I'm not married.  I have a grown 27-year-old son

6   who lives in California.  He's currently not working.  I have

7   a bachelor's degree and I'm currently a student in the

8   master's program.  I don't know if this is a problem.  I go

9   to school on Monday nights at Southern.  It starts at 5.

10          THE COURT:  I should have made this clear.  We would

11   recess typically by quarter to four.  Four would be the

12   latest.

13          A PROSPECTIVE JUROR:  Great.  I do like to watch TV.

14   I like the Voice and Top Chef.  You know, I thought I had no

15   for all the bottom three answers but my mother was hit by a

16   car in California and was killed and there was a court

17   case.

18          THE COURT:  How long ago was that?

19          A PROSPECTIVE JUROR:  2010.

20          THE COURT:  Were you involved in the court case?

21          A PROSPECTIVE JUROR:  I was involved but I lived

22   here in Connecticut so I wasn't involved.

23          THE COURT:  Is there anything about the process, the

24   criminal justice process, that you were involved with in

25   connection with that case -- was there a charge against the

1    person?

2           A PROSPECTIVE JUROR:  There was vehicular

3    manslaughter.

4           THE COURT:  Anything about your experience with the

5    criminal justice system in California that would affect how

6    you would approach this case?

7           A PROSPECTIVE JUROR:  No.

8           THE COURT:  How about the last two questions?

9           A PROSPECTIVE JUROR:  No.

10          A PROSPECTIVE JUROR:  39, number 39.  I reside in

11   North Haven, Connecticut.  I'm a project manager for Kubota

12   Technology which is a telephone communication company in

13   Waterbury.  I'm married.  My partner works for the Bank of

14   America.  I have three children, four grandchildren.  I have

15   an associate's degree and I like to do furniture restoration

16   I volunteer at the soup kitchen.  No to the last three.

17          A PROSPECTIVE JUROR:  Juror 40 and I'm from Oakdale.

18   I'm employed at the boatyard.  I'm a bookkeeper.  Many other

19   small things.  I'm engaged to be married.  My fiance is a

20   plastic mold injection specialist.  I have a daughter who is

21   14.  And I have some college education.  Things I like to do,

22   I like hockey, I like crafts, I look cooking, I do a variety

23   of things.  No one has been a victim of a crime or witness.

24   I was married to a police officer from New London.  He's

25   since passed away.  My brother is a criminal, has been

1    breaking restraining orders, but I have no connection to that

2    or was not involved in any of those things.

3            THE COURT:  I had asked questions about judging law

4    enforcement officers the same as others.  You didn't raise

5    your hand.

6            A PROSPECTIVE JUROR:  That's fine.

7            THE COURT:  You treat every witness you judge the

8    same?

9            A PROSPECTIVE JUROR:  Absolutely.

10           THE COURT:  Thanks very much.

11           A PROSPECTIVE JUROR:  Juror 41.  I live in Cheshire,

12   Connecticut.  I'm employed as accounting finance

13   professional.  I'm married.  My wife is also an accounting

14   finance professional.  I have no children.  MBA.  I like to

15   travel, I look sports, spent time with my triplet nieces.  I

16   read a number of magazines financial, a little more light

17   hearted NPR.  That's about it.  I had a car stolen in

18   college.  I don't think it is a big deal and no and no.

19           THE COURT:  Then 43.

20           A PROSPECTIVE JUROR:  Juror 43.  I live in Ledyard.

21   I am a scientist at Pfizer.  I'm engaged to be married this

22   summer.  He's also a biologist at Pfizer.  No kids I have my

23   bachelor's.  I hike, I dive, anything outside.  No to the

24   crimes.  My soon to be brother-in-law is a Norwich cop.  My

25   soon to be father-in-law is a retired cop.

1          THE COURT:  How about the third question?

2          A PROSPECTIVE JUROR:  No.

3          A PROSPECTIVE JUROR:  44.  I'm from Woodbridge.  My

4   wife works at Gaylord in sleep study.  Three kids, 15, 16,

5   22.  Oldest bought his own house.  He works in manufacturing,

6   hobbies are the antique gas engines.  I don't watch much TV,

7   too many advertisements, no to last three.

8          THE COURT:  Are you employed?

9          A PROSPECTIVE JUROR:  Yeah.  I work in North Haven

10  in a power shop.

11          THE COURT:  Thank you.  Do counsel need to see me at

12  side?

