```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3  _____
    United States of America  )  June 2, 2016
 4              Government  )  2:00 p.m.
    v.                      )
 5  Jesse C. Litvak         )  3:13cr19(JCH)
                Defendant.  )
 6  _____)

 7                             141 Church Street
                               New Haven, Connecticut
 8

 9                 HEARING

10

11  B E F O R E:
                  THE HONORABLE JANET C. HALL, U.S.D.J.
12

13

14  A P P E A R A N C E S:

15

16  For The Government  :   WILLIAM NARDINI
                            JONATHAN N. FRANCIS
17                          HEATHER CHERRY
                            U.S. Attorney's Office
18                          157 Church St., 23rd floor
                            New Haven, CT 06510
19

20  For the Defendant   :   ROSS GARBER
                            Shipman & Goodwin
21                          One Constitution Plaza
                            Hartford, CT 06103-1919
22
                            C. J. MAHONEY
23                          ADAM HARBER
                            Williams & Connolly LLP
24                          725 Twelfth Street, N.W.
                            Washington, DC 20005
25
```

1          THE COURT:  We're here this afternoon in the matter

2     of United States versus Jesse Litvak, case number 13cr19.  If

3     I can have appearances please.

4          MR. NARDINI: Appearing for the United States,

5     William Nardini.  With me at counsel table is Jonathan

6     Francis and Heather Cherry.

7          MR. MAHONEY:  For Mr. Litvak, C. J. Mahoney, Adam

8     Harber, Ross Garber and Mr. Litvak is in the courtroom today.

9          THE COURT:  Good afternoon to all of you.  I know

10    there's quite a few pending motions.  I believe I have

11    scheduled a hearing on what I will call motions in limine

12    that are pending.  I can't remember the date.  If I misstate

13    it, I'm not changing it with you.  I think it is around the

14    17th, a couple of weeks from now, and I understand that I

15    think as of yesterday or today, the motions are joined so I

16    expect to take up any remaining motions.  I'm aware that the

17    parties had stipulated as to certain of those motions and I'm

18    keeping a run track.  There seems to be more than enough to

19    occupy me over the next couple of weeks to get ready.

20          We're here this afternoon for what was originally

21    calendared on the government's motion concerning the

22    defendant's expert witnesses.  The motion was number 374.

23    However since that came in, there was then a motion by the

24    defense, I will call it the Brady motion which I think is

25    numbered 381 which I thought it would be advisable to try to

1    take up today if we can.

2          I don't know if you folks are aware of that by the

3    briefing schedule.  Maybe you had the hint that I would hope

4    to reach that today, so those are two things I would like to

5    accomplish.

6          If the parties have other issues or problems in

7    connection with the case in getting it to where we can

8    dispose of it eventually, obviously I will take that up when

9    we're done with the two motions that I mentioned.

10          On the expert disclosure, motion number 374, I will

11    articulate what I understand to be the current situation or

12    status.  I will then ask each side if I'm mistaken.

13    Obviously you can correct me please, but then with an

14    understanding by all of us as to where we are, I will address

15    what might be the few remaining issues.

16          As I understood the last pleading that I received

17    from the government which was your reply in response to what

18    was the defendant's opposition in which they disclosed a

19    revised expert disclosure, I understand it is the

20    government's position that the defendant has remedied what

21    the government viewed as the Rule 16 defect of the phrasing

22    of the opinion as, quote, may give, end quote, to change that

23    language the defendant wrote that these people are prepared

24    to give and the government, as I understood it, accepted that

25    as an appropriate response to their complaint or their

1    motion, that portion of the motion.

2          And that, second, I think the government indicated

3    in their reply that the defendant's opposition wherein it

4    addressed and then revised the disclosure to be more specific

5    about the bases for the opinions that were articulated, that

6    the government is satisfied in that respect.

7          All of this is without prejudice to the government

8    pressing what I think are three motions in limine concerning

9    the expert testimony obviously.  Nothing I have said in my

10   view has taken away from the government to press the issues

11   they've raised there, but I'm speaking generally about the

12   disclosure.

13         However, the government continues to press for a

14   ruling by the Court that the defendant make no further

15   expansion or alteration upon the disclosed opinions and that

16   the defendants be precluded from offering any expert

17   testimony that's not contained within the revised May 20

18   disclosure.

19         First, have I accurately stated what the defendant

20   feels is the status of this motion, what has been resolved

21   and what remains to be addressed?

22         MR. MAHONEY:  You have, your Honor, yes.

23         THE COURT:  From the government?

24         MR. FRANCIS: You have with one exception.  I believe

25   you reference three pending motions in limine. One of them

1    the parties reached a stipulation yesterday regarding fair

2    market value.  We submitted a notice on.

3          THE COURT:  I haven't seen that.  Whatever hasn't

4    been resolved, I don't mean anything I'm saying to say that

5    you can't press those issues.  I'm speaking generally and

6    more to the point of what was the general expert motion.

7          MR. FRANCIS: With that, yes, we agree.

8          THE COURT:  Fine.  I guess my reaction to what the

9    government seeks goes sort of like this.

10         First, I would ask defense counsel, Attorney

11   Mahoney, would you agree that under the scheduling order of

12   the court and rules that you can't disclose any further

13   expert opinions?  In other words, what's in the amended

14   disclosure is the sum of the expert opinions you can offer.

15   You may not offer them all, but this is what you can offer.

16   Would that be fair to say?

17         MR. MAHONEY:  Well, your Honor, I think what we

18   would say is that for good cause and assuming that we were

19   not unduly prejudicing the government, I can imagine

20   situations in which we would ask to amend.

21         For example, we have third party discovery requests,

22   we still have some discovery and I think the government will

23   talk about this a little bit today that we have yet to

24   receive from the government in addition to the seven million

25   pages of documents that are the subject of the Brady motion.

1  I could imagine situations in which something can be found in

2  those compilations of documents that would cause us to want

3  to supplement the expert reports.  I could also envision a

4  situation in which the government does something in its case

5  in chief that we could not have anticipated and under those

6  situations, we might ask to supplement.

7       I can assure the Court we're not holding anything

8  back.  We understand we have a bar to clear if we want to

9  supplement it.  I'm not operating on the assumption that I'm

10  going to have very much room to do so.

11       THE COURT:  Let me revise what I think is the case

12  and see if you agree with me.  Absent leave of court, you are

13  limited to the 5-20 amended disclosure in terms of what you

14  can offer as expert opinions.

15       MR. MAHONEY:  We would agree with that, your

16  Honor.

17       THE COURT:  I would agree.  I'm not going to

18  disagree with you there might not be some circumstance.  I

19  think not likely, maybe the third party stuff, but we have

20  been through this once before.  I hope there are no

21  surprises.  I would be really surprised it would be good

22  cause.  I agree with you.  I'm not meaning to take that away

23  from you.  All I'm saying absent leave to amend, you are --

24  you are with your expert disclosure what you said in your May

25  20 disclosure.  Is that fair to say?

1          MR. MAHONEY:  Yes, your Honor.

2          THE COURT:  And then the second half of what the

3    government wanted me to do, they wanted me first to say there

4    could be no further expansion or alteration of the opinions

5    which I think you have just conceded aptly there won't be.

6          They also want me to preclude any testimony not in

7    the revised May 20 disclosure, again with the caveat that

8    without leave of court, if we're standing merely on the 5-20

9    disclosure and you do not get leave of court to add any

10   further expert opinions, would you agree that you aren't

11   going to try to offer expert testimony outside the scope of

12   the 5-20 disclosure?

13         MR. MAHONEY:  We would agree we would not offer

14   testimony outside the scope of the disclosure.  The only

15   caveat I will add to that we're required under the rule to

16   give a summary of the testimony.  I think we have given what

17   the government says is an adequate summary, whether -- are

18   the particular words going to, you know, not track the

19   disclosure --

20         THE COURT:  Well, I think that --

21         MR. MAHONEY:  I think we would hope we could agree

22   --

23         THE COURT:  I understand.  That to me is the

24   challenge of Rule 16 versus the Civil Rule 26.

25         MR. MAHONEY:  I  agree.

1          THE COURT:  I don't particularly like the ways the

2     criminal rule is, but I think it is what it is.  So I think

3     that's -- so with respect, that's the first part of

4     the defendant's.  I understand the government has a second

5     request about redundant testimony.  We'll get to that in a

6     minute.

7          As to the first point of the relief you sought --

8     continue to seek in your reply, the preclusion of expert

9     testimony that isn't in the May 20 disclosure and no

10    expansion or alteration of those of the disclosure, I don't

11    see a need for an order.  I will guard the gate I guess.  I

12    don't think it is in anybody's interest to try to have

13    experts testify about things that the other side has no

14    notice of or understanding of the scope of the testimony or

15    whatever else Rule 16 permits to you. I don't know why I have

16    to enter an order.

17         MR. FRANCIS: Well, based on the representations we

18    just heard from defense counsel, the government is content to

19    have your Honor guard the gate.

20         THE COURT:  Okay.  The second aspect you asked for

21    is to preclude redundant testimony.

22         First, I will state again my understanding based on

23    the pleadings, is the government is not objecting, as I think

24    the defense thought they might be, to the fact that more than

25    one expert may state the same expert opinion.  But the

1       government doesn't object to that if it is arrived at based

2       on different experience or knowledge or training, but I think

3       I would like the defense to tell me why and to be honest, I

4       haven't really completely studied the expert disclosures. I

5       think there's some by the name of Burnaman, Dolan who seem to

6       have similar backgrounds whose summaries appear to be quite

7       similar.  I'm assuming that you are not going to put one of

8       them on and follow with the second one that's going to sound

9       an awful lot alike.  Am I correct in that assumption?

10              MR. MAHONEY:  You are correct, your Honor.  I think

11      that the line that your Honor just articulated is a quite

12      sensical one to draw.  We would potentially present expert

13      testimony that would cover the same opinions, but we would

14      not intend to present any duplicative testimony that was

15      arrived at using the same methods and experiences.  I think

16      the two experts your referenced who would be Mr. Burnaman and

17      Mr. Dolan is the actually the second one.  They have

18      experiences which are not identical but certainly overlap to

19      some extent.  We would not be offering the same opinions from

20      both of them based on their overlapping experiences.

