```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     United States of America  )  June 16, 2016
4              Government  )  9:30 a.m.
     v.                         )
5    Jesse C. Litvak            )  3:13cr19(JCH)
                 Defendant.  )
6    _____)

7                              141 Church Street
                               New Haven, Connecticut
8

9                 HEARING

10

11   B E F O R E:
                   THE HONORABLE JANET C. HALL, U.S.D.J.
12

13

14   A P P E A R A N C E S:

15

16   For The Government  :   WILLIAM NARDINI
                              JONATHAN N. FRANCIS
17                            HEATHER CHERRY
                              U.S. Attorney's Office
18                            157 Church St., 23rd floor
                              New Haven, CT 06510
19

20   For the Defendant   :   MICHAEL CHASE
                              Shipman & Goodwin
21                            One Constitution Plaza
                              Hartford, CT 06103-1919
22
                              C. J. MAHONEY
23                            ADAM D. HARBER
                              ELISE M. BAUMGARTEN
24                            KRYSTAL R. COMMONS
                              Williams & Connolly LLP
25                            725 Twelfth Street, N.W.
                              Washington, DC 20005
```

```
 1          THE COURT:  Good morning to you.  We're here this

 2   morning in the case of United States versus Jesse C. Litvak,

 3   3:13cr19.  If I can have appearances please?

 4          MR. FRANCIS:  For the government, your Honor,

 5   Jonathan Francis.  With me at counsel table is AUSA Heather

 6   Cherry and AUSA William Nardini.

 7          THE COURT:  Good morning.  For the defendant?

 8          MR. MAHONEY:  Thank you, your Honor, for Mr. Litvak

 9   C.J. Mahoney, Adam Harber, Elise Baumgarten, Krystal Commons

10   and Michael Chase. I will note that Mr. Litvak is here with

11   us in the courtroom.

12          THE COURT:  Good morning to all of you.  We're here

13   today hopefully to address a number of motions in limine that

14   are pending.  I have lost count of how many are still

15   pending.  I guess we will start at the beginning, as they

16   say.

17          I believe the first one numerically speaking is

18   Number 356 which is Jesse Litvak's motion in limine to

19   exclude evidence of Mr. Litvak acted as a "agent" or "broker"

20   for counterparties.

21          I guess actually I would like to start this one off

22   by asking the government, having read the parts of the

23   transcript from the oral argument at the Court of Appeals, is

24   it correct that the government concedes that Mr. Litvak was

25   not an agent or a broker?
```

```
 1              MR. FRANCIS:  That's true, your Honor.

 2              THE COURT:  Okay.  Thank you.  I will turn to the

 3     movant.  Attorney Mahoney, will you handle the arguments?

 4              MR. MAHONEY:  I will be handling the argument for

 5     this one and a few others.  Ms. Commons and Ms. Baumgarten

 6     will handle others.  If you will excuse us while we switch

 7     around a little bit.

 8              THE COURT:  I will note among the many issues raised

 9     by the defendant on appeal, you didn't argue prosecutorial

10     misconduct in connection with the argument to the jury by the

11     government.  I'm correct about that, am I not?

12              MR. MAHONEY:   You are, your Honor.

13              THE COURT:  Is there anywhere that you can point me

14     to in the Court of Appeals' ruling that it was error for a

15     witness to testify about his or her perception of something,

16     his state of mind, his point of view, absent a 403 bases to

17     keep it out I suppose?

18              MR. MAHONEY:  It was not in the Court of Appeals'

19     opinion, your Honor, but we also moved to exclude this

20     evidence pursuant to Rule 701.  I think Rule 701 does not

21     make a distinction between a witness testifying about his

22     understanding as his opinion.  I think that's a pretty

23     ephemeral distinction.  The government concedes in its brief

24     that characterizing something as an agency relationship or

25     not is something that requires specialized knowledge of
```

1    experience of the kind that's covered under Rule 702.

2        THE COURT:  Can I roll the tape back?  Something was

3    ephemeral. I didn't catch it.

4        MR. MAHONEY:  The government is seeking to draw this

5    distinction between -- this really relates to Mr. Wollman,

6    and he was the only witness who actually got out the word

7    agent in the first trial.  The government's trying to draw

8    the distinction between Mr. Wollman's understanding that

9    there was an agency relationship and whether there was in

10   fact an agency relationship as a matter of law.  We think

11   that that's a pretty ephemeral distinction.  I would point

12   out that the government when it made arguments about this in

13   its closing, said at a couple of points that Mr. Litvak was

14   an agent.  They go back in their reply and suggest that the

15   court reporter didn't accurately capture the punctuation in

16   that.

17       THE COURT:  Let's focus on the testimony of a victim

18   and the use of the word agent by such a witness. Forget about

19   the government's argument.  What's wrong with that?

20       MR. MAHONEY:  Well, I think both under Rule 401, it

21   is not relevant because it is illegally erroneous.  It is

22   confusing under Rule 403.  An agent saying that somebody had

23   an agency relationship --

24       THE COURT:  He didn't say that.  He said I viewed

25   him as my agent.  It is his point of view. You can

1    cross-examine him until the cows come home about why he may
2    be wrong as a matter of law or a matter of fact.  I don't
3    know why and I mean I guess there's a 403 argument to be
4    made, but I don't see that it is terribly strong.  I don't
5    see -- if the government doesn't make the argument to the
6    jury that he was the agent in a legal argument sense, all
7    right.  Let's assume that argument isn't made. I don't
8    understand what confusion arises because a witness uses a
9    word that is commonly used by a lot of people in everyday
10   conversation.  And it may not rise to the level of what we
11   legally understand, but he's not testifying to a legal
12   opinion.  He's not giving an expert opinion on it.  He's
13   saying this is how I viewed him.  This is how I viewed him.
14   I don't know why you have to take that word that he uses to
15   describe his view of Mr. Litvak out of his mouth.
16        MR. MAHONEY:  Because it is a loaded word, your
17   Honor.  It is a word that conveys that somebody owns a legal
18   duty of loyalty.  The agent has a duty to put his --
19        THE COURT:  Where is that going to come from at the
20   trial?  Where is that going to come from?  I'm not going to
21   instruct the jury in that regard or I could instruct them
22   this is what an agent is.
23        But, you know, there's not going to be any evidence
24   that he meets that definition, right?  At least if your
25   argument is correct he isn't and the government's just

1    conceded it.  Presumably there will be no evidence that he

2    will meet it, but I think that someone's understanding when

3    they are told something, how they view the person telling

4    them, I think is not -- it seems to me it is relevant.

5         I mean all I see -- not all, but what the circuit

6    said in this regard is you were harmed by not being able to

7    have Mr. Menchel testify about the nature of this market and

8    the nature of the relationship between and among people.  You

9    are going to be able to do that.  You are going to have an

10   expert on the stand who is going to describe in effect that

11   Mr. Litvak was not an agent, as that word is understood in

12   any market, you know, context or otherwise.

13        If that's the case, I don't understand where the

14   confusion will arise or what the harm is other than it is a

15   victim's perception of whom they were dealing with.  And I

16   don't see that it is -- I'm having trouble with the 701.

17   Well, he's my agent on this one.  I don't mean a legal

18   relationship.  I tasked somebody to do something for me.  No

19   duty owed to me.  I might use the phrase that way.

20        It is like a layperson saying he was drunk, he got

21   out of the car and he was staggering.  That's not an expert

22   that's done a blood test and testified this test is reliable.

23   I rely on it.  Yes, he was intoxicated, but I think we allow

24   people to say I perceive this person to be drunk.  I think

25   that's what Mr. Wollman is saying.  I perceived him to be my

1    agent.

2          I guess the only way to ask it is if I granted this

3    motion, would that mean that Mr. Menchel doesn't need to

4    testify?

5          MR. MAHONEY:  No, your Honor.

6          THE COURT:  Why not?

7          MR. MAHONEY:  Well, because if I can just step back

8    for a second.

9          THE COURT:  No.  You could answer my question.

10         MR. MAHONEY:  The answer to your question, your

11   Honor, is we would still I think need to put on testimony

12   from Mr. Menchel because of the way that the government is

13   going to seek to describe this relationship qualitatively

14   regardless of whether they use the term agent.

15         What I wanted to say was that if you look at their

16   cases.  If you split what they want to use this evidence to

17   show, they want to argue to the jury that Mr. Litvak and his

18   counterparties have this close relationship of trust that

19   took place in the context of the Bloomberg chats.  They can

20   argue that.  They can argue that qualitatively.  They can

21   elicit testimony from Mr. Wollman and others --

22         THE COURT REPORTER:  Could you speak a tad bit

23   slower.

24         THE COURT:  Otherwise we may get more of those

25   mistakes.

1          MR. MAHONEY:  As I was saying, we have no objection

2   to the government describing the relationship and eliciting

3   testimony about what the relationship was in a qualitative

4   sense.  Things like having the witness say I trusted Mr.

5   Litvak, I thought he had my best interest at heart.  I think

6   that's fine.

7          The only thing we object to is the government going

8   the extra step of gilding the lily, using the term that we

9   all agree is legally erroneous in this context.

10          With respect, your Honor, the analogy that you drew

11   to whether someone was drunk, I think that's something that

12   lay people can draw that conclusion based on experiences in

13   their every day lives.  The government concedes that whether

14   someone is an agent is something that requires specialized

15   training and knowledge.

16          If you look at how the government questioned

17   Mr. Wollman on this, they were talking about agency in a very

18   specific context.  They were saying this trade was this an

19   agency trade or is this a principal trade.  I don't think

20   that they were really accurate to say that they were using

21   the term agent in the colloquial sense.

22          Setting that aside, we would submit your Honor that

23   the word agent that's something that carries with it certain

24   implied meanings; namely, I think most jurors.  In

25   particular, jurors who have any exposure to this kind of

1    thing would understand that an agent is someone who owes a

2    legal duty of loyalty to their client.  That's prejudicial to

3    my client because it suggests if you believe the government's

4    allegations in the indictment, that means he not only

5    committed securities fraud but violated some duty of loyalty

6    to his counterparties.  He, in fact, owed no duty of loyalty.

7             The COURT:  Part of your motion is to exclude the

8    use of the word broker.  I think that your expert uses the

9    term and I think the exhibits are I recall from the first

10   trial use the word broker.  Would we redact all of that and

11   strike Mr. Menchel?

12            MR. MAHONEY:  Your Honor, we conceded in our reply

13   brief that we're not asking to have your Honor police the

14   testimony of witnesses to eliminate the use of the term

15   broker.  We understand that some of the witnesses use the

16   terms broker and dealer interchangeably.  We also understand

17   that's in some of the documents.  We're not asking for that

18   to be redacted.  All we're asking for there is for the

19   government not to analogize Mr. Litvak to the kind of brokers

20   that the jurors might have interactions with in their daily

21   life, a real estate broker, investment advisors, et cetera.

22            I point out that the government did that in its

23   rebuttal in the last case.  It was a major theme of the

24   government's case that Mr. Litvak was an agent.  He said he's

25   just like your real estate broker, and if your real estate

1   broker said you can have the house for 200,000, but it

2   actually turned out the real estate broker bought it for 190

3   and pocketed the difference, that's a false analogy in light

4   of the government's concession in the Second Circuit.   I

5   don't think they can contest it that it was a false analogy.

6          THE COURT:   Attorney Francis, why should you be able

7   to make the arguments you made in the first trial how he was

8   the agent, he was the broker, about real estate brokers, you

9   know how that this is.   They owe you a duty.   You wouldn't

10  like it if they weren't truthful with you.   How can you make

11  those arguments in light of the concession he wasn't an agent

12  and he wasn't a broker?

13         MR. FRANCIS:   The concession that we made is that as

14  a matter of law, he's not a broker.   The testimony that

15  Mr. Wollman and other people used the word agent, Mr. Norris,

16  described a relationship of giving Mr. Litvak instructions,

17  and expecting Mr. Litvak to carry those out and compensating

18  him with the commission on top.   A set amount of commission

19  he would choose.   That's why we think the witnesses should be

20  allowed to use agent.   Once --

21         THE COURT:   Actually I think the word agent came out

22  because you posed a dichotomy question to Mr. Wollman.   Was

23  he an agent or principal and the answer was an agent.

24         MR. FRANCIS:   Yes.   Mr. Wollman admitted that as a

25  matter of logistics of purchasing a bond, he understood that

1    Mr. Litvak and Jefferies were purchasing the bond and selling

2    it to him.  The question was perhaps inartfully phrased.

3    Obviously to the extent there's going to be a continuing

4    issue at the next trial, I will phrase it more artfully.  I

5    take responsibility for that unartful phrasing. The question

6    was aimed at did you understand he was functioning on your

7    behalf in the colloquial sense of an agent.  He was doing the

8    thing you instructed him to.  Mr. Wollman's answer was yes.

9    We asked why.  He explained he understood he had the

10   relationship on the basis of the communications he had with

11   Mr. Litvak and the instructions he had given him and the

12   information he had gotten back from Mr. Litvak with.

13          THE COURT:  Why is that relevant?

14          MR. FRANCIS:  Well, because it is part of the

15   scheme, your Honor.  Part of Mr. Litvak's scheme is to create

16   the illusion that he is not operating at an arm's length from

17   his victims, and if I can respectfully direct your Honor to

18   pages 8 and 9 of our opposition, we pull out some examples of

19   evidence that we intend to put on that show Mr. Litvak saying

20   things like I'm working for you.  I'm prepared to work

21   skinnier on this or I will work for whatever you want which

22   is not the typical arm's length principal transaction.  It

23   appears to be setting up a transaction where he proposes to

24   be executing orders given to him by his victims in exchange

25   for a set amount of compensation to be determined outside of

1    the normal principal way of determining which would be the

2    spread between the purchase and the sale.

3            THE COURT:  Do you intend to argue to the jury as

4    you argued in the first trial that he was their agent, that

5    the jury knows about if they had an agent.  I can't.  I tried

6    to find it.  I know it is attached.  I read it but the

7    argument about the real estate broker or how you understand

8    in your life how you rely on people.  I'm not talking about

9    the way I just characterized it, which might be consistent

10   with the testimony you just described that you are going to

11   elicit that didn't include the word agent.  I'm talking about

12   the argument you made in the first case in which you very

13   much alluded to parallel or analogy that it was like a real

14   estate agent or a real estate broker.

15           MR. FRANCIS:  Well, yes, I think we would intend to

16   argue that.  However, as in the first trial, your Honor

17   expressed with a couple of subjects, your Honor expressed

18   some concern about how we would phrase things, rather than

19   push them, we receded.  This is an analogy.  To say it does

20   not perfectly capture all the facts of the relationship of a

21   broker dealer in the RMBS market is a truism.  That will also

22   be true.  The analogy is to simplify things.  The defendant's

23   argument, as I understand it, is this is too close to

24   something that the jurors will understand.  That's the

25   utility of an analogy.  It is trying to take what is

1    something outside their normal experience and bring it into

2    something they understand.

3         THE COURT:  So should I charge the jury on what is

4    an agent is which will charge out the analogy.  Should I

5    bother to do that?  He's not the agent.  You have conceded

6    that as a matter of fact and as a matter of law, he's not an

7    agent.  The agent that you are drawing an analogy to is in

8    the law an agent as I understand it.  When I hire someone to

9    help me find a house, they are my agent.  They owe me a duty

10   under the law.  If they breach that duty, I have recourse.

11        As I understand the position you took at the Court

12   of Appeals, which is not the position you took before me,

13   he's not an agent as a matter of law.  And that no duties

14   flow from the status of an agency between the defendant and

15   the victims.  So I don't understand how you can try to draw

16   an analogy to something which we know as a matter of law is a

17   false analogy.

18        If for no other reason, it would be 403 material.

19        MR. FRANCIS:  To answer your first question, the

20   government would have no objection to you charging the jury

21   that as a matter of law because your Honor is the one who

22   gives them the law, not any victim witness, that Mr. Litvak

23   was not an agent, that's fine.

24        THE COURT:  You want me to let you argue to the

25   jury, quote, in fact he was their agent, end quote,

```
1    effectively as his agent, quote unquote, and then that will

2    be hard on followed by my telling the jury ignore the

3    government's lawyer because what he said to you a moment ago

4    that he's the agent is not true.  As a matter of law he is

5    wrong.  Would you like me to do that, sir?  You want to

6    invite me to do that?  That's what's going to follow from

7    that argument.

8              MR. FRANCIS:  Clearly, your Honor, the government

9    will not argue it that way.

10             THE COURT:  That's what I asked you three or four

11   minutes ago.  Are you going to argue it that way?  I finally

12   found a copy of the transcript that I was looking for.

13   That's how you argued it.  You also argued he misled his

14   customer about the nature of their relationship, he deprived

15   them of a chance to negotiate.  By lying making his victims

16   think he was on their side.  He was working for them.  He was

17   working with them.

18             I will ask the defense counsel in a moment, I'm sure

19   they probably have an objection to that as well, but I don't

20   see the problem with that argument.  That's fair argument.

21   And that's I think cast more in the nature of his scheme

22   which is relevant, and I don't see any confusion because you

23   don't use the word agent in there.  When you introduce the

24   last sentence of that paragraph, in fact he was their agent,

25   I don't know how you can say that.  I don't know how you can
```

1    make that argument.

2         MR. FRANCIS:  I apologize, your Honor.  I thought

3    you were asking what argument we expect to make with respect

4    to the analogy about buying a house.  Obviously that saying

5    it that way once again that was me talking so I will take

6    responsibility for it.  That's at best inartful.  Perhaps a

7    better way to say it was he created the impression he was

8    their agent.  The wrong impression he was their agent.

9         The government will not argue in its opening or its

10   closing that Mr. Litvak was an agent and, your Honor, just

11   because you raised it previously, I don't want you to think

12   there's any daylight between what we told your Honor at the

13   first trial and the concession we made before the Second

14   Circuit.

15        What we told your Honor was we knew that

16   Mr. Wollman's testimony, we were not eliciting false

17   testimony from him because it was about his perception.

18        THE COURT:  Absolutely.  I think you heard me

19   chatting with Mr. Mahoney.

20        MR. FRANCIS:  Right.  What I told the Second Circuit

21   in an argument in a concession I made that's cited in the

22   footnotes of the opinion by the panel is that Mr. Litvak as a

23   matter of law was not an agent.  That's just a legal fact.

24   That's just a legal true thing to say.  He was not an agent.

25        THE COURT:  Then your argument he was an agent is

1    unsupportable.

2           MR. FRANCIS:  I agree, your Honor.  I would not say

3    it so poorly in a retrial.  I hope there are many things that

4    I do better in the second trial than I did in the first

5    trial.  That would be a good example.

6           The final thing I would say, your Honor, just

7    because the defense has said it a couple of times, we would

8    never impose to criticize, particularly in an offhand way,

9    the court reporter.  All we did insert proposing alternate

10   construction of the sentence with a different punctuation was

11   to attempt to show what I meant to say in my closing kind of

12   how I intended it to come out.  The court reporter, Terri,

13   obviously does a great job.  We would never criticize her.

14          THE COURT:  She obviously can do a better job if

15   everybody slows down myself included.

16          Can somebody point me to the attachment where your

17   argument is with the analogy about broker dealer?  I had

18   other things copied, but I can't find that.  I guess that

19   didn't get separately copied, so I'm having trouble finding

20   it.

