1              UNITED STATES DISTRICT COURT.

2               DISTRICT OF CONNECTICUT

3  _____
   United States of America    )December 20, 2016
4              Government      )2:06 p.m.
            v.                 )
5  Jesse C. Litvak             )3:13cr19(JCH)
               Defendant.      )
6  _____)

7

8                              141 Church Street
                               New Haven, Connecticut

9           CONTINUED PRETRIAL CONFERENCE

10

11

   B E F O R E:
12             THE HONORABLE JANET C. HALL, U.S.D.J.

13

   A P P E A R A N C E S:
14

   For The Government  :    Jonathan Francis
15                          William Nardini
                            Heather Cherry
16                          U.S. Attorney's Office
                            157 Church St., 23rd floor
17                          New Haven, CT 06510

18
   For the Defendant   :    C. J. Mahoney
19                          Adam Harber
                            Williams & Connolly
20                          725 12th St., N.W.
                            Washington, DC 20005-5901
21
                            Michael Chase
22                          Shipman & Goodwin
                            One Constitution Plaza
23                          Hartford, CT  06103

24

25

1          THE COURT:  My apologies for being late.  We're here

2     this afternoon in the matter of the United States versus

3     Jesse C. Litvak, Case Number 313cr19.  If I can have

4     appearances please.

5          MR. NARDINI:  Good afternoon, Your Honor.  For the

6     United States, William Nardini.  With me at counsel table are

7     Jonathan Francis and Heather Cherry.  We also have some of

8     the agents Mr. O'Connor, Mr. Breen and we have our paralegal

9     Mr. McGowan.

10         THE COURT:  Good afternoon to all of you.

11         MR. MAHONEY:  For Mr. Litvak is C.J. Mahoney, Adam

12    Harber and Michael Chase.  Mr. Litvak is with us at counsel

13    table as well.

14         THE COURT:  Good afternoon to all of you as well.

15    This is a continued pretrial.  I have an agenda.  I don't

16    know if there's other things that you folks want to cover.

17    But I will get started with mine that I think are not going

18    to take too much time.

19         My first priority I guess is the pretrial

20    instructions.  I believe the defense in their pleading

21    response to the Government's proposed jury instructions, 472,

22    made a request that I add a sentence, quote, You are to draw

23    no inferences from the fact the Government has brought

24    charges against Mr. Litvak.  Does the Government object to

25    adding that language?

1          MR. NARDINI:  We think it is redundant.  If the

2   Court feels strongly, we're not going to object.  We do feel

3   that the sentence that already appears on page 2 of the

4   Court's pretrial instructions is clear enough.

5          THE COURT:  I'm not putting my hand on the pretrial

6   at the moment.

7          MR. NARDINI:  The first full sentence.  You should

8   clearly understand that the Indictment is similarly a

9   statement of what the prosecution claims and that it is not

10  in any sense evidence of the allegations it contains.  I

11  don't think there's anything incorrect about the language the

12  defense is proposing, so we leave it to the Court's

13  discretion.

14         THE COURT:  I would be inclined to add it.  It is

15  not harmful.  It is not inappropriate.  It is appropriate.

16  It seems to me the jury should draw no inference, so I think

17  it follows on that sentence which is I think okay with me.

18  So with that addition, does the Government have any objection

19  to any other parts, any parts on the pretrial instruction?

20         MR. NARDINI:  No, Your Honor.

21         THE COURT:  Okay.  So we have the pretrial

22  instructions set.  That's good.  I'm also told.  I have been

23  out all morning until two minutes ago.  I have been various

24  places, lastly Bridgeport, Chief Judge stuff.  I'm told

25  there's an agreement, an agreement on the statement of the

1    case and a jury verdict form which I don't need to address

2    that today, but let me take a quick look.  Okay.  Both sides

3    agree to that statement that's e-mailed to my clerk?

4         MR. FRANCIS:  Yes, Your Honor.

5         MR. MAHONEY:  Yes, Your Honor.

6         THE COURT:  All right.  Well, then I will read that

7    statement.  I'm not going to try to jimmy with it I guess.

8    That, of course, brings us to the question of opening

9    statements.  The defense had asked for 45 minutes and the

10   Government had left it up to me.  If it is left up to me they

11   are going to be five or ten.  You still need 45 minutes?

12        MR. MAHONEY:  Well, Your Honor --

13        THE COURT:  The case is a lot more streamlined,

14   right?  We've just got one kind of crime charged, there may

15   be multiple counts but you are not -- I doubt that you are

16   going to go through, you should I suppose, try to go through

17   each of the counts separately, but what evidence you think

18   there won't be.  You don't have to tell me what your plan is

19   or what your partner's plan is, but I don't know.  If I give

20   you 45, the Government wants 45, that's an hour and a half.

21   We'll not get out of the box until after lunch.

22        MR. MAHONEY:  Your Honor, again we would.

23        THE COURT:  You still ask for 45.  Does the

24   Government have a position now?  How much time do you think

25   if nobody set a limit, nobody set a minimum or the maximum,

1    you were to try to do what you want to do to open, how much

2    time do you think the Government is going to take?

3           MR. FRANCIS:  Last time something 25 to 30,

4    something like that.  As Your Honor said, it is more

5    streamlined.  We would be fine with the 30 minutes.  We don't

6    want to fight.

7           THE COURT:  I appreciate you are not objecting or

8    anything.  If the defense wants 45 and I gave 45, will you

9    fill 45 just to fill it?

10          MR. FRANCIS:  I doubt it.

11          THE COURT:  How long is the trial going to be?  Are

12   we still talking four or five weeks, 20 days of evidence?

13   I'm talking total, not the Government's case.

14          MR. FRANCIS:  Right.  It is hard for us to predict

15   because the cross of the victims could be very long or could

16   be very short.  Last time Mr. Canter's cross lasted a day.

17   It is hard for us to predict.  We're budgeting I believe

18   we're seven trial days.  We're estimating to finish our case

19   just based on our best guess.

20          THE COURT:  With cross obviously?

21          MR. FRANCIS:  Yes, including cross.

22          THE COURT:  How about defense?  Any better picture

23   of what your case is going to be?

24          MR. MAHONEY:  Well, I think -- I would think that

25   our total case would not be any longer than the Government's

1   and likely would be shorter.  I think last time the whole

2   thing lasted three weeks.

3          THE COURT:  I think it was, but you folks have been

4   talking to me.  I think as we prepared for this trial, it

5   seemed to be longer.  I don't know.  I don't have any notes

6   in front of me.  I was telling Diahann to tell the jury pool

7   they need to be available through February 3.

8          MR. MAHONEY:  The additional length, Your Honor,

9   will be due I think primarily to the expert case that we

10  would have.

11         THE COURT:  No, I understand.  How long was the

12  defense case the last time?  I'm not remembering.

13         MR. MAHONEY:  I don't recall, Your Honor, but I

14  think it was a couple of days.

15         MR. FRANCIS:  I think it was two and a half days.

16         THE COURT:  I was going to say three.

17         You say seven.  You are adding a couple of experts.

18  All right so I guess when we tell the jury if I budget 15

19  trial days, does that sound reasonable?  Seven and seven and

20  one for good luck as they say to overload.  If there's a

21  reply case, then I count a day for closings and charge.  And

22  I count, I will probably assume four, maybe five days

23  deliberation.  Could be four hours, but I have to give them

24  10 counts.  I have to give them the time if they take it.

25         MR. FRANCIS:  When we were together at the last

```
 1    pretrial conference, you were asking how long you should
 2    advise the jury with the deliberation.  I think everyone was
 3    comfortable with the end of the month.  If I had to guess, my
 4    guess would be it is going to be shorter.
 5            THE COURT:  Generally the criminal cases are, but my
 6    last experience was not that.  I'm a little bit gun shy.
 7            MR. FRANCIS:  That case seemed unique in a number of
 8    ways.
 9            THE COURT:  You can say that.
10            MR. FRANCIS:  I think, if anything, this trial would
11    likely be shorter than this.  Trying Mr. Litvak will be
12    shorter than last time.
13            THE COURT:  Bear in mind I have to take that day
14    off.  I will go back and count.  As far as what I put on the
15    notice, you will see it on jury selection.  If I remember, I
16    will tell you ahead of time.  Back to where I was when I was
17    trying to figure out the opening statement.  I'm going to say
18    40 minutes for opening, and I will tell the jury that I have
19    allotted each side 40 minutes, so there's no inference drawn
20    if somebody is short of that.
21            Just for whoever is doing openings understanding,
22    you know, you are not going to get shot when it is 41
23    minutes, but I ask the people who want a warning when they
24    are close, if you want one.  If not, it means somebody else
25    on the team or yourself will have a watch and watching it.
```

1           If you start rolling into 41 and 42, I will say

2    something like it is time to wrap up.  That's not a signal

3    you can start your last five minutes.  It is a signal you

4    need to be in your chair in about 30 seconds.  That's what

5    wrap up means.

6           The only reason I do that is, one, I don't think

7    these things should go on forever and it can be unfair.  Some

8    people will say Judge, I need 20 minutes.  The other says

9    okay 20.  The person goes for 30 when the other person

10   prepared for 20 and expected to do 20, and all the sudden it

11   is not fair.  That's why if I'm viewed as a stickler on the

12   time limits, that's why I am.  Okay.

13          So I had a question about the redacted indictment.

14   I gather there's agreement about that.  Can I hear from

15   counsel about what I'm going to do with the redacted

16   indictment.  The historic custom in this District is to read

17   the Indictment to the jury.  That works fine when the

18   Indictment is a page long or two pages long like two drug

19   dealing counts or conspiracy to distribute drugs, those can

20   be short.  I did not read the Indictment in the Lillemoe

21   case.  It is way too long and way too almost in my view

22   somewhat argumentative.  But obviously this is a different

23   Indictment and it's been redacted.  It is not as long as it

24   was before, so I would like to hear from the Government as

25   to -- I don't have my other three notebooks -- what their

1   request would be with respect to the Indictment.

2           MR. FRANCIS:  We would request that Your Honor read

3   the Indictment to the jury in your pretrial instructions.

4   There's a spot where you indicate --

5           THE COURT:  Will you ask for me to read it again

6   later at the close?

7           MR. FRANCIS:  No.  Once is sufficient as Your Honor

8   said.

9           THE COURT:  It is 18 pages long, 17 of text with

10  some -- you renumbered the pages so there are actually that

11  many pages.  It is not like you cut out a bunch of pages

12  between one and 17, correct?

13          MR. FRANCIS:  Correct.

14          THE COURT:  That's a lot of reading.  Remember the

15  last time I read an Indictment that long, I wanted to shoot

16  myself by page 10 and the jury was there right with me.  I'm

17  not really sure why it is appropriate.  I did a lot of

18  research on the last trial which was longer than this.  But I

19  don't know.

20          MR. FRANCIS:  Our request is partially informed by

21  the way it went last trial.  Your Honor did read the

22  Indictment.  It was longer then.

23          THE COURT:  That may have been the case where I was

24  ready to shoot myself after 10 pages.

25          MR. FRANCIS:  I recall you saying something along

1    those lines.

2              THE COURT:   I surveyed my colleagues before the last

3    trial.   I don't think there's anybody now.   I think all the

4    judges from the last generation whose practice was to do

5    that, are no longer with us or don't do criminal cases.

6    Maybe you can tell me one of my colleagues.   Certainly the

7    people I heard back from they said they don't do it and they

8    consciously don't do it.

9              The problem becomes how do I acquaint the jury with

10   what the charges are.   And in the sense of not just that you

11   are charged with the 10 counts of security fraud, but the

12   particulars of them because the idea the pretrial instruction

13   is to give them a neutral presentation of what the case is

14   going to be about.

15             So, for example, knowing in the 10 or 11, whatever

16   counts, 10 totally skipping number seven goes up to 11,

17   what's the trade date and the name of it, the basic

18   allegation that appears at page 17, paragraph 55.   That

19   information seems to me the jury needs to have.   They all

20   won't retain it.   Some of them will.   They will understand

21   what dates are important, what bond they are listening for,

22   but I mean there's an awful lot of what I will kindly call

23   background.

24             You have more victims listed at pages 3 through 4

25   then they are counts and bonds traded.   I have a whole

 1    lecture about RMBS, what they are and how they trade.  I

 2    don't know.

 3         To be honest with you, I hadn't thought ahead of

 4    time about what I was going to do.  I wanted to raise the

 5    question of you didn't renumber and you left blanks here,

 6    whether anybody is troubled by that or what I tell the jury.

 7    I don't know what the defense's position is going to be.  Is

 8    the Indictment going to the jury at the end of the case.

 9         MR. FRANCIS:  I think these things are all related,

10    Your Honor.

11         THE COURT:  Yeah, they are.

12         MR. FRANCIS:  If you are not going to read it, not

13    send it back to the jury, then that influences -- our

14    understanding of what Your Honor was planning to do, based on

15    the last trial and also the last time we spoke about this

16    issue, influenced our agreement for a very short joint

17    statement of the case and also it affects our thinking about

18    the opening, how long we need.  I don't think it radically

19    changes.  I don't think we'll say now we need an hour and a

20    half with what we're going to try to accomplish with the

21    opening, so I think -- I think it is appropriate to read it

22    in a case, in a complicated case.

