IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                                              CASE NO. 3:13CR19 (JCH)

JESSE C. LITVAK
                                                                FEBRUARY 10, 2017
            Defendant.

_____/

**DEFENDANT JESSE LITVAK'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR JUDGMENT OF ACQUITTAL
OR, IN THE ALTERNATIVE, A NEW TRIAL**

The jury rejected the government's superficially attractive yet deeply flawed theory of this case, acquitting on nine of ten counts.  The Court should now enter a judgment of acquittal on the remaining count, Count 4, and bring this matter to a close.  The government's evidence of materiality on Count 4 was notably weak and ultimately insufficient to support a conviction for at least three reasons.

*First*, the government's sole evidence of materiality in Count 4 consisted of testimony from Mr. Litvak's counterparty to the trade at issue, Invesco's Brian Norris, that he would have considered a statement Mr. Litvak made in the negotiations to be "important."  But Mr. Norris's views were based, not only on hindsight, but also on a demonstrably false premise—that Mr. Litvak was an agent, obligated to act in Invesco's best interest, rather than an arms-length principal pursuing his own self-interest.  As the Court instructed the jury, that was not the case.  There was no evidence that Mr. Litvak did anything to cause Mr. Norris to believe he was acting as his agent.  And no reasonable investor standing in Mr. Norris's shoes could have thought so,

especially given that Mr. Norris had been expressly instructed by Invesco's legal and compliance department that, in trades of the kind at issue, dealers like Mr. Litvak are principals, not agents.

Far from being a "red herring," as the government stated in its rebuttal during closing, Mr. Norris's mistaken view of his relationship with Mr. Litvak was absolutely critical to the government's case, because Mr. Norris explained on redirect that it affected the way he approached his negotiations over the Count 4 trade and the weight he accorded statements Mr. Litvak made in the course of the negotiations. Although Mr. Norris testified (consistent with several other investor witnesses) that he typically takes information a counterparty volunteers in negotiations with a "grain of salt," he said he abandoned such caution here because he was under the impression that, as an agent, Mr. Litvak had a duty to "act[] in my best interest," not in the best interests of Jefferies. Tr. 748:11-12; Tr. 807:1-3. A "reasonable investor" in the RMBS market would not have misunderstood Mr. Litvak's role and thus would not have viewed the statements at issue to be material.

*Second*, the evidence showed that, despite what Mr. Litvak said during the negotiations, Mr. Norris ended up right where he had started, willing to pay a price of 79-30 to acquire the bond in question at auction. Mr. Norris started the negotiations by instructing Mr. Litvak to submit a bid of 79-24. But Mr. Norris testified that, at the time he gave that instruction, he fully expected that, once Jefferies acquired the bond and marked it up, Invesco would pay an all-in price of 79-30—i.e., the price it ultimately paid. The very fact that Mr. Norris ended where he began means perforce that no statement Mr. Litvak made in the negotiations "significantly *altered* the total mix of information available" to the investor. Instruction No. 35.[1]

---

[1] All emphases are added except where otherwise noted.

*Finally*, in order to be material, there must be a "plausible way that [the investor] could suffer financially" as a result of the misrepresentation. *Levine v. NL Indus., Inc.*, 926 F.2d 199, 202–03 (2d Cir. 1991). There was no such evidence as to Count 4. To the contrary: Mr. Norris conceded Invesco had no reasonable expectation of acquiring the bond at a price lower than 79-30. He testified that "if Jesse had followed [his] instruction and put in a bid of 79-24 that [he] authorized, [Invesco] would have paid 79-30," i.e., the exact price it ended up paying. Tr. 765:21-766:13.

