IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                                          CASE NO. 3:13CR19 (JCH)

JESSE C. LITVAK
                                                            MARCH 20, 2017
         Defendant.

_____/

**DEFENDANT JESSE LITVAK'S REPLY IN SUPPORT OF HIS
MOTION FOR JUDGMENT OF ACQUITTAL
OR, IN THE ALTERNATIVE, A NEW TRIAL**

Dane H. Butswinkas (phv07986)
Adam D. Harber (phv07988)
C.J. Mahoney (phv08039)
Katherine A. Trefz (phv08040)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

-and-

Ross H. Garber (ct17689)
Michael G. Chase (ct28935)
SHIPMAN & GOODWIN LLP
1 Constitution Plaza
Hartford CT 06103

*Attorneys for Jesse Litvak*

The Court properly instructed the jury that materiality had to be assessed "objectively" from the standpoint of a "reasonable investor" "*in the RMBS market*," taking into account "the *sophistication of investors in that market*." Instruction No. 35.[1]  The evidence showed that the "reasonable investor" in this market is extremely sophisticated, supported by teams of research analysts, and—of critical importance here—highly skeptical of unverified information.  Like the prototypical "reasonable" RMBS investor, the government's only materiality witness on Count 4, Brian Norris, worked for a large institutional asset manager, Invesco, and routinely conducted multimillion dollar bond transactions.  And, like a "reasonable investor," in most of these trades, he treated information volunteered by bond dealers "with a grain of salt."  Tr. 794:20-23.  But in the Count 4 trade, Mr. Norris abandoned skepticism.  He did so, not because of anything Mr. Litvak said or did, but because he was under the mistaken impression that Mr. Litvak was an agent who was "supposed to be acting in my best interest."  Tr. 806:25-807:3.  Mr. Norris made this mistake despite having been expressly instructed by Invesco's legal and compliance department that in trades of the kind at issue here a dealer like Jefferies & Company was "acting on *its own behalf* as principal . . . and *has not acted in an agency capacity*."  DX2178.

The record supports no other conclusion but that Mr. Norris was an *un*reasonable investor in this market.  The government makes no real attempt to argue otherwise.  It acknowledges Mr. Norris "incorrectly distinguished between principal and agent trades."  Dkt. No. 520 at 11.  It concedes there was no "relationship of trust" that might explain Mr. Norris's mistake.  *Id.*  These are damning concessions.  The government based its entire Count 4 case on Mr. Norris.  Without his testimony, the government is left with nothing.

For this reason, the government tries to latch on to testimony from Michael Canter.  But the government did not ask Mr. Canter to opine about the Count 4 trade.  And the testimony he gave on different trades is not the life raft the government needs.  This testimony was specific to the particular trades Mr. Canter was discussing.  In any event, the jury rightly acquitted on the

---

[1] All emphases are added except where otherwise noted.

1

counts Mr. Canter actually testified about (Counts 1-3). That testimony is not enough to resuscitate a different count.

The government's failure to offer any evidence about whether a "reasonable" RMBS investor would have found the misstatement in Count 4 material is sufficient grounds, standing alone, to enter a judgment of acquittal. But there's more. The government completely ignores Mr. Norris's critical admissions that he began the negotiations by revealing his bottom line price of 79-30 to his counterparty (thereby setting a price floor) and that "if Jesse had followed [his] instruction and put in the bid of 79-24 that [he] authorized, [Invesco] would have paid 79-30," i.e., the exact price it ended up paying. Tr. 765:21-766:13. These admissions likewise preclude a finding that the misstatement in Count 4 "significantly altered the total mix of information"—a phrase that, quite tellingly, appears nowhere in the government's brief.

## I.   The Government Offered No Evidence that a "Reasonable" Investor Would Have Considered the Misstatement Material.

***The Government effectively concedes Mr. Norris was not a "reasonable" investor.*** The government's implicit concession that Mr. Norris was not a "reasonable investor" is a major development in this case. Consistent with the articulation of materiality found in the jury charge, testimony from "unreasonable" investors cannot support a materiality finding.[2] The Court therefore must disregard Mr. Norris's testimony on materiality and assess what remains.