13          MR. GLOVER:  Just briefly.

14           (Beginning of sidebar)

15          MR. GLOVER:  Number nine mentioned a Meriden Police

16  Officer.  Our office prosecuted a Meriden Police Officer last

17  year Cosette and Cosette's father is the chief.  I would like

18  some brief.

19          THE COURT:  That's opening Pandora's box.  I got the

20  Meriden cop reference.  What I will do, I will ask the name

21  to see if it comes out Cosette.  I don't know what you want

22  me to do with that.  You didn't prosecute him.  It is your

23  office but you can't have me ask about the case.

24          Why would I?

25          MR. GLOVER: People associated with the Meriden

1    police officer probably aren't too fond of our office.

2    That's probably the fact of the matter.  Excessive force

3    prosecution.

4         THE COURT:  Anything else?

5         MR. SMITH:  No.

6         THE COURT:  Could I ask Juror 9 to come up for a

7    second if I can see you for a second.

8         I think you said -- I might have it wrong.  You said

9    you have a brother-in-law.  That's your wife's brother?

10        A PROSPECTIVE JUROR:  It is my sister's husband's

11   father.

12        THE COURT:  That has nothing to do with us so.

13        Do you have any friends in the Meriden Police

14   Department?

15        A PROSPECTIVE JUROR:  I believe the same

16   brother-in-law has a cousin.

17        THE COURT:  But you don't know who that is?

18        A PROSPECTIVE JUROR:  I see him at birthday parties

19   for my nieces, not outside of that.

20        THE COURT:  Any follow-up?

21        Thanks very much.  Are we all set?  Diahann she has

22   the blue slip that's back and forth.  Obviously the

23   government starts but you have to do double until you catch

24   up because you have more.  Anything further?

25        MR. SMITH:  Start right away.

1          THE COURT:  I may try to go straight through.  They

2    would rather do that than waste an hour in the snow.

3          MR. SMITH:  We would like sometime to confer over

4    our notes and exercise our strikes.

5          THE COURT:  You will have that time as you exercise,

6    you will take less and less time.  You can confer while they

7    are deciding on theirs.  They are going to need sometime to

8    decide unless they know.  Generally when I ask would you like

9    an hour lunch or go straight through, you should be done by

10   two or three, they will vote for two or three.

11         MR. SMITH:  At a minimum we would like 10 minutes

12   how we'll exercise our first strike, a bathroom break,

13   however you want to characterize it.

14         THE COURT:  The problem if they break and leave the

15   building, they can't get one hundred people back through

16   security.

17         MR. SMITH:  I'm suggesting 10 minutes.

18         THE COURT:  We'll do that.  I will tell them I will

19   take a brief recess.  Use the rest room, get up and walk

20   around.  Back here in 10 minutes.

21         (End of sidebar.)

22         THE COURT:  Next stage of the process, that's the

23   last stage, involves a right which both sides in this case

24   have to unselect some of you from the jury.  De-select.  I

25   don't know what word you prefer.  We don't allow anybody who

1   is a party to the case to decide who is going to be on the

2   jury.  We do give them a little bit of discretion to say that

3   person I don't think would be the best person for my case.

4   Now some people I think hold their breath when I say this.

5   It is not going to be you out.  We're going to do it on the

6   sheet of paper.  You will see Diahann, the deputy, going back

7   and forth to the lawyers so that takes a little bit of time.

8   It is very helpful if the folks up here are in their seats.

9   They can look at the chart, their notes, now I remember that

10  person.  However you may have noticed we were out here by

11  quarter to nine before you folks came in the room, so I need

12  to take a brief break as I think probably the counsel,

13  everybody at those tables need a brief break.  My inclination

14  is not call for a full lunch break.  If you leave the

15  building, that at a minimum takes an hour to get you back

16  through security.  For me to take a 10-minute-break to do

17  what those of you have been in here, you folks haven't moved

18  either but to forge on.  If there are people here who have

19  medical reasons, they need to eat lunch at a certain time

20  such that we take a break, somebody let me know that.  If

21  there's a few of you like that, there's in the building next

22  door in the back of the building, they sell food.  If 100 of

23  you go back, we'll never be back in 10 minutes.  I'd like to

24  keep it at 10.  We'll be done sooner.  Everybody will be able

25  to go on their way to other things.  If I see a strong

1    outpouring that you would like a civilized lunch hour, come

2    back in an hour, you need to let me no that.  Seeing no such

3    strong outpouring, we'll take a break until 1:00.  As I say,

4    I need everybody back.  Nobody is excused yet.  Thanks very

5    much.