21              THE COURT:  With that understanding, but I will add

22      a little bit of my gloss to it.  The government and the

23      defendant in response to any expert by the government, always

24      has the right to their client the obligation to object if it

25      is redundant testimony.  And so I think,  you know, I -- but

1   it is difficult -- I understand your desire, Attorney

2   Francis.  In the reply you say if we do this now, we won't

3   delay the progress of the trial.  We won't be constantly

4   interrupted with objections, my having to get the disclosure

5   out, tell me at what page, Attorney Mahoney, I will find this

6   disclosure or haven't you asked this exact same question?

7   No, Judge, it was based on a little bit different.  Much akin

8   to asked and answered objections, you know.

9           I appreciate that you want to get that out of the

10  way ahead of time, but I think it is very difficult to do

11  that.  It is like you have to be there.  You have to get the

12  first question asked and answered before you can understand

13  is this second question really redundant, unnecessary,

14  cumulative, whatever the objection is.

15          I think given your articulation in the reply.  I

16  think it is page 4.  You talked about what I just said to

17  Attorney Mahoney.  You don't object to two experts who might

18  come to what's phrased as what's your conclusion.  My

19  conclusion is A and the next guy says my conclusion is A.

20  You don't object if they each come to A based on different

21  experience, bases, et cetera.  I think that's a reasonable

22  position.  I still might think it is redundant.  I don't

23  think it starts out of the box as redundant.  I would have to

24  hear how many questions are being asked, are we wasting too

25  much time on things we've already heard about.

1          Beyond that, I don't see how I can rule.  To say I

2     preclude redundant testimony.  We'll spend hours arguing over

3     whether it is redundant.  That's the ultimate question,

4     right?  You will think it is redundant.  He doesn't think so.

5     That's what objections are for.

6          MR. FRANCIS: That might be true, your Honor.  So

7     perhaps I'm unduly influenced by our experience in the first

8     trial in this matter.  It is different counsel.  It will not

9     go exactly the same, but there were occasions where we would

10    have, before the jury would come out, we would attempt to

11    resolve issues.  Sometimes there wasn't enough time to do

12    that.  On other occasions, we would stay after the jury left

13    and attempt to resolve issues.  This is one of these things

14    that I envision us addressing --

15         THE COURT:  I think it is not easy.  Expert

16    testimony in the sense of what are they going to testify to,

17    what questions are appropriate, has it been properly

18    disclosed.  They are not easy evidentiary objections to rule

19    on.  Objection leading, asked and answered, what color was

20    the stoplight?  Those are easy.  Still make a mistake.  They

21    are easy.

22         Expert disclosure questions not within the

23    disclosure, redundant requires me to not only think about

24    what did I just hear asked but then what did I hear earlier.

25    Let's go back to the transcript.  What's in the disclosure.

1    Things like that.  So I agree with you they are not easy.

2    Maybe we need to talk about the timing of the case.  Maybe we

3    need to start the jury at 10:00 so we have more time in the

4    morning.  I think I was in every day by 8:30.  Apparently

5    wasn't enough time.

6         MR. FRANCIS:  Don't take anything I said as

7    criticism of your Honor.

8         THE COURT:  I didn't take it that way.  You are

9    reminding me you are right we spend a lot of time, everybody

10   knows that I don't like to waste the jury's time, there's no

11   point of them sitting in the jury room.  There's no point of

12   them coming in.  I might as well tell them to come in at noon

13   if we'll not get to them until noon.

14        The way I address that anxiety on my part of wasting

15   the jury's time is that I try to come in early in the

16   morning, have counsel come in, issues come up overnight or

17   counsel can see I said something about experts, you have an

18   expert coming, you know there's going to be a problem, we

19   raise them.  If there's not enough time, maybe we have to

20   figure out how to make enough time to deal with those issues.

21        MR. FRANCIS: That's probably a good suggestion.  All

22   this presupposes the defense is putting on this case which of

23   course they have no obligation to do.  Given they noticed two

24   experts that are major and minor keys of the same song,

25   Burnaman being the major and Dolan less so.  It might make

1    sense if to the extent your Honor doesn't want to decide this

2    in the context of a motion in limine, to have the defense

3    either sort of let us know what is Burnaman is going to

4    testify to and what is Dolan going to testify to in advance

5    of that so we can guard against this redundancy thing and

6    avoid wasting the time of the jury in the middle of the

7    testimony or we take it when the defense decides whether or

8    not to put on a case in some sensible way outside the

9    presence of the jury.

10          THE COURT:  I think we would do that.  I will say

11   specifically on this one with those two witnesses, if the

12   defendant decides to put on a case and decides that part of

13   its defense is going to be expert testimony and going to be

14   Mr. Burnaman, and maybe it will be Mr. DeLarry.  I want to

15   hear from the defense in advance and with time for the

16   government to respond what else is Mr. DeLarry going to say

17   that Mr. Burnaman didn't or couldn't say and that I guess

18   involves two things.

19          One, is it requires you to tell the government this

20   is an issue I can see it on the road ahead of us.  The judge

21   said it is a problem for her. We are going to call both of

22   them I suppose and again you don't know that now.  You don't

23   know when we start the government's case.  You are going to

24   know it at some point.  You are going to know it more than

25   probably the day before the witness gets on the stand.  You

1    will not put an expert witness on the stand that you haven't

2    been grilling and preparing back at the hotel or the office,

3    right, so you are going to know it in advance.  You are going

4    to raise it with the government.  I'm expecting the

5    government is going to do this with issues they see.

6    Presumably you can say to them, look, we have to call

7    deLarry.  He's going to say X and Burnaman doesn't have that

8    experience.  He can't say that.  I assume the government is

9    going to say okay, if that's why you are calling DeLarry, you

10   are going confine it to that, maybe a little background to

11   pretty him up, that's really the thrust of why he's being

12   called which you are going to spend time on.

13           I will think the government will say that's not a

14   problem but if they think it is a problem, then it is up to

15   them to come and tell me we had this conversation as you told

16   us.  This is what we think should happen.  You tell me what

17   you think should happen.

18           Again knowing that I will take things up generally

19   in the morning or the afternoon, this has to happen a couple

20   of days before the problem arises, but I would think in a

21   case of this length and preparedness, you will know it.  I

22   would be shocked if you don't.  All right.

23           MR. MAHONEY:  We understand and agree as to Dolan

24   and Berman.

25           THE COURT:  At this point, I'm going to treat 374 as

1    terminated as moot in part in light of the defendant's

2    representations and denied without prejudice to renew either

3    outside the presence of the jury or in the context of

4    specific questions that are being asked.

5         Before I finish with it, Attorney Mahoney, I don't

6    want to get into a big to-do about this, but in your brief

7    one of your arguments was well, we need four experts, you

8    know, that's fine. That's your judgment for your client, your

9    strategy, that's fine. No problem with that.  That's your job

10   but -- there was sort of what I call they are going to have

11   six witnesses so we need to have more, and I don't think that

12   that's not the way I view this.

13        Specifically experts I don't view it that way.  I

14   mean, yeah, so I don't want to spend too much time on that.

15   I didn't want to let it pass. Let you get it out there

16   without my saying something.

17        MR. MAHONEY:  Message received, your Honor.

18        THE COURT:  Thank you.  The government is guilty of

19   it, too.  You will hear me at some point during this case say

20   something like that to them.

21        The next issue is the 381, Brady filed by the

22   defendant.  Before we get to it, there's a motion to seal.  I

23   wonder if counsel can tell me whether it's Attorney Garber or

24   Attorney Mahoney, your motion to seal asked to seal one

25   through 11 and 14 through 16, 7 and 14 through 16 are letters

1    of correspondence with the government.  I don't know why we

2    need to seal that.  I understand the other are documents

3    produced.  They are not coming in as exhibits at trial.  They

4    are protected I guess was the reasoning, but I couldn't

5    understand letters between the government and the defendants.

6    Would we normally seal those?

7              MR. MAHONEY:  I believe we did that out of an

8    abundance of caution.  Some of the letters describe the

9    production which is covered by the protective order.

10             THE COURT:  Does the government agree that I should

11   seal what's requested in the Motion to Seal one through 11

12   and 14 through 16?

13             MR. FRANCIS: I would like an opportunity to take a

14   look at the specifics of those letters.  Might be they are so

15   general the sealing is not necessary.  If we can get back to

16   you.

17             THE COURT:  That's fine.  If you confer with defense

18   counsel before you let me know and you can let me know if he

19   agrees or doesn't agreement.  If he doesn't, I assume I will

20   get something.  Hopefully you will agree.

21             Again I will try to articulate what I think the

22   Bradly/Giglio obligation is.  I will ask counsel to educate

23   me about my ignorance in this respect.

24             Generally, the Bradly/Giglio obligation is to

25   disclose, not to identify, and what it is that's the subject

1    of that verb is things that are material to either guilt or

2    punishment or the credibility of a government witness.  Have

3    I got it right so far?

4         Hearing nothing I will proceed.  There are, however,

5    situations where courts have recognized with enormous

6    quantities of production of documents that the Bradly/Giglio

7    obligation may change depending on the circumstances.  That's

8    Skilling obviously, but there's a lot of cases, not a lot,

9    but there's some cases around that. Am I right so far?  Okay.

10        MR. MAHONEY:  Yes, your Honor.

11        THE COURT:  Lastly, as an introductory statement

12   before I turn to counsel, the request of the defendant is

13   articulated in this Motion 381, is that the defendant

14   requests an order that the government identify Bradly/Giglio

15   material known to the government.  Is that correct?

16        MR. MAHONEY:  Yes, your Honor.

17        THE COURT:  All right.  And, all right, so Attorney

18   Mahoney, on the circumstances we have here, give me a second.

19   Let me find this.  You asked to have me order the government

20   to tell you what Bradly/Giglio is in this pile of stuff

21   that's known to the government, correct?