21          MR. MAHONEY:  Exhibit 6 to our memorandum.

22          THE COURT:  I have it.  Thank you.  I'm dubious that

23   that analogy can stand in the face of the concession that

24   he's not an agent as matter of law.  The analogy incorporates

25   the fact that the real estate agent is an agent as a matter

```
1    of law.  It isn't just that the seller of the house or the
2    buyer of the house perceived that the person was acting on
3    their behalf.  It was led to believe it.  In law, they do act
4    on the behalf of a buyer or seller of real estate, right?  So
5    I think we can revisit it when we get closer to the closing
6    argument or opening statement, but I think that that may be a
7    dangerous analogy.
8            MR. FRANCIS:  I understand your Honor's comments.
9    If I may, one thing that bears pointing out about this.  We
10   are not focused on the fact -- I think we used realtor
11   multiple times here.  We're not focused on the agencyness of
12   it, the fiduciary duties that the real estate agent owes to
13   their client because in fact what we propose here in this
14   analogy is a situation where the realtor for some reason is
15   purchasing the house as an intermediary from the seller then
16   selling it to the buyer.
17           Clearly that isn't the way that people buy homes.
18   That's not how homes are sold and so this is not a perfect
19   analogy, never could be but all we're trying to do is bring
20   it to something that an ordinary person would understand.  It
21   is a high volume item like a home, these are multimillion
22   dollar bonds.  A lot of thought and work goes into it like
23   the due diligence and analysis that the victims put into
24   analyzing the fundamentals of the bond but ultimately at some
25   point, it comes to the negotiating table.  That's what we're
```

```
 1   trying to do.
 2            I believe the defense did it in the opening with the
 3   cars where they propose a situation where there's an
 4   intermediary who buys a car from the seller and sells it to
 5   the buyer.  We're just using an alternative of that.
 6            To the extent your Honor is uncomfortable with it
 7   and thinks it treads on dangerous ground, we can work hard to
 8   find a different analogy.
 9            THE COURT:  I think that the problem is there's
10   going to be likely members of the jury who have bought and
11   sold houses, who have hired real estate brokers or agents and
12   I presume have understood the duties owed to them growing out
13   of the status as an agent and so unless I end up charging
14   this sort of out of the case, it is kind of like why
15   introduce it in the first place, then I don't have to deal
16   with it.
17            I may come to a different view.  I may hear
18   something from Mr. Menchel that I decide I have to tell the
19   jury.  They are going to be wondering about it.  I'm not
20   going to rule today.  I will probably do a written ruling.
21   My experience, something I've learned from the first trial, I
22   would be better off having set it down in writing, but I
23   really don't think I can -- I could if there was a
24   significant 403 issue or if the testimony wasn't terribly
25   relevant or if it violated 701.  I don't think any of those
```

1    are true here.

2         I think that the victim's view of the scheme, in

3    effect, as you put it at the beginning which I think is the

4    right way to focus it.  That's what you have to prove a

5    scheme to defraud, and I think that the witness's factual

6    testimony about what was said or done to him and how he

7    perceived and received that information or lack of

8    information is highly probative and the prejudicial effect is

9    very small, if at all, if we agree that the argument made

10   would not be made again about the agent.

11        And as I say, I'm inclined to think that there's not

12   a 701 problem with this because it will be clear that the

13   witness is testifying about how he perceived the situation

14   based upon what was said and done by Mr. Litvak which I

15   understand the circuit has said the defendant has a right to

16   offer expert testimony, but I don't think they said the

17   government doesn't have the right to offer the testimony of

18   the actual victims as to how they perceive the scheme of Mr.

19   Litvak.  Nor do I think the Second Circuit ever said at any

20   moment that Mr. Litvak didn't lie.  So I think the witnesses

21   get to testify about how they perceived that lie.  How they

22   understood it.

23        MR. FRANCIS:  If I may, with respect to the analogy

24   because we are so far from trial, I will confess I haven't

25   prepared the closing argument yet, I would ask maybe this

1   would be something we can raise prior to closing argument so

2   we're not trying to do it a sidebar or something like that.

3        It may be that we can come up with an analogy

4   similar to this that contains enough cautions to the jury

5   that Mr. Litvak has no fiduciary duties such the defense and

6   your Honor would be comfortable so this is not going to be a

7   continuing issue for any possible appeal.  So if your Honor

8   would consider reserving on that, we would appreciate that.

9        THE COURT:  I will probably reserve in part.  I'm

10  not ruling on what your argument is going to be.  That I

11  don't know what it is.  I'm not going to reserve, I don't

12  think, on the part where I will say that you cannot argue

13  that he was an agent.

14       MR. FRANCIS:  Understood.  That makes sense, your

15  Honor.  Thank you.

16       THE COURT:  The next is 357.  Motion in limine by

17  the defendant to preclude the government from identifying

18  investors.  The focus I think of the motion is principally on

19  government money, taxpayer money, TARP money, but I'm not

20  sure -- I guess let me take a quick look again at the motion

21  to see whether the defendant wishes to also preclude evidence

22  about the identity of investors and counterpart funds, so I

23  think it would seek to preclude references to pension monies,

24  et cetera.

25       Attorney Mahoney, is this you or is this your

1    colleague?

2            MR. MAHONEY:  This will be me, your Honor.

3            THE COURT:  Sir, I read every one of the cases you

4    cited, and they all seem to involve arguments by the

5    government which the circuit courts involved or district

6    courts disapproved of to the effect that the government is

7    asking the jury to personalize the harm.  This isn't the

8    plaintiff that was hurt.  This was you that was hurt.  <u>Lotsch</u>

9    uses the phrase juror's pocket.  <u>Blecker</u> uses the phrase we

10   had to pay more meaning pointing to the jury.  <u>Moore</u> says

11   that the victim city it is you.  That was Chicago I think.

12   <u>Smyth</u> says that's your tax money and <u>Palma</u> involved, quote,

13   he got money from you and you and you and you.

14           Is there anything in the first trial that the

15   government did that went anywhere near that?

16           MR. MAHONEY:  I think so, your Honor.  They didn't

17   use the specific -- some of the specific phrases that your

18   Honor highlighted.  I acknowledge that.  But they said it was

19   one of the very first things said in closing was I want you

20   to pause and think about who the victims were here, pension

21   funds, taxpayers.  It doesn't take much of an inferential

22   leap for the jurors to understand they were potentially

23   victims of Mr. Litvak's alleged fraud.

24           And I just want to point out that the reason that

25   the government gave at the first trial for needing to

1     introduce evidence about taxpayers' fund was in order to

2     satisfy the jurisdictional elements of the TARP counts.

3     That's now fallen away.

4           I also want to point out that the government just

5     conceded they are not going to talk about taxpayer harm.  I

6     think that's a concession that we face severe prejudice if

7     the jurors think about themselves as taxpayers as victims of

8     the purported scheme.

9           THE COURT:  I will get to that with the government

10    in a minute.  But I don't know why the victims who come and

11    testify and are introduced to the jury, what do you do, where

12    did you work at the time in question, what did you do, what

13    was the nature of your job?  I invested monies.  I don't

14    understand why it is so prejudicial to ask them what's the

15    nature of the funds they are investing because to me it is

16    relevant, isn't it, to sort of the -- and I use these words

17    nonlegally -- but the sense of duty they owe to their

18    customer to safeguard the money to be miserly about its

19    spending on expenses such as what it paid to someone who sold

20    a security, right?  Isn't that somewhat relevant?

21          MR. MAHONEY:  I do believe that the fact that the

22    portfolio managers owed fiduciary duties to their investors

23    is relevant.  I don't have an objection to the government

24    saying that.  The fact of the matter is they owe that duty to

25    all investors irrespective of who they are, whether it is a

1    government, a charity, a university or some hedge fund.

2          THE COURT:  Then they owed different duties because

3    of the agreements that were signed because of the fact that

4    it was government money involved in the TARP programs.  There

5    were special agreements signed.

6          MR. MAHONEY:  I don't think that they owed any duty

7    to the government that was different than the duty that they

8    owed investors that would be relevant to the question of

9    materiality.  That's basically where this goes.  What they

10   say is we had a duty to get the best price for our investors.

11   They owed that same duty to all of their investors.

12          I will point out the government has charged here

13   fraud not only against the portfolio managers who were

14   managing TARP money but also against managers that were not

15   managing government money.  There's no distinct theory of

16   materiality here that relates to the managers that were

17   involved in the PPIF funds.

18          THE COURT:  What about Mr. Canter's testimony about

19   his reaction when he learned about Mr. Litvak's lies?

20          MR. MAHONEY:  I think his reaction the fact that he

21   called Mr. Litvak, that he chewed him out.  The fact he

22   reported it up the chain.  Critically he didn't report it to

23   the government.  His testimony was he reported it to his

24   compliance officer at AllianceBernstein then the head of

25   sales training.

1           THE COURT:  No.  But what he said -- I'm not talking

2      about reporting.  I'm talking about his reaction that he

3      described as follows that he said to Mr. Litvak, quote, are

4      you freaking crazy doing this to the United States Treasury

5      Department.  Because of this, I'm going to have to report

6      this, end quote.  You don't think that his reaction when he

7      learned he had been defrauded.

8           MR. MAHONEY:  I think that his reaction that he was

9      upset that he had been according to him he had been

10     defrauded.  He believes one of his investors was injured.  I

11     think that's relevant.  I don't think the identity of the

12     investor is relevant.  I think it is highly prejudice for the

13     reasons we set forth.

14          THE COURT:  Why is it highly prejudicial?  What case

15     can you cite to me where a party references the victim is the

16     United States Government of the U.S. Treasury?  No mention of

17     taxpayer money, no mention of your money, no mention of your

18     pocket to the jury.  Just that the monies were U.S. Treasury

19     or U.S. Government money.  How is that highly prejudicial?

20     I'm sorry.  Let me rephrase the question.  Tell me a case

21     that says it is highly prejudicial for someone in a trial to

22     refer to the victims' money as the U.S. Government or U.S.

23     Treasury.

24          MR. MAHONEY:  We have cited the cases that invoke

25     the golden rule.  I cannot cite your Honor a case --

1          THE COURT:  I told you the five of them that I read

2     and none of them use the phrase U.S. Treasury or U.S.

3     Government's money.

4          MR. MAHONEY:  With respect, your Honor, we don't

5     think that there's a meaningful distinction between using the

6     phrase, taxpayer dollars, treasury dollars or government

7     dollars.  I think the jury will understand they are all one

8     in the same.

9          THE COURT:  You may understand that.  I'm asking you

10    to tell me what court has accepted that clear point that you

11    understand that using reference to the United States

12    Government or the U.S. Treasury Funds is in effect invoking

13    the golden rule like the cases that you cited me where "you"

14    was used, for example, in pointing to the jury, your money.

15         MR. MAHONEY:  I don't have a specific cite for your

16    Honor that uses that specific formulation.  My point is I

17    think the general principle that the courts are relying upon

18    to exclude that testimony applies here just as strong as did

19    in the facts that were presented in those cases.

20         THE COURT:  Do you know of any Second Circuit cases

21    that say that it was not a violation of the golden rule or

22    did not implicate strongly 403 factors when the government

23    referenced the victim money coming from the United States

24    Department or the United States Treasury?  Do you know of any

25    Second Circuit cases that don't support your argument?

1          MR. MAHONEY:  I don't, your Honor.  I want to point

2     out as well there very well might be cases.  Arguably this

3     case the last time around when the TARP charges were still in

4     the case, was a situation where there was some offsetting

5     probative value to that kind of testimony.  The balance, as

6     your Honor knows, you have to do between 401 and 403, is to

7     weigh the risk of unfair prejudice against the probative

8     value.  The incremental probative value is saying that there

9     were taxpayer funds at issue here.

10          The best that the government can really come up with

11     is the fiduciary duty argument which is a red herring because

12     it applies to all investors, then they talk about context.

13     If context --

14          THE COURT:  Clearly Mr. Canter has told us and may

15     not be a function of the law or any agreement, but his

16     perception was if you're ever going to lie to me about a

17     trade, what are you doing lying to me when it is the United

18     States Government.  That isn't necessarily a heightened duty

19     or a fiduciary duty.  I think it is common sense.  I think

20     the government is more likely to prosecute, investigate and

21     prosecute people who defraud them than some other individual

22     like you and me.  They may prosecute if it was me that

23     defrauded or you, but I think what Mr. Canter is reflecting

24     is common sense.  Of all the victims to pick you idiot why

25     did you pick the United States Government.  I think that does

1    have some probative value.

2           MR. MAHONEY:  With respect, your Honor, we disagree.

3    There's no suggestion here and I don't think Mr. Canter will

4    agree, I don't think the government would agree that somehow

5    it was securities fraud to make these statements.  Section

6    10(b) doesn't distinguish between lies that are told in

7    connection with purchase or sale of securities to or from the

8    government or to or from private investors.

9           What matters here is that Mr. Canter had the

10   reaction that he said he was upset about this.  That he

11   called Mr. Litvak and chewed him out and that, you know,

12   potentially he thought it was important enough to report to

13   one of his investors but just that extra detail saying it is

14   the U.S. government, we think that opens up a can of worms

15   that's not worth the probative value.

16          I have to go back. I understand your Honor is

17   focused on Mr. Canter.  Our position that he shouldn't be

18   able to use the term taxpayer funds or U.S. Government any

19   more than the government should be able to do in argument.

20          I feel I have an obligation to my client to point

21   out to your Honor that at the last trial, this issue came up.

22   There was several pages of transcript where this same

23   conversation was had between your Honor and the government.

24   And the government came out and said we want to introduce

25   this evidence to show that the nexus to the Treasury use of

1    the term taxpayer funds, we have to use that.  They took that

2    and that narrow justification and drove a truck through it.

3    They talked about harm to taxpayers, they talked about harm

4    to pensioners, so that prejudice that our client felt I think

5    is just as dramatic as the prejudice that the defense felt in

6    the Lotsch case and other cases that we cited our brief.

7              THE COURT:  All right.  Thank you.  I think in your

8    opposition you -- let's go back to the first trial.  Is it

9    correct that you broke your promise as to -- sorry, you

10   weren't here.  Is it correct the government broke its promise

11   about the extent of the reason for the introduction of

12   evidence about victims and what use would get made of them?

13             MS. CHERRY:  May I have one moment, your Honor?

14             THE COURT:  Sure.

15             MR. FRANCIS:  Your Honor, if it is all right, not to

16   tag team the argument but since it relates to the first

17   trial.  No.  To answer your Honor's question no, we did not

18   break our promise.

19             THE COURT:  Go ahead.  I wrote a note that said you

20   did.  I will have to find it.  You tell me why not.

21             MR. FRANCIS:  I hate to disagree with your Honor's

22   note, but I believe the argument that Mr. Mahoney is

23   referring to was the thrust of the defendant's motion in

24   limine was to prevent the government from saying taxpayer.

25   We said we won't open on taxpayer because your Honor

1    expressed some concern that what we would be doing is

2    inflaming prejudice of the jury and the government

3    appreciated the fact that just throwing out taxpayer, kind of

4    devoid of any context might have that effect.  We wanted to

5    protect our record.  So we didn't open on that.  And instead

6    we opened on the structure of the PPIF program.  We

7    introduced the evidence and on closing, in sort of responding

8    to the defendant's arguments or implicit arguments they made

9    in cross-examination in the defense case, that these lies

10    were di minimis or like water off a duck's back or didn't

11    matter.  We were laying out our materiality evidence and we

12    had six things or seven things.

13          One of them was Mr. Litvak's knowledge of the

14    identity of the ultimate victims and thus the taxpayer and

15    the pension fund and the charitable endowments were all

16    relevant to show that Mr. Litvak knew his victims cared about

17    this.  They cared about their investor money.  I believe it

18    was in some way it responded to the intent argument.  He

19    didn't intend for anyone to be hurt or defrauded or deceived

20    and so that was how we were phrasing it so that's a long way

21    of elaborating on the answer, the original answer is no.  The

22    government did not break its promise.

23          THE COURT:  So your promise is solely not to use

24    taxpayer or word taxpayer, you kept that?

25          MR. FRANCIS:  I think the promise was not open on

1    the taxpayer.  I think what your Honor said was you need to

2    connect it.  You need to show what the relevance of taxpayer

3    is opposed to just government or treasury.

4         And when we got into I recall a discussion with your

5    Honor about taxpayer being in the organic statute, the

6    statute that created the PPIF program that specific word

7    protecting taxpayer funds. We explained that's why we wanted

8    to use it.  The fact it is not in -- it is no longer in any

9    of the charged counts is why the government now concedes we

10   won't use taxpayer at all at any phase of the trial.  It is

11   no longer necessary.  We understand it is too dangerous to

12   get close to that line.  But the government as your Honor

13   pointed out, it is the facts of the case.  It is government

14   money.

15        THE COURT:  Why is it probative?  What's the

16   relevance of knowing that there was government money in one

17   of the funds that was the victim?

18        MR. FRANCIS:  Well, your Honor.

19        THE COURT:  Or pension money.  What does it matter?

20        MR. FRANCIS:  I think there's a couple of things.

21   One is the sophistication and the reasonableness of the

22   victims clearly is going to be an issue the defense is coming

23   after and the fact these victims are at least in some cases

24   like with Mr. Canter, is the person who was selected in the

25   competitive process as the best of the best, entrusted with

1    investing taxpayer money.  We won't say taxpayer, government

2    money.  Likewise hedge funds which are themselves

3    sophisticated entities.  Mr. Wollman works for a hedge fund.

4    Other hedge funds, not Mr. Wollman's, intrusts their money to

5    people like Mr. Canter and other victims in this case.

6        The fact that they are regarded in the industry as

7    being that good is relevant to the government's case to show

8    to the extent we're using these as the defense puts it, proxy

9    for reasonable investors, I wouldn't say it exactly that way.

10   We were putting them forward as having some attributes in

11   common with reasonable investors or in a sense what they

12   think is important is something a reasonable investor would

13   think is important when it comes to these lies. All the

14   facts that go into showing them to be that good, that

15   sophisticated, the best of the best are important.

16        In addition, as your Honor said, they have fiduciary

17   duties, in explaining that their fiduciary duties are not a

18   matter imposed on them by regulation or law but something

19   they feel strongly about personally.

20        THE COURT:  Is there anything special that arises

21   out of PPIF fund in the agreements with the investors there

22   that's different from any duties or understanding of

23   responsibilities that arise generally in an investment

24   relationship?

25        MR. FRANCIS:  Yes, your Honor.  As a matter of

1    contract, the government, the way that the PPIP was put in

2    place and certain funds were selected, one of their

3    obligations is special reporting requirements and special

4    supervisory.

5         THE COURT:  Does that have anything to do with the

6    duties owed?

7         MR. FRANCIS:  Yes.  Why Mr. Canter said I have to

8    report this whereas, I don't know, others might not have, it

9    seems clear that one of the things the defense would like to

10   do is show Mr. Canter is unreasonable.  He's not a reasonable

11   investor.

12        The government, therefore, is sensitive to that that

13   he is somehow the eggshell skull victim or he's

14   hypersensitive.  The reason he felt he had to report it.  The

15   reason why his response was are you freaking crazy to do this

16   to the government, is because he knew he had these special

17   supervisory, he was being supervised by the government.  He

18   had special reporting obligations and there's a separate kind

19   of police force just for his fund.  Recall Mr. Canter was

20   only trading PPIF funds.  He doesn't have any other money.