23         As Your Honor will, particularly with the new

24    addition of the instruction that they have asked for in the

25    pretrial instructions, they should draw no inference, the

1    jury should draw no inference from the fact of the

2    Indictment, I think it is appropriate to orient the jury as

3    to what we're doing here.  It helps speed things along.

4    Makes the testimony that much faster because the jury has not

5    heard for the first time a word and oh, my gosh, what are we

6    talking about, let's slow down and talk about it for 20

7    minutes.  RMBS the first time they hear it, it won't be out

8    of the first witness's mouth.

9            THE COURT:  I think they are going to hear about in

10   your opening.

11           MR. FRANCIS:  True.  I suppose the first explanation

12   of it won't be from the witness.  So obviously, Your Honor,

13   it is within your discretion to do what you think is best

14   here.  The way it be worked last time seemed to be effective.

15           My recollection is the Indictment didn't go back to

16   the jury, but you read it.  You read it once and not in the

17   closing.  That was I think everyone agreed on that.  I can't

18   recall exactly the defense's position, but certainly the

19   Government didn't object to it.

20           THE COURT:  Can I hear from the defense?

21           MR. MAHONEY:  We share Your Honor's sentiment that

22   reading a 19-page Indictment could take some time, not the

23   most efficient way to start.

24           In response to Mr. Francis's comments, first of all,

25   I have complete confidence in his ability to explain the

1    Government's case in his opening so he'll have a fair and

2    full opportunity to do that.

3         Regarding the statement to the extent the Government

4    agreed to the more truncated statement because they thought

5    you were going to read the Indictment, I think that means

6    maybe we ought to add a couple more things that the

7    Government wants to in the statement.

8         THE COURT:  The statement's purpose -- it gets

9    incorporated into the pretrial instruction.  The main purpose

10   is just the jury selection.  I don't think that has to have

11   detail.  The question is in the pretrial instructions, don't

12   they need some sort of outline of what the charges are.  It

13   is usually accomplished by reading the Indictment to them,

14   right, that tells you what they charged, but the challenge I

15   think for the Court is that nowadays we don't write an

16   Indictment just to put people on notice of the charge.  We

17   write an Indictment that tells a story.  That's fine.  I'm

18   not being critical of the Government for doing that, taking

19   the opportunity to do it, but I'm also not sure that I should

20   be telling their story to the jury I guess.  There aren't a

21   lot of cases out there, but I think I looked at all of them.

22   That's really where the concern comes in.

23        So I guess I thought that I had -- I thought I was

24   in good shape on all of the issues for January 4.  I will

25   have to think about that.

1          Mr. FRANCIS:  Your Honor, if you are not going to

2    read the Indictment, the Government's concern then what you

3    would be doing is paraphrasing the allegations in the

4    Indictment.  That's a real concern to us.  Obviously the

5    whole purpose of the trial is to see whether or not the

6    Government can prove the charges as set forth in the

7    Indictment and picking and choosing or changing the language,

8    and I don't mean to minimize the burden on Your Honor.  It is

9    not fun.  I read this Indictment to the Grand Jury.  I recall

10   thinking I'm not enjoying this process.  However, it is

11   important and necessary.  Seems like one of those things

12   might be better to bite the bullet and get through it as

13   alleged in the actual Indictment rather than trying to go

14   through a process which I would expect would be extremely

15   vigorously advocated what exactly should the paraphrase of

16   the Indictment be.

17          THE COURT:  I guess, you know, that's a very

18   reasonable position.  My question back at you is do you

19   really think that after about 35 minutes, when I hit page 17,

20   which is really where you want the jury to be focused and

21   remembering Count One, that's this bond, Count Two, that's

22   this bond, do you think anybody is still going to be

23   listening keenly?  I have to say the jury we had on the last

24   trial was fantastic.  No one ever nodded. They were totally

25   attentive.  But even when you are attentive, I can confess,

1    you are not always listening as well as you can listen and

2    that's what bothers me.  I get to the part they really need

3    to know, and it is at the end of 17 pages of the story.

4          MR. FRANCIS:  Obviously, Your Honor, there's going

5    to be some amount of inattention as it goes on.  We're

6    talking about a jury charge that's currently drafted is 63

7    pages.

8          THE COURT:  That's short.

9          MR. FRANCIS:  Right.  So I think we have in the

10   federal system and in complicated white collar cases have to

11   assume and encourage a level of attention from the jury that

12   goes on and also there seems to be at least -- that's an

13   aspect of how compelling is the reading of the Indictment,

14   but it is not Shakespeare In The Park.  It doesn't need to be

15   compelling.

16         At some point, making a record in and of itself has

17   its own value.  That's why we are asking to read it once.  We

18   understand it is an imposition on Your Honor.

19         THE COURT:  It is not the imposition on me that I'm

20   worried about.

21         MR. FRANCIS:  It is an imposition on the jury as

22   well.

23         THE COURT:  You could read it.  You could take your

24   40 minutes and read it.

25         MR. FRANCIS:  That's what I'm worried about.  If the

1    Government has to take the opening to explain what are the

2    charges against Mr. Litvak rather than this is what evidence

3    will show.

4           THE COURT:  But the problem is the Indictment is 90

5    percent, this is the evidence.  On this day, Mr. Litvak did

6    this chat.  In this chat, he said this.  In this other chat,

7    it was different, so a lot of it is evidence.

8           MR. FRANCIS:  I have heard Your Honor previously say

9    that maybe the U.S. Attorney's Office should do very short

10   Indictments and deliver a letter to the defense that says

11   this is all the evidence against you.

12          THE COURT:  I hope I never told you how to do --

13          MR. FRANCIS:  I think it was more like a thought to

14   be considered.  That would be one way to do it.  In

15   complicated cases this Indictment has many audiences.

16   There's value in explaining what exactly Mr. Litvak is

17   accused of having done beyond the one-page statutory

18   language.  We think it is just appropriate here.

19          THE COURT:  I hear you.

20          MR. FRANCIS:  It avoids a lot of problems people are

21   worried about.

22          THE COURT:  Okay.  I'll take it under advisement.  I

23   don't think we settled on the number of alternates.  I think

24   the Government wanted four and the defense thought two to

25   three was enough.  It is flu season and snow season.  We're

1    going to be three weeks.  Three might be enough.  I think I

2    did a six week trial with four.  We lost one we shouldn't

3    have picked.  We knew we were going to lose him.  That was

4    sort of stupid.  We didn't lose any past that, but it wasn't

5    flu season.

6              MR. FRANCIS:  We're not sure what harm there is in

7    having four.

8              THE COURT:  It is a waste of somebody's time.  They

9    feel like they are not doing what they are spending all this

10   time doing.

11             MR. FRANCIS:  If we knew for sure it wasn't going to

12   snow and flu epidemic, yes, fine, we don't want to waste

13   anyone's time.  Given the fact we don't want to have a

14   retrial.

15             THE COURT:  No, I agree.  I guess we'll pick four

16   then.  I think I explained that we'll pick the pool of

17   alternates separate and so if not clear to you where we cut

18   off, be sure to ask Diahann or me as we go through the

19   process and we all agree.

20             I can't remember was there any motion practice about

21   the defendant's experts or the Government now have the

22   disclosure they think was required and they have no

23   objections?  I don't have any motions, but I want to ask.  I

24   guess are there any issues around the defendant's experts?

25             MR. FRANCIS:  So there was no -- yes, there was no

1    motion under 701 or 2.  There was no Daubert -- request for

2    Daubert hearing or anything like that.  There was a motion in

3    limine practice dealing with some of the things the experts

4    proposed to testify to.

5           THE COURT:  Okay.  And I ruled on those?

6           MR. FRANCIS:  You did, Your Honor, I believe in

7    every instance.

8           THE COURT:  Okay.

9           MR. FRANCIS:  I have to go back and look to be

10   certain but I believe so.

11          THE COURT:  Was that in the June motion in limine

12   written ruling or on the record?  That was in June.

13          MR. FRANCIS:  I believe it was in June.

14          THE COURT:  I might actually have that.  Do you

15   recall the gist of it?

16          MR. FRANCIS:  So I believe issues about, for

17   instance, profitability of victims, fair market value, bad

18   behavior of other broker dealers, the Government was raising

19   those in the context --

20          THE COURT:  Of the experts.  I remember that now.

21   Nothing in particular about the expert disclosures other than

22   those general topics might be implicated in their

23   testimony.

24          MR. FRANCIS:  We also had a motion in limine to

25   prevent -- I believe it was phrased in a motion in limine to

1    prevent, maybe it was a Rule 16 motion, I can't recall right

2    now, to prevent the defense from further amendment of their

3    expert notice and restrict the experts from testifying

4    outside the four corners of the notice.  I believe Your Honor

5    may have ruled it is moot based on the representations or I

6    can't recall exactly how you phrased your ruling, but I

7    believe you said that was a truism.

8              THE COURT:  I don't think the defense gave me any

9    grief about that.  I expect to hold them to the disclosure

10   and I expect the opinions will be given as they were

11   disclosed.

12             MR. FRANCIS:  I think that's right.  So the original

13   question is is there a motion.  The answer is no, there's not

14   one pending.

15             THE COURT:  There's no issues right now for you.

16             MR. FRANCIS:  I don't think there's a 701 issue or

17   702.

18             THE COURT:  Tell me what issues there are, if there

19   any.

20             MR. FRANCIS:  I think there might be an issue as to

21   the admissibility of some of the opinions and some of the

22   documents that we could imagine them trying to introduce --

23             THE COURT:  We kind of touched on that issue when we

24   started talking about exhibits.  I don't think just because

25   an expert relies on a document, I believe the rule it is not

1    necessarily admissible because of that.  He can refer to it

2    and he can say this is why I give the opinion I give is among

3    other reasons is this treatise or whatever else it is that

4    isn't admissible, but it's reasonable for an expert to rely

5    on.  That doesn't open the door to shovelling in a thousand

6    pages of something.  I don't think the defense gave me.  I

7    think I expressed that the last time.  I don't think there

8    was much disagreement from that side of the room.

9           I guess I have two questions for the defense.  I

10   have now gone through and read the expert disclosure, and I

11   don't like to stir I guess the pot unnecessarily if the

12   Government is not unhappy, but it struck me there were

13   several places where it looks like and maybe this is what the

14   Government means there may be objections to certain opinions,

15   but it looks like you were going to be asking the experts

16   about things after the time at issue in the case.  I would

17   think that you are going to have to tell me why that's

18   relevant.  The article that they tried to get in the last

19   time about how, you know, the investment houses were now

20   training their folks about the fact they can't do, they can't

21   do that in light of various prosecutions that were coming out

22   including Mr. Litvak's, and I have trouble with understanding

23   why that is relevant to what occurred in this case and that

24   he's charged with.  In other words, the trades that occurred

25   when they occurred.

1          MR. MAHONEY:  I believe Your Honor ruled on that

2     specific issue.

3          THE COURT:  I couldn't remember.

4          MR. MAHONEY:  Ruled it was irrelevant for the

5     reasons you gave.