Mr. Litvak appreciates the jury's service in this case, which, as the Court knows, was rendered under unusually difficult circumstances. That the jurors' deliberations spanned two weeks is a testament to how seriously they took their duty. But, when the evaluating the evidence, the Court should consider the very real possibility that, as to Count 4, the jury was led astray by the government's efforts to conflate the allegations in Count 4 with evidence Mr. Litvak altered an email he sent Mr. Norris regarding a ***different, uncharged trade***. Members of the press who sat through the entire trial were confused on this point; it stands to reason that jurors were as well.[2] Mr. Litvak's conduct in the negotiations over the uncharged trade is not to be commended. But the government chose not to bring charges regarding that trade. Nothing from the record of that trade can compensate for the government's failure of proof on Count 4.

In all events, Mr. Norris's mistaken understanding of his relationship with Mr. Litvak, the uncontestable fact that nothing Mr. Litvak said changed Mr. Norris's negotiating position, and

---

[2] *See* Erik Larson, Bob Van Voris & Chris Dolmetsch, *Tweaking Chat Trips up Ex-Jefferies Bond Trader Jesse Litvak*, Bloomberg Markets (Jan. 27, 2017), available at https://www.bloomberg.com/news/articles/2017-01-27/tweaking-a-chat-trips-up-ex-jefferies-bond-trader-jesse-litvak ("During negotiations, Litvak altered an electronic chat to make it appear he had paid more for the bond than he did, then forwarded it to a trader at Invesco Ltd. to whom he was trying to sell the security, prosecutors said. ***That act*** got the 42-year-old convicted Friday for a second time of securities fraud.").

the complete absence of any evidence of investor harm, meant that there was ample cause to "hesitate or pause" on Count 4.  *See* Instruction No. 5 (Burden of Proof Beyond a Reasonable Doubt).  Mr. Litvak therefore requests that the Court enter a judgment of acquittal on Count 4 pursuant to Federal Rule of Criminal Procedure 29 and the Fifth Amendment, or, in the alternative, grant a new trial.

### I. The Evidence Regarding Materiality Was Insufficient To Convict on Count 4.

In order for Mr. Litvak's sole conviction to withstand scrutiny under Rule 29, the Court must be satisfied that, at trial, the government "introduce[d] sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged ha[d] been proven beyond a reasonable doubt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  It is not enough for the government to introduce evidence "'at least as consistent with innocence as with guilt.'"  *Id.* (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).  "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury [would have] necessarily entertain[ed] a reasonable doubt,'" and the Court must enter a judgment of acquittal.  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).  The government's evidence as to Count 4 fell well short of this mark, at least as to the element of materiality.  The Court therefore should enter a judgment of acquittal on that count.

In the alternative, this Court should find that, considering the record as a whole, letting a guilty verdict stand would be a "manifest injustice," and thus grant Mr. Litvak a new trial on Count 4.  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (affirming district court grant of a new trial under Rule 33).

4

### A. The Evidence as to Count 4.

#### 1. The Negotiations Over the SARM 05-21 7A1 Bond.

Count 4 arose from a trade between Mr. Litvak's employer, Jefferies & Company, and Invesco Ltd. The evidence showed that on July 1, 2010, Brian Norris, a portfolio manager at Invesco, told Mr. Litvak that he was interested in buying the SARM 05-21 7A1 bond, which was up for auction that day via a bid-wanted-in-competition (BWIC) list. Using the Bloomberg message platform, Mr. Norris wrote to Mr. Litvak that "[Invesco] can bid 79-24 on the SARM 05-21 7A1." GX43B. Mr. Norris testified that "*at the time*" he submitted the bid, it was assumed that Jefferies would markup the bond "[l]ike 6 ticks" over 79-24, resulting in an all-in price of 79-30 for Invesco. *See* Tr. 765:21-766:13. Thus, by submitting the 79-24 bid, Mr. Norris effectively communicated to his counterparty, Mr. Litvak, Invesco's willingness to pay at least 79-30 for the bond. Mr. Norris went on to tell Mr. Litvak that Invesco's true bottom line price was even higher than that, adding he "got some room too." GX43B.