The answer is not much. Once Mr. Norris is taken out of the equation, the materiality evidence on Count 4 is just as meager as the evidence on the counts for which the government offered no witness testimony at all, i.e., Count 5 (Vlaginac) and Count 6 (Sarabonchong). The government tried to obtain convictions on those counts simply by pointing to the Bloomberg

---

[2] *See Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 1996 WL 680265 at *7 (S.D.N.Y. Nov. 25, 1996) (Sotomayor, J.) (disregarding, for purposes of the *TSC/Basic* materiality inquiry, the actions of an investor whose "decisions necessarily would have reflected numerous considerations other than those ordinarily or properly of concern to investors" because "[n]o reasonable juror could view [the witness], under these circumstances, as the 'reasonable investor' envisioned by the Supreme Court in *TSC*"); *Blanchard v. Edgemark Fin. Corp.*, 2001 WL 587861 at *7 (N.D. Ill. Mar. 12, 2001) (disregarding, for purposes of the *TSC/Basic* materiality inquiry, testimony from witnesses who "were not 'reasonable investors' because they did not reasonably interpret defendants' communications"); *cf. Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1197 (2013) ("***[O]bjectively unreasonable reliance*** does not give rise to a Rule 10b-5 claim.").

chats and asserting, as it does here, that "the misrepresented information was material because otherwise Mr. Litvak would not have bothered to lie about it." Dkt. No. 520 at 10.  The jury rightly rejected that argument because, in the context of a highly specialized market dominated by sophisticated investors, materiality is "a very fact-specific inquiry" that must be assessed from the standpoint, not of any "reasonable person," but a reasonable "investor *in the RMBS market*."  Instruction No. 35.  Indeed, the average "reasonable person" cannot even participate in this market.  Tr. 128:6-15.  For this reason, the Court expressly instructed the jury that it had to "consider the *sophistication of investors in that market*."  Instruction No. 35.

In order to sustain a conviction on Count 4, the government therefore had to present at least some evidence about how a ***reasonable RMBS investor*** would have viewed the misstatement.  It might have called an industry expert, like the defense did.  Or it could have asked one of the other investor witnesses who appeared at trial (i.e., Mr. Canter) about Count 4.  Instead, it staked its entire Count 4 case on Mr. Norris.  And when Mr. Norris was shown to be a patently ***un***reasonable investor, the evidence on Count 4 was rendered insufficient as a matter of law.[3]

*Mr. Norris's mistake affected the weight he gave the misstatement.*  The closest the government comes to an attempted rehabilitation of Mr. Norris is to assert that, notwithstanding his abject and unexplained misunderstanding of Mr. Litvak's role, Mr. Norris supposedly "made clear that Jefferies' principal or agent capacity was irrelevant to his prior testimony that the misrepresented information 'mattered' and was 'important.'"  Dkt. No. 520 at 12.

This mischaracterizes the record.  The government asked only whether Mr. Norris's mistaken view of Mr. Litvak's role influenced whether he thought his "agent" was telling the truth.  *Id.*  But insofar as materiality is concerned, the critical question is the degree to which the misstatement would have affected his investment decision at the time.[4]

---

[3] Indeed, the only other witness who was asked questions about Count 4 relevant to materiality was Mr. Burnaman, who confirmed that reasonable investors in the RMBS market do not rely on unverified information.  Tr. 1248:1-3.
[4] *See* Tr. 386:15, 388:23-24 (Court finding that "importance" testimony was relevant insofar as it went to "state of mind" at the time of the trade and what "was ***part of [the investor's] decision***").

3

The question that went to that issue came a few lines later in the transcript. And in response to it, Mr. Norris left no doubt that he did not simply fail to appreciate a "legal nuance" as the government suggests. *Id.* His mistake had a profound effect on the weight he put on the misstatement. Like reasonable investors, Mr. Norris said that he typically treated such statements "with a grain of salt." But he took a different tact in the Count 4 transaction precisely because he thought Mr. Litvak was acting in his "best interest":

> Q. You were asked about not relying on volunteered information. ***Was Mr. Litvak's statement to you that he was using your bid info that you relied on***?
> A. ***Yes.***
> Q. ***Why?***
> A. That's because we were in the middle of a negotiation on a transaction. That's not—that's not information that you take with a grain of salt. You're supposed to be acting—***he's supposed to be acting in my best interest*** and, you know, I accept what he tells me in that instance as the truth.

Tr. 806:18-807:3.

No reasonable investor would have had such a mistaken view of Mr. Litvak's role. And the Court not need take the Defense's word for it: Mr. Canter—the government's last, best hope to salvage Count 4—confirmed that a "reasonable investor" in this market is "especially careful when . . . weighing information that you got that could not be verified." Tr. 412:18-24.

***Mr. Canter's testimony on other transactions cannot resuscitate Count 4.*** In view of its effective concession about Mr. Norris, it is unsurprising the government has scoured the record for other evidence to sustain the sole conviction it won at trial. It grasps at Mr. Canter's testimony about BWIC trades. But Mr. Canter's statements about the "importance" of misrepresentations in BWIC trades arose from factors unique both to the Jefferies-AllianceBernstein relationship and to the specific trades at issue. None of those factors was at play in the Count 4 trade. As such, the Canter BWIC testimony is not transferrable to that count and insufficient to sustain the conviction in any event.