6            (Whereupon, a recess was taken.)

7            THE COURT:  I think it looks like we have all of the

8    panel up here back so I think we could begin, Diahann.  You

9    can chat if you want to but not too loud.  It will take a

10   little bit of time to go back and forth and consult.  I just

11   ask your patience.  It is still snowing.  I'm sure it will

12   not be a fun ride home.  We'll get out of here before it gets

13   dark which is the best thing I can do.

14           (Discussion off the record.)

15           THE COURT:  All right, ladies and gentlemen.  We're

16   doing very well at this point.  I would ask if you would be

17   attentive to Diahann.  She'll call out certain numbers.  If

18   you hear your number, I would ask if you would please stand

19   and remain standing for the moment.  Jurors 9, 15, 18, 19,

20   21, 22, 28, 31, 34, 35, 36, 37, 39, 40, 43, and 44.

21           THE COURT:  Those of you who are standing have been

22   selected to serve as the jury.  I would ask the government if

23   the jury as arrayed is acceptable to the government.

24           MR. GLOVER:  It is.

25           MR. SMITH:  Yes, your Honor.

1          THE COURT:   I'm going to ask you all just to stay

2     right there.  Anybody who is standing do not move. However

3     because I have a few things to tell you, then Diahann has to

4     sort of tell you a little bit of information as well.

5     However everyone else who is here both those who are seated

6     up in the jury area, those in the back, I want to express my

7     appreciation to you.  As you can see, we can't pick out a

8     jury without calling in more people than we need at the end.

9     I appreciate all of your service.  Anyone who isn't standing

10    is excused from today's jury service.  Thank you very much.

11    Those standing need to stay for a few moments.  Won't be much

12    longer.  I promise.

13         You all may be seated.  You don't need to remain

14    standing so as long you remember who you are and you are

15    still here.  I have already given you the days for the trial.

16    Just so you have them in your mind.  We'll not be back here

17    until Tuesday, the 18th.  That's two weeks from tomorrow.  I

18    don't need to see you until then.  When you come, as I say,

19    we start with the jury at 9:30.  I'm often here earlier with

20    the lawyers and everything.  I expect you folks to be out

21    doing your job as jurors at 9:30 so I would ask you to come a

22    few minutes earlier every day so you don't hold up your

23    fellow jurors.  If you happen to run into traffic especially

24    the first day, you know where you are going, how long it

25    takes, I know you have done that today.  Hopefully it won't

1    be snowing.  Every day you come it will be different.

2            Diahann will tell you the logistics.  She'll show

3    you the jury room, where you need to report on the 18th in

4    the morning.  You don't come into the courtroom.  She'll show

5    you how to get there without coming in the courtroom.  The

6    one thing I want to impress upon all of you if you have any

7    questions, you need to raise your hand.

8            I covered this in the questioning but it is

9    extremely important you not discuss this case with anyone and

10   don't let anyone discuss it with you.

11           You are going to go home or go to work.  You are

12   going to say I got picked for a jury.  I guarantee you

13   someone will tell you how to decide this case.  It is just

14   human nature.  That's right coupled with all the TV

15   shows about courts and trials and things like that.  I'm sure

16   they are well meaning, but you need to tell them I can't talk

17   about it.  The judge has ordered me that I cannot listen to

18   anybody talk about it and I can't talk about it. Thank you

19   very much.  I will be leaving.  If you are listening to the

20   television and you think you hear something come on the

21   television that might related to this case, walk out of the

22   room.  If you don't control the changer or change the

23   station, might not be this case.  A lot of other cases going

24   on in Connecticut, New York.  Don't listen long enough to see

25   that it is this case.  By then you probably heard too much

1    from some person, no offense to the media, who are reporting

2    second hand and taking information some of which you may

3    never hear about.  If you did, it would be subject to

4    examination in front of all of us.  The same thing goes to

5    the newspaper, radio anything like that.

6           And again in this day and age of the Internet, there

7    have been some problems in jury cases with the people going

8    on the Internet either to research, you know, you want to

9    know who I am.  Maybe you are not interested in me.  You

10   might be interested in somebody else in the trial.  Maybe

11   after a few days, you might want to know this about a witness

12   or that about a lawyer.  Nowadays we're so used to it.  I

13   will search on Google.  You can write down on a piece of

14   paper, put in the drawer.  When the trial is over, go for it.