22        MR. MAHONEY:  Correct, your Honor.

23        THE COURT:  I read the government's obligation to be

24   we don't think we have to answer that question.  Because

25   we're nice guys, we'll tell you we don't know of any.  Do you

1    read it that way?

2         MR. MAHONEY:  I read it that way.  I would like to

3    comment on the way the government interprets the

4    Bradly/Giglio.

5         THE COURT:  I knew you were going to want to do

6    that.  That's like page 3 and 4 of my notes.  So I just want

7    to deal with the obligation I guess, then we'll talk about

8    what the "it" is of that obligation.  So they have said they

9    don't know of any.  What more can I do?  I mean other than

10   and this may be your second step that you want to get to.  I

11   will hold you from it for a minute.  What can I do at this

12   point assuming you went through the seven million or how many

13   pages there are and you don't find what you call Brady

14   hypothetically and the government says it doesn't know of

15   anything in this material, is there any case law that would

16   say that I can make the government do anything more?

17        MR. MAHONEY:  We're not requesting that the

18   government do anything but identify the known Brady and

19   assuming that we agree on what Brady is which I will not get

20   ahead of your Honor.  If we agreed on that, I don't think we

21   do, this motion would be moot.  We have said all --

22        THE COURT:  I'm trying to break it into two parts.

23   That's the answer I'm looking for.  I'm only looking at the

24   first part.  I think it is moot.  There's no evidence in

25   front of me that they are burying Brady.  They didn't find

1  6,999,000 pages of paper to stick that one document in the

2  middle of and say you find it.  We don't have any evidence at

3  this point of that?

4       MR. MAHONEY:  We don't have any evidence of that,

5  right.

6       THE COURT:  The government says you may want to

7  contest this.  If you do, please do so.  They say they gave

8  you all.  That it is other investigations.  You know that.

9  They put it in a format requested.  I understand you folks

10  have struggled mightily to get it up and running.  They

11  tried.  I don't think there's evidence that they sabotaged

12  the format of the disclosure.  I believe they also say --

13  then there's letters.  Some of those exhibits we talked about

14  back and forth.  How do you want it.  Maybe you should look

15  at those first.  We think these are where you should start.

16  They will tell you where else to go.  So I think that if I

17  look at the Skilling opinion, it looks like they have done

18  many.  It is not identical, but many of the same kinds of

19  things that the government did there that the circuit thought

20  made it okay even though it's a huge number.  Would you

21  agree?

22       MR. MAHONEY:  Two points, your Honor.  First of all,

23  just to the point of whether they produced everything.  The

24  government will have an opportunity to explain this if they

25  want to.  We learned before we walked into the courtroom,

1    there's another production of 6 million documents that the

2    government has yet to produce to us.  I don't know the

3    circumstances of why those weren't produced yet.  I'm not

4    suggesting anything about that. That's something that your

5    Honor should know.

6         THE COURT:  I will take that up with the

7    government.

8         MR. MAHONEY:  With regard to Skilling in terms of

9    what the government did in Skilling to make the documents

10   accessible to the defense, there's nothing that we're asking

11   them -- I agree that's not relevant.  That's a way in which

12   our case is not distinguishable from Skilling.  I think the

13   major distinction between Skilling and this case is the

14   defense's knowledge of these documents and its ability to

15   meaningfully locate possible relevant material in a

16   collection of documents that our client was not involved in

17   creating, that they deal with transactions he wasn't involved

18   in.  Nonetheless are relevant to the case.  They deal with

19   the same counterparties and can reveal things like chats

20   between Mr. Wollman and Mr. Steffer, which is one of the

21   documents we highlighted in our paper where Mr. Wollman says

22   he discounted the value of information he gets from the

23   dealers.  I think that's very different from Skilling where

24   the documents at issue there were about Enron transactions.

25   Skilling was the CEO of Enron.

1           Relative to the government, I don't think there was

2    an information asymmetry that made it much easier for the

3    government to examine those documents.  I think that's a

4    different thing here.  They are the ones that investigated

5    the case.  They are the ones that interviewed the witnesses.

6    They collected the documents and again they are from the same

7    counterparties in our case.

8           THE COURT:  That's why I started with the first

9    principle depends on the -- seems to me in these cases.  I

10   can't remember if it is Judge Berger in the Blankenship case

11   goes to one thing and the judge in New York did another

12   thing.  It is very fact specific I think.  Yes, it is the

13   government's investigation, but my sense was a significant

14   portion of the documents aren't the government's documents.

15   The ones that are the governments are like their interview

16   memos or their report memos, the ones I think they called hot

17   or some of them and said start here.  They knew about those,

18   right?  That's the situation.  Those are theirs.  They are

19   calling those out to you.  Those are not huge in number.  So

20   and I think I don't want to say -- they are from another

21   brokerage company or another Wall Street firm or hedge fund

22   or whatever or buyer of bond.  It is not his company.  He's

23   not familiar with the chats or how things are set up.

24   Neither are the government lawyers any better familiar with

25   it.

1          Lastly, I guess I would respond to your argument and

2   say if it is searchable, I think that's not the answer

3   always.  I think there could be a set of facts even though it

4   is searchable by the defendant as by the government.  If they

5   were uniquely knowledgeable to the government and, et cetera,

6   I still might say the government should do more.  I think the

7   fact they are searchable here is also a big thing and that

8   most of the documents the government I think hasn't really

9   puzzled over so intimately familiar with, other than their

10  own memos, the things I mentioned.

11          I think on this issue, just this issue of the

12  Skilling issue, I think the facts and circumstances at least

13  presented to me so far suggest that begs the question of

14  what's Brady.  That they have satisfied their Brady

15  obligation assuming we can agree on the second step of this

16  argument about what Brady is.

17          MR. MAHONEY:  Again I will hold off on getting to

18  the second step.  I think that's where the rubber meets the

19  road for us, but in terms of what the government has done to

20  review these documents, first of all, they collected them.

21  They knew what they were collecting presumably.  I believe

22  they represented that they haven't reviewed most of them.

23  That doesn't eliminate the possibility they reviewed some of

24  them.  As far as we know and I don't know this, they haven't

25  denied that they've isolated the kind of things we think

1    would be Brady material here.  Examples of the counterparties

2    lying to other market participants, examples of the

3    counterparties expressing skepticism.  If they have done

4    that, if they identified that themselves, they produced that

5    to us in this collection of seven million pages of documents.

6    I do think that's problematic.  I think that's something that

7    would separate this case from Skilling.

8         THE COURT:  Go back to my first principle.

9    Bradly/Giglio is disclosure, not identification.  Yes.  We

10   have a huge volume here.  It is searchable.  The government

11   has I think identified, quote, hot documents.  I don't think

12   the government has to say we think Document 447 is Brady.  I

13   don't think they have to do that.  They just have to produce

14   Document Number 447.  Do you agree?

15        MR. MAHONEY:  With respect to, your Honor, I don't.

16   I think in a voluminous production --

17        THE COURT:  Let's start with baby steps.  I'm not an

18   expert on Brady.  Let's say there's 1,000 documents produced

19   to you and Number 447 has Brady in it by anybody's

20   definition.  I don't think the government has to say to the

21   defendant here's your 1,000 pages.  By the way, 447 is Brady

22   material.  I don't think that's their obligation.

23        MR. MAHONEY:  I would agree under that

24   hypothetical.

25        THE COURT:  That's where we get to the specific

```
 1    circumstances of volume and the idea of burying a defendant,

 2    making it I believe impossible to prepare for trial, thus the

 3    due process violation.  I think we went through a number of

 4    circumstances identifying Skilling and a number of cases.  I

 5    don't see any evidence of bad faith by the government.  They

 6    have answered your question.  They haven't identified Brady.

 7    We can discuss whether they should have or not.  I presume

 8    they are answering in good faith and as officers of the

 9    court, signed a pleading to say that.  They haven't sworn it

10    to me, there's consequences if they are not being truthful,

11    based on their knowledge which is all you asked of them.  I

12    don't know even when there's seven million, I don't know what

13    more I can make them do, right?

14            MR. MAHONEY:  Again, your Honor.  Assuming we agree

15    on what the scope of the obligation is.

16            THE COURT:  Let me get to the government on the

17    first step.  Then I will be able to release you from the

18    binding that doesn't allow you to go to that.

19            I think you sense that at least on the preliminary

20    issue here, I don't see that I'm going to do anything or that

21    I think you need to do anything more.  I.e., that I need to

22    order you to do something.  I guess while we're on the first

23    step, I want to talk about production.  How in heaven's name

24    can there be seven million and apparently six more million

25    coming in disclosure in a case we already tried?
```

1          MR. NARDINI: Well, because this is a function of the

2    government.  Let me say this right now.  We overlooked this

3    one particular thing for the April deadline.  We're going to

4    have ongoing production.  It is because of a function of the

5    government having agreed with the defense that we're going to

6    turn over really massive amounts of evidence from other

7    parallel investigations that are ongoing.  That's why it's

8    under seal.

9          THE COURT:  What's the earliest date in a document

10   of the seven million that you turned over?  Any documents

11   that are going back to 2013, 2014?  The trial.

12         MR. NARDINI:  These are from other investigations.

13         THE COURT:  Understood.

14         MR. FRANCIS: Just a point of clarification, Judge,

15   when were they turned over or when were they created?

16         THE COURT:  I know when they were turned over.  I

17   read too many letters on the subject of turning them over.

18   You turned over in April of this year under my order,

19   documents, a large number of documents, which I'm asking how

20   come they weren't turned over sooner.

21         MR. NARDINI: I can explain that.  Because I think

22   these were simply not in play in the first trial until the

23   Second Circuit reversed and changed everyone's view and I

24   think the Court's ruling on materiality.

25         These are documents we're turning over from other

1    investigations that have nothing to do with Mr. Litvak.

2    These are investigations we have into other people, other

3    broker dealers, other things in our view that had nothing to

4    do with Mr. Litvak.  And as I recall, I wasn't at the first

5    trial.  I'm trying to play catch up.  That your Honor

6    excluded evidence of what was going on by other broker

7    dealers at other places and that was viewed as inadmissible

8    and immaterial.