21   He only has PPIF money at the time, so he's very sensitive to

22   that.  Without being able to offer context, one fear the

23   government has is that Mr. Canter comes across as being

24   hypersensitive and thus unreasonable.

25        And as you may recall in the first trial, the

1    argument was this is a pickup basketball game.  This was the

2    defense's argument at the closing.  This is a pickup

3    basketball game and big boys call their own fouls. Mr. Canter

4    is not a big boy.  He goes and gets a referee when he gets

5    fouled.

6         Now I have no idea whether or not the new defense

7    thinks that's a successful argument and intends to make it

8    again, but at the very least the facts are Mr. Canter said

9    what he said, had reasons to say what he said, and had a

10   reason to do what he did.

11        If we can't present all of that evidence, we have to

12   sanitize out a portion of the evidence, then the jury will

13   not understand the context of why what Mr. Canter was doing,

14   not something imposed on him by fiduciary duties but was

15   eminently reasonable.

16        THE COURT:  I'm still struggling with at page 5 you

17   say that this evidence bears on elements of Litvak's fraud.

18   I understand the defendant is going to try to show that

19   Mr. Canter or the other victims weren't reasonable investors

20   because they should have done all of these things that we're

21   going to hear about reasonable investors do apparently.  I'm

22   still not sure how they do that.  I guess the expert is going

23   to tell us that.

24        What I'm struggling with is I understand your right

25   to elicit from these people evidence that shows that they

1    were reasonable in what they did, that they acted in a way

2    that's the way that everybody acts, their understanding I

3    guess or this is the way they always act and they were

4    reasonable because of among other things what Mr. Litvak said

5    to them.  I don't understand why what he does after the fact

6    when he learns of the lie, tends to bear on the element of

7    fraud.

8            In other words, his reaction as we talked about it.

9    I quoted part of it.  I'm not sure why that would tend to

10   prove intent to deceive on the defendant's part or relatedly

11   materiality as to a reasonable investor.

12           MR. FRANCIS:  Respectfully, your Honor, I think it

13   goes to materiality most clearly.  That's what I see most

14   clearly.  Just as it is relevant that an investor -- a victim

15   will take the stand, asked if you had known Mr. Litvak had

16   lied to you, what would you have done in this case and some

17   might say I would have gone back and torn up the trade

18   ticket, undone the trade, that's what Ms. Corso said in the

19   first trial.  Another might say I put him in the box, put him

20   in the penalty box, a couple of people said that.  Mr. Canter

21   did that and also escalated this to Treasury as he understood

22   was his responsibility.  Those kind of after-the-fact

23   actions that they take I think are relevant to materiality in

24   that they intend to show that this was not immaterial

25   information.  This was not information that was so

1    insignificant in the total mix of information to a reasonable

2    investor, that they disregarded it or that had an impact on

3    their investment decision.  They take it the fact of what

4    they would have done or what they actually did once they

5    discovered the fraud in Mr. Canter's case, shows how

6    important the information was to them.

7            THE COURT:  Okay.  The other issue that is raised I

8    guess in connection with this motion is what, if any,

9    redactions are appropriate from the indictment in light of

10   the circuit's decision, and as I reviewed and compared the

11   two proposals, I think that the parties are in substantial

12   agreement and the differences that I see are that the

13   defendant wishes to redact and the government does not,

14   paragraphs 6, 9, 10, and the definitions of TARP-funded

15   victim at the end of 11 and any place where that phrase is

16   later used.  Have I caught the differences?

17           Also I'm sorry.  The definition at the end of the

18   beginning of paragraph 12 privately-funded victim which, of

19   course, there would be no need to contrast if the first

20   TARP-funded victim phrase is struck.

21           MR. FRANCIS:  Your Honor, I think our proposal is to

22   redact, the government's proposal is to redact 6, 9, 10 in

23   the definitions.

24           THE COURT:  I have it backwards.  I apologize.  Yes,

25   I agree.  I had the colors wrong.  I'm sorry.  You both

1     propose redactions that you agree on except that the

2     government proposes to redact 6, 9, 10 and the definition of

3     TARP-funded victim and privately-funded victim.

4          Does the defendant propose redactions that the

5     government doesn't agree with?

6          MR. MAHONEY:  Yes, we do, your Honor.  If I can

7     catalog them, we were proposing also redacted 5, 7, 8.

8          THE COURT:  And the government didn't agree with

9     that?

10         MR. FRANCIS:  That's right, your Honor.

11         THE COURT:  Then I will have to go back and reinvent

12    this analysis.  I misunderstood so the government would keep

13    5, 7, 8?

14         MR. FRANCIS:  Yes.

15         THE COURT:  Strike 6, 9, 10.  The defendant would

16    strike 5, 7, 8, not strike 6, 9, 10?

17         MR. MAHONEY:  Right.  There's a few other

18    references.

19         MR. FRANCIS:  If I may, your Honor.  I'm not sure if

20    your Honor misspoke.  The parties agree on getting rid of 6,

21    9, 10 and then everywhere we use the term funded or privately

22    funded.  They are defined and shows up in paragraph 32.

23         THE COURT:  The definitions, anywhere those appear

24    but appear at the end of 11 and 12.

25         MR. FRANCIS:  The parties are on the same page on

1    that.   The defense would also like to redact other

2    paragraphs.

3             THE COURT:  So the defendant wants to redact 5, 7, 8

4    and the government doesn't want to do this?

5             MR. FRANCIS:  Correct.

6             THE COURT:  Give me just a moment to readjust my

7    thinking.   It is the government's position that had you not

8    charged the TARP fund counts, you would have still included

9    5, 7, and 8?

10            MR. FRANCIS:  It is hard to answer that.  To some

11   extent, it intrudes on some of the decision making in the

12   office.

13            THE COURT:  I will reframe the question then.

14   Objection sustained.  Why should 5, 7, 8 remain in the

15   redacted indictment?

16            MR. FRANCIS:  First nothing in the indictment is

17   evidence as your Honor will instruct the jury.  We typically

18   when we have what is colloquially known as a speaking

19   indictment like this, it is because it is complicated sort of

20   case.   It is not just a typical case.  We want to layout some

21   of the facts.

22            In this instance, we think it is useful to the jury

23   to hear in sort of just as getting to know you way, when your

24   Honor reads the indictment to them, there's some terms they

25   are going to hear.

1              Your Honor will recall in the first trial, we handed

2       out a cheat sheet of abbreviations like PPIF and stuff

3       because they were going to hear them that often.  But they

4       are not going to hear them that often, but they will hear

5       them from one of the government's first witnesses.  They will

6       hear about all of these things.  From the government's

7       perspective, it is the government's right to put in whatever

8       it thinks is appropriate in the indictment.  To the extent it

9       can get the grand jury to return that indictment then that's

10      an appropriate indictment.  There's nothing here that creates

11      the possibility that the jury is going to think somehow just

12      because it is in the indictment, it must be true because I

13      recall your Honor's instruction on this is very clear.  So we

14      just think it is a useful way to put the jury in context so

15      opening statements don't need to be even longer and more

16      boring than necessary.

17              THE COURT:  You don't think reading the indictment

18      is boring?

19              MR. FRANCIS:  I understand it is boring for your

20      Honor.

21              THE COURT:  Trust me there is going to be 14 other

22      people who are going to share my view.

23              MR. FRANCIS:  If the government thought it didn't

24      have any utility, we wouldn't ask for it.

25              THE COURT:  It puzzles me because it is an odd

1    situation.  If there hadn't been counts dismissed, the

2    defendant makes a motion to strike surplusage or whatever, it

3    is not likely they will win unless it is inflammatory or

4    whatever.

5         The problem is we're striking counts and presumably

6    there's information earlier in the indictment that's related

7    to those counts.  I don't understand if you take 6, 9, and

8    10, out, I'm not sure why 5, 7, 8, is required in the

9    indictment when you don't have a TARP count anymore.  But

10   does anybody have any cases on this issue?  Striking language

11   in an indictment on a retrial on a remand when counts were

12   dismissed or vacated judgments vacated and counts dismissed I

13   guess.

14        MR. FRANCIS:  We do not.  We would be happy to go

15   look again.

16        THE COURT:  Well, I guess if anybody finds any in

17   the next few days, that would be very helpful.  I'm not sure

18   we did.

19        358, Defendant Litvak's motion in limine to exclude

20   evidence and argument regarding his compensation.  That

21   sounds very familiar to me.

22        The first thing I would observe which perhaps in

23   responding to later questions, you can work into your

24   responses to explain if I'm wrong, but the defendant seems to

25   argue and cite to testimony in things that happened in the

1    first trial that the government can't point to a particular

2    sale as it relates to the income of Mr. Litvak.

3         However, I didn't understand the government to argue

4    that in the first trial, and I don't understand that they

5    have evidence that they could introduce that would prove

6    that.  And they in turn cite to testimony that came in the

7    first trial on the relationship between the profitability of

8    a trade and the income received by the broker.  In this case,

9    Mr. Litvak.  It is kind of like you're two ships passing in

10   the night.  But before I kind of get to the substance of it.

11        There's a couple of hints dropped within the

12   government's memo about not having any testimony so do I have

13   to address this question at all?  I start out at the same

14   place I started out the last time which is this is obviously

15   subject to connection up I think is probably how I put it the

16   first time around.  Therefore, the government needs evidence

17   upon which it can base a connection between compensation and

18   what Mr. Litvak did.

19        And it strikes me, for example, if the testimony had

20   been the more trades you do, the more bonus you get, that

21   wouldn't be terribly relevant because Mr. Litvak could have

22   done a trade without a lie or as well as do a trade with a

23   lie, he would have got the same bonus.

24        I thought the testimony I think it was of

25   Mr. Eveland that the profitability of a trade bears a

```
 1    relationship to your income and that's exactly what the

 2    defendant did here was to increase the profitability to his

 3    company of the trade, and I think that's a connection.  But

 4    my first question to the government is are you going to have

 5    that evidence in the second trial?

 6              MS. CHERRY:  Well, we may not have it through

 7    Mr. Eveland, but we intend to bring it in possibly in other

 8    ways which may include some documentary evidence where we do

 9    some analysis and look at Mr. Litvak's compensation and the

10    profit and loss of his trading portfolio.  That's one

11    possibility.

12              There may be other witnesses that bring forth this

13    evidence. There may also be Mr. Litvak's own words where he

14    refers to the fact that he wants to make more dollar signs,

15    dollar signs, dollar signs; where he refers to the type of

16    commissions that he's getting on selling certain bonds.

17              THE COURT:  Why have you listed his W-2's as

18    exhibits?

19              MS. CHERRY:  I think his W-2's would be used if we

20    do some sort of analysis and need to show what his total

21    compensation is.

22              THE COURT:  We didn't get close to that in the first

23    trial.

24              MS. CHERRY: My understanding is the government

25    didn't need to because it had Mr. Eveland to make that
```

1    connection.  If we don't have a witness to testify to that

2    particular connection, there might be other ways that the

3    government chooses to try to present that connection.  One of

4    those ways might be to show the components of his

5    compensation in relation to his trading portfolio.

6              THE COURT:  I don't know how to respond to that.  I

7    will say what's on my mind.  There's no way you are

8    introducing his W-2 unless you have drawn some connection

9    between the information on the W-2 and the scheme at issue in

10   this case. You told me in the memo that your sole purpose,

11   it's a limited purpose is the phrase you use, to show his

12   motive for doing this.  Presumably to rebut any argument it

13   was innocent.  I didn't mean to do it.  You are showing

14   motive.  You are not going to make any other argument than

15   that at all, is that correct?

16             MS. CHERRY: Yes, in terms on his compensation, yes,

17   your Honor.

18             THE COURT:  Do you agree that talking about Mr.

19   Litvak's profits is a misstatement?

20             MS. CHERRY:  Well, I think that people refer to it

21   colloquially as his profit.  It is his book.

22             THE COURT:  I'm talking about government

23   arguments.

24             MS. CHERRY:  Well, I mean I think that -- I don't

25   think the government ever expresses and we don't intend to

1    express that he gets to pocket every dollar he makes when he

2    does a trade.

3            THE COURT:  When you use a word like Mr. Litvak's

4    profits from this trade were the delta of the lie.

5            MS. CHERRY:  I think we're trying to shorten the

6    fact that it is his book.  He refers to his profit.  People

7    in the industry refer to their trades, their profit.  Every

8    time he does a trade, we say Mr. Litvak did the trade.  We

9    don't say Mr. Litvak put in the order on behalf of Jefferies.

10   We have Mr. Eveland refer to it as the trader's profits,

11   their profits.  We call it revenue, their revenues.  I think

12   that's how people spoke about it in the industry.

13           THE COURT:  I don't have any problem with witnesses

14   testifying to how they speak about it.  I don't have any

15   problem with you using those statements in your arguments to

16   the jury.  But I don't think that means you can take a word

17   that a person uses like agent in their answer which is a

18   factual statement of a lay opinion and translate that into a

19   legal conclusion so similarly here, we have documents I think

20   of Mr. Litvak talking about his profits.  I may be wrong

21   about that.  I know there's evidence people talking in that

22   way, the way you just described.  That doesn't mean that

23   allows you to convert that into an argument by you that Mr.

24   Litvak profited on the trade and use the number that's the

25   total amount of the delta caused by this lie.

1          MS. CHERRY:  I understand, your Honor.  I think

2     that,  you know, what -- at the first trial, I don't think we

3     ever intended to say on a particular trade one hundred

4     percent of those dollars went to Mr. Litvak and we brought

5     out evidence later on from Eveland that that would not be the

6     case, that there was some smaller percentage funneling down

7     to Mr. Litvak and that when the profits were made from Mr.

8     Litvak's trades, they went to Mr. Litvak and Jefferies

9     obviously.  And so that was our intention.  I don't think --

10          THE COURT:  You understand in what you just said

11     although I would reorder the order of it, you need to make

12     two or three connections there.  Correct?  You have to show

13     he made more money.  He, Mr. Litvak, caused Jefferies to earn

14     a greater fee than otherwise by the lie.  Then you need to

15     show that there is a connection to his benefit, i.e., his

16     compensation by increasing the profitability of sales which

17     is what Mr. Eveland said.  He said exactly what he needed to

18     say to connect it up.  That doesn't allow you to translate

19     that into an argument that Mr. Litvak benefited by the gross

20     amount or some other argument like that about his profits on

21     the trade.

22          MS. CHERRY: Yes.  I understand, your Honor.

23     Obviously if we're able to make this connection as we did

24     through Mr. Eveland that the profits of the trades eventually

25     a part of that goes to Mr. Litvak, then we intend to make the

1    argument that Mr. Litvak profited from the trades that he

2    did.

3           THE COURT:  Yes, I agree, but the delta from the lie

4    are not his profits.

5           MS. CHERRY:  I understand, your Honor.

6           THE COURT:  Okay.  From the defense side, I made

7    that opening comment about you seem to be arguing one thing

8    which I don't think is what the government proved or argued

9    at the first trial or seeks to do at this trial, so I'm

10   really kind of confused about what you want me to do here.

11          I don't think I can tell witnesses don't use words

12   that you used especially if -- again I could be mistaken,

13   there may be words that Mr. Litvak uses or phrases he uses.

14   So I don't know what you want me to do here.

15          MS. BAUMGARTEN: I think we're in agreement there's a

16   little bit of two ships passing in the night here.  The two

17   things we're asking for first is that the absolute number of

18   Mr. Litvak's compensation to be excluded.  That's necessary

19   when they put Mr. Litvak's W-2's on their exhibit list and

20   refuse to stipulate to not introducing the amount of

21   compensation.

22          THE COURT:  They could connect up somehow that makes

23   that relevant.  I don't see it yet.  They didn't do it in the

24   first trial so they didn't come in.  But I'd suspect you

25   would probably hit the roof if they did connect it up and

1    then said now we want to our the W-2 for the years in

2    question and you would say that it's not on their list.

3        MS. BAUMGARTEN:  Well, that's I guess a hypothetical,

4    but the testimony at the first trial was to the contrary of

5    that saying there's no way to connect it up.  We would like

6    to preclude them from using that in opening for example.  The

7    only evidence in any record that there's no way to link Mr.

8    Litvak's trade ex-anti to the amount of compensation he

9    received.

10       THE COURT:  Well, there is a way in the sense that

11   his compensation increased.  We don't know by how much or how

12   much of his compensation in any one year was due to the fact

13   that he lied to the people who bought his bonds.

14       But the only thing that bothers me here is

15   Mr. Eveland is going to be here to say the same thing.  If I

16   assume the government can prove what they proved in the first

17   trial, I don't think that makes the W-2's admissible, but it

18   certainly allows them to make the arguments they made other

19   than what I talked about with the government's counsel, about

20   them arguing that he profited to the full extent of the

21   delta.

22       MS. BAUMGARTEN:  We agree.  We aren't objecting to

23   them trying to introduce evidence of motive, financial motive

24   here.  We are objecting to two specific things.  Numbers of

25   his compensation and second his conflation of Jefferies'

1    profits, Mr. Litvak's profits, statements from the first

2    trial like Mr. Litvak made an extra $73,000.

3         THE COURT:  Are you asking me to keep the witnesses

4    from saying that?

5         MS. BAUMGARTEN:  No.  The witnesses did not testify

6    that way in the first trial.  That's part of the reason it is

7    so prejudicial.  Mr. Eveland testified that ex-ante there's

8    no way to connect a trade to his profit.  Ex-post to do that

9    he thought yes, compensation was between five and 12 percent.

10   Ex-post reconstruction of how Mr. Litvak's compensation

11   worked is not relevant to the purpose the government is

12   trying to use this evidence for which is proving Mr. Litvak's

13   motive.

14        THE COURT:  Your motion asks me, quote, to preclude

15   the government from introducing evidence and argument at

16   trial concerning Mr. Litvak's compensation, end quote.  That

17   would sweep so broadly as to preclude the evidence that came

18   in at the first trial which in my opinion was perfectly

19   proper.  It laid a foundation, it drew a connection to the

20   fact that Mr. Litvak likely makes more money if his trades

21   were more profitable.

22        MS. BAUMGARTEN:  We agree and to the extent our

23   motion sweeps too broadly, we intended to clarify that in our

24   reply brief where we stated that he's moving to exclude two

25   categories in the first sentence of that reply, docket 410,

1    which is the first makes misleading statements conflating the

2    total amount of revenue.  Second, the absolute number of

3    compensation.  We think that would include type of

4    calculation that counsel for the government is describing

5    where you put up his numbers and try to, you know,

6    reconstruct what his motive would be.  That would be

7    misleading to the jury to try and, you know, apply there's

8    some direct connection that no one testified about at

9    present.

10         THE COURT:  With respect to the narrow relief you

11   seek in 358, as to the first, I have already had a

12   conversation with the government and it sounds to me if they

13   will be more careful in how they refer to profits and second,

14   as to introducing total compensation, my view is the same as

15   the first trial.  I don't see a basis right now for it to

16   come in.  I haven't heard anything the government said that I

17   think would permit them to come in.  They are not in right

18   now.  I'm not admitting them now.  I don't know that I can

19   say they are precluded if the government were able to develop

20   and offer evidence at trial that made them relevant and

21   demonstrated that that evidence would tend to prove the

22   purpose they are introducing any of this about which is

23   motive.