6          THE COURT:  I want to make sure it had been

7     addressed.  The other question I had is and again it may not

8     turn out this way as people testify and it may be that you

9     did this as a belt and suspenders.  What if one expert has

10    the flu and you haven't gotten them and you have to put the

11    other person up.  It struck me there's some overlap in

12    opinions between experts.  While I respect the Circuit's

13    opinion that experts are entitled to testify in defense of

14    Mr. Litvak, I think the evidence about cumulativeness would

15    still apply.  I don't mean to say and I don't mean to invite

16    the Government to be on their feet whenever there's some

17    slight overlap or somebody says something by way of a

18    background statement to what's going to lead their opinion or

19    be the basis of their opinion that happens to be what another

20    expert said.  I'm talking about like their opinions.  First

21    expert gives opinion A.  I don't think we're going to have

22    the second expert come in and say I have Opinion A, too, and

23    the third expert, I have Opinion A, too.  That I think is

24    cumulative.  If they are different, there's no issue.  I'm

25    just saying if literally they are saying the same thing, I

```
1    have a problem with that.
2         MR. MAHONEY:  I agree with Your Honor that the rule
3    that can't present cumulative evidence or at least can't at
4    some point applies to expert testimony.  This is something
5    that did come up at the motions in limine hearing and I think
6    where we settled on.  The one caveat I want to be clear on
7    we'll have, for example, Dr. Torous, the MIT finance
8    professor, give certain opinions.  His opinions are based on
9    his education and training as somebody who teaches finance.
10   Mr. Burnaman, Mr. Dolan.  I think most of the overlap between
11   Mr. Burnaman and Mr. Dolan who have very similar backgrounds,
12   their experiences are the basis for their opinion.
13        Now I think that to the extent that we would present
14   the same opinion from Mr. Dolan and from Mr. Burnaman based
15   on the same experiences, I would agree that would be
16   redundant.  We can't do that.  I think with regard to
17   Mr. Torous, there are some places where he will be making
18   some statements that are similar to what Mr. Burnaman might
19   make.  He's coming at it from a different angle.  I believe
20   that's where we ended up with the motions --  I will have to
21   look at the transcript.
22        THE COURT:  That's fine.  We'll take it up as you go
23   along.  I'm kind of old fashioned.  I probably grew up in the
24   state system.  I like an expert witness -- you can do his
25   qualifications and all of that.  I don't qualify an expert so
```

1    don't turn to me and ask me to view this witness as qualified

2    as an expert.  My view is I will listen to his qualifications

3    and then you put up this professor and you ask him how to fix

4    a washing machine after you made him an expert, obviously it

5    objectionable.  He's not qualified.  Depends on the question

6    that you ask him.  But I doubt there's going to be any

7    objection about qualifications of these topics, but I think I

8    like because I think it avoids problems asking the witness do

9    you have an opinion about X?  Yes, I do.  What is that

10   opinion?  It is and that answer I should be able to find it

11   somewhere in this disclosure.  It may be verbatim, but it is

12   in here.  Then you say, what's the basis for that opinion?  I

13   know that's old fashioned and I tried cases where experts are

14   kind of up there having a conversation with the jury.  I find

15   that can be troublesome and problematic and I think sometimes

16   unfair because things come out before the other side has the

17   opportunity to object either on qualification or outside the

18   scope or things like that.  I'm not saying it has to be

19   rigidly followed.  I think as a general practice, I would

20   suggest that trial lawyers on your side try to do that.

21        MR. MAHONEY:  Understood, Your Honor.  Thank you.

22        MR. FRANCIS:  Your Honor, if I may on this, I agree

23   with what Mr. Mahoney said.  We actually made a motion.

24        THE COURT:  I'm remembering now.

25        MR. FRANCIS:  And what Your Honor just said about do

1    you have opinion?  Yes.  What's your opinion?  What's your

2    basis for it?  Our one concern is we won't then know that

3    Mr. Dolan's basis and Mr. Burnaman's basis for the same

4    opinion -- I understand what Mr. Mahoney said with respect to

5    Professor Torous versus the traders.  But if the two traders

6    have the same opinion and based on the same basis, we're not

7    going to know that.

8              THE COURT:  You are going to know it is the same

9    opinion, if their expertise is the same, those two guys we

10   already agreed have the same background and experience and

11   expertise. If he says do you have an opinion to the first one

12   about A, that's fine, in comes the answer.  You don't object.

13   He gets the second guy up there, not Torous, not the

14   professor, not the guy with the different background and

15   different expertise, he says you have an opinion about A, I

16   would think you would object, cumulative.  If he doesn't do

17   it that way, if he starts having a conversation with the

18   second fellow, it probably will come out before you get a

19   chance to object.  I don't mean to be too strict.  I think

20   there will be things that they both say on some level that

21   sound similar as far as an opinion.  This is done in this

22   industry or people expect this or really big questions.  The

23   reason we wanted to have experts.  I think -- I don't know.

24   You tell me if you disagree but I don't think -- you can't

25   march up one after another and try to load the scales.  I

1    think you are entitled to present the evidence absolutely and

2    you will be able to do that, but not cumulative.

3            MR. MAHONEY:  We agree, Your Honor.

4            THE COURT:  Fine.  I should have gone back and read

5    the June ruling but I wanted to reread the disclosure.  It

6    came in on November 22, the last one, that's what caused me

7    to make sure we had addressed these things.  That's great.

8            There's a recent filing.  Something about the

9    Government's disclosure of the scheme evidence and I had

10   notes about how did it differ from what your prior disclosure

11   in that respect had been.

12           MR. FRANCIS:  There were some -- we took some

13   away.

14           THE COURT:  It was a lower number, might have been

15   different.

16           MR. FRANCIS:  We added one we had done in the prior

17   trial without the benefit of chats.  It was Mr. Canter's

18   testimony based on the fatfinger e-mail to his recollection

19   so in an abundance of caution, we added it to the scheme

20   evidence.

21           THE COURT:  Any objection to that?

22           That's not a surprise that was going to be evidence

23   at trial generally the subject matter.

24           MR. MAHONEY:  Right.

25           THE COURT:  I just want to be sure it wasn't going

```
 1    to become an issue.  Then I remember there was supplemental
 2    objections.  Can you bring out my canvas bag and I will find
 3    it in there with my notes.
 4         I think the Government may have added some exhibits,
 5    then the defense supplemented objections. It was very
 6    confusing to me.  I need my notes to tell you why.  It looked
 7    like there was only one difference in the new list.  You
 8    didn't object to that difference.  We'll wait until I get it.
 9         I had a couple of things we left open when we talked
10    about exhibits the last time.  I think one was Mr. Litvak's
11    Employment Agreement, Exhibit 205.  The defense had objected
12    it was prejudicial because of the language about, you know,
13    you can't work here if you don't obey the securities laws.
14    Therefore because he doesn't work there any more, they assume
15    he must have disobeyed the security laws.  I think I
16    suggested that the parties discuss -- I asked you if you
17    would be open to a stipulation that would cut out the
18    termination language and put it more positively.  That's what
19    my notes say anyways.  The Government seemed to be receptive.
20    The defense wanted to think about it and discuss it among
21    yourselves. Do you have a response on that or not?
22         MR. MAHONEY:  We do, Your Honor.  The Government did
23    provide us with a draft stipulation.  We appreciate the
24    effort to try to find the middle ground.  We're still going
25    to stand on our objection to the entire document coming in.
```

1              THE COURT:  I will have to rule on that.  I looked

2    at what were a large number of documents the defense was

3    offering I think could be characterized as documents

4    concerning PPIP's relation with the Treasury.  I think the

5    last time I said I'm not saying they are inadmissible.  I

6    thought it depended on what came in in the Government's case,

7    but having looked at them, I'm puzzled why the defense is

8    thinking of offering all of these.  Are you trying to bury

9    the jury?

10             MR. MAHONEY:  No, we're not.  I would urge you to

11   think about these in a couple of different categories.  For

12   one thing I don't have the sheet in front of me.  Perhaps my

13   colleague will get it to me.

14             For one thing, there are documents that detail in

15   the obligations that the PPIP managers owed to the

16   Government, talking about what kind of reports they needed to

17   give them, what kind of investment processes and standards

18   they needed to follow.  We think that's very relevant and

19   something we talked about at the last hearing.  That's one of

20   those fund agreements that said as a PPIP manager, this is

21   what you need to do and it includes descriptions how they had

22   to make investment decisions.  That gets right to

23   materiality.

24             THE COURT:  We're not blaming the victim, are we?

25             MR. MAHONEY:  No.  But those documents are relevant

1      to what these investors thought was important in how they

2      made their investment decisions.

3              THE COURT:  Why do I need 30, 40 of them?

4              MR. MAHONEY:  We don't intend to introduce 30 or 40

5      of them.

6              THE COURT:  It is only 23.  I exaggerated.

7              MR. MAHONEY:  Okay.  We don't intend to use 23.  I

8      think with a few of the witnesses where relevant.

9              THE COURT:  Right.  If you have a witness from that

10     company and you want to use it, I think that's fine.  My

11     concern back at the first pretrial and continued in my notes

12     as I looked at it, is kind of like, you know, it seemed like

13     an awful lot of paper that I don't know whether it is

14     cumulative or what the reason I'm having trouble with it, but

15     I would be troubled if you put in all 20-something of these

16     that multiple pages, double-sided, thinly defense print.

17     What is it that you want the jury to take from it?  You want

18     them to take what you said.  Do you need 24 of them to do

19     that?  That's kind of what I'm a little worried about.

20             MR. MAHONEY:  Understood, Your Honor.  If you would

21     like me to go through there's some other categories of these

22     things.  There's also documents that are marketing materials

23     that the PPIP funds -- that the managers gave to the Treasury

24     when they applied to become PPIP managers and a lot of these

25     applications say the kind of things that somebody would say

1    when they are trying to get a job.  They talk about this is

2    how great we are.  This is how sophisticated our investment

3    processes are.  We have all of these qualified investment

4    professionals who are working for us.  That goes directly to

5    investor sophistication.  That's something that the Second

6    Circuit held was of particular relevance here given the type

7    of market that we're dealing with.

8                THE COURT:  Right.  Which your experts will say

9    opaque, nobody really knows what's going on, it is not an

10   open market.  You can be as smart as a whip and I don't know

11   how you would know all that you would want to know.

12               MR. MAHONEY:  The fact they are sophisticated is

13   something that's relevant.

14               THE COURT:  No, no.  It is not me out there buying

15   the stock and not having a clue.  It is like throwing a dart

16   at the board.  Obviously they are different I would hope.

17   They are paid enough to do it.  They should have some

18   expertise.  I looked at Mr. Jennings' Separation Agreement.

19   I know I reserved on it.  I'm struggling to see the relevance

20   of it three years after the fact and without knowing the

21   circumstances under which he was let go or that they

22   separated so I think I still see 403 risk there.  Maybe we'll

23   just have to dig into it as you get closer to it.  I'm not

24   saying it is not coming in.  Please don't misunderstand me.

25   I'm saying that you are going to have to raise it again

1        before you try to use it.  Okay?

2                MR. MAHONEY:  Understood, Your Honor.

3                THE COURT:  So basically I spent a lot of time

4        looking at the experts.  I'm not sure that I resolved

5        anything, but I'm more familiar with the exhibits.

6                MR. MAHONEY:  Thank you, Your Honor.

7                THE COURT:  There was a motion for permission to

8        bring electronic devices into the courtroom during the trial.

9        You want to bring in a projector, a document camera,

10       speakers.  I thought you wanted to bring in your phones and

11       the computers.  We're equipped with everything. You don't

12       plan on bringing in your own electronic equipment, do you,

13       unless I'm misreading the form.  I didn't look at the exhibit

14       until now.  I thought you were asking to bring in phones and

15       computers which they won't let you bring unless I say you

16       can.  Here it is.  Checked various boxes that don't make any

17       sense but below it says computer monitors, six point VGA blah

18       blah blah, table with skirt, outlet strips, going to be a

19       meeting with Diahann for testing.  That's good.  What is myfi

20       jet pack what the heck is that?

21               MR. CASE:  The myfi jet pack is a wireless device.

22       Cannot use the courtrooms' internet.  The other point the

23       item the projector I think that we viewed the courtroom

24       technology request as a request to use the courtroom

25       technology with the respect to the specific devices that we

1    would like to bring through security, those are the

2    specifically enumerated in the attachment and otherwise.

3            THE COURT:  Okay.  Diahann, you can grant the

4    motion.  I assume the Government doesn't object, 473.

5    There's an attachment here.  Do you want me to sign approved

6    at the bottom and you can give that to the marshals or the

7    CSOs?

8            THE CLERK:  Okay.

9            THE COURT:  The only thing I would say we had this

10   problem in the last trial, I never had it before.  They

11   brought in a printer.  Nobody ever asked me.  It is amazing.

12   I didn't realize there was this form.  They asked could they

13   bring computers in and they brought in a printer and there

14   was a paralegal over there printing away.  Finally my law

15   clerk said Judge, I can't hear the witness because of the

16   noise from the printer, so we put a stop to that, so I'm

17   hoping you are not going to bring a printer.  I assume you

18   can send an instruction to print it offsite and you will have

19   what you want.

20           The only thing is sometimes computer keyboards can

21   be noisy.  You don't have the silent boards that you can

22   separately plug in.  You have to be careful that your folks

23   aren't energetically pounding away on their computers.