Shortly thereafter, Mr. Litvak reported back that Jefferies had won the auction after having "bid your level." *Id.* The government offered into evidence a trade ticket memorializing the price paid by Jefferies to the original seller, GX40A, which indicated that Jefferies in fact paid 79-16 to acquire the bond, not 79-24, as Mr. Litvak had stated. However, the Bloomberg message between Messrs. Litvak and Norris (read in light of Mr. Norris's testimony) shows that, in the end, Mr. Norris concluded the negotiations at the same place where he had been *before* Mr. Litvak said anything about Jefferies' bid price. Mr. Norris went into the negotiations willing to pay a price of 79-30 (79-24 plus the 6 ticks he expected to pay on top of that) to acquire the bond, communicated his position to his counterparty, and exited paying what he set out to pay, 79-30:

```
----- Original Message -----
From: BRIAN NORRIS (INVESCO ADVISERS, IN)
At:  7/01 15:31:48

thanks.  nice we finally got something done.

----- Original Message -----
From: JESSE LITVAK (JEFFERIES & CO., INC)
At:  7/01 15:26:04

ure timing was perfect....3pm bwic and he is good about trading things fast...so we got in there right at the right time.....good teamwork....6/32s is great...thanks BN

----- Original Message -----
From: BRIAN NORRIS (INVESCO ADVISERS, IN)
At:  7/01 15:24:38

wow...that was fast.  nice work.  6 ticks cool?  79-30 to me?

----- Original Message -----
From: JESSE LITVAK (JEFFERIES & CO., INC)
At:  7/01 15:20:28

winner bro....he had 2 other guys that were at 79 and trying to improve...but he just sold em to us...i bid your level...so will work for whatever you want big man...

----- Original Message -----
From: BRIAN NORRIS (INVESCO ADVISERS, IN)
At:  7/01 15:16:16

thx, got some room too

----- Original Message -----
From: JESSE LITVAK (JEFFERIES & CO., INC)
At:  7/01 15:15:58

using.....brb....

----- Original Message -----
From: BRIAN NORRIS (INVESCO ADVISERS, IN)
At:  7/01 15:15:21

we can bid 79-24 on the SARM 05-21 7A1
```

GX43B (highlighting added).

 Mr. Norris was quite candid that, after submitting a bid of 79-24 "with room" and with the expectation of paying an additional markup, he had no expectation of paying an all-in price lower than 79-30. He agreed that "if Jesse had followed [his] instruction and put in a bid of 79-24 that [he] authorized, [he] would have paid 79-30," i.e., the price Mr. Norris ended up paying. Tr. 765:21-766:13.

### 2. Mr. Norris's Mistaken Understanding that Mr. Litvak Was His "Agent."

But Mr. Norris also said that he believed that Mr. Litvak was acting "as an agent" in this trade and that, if Jefferies acquired the bond at a price lower than 79-24, it was obligated to pass the savings on to Invesco.  *See* Tr. 748:11-12; Tr. 750:11-14.

Mr. Norris testified that he was aware that false pricing information permeated this market and that he generally would have taken volunteered information of the kind Mr. Litvak conveyed in negotiations "with a grain of salt because we know the potential is there that it is inaccurate."  Tr. 794:20-23.  But Mr. Norris believed that in the BWIC context, the dealer acts, not as a principal but "as an agent" who owed a duty to "act[] in my best interest."  Tr. 748:11-12; Tr. 807:1-3.  Indeed, Mr. Norris testified that he was under the impression that, in the BWIC context, he was transacting with the person running the auction; the dealer, in his view, merely "serve[s] as an agent in between."  Tr. 748:5-10.  Accordingly, Mr. Norris testified that he "view[ed] that as an agency trade."  Tr. 767:1-2.