*First*, Mr. Canter said AllianceBernstein had a pre-existing "***arrangement*** with the broker dealers that we were working with that when we did [a BWIC trade], that they should pass

4

through our bid to the seller"—i.e., that they would not exercise their discretion to "back up the bid"—and that AllianceBernstein would "pay them 4 ticks on top . . . to arrive at the final price." Tr. 163:24-164:7.  When he found out Mr. Litvak had backed up bids and that Jefferies had made more than the "standard 4 tick amount," Mr. Canter was upset because "[i]t is not *what we agreed to*." Tr. 180:19-20, 182:9.  In other words, Mr. Canter was upset not because the misstatement was "important" in the abstract but because, by his light, Mr. Litvak had violated the terms of a pre-existing contract between AllianceBernstein and Jefferies.  Whether such a contract actually existed is doubtful,[5] but there was no evidence of any overarching BWIC agreement between *Invesco* and Jefferies.  Thus the Canter "importance" testimony does not apply to the misrepresentation in Count 4.

*Second*, as to the April 2011 trade the government references in its brief (Dkt. 520 at 5), Mr. Canter's complaint was not simply that Mr. Litvak breached an alleged pre-existing contract but also that he had been "told by Mr. Litvak [AllianceBernstein] *need[ed] to improve half a point to one*" point to win the auction. Tr. 167:11-14.  This was the specific complaint Mr. Canter voiced to Mr. Litvak when he confronted him.  Tr. 313:12-13 ("My complaint was that I was asked to increase my price *when it wasn't needed*").  Again, Mr. Norris had no such complaint:  He decided to pay 79-30 at the outset of the negotiations; communicated as much before there was any misrepresentation; and, in the end, paid 79-30.

In any event, the jury rightly found Mr. Canter's "importance" testimony to be insufficient proof of materiality on the three counts on which he actually testified.  As the Court's charge reflected, "while importance is undoubtedly a *necessary* element of materiality, importance and materiality are not synonymous." *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (italics in original).  And, to the extent "importance" testimony is relevant, what matters is what was important "as of *the time of the transaction*, *and not based upon a hindsight view*." Instruction No. 35.  The fact that Mr.

---

[5] On cross examination, Mr. Canter stumbled when asked about the details of this supposed "standard agreement"; he said it wasn't written down and couldn't recall when or the circumstances under which it had been negotiated. Tr. 308:3-310:1.

5

Canter was mad when he found out he had been lied to, months or years after the fact, says nothing about how the misstatement affected his investment decision at the time. And regardless of whether Mr. Canter thinks he got "best execution" after the fact, there is no doubt that Mr. Norris did: He admitted he had no reasonable expectation of paying less than the 79-30 he paid in the Count 4 trade. *See* Part III, *infra*.[6]

## II. The Misstatement Had No Meaningful Effect on the Investment Decision.

The government does not dispute that in the negotiations over the Count 4 trade, Mr. Norris ended up exactly where he started, at a price of 79-30. *See* Dkt. 516 at 12-13. The misstatement in that count therefore had no meaningful "effect on the likely or actual behavior of the recipient of the alleged misrepresentation," something the Supreme Court has held is required "[u]nder *any understanding* of the concept" of materiality.[7]

The government does not acknowledge or refute this testimony. Instead it seeks solace in the "importance" testimony elicited at the second trial and in a portion of the Court of Appeals opinion in which it cited "importance" testimony from the first trial. This argument is unavailing.

*First*, the Court of Appeals' holding obviously was confined to the record of the first trial, not the second. And it was only at the second trial that Mr. Norris (i) acknowledged that, by opening the negotiations by instructing Mr. Litvak to bid 79-24 with "some room," he effectively revealed his bottom line price of 79-30 before Mr. Litvak made a representation about Jefferies' acquisition price (Dkt. 516 at 5-6; 14-15); and (ii) admitted that "if Jesse had followed [his] instruction and put in the bid of 79-24 that [he] authorized, [Invesco] would have paid 79-30," i.e., the exact price it ended up paying. Tr. 765:21-766:13.

---

[6] The government asserts that "Litvak did not simply strike a deal with Norris to trade that bond at a particular price . . . ." Dkt. No. 520 at 16. That's exactly what he did; both the broker notification report and the internal Invesco trade ticket memorializing the deal, which Mr. Norris conceded each contain all of the "essential terms" of the transaction, list only a "total price" and no separate commission. *See* Tr. 800:18-801:7, 804:2-17; DX 621.