15   Research to your heart's content, but you cannot still do it

16   while you are a juror and before you reached a verdict.  It

17   would be wrong and against my order and would be improper.

18   By using the Internet or computers I mean anything.  I mean

19   Google.  I mean chat rooms, I mean Twitter messages,

20   research, Wikipedia, Facebook, linked In, Myspace, probably

21   invented another one of these while we're here this morning.

22   I don't know most of them.  I hope you know what I mean.

23          As far as this case is concerned, you are to concern

24   yourself with it from 9:30 in the morning until 4:00 in the

25   afternoon on the days we're in session.  Other than that, you

1    shouldn't be thinking about it, researching, talking to

2    anyone.

3           Diahann will cover everything else in the jury room.

4    She's going to ask you for a phone number so she can reach

5    you at.  When you did your questionnaire, you put a number

6    down.  That may not be a number at 6:30 in the morning.  If

7    we have a snow storm and you are coming from Gales Ferry and

8    have to leave the house soon.  Whatever number you give her,

9    she'll try to reach you if she can.  She takes it home every

10   night when we have a jury.  So give her the best number so

11   she can get you in the morning or night, whatever.  That

12   piece of paper that will have these phone numbers will never

13   be put in a computer.  Never going to be entered in a

14   database.  It will not be copied or shared with any other

15   person.  I will never see it.  The only one who sees it is my

16   deputy.  The only reason she has to contact you to avoid

17   coming to court because of the weather or illness.  When the

18   case is over she'll rip it up.  If you have an unlisted

19   number you have never given to anybody in your life, you

20   still don't want to, that's fine.  Understand the purpose of

21   which she's asking for the number.

22          I think that's all.  Otherwise I will see you folks

23   on Tuesday, the 18th of February.  As I say we hope to get

24   started right at 9:30.  Thank you very much.  Drive safely

25   going home after Diahann is done with you.

1              (In the absence of the jury panel.)

2          THE COURT:  Everyone, can be seated.  I need you

3     folks for another few minutes.  First of all, I should tell

4     you, I don't know if you noticed, one of the jurors who was

5     selected, approached the bench and started to speak with me.

6     I said I couldn't speak with him off the record.  It had to

7     be on the record.  He protested he didn't need this.  In the

8     course of coming up, I captured this is a really bad time for

9     me, basically he doesn't want to serve.  I said, sir, I gave

10    you an opportunity to tell me that.  Well, it was private.  I

11    said I don't know what I can tell you.  Can you  see

12    everybody leaving?  It is a little too late to raise it and

13    he withdrew.  I got the sense this is a hardship for him.  He

14    should have stood when I asked is there a hardship.  I

15    communicated it was too late to raise it.  He had the

16    opportunity.

17        One of the things we've all have been talking about

18    is the fact of how many phone calls will we get tomorrow or

19    Diahann will get tomorrow once they realize how many days of

20    work they will miss and their employer is not going to like

21    that or is not going to pay them for it.  I suspect we'll

22    hear from some.  We'll deal with it.  I'll take it up with

23    counsel.  We'll deal with what we have to deal with.  I can't

24    speculate what we'll do.  I wanted to let you know because it

25    was, in effect, an ex-parte.  I looked up and he was standing

1    at the corner there.  Nothing I could do about it.

2          The other issue is that it is my practice -- I think

3    I haven't had anybody ask for the jury list now for a long

4    time.  I believe other of my colleagues practice when

5    somebody asks for the jury list and you take them and use

6    them, that those then get returned to the court.  They are

7    not something you keep.  I don't know if anybody has an

8    objection to that.  I can make the copy I got an exhibit so

9    there's no question.  If you wrote on it, we can destroy it

10   in front of you.  The idea is -- this case may not be the

11   type of case -- generally jurors are uncomfortable when they

12   think lawyers and parties know where they are from, what they

13   do, they told how many children they have, et cetera.  I

14   doubt that's a real concern in this case.  It is a different

15   kind of case.  I would ask if there's a problem turning them

16   over to Diahann, rip them up and throw them away.

17          I had received a while ago a witness list from Mr.

18   Litvak's counsel, Attorney Smith.  I don't know.  Is the most

19   recent witness list dated December 24 and had 22 witnesses on

20   it?  Is that your current possible may call?

21          MR. SMITH:  There was an update.

22          THE COURT:  Either it got lost in the flurry of

23   papers.