9         THE COURT:  I didn't exclude evidence of what the

10   victim witness testified to that could be impeached by

11   something he said at another time.

12        MR. NARDINI:  I don't think we failed to turn over

13   any statements of our own witnesses.

14        THE COURT:  I have in mind Mr. Wollman's chat.

15   That's an exhibit to the defendant's motion.  We're moving

16   into the second phase.  Unfortunately, you will not get the

17   first crack at it.

18        MR. NARDINI:  That was an exhibit from the first

19   trial.

20        THE COURT:  These seven million documents were

21   turned over in '13, '12, '14?

22        MR. NARDINI: No.  I think that the defense exhibits,

23   largely the memorandum of interview are part of the new

24   production, and those interviews postdate the first trial.

25   So that's the new production that we turned over in April.

1  There is that chat that I believe was an exhibit in the first

2  trial that we turned over in discovery in the first trial and

3  that that defense was appending as an exhibit to this not say

4  look at what they found in new discovery but to illustrate

5  their point about what sort of things are material.  But

6  that's --

7          THE COURT:  I misread their memo then.

8          MR. NARDINI:  Correct me if I'm wrong, I think

9  there's an exhibit sticker from the first trial that

10 says that's a defense exhibit.

11         THE COURT:  No, I don't think so.  Hold on.

12         First page says Defendant's Exhibit 1215(a).

13         MR. NARDINI:  When I read the memo, they were trying

14 to illustrate the type of impeachment that you would find

15 relevant.  There's no claim that we have withheld any witness

16 statements or didn't turn it over.

17         THE COURT:  You would agree that this document what

18 is as you have pointed out to me 1215A from the last trial is

19 Bradly/Giglio?

20         MR. NARDINI:  I would have to read it real

21 carefully.  I apologize I wasn't at the first trial.  We

22 would turn it over no doubt as Jencks.  Whether I would agree

23 it is material.  When we talk about Giglio, we're talking

24 about one subset of discoverable material.

25         THE COURT:  Impeachment.

1          MR. NARDINI: Not only impeachment but impeachment

2    that is material subject to the caveat it has to create a

3    reasonable probability of a different outcome.  I don't know

4    whether I would concede that particular thing was Giglio.

5    That's a different thing from saying that we would turn it

6    over.  Of course, we did turn it over.

7          The COURT:  I need to what your view of

8    Bradly/Giglio is.  You are telling me you don't have any.

9    You have to fulfill that obligation.  I think we need to

10   pause and find out what you think Bradly/Giglio is.  The

11   opposition of the government at one point says something like

12   we can't guess.  It is kind of like, look, we don't know

13   anything is what you say, but come on, we can't guess at

14   every defense the defendant might come forward with and

15   figure out what might be material, et cetera, et cetera.

16          The fact of the matter is I think it's no secret to

17   anybody, even you who wasn't at the first trial, materiality

18   is the key of Mr. Litvak's defense.  It was in the first

19   trial, and I assume it is going to be in the second trial.

20          He's in effect admitted his counsel have and they

21   haven't contested it at the trial that I recall it, that

22   certain things were said.  It is in a chat, he can't contest

23   it.  His defense is I think in principal part materiality.

24          If I have a witness, you have a victim on the stand

25   who is testifying as you need him to.  We could go pull out

1    the government's opposition to the motion to set aside the

2    verdict and for a new trial, I guarantee there's pages in

3    there were you're quoting, you, Attorney Francis quoting from

4    the testimony of the victim, whose name I can't remember, I

5    will refamiliarize myself, with points in their testimony

6    where they said it made a difference.  It would have mattered

7    to me if I knew.  I would have done something different.  All

8    the things taken together allowed the government in closing

9    argument that I can go back and read.  I know it was argued

10   in closing argument.  These people told you it's material.

11   Listen to Judge Hall's closing instructions what materiality

12   is.  You heard Mr. So And So say this and the defendant was

13   there screaming just the opposite.  They didn't say that.  It

14   isn't enough.  They took it back on cross.

15           That's what this case is about, right?  So how is it

16   that you would hesitate to say, I understand you already

17   produced it, it is kind of tough.  I will hear from Attorney

18   Mahoney who is not getting the first shot at this.  If you

19   have a document in which one of those witnesses whom you know

20   previously said this information was important to me and in a

21   chat saying what I think reasonably could be construed as

22   what's it worth, in effect, it is worth nothing.  I can hear

23   the closing argument on that quote, that isn't Bradly/Giglio?

24           MR. NARDINI: I would say this:  It is something

25   we're going to turn over because the government doesn't try

1    to cut close.  What we try to do when we're doing our

2    discovery obligations. We have a number of overlapping ones.

3    I think it is the important to start with that, your Honor.

4    Between Brady, Giglio, Jencks and Rule 16.

5         The main thing, as your Honor started from, we have

6    a disclosure obligation.  We have an obligation to turn over

7    to the defense anything that falls in those categories so

8    that they can do everything they need to do to defend the

9    defendant at trial and in preparation for trial.  It may not

10   lead to admissible evidence.  I think the important thing is

11   that at no point is the government ever called upon to not

12   only turn that over, but then start drawing lines between and

13   oh, by the way, this falls into the Giglio bucket, by the

14   way, this falls into the Rule 16 bucket.

15        We think it is material to the preparation of the

16   defense, but we don't think it could be outcome

17   determinative.  You don't want the government to be making

18   those judgment calls.  The defense that can make the judgment

19   calls on how important is it as long as we're casting our net

20   wide enough to ensure the defense gets everything they have a

21   right to.

22        It becomes a bit of a trap for the government to try

23   to in advance announce what we think is going to be outcome

24   determinative.  I think that's the problem where you run into

25   cases where you do have a Brady violation showing up at the

1    Court of Appeals because the government was playing it too

2    close.  The government was trying to figure out what's

3    outcome determinative and what's not.  Inevitably we're going

4    to have some disagreements about what we think could create a

5    reasonable probability of a different outcome.  To avoid

6    getting into that debate, the government simply says we're

7    going to turn it all over.  That's what we're fighting about.

8    Should we give it to you or not.  Then we get into a question

9    of do we in good faith believe that it creates a reasonable

10   probability of different outcome and again we have made our

11   representation we don't think there's anything that meets

12   that standard.

13         Then the discussion becomes instead well, should the

14   government identify, not what it believes is Giglio or Brady

15   but what it believes the defense might believe is Brady or

16   Giglio which becomes an impossible exercise.  That's why.

17         THE COURT:  That isn't your obligation and that

18   isn't what they are asking.  The problem here is you are

19   focusing on the wrong end of the question.  I applaud our

20   U.S. Attorney's Office who takes generally in my opinion a

21   near open file approach, a broad approach to what they need

22   to disclose for all the reasons you just articulated. That's

23   fine.

24         What I'm struggling with I'm sitting here looking at

25   the document that's in the seven-million-page production, the

1    government is telling me they don't think it is

2    Bradly/Giglio.  I don't understand that.

3              MR. NARDINI:  No.  That document I think, your

4    Honor, is something we disclosed in the first trial.

5              THE COURT:  I understand.  It is not among the seven

6    million that's recently disclosed?

7              MR. NARDINI:  No.

8              THE COURT:  Would you agree with me if that were in

9    the seven million pages just disclosed that I should be

10   concerned about whether there are Brady violations in the

11   case?

12             MR. NARDINI: I would be cranky if I were the judge.

13   If I can focus the Court's attention on the interviews, we

14   may not have labeled anything as Giglio or Brady because we

15   don't think it is, but we highlighted for the defense the

16   things we think would be of primary interest to them.  I

17   think that's as close as the government can ever reasonably

18   be expected to do.

19             While I'm up, I would like to just correct the

20   record.  We did inform the defense shortly before the hearing

21   today that through an oversight that's our fault and we're

22   correcting the record, we did not wind up turning everything

23   over in the April 29 production.

24             Part of this again is a function of there are a

25   number of these other parallel investigations with enormous

1    volumes of documents that have been acquired by the

2    government, and there's one particular production that we got

3    from one particular company that is effectively raw data as

4    we informed the defense.  That it is an enormous amount of

5    raw data in what's called a load file that enables you to put

6    it up in a database.  It was sort of the data set from which

7    this particular company that gave us the raw data had

8    extracted anything they believe could be relevant to the

9    investigation, gave it to us.  Those extractions were part of

10   what we turned over to the defense in April, anything that

11   was deemed relevant by the party producing the material.

12   They also gave us the underlying data set.  At the time of

13   our production in April, it turns out that was still being

14   processed electronically within the Department of Justice.

15          Through our oversight, we did not make a copy of the

16   underlying data set and get it to the defense.  That's

17   something that's in process now.  It should have been done,

18   and we didn't do it, and we're now processing it.  And we're

19   going to get it.

20          Also because there are ongoing investigations, we

21   told the defense because we offered these materials to them,

22   as we develop new evidence, we're going to pass it along to

23   the defense.

24          THE COURT:  When did that material come into the

25   possession of the government?

1          MR. NARDINI: The possession of the government we

2     obtained a hard drive in March of this year, and it was sent

3     for processing to an outside vendor.  And as of the time of

4     late April, it was in processing, and I don't know if this is

5     getting into too much detail.  It wasn't in the database we

6     had here at the U.S. Attorney's Office.  When we had our

7     staff pull together all that data, this particular production

8     wasn't in that data set so when they pulled everything off of

9     there, they did not copy the other information on the

10    ancillary hard drives.  Copies of which had been sent to the

11    outside vendor.  It wasn't in the same spot.  We realized

12    that mistake.  It was a mistake. We're fixing it.  I wanted

13    the Court to know and the defense to know this is something

14    that we're attempting to remedy.

15         THE COURT:  Attorney Mahoney, you have been very

16    patient.