24         So I will reserve on this.

25         MS. BAUMGARTEN: I was going to ask that the

1    government be precluded from referencing his amount of

2    compensation at a minimum in their opening statement where we

3    know the evidence at the last trial did not link that total

4    amount of compensation up to his activity here.

5         THE COURT:  Does the government want to respond to

6    that before I express my view on it?

7         MS. CHERRY:  I don't think the government has an

8    issue with that.  To my knowledge, we didn't do it in the

9    first trial.

10        .

11        THE COURT:  I don't think did.  I wouldn't think you

12   have a problem with it.  I don't hear that you have a basis

13   to get it in right now.  Let's assume they were having

14   Mr. Eveland here saying exactly the same thing again, they

15   are entitled to make a reference I think to the fact the

16   evidence would show in their opening that Mr. Litvak had a

17   motive.  I think that testimony is supportive of that

18   argument.  I don't think it involves or could include any

19   reference to his total compensation or to Mr. Litvak's

20   profits per trade.

21        The next is 359 which I have a note that says should

22   be moot.  Does the defense agree on that?

23        MS. COMMONS: Yes.

24        THE COURT:  Does the government agree?

25        MR. FRANCIS:  Yes, your Honor.

1          MS. COMMONS:  We would ask the Court to order the

2     government to make a proffer we suggest by December 1, 2016.

3     Its final list of 404(b) evidence that it intends to offer at

4     trial.

5          THE COURT:  My understanding is -- I'm not sure who

6     is doing this.  You disclosed 19 trades you marked as

7     possible exhibits.  And I guess you did reserve the right to

8     introduce other exhibits.  Wasn't clear if that meant related

9     to those 19 or whether it meant you might increase the 19.

10          MR. FRANCIS:  We don't have any intention of

11     increasing the number.  We have an intention of decreasing

12     it.  We marked at the first trial 16 and didn't use 10.  We

13     intend to do that.  When we have confidence we don't need any

14     other, we'll let the defense know.  I wouldn't rule it out

15     because sometimes when if we want to bring in other trades,

16     for instance, to draw the sting or something like that, we

17     might add some.

18          THE COURT:  The date suggested?

19          MS. COMMONS:  December 1, 2016.

20          THE COURT:  December 1.  That's a little more than a

21     month before the trial.

22          MR. FRANCIS:  The proffer they are referring to is

23     what we did for the first trial.  It is a cheat sheet.  It

24     was a summary.  We'll do it whenever your Honor wants that.

25     It's for your benefit.

                    THE COURT:  I thought she wanted to know if your 19

was going to grow to 20.

                    MS. COMMONS:  That also.

                    THE COURT:  Also or what else?

                    MS. COMMONS: That's what we're asking.

                    MR. FRANCIS:  In that case, respectfully I think

we'll do the best we can.  When we're prepping witnesses is

when we tend to find out during the sting.  We have this

other trial that goes into November.  We'll do our best to

hit December 1.  The defense reserved the right to add to the

exhibit list.  We expect them to operate in good faith.  We

hope they will reciprocate and be open to an addition here or

there if it is something we learn about.

                    THE COURT:  When is Judge Chatigny's ending?

                    MR. FRANCIS:  October 18 is the jury selection.  We

don't know evidence.

                    THE COURT:  How long is the trial expected to be?

                    MR. FRANCIS:  At least as long as this one.  A three

defendant trial with three separate law firms so I think

likely longer than this one.

                    THE COURT:  I will set a date of December 15.  It is

a Thursday.  I will set the 15th.  I assume we'll have some

sort of status conference.  Maybe have to do it after your

trial up in Hartford but sometime in the fall and I probably

will have known myself whether that trial actually goes when

1    Judge Chatigny has set it.  If it doesn't go then, I guess I

2    would ask -- I'm sorry, I didn't write your name down.  I

3    apologize.

4            MS. COMMONS:  Krystal Commons.

5            THE COURT:  Attorney Commons, I would suggest that

6    if he's not on trial, everybody on that side is not on trial

7    in October, November, when we have a conference to deal with

8    whatever issues are open, pretrial conference that you remind

9    me that I set this date, given the situation that counsel

10   were in and their ability to be in a position after prepping

11   witnesses to identify maybe one or two more so hopefully

12   December 15 gives you some time after this trial to get

13   started prepping witnesses, but if you are not on trial, I

14   think we could make a little bit earlier.

15           MR. FRANCIS:  We don't intend to wait until the eve

16   of the deadline, your Honor.  Thank you for that.

17           THE COURT:  I think the next number is 360.  That's

18   really a question about the instructions on the materiality

19   or the exclusion of importance testimony.  I will skip that

20   for now.  I may come back before we finish today.  I will try

21   to get through some more, if I could.

22           366 I think is the next one I have which seems to be

23   agreed to.  It is the government's motion in limine to

24   preclude reference to dismissed counts.  You appear to agree

25   but disagree about the, quote, opening the door language, end

1    quote.  That occurs in another one as well.  I guess I need

2    to start with the defense first on this.  My first question

3    is how is the government going to open this door.

4         MS. COMMONS:  So, your Honor, it is not necessarily

5    we thought about this.  It is not we can necessarily come up

6    with any strong hypothetical about how they could open the

7    door.  It is always the case two parties stipulate if one

8    party opens the door, the other party has the opportunity to

9    respond to that.

10        THE COURT:  Why do I have to say it if it is always

11   the case?

12        MS. COMMONS:  To make the implicit explicit.

13        THE COURT:  I will make it explicit.  I don't like

14   to reinvent decisions I've made or stipulations the parties

15   agreed to.  It seems to me indisputable with any of my

16   rulings or any of your stipulations, if the underlying

17   foundation of the agreement or my ruling changes, then the

18   other side, one side is going to revisit it I presume if they

19   want to revisit it.  It troubles me that you can't tell me

20   what would open the door because normally what I do in

21   situations like this is to say that, I don't know, usually on

22   cross maybe of a defendant or something well, if he says X in

23   one of his answers, then that's going to open the door, and I

24   will say to the party who is arguing that, well, fine but you

25   are going to have let me know that you think he opened it,

1    what it is he said, we're going to do it at a break.  Not

2    wasting the jury's time, not coming to sidebar.  We are not

3    going to wait until you're examining him to ask the question.

4    We're going to address it as soon as he opens the door in

5    your view or as soon as possible, but usually I have an idea

6    what would open the door and so does the other side, and so

7    this is kind of a, I don't know how to describe it.  I agree

8    with you in theory that, you know, any party can open the

9    door on something which will result in the judge reexamining

10   the original decision because the circumstances have changed.

11   Because I didn't know what he would say that would allow you

12   as a matter of due process the right to cross-examine him on

13   that subject or introduce evidence to the contrary.

14        It bothers me I can't think of anything.  You can't

15   think of anything.  It is like -- bothers me because I have

16   this really worrisome feeling that I will be sitting in the

17   middle of this trial and some day you will say at the break,

18   he opened the door on the dismissed count so we get to -- and

19   it would be a complete shock to me and to the government that

20   that would have nailed it.  Do you follow me?  Usually we

21   know what's going to do it.

22        MS. COMMONS:  I understand your concern.  I think to

23   the extent that it raises concerns, we'll address that issue

24   with the Court.  If we have a question, we'll follow this

25   process.  We're being overly cautious and making sure it was

1    clear we're reserving our right to address this should the

2    door be open.

3         THE COURT:  Thank you.  The next is -- I might as

4    well dispose of that one.  366 is terminated as moot in light

5    of the agreement between the parties that reference to the

6    dismissed counts is not appropriate and will not be

7    undertaken obviously with the colloquy on the record about

8    the understanding that any ruling or agreement of the

9    parties is subject to being revisited if the circumstances

10   have changed such that it justifies a different outcome.

11        The next is government's motion in limine to

12   preclude argument that the government failed to use certain

13   investigative techniques.  I'm a little befuddled in reading

14   these memos on this motion because I'm not sure you are

15   talking about the investigative techniques.

16        Is it your view that you are going to introduce

17   evidence at trial that the government calculated in not

18   interviewing certain people until after the indictment in

19   order to be able to taint either through news magazines or

20   otherwise suggest to those witnesses what they should say

21   when they wouldn't otherwise have said it?

22        MS. COMMONS:  I should start by saying, your Honor,

23   it is not our intention to argue that the government should

24   have undertaken a different investigation.  That's simply not

25   what we're doing here.

1        With respect to the timing of when a witness is

2    interviewed, it is not necessarily our argument that the

3    government attempted to taint the witnesses.  That could

4    substantially go to witness bias.  Depending on what a

5    witness knows about the government's theory of the case that

6    may change or skew the way that they view the case, knowing

7    whether or not that there had been criminal charges filed.

8    All of these goes to the witness bias.  We think it is

9    relevant when a witness was interviewed and whether or not

10    they had adopted the government's theory prior to talking to

11    the government.

12        THE COURT:  I understand part of what you said is

13    bias but I guess maybe it can all be called bias, but all

14    right.  I won't quibble about that.  I do agree with you I

15    don't think it is an investigative technique issue.

16        So let me turn to the government on this.  I really

17    don't think your motion frames it as arguing about

18    investigative techniques.  They are not going to argue that

19    you calculating did it this way, so I don't see that it is a

20    technique issue that they are arguing about.

21        All the cases that you gave me are ones that I would

22    have been able to anticipate.  They didn't fingerprint the

23    gun so the defendant didn't possess it.  They didn't -- they

24    would have taken pictures of the meeting and they didn't so

25    we have to rely on this witness's testimony.  That's terrible

1    or they shouldn't use cooperators because it is not a good

2    idea.  We shouldn't encourage public policy.  Those are --

3    the latter maybe not.  The others are certainly techniques of

4    the investigation.  Those are clearly forbidden.  It is not

5    for the jury to worry about.  The jury has to worry about

6    what the evidence is or isn't and whether the burden of proof

7    has been met.

8           I don't understand why the defense can't

9    cross-examine a witness about his testimony to the point or

10   effect that your testimony was informed by articles you read,

11   was informed by the fact that the government indicted

12   somebody and, you know, maybe they will indict you, maybe I

13   better say what the government wants me to say, that type of

14   an argument.

15          MS. CHERRY:  I don't think -- we're not making the

16   argument that they cannot question the witness about the

17   witness's potential bias.  That's not at all the argument

18   we're trying to make.  What we're saying is asking a witness

19   when they were interviewed, does not go to, we do not

20   believe, goes to bias and as the defense sort of titles their

21   section conducting investigation is relevant to the absence

22   of evidence, that's our concern.

23          THE COURT:  Say that again.

24          MS. CHERRY:  They sort of talk about how the

25   techniques that we use are relevant to the absence of

1    evidence.

2           THE COURT:  Where do they make that argument?

3           MS. CHERRY:  They title their section on page 4.

4    What we're saying is this is not about the absence of

5    evidence but because if there's an absence of evidence,

6    obviously they should point that out but that it is the

7    reasons.  They can't go to, you know, what the government did

8    or didn't do.  And they shouldn't and whether or not they

9    interviewed a witness before the indictment or after the

10   indictment, we don't think goes to bias.  If we they want to

11   talk about the content of that interview and the questions

12   that were asked, we understand that could potentially go to

13   bias.

14          THE COURT:  Maybe what the witness read before he

15   was interviewed, whom he spoke to, what his supervisor may

16   have told him if it affected what he told the government I

17   suppose, get around the hearsay problem.  You can find a way

18   to get around it.  The fact whether he was concerned that he

19   might become a target.  You can ask them all those kind of

20   questions, right?

21          MS. CHERRY:  Yes, we don't have issues.  It is more

22   about when and also any references to who we didn't

23   interview.

24          THE COURT:  This all arises because in the last

25   opening defense counsel made some sort of argument about the

1    timing of the interviewing witnesses.

2         MS. CHERRY:  I think it was also in

3    cross-examination of at least one of the witnesses, if not

4    more.

5         THE COURT:  Timing then they had different

6    knowledge.  Why is the question about the timing wrong?

7         MS. CHERRY: Sorry.  I apologize. It was

8    cross-examination of our agent, Agent O'Connor, about when he

9    interviewed witnesses.  So that certainly wouldn't go to

10   witness bias.  They have the opportunity on cross of the

11   witnesses to raise witness bias.

12        THE COURT:  Attorney Commons, you argue at page 4 of

13   your memo something about to preclude Mr. Litvak from asking

14   questions of government witnesses that would allow him to

15   demonstrate the absence of key evidence.  What are you

16   referring to there?

17        MS. COMMONS:  So could you point me to that

18   language?

19        THE COURT:  It's page 4 of your memo, about the

20   sixth line down, the sentence is but it would preclude Mr.

21   Litvak from asking questions of the government witnesses that

22   would allow him to demonstrate the absence of key evidence.

23        MS. COMMONS:  So, your Honor, what we're concerned

24   about is the government's motion it sweeps too broadly.  It

25   asks the government or asks the Court to preclude the defense

1    from asking questions that may be permissible that go to

2    absence of evidence or witness bias.

3            THE COURT:  What's the absence of evidence?  We talk

4    about the bias.  I'm fine with you on that.  What's the

5    absence of evidence argument? That they didn't interview

6    somebody?  That's investigative techniques and decisions.

7    That is not permissible.

8            MS. COMMONS:  Yes, your Honor.  We think that they

9    are asking the court to rule on this in a vacuum.

10           THE COURT:  I'm asking you.  You made -- I

11   apologize.  I shouldn't interrupt.  I will be mad at you if

12   you interrupt me.  Since I did it, I won't do it again.  I

13   have done it.

14           I'm asking you what is the key evidence you will not

15   be able to introduce -- I'm sorry.  What's the absence of key

16   evidence you won't be able to introduce if I granted their

17   motion?

18           MS. COMMONS:  We wouldn't be able to introduce

19   evidence that could be important for context, your Honor.

20   We're talking about one witness here, the investigating

21   agent.  They are calling the investigating agent to come in

22   and say we did the investigation, the underlying facts are

23   the foundation to doing the investigation.  We think their

24   request sweeps too broadly.

25           A number of questions that were asked last time

1    about whether or not witness interviews were conducted,

2    potentially go to absence of evidence and so we want to be

3    able to make these arguments so that we can make our

4    arguments in closing.

5         THE COURT:  So you want to be able to ask questions

6    and argue about the government's investigative techniques.

7         MS. COMMONS:  Not necessarily.

8         THE COURT:  You have to tell me.  You are being too

9    vague.  You want to be able to introduce evidence and make an

10   argument.  I asked about what.

11        MS. COMMONS: Questions asked last time and not

12   objected to last time that went to whether or not the

13   investigating agent gathered and analyzed documents, what was

14   important when interviewing a witness for the first time.

15   There was an objection and sidebar.  Your Honor allowed the

16   question.  If hypothetical questions were using Mr. Litvak's

17   name occurred during the course of an interview.  There's

18   questions about if meetings with representatives from

19   Jefferies took place. One particular question was whether or

20   not the agent went out and collected best evidence -- best

21   execution policies from the alleged victims so their reliance

22   of questions last time that were permissible that now be

23   precluded by what the government is asking which is pretty

24   broad ruling on the abstract.  We ask your Honor to reserve

25   on that until we see what the evidence is.  We can ask your

1    Honor.

2              THE COURT:  It was used in opening.  So we have to

3    have some kind of ruling.  And I clearly sustained

4    objections.  I guess you tell me if you think I was wrong.

5    There were questions I think that I sustained objections to.

6    Was the interview after the indictment?  I sustained that

7    objection.  Is it your position that that was error that I

8    should have allowed the question of the timing?

9              MS. COMMONS:  With respect to the particular

10   witnesses, yes.  We again state that that goes to witness

11   bias if it is related to a particular witness.

12             THE COURT:  Why can't you ask the witness who was

13   interviewed, when he was interviewed and what he knew at the

14   time.  Isn't that -- I think a decision questioning an agent

15   about when he decides to interview someone, it looks like,

16   talks like, quacks like, an attack on the investigative

17   techniques.

18             If you do it in the context of a witness and you're

19   cross-examining him on his truthfulness, you are trying to

20   impeach him, then it is not an attack on the technique.  It

21   is an attack on the influence on the witness because of when

22   he was interviewed, what he knew at that time, you know, he

23   wouldn't have known that pre-indictment, but I don't think

24   you can ask the agent, in effect, suggest at that time the

25   agent should have done something different unless go back to

1    my first question to you which you denied.  You intend to

2    prove that the government intended and had a scheme to

3    structure when they went and found witnesses in order to get

4    people whose testimony would be tainted.  You told me no.

5           MS. COMMONS:  Correct, your Honor.  I think the

6    objection was sustained on Joe Wollman's testimony.  Prior

7    defense counsel asked him when he was interviewed.  There was

8    an objection.  That objection was sustained. We would say in

9    that case, we think that that objection was respectfully

10   erroneous.  We should have been allowed to ask that question.

11          THE COURT:  Is that what I did with Mr. Wollman and

12   why wasn't I wrong?  You seem to agree with them in your

13   reply that, you know, bias is fine.  Bias the phrase is

14   probably not the correct characterization of this, I would

15   call it impeachment.  They are attempting to attack the

16   truthfulness of the testimony either by suggesting the

17   witness is mistaken because he's imprinted post-indictment

18   information he learned on to his recollection of things that

19   he's telling you about or he's intentionally doing it because

20   he's biased. Those are two forms of impeachment that I think

21   are perfectly proper.

22          MS. CHERRY: I think the government would agree.

23          THE COURT:  So then I shouldn't sustain the

24   objection when it comes to a victim testimony?

25          MS. CHERRY:  I think if they are using for the

1    purpose of bias or impeachment, that's perfectly

2    reasonable.

3         THE COURT:  Why isn't the question of Mr. Wollman

4    for that purpose that I didn't allow?

5         MS. CHERRY:  May I have a moment, your Honor?

6         Your Honor, we believe that Mr. Wollman was

7    interviewed before the indictment.  That's our recollection

8    and so the question then is what was the purpose of that line

9    of questioning.  It wouldn't go to the bias so I think it

10   depends on the particular witness and the circumstances that

11   surround these type of interviews with the witnesses.

12        THE COURT:  Very good.  I don't know who is right.

13   Let's assume we have a victim witness on the stand who is

14   interviewed before the indictment.  How is the theory of

15   impeaching bias or lack of truthfulness or whatever based on

16   things that were learned after indictment going to be

17   relevant to that witness?

18        MS. COMMONS: We would say that to the extent there's

19   a theory of Mr. Litvak's conduct that exists, and the witness

20   is aware of that theory, we think that we should be able

21   to -- he's being investigated, he's being charged, there's an

22   indictment forthcoming, any of those things go to whether or

23   not a witness, you know, has created or has a particular

24   opinion based on the theory so, again we would say that when

25   is important because it leads to bias potentially, not

1    something that we intend to do with a witness at all.

2    Talking about very isolated, discreet incidences.

3              THE COURT:   I want to write that down and I can

4    guarantee you it won't be isolated and won't be discreet as

5    I've learned from going back over the record of the first

6    case.