24   That's all I ask and that your phones, your devices are shut

25   off when you are in the courtroom so we're not getting ring

```
 1   tones.  Okay.

 2          Are there any issues that the parties have to raise

 3   that I haven't dealt with?  The Government anything?

 4          MR. MAHONEY:  Your Honor, there's one other

 5   logistical thing.  We touched on it the last hearing.  I

 6   wanted to make sure we're following Your Honor's procedures.

 7   That's the issue of the jury research.  The topic that we

 8   addressed at the last hearing was what the boundaries were.

 9   What Your Honor said and we fully agree with is we can't

10   friend somebody on Facebook.

11          THE COURT:  You can't do anything.  You can't phrase

12   it that way because I don't know all the ways that you can do

13   it, so I will phrase it in a generic way.  You cannot take

14   any step that would cause the potential juror to be aware

15   that you are investigating them.  Is that the right way to

16   put it?  Does the Government agree?

17          MR. FRANCIS:  Absolutely.

18          THE COURT:  So friending somebody I think I don't

19   know, but I think the person gets a notice somebody friended

20   them so even though they don't know who Joe Schmo is, even if

21   they don't know it is you, they know somebody is trying to

22   contact them and so research them is probably the wrong verb.

23   You can't research someone in a way in which the target of

24   the research will be become aware of that research effort.

25          MR. MAHONEY:  I understand, Your Honor, that's
```

```
1    perfectly fine.  The only reason why I raised it again
2    looking at the docket from the last trial, I saw the defense
3    had actually filed a motion to do jury research, but to do
4    things short of what Your Honor said we can't do.
5              THE COURT:  You don't need to file a motion as long
6    as we're on the record and you heard me and you don't have
7    any question about it.  Also you asked for the list, right,
8    that you can get from the Clerk's Office. I think it is just
9    the day before.
10             MR. MAHONEY:  Yes.
11             THE COURT:  You get the list.
12             Diahann, how many is Nancy bringing in?
13             THE CLERK:  I asked her for 100.
14             THE COURT:  In the room 100.  The last time we
15   picked this three defendant case, I don't think we got above
16   45.  It was unbelievable.  Six-week long trial and nobody
17   wanted to be excused. My luck this one everybody will need to
18   be released and there's no school vacations so it is no
19   holidays, shouldn't be a problem.  We're going to bring 100
20   in.  They are prescreened for the dates.  What dates did we
21   give them, Diahann?
22             THE CLERK:  January 5 through February 3.
23             THE COURT:  I gave them through the 3rd.  You are
24   telling me that's plenty of time.  Anybody who wasn't
25   available for that time period has already asked to be
```

1    excused.  We'll still end up with a handful of people who

2    don't know how to read the instructions and don't know how to

3    request things, but it wouldn't be everyone.  Anything else?

4         MR. MAHONEY:  My colleague reminded me we wanted to

5    make sure we're okay having our jury consultant with us

6    during jury selection.

7         THE COURT:  You will have to introduce him.  I don't

8    know what you will call him.  Is there objection to that?

9         MR. FRANCIS:  None.

10        THE COURT:  But you do have to identify him by name,

11   where he's from.  You don't have to say he's a jury

12   consultant.

13        Well, I guess let's chat a little bit about

14   materiality maybe or about the objections to the charge.

15   Probably that might be helpful.  I don't know if the

16   Government had the opportunity to read it.  To be honest with

17   you, I had only skimmed it until this morning.  I won't say I

18   have studied their response, but if you have any feedback for

19   me, maybe we can have a beginning of a discussion about their

20   responses to the -- the charges issues that they see that are

21   set forth in Document 472.

22        MR. NARDINI:  We had read it, Your Honor, and we do

23   have some responses.  I think that they raise a number of

24   different issues, some related to materiality, some are

25   not.

1          THE COURT:  There are different ones.  We don't have

2   to just do materiality.  I have got about another hour, so I

3   think we can talk our way through them, if I can find the

4   right paperwork.

5          MR. NARDINI:  Document 472.

6          THE COURT:  I have that and I have notes.  All

7   right.  Let's get started and see if I have what I need.  If

8   not, I will listen to you folks talk me through it.  We

9   already agreed that I would add that one sentence on the

10  pretrial so the next is Charge 4, they want me to add to

11  Number 4 -- I'm sorry.  They want me to correct the charge

12  about unanimously agree about a reasonable doubt which

13  whatever, I will hear from the Government on.

14         MR. NARDINI:  I think there's some numbering

15  confusion.  I think it is actually Proposed Instruction

16  Number Five.  I think some of the numbers in the captions

17  might be references to the defense's proposed numbers. I

18  think we're talking about page 10 of Your Honor's draft

19  instruction.  And we do have, you know, an objection to the

20  language proposed by the defense.  Although, I think they did

21  flag a sentence or two that probably could use some attention

22  from the Court.

23         THE COURT:  I did have that reaction myself.  Yeah.

24         MR. NARDINI:  I have a couple of observations.  The

25  language the two full sentences that appear on page 10 of

1    your Honor's draft instructions are --

2              THE COURT:  The two full paragraphs on page 10.

3              MR. NARDINI:  Two full sentences.

4              THE COURT:  Okay, then I'm on the right page.

5              MR. NARDINI:  Are derived originally in some form

6    from Sand's instruction 4-2.  I think what happened is you

7    can tell these have morphed over time.  The original Sand

8    instruction does not include the reference to unanimously.  I

9    don't think that we have any conceptual opposition to

10   introducing the concept of jury unanimity here except for the

11   fact that the two sentences are not constructed in parallel.

12             The first sentence talks about whether it is your

13   duty to return a verdict of not guilty.  The second one talks

14   about whether you should vote to convict.  I think

15   effectively the two sentences as they currently are drafted,

16   toggle back and forth.

17             THE COURT:  It is backwards.  Seems to me when you

18   are talking about unanimity, you are talking about

19   convicting.  You can only convict if you find that the

20   Government has carried its burden.  If you are not unanimous,

21   you are not acquitting, you are hanging I suppose on lack of

22   proof.  But if you, as an individual juror, don't think the

23   Government's carried its burden, then I think you would note

24   not guilty in effect.

25             MR. NARDINI:  My suggestion is that part of it is

1  when you use unanimously, you have to be talking about the

2  collective you.  In that case, if you want to talk about what

3  the jury unanimously believes, then you should talk about the

4  returning a verdict of not guilty or returning a verdict of

5  acquittal or a verdict of guilty in the last sentence.

6       If instead you are going to take that last sentence

7  and use the "you should vote," then you need to take out the

8  consent of unanimity because the vote is an individual

9  juror's thing that does not focus on unanimity.

10       THE COURT:  It looks like both sides think it is

11  muddled.  I think I agree.  I will take some quiet time and

12  figure out how to fix it.  Maybe we'll send that out next

13  week so that you will have it ahead of time.  If we have

14  moment here or there, we can address some of these easier --

15  It is fairly easy.  You may think I didn't fix it right.  I

16  think we all agree on what I should be saying.  It is a

17  question of how I'm going to say it.

18       MR. NARDINI:  If I can give two suggestions to Your

19  Honor as you do think about that.  One would be to simply go

20  back to the original version of those two sentences in Sand

21  4-2 which I don't think go both between the collective and

22  individual you.

23       I would also suggest that the Court look at its own

24  proposed instruction Number 41 on page 60 of the instructions

25  where the Court does address jury unanimity.  It is on page

```
 1   60 at the bottom and I think it is very clear there.  It is a
 2   clearer version.  The Government is happy if you take Sand or
 3   if you want the unanimity use, the language from 60, either
 4   one of those I think is accurate.
 5            THE COURT:  That's fine.  I don't know if the
 6   defense wants to the add anything in light of what the
 7   Government said.
 8            MR. MAHONEY:  No, Your Honor, I think it makes sense
 9   to have both sentences be parallel so long as we fix the use
10   of unanimity that we pointed out.
11            THE COURT:  Okay.  The next one was Proposed
12   Instruction 32 which, of course, may not be 32, but it is
13   this purpose of the security frauds statute and the statute
14   defining the offenses.  I guess I would be interested in the
15   Government's -- I have given it because the Government has
16   requested it in the past and nobody ever objected to it.  Now
17   I have an objection so I need to hear from the Government why
18   it is appropriate.
19            MR. NARDINI:  We do think it is appropriate for the
20   Court to do what I think is a pretty standard issue in these
21   cases which is to talk about the purpose of the statute.
22            THE COURT:  These cases meaning security fraud cases
23   or?
24            MR. NARDINI:  Criminal cases.
25            THE COURT:  I don't tell them the purpose of the
```

1    drug laws.

2         MR. NARDINI:  In general, in my cases, I found in my

3    experience the Court generally does use a version of Sand's

4    purpose instruction.  I think it is helpful to orient the

5    jury.  I think the one version the Court has here is pretty

6    simplified I think as jury instructions generally go.  The

7    directions of the Court is moving from the general to the

8    specific.  So you have a sentence or two that generally

9    orients the jury as to what we're talking about here which is

10   securities laws. I think you move to the specific which is

11   reading the text of the statute which I think is very

12   important.  That's the charge returned by the grand jury.

13   And I think the Court needs to tell the jury what the law is

14   and then you follow that with the elements which is a very

15   detailed explanation to the jury of specifically what their

16   task is in applying that law to these facts.

17         THE COURT:  Okay.  Attorney Mahoney, I will turn to

18   33 first.  I don't think I have charged a jury in a criminal

19   case in 19 years without reading them at least an abbreviated

20   version, or an ellipses version of the statute.  I take out

21   extraneous stuff or if there's A, B, C and we're only doing

22   C.  But somewhere somehow I read them what Congress has

23   prohibited.  I guess I could ask my colleagues but I don't

24   know of any cases that say you can't do that or it is wrong

25   or prejudicial.  I think I agree with the Government on what

```
1    the statutes are.  I don't see your complaint on that one.

2         MR. MAHONEY:  Well, to be candid, Your Honor, our

3    complaint or objection to 33, I think is less passionately

4    felt than our objection on 32.  33 is the statutory language.

5    I stand by what we wrote in our papers.  We don't think it is

6    necessary if Your Honor is going to then read the elements

7    because what the jury needs to be paying attention to Your

8    Honor's description of the elements.

9         THE COURT:  See I view the charge, as I explained it

10   to my law clerks, kind of like, you know, the old windows.

11   You had the things up at the top and you click and drop down,

12   click again and drop down.  That's what a charge is.  You

13   start with the biggest generalization which in my opinion is

14   the statute, then you put it into English, those are three or

15   four parts in that statute that you have to find.  So let's

16   tell you how many of those you are.  Let's go and take each

17   other separately and within each one, I might have five more

18   instructions so I don't know.  That's what I view a charge

19   as.  Kind of logically breaking it down for the jury.  To me

20   you start with the beginning which is the statute.  We

21   wouldn't be here if Congress hadn't passed these statues or

22   enacted these rules, whatever, so I really -- I'm having

23   trouble with that.

24        The 32 one it is a bit of the Government's pitch,

25   you know, why we're here.  But also I don't know of any -- do
```

1    you know of any cases that say it is wrong.  It is the kind

2    of standard instructions.

3         MR. MAHONEY:  Well, Your Honor, a couple of points I

4    would make to answer your question directly.  No, I'm not

5    aware of a case, but I'm also not aware that anyone ever

6    objected to this before.

7         THE COURT:  They probably have, but it may not have

8    made its way to a decision.

9         MR. MAHONEY:  I firmly disagree with what

10   Mr. Nardini said somehow the purpose of the statute is

11   relevant to the jury's inquiry.  It is not.  What's relevant

12   to the jury's inquiry is what your answer to going to charge

13   them with is to the elements.

14        And the second point which is suddenly brought up

15   here, let's look at what this says. This says that what

16   Congress wanted to do was to outlaw deceptive and inequitable

17   practices.  Full stop.  Nothing about materiality, Nothing

18   about use of the mails.  Nothing about even -- I guess it

19   does say in connection with the selling or the buying of the

20   securities so you get one of the four elements there.

21        It suggests that Congress's purpose somehow departs

22   from what you're going to charge the jury with.  At best

23   that's a recipe for confusion.  At worst, it means the jury

24   is going to be invited to return a verdict that they think is

25   going to fulfill this policy goal that we think is not fairly

1    stated because Congress and the SEC did not intend to outlaw

2    all forms of deceptive and inequitable practices.  If they

3    are not material, they are not outlawed.

4         THE COURT:  Okay.  I hear you.  I think I will take

5    a little bit of a look at it and see what Sand cites.  I know

6    it is in the standard Sand charge.  Does he have any cases

7    that he relies on for it?

8         MR. NARDINI:  I think he has a lot of cases that

9    explain where he derives his instruction from.  If you look

10   at the Sand instruction, it goes on for more than a page,

11   Your Honor, is quite a distillation.

12        THE COURT:  Maybe that's the source of the problem.

13   Maybe I'm trying to be too brief.  Therefore, I'm

14   misstating what the purpose is.  I'm summarizing too much.

15        MR. NARDINI:  We would never suggest Your Honor is

16   mistaken.

17        THE COURT:  You should.  We're trying not to be

18   mistaken and have to do this again.

19        MR. NARDINI:  I can say the original Sand

20   instruction it would be useful to take a look.  Most of what

21   Your Honor deleted is a reference to the Securities Act of

22   1933.  As often happens with the Sand instruction, he's put

23   in a lot of language that could be used in different cases.

24   I think that Your Honor's, the two sentences that you used,

25   is the language that would be applicable to a charge of this

1    nature.

2           And I would also state that I think another way of

3    saying that the charge appropriately moves from the general

4    to the specific is that they have to be read in totality, so

5    I think it would be heard to imagine that a jury would think

6    that they were allowed to convict simply based on one of

7    these sentences in isolation.  When you were about to tell

8    them in the next following pages in order to convict, you

9    must unanimously find each of the elements beyond a

10   reasonable doubt:  One, two, and move on in a methodical way.