The evidence showed that Mr. Norris was fundamentally mistaken in his understanding of both the nature of his relationship with Mr. Litvak and the mechanics of BWIC trades.  As the Court instructed the jury, each of the trades at issue—including Count 4—were principal-to-principal trades in which Mr. Litvak owed no agency duties to any of his counterparties, including Mr. Norris.  Moreover, the fact that the Count 4 trade arose in connection with a BWIC auction didn't change the identity of Mr. Norris's counterparty; it was Mr. Litvak, not the original seller.  As Invesco's broker notification report memorializing the Count 4 trade made clear, the parties to this transaction were Jefferies and Invesco, not Invesco and the original seller.  DX621.  And this report—which Mr. Norris confirmed contained all of the "essential" terms of the agreement—made no reference to any "commission" that Jefferies earned on the trade, only to the all-in price of 79-30.  Tr. 801:4-7.

7

Moreover, the evidence showed that in August 2009, less than a year before the Count 4 trade, Mr. Norris received from Invesco's legal and compliance department a certification form that stated quite clearly that for PPIP trades of the kind at issue in Count 4, the "Broker is acting on *its own behalf* as principal in all trades in non-agency RMBS or CMBS securities eligible for the PPIP program with Invesco Institutional (N.A.), Inc. and *has not acted in an agency capacity*."  DX2178.  Mr. Norris not only received this form, he forwarded it to dealers and asked that they sign it.  Tr. 767:23-768:3.

Why Mr. Norris nevertheless believed Mr. Litvak was his agent is unclear.  But there is no evidence that Mr. Litvak did anything to mislead Mr. Norris about the nature of their relationship.  And what is clear is that Mr. Norris's misunderstanding of Mr. Litvak's role and the duties he owed to Mr. Norris greatly affected how Mr. Norris viewed his negotiations with Mr. Litvak.  On redirect, Mr. Norris testified that, in this trade with Mr. Litvak, he abandoned the skeptical attitude he typically would take about volunteered information of the kind Mr. Litvak provided.  What Mr. Litvak said was "not information that you take with a grain of salt," because "[Mr. Litvak] was supposed to be acting—he's supposed to be acting in my best interest and, you know, I would accept what he tells me in that instance as the truth."  Tr. 806:23-807:3.

Mr. Norris's mistaken impression of his relationship with Mr. Litvak not only affected the weight he accorded Mr. Litvak's statements in the negotiations but also the degree to which Mr. Norris was willing to share information about his bottom line that he otherwise would have withheld from a counterparty.  Mr. Norris said that it would be "unusual" for him to tell a dealer that he "had room" to bid a higher price for a bond.  But he felt that, in the context of an agency relationship, the dealer "won't use that information against you."  Tr. 749:2-5.  He further

expected that should his "agent," Mr. Litvak, acquire the bond for a price of lower than 79-24, he was obligated to pass the savings on to Invesco. *See* Tr. 748:11-12; Tr. 750:11-14.

### B. The Evidence on Count 4 Was Insufficient to Prove the Materiality Element Beyond a Reasonable Doubt.

#### 1. No Reasonable Investor Could Have Believed that Mr. Litvak Was Acting as an "Agent."

As with the other counts, the government attempted to prove materiality on Count 4 through witness testimony that what Mr. Litvak said during negotiations "would have been important." But what set Count 4 apart from the others was Mr. Norris's testimony that he believed Mr. Litvak was acting "as an agent." The only other witness who said he shared a similar perception was Mr. Wollman, whose testimony was belied by his contemporaneous expressions of doubt about Mr. Litvak's truthfulness, the lies Mr. Wollman told to Mr. Litvak and other market participants, and the information he withheld from his supposed "agent."[3] All of the other witnesses who testified on this subject said they understood that Mr. Litvak was acting in his own self-interest, not in theirs.[4]

In fact, as the Court properly instructed the jury, Mr. Litvak was not Invesco's agent. As such, he had no duty to submit a 79-24 bid as Mr. Norris had instructed, no duty to pass any savings on to Invesco if he acquired the bond at a lower price, or even no duty to resell the bond

---

[3] Tr. 859:15-20; DX1215 (Mr. Wollman to Mr. Steffa "[B]elieve as much of that as you will" with respect to Mr. Litvak's representation about previous sale of bond); *compare* DX1215 with GX102C (representing to Mr. Litvak that Mr. Wollman saw a 10% yield on the bond at 57 while agreeing with Mr. Steffa he saw a 10% yield at 58); DX1215 (asking Mr. Steffa to "hold off for a little bit" because "this guy [Mr. Litvak] is gonna be mad at me if he knows I sold off given his original print at 59 and the back and forth").