[7] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (alteration in original) (internal quotations omitted).

*Second*, the Court of Appeals did not rely exclusively on the "importance" testimony to support its sufficiency holding. It relied on testimony from government witnesses (but notably not Mr. Norris)[8] that the "misrepresentations were 'important' to them in the course of the transactions . . . , *and that they or their employers were injured by those misrepresentations* . . . ." *United States v. Litvak*, 808 F.3d 160, 175–76 (2d Cir. 2015). (The Court articulated this two-part formulation twice. *Id.* at 177.) Mr. Norris's testimony in the second trial proved there was no injury to Invesco.

*Finally*, even if "importance" testimony were enough to sustain a conviction—it is not and, as to the other nine counts, the jury rightly agreed—the government didn't elicit the right kind of "importance" testimony as to Count 4. For example, the government relies on Mr. Norris's statement that "if [he] knew at the time that Mr. Litvak wasn't telling [him] *the truth* about the bid, [that] would . . . have been important to [him]." Tr. 761:9-12 (cited at Dkt. No. 520 at 5). However, as this Court has recognized, where a misstatement, as opposed to an omission, is at issue, the relevant question is not how a reasonable investor would have reacted had he known the truth, but how much importance the investor placed on *the misstatement* at the time of the transaction.[9] The Court properly instructed the jury that "the government must prove beyond a reasonable doubt that there was a substantial likelihood that the *misstated . . . fact* would have been viewed by the reasonable investor as having significantly altered the total mix of information available" and that assessment must be made "as of the time of the transaction, and not based upon a hindsight view." Instruction No. 35. All the testimony the government cites from Messrs. Norris and Canter focused either on their post hoc reactions to finding out they had been lied to or their hypothetical reactions to the truth, not on the weight they put on the *misstatements at the time*.

---

[8] *United States v. Litvak*, 808 F.3d 160, 175–76 (2d Cir. 2015) (referencing notes 5 (citing Canter testimony); 6 (citing Corso testimony); and 7 (citing Lemin testimony)).

[9] If the touchstone for materiality in this case were the truth, not the misstatement, all of the testimony regarding investor skepticism—which this Court (and the Court of Appeals) held to be "*highly relevant* to the question of whether Litvak's alleged misrepresentations would have been material," Dkt. No. 432 at 25—would have been irrelevant. *See also Litvak*, 808 F.3d at 182.

7

**III.    Invesco Suffered No Harm as a Result of the Misstatement.**

As indicated, Mr. Norris confirmed he had no reasonable expectation of paying less than the 79-30 he ultimately paid to acquire the SARM 05-21 7A1 bond.  He conceded that if Mr. Litvak had followed his instruction to submit a bid of 79-24, the only thing that would have changed is that the original seller of the bond would have made more money and Jefferies less. Invesco, which was not a party to that transaction, would have been neither richer nor poorer. *See* Dkt. 516 at 14.

And even if Mr. Norris had not made this concession, his acknowledgement that he began an arms-length negotiation with a self-interested counterparty by effectively revealing a bottom line price of 79-30 (with "room") meant that Mr. Norris had set a 79-30 floor on the transaction price **before** Mr. Litvak made any representation about Jefferies' acquisition cost.  Mr. Norris admitted that nothing Mr. Litvak said altered his decision to pay 79-30—a decision that was based on and fully consistent with what Invesco's highly skilled internal analytics team said was an attractive price for the bond.  Tr. 765:15-16, 788:16-789:5.  (Indeed, the evidence showed Invesco was prepared to pay as much as 80.  DX 2079.)

The government ignores this testimony, just as it ignores most of the authorities cited in Mr. Litvak's brief establishing that the potential for financial harm is an essential component of materiality in the Section 10(b) context.  The only one it acknowledges is the Second Circuit's opinion in *Levine v. NL Industries*, 926 F.2d 199 (2d Cir. 1991), which it insists "did not announce a 'plausible financial harm' test."  Dkt. No. 520 at 15.  In fact, *Levine* was not the only occasion on which the Second Circuit has identified "the potential to cause the plaintiff financial harm" as an essential component of materiality.  *See Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540–41 (2d Cir. 1996).  But even if *Levine* is read as narrowly as the government suggests, Mr. Norris's admissions establish that the misstatement in Count 4 "necessarily ha[d] no effect whatsoever on the victim."  Dkt. No. 520 at 15.