24          MR. SMITH:  It is dated January 17.  It is the list

25   I worked off of.

1           THE COURT:  No rush.  If you can get it to me.

2           Do I have a current government's list right now?

3           MR. FRANCIS:  You do.  We're in the process of

4     updating to make it shorter.

5           THE COURT:  Make sure it gets to the law clerk and

6     opposing counsel.  The other thing, as you get closer to the

7     18th, probably by the Friday before, my rule is the day

8     before you let the other side know whom you plan to call.  I

9     don't know how many witnesses you have on your list.  Say it

10    is 30 or 20 or whatever it is, defense counsel doesn't have

11    to prepare.  We have a two-week break so he knows where to

12    put his efforts to begin with.  I think probably by the

13    Friday before, it is subject to change, somebody gets sick, a

14    flight gets canceled, but generally a good-faith judgment who

15    you are going to start with on the first day if you would

16    tell defense counsel that.  Later if the defendant puts on a

17    case, the same courtesy applies to the government that you

18    alert them the day before.  Certainly with respect to the

19    first day, maybe a couple of days before whom you think will

20    be your witnesses then roll out the notice.  All right?

21          MR. FRANCIS:  Yes.

22          THE COURT:  Same for defense?

23          MR. SMITH:  Yes.

24          THE COURT:  I had scheduled Thursday and Friday

25    because I thought we would be spending tomorrow doing jury

1    selection.  Obviously we're not.  I don't know whether the SEC

2    would be prepared.  I would like to take a shot at covering

3    some of this stuff on Wednesday.  Is that possible for folks?

4    Not that we would do Wednesday, Thursday, Friday.  I would

5    like to avoid Friday.  I would like to cut out Friday for you

6    folks, so I would like to -- I don't know that we'll need

7    Thursday, but I will reserve Thursday but start on Wednesday.

8              MR. GLOVER:  It is not for the government.  I will

9    communicate to the SEC right away.

10             THE COURT:  If they can't come on Wednesday, they

11   should come on Thursday.  I have a capias being served on

12   someone who hasn't responded.  He's being presented at 10:30.

13   If we can start 11 on Wednesday.  That may give the folks out

14   of town time to get here or 11:30, if you want a little bit

15   more time.

16             MR. GLOVER: That's fine.

17             MR. SMITH:  We haven't filed an opposition on the

18   SEC.  We need to do that.  So putting that down for Thursday

19   with all the things we need to do, I want to get that out of

20   the way as well.  It's a defense case issue.  We would have

21   to file the brief by tomorrow night.

22             THE COURT:  That's why I want to deal with it and

23   some of the other issues.  Let's do the SEC on Thursday.

24   Does that help?

25             MR. SMITH:  Helps.  We'll be here from 11:00 on

1    Wednesday.  We have to get it done tomorrow and in the

2    evenings.  It is not a herculean task.  Trial preparation is

3    not something I thought we would be doing this week.

4              THE COURT:  Do you want to stick with Thursday and

5    Friday?

6              MR. SMITH:  And hear the SEC?

7              THE COURT:  Do the SEC on one of those days.

8              MR. SMITH:  That's better.

9              MR. GLOVER:  We would be -- if it is an issue for

10   the Court, obviously we'll make ourselves available Friday

11   but we have things scheduled on Friday we would like to

12   keep.

13             THE COURT:  I thought I calendared Friday.

14             MR. GLOVER:  You did.  We'll be here.  If it's

15   simply a matter of the SEC being taken up Thursday, that's

16   fine.  They can get something on file on Wednesday.  We can

17   take up the expert issues on Wednesday.

18             THE COURT:  His point is if he's here Wednesday

19   arguing motions and exhibits, he's not able to do the brief

20   on Thursday's argument, so I was trying to give him Wednesday

21   free.  We'll be here on Thursday on the motion to preclude

22   exhibits and then do the SEC Friday morning.

23             MR. GLOVER: It is your pleasure.  48 hours turning

24   out a brief on the SEC matter is not asking all that much.

25   They had it since Friday.  They filed their expert pleadings

1    a week after we did.  We filed a reply on Tuesday from their

2    Friday filing to get it to the court as soon as possible.

3            THE COURT:  Before I decide, tell me where you are

4    at as far as exhibit objections.  I wanted to get through

5    those as well.  Doesn't sound very fruitful.