17         MR. MAHONEY:  Well, your Honor, I think you maybe

18    stole my punch line in discussing the Wollman chat.  As

19    Mr. Nardini noted, this is not a document we found within the

20    seven million.  We only had a couple of days to look at the

21    seven million before we filed our motion, but I think as you

22    probably surmised what gives us great discomfort in the

23    government's statement that they are aware of no

24    Bradly/Giglio is Mr. Nardini's refusal to admit that this

25    chat where one of their key witnesses.  Joe Wollman said two

1    things that were critical to the government's closing.  The

2    first one was this was important, the information.  That's

3    the cornerstone of their materiality defense.  A chat like

4    this one where he's dismissing the importance obviously is

5    Brady or Giglio.  Brady and Giglio are dead letter if that's

6    not the case.

7            THE COURT:  Some would think it is.

8            MR. MAHONEY:  Perhaps.  I'm sure not in this

9    courtroom.  The second point that the government relied on

10   Mr. Wollman for was the whole agency idea.  The idea that he

11   thought he had this trusting personal relationship with Mr.

12   Litvak and he didn't.  Anything that undermines his

13   credibility as a witness I think devastates that point.

14           THE COURT:  I agree but this example isn't from the

15   seven million documents that was previously unknown to you.

16   I realize you have only begun to look and maybe you have your

17   Brady motion post-trial if you don't succeed at trial, but I

18   never like to say what I'm going to do or what my view is if

19   something happens, but if some document like that wasn't

20   produced by the government, I think that you would have an

21   extremely strong Brady motion.  All right.  I agree entirely

22   with you.  I view it as Brady, but you have asked the

23   government, I think it is a very reasonable ask what your

24   motion is.  You didn't tell them pull out and flag and give

25   me every number of every document that's Brady, and I will

1    argue what I think is Brady.  You don't think is Brady.

2         You said tell me what you know is a Brady in this

3    seven million pages.  I thought that wasn't a bad ask.  They

4    have answered you.  And once you take Wollman out of your

5    exhibits, you may think and you may want to press at trial,

6    you will make your record and get dealt with somebody

7    somewhere else that what other people in the industry were

8    doing or what they understood or they knew nobody told the

9    truth, I'm still of the mind, I'm sure the in limines

10   somewhere will revisit it.  I may change my mind.  Right now

11   I'm saying I think there's examples of that in the

12   exhibits that they interviewed somebody who is a buyer.  He

13   says, everybody lies.  I think if it is not one of the

14   victims in the indictment or one of the 404(b) transactions

15   that I allowed them to do. It isn't somebody on the witness

16   stand saying I relied on this.  Of course, I expected him to

17   tell me the truth.  Those kinds of testimony, then I don't

18   think that everybody else in the industry's view of what was

19   going on is Brady or Giglio.

20         Again I may change my mind.  You may persuade me to

21   the contrary, but I think like, for example, I think it is

22   exhibit -- this is all the way to other side.  There may be

23   things in Exhibit 10 at page 4 Mr. Mark whom I can't remember

24   was a witness, but I gather my clerk seemed to find that he

25   was.  The name wasn't familiar.  Said this is not the, quote,

1    most important factor in the negotiation but certainly an

2    important one, I don't think that's Bradly/Giglio.   I don't

3    think you can impeach the witness.   If he said it was

4    important -- depends on what he says I suppose.   It is

5    supportive of the government's view of materiality, not

6    necessarily supportive of the defense so other than --

7    Wollman I'm one hundred percent in agreement with you.   But I

8    misunderstood as I reviewed the materials when Wollman got

9    disclosed.   I don't remember.   May be shocking but I don't

10   remember line by line of the trial, the first trial and I

11   don't intend to.   I hope I don't have to become intimately

12   familiar with each line of the transcript before we get the

13   second trial done, but any ways -- that's sort of I'm not

14   sure what more I can make the government do.

15          MR. MAHONEY:   I want to be very clear.   The seven

16   million pages of documents just so you understand those

17   include documents, chats, from Joel Wollman and Michael

18   Canter and many of the other counterparties who likely will

19   testify at trial.   The government selected those charts in

20   conjunction with their investigation of other dealers.   I

21   think the most important information that we can glean from

22   the seven million pages of documents which is documents that

23   would be relevant to the counterparties.   There's two

24   specific types of documents that we might be able to find.

25          One would be other examples of the Wollman Steff

1 chat that we talked about.  The other would be examples of

2 the counterparties telling lies of their own, and there was a

3 lot of evidence of that in the first trial about how

4 counterparties lie, about how much they are authorized to do

5 a trade at, they lie about what the cover is, what the next

6 best bid is on the bond.  We think that kind of material is

7 hugely probative of whether they can credibly say they expect

8 full truth and candor when they are in these 15 second

9 negotiations on Bloomberg chats.  Those are the types of

10 information that very well might be in the seven million

11 pages.

12   THE COURT:  But the government has told you.  One, I

13 guess I will hear from the government, they don't think it is

14 Brady.  Let's assume it is Brady.  They told you they don't

15 know it is in the seven million pages.

16   MR. MAHONEY:  I don't think the government told me

17 that.  Mr. Nardini said that he would agree you should be

18 angry.

19   THE COURT:  They have said -- maybe I made this up,

20 too.  Page 6, second paragraph, the government's opposition,

21 quote, the government is unaware of any Brady and Giglio

22 information in the discovery it has provided to the defense.

23 I assume they are referring to the seven million pages.

24   MR. NARDINI: Yes.

25   THE COURT:  That's what I meant when I say to you I

1    don't know what more.  That's what you asked me to make them

2    do and they did it.  If I'm missing something.

3          MR. MAHONEY:  Right, they go on to say on page 7

4    that Litvak now describes these materials.  He's referring to

5    the exemplars we have given them, including the Wollman

6    example as falling under Brady and Giglio.  The government

7    disagrees and believes that none of it rises to the level of

8    materiality under these constitutional standards.  You will

9    recall what Mr. Nardini said with his hesitation when you

10   showed this to him and said would you agree this is Brady and

11   Giglio.  He wouldn't admit that.

12         If the government will get up here today and say

13   we're aware of no other examples of documents like this one

14   between any of the counterparties, where they are expressing

15   skepticism about the value of information they received --

16         THE COURT:  That I called the victims when I was

17   talking to you.  I think he's already said that.

18         MR. MAHONEY:  That's not how I heard it.

19         THE COURT:  When we were talking about the

20   Mr. Wollman document, you corrected me and pointed out that

21   it had been produced earlier, it was an exhibit, it was well

22   known, you made the disclosure and I commented that you had

23   said and probably Attorney Francis, but you all signed this

24   memo.  The government is unaware of any.  In response to his

25   request, tell me -- all we ask is you tell us what you know

1    is Bradly/Giglio in the production.  I took that to mean that

2    you were saying we don't know of any.

3         MR. NARDINI: Correct.

4         THE COURT:  I sort of was flabbergasted by that

5    sentence because I'm looking at Wollman thinking how can he

6    say that.  That's when you corrected me about Wollman.  I

7    thought I then asked you, maybe I didn't, so I will ask you

8    again, is there anything in the seven million that you are

9    aware of that -- maybe I didn't frame it to you so I will

10   frame it.  I was focusing on Giglio, statements of victim

11   witnesses who will come to trial and testify on materiality

12   that it is Giglio, that would challenge their testimony that

13   things were material to them that Mr. Litvak said.  Do you

14   know of any?  You can tell me I don't have to answer that.

15   My obligation of disclosure is not identification.  I thought

16   you had in effect said I will tell you I can't identify

17   anything.

18        MR. NARDINI:  Let me say this.  Just consult with

19   lawyers who know better than I do.  I want to say two things.

20   There are statements by some of the counterparties in the

21   seven million of some sort.

22        THE COURT:  I said known to you, where you can say

23   well, I didn't read all seven million pages for sure.  This

24   is you, you.  You are saying to yourself when you got his

25   motion, I don't read all seven.  I'm not going to read all

1  seven million.  I assume that's your first thought.  Your

2  second thought is could have been --

3       MR. NARDINI:  That was my first thought.

4       THE COURT:  Your second thought could have been

5  well, I did tell them about the hot documents.  I told them

6  to go read these particular documents.  They are going to

7  tell him.  In my view, identifying those hot documents was a

8  way of answering his question, do you know of any Brady.  You

9  are not going to get into a debate with him over your view of

10 Brady versus his.  That's the trap you want to avoid.  I

11 heard that argument a hundred times from your colleagues.

12 That's fine.  I think you are allowed to do that.  In effect,

13 you are saying you may find some material in those hot

14 documents that's Brady.  I have identified them for you,

15 right?

16      MR. NARDINI: Correct.

17      THE COURT:  But other than in those hot documents,

18 if you say to yourself, lying awake at night, that chat

19 between witness number 3 on my list and so and so at his

20 company, defense better never find that in the seven million.

21 You know there's a document like the Wollman document I will

22 say in the seven million, defense is saying we at least have

23 the right to have them tell us that.  I think it is not

24 unreasonable but I thought you told me you didn't know of

25 any.

1          MR. NARDINI:  Correct.

2          THE COURT:  So he's answered you.  I think the hot

3   documents have been identified.  He's not representing

4   they're Brady.  I don't think he has to.  But he's saying

5   look, defense, red flag, you better look at these, these are

6   important, may be important to you.  We're not going to go

7   through every one and tell you which one would be Brady in a

8   post-trial motion, but you have to look at these.

9          Beyond that, he's telling you I can't identify

10  anything else in the seven million.  That's what your motion

11  was.  I think based on that answer, he's on the record, your

12  motion is moot.  Agreed, Attorney Mahoney, or not?

13         MR. MAHONEY:  Well, I agree that was a big

14  concession.  We have been asking them to make representations

15  like that for weeks now.  I understand what they are saying

16  is statements like that.

17         THE COURT:  You are too nice a person, Attorney

18  Mahoney, to do that.  I know I looked at this when you first

19  made your motion oh, my gosh, how is it this just happened on

20  April 20 something, right, you are a week late, government.

21  It's a mess.  It is like it is a story to be honest it is not

22  going to be helpful.  Some days I will be in such a mood that

23  I will dig down and blame one said or the other.  You will

24  not be happy if it is your side.  I don't know whether I'm

25  getting old.  There's some things it is not worth dwelling

1    on.  I think time has passed.  I can't get that time back.