7              Does the government object to the idea that they can

8    cross-examine a witness as to what they were told by the

9    government at the time they were being interviewed?

10             MS. CHERRY:   No, your Honor.   I think that would be

11   fair.

12             THE COURT:   Okay.   So what else do you want to do by

13   way of impeaching the witnesses?

14             MS. COMMONS:   Nothing else, your Honor.   I think

15   that we just -- we think this is a pretty broad ruling they

16   are asking.   To the extent the questions were asked last time

17   that were permissible, we ask those same questions of the

18   investigating agent be permissible.   Many of them were not

19   objected to.   We would ask for a bit of leeway.   We represent

20   to your Honor we don't intend to ask questions about the

21   investigative technique that don't go to witness bias or the

22   absence of evidence.   To the extent there's something that

23   potentially does, we would ask that the Court reserve and

24   rule on question by question basis just as we did last time.

25             We're only talking about one witness, the

1    investigating agent, to make a broad ruling now leads to us

2    quibbling at trial about what's within the scope or outside

3    the scope of your Honor's ruling.

4         THE COURT:  I think, you know, any trial judge says

5    there will be no questioning about investigative techniques

6    leads to quibbling at to trial about whether something is

7    investigative technique.  If you can figure out a way to

8    avoid that, I would be really interested in hearing it.  If

9    you want me to permit you to ask the questions you asked at

10   the first trial, you will have to point out to me what

11   questions that you asked at the first trial that you think

12   are proper and you would like to ask again.  Either whether I

13   allowed them or didn't allow them.  I don't remember the

14   questions that were asked.  I don't remember my rulings on

15   the agent's testimony and objections to questions that were

16   asked so talk about ruling in a vacuum.  I'm certainly not

17   going to rule that way in a vacuum.

18        MS. CHERRY:  I have a copy of the first trial

19   transcript if you would like me to hand up the highlighted

20   questions.

21        THE COURT:  You need the give the government a copy.

22        MS. COMMONS:  I have a copy as well.  May I

23   approach, your Honor?

24        THE COURT:  Yes.  I will take a look at that and

25   incorporate my reaction to it in the ruling.  I gather that

1    the highlighted sections are questions that you wish to still

2    ask and I should be clear any ruling on the government's

3    motion about investigative techniques does not preclude that

4    line of questioning.  Is that a fair statement?

5           MS. COMMONS:  Yes.

6           THE COURT:  The next is 369.  The government's

7    motion in limine to preclude evidence or argument blaming the

8    victim.  Let's start with the defense.

9           Attorney Mahoney, would you agree with me that you

10   cannot elicit questions, framed questions or make argument to

11   the effect that it is the victim's fault that any harm

12   occurred and that Mr. Litvak, therefore, is not guilty?

13          MR. MAHONEY:  As your Honor stated that, I think

14   that's appropriate because I think what's imbedded in the

15   statement that your Honor made is the suggestion that there's

16   somehow some comparative negligence defense to securities

17   fraud.  We certainly don't take that position and won't make

18   that argument to the jury.

19          THE COURT:  Okay.  You don't, therefore, intend to

20   have your experts testify in a way that would suggest that?

21   It sure locks like that.

22          MR. MAHONEY:  The suggests that is maybe what I

23   would quibble with.  What we're going to have our experts do

24   are two things.

25          Number one, is to explain primarily Mr. Burnaman is

1    going to offer the opinion that the types of information that

2    are the subject of the indictment are not important to

3    reasonable investors in this field.  What Mr. Burnaman is

4    going to say which is a common sense point, is the

5    sophisticated investors in this field follow the mantra of

6    trust but verified.

7         If you can't verify some things, it is unreliable

8    and you don't consider it very important.  Mr. Burnaman --

9    that's one of the bases for his opinion that this information

10   is not important.

11        Now, secondly, we will also point out that although

12   we actually think we agree with the government, these are all

13   very sophisticated investors, Michael Canter, Joel Wollman,

14   these guys are nobody's fools, but the government's

15   materiality case rests on holding up Wollman, Canter, Corso,

16   all of these counterparties as charismatic examples of the

17   reasonable investors.

18        What the Court of Appeals held was that we should be

19   able to rebut the assertion that portfolio managers and

20   traders who testified at trial, reflect the views of a

21   reasonable investor.  If we can't suggest something that

22   their testimony is not akin of that of what a reasonable

23   investor, it is the equivalent of forcing us to throw in the

24   towel on materiality before the trial begins.  We clearly

25   don't have to do that.

```
1              I understand there's sort of this affirmative
2      defense argument there could be the lines of questioning that
3      could be seen as badgering the witness, we're not going to do
4      that.  This all goes to our theory of materiality in the
5      case.  That's how we're going to use it.
6              THE COURT:  Are you confusing intent and
7      materiality?
8              MR. MAHONEY:  I don't believe so, your Honor.  This
9      is all about what a reasonable investor would consider
10     important.  It is not about Mr. Litvak's understanding of
11     what a reasonable investor would consider important.
12             THE COURT:  If you go back to fundamentals, isn't
13     that a statement of law.  You tell me.  Maybe I'm
14     wrongheaded.  I thought that the question of materiality
15     really is part of the defendant and his intent, his creation
16     of a scheme to deceive, a scheme that would not deceive a
17     reasonable person isn't a scheme to deceive.  Okay.  I
18     mean -- maybe I'm confused.  Maybe I'm wrongheaded and
19     obviously we have a long way to go with respect to what's the
20     number I passed 360 materiality before I get there.  But I
21     figure I would just throw it out.  Put on the record that I'm
22     probably stupid and don't understand this area of the law but
23     you go ahead and tell me.
24             MR. MAHONEY:  That's certainly not our suggestion,
25     your Honor.
```

1          THE COURT:  That is not yours.  I'm the one that

2    said it.

3          MR. MAHONEY: Materiality is a separate element of

4    securities fraud that's distinct from intent.  What the jury

5    has to do is has to assess the information that was

6    conveyed from the perspective of a hypothetical reasonable

7    investor in the field.

8          THE COURT:  What's the intent part of the securities

9    fraud violation?

10          MR. MAHONEY:  The intent is the intent to deceive

11    and also willfulness.  It is the intent to do something that

12    the law forbids.

13          THE COURT:  But it is an intention to deceive

14    someone, right?

15          MR. MAHONEY:  Yes.

16          THE COURT:  Why isn't testimony about whether the

17    victims could have taken more steps and learned that it was a

18    lie, why isn't that blaming the victim?  If the victim had

19    only done X, there wouldn't be any harm.

20          MR. MAHONEY:  That's not how we would articulate it,

21    your Honor.

22          THE COURT:  How are you going to articulate it?

23    Your expert articulates that a reasonable investor -- it is

24    interesting because sometimes would, sometimes should,

25    sometimes does so in the expert disclosures I think.  I'm not

1    sure which one of those is the correct one.

2         But they definitely are talking about a reasonable

3    investor would have done something different and therefore,

4    it is not material, right?  Therefore, they would have

5    learned something.  They wouldn't have relied on it.

6         Why isn't that saying that the victims who come and

7    testify who say it wasn't important to them, why isn't that

8    blaming them for not taking that further step which I'm

9    curious about how they would have -- this is an aside.  How

10   they would have learned that Mr. Litvak was lying.  I

11   understand the market is opaque.  The buyer doesn't know

12   where he's getting it from I don't think.  I don't remember

13   there was testimony at trial.  Did they know where it was?

14        MR. FRANCIS:  No, your Honor.

15        THE COURT:  In fact that's why they used Mr. Litvak

16   to find it in the market. Not everybody offered it.  It

17   wasn't like sugar or salt you can get at any store.  They

18   were particular bonds they wanted.  That's what Mr. Litvak

19   did is he found it.  I don't know how this investor is

20   supposed to see, I will call up the seller and ask him what

21   are you selling it to Mr. Litvak for.  I'm puzzled by what

22   your experts are going to say about this reasonable person in

23   this market.

24        MR. MAHONEY:  Your Honor, what they are going to say

25   is that these bonds are very difficult to put a valuation on

1    so what investors do is they invest a lot of money.  They

2    hire MIT --

3            THE COURT:  They analyze everything.

4            MR. MAHONEY:  But, your Honor, what they do is they

5    take steps to verify the information that they are relying

6    upon.  What's something they can do?  They didn't ask Mr.

7    Litvak and say okay, you said you bought it at X.  Let's see

8    the trade ticket.  All they.

9            THE COURT:  They are going to say that the person in

10   the market in Mr. Litvak's position would disclose that?  Did

11   disclose that in the ordinary course?  That's amazing.

12   That's going to be interesting to hear.

13           MR. MAHONEY:  The fact they don't ask is an

14   indication they don't consider it to be very important.

15            THE COURT:  The experts are going to say the

16   reasonable person in the market should have asked for it so

17   presumably the expert based on all the years of experience is

18   going to be able to testify that they do it because they

19   could do it because that's what makes them reasonable.  No?

20           MR. MAHONEY:  With respect --

21           THE COURT:  They have never seen it done, but they

22   are doing to say reasonable person.

23           MR. MAHONEY:  What they probably will say is the

24   dealer wouldn't hand over the trade ticket for various

25   reasons.  They wouldn't want to hand it over.  Because of

1    that, you can't verify the information.  Because of that it

2    is not something that's important to the investment decision.

3              THE COURT:  So we're back to they all do the

4    analysis.  This car is worth anywhere between $20,000 and

5    $22,000.  If I can get it for 22, even though I'm being lied

6    to, even though the person who is my intermediary is

7    pocketing multiples of what he said he's pocketing, that

8    doesn't matter to me.  It wouldn't matter to me that I can

9    get it for 20,000 instead of 22 because it could be valued at

10   22.

11             MR. MAHONEY:  It all goes to the question of how

12   much stock are they putting in the representation that are

13   being made to them from the dealer.  We don't think they are

14   putting very much stock in it at all.  One of the reasons why

15   is because this is information that's being conveyed.  It is

16   statements being conveyed in the context of negotiations that

17   you can't verify.  Investors in this field, Mr. Berman will

18   say based on his 30 years of experience in the field, is that

19   a sophisticated reasonable investor in this field follows the

20   mantra of trust but verify.  There's a lot of information you

21   hear in sales calls that might be -- might relate to the bond

22   but if you can't verify it, you do not rely upon it.  You

23   don't consider it important in your investment decision.

24             THE COURT:  How am I supposed to draw the line

25   between cross-examination of what's important and blaming the

```
 1   victim?  How am I supposed to draw that line?
 2              MR. MAHONEY:  I don't think that your Honor has to
 3   draw a line here.  I think it is a question of how it is
 4   presented and particularly, how counsel argues it.
 5              THE COURT:  That's what I'm asking you.
 6              MR. MAHONEY:  We're not setting up a defense.  We're
 7   not going to argue to the jury there's some comparative
 8   negligence defense to securities fraud.
 9              THE COURT:  You are.  You maybe aren't arguing it as
10   a comparative negligence defense, but you are effectively
11   saying that the victims are not a reasonable person as the
12   law uses that expression in the materiality aspect of
13   securities fraud because a reasonable person in this market
14   would have never accepted as true what Mr. Litvak said to
15   them about the price he was getting it at and what he was
16   making.  I don't know.  That sounds an awful lot like you are
17   blaming these folks.
18              MR. MAHONEY:  Your Honor, if we have to accept these
19   are reasonable investors, that means that we have concede the
20   element of materiality.  I don't think we have to do that.
21              THE COURT:  You absolutely don't.  But I also think
22   you cannot fight materiality on a blame the victim theory.
23   I'm genuine when I say to you how do I draw that line here.
24   It is like beauty is in the eye of the beholder.  You are
25   telling me we don't intend to do anything that blames the
```

1   victim, but the government views everything you do will in

2   effect come down to blaming the victim.

3          MR. MAHONEY:  Your Honor, I think as your Honor has

4   stated, we have to be able to make the argument that

5   Mr. Canter and Mr. Wollman, to the extent that they believed

6   and they relied on this information, that they do not reflect

7   the views of a reasonable investor.

8          Anything that we would do that would make that

9   argument, I think the government would say that blames the

10  victim.  There's a risk the jury is going to see that as

11  blaming the victim.  I point out all this blame the victim

12  case law that the government cites, my understanding this is

13  a boiler plate motion that the government often files in

14  fraud cases, there's not one of those cases, not one, that

15  deals with the relevance of blame the victim evidence in the

16  context of a 10(b)(5) prosecution where the issue is

17  materiality. There's some cases that deal with it in terms of

18  intent where the defendant was making the argument that well,

19  I didn't really intend to deceive him because I thought that

20  he was on to the lie that I was telling him.  That's not the

21  argument we're trying to make.  What.

22         We're trying to say is basically two points.

23         Number one, that reasonable investors in this market

24  follow the mantra of trust but verify.  If you don't take

25  steps to verify something, if you can't verify it, it is not

1    important.

2         Two, we want to be able to rebut the notion on page

3    number 197 of the Court of Appeals opinion.

4         THE COURT REPORTER:  What was the page number?

5         THE COURT:  You're going a little fast.  My brain

6    can't keep up.

7         MR. MAHONEY:  197.  Where the Court of Appeals

8    specifically held that we're entitled to present evidence

9    that will rebut the idea that the portfolio manager and

10   traders who testified at trial reflected the view of the

11   reasonable investor.

12        If we present evidence for that purpose, I don't

13   think the fact that it might be construed as blaming the

14   victim is grounds to exclude it.  If that's the case, again I

15   don't see how he can present a defense on materiality.

16        THE COURT:  Let's start with the basics.  You are

17   not going to argue that it is the victim's fault here?

18        MR. MAHONEY:  No, your Honor.

19        THE COURT:  Are you going to argue that they could

20   have learned that it was a lie what Mr. Litvak told him?  We

21   just a minute ago we went through because I was curious, the

22   experts talk about they should have investigated more.

23   Reasonable investor would investigate more.  I don't know how

24   you investigate more.  We went through that a few minutes

25   ago.  I think you ended up agreeing in this market you

1    couldn't.

2         MR. MAHONEY:  What we'll elicit that there were no

3    steps taken.  I think your Honor is correct that as a

4    practical matter in this industry, a dealer wouldn't show his

5    original trade ticket to the buyer.  I don't think there was

6    any legal reason why he wouldn't do that, but as a matter of

7    industry custom.  I think that's something that probably

8    wasn't done.  But because of that, that's a reason why the

9    information is not reliable.  It can't be verified.  That's

10   why reasonable investor in the field who understands how the

11   market works would not consider it important.  That's what

12   Mr. Berman's testimony is going to be based on his experience

13   in the industry.  He's going the contrast that with other

14   variables that go into the valuation model which these guys

15   spend lots of time, millions of dollars trying to verify.

16   There's instances they will go in and look at the zip codes

17   where some of these loans are and verify what the default

18   rates are, what the prepayment rates are.

19        THE COURT:  I think every one of the government's

20   witnesses acknowledge that their companies did these

21   analyses.  They put a value, a range of value on these

22   particular bonds based on their analysis of the underlying

23   mortgages and the market, Atlanta, wherever the bonds were

24   from.  I don't think one of them disputed it. There's no

25   question when these victims went out to find that bond, that

1    they had in mind their company's view of its value, a range

2    of its value, but I maybe mishearing you.  For a moment you

3    were beginning to persuade me but I think a lot of.

4              MR. MAHONEY:  Can I rewind that?

5              THE COURT:  No.  You sound like you are arguing

6    reliance and that's not an aspect of a securities 10(b), is

7    it?

8              MR. MAHONEY:  No.

9              THE COURT:  In other words, they didn't or shouldn't

10   have relied on it.  It is material and I'm going to be very

11   interested to hear the experts.  I didn't articulate it very

12   well in the first go-round.  I have trouble and I will be

13   very interested because they are going to testify obviously

14   to this with how someone can give an opinion about what's

15   material to individual people, but I just let me pose this

16   question.  It is probably rhetorical or maybe hypothetical.

17   It was clearly material to Mr. Litvak to get the extra margin

18   on these transactions to lie about what he was paying so his

19   company could pocket the extra one or two points.  That was

20   clearly material to him.  We had evidence it increased his

21   bonus, had relationship to the profitability, right?  Why

22   wouldn't it be similarly material to the companies of these

23   victims if they pay $50 for something instead of 51?  It will

24   be more profitable for their company.

25             MR. MAHONEY:  Imbedded in your Honor's question is

1    the assumption that they believe what Mr. Litvak is telling

2    them is the gospel truth.  Our position is that they did not.

3    Investors in this industry have heightened skepticism about

4    anything they cannot verify.  That's our point.

5          THE COURT:  So the expert will testify, we'll have

6    five or six victims come in and say they believed him.  It

7    was material, whatever words we allow them to use and

8    whatever words they do us on materiality.

9          Then we'll have an expert come in and say on this

10   market, it is not material because no one believes it or no

11   one should believe it.  That's what's going to happen.

12         MR. MAHONEY:  I wouldn't articulate it exactly the

13   way your Honor did.  I will said that investors have a high

14   degree of skepticism about anything they can't verify.

15   Therefore the representation I bought the bond at X is

16   something that does not have an impact on the views of a

17   reasonable investor. That's what Mr. Wilner was going to

18   testify to at the first trial.

19         MR. FRANCIS: Your Honor, may I respond?

20         THE COURT:  Just a moment.

21         Why is it correct as you've just done, Attorney

22   Mahoney, to equate materiality with truth?  Is that what you

23   have just done?

24         MR. MAHONEY:  I don't think so, your Honor.  What I

25   have done, what our expert Mr. Berman is going to say, is

1    that whether information is material depends in large part in

2    this market on whether you can verify it.  If you can't

3    verify it, it is not material.  What time my horoscope tells

4    me in the morning might give me some indication about how my

5    day is going to go, but I can't verify that information so it

6    is not very important to me.  I don't rely it.

7         THE COURT:  Then you are slipping into reliance.  I

8    will have to go back and read the cases in the skipped motion

9    on materiality whether that's equivalent to reliance.

10        MR. MAHONEY:  Reliance and materiality are -- let me

11   first start with the proposition I agree with your Honor that

12   reliance is not an element of a 10(b)(5) criminal offense.

13   But reliance and materiality clearly are related.  I can

14   provide your Honor with citations to that for that

15   proposition.

16        If you don't rely on information, how can it

17   significantly affect the total mix of information, to use the

18   government's phrase, how can it be important if it is not

19   something that you rely upon, if it is not something capable

20   of having some influence on your investment decision.  That's

21   one of the lines in the original jury instruction that we

22   agree should be left in, is that something affects the total

23   mix of information and it significantly affected the

24   investors' information.

25        If you know that you can't rely on the information,

1    how can it possibly affect your deliberations?  We don't

2    think it can.

3           THE COURT:  The answer may be if I can't rely on it,

4    I won't do the deal.  Isn't that material?  I'm having

5    trouble getting my head wrapped around it obviously, Attorney

6    Mahoney.

7           If you do have any cases on that, I would appreciate

8    receiving them unless you have given them to me in connection

9    with 360, that's the materiality charge issue.  Would the

10   government agree that the defendant has a right to impeach

11   the victims on what's important to them and why?

12          MR. FRANCIS:  Yes.

13          THE COURT:  Okay.  So how are they going to do that

14   if they are not going to do it the way that you're seeking to

15   have them not be able to do it?