11   So I don't think just like you would never say that the jury

12   just because you explain one element is going to forget that

13   you just are about to explain three other elements is going

14   to convict based on one alone. I don't think there's much of

15   an argument here that they are going to be led to believe

16   they can ignore the rest of your instructions.

17          THE COURT:  I think we're going to get to that in

18   the next objection.

19          MR. NARDINI:  I think we may have skipped over one

20   other of the defense's points on page 2 which is Proposed

21   Instruction Number 24.  This is very similar to their request

22   for the pretrial instructions.

23          THE COURT:  He says 20.  You are saying 24 to add

24   that sentence.

25          MR. NARDINI:  While the Government, you know, we

1    didn't have much of an objection to changing the pretrial

2    instructions, I do think that this winds up being really

3    redundant to add it again in the already lengthy final charge

4    to the jury.  I think that if you look at Charge Number 24.

5            THE COURT:  I'm looking at it.

6            MR. NARDINI:  If you look at the second full

7    paragraph, the first two sentences I think already adequately

8    cover the point that the defense is trying to convey.  I

9    think you should also take a look at your Proposed

10   Instruction Number 39 where you say that you are sending a

11   copy of the Indictment into the jury room.  You also say that

12   the jury is reminded --

13           THE COURT:  I said I was sending in a copy.  I don't

14   think I'm inclined to do that.  I didn't catch that when I

15   went over this draft.

16           MR. NARDINI:  Your Honor is thinking about deleting

17   instruction 39?

18           THE COURT:  It is all wrapped up in what am I going

19   to do about the Indictment.  I did not send it in for the

20   last trial.  I checked the case law.  There's criticism of

21   sending in long indictments to the jury.  Nobody gets

22   reversed yet, but it is clear that the message is coming.  I

23   asked my colleagues.  I don't think anybody does it anymore

24   with these kind of indictments.  I will double check those

25   e-mails.  I'm not taking out number 39.  I have my attention

1    drawn to it.  I'll let you know what I'm going to do with

2    it.

3          MR. NARDINI:  Our main point is reading the jury

4    charge as a whole.  If Your Honor is looking at 24, you will

5    want to look at 39.  Take out 39 that may or may not

6    influence what you want to do with 24.

7          THE COURT:  I need to read the charge as a whole

8    quietly to see if I need to add what they wanted me to add in

9    the pretrial, but I understand the request and I will take a

10    look at it.

11          So I was about to turn I think to the next one.  We

12    were turning to was the first element of the securities fraud

13    which is, you know, I knew that I was going to get this from

14    the defense, Attorney Mahoney, so I'm dying to give you my

15    retort.

16          You either want four elements or you want three.  If

17    you want me to talk about materiality in the first element, I

18    will talk about it, but there won't be a second element of

19    materiality.  You can't make me charge materiality twice.  I

20    struggled with your request.  I understand that's a central

21    part of the defense.  It is crucial to the case and

22    therefore, I made the decision, perhaps the Government is

23    going to object.  I decided okay, in this case, I will try to

24    accommodate what the defense wants.  I will separate it out.

25    Then I looked at the first one and I got the word "material"

1    in there.  I can't put material in the first element and not

2    explain it to them. Therefore, what will I do when I get to

3    element of materiality so I decided to take it out.  So now

4    you want me to add -- you don't like -- I guess you don't

5    like all kind of manipulate and deceptive acts because they

6    are only material ones.  I'm telling the jury they have to

7    find all four elements, right, so yes, these manipulative and

8    deceptive acts, one, that are material; two, that are, three,

9    whatever three and four is.

10          So I guess I could listen to you with an open ear.

11   The idea of all kinds of may be too harsh.  But it seems to

12   me prohibits manipulative and deceptive acts is a correct

13   statement especially when you say next you must find that

14   those acts were material.

15          If I got pushed and the Government didn't have a

16   really strong argument back at me, I might instead of "all

17   kinds of" use the word "certain manipulative and deceptive

18   acts," but I don't know how -- I don't know how I can charge

19   materiality in the first element and give you the second

20   element of materiality.

21          Mr. MAHONEY:  Well, I'm not going to ask you to do

22   that.  I take Your Honor's point.  I think frankly inserting

23   "certain" would solve the problem.

24          THE COURT:  But it may go too far.  I'm not sure it

25   is right.  It was off of the top of head reaction to the

1    objection.  I think the "all kinds of" is a bit too much.  It

2    is kind of over the top.  I don't know how else to describe

3    it.  It creates an impression about the category or universe

4    that it goes a bit too far.  It is kind of like I'm out there

5    and then going to pull it back on element two.  Why do I go

6    that far.

7          Right now I would be inclined to take out "all kinds

8    of" and say it prohibits manipulative and deceptive acts as

9    the first element, subject to them being material in the

10   second element.  I think that's where I am right now.

11         MR. MAHONEY:  The other question I would ask Your

12   Honor why that sentence is necessary at all.  You start out

13   by saying giving a definition of what fraud is.  Then going

14   on to say describing a general level what the law does.  I

15   don't really thing it adds anything.  It cause this

16   complication.  I take Your Honor's point that to qualify it

17   in a way that I originally suggested qualifying it makes it

18   redundant with the next instruction, but I think hanging out

19   there by itself unless if you said "certain" that would be

20   accurate and I won't have a problem with it.

21         THE COURT:  It doesn't belong at the end of that

22   paragraph I don't think.  I'm not sure it needs to come out.

23   It may belong some place else.  I will have to look at it in

24   the quiet of my office I suppose.

25         Do you agree with me that "all kinds of" is a bit

1    over the top?  I don't know how else to describe that.

2          MR. NARDINI:  I think what this sentence is meant to

3    convey is that there's no limit on the type or kind or

4    matter.

5          THE COURT:  That language from those cases about the

6    creativity of man notwithstanding kind of thing.  We can't

7    tell you what's illegal because the next fraudulent scheme

8    hasn't been invented yet.  I know what's why it is in here.

9    I would agree with you.

10          MR. NARDINI:  I agree with Your Honor that really I

11    don't think that this opens the door to the jury then again

12    imagining that they can disregard every instruction that you

13    are about to give them.

14          THE COURT:  I'm not telling them puffery is illegal.

15    Puffery is a deceptive act, but it is not illegal, right,

16    because it isn't material.  We're going to carve that out as

17    not material.

18          MR. NARDINI:  I think the fact that Your Honor then

19    has split out this entire additional element of materiality.

20    By the way, we don't have an objection.  We think it is

21    preferable.

22          THE COURT:  I spent so much time agonizing over it.

23          MR. NARDINI:  You should have asked us first I

24    guess.

25          THE COURT:  No.  It was useful for me to think about

1    it.  It is not the way it is in the standard instructions

2    anyway.  I might have found another Circuit that breaks it

3    out.  I don't see the our Circuit as having had that charged

4    that way, but if everybody agrees that's great, but I don't

5    see it as error.

6         MR. NARDINI:  I don't think it is error.  I think as

7    long as -- as long as Your Honor is giving a legally accurate

8    definition of materiality in this case, I don't think it

9    matters if you give an extra long definition of the first

10   element that subsumes materiality or whether you address

11   material separately.

12        But I would agree with Your Honor's principal point

13   that I'm not concerned that there's any false suggestion in

14   the sentence that somehow materiality has been written out of

15   the statute because you're going to get to it in full force

16   in Element Two.

17        THE COURT:  I think the reason why I decided to

18   separate it -- I don't want to say it gives it more emphasis.

19   I tell the jury everything in the Charge is important.  I

20   think the defense made a good point.  The first element was

21   long the last time.  When you get to the end, you get to

22   materiality.  It loses its significance I think.  I don't

23   know how else to say that.

24        Basically I'm trying to help the jury think about

25   the case in a logical fashion and go through the evidence

1    with some logical framework about what they have to find.  I
2    thought by and effectively all I did was cut off the end of
3    the first element and make it the second one.  I think that
4    that helps them do it.  It is kind of that window, the
5    dropdown windows.  It is easier for them to find and focus on
6    it.  That becomes what they think is important.  The defense
7    thinks it is important.  That may not be what they think is
8    important.
9        MR. NARDINI:  I think given Your Honor highlights
10   materiality by giving instructions in a stand-alone element,
11   I think that removes any danger that that last sentence on
12   page 46 might somehow be read out of context to somehow tell
13   the jury, by the way, when we get to materiality, you can
14   ignore everything I'm about to say.
15       THE COURT:  I will take a look at it, whether it is
16   in the right place, whether it is needed, whether it should
17   be edited a bit.
18       Now the subject of importance.  Do we all seem to
19   agree -- I think we agree somewhere -- that important doesn't
20   necessarily equal materiality.  Have we agreed to that?  That
21   somehow I drafted the charge that defends that principle it
22   seems.  Let me see if I can find my notes.  I think the
23   defense at page 7 of their response number 472 tells me three
24   ways of which the instruction is at odds with the Circuit's
25   view of by equating materiality with importance or

1    significance.

2         The first is that, quote, a material fact is one

3    which would have been significant to reasonable investor in

4    making an investment decision.  Again I guess -- not again.

5    I do appreciate you put in parenthetical not just importance

6    but significance that you are concerned about, but that

7    sentence doesn't contain the word important or importance, so

8    I'm not sure how I run afoul of what you claim is the Second

9    Circuit precedence that says don't equate those two concepts.

10   I don't use the word "importance".  How can I have violated

11   the Second Circuit view as you view it?

12        MR. MAHONEY:  Well, Your Honor, our original motion

13   on this was a motion to amend the instruction to take out and

14   you do take out I believe the phrase "cared about" was in the

15   original instruction.  You had taken that out.  Significant

16   it is a synonym for importance so I don't think it is -- I

17   think that that single sentence articulation of it, I think

18   is at odds with what the Circuit said in the City of Pontiac

19   case.

20        My problem with the way that it is written is that

21   there's nothing -- I'm going to anticipate what Mr. Nardini

22   is going to say because basically his answer just about every

23   problem we have with the jury instruction you have to look at

24   holistically.  That's Mr. Nardini's argument. Let me respond

25   to it.

1           The problem here is that we do have an articulation

2    of the Basic versus Levinson test.

3           THE COURT:  I quoted it.

4           MR. MAHONEY:  You did, Your Honor.

5           THE COURT:  But you complained about that.

6           MR. MAHONEY:  I will get to that.  The materiality

7    standard is the Basic test.  That was what in the most recent

8    case the Supreme Court decided on materiality in the Matrix

9    case. They repeatedly refer to it as the Basic test.

10          THE COURT:  That's why I went back.  You can see my

11   copy of Basic.  All those stars and the blue lines and

12   highlights.  Those were cut and pasted into the charge.

13          MR. MAHONEY:  Let me get to the discussion of

14   Basic.

15          THE COURT:  You look Basic but you don't really like

16   it.

17          MR. MAHONEY:  I like Basic a great deal.  But to go

18   back to the first two sentences in the first paragraph --

19   excuse me.  The second and third sentence which is the ones

20   that I think are the most problematic.

21          What it suggests -- I think it suggests three

22   different standards of materiality.  One is it is material if

23   it is significant to the investor.  Two, it is significant if

24   it is important to the investor.  Three, it is significant if

25   it significantly alters the total mix of information.

1           My preference would be to delete the second and

2    third sentences.  But I think at a minimum, there's got to be

3    a sentence there that connects.  There's got to be a fourth

4    sentence that be connects the first, the second, and third

5    sentences to the fourth.  It can be something.  We suggested

6    some language in the pleading that we just filed.  We had

7    suggested a slightly different articulation in the reply

8    brief we filed in support of the motion in limine.  We think

9    more closely tracked what the Second Circuit said in the City

10   of Pontiac case which is that it is necessary that

11   information be important in order to be material, but it is

12   not sufficient.  That thought is one that I don't think comes

13   through in how Your Honor has written the first paragraph

14   with all due respect, of course.

15           THE COURT:  Of course.  So where is that concept in

16   Basic where Basic writes, quote, it is further explained that

17   to fulfill the materiality requirement, okay, so this is what

18   materiality is, quote, there must be a substantial likelihood

19   that the disclosure of the omitted fact would have been

20   viewed by the reasonable investor has having significantly

21   altered the total mix of information made available which is

22   I think I have in the charge word for word, right?

23           MR. MAHONEY:  The issue there, Your Honor, is that

24   the formulation of disclosure of the omitted fact, that

25   applies when you are talking about an omission.  Basic was

1    omission case as was TSC.  What we're talking about here

2    primarily are misstatements.  When you are talking about a

3    misstatement -- the charge that Your Honor gave the last time

4    stated it accurately.  What it said is that the misstated

5    fact would significantly alter the total mix of

6    information.

7         THE COURT:  If you look above what I just quoted and

8    there again addressing TSC, they say in a proxy solicitation

9    context, but as you say, this language gets repeated on

10   materiality in all kinds of contexts, right?  Am I right

11   about that?  That quote -- this is an omitted fact is

12   material if there's a substantial likely that a reasonable

13   shareholder would consider it important in deciding how to

14   vote.  You are telling me that language is inapplicable

15   because we're not in a proxy setting and it is not a

16   shareholder?