[4] Tr. 307:9-20 (Canter: "you understood when you were dealing with Jefferies, each and every time on each trade in this case that Jefferies was trading for its own account as a principal on the dealer side of the house"); Tr. 542:15-22 (Corso: "Q. When Jefferies buys a bond, it owns it as a principal? A. Yes. Q. It can hold it or sell it? A. Yes. Q. It is entitled to every cent of the profit it earns when it sells it? A. Yes.").

9

to Invesco if it would not pay a price Mr. Litvak deemed acceptable.  *See* Instruction No. 27 (No Agency).

Ultimately, however, what matters is not Mr. Norris's subjective understanding of his relationship with Mr. Litvak, but how a "reasonable investor" would have perceived the relationship.  As the Court's charge made clear, "the jury [was] to evaluate materiality in an ***objective*** manner."  *Litvak*, 808 F.3d at 184; *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."); Instruction No. 35.  In considering this objective "reasonable investor," the Court instructed the jury that it "must consider the sophistication of investors in that market and the sorts of information available to investors in that market."  Instruction No. 35.  No reasonable investor in Mr. Norris's shoes could have believed that Mr. Litvak was acting as his agent.  Accordingly, no reasonable investor would have abandoned the skeptical attitude that investors in this market— including Mr. Norris himself—have about information a counterparty volunteers in the course of negotiations.[5]

Nevertheless, in rebuttal (notably not in the main closing), the government nonetheless argued that Mr. Norris's "perception" of an agency relationship was reasonable because of the supposed "relationship of trust" that existed between him and Mr. Litvak.  Tr. 1456:19-1457:2.

---

[5] As the Court knows, Mr. Norris was not alone in expressing the view that reasonable investors typically do not place much stock in unverified, volunteered information.  *See, e.g.*, Tr. 426:23-25 (Canter: confirming there is "a lot of false pricing information out and about in this market"); Tr. 794:6-14 (Norris: aware that "people intentionally put out misleading information in the market" and thus had "skepticism about volunteered information"); Tr. 735:20-736:1 (Lemin: had "a level of skepticism" "[a]bout any information . . . communicated to [him]"); Tr. 515:6-8 (Corso: does "the best that [she] can" not "to give undue weight to information that [she] can't verify"); Tr. 950:3-17 (Wollman: keeps his "antennas up" for "false pricing information").

This "relationship of trust" was a pure invention by the government.  Mr. Norris said that he abandoned the skeptical attitude he ordinarily would take in negotiations with dealers, not because of anything Mr. Litvak did to cultivate a relationship of trust, but because Mr. Norris mistakenly viewed BWIC trades as "agency trade[s]."  Tr. 767:1-2.  Mr. Norris said he did not trade with Mr. Litvak "very frequently" and that "Jefferies wasn't one of our top firms that we dealt with."  Tr. 744:24-745:1.  He said that "out of our say up to 30 [dealers] that we transact with on a given year, Jefferies is generally around 15th or so—15 to 20[th] place."  Tr. 745:1-3.  Mr. Norris did not socialize with Mr. Litvak; he couldn't recall if he had ever communicated with Mr. Litvak on the phone as opposed to in cryptic Bloomberg messages; he said the two had never visited each other's offices; and he admitted that he had never negotiated with Mr. Litvak in person.  Tr. 791:12-792:24.  Indeed, there was nothing in the record to distinguish Mr. Norris's relationship with Mr. Litvak from the relationships Mr. Norris had with nearly two dozen other dealers during the relevant time period.  Tr. 791:2-7.  The most the government could get Mr. Norris to provide as the foundation for the unique "relationship" of trust between Messrs. Norris and Litvak was the fact that they engaged in "small talk" via Bloomberg message after the Count 4 trade was completed.  Tr. 751:15-17.