The government's key argument for why there was potential for investor harm in Count 4 is that the misstatement "went directly to the price."  Dkt. No. 520 at 16.  But the fact that a

statement "went" to price does not mean that it had a meaningful *effect* on the price, much less that it significantly altered the total mix of information. Again, Mr. Norris confirmed precisely the opposite—that he had no reasonable expectation of paying any less than the 79-30 he paid.

In a similar vein, the government suggests that Mr. Litvak's representation about Jefferies' acquisition price "changed the negotiations" over the Count 4 trade. Dkt. No. 520 at 8. But, again, what matters is not whether the misstatement had some effect on the *negotiations* but whether it had a mix-altering effect on the ultimate *investment decision*. *See* Instruction No. 35 ("[T]he false statement . . . must be of such importance that it could reasonably be expected to cause or induce a reasonable investor to act or not act with respect to the transaction at issue."). Mr. Norris confessed that nothing Mr. Litvak said to him in the negotiations over the Count 4 trade altered his decision about how much to pay for the bond.

## IV.   Uncharged Conduct Cannot Remedy the Failure of Proof on Count 4.

Any objective observer of the second trial would dispute the government's assertion that it "took pains"[10] to separate the charged and uncharged conduct in its presentation to the jury (just as any objective observer of the first trial would dispute that the government "has always acknowledged" that Mr. Litvak was acting as a principal, not an agent. *Compare* Dkt. No. 520 at 11 *with* Dkt. No. 356-6 (Tr. 2363:17) ("In fact, [Mr. Litvak] was [his counterparties'] *agent*.") (Gov't closing at first trial)). But what matters for present purposes is the government's concession that the charged and uncharged Invesco trades were "distinct," "occurred in different months, involved different bonds, were negotiated in separate time-stamped chats, and documented in distinct time-stamped trade tickets." Dkt. No. 520 at 17. As such, none of the uncharged trade evidence is relevant to materiality on Count 4.

## CONCLUSION

The government finds itself in a predicament entirely of its own making. The government brought Mr. Norris's mistaken understanding of his relationship with Mr. Litvak into this case. The government elicited the statement from Mr. Norris that he thought Mr. Litvak

---

[10] Dkt. No. 520 at 18.

was his agent. The government, on redirect, established Mr. Norris had abandoned his typical skepticism in the Count 4 negotiations because he wrongly thought Mr. Litvak was his agent.

The Court will recall that the defense moved to exclude all agency-related testimony (Dkt. 356), and the government fought tooth-and-nail to keep it in. At the time, it said this evidence "bears on some of the trial's central issues." Dkt. No. 387 at 10. It said this evidence would prove that Mr. Litvak's modus operandi was to "create [for investors] the illusion that he is not operating at an arm's length from his victims." Tr. 11:14-17 (Hr'g Tr. June 16, 2016).

Now the government tells the Court that, in fact, there was no "relationship of trust" between Messrs. Litvak and Norris and the agency testimony it fought so doggedly to introduce wasn't so important after all. In light of these concessions, coming as they do after a first trial in which the government affirmatively argued to the jury that Mr. Litvak was an agent and then reversed that position on appeal, the government has lost all credibility on this issue.

The government's case on Count 4 rested entirely on Mr. Norris. And now that the government has no choice but to concede he was an unreasonable investor, it has launched a desperate attempt to save face. It has failed. Mr. Canter's trade-specific testimony is insufficient evidence to sustain Count 4. Mr. Canter said nothing about the Count 4 trade, and the jury acquitted on the counts on which he did testify. If Mr. Norris's testimony on Count 4 was a slender reed, Mr. Canter's is a brittle twig. Neither can support the weight of a criminal conviction.

    Respectfully Submitted,

    **THE DEFENDANT,**
    **JESSE C. LITVAK**

By: *s/C.J. Mahoney*
    Dane H. Butswinkas (phv07986)
    Adam D. Harber (phv07988)
    C.J. Mahoney (phv08039)
    Katherine A. Trefz (phv08040)
    Williams & Connolly LLP
    725 Twelfth Street, NW

Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
dbutswinkas@wc.com
aharber@wc.com
cmahoney@wc.com
ktrefz@wc.com

Ross H. Garber (ct17689)
Michael G. Chase (ct28935)
SHIPMAN & GOODWIN LLP
1 Constitution Plaza
Hartford, CT 06103
Tel:  (860) 251-5000
Fax:  (860) 251-5099
rgarber@goodwin.com
mchase@goodwin.com

*Attorneys for Jesse Litvak*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of March, 2017, a copy of the foregoing motion was uploaded to and filed with the CM/ECF System for the United States District Court for the District of Connecticut.

                                                 */s/ C.J. Mahoney*