6            MR. GLOVER: We would like to know the basis for some

7    of what we think looks like hearsay.  We can define the

8    relevance in the documents.  There was no proffer

9    forthcoming.  That's part of the reason why we ended up

10   agreeing with them saying they would pare it down to 50 or

11   60.  I don't think it is a serious exhibit list.  When they

12   say they will pare it down to 50 or 60 exhibits out of 350.

13   We took them up on the offer to say I think it is going to be

14   a waste of the government's time and Court's time to go

15   through 350 that they are not going to offer.  Particularly,

16   if they are not going to proffer what the evidentiary value

17   is, what the purpose of the offer is so we can respond

18   intelligently whether we have an objection or not.

19           MR. HILLEBRECHT:  I was going to try and clarify

20   what Mr. Glover said.  We did have a discussion the basis for

21   admissibility not line by line or document or document basis.

22   The statement about paring down the exhibits was not in any

23   way meant to suggest it is not a real exhibit list.  It is a

24   recognition of the fact that as we see their case, we may not

25   need to put in some of the exhibits.  We don't know that yet.

1    In terms of the bases for admissibility, we had a general

2    high level discussion about that.  The key issue here for the

3    vast majority of the exhibits which they've objected, my

4    current best estimate we wouldn't be offering the vast

5    majority of those for the truth of the matter asserted.  It

6    would be a fairly small number of those that they would have

7    a true hearsay objection to.  The others go to the state of

8    mind.  I was hopeful that given some time we would be able to

9    reach agreement as to those documents on a document by

10   document basis.

11        THE COURT:  This is what I will do.  I would invite

12   you folks to be here on Wednesday at 11:30.  I intend to take

13   up the motion to preclude and I intend to take up the

14   government's exhibits and the defendant's objections thereto.

15   It will be my intention to move into the defendant's exhibit

16   list and we might, perhaps by way of example or sampling,

17   maybe set some parameters that will inform people, if not

18   complete the review of the list and the objections thereto.

19        I would expect to receive a filing, if any, that the

20   defense wishes to file about the SEC motion to quash I would

21   say by 11 a.m. on Thursday morning.  I will set down the SEC

22   argument for Friday at 9:30.  It may be we're still here on

23   Thursday doing the things I outlined on Wednesday.  I'm

24   optimistic we won't be.  We might be.  It could continue into

25   Thursday.  Everybody should understand they should be

1    available, but my intention would be that I would hope we

2    would be done with everything except the SEC for Friday at

3    9:30, giving the defendant's the opportunity  to file by

4    Thursday morning so that gives you three nights more,

5    Attorney Smith, or your associate.

6            MR. SMITH:  Rather than separate the hearing days,

7    let's just do Wednesday and Thursday.

8            THE COURT:  We'll plan to have the SEC come in

9    Thursday, so you file something by Wednesday.

10           MR. SMITH:  Wednesday night, your Honor.   We'll be

11   here during the day on Wednesday.  I will get something filed

12   probably after business hours on Wednesday.  We'll get the

13   brief filed.  You will have it.  We can argue on Thursday.

14   They will have it.

15           THE COURT:  Let's set -- yeah, that's fine.  The

16   problem is I have a bench bar function on Wednesday night

17   that I will go to.  My clerk I'm sure could dutifully be

18   here, but if you file at 9 or 10 at night, I doubt anybody is

19   going to read it until Thursday morning which I guess we're

20   in pretty early.  We can read it on Thursday morning.  It is

21   going to make it more difficult I guess to consider it.  The

22   sooner you can get it on Wednesday, the better.  That's fine.

23   We'll calendar the SEC argument at 11.  If we finish on

24   Wednesday, that will give me more time in the morning to

25   prepare.  They can drive from Boston without having to stay

1    overnight.  Is that all right with everyone?  If we haven't

2    finished up the matters on Wednesday, I don't expect the SEC

3    argument -- it is not going to take all day.  We can revert

4    to the other issues after the SEC argument.  Okay.  Is that

5    all right with everyone?  Then we'll stand in recess.

6              (Whereupon, the above hearing adjourned at 2:10

7    p.m.)

8

9

10

11   COURT REPORTER'S TRANSCRIPT CERTIFICATE

12   I hereby certify that the within and foregoing is a true and

13   correct transcript taken from the proceedings in the

14   above-entitled matter.

15

16   /s/  Terri Fidanza

17   Terri Fidanza, RPR

18   Official Court Reporter

19

20

21

22

23

24

25