2            You are a very effective advocate, Attorney Mahoney,

3    so stick with your arguments and not trying to zing the

4    government.

5            By the way, I say the same thing to the government,

6    there's a little too much zinging in the pleadings.  We can

7    do a little less of that.

8            MR. MAHONEY:  Setting the issue of the I will call

9    the Wollman live chats aside, we have that representation

10   now.  But there are there are two other categories of

11   documents that I have not heard representations from Mr.

12   Nardini about.  The one that I think is the most important

13   would be other examples of the counterparties telling lies of

14   their own.  Lies about cover, lies about --

15           THE COURT:  Is it other counterparties or the

16   witness at the counterparties?

17           MR. MAHONEY:  The witness.

18           THE COURT:  I don't care if Joe Smith at the next

19   desk is lying through his teeth.  That's not going to impeach

20   the witness.

21           MR. MAHONEY:  That's not what I'm referring to.

22           THE COURT:  Giglio.

23           MR. MAHONEY:  Right, Giglio, the government

24   witnesses who were Mr. Litvak's counterparties.  That's what

25   I'm referring to.  I have not heard a representation about

1    that.

2         Now, what I would consider the third category, I

3    understand, I think your Honor expressed some preliminary

4    views on this, would be statements from like those that we

5    have from the people at Ellington and Elliot Capital, other

6    investors in this area who were interviewed by the

7    government, who said we don't take anything we hear from a

8    dealer seriously.

9         THE COURT:  I think those were great bases for your

10   expert opinion, right?  Obviously I had a different view of

11   expert testimony in this area.  And one of the problems I

12   have with it is what's the basis for it.  Maybe I'm too much

13   of a civil lawyer and not a criminal lawyer.  I looked at

14   those documents and I said to myself, well, there's the basis

15   for your expert's testimony.  Not only his own experience, he

16   has four, five, six, seven, ten, one hundred people saying

17   nobody believes anything anyone says.  I thought it was very

18   interesting from that perspective which made me more inclined

19   to think that your experts have something to say maybe.  But

20   I don't see that it is the admissible.  Bearing in mind not

21   all things relied upon by experts are admissible.  I don't

22   know why that's relevant to -- poor, Attorney Sullivan, if

23   I'm remembering correctly.  Mr. Smith, he and I went around

24   this bush so many times.  It was tiring.  I'm sure he was

25   completely frustrated with me.  I don't see the relevance

1    unless you tell me the page on the Court of Appeal opinion

2    where they said I was wrong about that.  I haven't yet

3    changed my view.

4         Your second category, though, the victim witnesses

5    at trial and the transactions that are either in the

6    indictment or 404(b) in which they are lying.  Let's hear why

7    that isn't viewed as classic Bradly/Giglio and if so, would

8    the government --

9         MR. NARDINI:  I can kind of shortcut that.  We don't

10   have any other instances where we know them to have been

11   lying.  Buried in the seven million documents, I think there

12   is a lot of Jencks.

13        THE COURT:  He's asking the question known to you.

14        MR. NARDINI:  Correct.  I would say it is known to

15   me that many of these victim witnesses and probably make some

16   statements in the seven million whether something they said

17   happened to be a lie, that is unknown to us.

18        THE COURT:  If they say something like let's say Mr.

19   Mark was going to be one of your witnesses, he was a

20   counterpart to Mr. Litvak's transactions, one of the

21   transactions that's in the indictment or in the 404(b), I

22   don't think he is.  You told me he isn't.  Let's say

23   hypothetically he was, I believe in the Exhibit 10 is the one

24   that's marked, he says something about everybody always lies.

25   I could have that wrong.  Could be Fletcher that says.

1   Seagle.  One of them says everybody is lying so

2   hypothetically, I got a victim witness and you have a

3   writing, a document, in the seven million and you know as you

4   stand here or reasonably could refresh your memory, you took

5   notes or reviewing of the documents or something like that,

6   that he is on paper somewhere saying, you know, don't believe

7   a thing I say or oh, boy, look, at what I told this guy.  I

8   sold him down the river.  I was lying through my teeth.

9           If you knew of such documents in the seven million,

10  I would think you would want to point those out as a hot

11  document because of Giglio.

12          MR. NARDINI:  I would tell you right now and the

13  answer is no.

14          THE COURT:  As you stand there, you have no way to

15  easily refresh your memory of some document.  For example, as

16  a lawyer, if I go through four million pages and review.

17  This is the old days when lawyers actually did that instead

18  of other people.  I had a partner in the collapse of the roof

19  of the civic center.  I think eight million pages were

20  produced.  He reviewed all of them.  He pulled 400 documents

21  four years before trial and we tried that case on those 400

22  documents.  He was a good lawyer.

23          You could in preparing having zeroed in on

24  something, pulled out a couple of pages, written down bates

25  numbers for a couple of pages that you want to look at, show

1    to a witness, whatever it is you want to do.  The last thing

2    you are not going to do with them is bury them.  You know of

3    them because of what you have done in your review.  You would

4    tell defense counsel.

5           MR. NARDINI:  Correct.  I would like to point out

6    again, that's basically what we did by directing their

7    attention to the interview notes.  There are some things we

8    thought might be material to their preparation, might want to

9    focus their attention on.

10          THE COURT:  Other than those hot documents that you

11   identified, there's not anything else you know of, is that

12   correct?

13          MR. NARDINI:  Yes.  Mr. Francis is whispering in my

14   ear. Can I consult with him?

15          THE COURT:  Certainly.  You may always consult with

16   Attorney Francis.

17          MR. NARDINI:  The one thing we can also represent as

18   we go through these documents, if we see anything that would

19   qualify that would fall into what we're calling the category

20   of hot documents, we'll flag that for the defense going

21   forward.

22          THE COURT:  Because it is known to you.

23          MR. NARDINI: Yes.  If it becomes known to us, we'll

24   flag that.  Right now we don't have anything like that.

25          THE COURT:  Attorney Mahoney, can I terminate your

1    motion as moot in light of the discussion on the record and

2    recognition of the continuing obligation?

3            MR. MAHONEY:  I would say, your Honor, that much of

4    our motion has been rendered moot.  I want to go back again

5    to three categories that we were talking about.  I think your

6    Honor agreed that the first one being the Wollman-like

7    statements discounting the importance of the value of

8    information from dealers.  Got a representation from the

9    government that they are not aware of anything in the seven

10   million pages of that.

11           We have also got a representation as to the second

12   category.  These were the documents where it would be

13   examples of government witnesses telling their own lies to

14   counterparties in this industry.  My understanding is that we

15   have gotten a representation from them that they are not

16   aware of any of that.

17           THE COURT:  Not aware of.

18           MR. MAHONEY:  Right.

19           THE COURT:  Many of those they might not ever be

20   able to understand was a lie.  Might be some they'll know was

21   a lie, but they don't know of any.

22           MR. MAHONEY:  Of course.  That's all we're asking

23   for.

24           The third category which we would consider Brady.  I

25   believe your Honor has suggested that you do not believe it

1  is Brady, which is these would be examples of other people in

2  the industry, not people with whom Mr. Litvak traded, not

3  people who would necessarily be on the government's witness

4  list.

5      THE COURT:  People who weren't victims of Mr. Litvak

6  as the government alleges or who -- yeah.

7      MR. MAHONEY:  I don't believe that the government

8  has made a representation as to that category of documents.

9  We would still consider that to be Brady material.  If your

10 Honor doesn't, your Honor obviously has to make the threshold

11 determination on that.

12     THE COURT:  In a way, I don't think I do, and I will

13 tell you why probably because I have a misunderstanding of

14 Brady.  I think Brady is the government's obligation.  They

15 have told me at a high level before all of the I don't know

16 of this, I don't know of that, they have said they don't know

17 of any Brady.  I can't do anything with that.

18     It seems to me Brady motions get raised when a

19 defendant comes forward either before or after trial and

20 says, oh, my gosh, look at what I've just learned of this

21 document.  Mary Smith walked in my law office and gave it to

22 me.  She said she gave it to the government two years ago.

23     The government's lawyer says, oh, my gosh, this is

24 the death nail of our case.  You never got it in discovery.

25 That's when the judge has to do something.  They either grant

1   a new trial or sanction the government's lawyer, whatever

2   they do, I haven't had one of these yet, but I don't think I

3   decide Brady.  I guess I have to decide Brady in a vacuum

4   sort of in the sense that I've agreed with you that

5   theoretically I think there's Brady material when it relates

6   to a victim witness being impeached, saying he's lying to us

7   people or he's saying that I know it doesn't matter what Mr.

8   Litvak said to me.  That wasn't material in effect.  Yes, I

9   think that's Brady in light of what I think your defense is

10  going to be.  Whether a particular statement rises to Brady

11  or a bunch of them together meet all the criteria, that's

12  hard to say.  The government seems to agree with me and be

13  willing to answer.

14        The last category you identified I'm not yet

15  persuaded that it will be Brady or could be Brady because I

16  guess because I don't think it is admissible, so I don't how

17  its non-disclosure could have affected -- let me find some

18  case that tells me what Brady is.  Brady is not easy.  If

19  suppressed it deprives a defendant of a fair trial.  Only

20  where there's a reasonable probability the government

21  suppression affected the outcome of the case or whether the

22  suppressed evidence as reasonably taken put the whole case in

23  a different light as to undermine confidence in the verdict.

24  I'm not yet persuaded if you were bringing a Brady motion

25  post-trial to me and said, Judge, they didn't turn over the

1    documents that says that some other man like Mr. Litvak in

2    another company says he lied all the time.  There's bunches

3    of those exhibits in here.  You have examples of those.  I'm

4    not persuaded.