16          MR. FRANCIS:  I want to answer your Honor's

17   question.  This gets to your Honor's concern you raised a

18   couple of times with Mr. Mahoney about where to draw the

19   line.  I think it is fair game for them to say, for their

20   expert to opine on what a reasonable investor does and I

21   think it is fair game for them to cross-examine victims as to

22   what they did and what they did not do.  I don't think that's

23   a concession by the government I think that's just

24   materiality evidence.

25          Blaming the victim is when they cross the line as

1    your Honor points out Mr. Dolan's expert testimony or

2    proposed expert testimony, Mr. Menchel's proposed expert

3    testimony gets into what they should have done and failed to

4    do, sometimes implicit, sometimes explicit, the second part

5    they failed to do.  And so while I think it is fair for them

6    to ask, I don't know, Mr. X, Mr. Canter, did you request the

7    buy ticket from Mr. Litvak to prove the information?  I don't

8    think it is fair to say you should have requested that or to

9    then call their expert to say oh, yeah, they should have done

10   that.  That's blaming the victim.  That's some truth to what

11   Mr. Mahoney says --

12          THE COURT:  But he could ask his expert what would a

13   reasonable investor do and one of those things could be he

14   could asked for the ticket.

15          MR. FRANCIS:  As your Honor pointed out, I think

16   they are going to have a hard time getting an expert to say

17   that.  That's counter factual.  God bless them if they

18   testify that way.

19          THE COURT:  You would have a nice cross.

20          MR. FRANCIS:  I look forward to that.  I'm not too

21   concerned about that.  I'm very sensitive to the record on

22   appeal on this issue.  Materiality is clearly where the bulk

23   of where the defense is putting its efforts right now to the

24   extent there's a defense team.  Obviously they have no

25   burden, but it seems like materiality is where they are

1     putting a lot of their effort.  I anticipate that's going to

2     be the bulk of their appeal or issue on appeal.  I think your

3     Honor is wise to write opposed to ruling from the bench.  I

4     think that's helpful for the record.  This is why I think the

5     government doesn't make this concession but wants to be

6     clear, this is an objective standard and evidence that tends

7     to show what an objective reasonable investor does, not

8     should do, but does, comes in.  Evidence that tends to show

9     that the victims were subjectively unreasonable stays out

10    because that's just saying if you were better at your job,

11    you would have stopped Mr. Litvak from ripping you off.

12           THE COURT:  Do you agree that it is proper

13    cross-examination of Mr. Wollman, for example, about

14    statements he made about whether he believed people like Mr.

15    Litvak or not?

16           MR. FRANCIS: Yes.

17           THE COURT:  He made allegedly, I think he made a

18    comment to a counterparty you should be believe as much as

19    you will about statements.

20           MR. FRANCIS:  Yes.  If I may expand on that.  We

21    elicited in direct from the victims whether or not they

22    trusted Mr. Litvak because that's an element of the scheme

23    and so I think it is a fair response to --

24           THE COURT:  It is impeachment of that testimony.

25           MR. FRANCIS:  Exactly.

1          THE COURT:  It is proper to ask about the efforts

2     that their firms s invest in trying to analyze the, quote,

3     value of the bond?

4          MR. FRANCIS:  Correct.  That's prenegotiation.

5          THE COURT:  Prenegotiation.

6          MR. FRANCIS:  Yes.

7          THE COURT:  When he goes out to the market to buy

8     something, what does he go out with?  He goes out with the

9     knowledge that his analytics value it at a certain range.  We

10    heard that testimony.

11         MR. FRANCIS:  We elicit that.  It is fair for them

12    to cross on that.

13         THE COURT:  Give me just a second.

14         MR. FRANCIS:  To the extent that you are looking for

15    cases on this.  The defense, Mr. Mahoney, is correct to point

16    out we don't have a 10(b)(5) case in which blame the victim

17    is raised on materiality.

18         When we made our motion in the first instance.  We

19    didn't know they were going to restrict themselves to the

20    materiality part element.  Typically this comes in on the

21    intent side.  That's what a lot of cases deal with.

22         However, there are at least two cases we saw that

23    deal with the question of how to blame the victim bears on

24    materiality where materiality is an objective standard.

25         One of them is the Isola case that we cite.  That's

```
 1   an unreported Second Circuit.  It is a brief paragraph.
 2   Nonetheless it is very clear it is irrelevant because where
 3   materiality is an objective standard, it doesn't really
 4   matter whether or not an individual victim was gullible or
 5   not because even gullible people tell us with prediction of
 6   law, if the information is misrepresented is of the sort that
 7   a reasonable investor would tend to think it is significant
 8   in the total mix of information, it doesn't make a difference
 9   that you happen to have found a gullible victim, the moron
10   victim.  That's not the analysis.
11        THE COURT:  Is the government going to be arguing to
12   the jury that in connection with the jury's having to find
13   the reasonable investor, what they would or wouldn't have
14   done or anything like that relevant to materiality that your
15   victim witnesses are evidence of the reasonable investor?
16        MR. FRANCIS:  Of course.
17        THE COURT:  So I'm not really sure how Isola  -- why
18   can't they impeach the fact that these witnesses were not
19   reasonable investors?
20        MR. FRANCIS: They can show the things they did took
21   them outside the ambit of reasonableness.  That's fair.  So
22   the expert say a reasonable investor always requests the
23   tickets from the broker dealer to verify information.  So
24   maybe the jury credits that, then they hold the victim up to
25   the standard did they do that.  To the extent they can show
```

1    they didn't do that, that's okay.  If what they are trying to

2    do is show you could have done more and if you had done that

3    something more, you would have discovered the fraud.  That's

4    subjective.  That's not objective evidence.  The subjective

5    failure of an individual victim to be fraud proof doesn't

6    bear on materiality.  I don't know unless their expert is

7    going to say there can be no fraud.  This is where this all

8    heads.  In the end the logical conclusion of what their

9    experts are all saying is reasonable victims don't allow

10   things they can't verify.  You can't verify information the

11   broker dealer tells you, therefore, reasonable victims never

12   are defrauded.  So therefore, there's no fraud in the

13   industry so it is okay for Mr. Litvak to tell any lie he

14   wants about anything because reasonable people don't rely on

15   things they can't verify.  Broker dealers are unverifiable by

16   their nature.

17        THE COURT:  You can lie all you want.  You can be

18   the most disreputable person in the universe because you have

19   another element under 10(b) has to be material.

20        MR. FRANCIS:  They are saying is nothing can be

21   material because unverified information is immaterial and

22   because you can't verify what the broker dealer tells you.

23        THE COURT:  Who says something has to be material?

24   I realize it is a ridiculous.  I don't know there can't be a

25   situation, a transaction, in which nothing said was material.

```
1         MR. FRANCIS:  I don't know.

2         THE COURT:  We would never get an acquittal in a

3    securities fraud case.  I'm sure there's been one sometime.

4         MR. FRANCIS:  I think it is true there's such a

5    thing as immaterial material.  For example, if Mr. Litvak

6    said you are going to love these bonds.  They are printed on

7    blue paper.  Okay.  That's immaterial.  But that's not what

8    he said.  I don't think anyone has charged that case.

9         THE COURT:  Their experts are going to say what he

10   said is immaterial because nobody in their right mind would

11   have trusted him he was telling the truth.  Everybody knows

12   you lie.

13        MR. FRANCIS:  Well, that's okay.  What they are

14   saying is a fact in the industry.  Not what is the standard

15   to which the victims failed to attain of, you know, self

16   help.

17        THE COURT:  How would they make the argument the

18   victims aren't the objective reasonable investor?

19        MR. FRANCIS: They establish what a reasonable

20   investor does.

21        THE COURT:  Argue that the victims did do it.

22        MR. FRANCIS:  They know what their experts are going

23   to say presumably or at least they will by the time of the

24   trial.  They will know what they are prepared to testify to.

25   They can cross them on did you do X.  Did you do Y?  The
```

1    answer presumably is no.  Otherwise they wouldn't be asking

2    the question and the experts come in and says reasonable

3    investors do X and Y, that's fine.  That's fair.  That's fair

4    game.  They should be allowed to do that.  That's just the

5    government's position.  That needs to happen.  Otherwise I

6    don't want to do this trial a third time.  I think

7    materiality when the Second Circuit looks at it, they need to

8    see your Honor was looking at an objective standard.  Also

9    was being sensitive to the sort of relevant standard.  The

10   expansive relevant standard the Second Circuit used in its

11   decision to say what is relevant to materiality.

12          However, what a victim should have done and didn't

13   do, you know, you screwed up because you didn't do X, Y and

14   Z, that's just blaming the victim, whether you call them

15   badgering them or not, that's just blaming them.  You were

16   bad at your job.  Therefore, you got ripped off and you

17   deserve it.

18          THE COURT:  They didn't do X, exactly what you

19   started two minutes ago by saying they could make that

20   argument.  These aren't the reasonable people you should be

21   using as a standard to measure materiality. You should use my

22   expert's characterization because these people they didn't do

23   X, Y and Z and as you heard the expert say, the reasonably

24   investor in this market would have done X Y and Z.

25          MR. FRANCIS:  It is the extra step of saying they

1    should have done this.  We're drawing a line here.  It is not

2    perfect.  The government wants to air on the side of

3    inclusion such that the defendant can put on valid

4    materiality evidence.

5            One of the pieces of materiality evidence that they

6    think they have, they have an expert.  For instance, Mr.

7    Menchel isn't a good example, but says nothing Mr. Litvak did

8    prevented any buyer from checking prices at other broker

9    dealers.  I don't think they can say it that way.  I don't

10   think Mr. Menchel gets to say that.  If he says in my

11   experience reasonable investors before they do any purchases,

12   they call around to other broker dealers.  If they are going

13   elicit that testimony, I think it is fair to ask Mr. Canter,

14   did you call other broker dealers.

15           THE COURT:  All right.  Thank you.

16           Attorney Mahoney, would you respond to that last

17   distinction between how the expert's testimony has been

18   disclosed and what the government views would be the proper

19   form of the testimony coming in.

20           MR. MAHONEY:  Well, I think let me start with the

21   formulation of what the investor should have done.  We're not

22   going to frame things in that way.  Our experts won't be able

23   to frame things that Michael Canter should have done X.  Joel

24   Wollman should have undertaken X.  Therefore, they are to

25   blame and Mr. Litvak should be acquitted.  That's not our

1    argument.  That's not what our experts are going to testify

2    to.  How I see this happening would be we'll elicit an

3    opinion from the experts about whether a reasonable investors

4    take -- whether.

5              THE COURT:  What they do.

6              MR. MAHONEY:  Yeah.  What they do, whether they

7    consider this information to be important.  How it affects --

8              THE COURT:  So it is an active verb.  It is not a

9    subjective would have, should have, could have.  It is they

10   do this.  They do that.

11             MR. MAHONEY:  I do think, though, there will be

12   follow-up questions about well, so we'll elicit the opinion

13   that this information does not play a role in investment

14   decisions.  We'll ask a follow-up question and say why.  One

15   of the reasons, for example, Mr. Berman will give is the one

16   I have been talking about which is the trust but verify

17   mantra.  If the information can't be verified it is

18   unreliable and doesn't play any role in the investment

19   decision.

20        Q.   So, for example, people who bought bonds from Mr.

21   Litvak and were told he's buying them for $50 and he would

22   get four ticks.  They should have assumed he was buying them

23   then at $10 and if their value model but the value at 51,

24   then they should be grab them?

25             MR. MAHONEY:  I think in your Honor's question you

1   have used the should language which is not what we're going

2   to do.  What we would say is that because you can't verify

3   that information and because the investors know that Mr.

4   Litvak's interests are not aligned with theirs, they don't.

5   Reasonable investors as a matter of fact don't put any stock

6   in that statement.

7           THE COURT:  Okay.  All right.  The next motion is

8   371 which is the government's motion in limine to exclude

9   evidence and argument suggesting the absence of criminal

10  activity uncharged transactions.  This looks like what I

11  spoke to Attorney Commons about.  The parties seem to agree

12  except for the reservation of the open door possibility such

13  that some door could get open to allow something to do with

14  routine practice and total compensation.  I think my notes

15  are fuzzy.

16          Again I'm not going to reserve -- I will incorporate

17  by reference what I said earlier about opening the door.  I

18  don't think it has to be in any stipulation or in my ruling

19  here.  Clearly this is without prejudice to a changed

20  circumstance, changing the ruling or the agreement.

21          I would like to inquire, though, I would think and I

22  will ask the government if they agree, that should they try

23  to introduce evidence that Mr. Litvak had a routine practice

24  of engaging in conduct of this type, routine meaning beyond

25  the scope of the charged transactions plus the 19 or whatever

1    it is going to be transactions, that that would open the

2    door, but I don't understand the offering evidence about

3    compensation why that opens this door.

4          MS. COMMONS:  What we're asking for, your Honor, is

5    consistent with your ruling last time.  You granted the

6    motion in part but reserved with respect to the financial

7    motive argument.  Your Honor stated you wanted to see how the

8    government argued and what evidence they introduced relation

9    to Mr. Litvak's total compensation.  We would ask that the

10   same reservation be implemented here.

11         THE COURT:  It is -- I'm sorry because I need to

12   have you -- I need you ask you something about that part of

13   what you just said before you say something else and I lose

14   track of it.  I don't think you understood my question.  My

15   question is I will be clearer.  How is it that reference to

16   Mr. Litvak's total compensation would open the door to the

17   defense introducing evidence that he transacted, you know,

18   thousands of transactions that the government hasn't argued

19   involved criminal conduct.

20         MS. COMMONS:  Yes, your Honor. To the extent that

21   the government tries to introduce evidence or argument that

22   his total compensation, to directly quantify or correlate his

23   total compensation to the particular charged and uncharged

24   transactions, we would like to rebut that with there were

25   something like 2700 transactions.  The number that's being

1   presented to the jury is only a very small two to three

2   percent, so if they try to make that direct correlation which

3   I believe in talking about early in talking about the

4   compensation, we should be permitted to say actually you

5   can't make this direct correlation.  But even if you could,

6   the charged transaction represents only a small percentage of

7   his total compensation.

8           THE COURT:  That's not what the government wants to

9   keep out.  The government wants to keep out you arguing that

10  because they didn't charge anything other than 19 plus 10,

11  therefore Mr. Litvak's 4,000 other trades in this time period

12  were perfectly lawful so what arguments follow from that.  He

13  just made a little mistake.  He doesn't usually do this and

14  mea culpa.  Whatever argument you want to make from it.

15  That's what they want to keep out.

16          MS. COMMONS:  We agree we won't make that argument.

17  It is our position if the record looks like it does last

18  time, the government didn't open the door.  Absence of the

19  criminal evidence wouldn't come in.

20          THE COURT:  Does the government have anything they

21  want to say on this?  There appears to be an agreement.

22          MS. CHERRY:  Yes, your Honor.

23          THE COURT:  Does the government agree with me that

24  the first way they are worried that they suggest you could

25  open the door that you offer evidence you argue that he had a

1    routine practice of engaging in conduct of this kind, the

2    government isn't doing that, right?

3          MS. CHERRY:  Yes.

4          THE COURT:  I presume if you did, you would agree

5    that would probably open up the door to have them argue you

6    haven't charged me with the 4,000 others, et cetera?

7          MS. CHERRY:  Yes, your Honor.

8          THE COURT:  So again I will treat this one as moot

9    in light of the agreement of the parties.  This is 371.  The

10   agreement of the parties.  I'm not incorporating the open

11   door language in the order that defense requests because as I

12   have said earlier, I think that's implicit in my ruling.  I

13   guess it is beneficial to see how a party thinks a door could

14   be opened.  I do agree on the first ground it could very well

15   open it depending on what got introduced.

16          The second I'm having trouble with it.  I don't

17   think it is going to come in.  I don't see the government

18   getting from here to there.  I'm not sure the total

19   compensation is all that relevant especially when I have to

20   go to 403 afterwards, but I do think it is relevant to the

21   trades in question in the case that the profitability was

22   raised to his firm and that profitability is an important

23   factor as Mr. Eveland said in determining bonus.  Ergo

24   important to Mr. Litvak's income.  That doesn't get you

25   anywhere near total compensation.  I don't whether it would

1    open the door.  I guess I don't know that it would.

2    Hopefully it is one bridge that we don't have to cross.

3            I have a pile of ones that were done by stipulation

4    so I'm not going to touch those.  That leaves me only with

5    the one that I skipped and to be perfectly honest, I haven't

6    ruled.  Probably that ruling will not include a ruling on

7    this motion because I think I need to do a lot more thinking

8    and reading on this subject than I have done so far I guess.

9    But counsel are here.

10           MR. FRANCIS:  Your Honor, before we get to that

11   motion, I believe 372 is a live motion that's not resolved by

12   stipulation.  It is one of the smaller ones.  It is the one

13   about other broker dealer conduct.

14           THE COURT:  Sorry about that.  Clipped together with

15   another one.  I guess it is the government's motion, if you

16   can start.

17           MR. FRANCIS:  I think we have come down to three

18   things through the motion, through the papers.  If I'm wrong

19   about that I'm sure Mr. Mahoney or someone from the defense

20   team would correct me.  I think they would like to be allowed

21   to show that the victims were lied to by others.  They would

22   like to get in the fact there's agency practice of broker

23   dealers lying to their customers.  Industry practice is a

24   quoted phrase they pulled out of a 302.

25           THE COURT:  What is the second one?

1          MR. FRANCIS:  Industry practice.  It is something

2    that I said in an interview so it was in a 302.  Then the

3    third thing is the post-indictment.  After Mr. Litvak was

4    indicted, changes that were made at another bank in 2013.

5          Nomura.  They learned about through statements were

6    made in front of Judge Chatigny by AUSA Brennan.  To take

7    them one at the time the government's position on each of

8    these if victims were lied to be other broker dealers and

9    they know it at the time and there's evidence of that, that

10   would seem to go to materiality.

11         So, for instance, that email that chat with Mr.

12   Wollman, the take it for what it is worth, if that's in the

13   context of a trade with Nomura, Mr. Wollman says they are

14   telling me X which is similar to something Mr. Litvak

15   misrepresented to Mr. Wollman, take that for what it is

16   worth, then of course that should in as materiality, but

17   that's only if Mr. Wollman knows at the time or believes at

18   the time, he's being lied to.

19         If it is evidence that the victim is being lied to

20   by other broker dealers, then it is irrelevant because it is

21   other instances of other crimes by other people against the

22   same victim.

23         Point two, with regard to industry practice, if they

24   believe they have evidence that shows that Mr. Litvak is

25   aware of the industry practice, that would tend bear on

1    intent.  I can see the argument he can get it in then, but

2    absent his knowledge, absent some connection because Mr.

3    Litvak and this industry practice, it is irrelevant.  It goes

4    to show other people similarly completed crimes.  That's like

5    a bank robber saying I robbed a bank and other people rob

6    banks wearing masks.  Okay so what unless you think it bears

7    on your intent that robbing banks is an okay thing to do.  It

8    is irrelevant to this crime.