17        MR. MAHONEY:  No.  Not because it's a proxy setting.

18   That statement is completely accurate.  It is the way to look

19   at the effect of the total mix of information if it is fraud

20   by omission, but if it is fraud by misstatement, what matters

21   is not whether the truth would have altered the total mix,

22   but it is whether the misstatement would have altered the

23   total mix.

24        I will remind Your Honor.  This is particularly

25   important in this case.  I will remind Your Honor of both the

1    Second Circuit ruling and also your own ruling on the motion

2    in limine about what I call the investor skepticism evidence.

3            One of most important issues in this case that's

4    critical to the defense is that a reasonable investors do not

5    put a lot of stock in the sales talk that they hear from

6    dealers in RMBS transactions.

7            THE COURT:  That's your story and you are sticking

8    to it.

9            MR. MAHONEY:  Absolutely.

10           THE COURT:  I heard witnesses say the opposite so it

11   will be for the jury to decide.  On the point that I think

12   you are making, you are telling me go back and look at my

13   motion in limine ruling and the Circuit's opinion and I will

14   find in both of those the fact that this language in Basic,

15   which you tell me Basic is the bible, isn't really applicable

16   because it is a misstatement, i.e, a lie, opposed to an

17   omission, a failure to speak.  You are telling me that?

18           MR. MAHONEY:  No.

19           THE COURT:  Then I don't know what you are telling

20   me.

21           MR. MAHONEY:  Perhaps I'm not being clear.

22           THE COURT:  Let me ask you a question.  Would it be

23   error in this case for me to charge the jury that a

24   misstatement is material if there's a substantial likelihood

25   that a reasonable person, reasonable investor would consider

1    it important in deciding whether to buy?

2         I just buried the exact quote from TSC that's

3    repeated in Basic.  Instead of omitted fact, I've said a

4    misstatement of fact.  Instead of how to vote, I have said

5    whether to buy and instead of shareholder, I said investor,

6    but otherwise every other word is from there.  Is that a

7    misstatement?  Would that be wrong to charge the jury that

8    way in this case?

9         MR. MAHONEY:  Well, let me break that up because the

10   articulation that you gave used "important" as shorthand for

11   materiality.

12        THE COURT:  No, it is actually the sentence defines

13   materiality using the word "important."

14        MR. MAHONEY:  It does, Your Honor, but I go back to

15   what Your Honor said in your minute order and what the Second

16   Circuit said in the City of Pontiac case is that importance

17   is not synonymous with materiality.  I agree it is a

18   necessary condition for the Government to show that

19   materiality has been met, but it is not sufficient.

20        In order for a misstatement to be material, it means

21   that the misstatement itself, the misstatement, what is said,

22   the misstatement has to significantly alter the total mix of

23   information available to the investor.

24        THE COURT:  So whether it is important to the

25   investor is irrelevant when it is a misstatement?

1          MR. MAHONEY:  Not at all, Your Honor.  I don't

2    believe that it is at all.

3          THE COURT:  Could you answer my question?  I just

4    quoted you language and I asked you if I included that in the

5    charge, would it be error.

6          MR. MAHONEY:  Your Honor, I believe that your

7    statement, standing by itself, suggests that that's all the

8    Government needs to do is to show something is important.

9    That is not enough.  That's what the Second Circuit said in

10    the City of Pontiac case, and I go back to what Your Honor

11    said at the hearing on the motions in limine, also what Your

12    Honor said in the minute order that you issued.  Importance

13    and materiality are not synonymous.  In the sentence that you

14    just read to me, importance and the materiality are

15    particularly is --

16          THE COURT:  We know I'm not giving a charge on

17    materiality that's one sentence long.  You have two and a

18    third pages of my telling them materiality.  If that sentence

19    is in the two plus pages is it error?

20          MR. MAHONEY:  I think it is, Your Honor.  I think if

21    it is in those two pages without one more sentence like the

22    sentence that I suggested which would be derived almost

23    verbatim from the City of Pontiac case which says that it is

24    not enough that it be important.  It has to substantially

25    alter the total mix.

1          THE COURT:  Okay.  That also has to be understood in

2     the context of the facts of that case, right, as opposed to

3     Basic which we have to understand in the context of an

4     omission to a shareholder on a vote on a proxy.

5          In this case, I think it is Judge Cabranas is

6     talking about concentrations of risks which is in a

7     disclosure statement deemed to be puffery.  I don't know that

8     I put as much weight, and I don't mean it out of any

9     disrespect to the Circuit, I think they are talking about

10    something that's not quite exactly what we're talking about

11    in this case.  It is a different set of facts so while I

12    don't reject -- I didn't reject in my motion in limine ruling

13    the lack of an equation between the two words, which is what

14    this says, I don't think that means that I wipe everything

15    else out of the charge that uses the word "important."

16         For example, the City of Pontiac recognizes a

17    necessary element of materiality is importance to the

18    listener.  Right?  So even your case tells me that I should

19    instruct the jury in some regard in connection with

20    materiality about importance.

21         MR. MAHONEY:  Your Honor, I'm perfectly fine.  I

22    suggested the sentence that you pointed out in the City of

23    Pontiac that would solve my problem with this.  The problem I

24    have with it is the suggestion that because something is

25    important or because something is significant that in and of

1   itself is enough.  It is not enough.  It is necessary but it
2   is not sufficient.
3           Your Honor, I beg you to go back and look at your
4   minute order where I think you state very clearly that you
5   can equate something being material with something being
6   important.
7           THE COURT:  Where do I say the opposite of that in
8   the charge that I propose?  Where do I say that importance is
9   materiality?
10          MR. MAHONEY:  It says a material fact is one which
11  would have been significant.  A false statement is a material
12  fact if there's a substantial likelihood that a reasonable
13  investor would consider it important.  That's equating
14  materiality with importance.
15          I don't see how it could be read otherwise.
16          THE COURT:  Does the Government want to express
17  their views on the subject?
18          MR. NARDINI:  Yes.  We think that the Court's
19  instruction which is drawn directly from Basic and TSC does
20  not at any point equate or synonymize importance and
21  materiality.  We think the word "important" is used in
22  various sentences but also in a context.  Just to take the
23  first sentence which is a near direct quote from Basic.  A
24  material fact is one which would have been significant to a
25  reasonable investor.  Now, all the sudden we have introduced

1    the concept of the reasonable investor, in making an

2    investment decision.  Now we have the context in which the

3    fact or the omission would be important to the reasonable

4    investor.

5         If you look at each of the sentences in which

6    importance or significance is used by the Supreme Court and

7    that this Court uses, in every circumstance importance or

8    significance is placed in the proper context, so I do think

9    that by using the language that the Supreme Court itself has

10   announced as the standard for materiality, I think that the

11   context is clear and that each individual sentence is clear

12   enough.

13        But as Mr. Mahoney points out, I do continue to

14   think that reading them all in context is important.  If the

15   Supreme Court uses three sentences to spell out materiality,

16   put another way it means this, put another way it means this.

17   You put all three things in there and the Supreme Court keeps

18   quoting itself, that's a pretty good clue that the Supreme

19   Court think it is the standard of materiality.

20        THE COURT:  Do you have any objection to my proposed

21   charge on materiality?

22        MR. NARDINI:  I think we have a couple points.  Not

23   the one we're talking about right now.  If we get to page

24   50.

25        THE COURT:  He has an objection at the top of 50.

1    One of defense's objection is the second sentence I think of

2    the first paragraph so we're on 50.

3         MR. NARDINI:  If we're moving to page 50, looking at

4    the second paragraph starts for the purposes of this case, we

5    saw that Your Honor added a sentence I believe at the

6    recommendation of the defense which says in determining

7    whether the stated or omitted fact is material, you must

8    consider the sophistication of investors in this market.  I

9    think that is accurate as far as it goes, but what's

10   happening there in some ways is a marshalling of the

11   evidence.  The sophistication of the investors is obviously

12   something that the defense wants to focus on in asking the

13   jury to think about what is a reasonable investor.  I think

14   the case law is clear that you have to look at all of the

15   facts and circumstances.

16        THE COURT:  About what?  About what's important to a

17   reasonable investor or what makes up a reasonable investor in

18   any particular case, i.e, in this case is sophisticated?

19        MR. NARDINI:  What constitutes a reasonable investor

20   in this market, the RMBS market.  I think the Government's

21   point that we'll be making to the jury, if you are looking at

22   in this context who is a reasonable investor in the RMBS

23   market, it is fair to look at the sophistication of

24   investors.  It is also fair to look at the characteristics of

25   the market.  We'll be emphasizing the opaque nature of

1    pricing in this market, so we would suggest that if the

2    defense wants to have one of the factors, one of the

3    circumstances flagged in the Court's instruction that's the

4    sophistication of the investors, it would be also appropriate

5    for the Court to reference something fairly general.  We

6    would say something like at the end of that sentence and the

7    sorts of information available to investors in this market

8    because again now if we're going to start about particular

9    characteristics of a reasonable investor that the defense

10   would like to focus on, then I think it is fair to flag for

11   the jury another one of the relevant circumstances which in

12   our case would be something like the sorts of information

13   available.  We're not asking the court to make our argument

14   for us and say oh and by the way, there are obstacles to

15   verifying price or anything like that.  That's why I think

16   something like a category that's the sorts of information

17   that's available to investors in this market would be a fair

18   and generic reference to the categories of information that

19   the jury may or may not wish to consider.

20          THE COURT:  Okay.  Anything else on the materiality

21   charge from the Government?

22          MR. NARDINI:  The sentence that follows which is the

23   hindsight view.

24          THE COURT:  The last sentence.

25          MR. NARDINI:  And I understand that was an

1  adaptation that the Court took from Judge Weinfeld's case.  I

2  think there was a different version of that sentence that the

3  defense had proposed.  Part of our concern there is that that

4  sentence we think can be taken out of context.  Obviously it

5  is one sentence from Judge Weinfeld in a pretty lengthy

6  opinion about saying you can't look back or 20/20 hindsight.

7  He used 20/20 in his original quote.

8          We're a little concerned that this is going to be

9  used by the defense to say don't listen to the hypothetical

10  questions posed by the Government or the victim saying if you

11  had known fact X at the time or if you had known that you

12  were being lied to, would you have done something different,

13  and we're afraid that's going to be cast as oh, that's

14  hindsight.

15          THE COURT:  You could just as well argue that their

16  experts are looking at this in hindsight and they shouldn't

17  rely on the expert testimony.  I don't know.  It seems to me

18  it applies to really anything that is being said about what

19  could have or would have or should have or maybe did happen

20  back in 2007 to 2010.  I don't know.  I will think about it.

21          Anything else on your -- anything you have on

22  materiality or anything else?

23          MR. NARDINI:  Let me look at my notes.

24          THE COURT:  So you would want me to strike that

25  sentence?

1           MR. NARDINI:  I think it is best to strike the

2   sentence.  It is not part of the standard instructions, and

3   we do think it would wind up adding to the confusion here.

4   In particular, undermining what are going to be questions

5   that Your Honor is going to permit which are those questions

6   to the victims would you have done something different had

7   you known X or had you not been told X.  We think that that

8   would effectively be used in a way that would contradict Your

9   Honor's ruling in admissibility.  If I can ask the Court's

10  indulgence for one second.

11          THE COURT:  Yes.

12          MR. NARDINI:  There was one other sentence that is

13  not in Your Honor's instruction on page 50 and it was in the

14  Government's proposed instructions.  It was in Your Honor's

15  instruction from the last trial.  And it was from the

16  Government's proposed instructions which is Document 363.  It

17  was our page 46.  There was language about the Government

18  need not prove the misrepresentation would have deceived a

19  person of ordinary intelligence, goes onto say that it

20  doesn't matter whether the intended victims were gullible

21  buyers or sophisticated investors because the securities laws

22  protect the gullible and unsophisticated as well as the

23  experienced investor.

24          THE COURT:  Yeah.  What do I do with the Circuit's

25  language about sophisticated markets?

1          MR. NARDINI:  That's a suggestion that I was going

2     to have.  Because we're talking about sophistication of

3     investors in this case, it points to how the word

4     sophisticated could be understood in that language I just

5     read that we used before and that perhaps could get tweaked

6     in this case.  I think gullible as opposed to sophisticated

7     has always been used to suggest that the level of credulity

8     or credulousness on the part of an investor or the hearer of

9     a misrepresentation, it doesn't matter whether someone is

10    gullible, whether they are easily duped into believing

11    something or not is a level of their skepticism or

12    gullibility which is different I think from what we mean by

13    sophisticated in this case.  I think what we're going with

14    sophisticated in this case is somebody who has lot of

15    algorithms, super computers in the back room, all that sort

16    of thing, how much do they analyze things, how much do they

17    know about bonds, how much research they have done, who has

18    the bigger algorithm.