But no amount of "small talk" would have given a reasonable investor cause to disregard the express guidance he had been given by his own legal and compliance department that, for PPIP trades of the kind at issue in Count 4, the "Broker is acting on *its own behalf* as principal in all trades in non-agency RMBS or CMBS securities eligible for the PPIP program with Invesco Institutional (N.A.), Inc. and *has not acted in an agency capacity*."  DX2178.  The evidence showed that Mr. Norris not only received this guidance, he forwarded it to dealers and asked that they certify that they shared the same understanding of their role.  Tr. 767:23-768:3.

11

Based on this record, there simply was not sufficient evidence to support the government's argument that a reasonable investor would have believed that Mr. Litvak was acting as an agent in Count 4.  Accordingly, no reasonable investor would have shared Mr. Norris's view that the statements at issue would have been "important" to him.

### 2. Mr. Litvak's Statements Were Not "Meaningful" in the Count 4 Trade.

The Supreme Court recently made clear that "[u]nder *any understanding* of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (second alteration in original) (quoting 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 69:12, at 549 (4th ed. 2003)).[6]  The Second Circuit echoed this sentiment in its opinion in this case; it rejected Mr. Litvak's sufficiency challenge because of evidence that his statements were "*meaningful* in the course of th[e] transactions" at issue.  *United States v. Litvak*, 808 F.3d 160, 177–78 (2d Cir. 2015).[7]  The Court's charge on materiality conveyed the same message:  "to 'significantly *alter* the total mix of information available' means to *meaningfully affect* a reasonable investor's consideration about whether to buy or sell, and at what price."  Instruction No. 35.

Viewed against this standard, the evidence at the second trial was insufficient to support the conclusion that Mr. Litvak's representation about Jefferies' bid price was material to the Count 4 trade.  Despite Mr. Litvak's representation about Jefferies' bid price, in the end,

---

[6] *Escobar* arose under the False Claims Act, not the Exchange Act.  But its sweeping statement about "any understanding of the concept" of materiality extends beyond the False Claims Act.  And, for the reasons stated above, the sentiment expressed in *Escobar* is echoed in Exchange Act decisions handed down by the Second Circuit as well as in the jury instruction given to the jury by this Court.

[7] It bears noting that none of the evidence cited in the relevant portion of the Court of Appeals' opinion related to Count 4.

Mr. Norris's negotiating position did not change. He concluded the negotiations precisely where he began—willing to pay a price of 79-30 to acquire the bond. Accordingly, nothing Mr. Litvak said in the interim can be said to have "significantly *alter[ed]* the total mix of information available" or to have had a "*meaningful[]* effect" on the investment decision.

In retrospect, Mr. Norris said that he didn't like being lied to, and if he had known Mr. Litvak was lying, he wouldn't have traded with him.[8] But that's not the same thing as saying that the statement had an effect on the transaction at the time. As the Court properly instructed the jury, in the Section 10(b) context, the materiality inquiry turns on whether "the false statement . . . was material to a reasonable investor *as of the time of the transaction*, and *not based upon a hindsight view*." Instruction No. 35.