5           At this point, I don't understand them to be Brady.

6    I'm not really making a Brady ruling.  For purposes of making

7    the government answer that they have turned over any Brady

8    material with respect to that, it seems to me to be an empty

9    exercise.  Their view probably I think is more to the right

10   or left, I don't know which direction, than mine as to

11   whether that material has any bearing on this case.  Let

12   alone it rises to the level of Brady.

13          So maybe I will change my mind about that type of

14   evidence and then maybe you will need to ask me again about

15   Brady.  It is like me saying to the government you represent

16   to the defense counsel that you don't know of any documents

17   in there that show that Mr. Litvak scored 72 on his class

18   whatever the securities exams are 27, instead of a 71.  It is

19   kind of like yeah, so what or that, you know, when somebody

20   executed a trade, I'm picking a really obvious example, in

21   2015 and they weren't forthcoming about the price of the cost

22   of the bond, that that somehow proves something about Mr.

23   Litvak's conduct.  I would say it is not relevant, right,

24   time frame wise it is not relevant, maybe it is, but I don't

25   see it.  I kind of view this evidence that you are asking me

1    about categorically in number three to seek a commitment

2    about Brady to be in that same category.  Why would I ask the

3    government about that?  I don't know.  If I'm missing

4    something, please tell me.

5         MR. MAHONEY:  I think we made -- on the first two

6    categories, we made a lot of progress today.  I just don't

7    want to in agreeing that our motion is moot as those two

8    categories of documents.  I don't want to go further than

9    that and somehow waive my clients rights to later bring a

10   post-trial Brady motion because of their failure to identify

11   something else.  I think it could be the third category and

12   some other category.  That's the only thing I wanted to

13   represent on the record.

14        THE COURT:  I will rule for the purposes of the

15   record and the clerk's responsibility that I view the motion

16   as moot in light of the representations and response of the

17   government on the record, but I will make explicitly clear

18   it's obviously without prejudice either to the defendant

19   renewing a similar motion once you get review of the

20   documents.  I understand when you filed your motion you

21   hadn't.  Maybe you will turn up 47 examples of Mr. Wollman,

22   and they will have Mr. Nardini's handwriting on them with

23   words like wow.  I don't know.  I can't anticipate what's

24   going to be in seven million pages so no, absolutely it is

25   without prejudice and certainly post-trial if Mr. Smith walks

1  in with a document I just described, you absolutely have a

2  right to make that motion.  All I'm saying is at this point I

3  don't see any more relief that I can reasonably give to you

4  under the circumstances in front of me today, so I will leave

5  it at that.

6          Is there anything else that we should discuss today?

7          MR. NARDINI:  The next question is the question of

8  the trial date.

9          THE COURT:  I love it.  You will go to trial

10 tomorrow, but you seem eager to raise the idea that we won't

11 go to trial in July.

12         MR. NARDINI:  I want to know.  The reason is if the

13 court as it sounds has now denied the defendant's Brady

14 motion, I want to be clear and on the record so there's no

15 claim later they didn't have time to go through it.  Do they

16 feel knowing the court ruling, are they ready to go to trial

17 in July or do they feel they need more time to go through it.

18 Because I don't want to plan a Sixth Amendment claim down the

19 road that they didn't have enough time to go through this

20 information for their client's benefit.

21         We're indifferent frankly to their answer as long as

22 the defense can say right now they can go through the

23 material that we're providing and feel prepared to go to

24 trial on July 20th or they don't feel they have enough time.

25 They need a continuance.  We don't care what the answer is

1    but we think we need to know.

2              MR. MAHONEY:  Your Honor, as we indicated, one

3    complication that we have and the reason we did not ask for a

4    continuance but --

5              THE COURT:  I appreciate that.

6              I'm going to say his name wrong because he's not

7    here.  Attorney Butswinkas.

8              MR. MAHONEY:  As we indicated, he will serve as lead

9    counsel at trial.  He has a number of commitments and has a

10   window between the last week of October up to basically

11   February 3.  If your Honor had time to accommodate a

12   three-week trial within that period, we would gladly take a

13   later trial date within that period to give us more time to

14   go through the documents. We don't want to ask for an

15   open-ended continuance.

16             THE COURT:  We will never do that I can assure you.

17   I'm glad you won't ever ask for it but I won't ever do that.

18   I'm smiling because there's two people in the courtroom that

19   I'm going to avert looking at them.  One is my law clerk who

20   has come so close to many trials, only to be left on the

21   rocks of despair because people decide they don't want to try

22   their cases, and I finally said why don't you take this case.

23   It will definitely go to trial.  We have a firm date.  Mr.

24   Litvak I know is going to go to trial.  You are going to get

25   this really good trial experience.  I'm not going to look at

1    her and the other person I'm not going to look at is counsel

2    for the government in another criminal matter that I have a

3    three defendant fraud on the Department of Agriculture case

4    which I set down for the beginning of October.  I was advised

5    by the defense and the government and I'm still having

6    difficulty grappling with the reality of this it will take

7    six weeks.  I really need a conference in the case because

8    there's no way that 12 people are going to sit and listen to

9    the Department of Agriculture guarantee program for six

10   weeks.  Ppifs and spifs and all of that with RMBS's.  I

11   thought that was pressing with the jury for three weeks, but

12   I thought they did a very good job.  Three weeks is different

13   than six.  I'm struggling with that.  I basically blocked out

14   from what is it Columbus Day or the week before Columbus to

15   Thanksgiving realistically I can't try the week of

16   Thanksgiving. Nobody is here so I have December but again

17   realistically December somehow gets enveloped by Thanksgiving

18   and Christmas. Nobody wants to go a jury on Christmas Eve.  I

19   don't want to be in court on Christmas Eve so you think

20   there's a month in there but it's not really a month.

21          If everybody thinks this case is no more than three

22   weeks, we can fit it in December, start right after

23   Thanksgiving, pick the jury in November.  The other case

24   won't take the six weeks.  I will be done just before

25   Thanksgiving the week before to pick the jury.  I could do

1   that in December.  I did promise a class action case they

2   could have January.  If I had to I would give you folks

3   January if that worked.  It has to be done by like the 10th

4   of February.  I have a commitment at a conference at that

5   time that breaks up that window you are telling me Attorney

6   Butswinkas is not available after when?

7           MR. MAHONEY:  February 3.

8           THE COURT:  We're looking at right after

9   Thanksgiving or right after New Years.  I don't know what day

10  New Years falls on.  I don't have a calendar but a reasonable

11  day right after New Years.  I don't mean the second.

12  Christmas is Sunday or Monday.  We would pick a date a few

13  days after the holiday.  If I don't look at this lovely,

14  talented law clerk to my left, I guess, to be perfectly

15  honest the challenge would be that if this agricultural case

16  takes six weeks, it is very difficult to be attending to

17  pretrial matters in a case that's going to start for another

18  three weeks.  I think I was pretty strict in setting a

19  calendar here and telling you this case was going to be ready

20  for trial by the end of June.  I'm not going to be here then

21  I'm going to come back and start the trial.  So I wasn't

22  going to be looking to get any pleadings in the beginning of

23  July.  You can prepare your witnesses or draft your opening

24  statement.  I expected to have put to bed and ready to go.

25           Because, as I say, I have dates for substantive

1    motions.  There's motion to dismiss in that agricultural case

2    so there's a lot of pretrial stuff in that case.  That case

3    is the first time around.  I haven't seen the issues and

4    whatever.  Going to take a while to get that up and ready.

5    That's sort of where I am on schedule.  I'm not happy to do

6    it in July.  The time is there.  I blocked it off so I think.

7    I guess I have to agree with Attorney Nardini.  It is a

8    question to you on Mr. Litvak's behalf in terms of the seven

9    million.  If I understand this new 6 million is the raw data

10   that supported the analysis of buyers of these bonds and you

11   had the analysis but you didn't have the raw data.  I don't

12   why they gave the raw data.  Do I have it right?

13             MR. NARDINI:  Not quite.  It is basically an

14   enormous pool mostly of one particular firm of a number of

15   people over a period.  The law firm that produced and

16   collected all of that data, had extracted things that they

17   thought where of relevance to that particular investigation.

18   We gave in the April production the things that the law firm

19   had identified to us as being meaningful.  The whole pool of

20   everything they looked at for that particular segment, that's

21   what we're giving which is the back up which is much more

22   expansive back up pool.

23             THE COURT:  Might be back up.  Might be a document

24   that the lawyer for this firm didn't think it was important

25   but it may be important to Mr. Litvak.

1          MR. NARDINI:  That's why we're turning it over.

2          THE COURT:  I had thought it was these companies run

3    these analyses what something is worth, the range of 58 to 62

4    dollars on something like this.  This was the raw data that

5    went into their algorithm or whatever else these folks used

6    to figure out with a the 58 to 62 is going to be.  That's not

7    it.

8          MR. NARDINI: This is the pool of all communication.

9          THE COURT:  Universe of the communication from which

10   the lawyers culled what they thought was responsive to the

11   government's demand.  You produced what was the responsive

12   part but you realized later they had given you everything.

13         MR. NARDINI:  Correct.

14         THE COURT:  There could be stuff that you do need to

15   search.  It is your choice.  Not choice.  Obviously there's a

16   speedy trial right here both Mr. Litvak and the public.  Mr.

17   Litvak had this hanging over his head for a very long time so

18   you were here when you first came on board and we had trouble

19   finding a schedule.  Obviously Attorney Butswinkas is a very

20   busy trial lawyer.

21         MR. MAHONEY:  It was my colleague and we're mistaken

22   for each other frequently.

23         THE COURT:  There was somebody else with him.  I

24   didn't get the sense he traveled alone.  We had difficulty

25   finding a time.  He wanted to put it off into the period or

1   later and I was not happy about that for a variety of

2   reasons.  But I think Attorney Nardini is correct. It is your

3   call because of this production and the volume of the

4   production.  I guess it is 13 million pages. If you find two

5   more Wollman-type statements, that's pretty available to you

6   and so I mean I guess.  I'm having trouble getting the words

7   to come out.  If you want a continuance, I will entertain it.

8   I will put it that way.  I will hedge my bet.

9           MR. MAHONEY:  We would prefer, your Honor, I will

10  avert my gaze from your law clerk and our apologies to her.