9         The third point, we talk about in our papers, the

10   experts are going to opine or one of the basis for their

11   opinions is that changes were made, I'm not sure what the

12   actual opinion is, but that changes were made at other banks

13   after Mr. Litvak was indicted which was more than a year

14   after Mr. Litvak was fired, so it is like a year after the

15   scheme ends and the fact that changes were made at other

16   banks to stop people from committing similar

17   misrepresentations is relevant to industry practice I guess.

18   I'm not sure what it is relevant to.  In any event, we think

19   it is temporally irrelevant.  It is the wrong bank.  It is

20   not at Jefferies.  There's evidence.  There's documents that

21   we produced to the defense that shows that Jefferies made

22   some changes after the fact after Mr. Litvak was fired that

23   would seem -- that would seem to come in if they wanted to

24   show that Mr. Litvak thought it was an okay thing to do

25   because everyone else was doing it, that's okay.  If it is

1    just everyone else is doing it, then that's the Merritt

2    Parkway speeder argument that we have been through so many

3    times.

4              THE COURT:  Well, if everybody is doing it and Mr.

5    Litvak knows about it, that could go to his intent, right?

6              MR. FRANCIS: If they want the say -- if you're

7    arguing the Merritt Parkway and the police officers, I

8    thought it was okay to drive 85 miles an hour,

9    notwithstanding the 55 miles an hour speed limit sign,

10   because everyone else was doing it, that goes to your intent,

11   if this is a specific intent crime.  If they want to say

12   other people were doing it.  Mr. Litvak didn't know other

13   people were doing it.  That's why Jefferies would come in but

14   Nomura would stay out unless they have some evidence that Mr.

15   Litvak knew what was going on at Nomura or some of these

16   other banks.  If they can connect it to Mr. Litvak or his

17   state of mind or his knowledge, I think it comes in for

18   intent.  If they can't do that, it shouldn't is our position.

19             THE COURT:  For the defense.

20             .

21             MS. BAUMGARTEN:  I would first like to address with

22   respect to a slight mischaracterization of our position here.

23   What we would like to introduce this evidence of other broker

24   dealers for is not everyone does it defense.  Rather it is

25   everyone does it, therefore, a reasonable investor would not

1    believe it.  It goes to whether or not the type of

2    information that would be material to a reasonable investor.

3         THE COURT:  I don't understand the logic of that.

4    Obviously I didn't understand a lot of the logic that the

5    Court of Appeals has seen in some of the arguments of Mr.

6    Litvak's counsel so I think I need to take this very slowly

7    and make sure if there is any chance I can see the logic, it

8    will be there.  You want to prove that everybody did it so

9    that a reasonable investor wouldn't, couldn't, didn't rely on

10   it, however you want to characterize it, is that fair to say?

11        MS. BAUMGARTEN:  In a way.  I will break it down to

12   more specifically so that it is more concrete.  The first

13   category of evidence that one counsel from the government was

14   referencing. If we have counterparties here dealing with

15   another broker dealer and they express skepticism about that

16   other broker dealer's statement, we think that goes to

17   materiality.

18        THE COURT:  Like Mr. Wollman's statements.  That's

19   fine.  That means that Mr. Litvak's victim was aware that

20   this was, quote, standard practice, everybody did it.  I

21   don't have a problem with that.

22        MS. BAUMGARTEN:  We think that goes to the second

23   category which is that other investors in the market also had

24   skepticism of other broker dealers so just because someone

25   like Mr. Wollman, who is at a different hedge fund or a

1    different bank, expressed skepticism of what other broker

2    dealers were saying.  That's relevant.  The standard here is

3    whether a reasonable investor would rely on this type of

4    information.  We aren't limited to proving that the victim at

5    issue here found it is material.  Like I have the benefit of

6    going after Mr. Mahoney who explained this is an objective

7    standard what reasonable investors believe or don't believe

8    is at the end of the day an important question the jury will

9    have to answer.

10          THE COURT:  Right.  That's what reasonable investors

11   believe or didn't believe or knew or understood.  You are

12   talking about evidence that would be to the point everybody

13   did this.  That doesn't prove that the investors knew of it.

14          MS. BAUMGARTEN:  I will get to that everyone did it

15   evidence I think it is a slight overstatement or

16   mischaracterization, but before we get there I'm talking

17   about evidence, for example, was cited in our Brady motion.

18   That's Docket 382.  We pulled out some 302's from other

19   investors in this market stating things they were not

20   expecting the truth from other broker dealers and the fact

21   that those other investors were not expecting the truth from

22   other broker dealers is relevant to how --

23          THE COURT:  Are you going to call those people in to

24   testify to that effect?

25          MS. BAUMGARTEN:  We don't know yet.  We just

1    received millions of pages of documents.  We're currently

2    evaluating whether those documents should be used.  We're not

3    sure how to introduce it but we think we should have the

4    ability to introduce that evidence.

5          THE COURT:  If I recall the Court of Appeal's

6    opinion correctly, they bemoan the fact that because I didn't

7    let you have an expert testify, you had no way to counter the

8    victim's testimony, that this was in effect material to them.

9    They did point out that you called one witness at trial who

10    testified contrary to the victims and said no, this isn't

11    important to people like us.  My reaction was you could have

12    called five or six or seven people I suppose, and you are now

13    going to call an expert who's going to say that in effect, so

14    I'm not sure what evidence we're talking about here.

15          I read your opposition and at the end you say to me,

16    you know, the Court previously limited your ability to

17    present evidence of other Jefferies traders engaged in

18    conduct of the same sort alleged in the indictment, but you

19    offered it to prove intent, not materiality.

20          Since the first trial, the Court of Appeals has held

21    in order to counter the government's case on materiality that

22    Mr. Litvak is entitled to present evidence demonstrating,

23    one, the specific statements at issue would not be important

24    to a reasonable investor or, two, the types of statements at

25    issue are generally not important to a reasonable investor.

1    Those sound like expert testimony type of testimony.

2         Does the government object if a person in the same

3    position as Mr. Wollman at a firm, buying these bonds from

4    people like Mr. Litvak at the time in question, came in and

5    said I never relied on what the broker told me.  Excuse me if

6    that's that's the wrong word.  What the Mr. Litvak told me.

7    Would you object to that testimony?

8         MR. FRANCIS:  No, your Honor.

9         THE COURT:  So is that what you mean by category two

10   or --

11        MS. BAUMGARTEN:  That's what I mean by category two.

12        THE COURT:  How is it that the experts are going to

13   testify about changed -- the disclosure is really kind of

14   bizarre.  As I read it, it says Mr. Burnaman may describe

15   industry standard compliance programs and indications about

16   how those programs have changed in recent years.  I don't see

17   an opinion in there.

18        MS. BAUMGARTEN: I think this goes back to just to

19   stay within the metric what I call category three which was

20   as the government stated, there's an industry-wide practice

21   of using misrepresentations, and we think that's relevant not

22   because everyone did it defense but if everyone is

23   misrepresenting information in a highly sophisticated market

24   that people buy and sell, they make it less likely and less

25   credible that people rely on this type of information.  We

1    can introduce evidence in different ways to get to the fact

2    there's an industry-wide practice.  We can have our experts

3    testify to it and one of the supporting facts is the changes

4    in the compliance programs.  It is relevant to the third

5    point that pre Mr. Litvak's indictment, there was no great

6    effort to eliminate his statements or misrepresentations in

7    this industry and the basis of that opinion is the expert's

8    general knowledge of the industry.  I think it has been

9    somewhat mischaracterized in the government's brief as saying

10   they are going to testify about the Nomura trial that

11   happened a year later.  We simply cited that in the

12   attorney's disclosure as pointing to the specific type of

13   compliance program that the experts are going to testify

14   about.

15        THE COURT:  I presume there's no evidence that the

16   expert is going to tell us about exists in records of

17   companies or firms like Mr. Litvak that says you can tell the

18   buyer anything about what it is costing you, right, that's

19   not in their policy and procedures is it?

20        MS. BAUMGARTEN:  I certainly don't expect that.  The

21   fact there was no warning against doing that until after Mr.

22   Litvak's indictment is telling of what the industry focused

23   on before and after the indictment in terms --

24        THE COURT:  No.  It could be just as telling that

25   nobody knew it was happening.

1        MS. BAUMGARTEN:  It could be and that could be a

2    point of cross for the expert.  I don't think that makes it

3    irrelevant.

4        THE COURT:  I don't know.  Maybe I'm thinking in

5    terms of the broken stairs and the rule against introduction

6    of remedial efforts is generally not permitted.  I understand

7    this case is an entirely different case but tell me what

8    would proof of new instructions and guidance two years after

9    Mr. Litvak told his last lie, what that would tend to prove

10   in this case when those instructions were issued at a firm

11   that Mr. Litvak wasn't at?

12       MS. BAUMGARTEN:  I will answer your question but so

13   the tail isn't wagging the dog here, I do want to emphasize

14   this is one tree in the forest of what we hope to prove --

15       THE COURT:  If you don't want to offer it, then we

16   can stop talking about it right now.

17       MS. BAUMGARTEN:  No, we do.

18       THE COURT:  Then it is not a tree in the forest.  I

19   have to deal with it.

20       MS. BAUMGARTEN:  Yes, you do.

21       THE COURT:  So answer my question.

22       MS. BAUMGARTEN:  The expert would testify as to what

23   the compliance programs were at the time of Mr. Litvak's

24   underlying activity.  They did not include any specific

25   warnings about this type of behavior.  This is reflective of

1   the fact that pre Mr. Litvak's indictment there's an

2   industry-wide practice of telling misrepresentations that was

3   commonly used throughout the industry, not just at Jefferies

4   but throughout.

5          THE COURT:   What warnings will he testify and tell

6   me and the jury were in the procedures?

7          MS. BAUMGARTEN: That I do not know.  I can look at

8   the exact words of the procedures if we wanted to look at it.

9   There certainly wasn't the training that was specific to

10   these type of misrepresentations preMr. Litvak's indictment.

11          THE COURT:   I would be curious to see if there's

12   anything about lying.

13          MS. BAUMGARTEN:   I do not know.  The fact there's

14   increased attention paid to it is supportive of the idea.

15   The government admitted there's industry-wide practice prior

16   to the indictment of misrepresentations.

17          THE COURT:   I guess I'm sitting here struggling

18   mightily with the criminal law provisions for disclosure of

19   experts and how in God's name we address issues without

20   making a jury sit in the jury room for hours while we have

21   arguments over whether an expert can give an opinion that he

22   hasn't really disclosed yet, let alone told me the basis for

23   or provided to the opposing side a base for.  If you stood up

24   and asked an expert that question about what were the

25   procedures in place back in 2011, is he going to be answering

1    it at Nomura?  Is he going to answering it for every industry

2    firm?  Is he going to answer it for Mr. Litvak's firm?  What

3    would be the basis for it?  Is he going to talk about an

4    industry practice or lack of advice, but he's only get one

5    set of procedures of one firm.  That's just

6    cross-examination?

7         MS. BAUMGARTEN: He has been offered as an expert in

8    the industry as a whole.  He has worked various places over

9    the years and dealt with many different compliance programs.

10   He can to the extent necessary review documents of different

11   firms we had produced to us recently in this case.

12        THE COURT:  I'm really struggling with the idea

13   because people do something different after the fact occurred

14   that necessarily proves that no one knew what they were doing

15   was wrong.

16        MS. BAUMGARTEN: I agree that doesn't necessarily

17   prove that, but it is a piece of evidence that goes to

18   establish that there was an industry-wide practice of people

19   doing these misrepresentations and that it makes it less

20   credible that reasonable investors in this market relied on

21   information that was known not to be governed by specific

22   compliance programs and subject to an industry-wide practice

23   of misrepresentations.

24        THE COURT:  What does it prove about the victims?

25   It may prove it was common practice.  No one knew it was

1    wrong.  That doesn't tell me anything about what the victims

2    reasonably could have assumed was happening to them.  All I

3    keep thinking of is boiler rooms, right, we would all agree

4    they are purely illegal, correct?  People get on the phone

5    and call elderly people to sell them penny stock that doesn't

6    even exist off a script that's all false, right?

7             MS. BAUMGARTEN: Yes.

8             THE COURT:  Somebody gets indicted and one of those

9    firms two years later says we can't say line 7 in the script.

10   We better get that out.  How did the victim know of that

11   boiler room or how did the victim of Mr. Litvak know that he

12   wasn't being lied to.  I don't know that it proves because

13   everybody is doing something wrong, knows they are doing it.

14   Because they know everybody else is doing it, that leads them

15   to believe it is okay.  I'm not sure how that tells me

16   anything about the reasonable investor.

17            MS. BAUMGARTEN:  I think two things.  The first is I

18   think that the analogy to speeding to the boiler room is

19   somewhat inept because lying here isn't necessarily a crime.

20   So we're exploring whether another element of the crime

21   materiality is met.

22            The second issue is that when there's an

23   industry-wide practices and the Second Circuit said in a

24   market with highly sophisticated investors where they don't

25   just have one position in the market as Mr. Canter testified

1    I believe that he both bought and sold in this market and

2    interacted with many different broker dealers, then it

3    becomes less likely that investors will simply take these

4    type of representations at face value.

5            THE COURT:  Where did the circuit tell me this?

6            MS. BAUMGARTEN:  The Second Circuit had a few

7    statements, most specifically it said the full context and

8    circumstances in which RMBS are traded were undoubtedly

9    relevant to the jury's determination of materiality.  That's

10   page 183.

11           Goes onto state that general background testimony

12   about how RMBS market operated is key.  The jury is going to

13   evaluate this from an objective standpoint of a reasonable

14   investor so the type of information in the market and the

15   context on which those reasonable investors traded are

16   relevant.

17           THE COURT:  If you want to ask a victim who played a

18   dual role, when he traded if he lied to his buyers, and he

19   says yes, that's perfectly relevant to the materiality to

20   him.  It impeaches the heck out of him and it supports your

21   expert's opinion, but to sort of sweepingly say that because

22   everybody does it, it could never be material, I really

23   struggle with that.

24           MS. BAUMGARTEN:  I don't think that's what we are

25   saying.

1          THE COURT:  It sounds like it.

2          MS. BAUMGARTEN:  I think we're saying that because

3   an industry-wide practice isn't proof that it is not material

4   but it makes it less likely that a reasonable investor would

5   rely on this type of information.

6          THE COURT:  And why?  Am I unreasonable investor if

7   I accept a statement made to me in the contention of Mr.

8   Litvak made it to me, even if everybody every Mr. Litvak in

9   the industry would have said the same thing and would have

10  lied to me, why am I all the sudden unreasonable because I

11  believed it?  I never do a person.  I never said what

12  Mr. Wollman said.  I'm just a buyer from Mr. Litvak and he

13  told me X, why am I unreasonable to consider that in my

14  decision?

15         MS. BAUMGARTEN:  What the evidence would go to is an

16  assumption, a hypothetical which is that a buyer in a

17  sophisticated market wouldn't believe what Mr. Litvak said

18  simply because a reasonable investor in the market would have

19  had exposure on both sides and would have knowledge of this

20  type of practice.

21         THE COURT:  So the six victims were total bumbling

22  idiots.

23         MS. BAUMGARTEN:  That's not our position.

24         THE COURT: Why not?  You just said it.  No one in

25  the industry.  I don't have my real time up.  I think you

1    said, quote, no one in the industry.  I have six people or

2    five, I don't know how many I heard from victims, struck me

3    as fairly sophisticated, intelligent, articulate people.

4         MS. BAUMGARTEN:  Yes.  They came in and testified

5    that they were upset about the lies.  If they knew the truth

6    that would be important to them.  That's a different question

7    whether the ultimate issue in this case as to whether it was

8    material to a reasonable investor in the market.

9         THE COURT:  I understand it is a different question

10   because I couldn't let the question be asked if it wasn't

11   different because it would be the ultimate issue.  I'm still

12   grappling with the concept that these five or six people said

13   it was important.  In effect, you are saying no reasonable

14   person in this market would ever think it was important.

15        MS. BAUMGARTEN:  I think that's conflating

16   importance and materiality.  We have a right to say that just

17   because someone thinks in a post hoc world, if they had known

18   the truth, it would have been important.  It doesn't

19   necessarily mean that a reasonable investor approaching this

20   ex-ante would view that as part of the total mix of

21   information in making that decision.

22        THE COURT:  I will have to get the transcript to

23   understand that agreement.

24        MR. FRANCIS:  Your Honor, may I help you out with

25   one more thing.

1          THE COURT:  I'm not sure you will help me but go

2     ahead and try.

3          MR. FRANCIS:  I will do my best.  With respect to

4     the experts, the government is sensitive to expert testimony

5     for purposes of the record, the eventually appeal to the

6     extent an expert wants to offer testimony to what was known

7     in the industry by victims or known in the industry by people

8     like broker dealers, then at least there's an argument that

9     that should come in as relevant to the materiality or intent.

10          I think your Honor raised a point, well, what's the

11     base for saying that.  I think the government can address

12     that in cross.  If Mr. Burnaman wants to come up and say I

13     worked at two places neither of which were Jefferies.  It was

14     20 years ago or whatever but based on my experience, every

15     broker dealer knew it was okay to lie to their victims, I

16     think we can handle that on cross.  We show the Code of

17     Conduct of Jefferies that says you have a duty to treat your

18     customers fairly, whatever it said.  We'll take care of that.

19     That can fall on the government to impeach the expert that

20     way, but if it is after Mr. Litvak's crime ended, that's a

21     problem because it presupposes that anything happens after is

22     different from what was happening before.  They don't have

23     that.  They never made that connection.  They have Mr.

24     Burnaman saying there was a training at Nomura in 2013.  They

25     don't have any evidence of what's going on 2011 or 2010.

1          THE COURT:  Their argument is that it tends to show

2     in my view it is extremely thin thread if there is a

3     connection, but why would you have to call out certain

4     conduct if that's no longer acceptable, if they were not

5     engaging in that conduct before it was called out?

6          MR. FRANCIS:  How they are going to get this in

7     about Nomura in particular, I don't know.

8          THE COURT:  They are going to drive it through the

9     truck called the expert.

10          MR. FRANCIS:  In that case, the expert can't mention

11    Nomura or this training or anything like that.  All he can

12    say I know there was different training after the fact.

13          THE COURT:  Who says he can't mention Nomura?  Why

14    can't he mention it?  What's the basis for your testimony?

15    Well, I read an article about Nomura.

16          MR. FRANCIS:  Well, I think we would probably have

17    some hearsay objections to that.

18          THE COURT:  For an expert?

19          MR. FRANCIS: If he's testifying --

20          THE COURT:  Read the expert rule.  The expert can

21    testify based on what would otherwise be inadmissible.

22          MR. FRANCIS:  He can form a basis.  He can't then

23    say let me tell you all about this inadmissible evidence I

24    have.

25          THE COURT:  No. His fundamental opinion goes back to

1    everybody did it, and this is a piece of evidence that tends

2    to support that opinion.  To wit, if someone called it out as

3    conduct we can't continue to do, you can -- I infer that that

4    meant that they were doing it.  Therefore it supports my

5    opinion that everybody did it.

6           MR. FRANCIS: If it is we can no longer do it, then

7    yes, that's a change, right, but if it is just, hey, we have

8    a continuing legal education meeting and we're going to talk

9    about a lawyer who stole from an IOLTA client, a client

10   account and so we're going to tell you about this.  That

11   doesn't necessarily tend to show we were all stealing from

12   our client escrow accounts beforehand unless the training is

13   you know how we're all stealing from IOLTA accounts, let's

14   stop doing that because here's a guy that got caught.  I'm

15   trying to help your Honor out by saying I don't think you

16   need to rule out everything on this.  I think it is just when

17   the expert is making a logical leap.