19         I think the point in Sand that's different from when

20    you go to the negotiating table and you believe something

21    that someone tells you.  This is standard I think in any

22    fraud case, you know, if someone offers to sell you the

23    Brooklyn Bridge and you buy it, you don't say well, you know,

24    you were just a sucker for believing that he owned the

25    Brooklyn Bridge.  I think the same principle applies here.

1    Maybe using the Government language instead of contrasting

2    gullible and sophisticated, something like the gullible and

3    the less gullible or something like that.  I think it would

4    get to the same point of credulity or lack of credulity is

5    not a factor in fraud cases on the part of the victim.

6              THE COURT:  Everything you say sounds very

7    reasonable.  It rolls off your tongue.  I don't know how I

8    reconcile Judge Straub's discussion of the sophistication of

9    this market.  I'm trying to find that language.  I think he

10   talked about the people in the market with the standard black

11   letter law about you don't blame the victim for not doing

12   more research, doesn't matter whether they are smart or

13   stupid, everyone is entitled to honest information of

14   material facts, right?  That's what the securities laws say,

15   but at page 185, we've recognized a misstatement may not be

16   material or resulted in a mere, quote, slight inflation, end

17   quote, of transaction costs, and District Courts in the

18   Circuit have held repeatedly in the analogous civil context

19   that, quote, the sophistication of the investor, not the

20   market, the investor is relevant both to the adequacy of the

21   defendant's disclosure and to the extent of the investor's

22   reliance on any alleged misrepresentation.

23             That's a Circuit quoting with approval District

24   Court cases writing in those words. What do I do with that in

25   the face of the language that you asked me to charge?

1          MR. NARDINI:  Again I think the difference there is

2    between sophistication and skepticism, and I don't think the

3    Court is talking about sophistication being the same as

4    skepticism.

5          THE COURT:  What do you mean by skepticism?  Whose

6    skepticism?

7          MR. NARDINI:  On the part of victim or the investor.

8          THE COURT:  Is this skepticism something we expect

9    the investor to have here or we don't expect him to have?  I

10   don't know what I do with the word "skepticism."  I'm totally

11   lost. Is that in your request to charge that I didn't use?  I

12   don't know what skepticism means.

13         MR. NARDINI:  We say gullible as opposed to

14   sophisticated.  What I'm saying now since Your Honor has

15   added references to the sophisticated investor on page 50 of

16   your draft instructions, one way to add back the language

17   that the Government requested about the gullibility of the

18   investor not mattering, if you want to add that back without

19   using the word "sophisticated" as the opposite of gullible,

20   because you don't want to create a tension there, I think the

21   point is sophisticated may not have been the best word there.

22   Gullible versus sophisticated.  Perhaps a better way to say

23   it is gullible versus the less gullible or the gullible

24   versus the skeptical.  I'm suggesting those are two different

25   concepts.  Again the credulousness of a particular investor

1    is different I think from the sophistication of an investor.

2         You can be a Nobel Prize winner in Chemistry and you

3    can be the most sophisticated, brilliant person on earth and

4    you can still be a sucker and believe what you hear.  I think

5    that's what we're saying is that there's a distinction

6    between somebody who is more or less credulous of what they

7    are told.  That's different from someone who's a

8    sophisticated investor.

9         The COURT:  Okay.  Anything else on this charge?

10        MR. NARDINI:  From us?

11        THE COURT:  I would like to exhaust the Government's

12   at least objections as of now to this charge.

13        MR. NARDINI:  I don't have anything else on

14   materiality at this point.

15        THE COURT:  That's fine.  Yes, Attorney Mahoney.

16        MR. MAHONEY:  I have three points to make.  Let me

17   start with the last subject of discussion which was

18   Mr. Nardini's request to have this language resurrected about

19   how you, the jury, don't have to care if the investors were

20   gullible or people of less than ordinary intelligence.  We

21   think that is the problematic.  I think Mr.

22   Nardini's solution is even more problematic.  What he's

23   saying is it doesn't matter if somebody is skeptical.

24        I will recall for Your Honor what Your Honor said on

25   page 25 of your order on the motions in limine.  You said

1    that evidence that investors were aware of and did not care

2    about the misrepresentations of the kind allegedly made by

3    Litvak would, quote, be highly relevant to the question of

4    whether Mr. Litvak's alleged misrepresentations would have

5    been material to reasonable investors and is, therefore,

6    admissible under Rule 401.

7           The Second Circuit made a similar statement on page

8    179 of its ruling where it said that it was reversing in part

9    because the expert testimony that we had offered about

10   whether the statements would be -- why they considered within

11   the industry as bias and often misleading was relevant.  It

12   was relevant precisely because skepticism is relevant to how

13   much weight a reasonable investor in this market places on

14   the information at issue.

15          That's a cornerstone of the defense.  In light of

16   what the Second Circuit said and in light of what Your Honor

17   said, I don't see how we could have a reasonable

18   conversation.

19          THE COURT: Does it mean that the concept of blaming

20   the victim, there's an exception in this case in a

21   sophisticated market or sophisticated investors that you do

22   get to blame the victim contrary to black letter securities

23   fraud case law?

24          MR. MAHONEY: Absolutely.

25          THE COURT:  How do I instruct them on that concept

1    that you can't blame the victim?

2          MR. MAHONEY:  Well, Your Honor, blaming the victim

3    would be saying that this particular person -- remember, Your

4    Honor --

5          THE COURT:  What does it mean to be a sophisticated

6    investor then?

7          MR. MAHONEY:  A sophisticated investor in this

8    market is, number one, somebody who is skeptical of what they

9    learn on sales calls when they are told information that

10   cannot be verified.

11         THE COURT:  I can be very unsophisticated and still

12   be very skeptical.  I can have a very low IQ and be skeptical

13   of things people tell me.  There's a lot of quote news that

14   I'm skeptical about nowadays.  I don't know that I'm

15   brilliant or knowledgeable or politically astute but I'm

16   skeptical.  I don't understand the equation this concept that

17   sophistication means skeptical.

18         MR. MAHONEY:  I don't think sophistication means

19   skeptical.  One of the fact questions in this case is who is

20   the reasonable investor in this market, what do they consider

21   when making their investment decisions, what do they place a

22   lot of stock in, what do they not place much stock in, how do

23   they process all of this information and ultimately how does

24   it affect the total mix.

25         I'm reading directly from what Your Honor said in

1    the order on the motions in limine.  What you said is that

2    evidence that investors were aware of and did not hear about

3    misrepresentations of the kind allegedly made by Mr. Litvak

4    would be highly relevant to the question of whether Litvak's

5    alleged misrepresentations would have been material to a

6    reasonable investor.  That's directly parallel to what the

7    Second Circuit said.

8              THE COURT:  Okay. That's one aspect of what I would

9    charge the jury or what evidence I would let into the trial.

10   How do I tell the jury that, you know, it is not -- it isn't

11   the victim's fault.  You are not looking to see what the

12   victim shouldn't have been doing or had to do.  If somebody

13   lies to you, they lie to you.  It is not material.  That's

14   fine.  If they said they are the best car salesman in the

15   world, I guess we don't find that illegal. If they lie to you

16   about something, then we have to figure out would that have

17   been important.  Important, that's a bad choice of words  --

18   material to the listener.  You know, that reasonable person

19   who is in the shoes of the person receiving the information.

20             I'm looking at what I wrote at 25.  I still think it

21   was fine.  I don't know that the Government thinks it was

22   right.  I stand by what I wrote.  That isn't period, end of

23   paragraph.  That isn't the end of the case.  That's not the

24   only thing that I have to think about in this case.

25             I don't understand -- I guess I will go back to

1    where I started.  I don't understand why sophisticated

2    investor or sophisticated market is a skeptical person.  I

3    can be as sophisticated as possible.  I couldn't possibly run

4    or write the programs that these guys run these bond -- the

5    makeup of these bonds through to figure out the risk.  The

6    houses in Tampa are going up in value or they aren't or jobs

7    are being lost.  Therefore, more foreclosures will happen and

8    they come up with some formula for why this bond is worth 60

9    percent of its face value as opposed to the next one two

10   towns away is 40 percent.  I couldn't possibly do that.

11          In that sense, it is a sophisticated market, but I

12   don't know that because I can do that, if I could do that, it

13   doesn't mean I'm sophisticated in everything in the world

14   that gets said to me.  There's nothing sophisticated about

15   what a price of a bond is.  It is.  It is a fact.  It is a

16   very simple fact.  I don't think I need to be sophisticated

17   to understand the price that this is a price.  This is the

18   price somebody is telling me.  So and so you then retreat to

19   well, they are sophisticated so they are skeptical.  I don't

20   know that sophistication equals skeptical.

21          I met a few mathematicians who could probably write

22   this code who are very naive.  I could sell them the Brooklyn

23   Bridge.  It is not the world they live in.  They could write

24   the most complicated code and most sophisticated analysis and

25   be dead on right.

1              I'm having trouble with the idea that I will equate

2     sophistication where the Circuit talked about this market

3     being sophisticated that that means that the reasonable

4     investor is some -- I don't know.  Maybe they are geniuses,

5     but it doesn't make them Pope-like, infallible, able to see

6     through any state.

7              Your own experts, I was interested to read, talk

8     about how the market is opaque, how it was difficult to know

9     what things were valued at, and I understand that's the

10    thrust of one of Mr. Litvak's defenses is that the buyer had

11    to run their own analysis.

12             If they got to buy the bond in the range what they

13    thought these things were worth, more power to them, no harm,

14    no foul.  I'm not saying it as pretty as you will.  I think

15    it is a good argument, but it doesn't answer the question of

16    what I tell the jury about the fact that these folks can do

17    those sophisticated analysis and they can figure out that if

18    they bought this at 50, that's good for them.  Should they

19    buy it at 50 if they -- would they buy it at 50 if they were

20    told that it really only cost 49.  That isn't sophistication.

21    Maybe it would be.  They would say it is worth 50.  I will

22    pay 50 and I will let Mr. Litvak walk away with more money in

23    his pocket than he deserves or maybe they would say no, I

24    don't want to deal with you.  I'm going to go down the street

25    and find it or maybe they would say I can't find it down the

1    street.  I have to buy if from Mr. Litvak.  And he knows it

2    because he's making this market, so I'm going to buy it from

3    him.  But I don't know that that's all that sophisticated.

4         MR. MAHONEY:  Your Honor, the reason why I -- what I

5    was trying to say, these are complicated somewhat

6    metaphysical concepts.

7         What Mr. Nardini was suggesting was that you give

8    the jury an instruction, as I heard it, one version of it was

9    that you should not consider evidence that the investors in

10   this market are skeptical.  That's what I proposed.  I'm not

11   asking for an affirmative instruction from Your Honor that a

12   sophisticated investor is a skeptical investor.  That's

13   something that I have to prove.  That's what I will try to

14   do.

15        What I'm responding to was Mr. Nardini's suggestion

16   that the jury be instructed you don't have to care about

17   whether investors are skeptical.  That's irrelevant to your

18   inquiry.  We think it is of central relevance to the inquiry

19   for the reasons Your Honor said and reasons the Second

20   Circuit said.

21        THE COURT:  There's two others.

22        MR. MAHONEY:  I do have two other points.

23        One is with regard to the sentence that Your Honor

24   added about in determining -- this is the second sentence on

25   page 50 that Mr. Nardini pointed to in determining whether

1   the stated or omitted fact is material, you must consider the

2   sophistication of investors in this market.

3        THE COURT:  I can't find that.  Slow down.  Where is

4   that?

5        MR. MAHONEY:  Page 50, the second paragraph, second

6   sentence, sorry.

7        THE COURT:  You should consider in determining.

8   Thank you.

9        MR. MAHONEY:  So you will recall Mr. Nardini

10   mentioned the sentence.  He said that the Government thought

11   and what he said was it would cure the Government's

12   objection.  The defense would be fine with that.  So if you

13   add that, that's okay so long as you -- and my third point,

14   Your Honor, and I realize I'm perhaps testing the Court's

15   patience on this, but I do so only because I really think it

16   is a critical issue in the case on the equation of

17   materiality and importance.

18        And something that I didn't say when I talked about

19   this the first time around to emphasize the degree to which

20   the Government equated materiality and importance in its

21   closing at the last trial.

22        The words "total mix of information" never passed

23   from Mr. Francis's lips.  He said important, important,

24   important.  I don't think he even said materiality.  They

25   equated materiality with importance. They are going to do it

1      again.  That's why we need language in the instruction that

2      makes clear that materiality and importance are not

3      synonymous.

4              THE COURT:  Are you going to do it again?

5              MR. FRANCIS:  I didn't do it the first time.  I said

6      material and I said there are six or seven ways you know they

7      said it is important, then I had a list of five or six others

8      including the inferences they can draw from the fact that it

9      is an item that's negotiated between Mr. Litvak and his

10     victims or testimony that half a tick or a tick matters or

11     the fact that it is the investor's money and they have a

12     fiduciary duty.