### 3. Invesco Suffered No Harm as a Result of Mr. Litvak's Statements.

In order to be material, a misstatement must not only have some meaningful effect on the investor, there must also be a "plausible way that [the investor] could suffer financially" as a result of it. *Levine v. NL Indus., Inc.*, 926 F.2d 199, 202–03 (2d Cir. 1991). The government need not prove beyond a reasonable doubt that the putative "victim" of the fraud in fact suffered financial harm as a result of the misstatement. Yet materiality in the Exchange Act context nonetheless "has an element of causation built in, because a statement is material only if it so alters the 'total mix' of information available to the investor that it has the potential to affect the decision." *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir. 1988) (citation omitted); *see also Trs. of Hotel Emps. & Rest. Emps. Int'l Union Welfare Pension Fund v. Amivest Corp.*, 733 F. Supp. 1180, 1186 (N.D. Ill. 1990) ("doubt[ing]" that the plaintiff could

---

[8] Tr. 808:3-11 (Norris: "If I had known that he wasn't using—if he was being dishonest with me, yes, I would certainly choose to go to a different broker-dealer that would deal with me in a fair manner, yes.").

meet the materiality requirement because "'[a] fraud that does not affect the decision to make the investment in which the loss complained of is incurred is not actionable under Rule 10b-5'" (quoting *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1325 (7th Cir. 1989)). Again, the Second Circuit reiterated this point in the appeal in this case; it rejected Mr. Litvak's sufficiency challenge based on evidence that the counterparties "were harmed by Litvak's misleading course of conduct." *Litvak*, 808 F.3d at 177–78.  (Once more, the evidence referenced by the Court of Appeals related to counts other than Count 4.)

There was no such evidence as to Count 4 at the second trial.  To the contrary, the evidence showed that Invesco ended up paying the very same price Mr. Norris had decided to pay (and communicated to Mr. Litvak that he would pay) at the outset of the negotiations. Mr. Norris admitted that, if Mr. Litvak had in fact "bid [his] level," as Mr. Norris authorized and expected him to do, that would have no effect on the transaction between Invesco and Jefferies. Invesco still would have paid 79-30.  The only difference would have been that, in the *separate* principal-to-principal transaction between Jefferies and the original seller (to which Invesco was not a party), Jefferies would have paid a little more (and thus made less had it resold the bond to Invesco at a price of 79-30), and the original seller would have made a little more.  From an economic perspective, Invesco would have been in exactly the same position.

Even setting this critical admission aside, the very fact that Mr. Norris opened the negotiations by effectively revealing to his counterparty Invesco's willingness to pay at least 79-30—79-24 plus the assumed markup of 6 ticks—meant that Invesco had no reasonable chance of acquiring the bond at a lower price.  Even the least skilled buyer knows that in an arms-length negotiation between counterparties an opening bid becomes the floor below which the price will

14

not fall.  This basic truism of negotiations was not lost on "reasonable investors" in this market, whom the evidence showed to be highly sophisticated qualified institutional buyers (QIBs).

### C. The Government Cannot Remedy Its Failure of Proof on Count 4 by Pointing to Uncharged Conduct.

In assessing the evidence, the Court should bear in mind the very real possibility that the jury's decision to single out Count 4 from the other nine on which it acquitted was the result of the confusion caused by the government's effort to conflate the Count 4 trade with a different, uncharged trade between Messrs. Litvak and Norris.  This is particularly relevant for the Court's analysis under Rule 33.  *See United States v. Hoffer*, 680 F. Supp. 673, 679 (S.D.N.Y. 1988) ("'Where there is doubt as to whether a conviction is predicated on an impermissible ground, that doubt must be resolved in the defendant's favor and the conviction vacated.'" (quoting *Ingber v. Enzor*, 841 F.2d 450, 456 (2d Cir. 1988)).

The record from that chat regarding the uncharged trade, GX442E, reveals that Mr. Litvak told Mr. Norris that he had acquired the bond in question (the FHASI 2007-AR1 1A1 bond) at a price of 79-26.  After the trade was completed, Mr. Litvak forwarded Mr. Norris an email, designated as GX442F, memorializing the transaction between Jefferies and the original seller, which indicates that Jefferies paid a price of 79-26 to acquire the bond.  The government also presented a different copy of the same email, GX441D, which indicates that Jefferies' actual acquisition price was 2 ticks lower (79-24).