11  We would prefer to go to December right after Thanksgiving

12  would give us the time that we need to do a comprehensive

13  review.  Your Honor made the suggestion maybe doing the jury

14  selection right before Thanksgiving.  Certainly keep the same

15  pretrial with motions in limine so not interfere with your

16  other trial.

17          MR. NARDINI:  If we're looking at that very narrow

18  window that your Honor articulate, I think the government

19  would prefer January.  Ms. Cherry will be on trial in the

20  Numora case.  The case agents will be tied up in that too.

21  That's currently scheduled for jury selection is October

22  18.

23          THE COURT:  How long is that that trial?

24          MR. NARDINI:  About three weeks but we don't have a

25  firm start date.

1          THE COURT:  Is that Judge Chatigny?

2          MR. NARDINI: Yes. I think in terms of just like your

3    Honor will be coming right off a trial with the Lillemoe

4    case, co-counsel will be doing the same.  If we have that

5    little bit of breathing space, I think starting right after

6    the new year would be preferable to the government.

7          THE COURT:  Does everybody still think the three

8    weeks is what it is going to take?

9          MR. MAHONEY:  We certainly do, your Honor.

10         THE COURT:  You don't know whether you are going to

11   do a defense.  Does that include, your answer include an

12   assumption of doing a defense or not doing a defense?

13         MR. MAHONEY:  The caveat it is hard to predict with

14   absolute certainty.  We expect three weeks is sufficient

15   time.  Three weeks of presentation, not including jury

16   selection and jury deliberations.

17         (Discussion off the record.)

18         THE COURT: Attorney Mahoney, I know you expressed a

19   preference for December.  I'm having the same feeling they

20   are having about their double back to back.  I'm concerned

21   that I'm going to get this agriculture case done, get it done

22   before Thanksgiving.  When I go and count the days there's

23   two federal holidays in there and other things I actually

24   looking at the calendar and worried would I get it done by

25   Thanksgiving so probably will be because things never go as

1    long as people say they are going to go.  It would create a

2    problem if I bind your partner to December and he's then

3    booked in January, then I will never get the case tried if it

4    slips because of the other one so I think January is safer if

5    it doesn't make a big difference to the defense.  Not that

6    I'm expecting any last minute motions, it gives me some time

7    in December if there are last minute motions to get them

8    briefed and argued.

9         MR. MAHONEY:  Just to point out I think that

10   Thanksgiving is early this year on the 24th which means like

11   so we would be four full weeks before Christmas.  Again that

12   would be our preference, but I understand the other

13   constraints.

14        THE COURT:  I did remember Thanksgiving is early.

15   That's why I was sitting in my office counting days.  Will I

16   have to suspend the week of Thanksgiving and finish up the

17   Lillemoe case in December.

18        If you don't mind, what I would like to go back to

19   my chambers, put my calendar up, I have a list of trial ready

20   case with the days that I tentatively promised people.  I

21   know I promised someone the January time. They will have to

22   be bumped.  I think I'm leaning to January.  What's the last

23   day he's available?  If you go three full weeks and pick the

24   jury a few days.  We could pick the jury in December.  If

25   it's a long trial, I like to let the jury know, give them

1    some time to adjust their life.  So picking the jury on the

2    4th and starting the evidence on the 5 will be a shock to

3    them.  We can face that later.  Say we pick on the 4th and

4    start right away and takes three weeks.  It could go to the

5    jury on Monday, the 30.  Go meaning closings, charge, in

6    their hands.  Let's assume two days to deliberate.  We would

7    get a verdict by Thursday.  Is counsel still available?

8          MR. MAHONEY:  Mr. Butswinkas is free until February

9    3.  That's the Friday of that week.

10         THE COURT:  Yes.  Unless you folks tell me three

11   weeks is not what it is going to be seems like a good window.

12   Picking the jury on the 4th, we would have three weeks and

13   two days of evidence, go to the jury on Monday.  I'm thinking

14   worse case could go the Thursday or Friday of the week

15   before, you could be done before that Wednesday.  He would

16   have a week free.

17         MR. MAHONEY:  We're free and can do it in January.

18         THE COURT:  Let me look at January.  Maybe I should

19   get on the phone.  I can't remember when our next proceeding

20   in that case is.  But if it is not soon, maybe I will do a

21   quick telephone call and get a sense of what people think in

22   terms of six weeks that was thrown out.  Maybe if it is

23   shrinking a little bit, then maybe I will revisit December.

24         MR. FRANCIS: With respect to December, I believe

25   there's potentially overlap of witnesses in the two cases so

```
1   I think it would be difficult to have a trial before Judge
2   Chatigny which may start after the October 18 jury selection,
3   may not start immediately.
4           THE COURT:  I can inquire of him on that if he says
5   oh, no, I'm not starting until November 1 or something like
6   that, then I will not be able to do November.  You said three
7   weeks so it's going to go into November.
8           MR. FRANCIS:  That's a three defendant case before
9   Judge Chatigny.  Our concern would be the witnesses having to
10  turn around --
11          THE COURT:  I don't think he should buy a lottery
12  ticket. For those of you who are familiar with the criminal
13  docket that Judge Chatigny had for the last 12 months.
14          MR. FRANCIS: We think it would be very difficult on
15  the witnesses to appear in back to back trials in November
16  and December.  We need time to prep them.
17          THE COURT:  I think we're looking at January.  I'm
18  hearing you and you would prefer to put it off.  Prefer is
19  not the right word.  Given the circumstances we face now is
20  that you would rather proceed later than in July.  Is that a
21  fair statement?
22          MR. MAHONEY:  We would prefer the window that we
23  gave you, right.
24          THE COURT:  As I say, I'm not available at the
25  beginning of that window, the October/November definitely not
```

1    available so the only possibility is December or January.  I

2    think in light of the government's witness availability and

3    agent availability, it is not reasonable to say we'll do it

4    in December.  My concern about the other case.  I may find

5    out that's not a concern.  I have a feeling I won't find that

6    out now.

7         We'll put it down -- for now, we'll say it will

8    begin on January 4.  I may put a jury selection date in the

9    third week of December.  It is a long time before the trial,

10   but I also, as I say, I don't like picking the jury and going

11   right into a long case, short cases yes, not a long one.  Let

12   me think about that.  Does counsel have a view on either

13   side?

14        MR. MAHONEY:  I would saying, your Honor, I think

15   selecting the jury a few days in advance to accommodate

16   holidays is okay.  It makes me, if it is going to be a long

17   time, that's time for people to search the Internet, that

18   makes me a little uncomfortable.

19        THE COURT:  As we get closer, we have further

20   pretrial, if the folks are the saying it is a two week trial,

21   we'll start the evidence on the Monday and pick the jury on

22   Wednesday.  Put in your books the trial will start the 4th of

23   January with jury selection and we'll do the evidence dates

24   as we get closer and fine tune the amount of evidence.  I do

25   think I need to make a Speedy Trial Act finding.  That based

1    upon and I would base it upon the recent disclosure of the

2    government of the large volume of documents, then further

3    identification of further large volume of documents, which

4    the defendants needs further time to make searchable and to

5    search in preparation for his defense.  The Court finds that

6    the time period from what was the jury selection I have

7    already gone to the July date.  The time from July 20 through

8    January 4 is excluded from consideration of Speedy Trial act

9    because the Court finds in the interest of justice and

10   interest of the defendant preparing a defense, outweigh the

11   other interests identified in the Speedy Trial Act. Does the

12   defense have any objection to the Court's finding?

13            MR. MAHONEY:  We do not.

14            THE COURT:  Does the government request I make a

15   further finding.

16            MR. NARDINI:  No, your Honor.

17            THE COURT:  All right.  Anything else?

18            MR. MAHONEY:  Your Honor, I want to inquire whether

19   you still wanted to keep -- you said you would make some

20   additional adjustments to the schedule. Were you keeping the

21   June 16 date?

22            THE COURT:  Yes, I am.  I just canceled a conference

23   I was going to attend so I would have time next week to get

24   through the pile.  I will get through the pile and I will

25   address them.  I think we should continue apace on the

1    schedule in the hopes of getting the case as prepared as

2    possible.  I hate to say this probably I'm sure there will be

3    some motions as a result of the discovery but let's try to

4    narrow it down to what's left to argue in terms of getting

5    ready for the trial.  Anything else?

6          MR. FRANCIS:  Would that include keeping the

7    pretrial conference dates that we have at the end of June?

8          THE COURT:  I don't think we need that.

9          When we come back on the motions, when I'm trying to

10   address what's on the pending motion list, when we finish

11   that somebody remind me that we should talk about scheduling.

12   For example, striking that date from the calendar, maybe

13   picking a date for a status conference in September.  Make

14   sure that the dust has settled and not being stirred, aren't

15   things that have to be addressed, then set a final pretrial

16   conference.  Probably dates for disclosure of witnesses and

17   exhibits.  Has that been done or coming up?

18         MR. FRANCIS:  Already passed.

19         THE COURT:  Well, we can talk about if people think

20   we should have a date for amended disclosure on that well in

21   advance of the trial date that maybe something comes out of

22   these documents that will change the defendant or the

23   government's view of who should be a witness so.

24         It is hard to sit here and have somebody looking at

25   the bubble over your head.  I thought you were an honest

1   person.  You told me this case would go to trial in July.

2   Anyway, is there anything further?

3            MR. FRANCIS:  Nothing from the government.

4            MR. MAHONEY:  Nothing from the defense.

5            THE COURT:  Well, have a nice summer anyways.  We'll

6   see you in a couple of weeks on the motions.

7            (Whereupon, the above hearing adjourned at 3:45

8   p.m.)

9

10

11

12   COURT REPORTER'S TRANSCRIPT CERTIFICATE

13   I hereby certify that the within and foregoing is a true and

14   correct transcript taken from the proceedings in the

15   above-entitled matter.

16

17   /s/  Terri Fidanza

18   Terri Fidanza, RPR

19   Official Court Reporter

20

21

22

23

24

25