18          Secondly, they refer a lot to the industry practice

19   and talk about the government submitted that, we have a

20   stipulation and the government never admitted anything.  They

21   have a line in a 302 where I tell someone, maybe in quotes,

22   maybe not, I use the word industry practice.  I can't recall

23   in the actual interview.  I'm not sure whether I was speaking

24   ironically.  Unless they intend to call me as a witness, they

25   will have a tough time couching industry practice.  If they

1    want to, they should let us know because we have a 403

2    objection to pausing this trial and having another trial in

3    the middle of it about what every other broker dealer was

4    doing.  I don't see how they establish an industry practice

5    otherwise unless their experts will stand up and say it was

6    an industry practice everyone lied and everyone knew everyone

7    lied.  Like you said, that goes to materiality or goes to

8    intent.

9              THE COURT:  So the expert can do it?

10             MR. FRANCIS:  The expert can say that victims knew.

11   It is my experience victims know that they were lied to all

12   the time.  He's wrong.  We'll handle it on cross but that's

13   relevant to materiality.  If they say broker dealers lied all

14   the time and all the broker dealers know it, he's wrong,

15   we'll deal with it on cross, that's relevant to Mr. Litvak's

16   intent.

17             THE COURT:  Right.

18             MR. FRANCIS:  I thought that was helpful.

19             THE COURT:  I don't know.  I guess I will hear from

20   counsel on number 360 I think it is, but I will have not much

21   in the way of questions.  I will listen.  I have read the

22   papers.  I should say that.  I read the papers you think this

23   recent Second Circuit case Pilgrim or Pontiac Retirement Fund

24   you think has changed or made clear that we need to get back

25   to the fundamentals or Rosarian (ph.).  I'm not sure which it

1    is that therefore my charge is wrong.  It ought to be

2    amended.  You propose everything else in the trial should

3    flow accordingly.  I did read it.  You think the statement of

4    material fact is one that would have been significant to a

5    reasonable investor in making an investment decision is error

6    as a matter of law.

7            MR. MAHONEY:  With respect, your Honor, we do

8    believe that that statement in isolation is not an accurate

9    statement of the law.  What it implies is that it is

10   sufficient if the jury finds that the information was

11   significant irrespective of whether it significantly

12   affected the total mix of information.  It is that last part.

13   It is the Basic versus Levinson test.  I note that the

14   government tweaked us a couple of times by suggesting it is

15   not referred to as the Basic test.  That's how the Supreme

16   Court referred to it numerous times including in the Matrix

17   case that we cited in our brief, but I think on this

18   particular point, your Honor, if I'm reading the government's

19   brief correctly, I think there's agreement on the basic point

20   that important, significance, cares about, those are not

21   synonyms for materiality.  I think we agree on that.  I think

22   where we disagree is over whether the prior jury instruction

23   was acceptable to that specification.  We think it was and

24   that at the very least this is something that ought to be

25   clarified.  I will also note what Mr. Nardini said at the

1    Brady hearing and repeated in their briefs which is that in

2    addition to City of Pontiac, the Second Circuit opinion in

3    this case has altered the landscape on materiality.  So I

4    think that's justification in itself for reviewing the

5    instruction.

6         If I can say one thing.  I recognize we're getting

7    to the end of the day.  There's lot here to process.  I would

8    be happy to come back if your Honor wants to have a specific

9    session on this instruction.  I think we all agree that

10   materiality is a hugely important issue in this trial.  We're

11   happy to handle it however your Honor would like.

12        THE COURT:  I would like you to tell me where in the

13   opinion, the Circuit Court's opinion, you think they have

14   pointed out errors in the original instruction.

15        MR. MAHONEY:  Your Honor, we didn't challenge the

16   original instruction.

17        THE COURT:  Tell me where then they hint at that.

18        MR. MAHONEY:  What we cited in our brief, your

19   Honor, regarding the importance of investor's sophistication

20   and also the fact is the government said several times here

21   today that materiality is an objective standard.  That's

22   something that wasn't in the prior instruction so it is those

23   two.  I think that really all goes to the question of who is

24   the reasonable investor.  That's very important here. We're

25   sensitive to the jury confusing the government witnesses as

1   reasonable investors.

2          THE COURT:  They certainly could find they were.

3          MR. MAHONEY:  They certainly could.  We think it is

4   important that the jury be told expressly a couple of things.

5   One, is an objective determination.  We propose that the jury

6   be specifically instructed that they can consider the fact

7   that the witnesses both they can consider the government's

8   testimony from the government's witnesses is that the

9   information was important.  They can also consider evidence

10  testimony from our witnesses it was unimportant, but at the

11  end of the day, they have to make an objective decision from

12  the standpoint of a reasonable investor in this market and

13  they have to consider all of the factors that make this

14  market unique.  Mainly the high level sophistication that

15  anyone who participates in this market possesses.

16         THE COURT:  At page 12 of your memo, you said City

17  of Pontiac decision the question of whether the plaintiffs

18  adequately plead materiality for an alleged civil securities

19  fraud by UBS.  You cited 184.  I guess because there the

20  circuit states that the district court dismissed for failure

21  to plead materiality or scienter.  Is that why you cite it

22  there?  Okay.

23         MR. NARDINI:  That might be the government's brief.

24         THE COURT:  I'm trying to find where in the City of

25  Pontiac I will be told what you are telling me.

1          MR. MAHONEY:  It is page 185 is where the discussion

2    on materiality was and whether the plaintiffs had adequately

3    pled it.

4          THE COURT:  Okay.  I appreciate fully that

5    importance and materiality are not synonymous, but I'm struck

6    by what the circuit, I think it was Judge Cabranes but I

7    could be wrong, goes on to say immediately after he

8    makes that point which I have absolutely no difficulty with

9    in my charge to the extent you think it wasn't clear enough,

10   I will make it clear that merely because something isn't

11   important it doesn't necessarily equate materiality.  It can

12   but it doesn't necessarily.  Then Judge Cabranes says, quote,

13   to be, quote, and material, end quote, within the meaning of

14   10(b), that's our case, the alleged misstatement must be

15   sufficiently specific for an investor to reasonably rely on

16   that statement as a guarantee of some concrete fact or

17   outcome which when it proves false or doesn't occur, forms

18   the basis for the claim.

19        So we have a specific statement here that the bond

20   cost X dollars, has to be sufficiently specific for the

21   investor to rely on it.  The investors are telling us they

22   relied on it.  I understand that doesn't equate to a

23   reasonable person, that it was a guarantee of some fact which

24   proves false.  I don't know.  You tell me how that statement

25   is helpful to the defendant.

1          MR. MAHONEY:  Well --

2          THE COURT:  On the materiality charge that I have to

3     reframe.

4          MR. MAHONEY:  Part of it is, I think one of

5     authorities I was thinking about on the interplay between

6     reliance and materiality.  I think there Judge Cabranes is

7     very clearly saying that if the information is such you

8     wouldn't rely on it, it can't be material.  I think what he's

9     drawing out there is the specificity.  I think you can insert

10    reliability for specificity.

11         THE COURT:  So it must be sufficiently reliable for

12    an investor to reasonably rely.  That's not what he's saying.

13    I will throw you a rope.  He's talking about the difference

14    between puffing or we're wonderful, we're the best, all of

15    that sort of thing.  We're going to do great things.  Is it

16    specific enough that any reasonable man would have relied on

17    it, but we don't have that issue in this case.  The fact at

18    issue is the price of the bond.  That's about as specific a

19    statement as you could get.  There was a statement about the

20    price.  There is a price for the bond.  They aren't the same.

21         So I guess mostly I'm asking this not because I

22    disagree with anything Judge Cabranes said, what I don't

23    understand is why you think the case is so law altering, so

24    important.  It is important because it makes the bold

25    statement that importance is undoubtedly a necessary element

1    of materiality.  It isn't synonymous with it.  That's

2    extremely helpful.  To the extent, I didn't understand it or

3    I gave a charge that didn't reflect that, based on that

4    alone, I will change it but the rest that follows, I wonder

5    what that will cause me to change the charge to.

6         MR. MAHONEY:  Your Honor, we cited it for the

7    proposition that materiality and importance are not

8    synonymous.  That's what we think goes to the issue that's

9    raised in our motion.

10        With regard to this question of specificity, that

11   was the issue in this case.  The issue was whether I think it

12   was something to do with asset concentration, some vague

13   statement about asset concentration, whether that was

14   sufficiently specific, but I think that it is not -- I don't

15   think that the statements suggest that a specific statement

16   is per se material.  I'm assuming that's how your Honor is

17   interpreting it.

18        THE COURT:  I'm not going to answer that question.

19   I don't understand the import of the question so.  Does the

20   government want to add anything on this motion?

21        MR. NARDINI: The main question is two things.  One

22   is a simple logistics.  If the court is interested in dealing

23   with those now, our main point would be if we're going to be

24   talking about the jury instructions, we need to do it as a

25   whole.  We can't just look at a few lines here and there.  I

1    think they need to be looked at comprehensively.  The time to

2    do that typically at the charge conference towards the close

3    of evidence.  We think that's straight forward enough we can

4    handle it then.

5         If the court wants to look at these earlier, we need

6    to look at all of the instructions on the materiality.  We

7    might need to look at a lot more because there may be pieces

8    of this which I can't predict what language people might talk

9    about, might bear on how intent is described or something

10   else.  We can't look at piecemeal is my first point.

11        The second thing I would like to simply mention, I

12   don't want to leave it out there is that what I described as

13   number 2.  The one that the defense identified they believe

14   in isolation could be read as falsely equating importance and

15   materiality.  That is taken nearly verbatim from the two

16   Supreme Court cases as their holding of what they turn in

17   quotes the general standard of materiality.  So for one

18   thing.

19        THE COURT:  When you said number two on page two?

20        MR. NARDINI: No.  In our brief, we had on page 7 of

21   our brief, italicized numbered the four sentences that the

22   defense had flagged as problematic for ease of reference.

23   Page 7.  You see the block quote from your Honor's

24   instruction in the first trial.

25        THE COURT:  I still haven't found the right brief.

1          MR. MAHONEY:  It is document 399.

2          THE COURT:  I have it.  I'm on 7, start again

3     please.  You can see that the second italicized sentence on

4     page 7.  This is the second of the four sentences that the

5     defense seeks to strike from your Honor's instructions.  That

6     comes verbatim nearly from the Supreme Court's decision in

7     Basic and TSC and that is what the Supreme Court described as

8     in its terms, quote, the general standard for materiality.

9     We quote that passage from TSC on pages 8 and 9.  I think the

10    court in its leisure can compare that language.

11         So number one, we think that quoting what the

12    Supreme Court itself has twice defined as the general

13    standard of materiality certainly cannot be described as

14    error.

15         Second of all, it is not taken in isolation.  The

16    Court did not deliver that sentence in isolation and in fact,

17    if used the remaining language from Basic and TSC in its

18    instructions.  But again we can walk through all of these

19    things now.  I think it would take a long time because there

20    are some changes that the defense proposes in its motion in

21    limine that's unusual to be talking about jury instructions

22    now.

23         There are other changes to the materiality

24    instructions that they propose in their overall proposed jury

25    instructions, and I don't think we can look at just a few

1   lines here and there.  We have to do it organically as a

2   whole.  The jury instructions are going to be thorough and

3   accurate.  So I think this is mostly logistical question for

4   your Honor how you would like to address this.

5          THE COURT:  Is the government correct that the

6   defense takes issue with the statement Securities fraud

7   statute does not prohibit misstatement or omissions that

8   would be minor, trifle or unimportant to a reasonable

9   investor?  Did you object or complain about that in this

10  motion?  They have italicized it and called it the third

11  point that you made.  I don't know where the government got

12  that from in your brief.  It strokes me as I read as an odd

13  thing for a defendant that wants eliminated.

14         MR. MAHONEY:  Your Honor, we proposed a couple of

15  deletions to streamline the instruction and to Mr. Nardini's

16  point, I agree with him that it makes sense to consider the

17  instruction as a whole and we certainly didn't intend to

18  suggest that your Honor should proceed otherwise.

19         We understand it is unusual to raise an issue like

20  this at the motion in limine stage.  The reason why we did it

21  is because we think that the prior instruction credited an

22  ultimate issue problem with the importance testimony.  Our

23  issue at the end of the day is not with the importance

24  testimony itself, it is with the importance testimony in

25  light of the jury instruction so if your Honor admits the

1    jury instruction in a way that I understand that you intend

2    to in light of the language in the City of Pontiac case, I

3    think that would cure the ultimate issue objection and allow

4    the trial to proceed more swiftly.

5         Again I want to emphasize I think it does make sense

6    to consider this as a whole perhaps with other instructions.

7    We would be happy to do that in advance of trial.  We can

8    revisit anything after the close of evidence to see if the

9    instructions need to be tweaked at that point.

10        THE COURT:  I've been thinking of asking my law

11   clerk to go through all the transcripts.  Every time we have

12   a proceeding and to pull out all the statements like that

13   one.  If I did that, it will proceed more quickly, et cetera,

14   et cetera, then when I do it and if it doesn't proceed

15   quickly to remind you what you said.  Alternatively the

16   government says they won't make a certain argument, then they

17   do.  Actually that may be fruitful, may be not.

18        Your motion is to amend the instruction on

19   materiality which was in ways other than just the importance

20   equation or alternatively to exclude them from eliciting

21   importance testimony at trial.

22        So I now take your motion to be that I should amend

23   the instruction to reflect the fact that importance doesn't

24   equate to materiality and that's the remedy you seek.

25        MR. MAHONEY:  That's part of our motion.  We also

1    think that --

2              THE COURT:  I know your motion is.

3              You propose a couple of deletions that's would

4    streamline the instructions.  But now you agree with him that

5    we should take up the instructions as a whole and probably at

6    a later date.  But the reason you filed this motion was that

7    something about the instruction with the ultimate issue

8    problem with the importance testimony.

9              I understand you now to be taking the position that

10   the question of the jury charge on materiality is part of the

11   jury charge as a whole.  You will take up issues with that

12   charge later when we can look in the context of the whole to

13   the extent that you ask that the charge include language that

14   would be reflective of the City of Pontiac statement that

15   importance doesn't equal materiality.  The court will do

16   that.

17             Beyond that I thought I definitely heard you say

18   that excluding testimony by witnesses about what's important

19   to them wouldn't be necessary if I gave the right charge.

20             MR. MAHONEY:  Correct.

21             THE COURT:  Your alternative relief at docket number

22   360 is denied, that the court will grant 360 to the extent it

23   sought the amendment of the jury instruction to reflect that

24   importance doesn't equal materiality.  The Court intends to

25   do that, subject, of course, to looking at the charge as a

1     whole.  I would be surprised if I didn't have something like

2     that in the charge.  I didn't hear the government to be

3     objecting to something like that in the charge.  To extent

4     your motion seeks to address the materiality charge as a

5     whole, the Court will do at a later time.

6          There was a motion number 390 by the defendant to

7     seal.  This had to do with the motion to preclude testimony

8     about other broker dealers and Exhibit Number 1.  Is there

9     any objection to the defendant's motion to seal?

10          MR. FRANCIS:  What exhibit?

11          THE COURT:  Exhibit 1 to the opposition to the

12    government's motion in limine to preclude evidence regarding

13    other broker dealers which I think was the 372 one that I

14    skipped by mistake so the memorandum of the defendant is

15    Number 391.  Exhibit 1 that's attached to document 391.

16          MR. FRANCIS:  No objection, your Honor.

17          THE COURT:  The document number 390 motion to seal

18    is granted.  That's all that the court intends to take up.  I

19    will take any motion that I haven't ruled on from the bench

20    under advisement and We'll issue a.  Ruling is there anything

21    that the parties require my attention today?

22          MR. MAHONEY:  Your Honor, I don't know if you want

23    to use this opportunity while we're all here with our

24    calendars to set a new date for the pretrial conference.

25    We're obviously a ways away from that.

1      THE COURT:  What's the current date for it?

2      MR. MAHONEY:  I believe on the order right now

3   there's no specific date, but your Honor indicated you would

4   hold a pretrial conference sometime between now and when the

5   original trial date is scheduled July 20. Now the trial has

6   been moved to January 4 of next year, we talked last time

7   about having a pretrial conference sometime in November or

8   December.  I wanted raise that as something you might want to

9   discuss now.

10      THE COURT:  I will not do it now.  I will have to

11  talk with my assistant but I expect it will be early

12  December.  I have a trial that will take most of October and

13  November so I think it will be right after Thanksgiving but I

14  need to look when my jury selection is.  I can't do it from

15  here.  We'll issue a calendar shortly.  Anything else?

16      MR. MAHONEY:  Not from the defense, your Honor.

17      MR. FRANCIS:  So I'm left with one question, your

18  Honor.  We talked about this proffer of scheme evidence that

19  we gave you before the first trial, the uncharged trades that

20  are part of the scheme. You requested that before the first

21  trial.  We indicated in one of our motions that we would

22  provide that to your Honor if you would like it.  Then we

23  talked about identifying which trades are going to be our

24  scheme trades.  Is this something your Honor wants?

25      THE COURT:  I will confess I have no recollection of

1    it.

2          MR. FRANCIS:  That's fine.  We can take it up at the

3    status conference.

4          THE COURT:  If you can send me, maybe email to me,

5    copied to the defense counsel, what this proffer or chart was

6    that you prepared in the first case, and I presume when I see

7    it that will refresh my recollection.

8          MR. FRANCIS:  We filed it.

9          THE COURT:  Is it attached to the memo?

10         MR. FRANCIS:  Yes.

11         THE COURT:  I don't remember which motion that was.

12   It was the 404(b) motion.  I will look at it.  I did look at

13   it.

14         MR. FRANCIS:  It was because in the first trial you

15   asked for a cheat sheet.

16         THE COURT:  Why did I want it?

17         MR. FRANCIS:  I think you were worried that there

18   were going to be a lot of different trades being discussed

19   and at that point I think there were 26 trades.

20         THE COURT:  Keeping track of them.

21         MR. FRANCIS:  You wanted to know when we talk about

22   this trade, the trade on January 1, 2010, what trade are we

23   talking about.  You wanted a chart.

24         THE COURT:  Then that would be helpful.  When will

25   you do that by?

1      MR. FRANCIS:  We do it by whenever your Honor would

2  like it.  Hopefully not later than today.

3      THE COURT:  Within 14 days.

4      MR. FRANCIS:  Absolutely.

5      THE COURT:  That's fine.  Anything else?

6      MR. FRANCIS:  Nothing from the government.

7      THE COURT:  We'll stand adjourned.

8      (Whereupon, the above hearing adjourned at 12:53

9  p.m.)

10

11  COURT REPORTER'S TRANSCRIPT CERTIFICATE

12  I hereby certify that the within and foregoing is a true and

13  correct transcript taken from the proceedings in the

14  above-entitled matter.

15

16  /s/  Terri Fidanza

17  Terri Fidanza, RPR

18  Official Court Reporter

19

20

21

22

23

24

25