13              This idea that we proved our case and relied on

14     strictly just the fact they used the word important.  That

15     didn't happen the first time.  It is not going to happen the

16     second time.

17              THE COURT:  We'll go back and check that.  I've

18     found generally Attorney Mahoney's been accurate when he

19     tells me to look at something and it is a certain way.  I

20     don't remember your closing that way.  I wouldn't rest

21     anything on that, so I will go back and look, then we'll

22     start the conversation again.

23              There's something about City of Pontiac.  I read all

24     of the stuff when I was drafting this charge and I spent a

25     lot of time on City of Pontiac and I'm not remembering what I

1    think is a better answer to you about City of Pontiac, but I

2    will remind myself.  This time I will write it down.  I will

3    share it with you and you will tell me why I'm wrong.  We can

4    have a better discussion about that case.  Has to do with the

5    context of the case but I'm not remembering why.

6         MR. NARDINI:  One thing Your Honor may be wanting to

7    think about that sentence is immediately followed by a

8    discussion of reliance.  That's only an issue in civil cases.

9    Specificity of the statement that was at issue in the

10   omission was a problem because it wasn't sufficiently

11   specific that someone would have relied upon it.  Of course,

12   we're in the criminal context here so reliance is not an

13   issue.  I don't think that really goes to the previous

14   sentence.

15        THE COURT:  There's one other thing I wanted to ask

16   the defense.  This is later on in your discussion about the

17   materiality charge.  You are talking about the Basic test.

18   Page 9, at the bottom you say that I misstate that test in

19   subtle but important way.  You.

20        Say, quote, the question is properly framed not as

21   to whether, quote, disclosure of the misstated fact would

22   have significantly altered the total mix, quote/unquote, but

23   as to, quote, whether the misstatement significantly altered

24   the total mix and you cite ECA which is a District Court

25   case.  No.  I'm sorry.  That's a Second Circuit case.  I

1    apologize.  But I think when you went and looked at that

2    case, I found the language you quoted to me which cites which

3    is a quote of the TSC industries case but about 30 lines

4    later, they say we consider the factors it sets forth, that's

5    SAB number 99, in determining whether, quote, the

6    misstatements significantly altered the, quote, total mix of

7    information available from investors.  Isn't that what I

8    said?

9          MR. MAHONEY:  No, Your Honor.  What you said in the

10   original instructions was correct where you said that the

11   misstated fact alters the total mix.  What you added was the

12   disclosure of the misstated fact.  There's a difference

13   between the misstatement and disclosure of the truth.

14         What the language that we're pointing to says is

15   that the relevant touchstone here is the statement, what was

16   actually said.  So if go back to what you said the last time

17   which is that --

18         THE COURT:  Does the Government agree with the

19   defendant on this?

20         MR. NARDINI:  No.  Just to be clear to the claim

21   that it misstates Basic versus Levinson.  It is quoting Basic

22   versus Levinson.

23         THE COURT:  That's what I thought I had done.

24         MR. NARDINI:  It is kind of hard to say that you are

25   misstating the Supreme Court by looking at a Second Circuit

1   opinion that's kind of relying on Basic but Basic and TSC

2   both talk about disclosure.  The other thing I really

3   think --

4          THE COURT:  Where do you find the word

5   "misstatement" or so the word "disclosure" is in Basic.

6          MR. NARDINI:  Correct.  You added -- I think you

7   added misstated because we're talking about misstatements

8   here as well as implicit omissions.  I said the false thing.

9   I omitted to tell you the true thing.  That are pairs.

10  Paired up.  But the disclosure is what the Supreme Court has

11  said twice.

12         THE COURT:  I will take a look at it again.  I

13  didn't really have time.  As I said, I read the defendant's

14  pleading, but I didn't really have time to go back and look

15  at the charge as a whole and then break it down as to the

16  sentence that you complained about.  Did you tell me there's

17  something you said you don't object to including?  Now I have

18  lost track of where that was.

19         That's on page 50.  How about the defense puts an

20  alternative language at page 11.  There's, you know, italics,

21  in this context, however, a false statement or an omitted

22  fact is not material simply because it may have been

23  important or significant to a reasonable investor within the

24  ordinary meaning of those words.  The Government would

25  object to that?

1          MR. NARDINI:  Correct.  I think that's going to the

2    City of Pontiac objection.  We don't think there's confusion.

3    We don't think even if they were confusion, I don't think

4    that statement would cure it.  Maybe if the Court decides on

5    its own, if you think there's confusion that needs to be

6    cured.

7          THE COURT:  I finally found those papers about the

8    supplemental exhibits that didn't make any sense to me.  Now

9    I have lost them again.  The Government's Revised Exhibit

10   List we compared to the defendant's objections like we did a

11   summary of what we talked about in all the different

12   objections.  Exhibit 214 and 223 are on the defendant's

13   objection list but not in the revised exhibit list.  Anybody

14   help me on that?  Do the defense object?  Does the Government

15   have an Exhibit 214 and 223 on its revised list?  This is

16   what happens when days pass when I look at something.

17         MR. FRANCIS:  Potentially 224, Your Honor.

18         THE COURT:  223.  You have 214 that's a ton of A's

19   through something but no straight 214.  And the defendant

20   objects to -- no.  There isn't any objection.

21         MR. FRANCIS: We added 224, 225 and 226.  Those are

22   FINRA rules.  They filed a one page or two page piece of

23   paper to say they object to those, and I'm not sure that Your

24   Honor needs to decide it now.  I'm happy to talk about it.

25         THE COURT:  I really don't have a lot of time.

1    That's what I'm not putting my hand.  Notice of Defendant's

2    Objection to Supplemental Government Exhibits.  In the

3    appendix there's an update of the objections but I can't.  I

4    guess I could study and spend four or five hours comparing

5    the old list to the new one.  Can you tell me in your

6    pleading 469 where I might find the changes.

7            MR. HARBOR:  I apologize that's not more clear.  As

8    Mr. Francis said, the Government added Exhibits 224, 225,

9    226a and 226b which I believe in the appendix are on page

10   eight of 14.

11           THE COURT:  I found it.

12           MR. HARBOR:  I think as Mr. Francis said we have

13   done this just to make the record of our objections.  I think

14   these loosely fall into the category we have already

15   discussed and might make more sense to wait until it comes up

16   at trial to see what context.

17           THE COURT:  How about the Government added 477 and

18   did you object to that?  Did you add anything on your list?

19   No, you didn't update your list.

20           MR. FRANCIS:  We did.  We added 477.

21           THE COURT:  You need to look at 477.  That's not on

22   your list.

23           MR. HARBOR:  I think those were added after this.

24           THE COURT:  That's fine.  Do you agree the FINRA

25   rules we wait until we hit that at trial?  It is dangerous.

1          MR. FRANCIS:  Of course it is dangerous.  I'm not

2     sure exactly what their objection is.  If it is placeholder

3     objection, of course, they need to make their record.  If it

4     is a passionately-held objection that once we raise it, they

5     will demand a sidebar, we probably should talk about it.

6          THE COURT:  What's the objection to FINRA rules?

7          MR. HARBER:  What they have added are four rules

8     printed out from the FINRA website and we have attempted to

9     meet and confer with them about how they would introduce

10    these rules, is it something they want to cross Mr. Menchel

11    or our FINRA expert on, something they would put through

12    another witness.  As it stands we don't know.  They are

13    basically throwing rules with no interpretation in front of

14    the jury.

15         THE COURT:  Let me stop you.  When and how are you

16    proposing to introduce them?

17         MR. FRANCIS:  I think they will likely come in

18    through Mr. Carocci who is an employee of FINRA who will

19    introduce about Mr. Litvak's licensing and the exams he took

20    and do you recall Mr. Carocci last time?

21         THE COURT:  I recall.  I'm still struggling with the

22    study guide.  I know I let it in before.  I'm flip flopping

23    on that one.  I feel like a fish on the dock how good an

24    inference can be drawn or not.  Is it speculation.  That's

25    still an open question.  Whether he took a test on a certain

1    day, did he pass?  Do the records of FINRA show that?  Sure.

2    Mr. Carocci is a fact witness, correct?

3        MR. FRANCIS:  He is.  You will recall there's, for

4    instance, Mr. Litvak's employment agreement says he promises

5    not to violate any rules and regulations.  What are those

6    rulings and regulations?  One of them is a rule about

7    standards of commercial honor and principles of trade and

8    another one is use of manipulative, deceptive or other

9    fraudulent device.  That is basically a distillation of

10   10(b)(5).  That's a FINRA rule.

11       To the extent that the Government has the burden of

12   showing that his intent was not just that he was going to do

13   something wrongful, but he was going to do something

14   unlawful, there's a little bit of a discrepancy in where our

15   proposed instruction is from theirs because this goes to his

16   intent.  He promised to follow the rules.  One of the

17   rules is he won't commit manipulative or deceptive acts in

18   connection with the purchase or the sale of securities.

19       THE COURT:  I don't know how that goes to intent.

20   Everything goes to intent, the whole ballpark goes to intent

21   I suppose, but I really don't.  I have trouble with drawing

22   the inference on that.  Put that aside, how does Mr. Carocci

23   introduce FINRA regulations?

24       MR. FRANCIS:  All he does is say is that a rule of

25   FINRA or maybe we do it through whoever puts in Mr. Litvak's

1    Employment Agreement.  That would probably be Mr. Darconte

2    who is a Jefferies' employee.  He said yes, that's an

3    Employment Agreement.  Does it have this provision?  Yes.

4    We'll be doing this through cross-examination.  We'll say,

5    okay, is this a rule and regulation of FINRA in effect at the

6    time?  Yes, done.  We're not asking for opinion.

7              To the extent that Mr. Harbor indicated that we

8    attempted to meet and confer, we did meet and confer.  We

9    explained we wouldn't offer any opinion so.

10             THE COURT:  Now you know why they want to introduce

11   it and may be how multiple possible alternatives but

12   generally so do you object?

13             MR. HARBOR:  We do, your Honor.

14             THE COURT:  Do you object to authentication grounds?

15             MR. HARBOR:  Not to authentication.

16             THE COURT:  So it is what it purports to be.  They

17   didn't edit it or anything?

18             MR. HARBOR:  That's correct.

19             THE COURT:  And the Employment Agreement I believe

20   is coming in.  I don't recall you are objecting.  Did you

21   object to that?

22             MR. HARBOR:  We have objected to that.

23             THE COURT:  Assuming it came in.  So it is in

24   evidence and it talks about FINRA regulations, why wouldn't

25   it be relevant to the Government's case to show what those

1    regulations were that he promised to obey?

2         MR. HARBOR:  There's two issues here, Your Honor.

3    There's two sets of rules.  Two of these are kind of -- I

4    think Mr. Francis sort of paraphrased one that's general

5    statement of honor in the profession.  These are not things

6    that Mr. Litvak has been charged with violating so we think

7    the danger by throwing the language of the regulations in

8    front of the jury without any explanation, without any

9    testimony about what they mean or what the context is, you

10   are basically inviting the jury to confuse that shorthand

11   standard with what the charges are in the case.  The second

12   two of these, Exhibits 226A and B are rules or regarding

13   communications with the public and they are not -- the issue

14   is, at best, there is a question about whether or not those

15   rules even apply to anything that's been charged in this

16   case.  Our expert Mr. Menchel would say they don't apply.

17   What the Government is doing is taking these rules and

18   throwing them in front of the jury with no explanation that

19   we think is a confusion -- recipe for confusion.

20         MR. FRANCIS:  On 226, before you spend time looking

21   that one up.  As we told Mr. Harbor literally before Your

22   Honor came out, we're considering withdrawing 226a and b

23   because it may be those don't apply.  So really it is just

24   224 and 225.

25         THE COURT:  Your objection to that then is that?

1   That seemed to be pretty close to what he's charged with

2   doing so your objection then would be -- your second

3   objection was only 226.  What's you are objection to 224,

4   225?  I'm not sure I follow it.

5        MR. HARBOR:  They are basically short hand rules

6   that describe conduct that's broader than what's been charged

7   in this case.  And basically they are inviting the jury to

8   confuse that with what's been charged here.

9        THE COURT:  All right.  I do need to recess.  It's

10  passed the time I had.  I admit that I will be spending some

11  time on.  I don't think I need to see you folks.  It is

12  possible.  Watch your CMECF inbox.  If I think we need to

13  chat on the third in the afternoon, I'm assuming everybody

14  will be in town.  If I'm concerned about something, I will

15  let you know that I need to see you then.  Otherwise we'll

16  take it up after jury selection or, you know, as the days go

17  on.  All right.

18        (Whereupon, the above hearing adjourned at 04:13

19  p.m.)

20

21

22

23

24

25

1

2       COURT REPORTER'S TRANSCRIPT CERTIFICATE

3       I hereby certify that the within and foregoing is a true and

4       correct transcript taken from the proceedings in the

5       above-entitled matter.

6

7       /s/  Terri Fidanza

8       Terri Fidanza, RPR

9       Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25