The government made much of the GX442F document in Mr. Norris's redirect and its closing.  It was quick to connect this document to Mr. Norris, but failed to point out that the document had nothing to with the only Norris trade at issue in the indictment.  *See, e.g.*, Tr. 1445:1-2 (Government Closing: "What does he do to Mr. Norris?  He sends him an altered e-mail.").  Under the circumstances, it's quite possible the jury was confused and thought that

15

Mr. Litvak altered a document in connection with Count 4.  As indicated at the outset, reporters who sat through the trial apparently came away with the same misimpression.[9]

In all events, the government made the decision not to bring charges regarding the FHASI 2007-AR1 1A1 trade.  The government cannot compensate for its failure of proof on Count 4 by pointing to GX442E.

## II. Other Grounds for Entry of a Judgment of Acquittal.

In addition to the reasons outlined in Part I, Mr. Litvak is entitled to a judgment of acquittal on Count 4 because he had no duty to disclose the price Jefferies paid to acquire the bond at issue and his statement about Jefferies' bid price did not go to the heart of the bargain between Jefferies and Invesco or to the value of the securities at issue.[10]  The government therefore failed to demonstrate that the statement in question fell within the ambit of the statements and conduct described in 15 U.S.C. §§ 78j(b) and 78ff and SEC Rule 10b-5, that the statement was material as a matter of law, or that Mr. Litvak acted willfully and with an intent to defraud.  *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 613 (7th Cir. 2012); *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016); *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).  The government's case with respect to the third element of intent was insufficient due to its failure to prove contemplated harm.  *See Takhalov*, 827 F.3d at 1312-14; *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003).  No rational trier of fact could find guilt beyond a reasonable doubt applying the proper legal

---

[9] *See* note 2, *supra*.

[10] Mr. Litvak maintains that the "omissions" language in the instruction should not have remained in the materiality instruction in light of the evidence offered by the government.  With respect, the inclusion of this language, combined with the fact that Mr. Norris was permitted to testify about his mistaken view that Mr. Litvak was his agent (testimony to which Mr. Litvak maintains an objection), likely was a contributing factor to jury confusion in this case.  *See* Dkt Nos. 356-1; 500; 501.

standards; the conviction thus should be overturned both under Rule 29 and the Fifth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307, 317 (1979).

## CONCLUSION

The evidence at trial simply did not support the conclusion, beyond a reasonable doubt, that what Mr. Litvak said to Mr. Norris meaningfully affected the transaction or caused harm to Invesco.  The only way to conclude otherwise is if one accepts the government's false and unsupported premise that an investor in Mr. Norris's position reasonably could have believed he was negotiating with an agent, and not a principal.  A conviction in a criminal case cannot rest on such a flimsy reed.  For these reasons, Mr. Litvak respectfully requests that the Court enter judgment of acquittal as to Count 4, or, in the alternative, grant a new trial.

Respectfully Submitted,
**THE DEFENDANT,
JESSE C. LITVAK**

By: *s/C.J. Mahoney*
Dane H. Butswinkas (phv07986)
Adam D. Harber (phv07988)
C.J. Mahoney (phv08039)
Katherine A. Trefz (phv08040)
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
dbutswinkas@wc.com
aharber@wc.com
cmahoney@wc.com
ktrefz@wc.com

Ross H. Garber (ct17689)
Michael G. Chase (ct28935)
SHIPMAN & GOODWIN LLP

1 Constitution Plaza
Hartford, CT 06103
Tel: (860) 251-5000
Fax: (860) 251-5099
rgarber@goodwin.com
mchase@goodwin.com

*Attorneys for Jesse Litvak*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February, 2017, a copy of the foregoing motion was uploaded to and filed with the CM/ECF System for the United States District Court for the District of Connecticut.

                                                              */s/ C.J. Mahoney*