## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 3:13–CR–19 (JCH) |
| | : | |
| JESSE C. LITVAK, | : | APRIL 17, 2017 |
| Defendant. | : | |

## RULING RE: MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL (DOC. NO. 516)

## I.   INTRODUCTION

Approximately two weeks after receiving the case to deliberate,[1] a federal jury

convicted defendant Jesse Litvak ("Litvak") of one count of securities fraud, while

acquitting him of nine counts.  See Verdict Form (Doc. No. 510) at 1–2.  Litvak now

moves for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29

or, in the alternative, for a new trial.  See generally Def. Jesse Litvak's Mem. in Supp. of

his Mot. for J. of Acquittal or, in Alternative, New Trial ("Motion") (Doc. No. 516).[2]  The

government has opposed Litvak's Motion, see generally Govt.'s Mem. in Opp'n to Def.'s

Mot. for J. of Acquittal & for New Trial ("Opp'n" or "Opposition") (Doc. No. 520), and

---

[1] The jury deliberated over a two-week period, from January 13 through January 27, 2017.  Its deliberations were held on seven days: January 13, 18, 20, 23, 25, 26, and 27.  The jury did not deliberate on the following dates: January 14 (weekend), 15 (weekend), 16 (federal holiday), 17 (juror injured in car accident), 19 (no court), 21 (weekend), 22 (weekend), and 24 (juror illness).

An alternate juror died over the holiday weekend immediately following the Friday on which the jury was charged.  There has to date been no objection to the manner in which the court addressed that situation.

[2] Though Litvak's filing at Docket Number 516 is styled a "Memorandum in Support," see Motion at 1, there appears to be no separate Motion in support of which the Memorandum is offered.  In the absence of any objection to doing so, the court will treat the filing as both Motion and Memorandum in Support.

Litvak replied in a timely manner, see generally Def. Jesse Litvak's Reply in Supp. of his Mot. for J. of Acquittal or, in Alternative, New Trial ("Reply") (Doc. No. 521).

For the reasons set forth below, Litvak's Motion (Doc. No. 516) is **DENIED**.

## II.   BACKGROUND

On January 25, 2013, a federal grand jury returned a sixteen-count indictment against Litvak, charging him with the following crimes: (1) eleven counts of securities fraud, in violation of sections 78j(b) and 78ff of title 15 of the United States Code, see Indictment (Doc. No. 1) ¶¶ 27–55 (Counts One–Eleven); (2) one count of fraud against the United States, in violation of section 1031 of title 18 of the United States Code, see id. ¶¶ 56–58 (Count Twelve); and (3) four counts of false statements to the government, in violation of section 1001 of title 18 of the United States Code, see id. ¶¶ 59–60 (Counts Thirteen–Sixteen).  The Indictment alleged that Litvak, a licensed securities broker working at Jefferies & Co., Inc. ("Jefferies"), defrauded various counterparties in the purchase and sale of certain residential mortgage-backed securities ("RMBS").  See id. ¶¶ 1, 28.  Specifically, the Indictment alleged that Litvak misrepresented to RMBS bond buyers the price at which Jefferies had purchased RMBS bonds, see id. ¶¶ 33(a), 36, and to sellers the price at which it had negotiated to sell RMBS bonds, see id. ¶ 33(b).  Furthermore, according to the Indictment, Litvak sometimes falsely claimed to be effectuating trades between two non-Jefferies counterparties, when Jefferies in fact already owned the RMBS bond and was selling it from its own inventory.  See id. ¶ 47.

The Indictment provides a helpful summary of the ways in which the RMBS bond market operates:

RMBS bonds typically are sold in three ways:

> a. from a broker-dealer's inventory, in which the broker-dealer like Jefferies is selling a bond that it has owned for a period of time;
>
> b. as an order, in which the seller commissions the broker-dealer to seek a buyer, or the buyer commissions the broker-dealer to seek a seller, for a particular bond; or
>
> c. as part of a "bid list" or "BWIC" ("bids wanted in competition"), in which the seller circulates a list of specific bonds it is interested in selling so that the broker-dealer may seek a potential buyer willing to negotiate terms for the trade.

Indictment ¶ 16.  These concise, general definitions—of "inventory," "order," and "bid list" or "BWIC" trades—were undisputed and, in any event, supported by evidence offered at trial.  See, e.g., Trial Tr. at 159:11–161:4 (testimony of Michael Canter).

On February 17, 2014, the government moved to dismiss Count Seven, see Mot. to Dismiss Count Seven (Doc. No. 197) at 1, and the court granted the Motion, see Minute Entry (Doc. No. 201) at 1.  After a subsequent jury trial, Litvak was convicted of the remaining fifteen counts in the Indictment on March 7, 2014.  See Verdict Form (Doc. No. 229) at 1–3.  The court denied Litvak's pending and post-trial motions, see generally United States v. Litvak, 30 F. Supp. 3d 143 (D. Conn. 2014),[3] and Litvak was sentenced, see generally Judgment (Doc. No. 275).

The Court of Appeals for the Second Circuit reversed the judgment of conviction as to the fraud on the United States and making false statements charges, vacated the judgment of conviction on the securities fraud charges, and remanded for a new trial. United States v. Litvak, 808 F.3d 160, 190 (2d Cir. 2015).[4]

---

[3] The court's Ruling on the pending and post-trial motions following the 2014 trial is also available at Docket Number 265.

[4] The Second Circuit's Mandate, wherein it notes that court's disposition of the appeal, is also available at Docket Number 305.

At the second trial, the government's evidence consisted of, among other things: (1) time-stamped electronic chats ("Bloomberg chats") reflecting correspondence among Litvak, Litvak's coworkers at Jefferies, and various parties with whom Litvak negotiated RMBS bond trades; (2) trade tickets indicating the prices at which Jefferies—through Litvak—purchased or sold RMBS bonds; (3) testimony of a Bloomberg, LP employee, Sean Mossman, regarding various aspects of Bloomberg chats and the software and technology by which those chats are sent and received; (4) testimony of a Jefferies employee, Joseph Darconte, about Bloomberg chats, trade tickets, and employee training/compliance requirements; (5) testimony of Thomas Carocci of the Financial Industry Regulatory Authority ("FINRA") as to exams taken by Litvak; (6) testimony of Litvak's counterparties in several of the charged trades—Michael Canter of AllianceBernstein, Katherine Corso of York Capital, Vladimir Lemin of Magnetar Capital, Brian Norris of Invesco Advisors, and Joel Wollman of QVT Financial—who testified about their negotiations with Litvak, their experiences as traders in the RMBS bond market, and the impact of Litvak's misrepresentations on their trade execution; and (7) testimony of Special Agent James O'Connor, of the Office of the Special Inspector General for the Troubled Asset Relief Program, regarding the investigation into Litvak's activities at issue in this case.  Having disclosed four experts before trial, see generally Supplemental Expert Disclosure (Doc. No. 475-1), Litvak called one expert witness, Phillip "Buck" Burnaman, who testified about practices in the RMBS bond market.

Litvak moved for a directed verdict, see generally Oral Mot. for Directed Verdict (Doc. No. 497); Mem. of Law in Supp. of Jesse C. Litvak's Mot. for J. of Acquittal

Pursuant to Fed. R. of Crim. P. 29(a) at 1–6, 8 (Doc. No. 500), and the court denied that Motion, <u>see</u> Minute Entry (Doc. No. 498) at 1; Order (Doc. No. 505).  On January 13, 2017, the case was submitted to the jury.  On January 27, 2017, the jury returned a verdict of guilty on Count Four of the Indictment, while finding Litvak not guilty on Counts One through Three, Five, Six, and Eight through Eleven.  <u>See</u> Verdict Form (Doc. No. 510) at 1–2.  Following the jury's verdict, Litvak filed the pending Motion.

## III.    MOTION FOR JUDGMENT OF ACQUITTAL

### A.    <u>Legal Standard</u>

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal" after a guilty verdict.  The court must, upon motion of the defendant, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

"In challenging the sufficiency of the evidence, the defendant faces an uphill battle, and bears a very heavy burden . . . ."  <u>United States v. Mi Sun Cho</u>, 713 F.3d 716, 720 (2d Cir. 2013) (quoting <u>United States v. Crowley</u>, 318 F.3d 401, 407 (2d Cir. 2003)).  The court "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  <u>United States v. Litvak</u>, 808 F.3d 160, 170 (2d Cir. 2015) (quoting <u>United States v. Brock</u>, 789 F.3d 60, 63 (2d Cir. 2015)).  Although "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt,'" <u>United States v. D'Amato</u>, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting <u>United States v. Mulheren</u>, 938 F.2d 364, 372 (2d Cir. 1991)), the jury's verdict

must not be disturbed so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Brock, 789 F.3d at 63 (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Facen, 812 F.3d 280, 286 (2d Cir. 2016) (quoting United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003)). "Accordingly, [t]he government's case need not exclude every possible hypothesis of innocence, and where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." Id. (quotation marks and citations omitted). Finally, in ruling on a motion brought pursuant to Rule 29, the court must view the evidence "in its totality, as each fact may gain color from others." United States v. Cassese, 428 F.3d 92, 98–99 (2d Cir. 2005) (quotation marks and citations omitted).

B.    Discussion

Before convicting Litvak of any given count of securities fraud, the jury was required to find that the government had proven beyond a reasonable doubt the following four elements as to that count:

(1) In connection with the purchase or sale of the security identified in that count, Mr. Litvak—

   (a) employed a device, scheme, or artifice to defraud, or
   (b) made an untrue statement of a fact or omitted to state a fact which made what was said, under the circumstances, misleading, or
   (c) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

(2) The statement or conduct related to a fact that would be material to a reasonable investor;

6

(3) Mr. Litvak acted willfully, knowingly, and with the intent to defraud; and

(4) Mr. Litvak knowingly used, or caused to be used, the mails or any means or instruments of transportation or communication in interstate commerce in furtherance of the fraudulent conduct.

Jury Charge (Doc. No. 523) at 43.  In the pending Motion, as he did at trial, Litvak focuses almost exclusively on the sufficiency of the evidence on the second element, materiality.  See, e.g., Motion at 1 ("The government's evidence of materiality on Count 4 was notably weak and ultimately insufficient to support a conviction . . . .").

The jury convicted Litvak of one of the ten securities fraud charges on which it was asked to render a verdict.  Count Four—the count on which the jury found Litvak guilty—relates to Litvak's misrepresentations in the course of a July 1, 2010 trade with Invesco's Brian Norris ("Norris").  See Indictment ¶ 55.  Norris instructed Litvak to bid 79-24 in a BWIC auction for the "SARM 05-21 7A1" bond ("SARM bond").[5]  See Govt. Ex. ("GX") 43B.  Although Litvak informed Norris that he had "bid [his] level," see id., Litvak had actually acquired the bond for 79-16, see GX 40A.  Litvak and Norris subsequently agreed on a six-tick charge, in addition to the 79-24 price Litvak told Norris he had paid for the bond, to compensate Jefferies and Litvak for facilitating the transaction.  See GX 43B.  In the end, Norris and Invesco purchased the SARM bond for 79-30.  See GX 40B.

Litvak offers several arguments in support of his contention that there was insufficient evidence to prove the materiality element of Count Four.  First, he argues

_____

[5] In the RMBS bond market, the price of bonds are communicated as a percentage of the face value of the bond.  The number before the dash refers to a percentage of the bond value, in whole numbers.  The number after the dash refers to multiples of one-thirty-second of one percent.  Units of one-thirty-second of one percent are referred to as "ticks."  Thus, when Norris instructed Litvak to bid "79-24" for the SARM, he instructed Litvak to bid 79.75% (79% + (24/32)%) of the current face value of the bond.  See Trial Tr. at 582:11–583:25 (Darconte).

that Norris's misunderstanding of his relationship with Litvak—that Litvak was acting as Norris's "agent"—renders Norris an unreasonable investor and renders his views about the importance of Litvak's misstatements of no weight in any materiality inquiry.  See Motion at 1–2, 9–12; Reply at 2–4.  Second, Litvak contends that his lie about Jefferies's bid price was immaterial because it was not "meaningful" in the context of the trade with Norris.  See Motion at 2, 12–13; Reply at 6–7.  Third, Litvak argues that his misrepresentation was not material, because Invesco could not plausibly have been harmed.  See Motion at 13–15; Reply at 8–9.  Fourth, Litvak insists that the government cannot point to evidence regarding uncharged conduct as probative of the materiality of Litvak's misstatement in effectuating the SARM bond trade at issue in Count Four.  See Motion at 15–16; Reply at 9.  The government disputes each of Litvak's arguments in turn, see Opp'n at 10–18, and asserts that the evidence on materiality was sufficient to support a conviction on Count Four, see Opp'n at 4–10.

Before delving into the specifics of the Motion and related briefing, the court pauses to make two, preliminary points.  The court is not—just as the jury was not—limited to Norris's testimony regarding the SARM bond in determining if the government has offered sufficient evidence to prove beyond a reasonable doubt that Litvak's misstatement to Norris was material.  See United States v. Cassese, 428 F.3d 92, 98–99 (2d Cir. 2005) (requiring that, when ruling on Rule 29 motion, court view evidence "in its totality, as each fact may gain color from others" (quotation marks and citations omitted)).  Second, despite the temptation to try to tease out the jury's logic in acquitting on nine of ten counts, the court's "review of whether evidence was sufficient to support a conviction on one count is 'independent of the jury's determination that evidence on

another count was insufficient.'"  United States v. O'Connor, 650 F.3d 839, 856 (2d

Cir. 2011) (quoting United States v. Powell, 469 U.S. 57, 67 (1984)).

The court will first discuss and evaluate the sufficiency of the evidence on

materiality and will then address Litvak's specific arguments as to the insufficiency of

the evidence.

1.      Evidence on Materiality

Norris's testimony at trial concerning the trade at issue in Count Four provided

sufficient evidence for the jury to conclude beyond a reasonable doubt that Litvak's

misstatements regarding the price at which he had purchased the SARM bond were

material.  See Jury Charge at 47.  Crucially, Norris testified that broker-dealers earn

money facilitating BWIC trades in one of two ways:

> They can, you know, bid our level, which is what [I thought] happened here.
> Then after the fact, I will negotiate a transaction or a commission fee for them
> and I will pay slightly higher than this.  Or the second way to do it is to say, you
> know, I will back up the bid.  So they'll actually send a lower price to the seller
> and their commission will be the difference between that lower price and the
> price that I sent him.

Id. 750:7–750:14.  In purchasing the SARM bond, Litvak told Norris that he had "bid

[his] level," a misrepresentation which led to a brief negotiation as to the additional

amount Invesco would pay Jefferies.  See GX 43B.  According to Norris's testimony

quoted immediately above, if Litvak had told Norris he had actually bid 79-16, he would

have earned the eight-tick difference between that figure and the 79-24 bid price Norris

had set as his "level"; no meaningful negotiation would have followed.

Norris's testimony regarding the way in which the RMBS bond market worked,

particularly in the context of BWIC trades, provided sufficient evidence for the jury to

conclude that Litvak's lie about the bid price "significantly altered the total mix of

information available." See Jury Charge at 47.  Indeed, the negotiations that resulted in Norris's agreement to pay six ticks to Jefferies proceeded from the erroneous premise (created by Litvak's misrepresentation) that Litvak had paid 79-24, rather than backing up Norris's bid (at 79-16).  The jury could reasonably have concluded that Litvak's misstatement was material—significantly altering the total mix of information available to a reasonable investor—because it provided an incorrect baseline from which Jefferies's earnings were determined.  And further, it led to Litvak receiving income for his firm very much in excess of what Norris was led to believe he was agreeing to.

Norris testified that it would "have mattered to [him] if [he] had known that Jefferies bought the bond for 79-16," because that would mean Invesco "could buy the bond cheaper for [its] clients."  Trial Tr. at 751:23–752:3.  He elaborated, noting that it was "highly unlikely" he would have paid fourteen ticks—the difference between the price at which Jefferies actually purchased the SARM bond and the price at which it sold the bond to Invesco—to Jefferies for this kind of transaction.  See id. at 752:4–752:14.  From this testimony, the jury was permitted to draw the reasonable inference that Litvak's lie would have mattered and been important to a reasonable investor.

Moreover, Norris's testimony about the ways in which broker-dealers earn money was consistent with his testimony and interaction with Litvak regarding an uncharged trade, in which Invesco purchased a different bond from Litvak on June 24, 2010.  See id. at 756:11–757:4, 759:4–759:23.  Norris's testimony about these two trades may well have underscored for the jury the extent to which buyers in BWIC trades are dependent on the representations of the broker-dealer with whom they are working.  Norris appeared to have no way of independently verifying the price Litvak actually paid for the

bond,[6] which price would dictate the amount of money Litvak was to receive (if he "backed up" the buyer's bid), or provide the starting point for discussions as to the amount of money the buyer would pay in addition to his bid price to compensate the broker-dealer.

While this testimony alone would be sufficient, other government witnesses similarly testified about the importance of paying the minimum amount of money possible for RMBS bonds, in order to make more money for their clients. See, e.g., Trial Tr. at 169:16–169:21 (Canter), 498:9–498:23 (Corso), 762:8–762:20 (Norris). The jury could thus conclude that the reasonable investor would have viewed lies that caused them to pay even just slightly more than they had agreed to as important and material.

Based on the nature of BWIC transactions, as explained by Norris and others, and given extensive witness testimony underscoring the importance of paying as little as possible for RMBS bonds, the jury had before it evidence to find beyond a reasonable doubt that Litvak's misrepresentation to Norris, charged in Count Four, was material.

---

[6] Though he did not testify as to the specifics of Litvak's trade with Norris, Litvak's expert Phillip "Buck" Burnaman testified as follows, regarding the opacity of BWIC trades:

Q. And in BWICs, the broker-dealer knows the price it submits into the auction to the seller?

A. Yes.

Q. And the bidder only knows the price that the broker-dealer put in the auction in this BWIC if the broker-dealer tells them?

A. Yes.

Trial Tr. at 1272:20–1273:1. Here, Litvak/Jefferies was the broker-dealer, and Norris/Invesco was the bidder.

Next, the court turns to Litvak's specific arguments that the evidence offered at trial was insufficient.[7]

### 2.    Norris's Misunderstanding of Litvak's Status

The court begins with Litvak's contention that Norris's misunderstanding of his relationship with Litvak is grounds for an acquittal.  See generally Motion at 1–2, 9–12; Reply at 2–4.  Litvak's argument appears to be that Norris's erroneous belief that Litvak was his agent was unreasonable and led him to give weight to Litvak's lie that he would not otherwise have afforded it.  Indeed, in his Reply, Litvak states that, "Mr. Norris's mistake affected the weight he gave the misstatement."  Reply at 3.  In effect, Litvak's argument is that, because no reasonable investor would have thought Litvak was acting as his agent, Norris is not a reasonable investor.  Ignoring the rest of the trial record, Litvak then argues that, without Norris's testimony, there is no evidence that a reasonable investor would have given any credence to Litvak's misrepresentation that he had "bid [Norris's] level," and so the misstatement is immaterial.  See Motion at 9–12.  The government concedes that Litvak was not acting as Norris's agent in the RMBS bond trades, see Opp'n at 11, but disputes the significance of this point to the issue of

---

[7] While the record of the instant trial stands alone, without regard to the first trial record, it bears noting with regard to all of Litvak's materiality arguments that the record here is essentially the same as when the Circuit stated the following:

> We conclude that, on the trial record before us, a rational jury could have found that Litvak's misrepresentations were material.  The trial record includes testimony from several representatives of Litvak's counterparties that his misrepresentations were "important" to them in the course of the transactions on which the securities fraud charges were predicated and that they or their employers were injured by those misrepresentations.  This testimony precludes a finding that no reasonable mind could find Litvak's statements material.

Litvak, 808 F.3d at 175–76 (citations omitted).

12

whether there was sufficient evidence before the jury to support a guilty verdict on Count Four, see Opp'n at 11–13.[8]

Initially, the court notes that Litvak's argument appears inconsistent with the law set forth above.  See supra Part III.A.  Unless the defendant is arguing that, as a matter of law, Norris's testimony must be ignored, it is for the jury to assess and weigh the testimony and determine what inferences to draw from it (e.g., Norris viewed information as "material," and thus a reasonable investor would have viewed it as material).  If Litvak's argument is indeed that, because Norris viewed Litvak as his agent, his testimony is per se not evidence on which a reasonable jury can rely, the court notes the absence of any case citations to support such an argument.  While it is conceivable that a witness's testimony could be so fanciful that, as a matter of law, it could not support a guilty finding by a reasonable jury, Norris's testimony is clearly not so outrageous or incredible.  Norris presented as an intelligent, educated, calm, rational person, experienced in his field, whose testimony could well support a guilty verdict standing alone, but if necessary, Norris's testimony was further buttressed by testimony of other witnesses that was consistent with his own.

Before turning to address Litvak's contention that there is no other evidence of materiality once Norris's testimony is erased, the court will also address what it views as a false premise of the defendant's argument.  While clever, in the court's view it misses the mark.  Assume, because Norris viewed Litvak as his "agent," Norris trusted Litvak

---

[8] Contrary to Litvak's view, the government's Opposition does not appear to concede—explicitly or implicitly—that Norris was not a reasonable investor.  But see Reply at 2 ("The government's implicit concession that Mr. Norris was not a 'reasonable investor' is a major development in this case.").  In fact, the government argues that "Jefferies' principal or agent capacity was irrelevant to [Norris's] prior testimony that the misrepresented information 'mattered' and was 'important' . . . ."  Opp'n at 12.

more and expected Litvak to act in his best interest.[9]   Contrast that with a broker-dealer

whom Norris did not view as acting in an "agency" relationship (let's call him Jones).

Norris may not trust what non-agent Jones says.   However, as is clear from Norris's

testimony, he would still view statements by both Litvak and Jones concerning the price

at which they purchased the bond as important.   As to knowing the true price Litvak (or

Jones) paid for the bond, Norris testified that it "absolutely [ ] would" matter.   Trial Tr. at

751:25; see also Trial Tr. at 752:10 ("Yes, absolutely it would be important."); Trial Tr. at

752:17 (characterizing the difference between the amount Norris thought Jefferies

received and amount it did receive—i.e., the cost to Norris's clients of Litvak's

misrepresentation—as "significant"); Trial Tr. at 805:11–805:15 ("Q.  And whether Litvak

was an agent or principal, did that make a difference to you as to whether you thought

Litvak was telling the truth when he said he was using your bid?  A.  No, it does not.").

While Norris might trust the truthfulness of the statement made by Litvak more than one

made by Jones, Norris would view information about price as important regardless of

whether Jones or Litvak was the speaker.

    Norris not only testified clearly that misstatements regarding the price paid by the

broker-dealer were material—as they would be "important in making an investment

decision," Jury Charge at 48—he explained why being told a lie about the price paid

mattered.  If not lied to, Norris would not have paid 29-30.  Trial Tr. at 752:12–752:14

("Because it [the 14 ticks Jefferies made on the trade] is significantly more than we

would typically pay for this type of transaction, so it is more money that our clients are

paying for the bond.").  In the trade at issue in Count Four, the difference was

---

[9] Surely, given Litvak's lies, Norris was sorely disappointed.

14

approximately $73,000.  See id. at 1091:3 (O'Connor).  Norris later testified that a difference of as little as two ticks (worth just $276) mattered.  See id. at 762:14–762:16.

Defendant seeks to obfuscate this clear evidence by suggesting Norris gave unreasonable weight to the price information Litvak gave him.  Reading all of Norris's testimony, as a whole, the jury could (and did) reasonably conclude beyond a reasonable doubt that a misstatement about price mattered to a reasonable investor in Norris's position.  In fact, there was sufficient evidence from Norris's testimony alone for the jury to conclude that such misstatements mattered to a reasonable investor, whether put to him by an agent or another.  See id. at 805:11–805:15 ("Q.  And whether Litvak was an agent or principal, did that make a difference to you as to whether you thought Litvak was telling the truth when he said he was using your bid?  A.  No, it does not.").  That Norris mistakenly viewed Litvak as an "agent" might affect the level of shock he experienced to learn that Litvak had lied to him.  However, it would not alter the importance to Norris of the price information he received in pursuing a trade.

To be clear—whether Litvak was his agent or not—the reasonable investor, including Norris, might very well not have given Litvak's characterizations of the deal they were consummating (e.g., whether they were getting a "good" or "fair" price, or it was a "great deal") very much credence, in the face of internal analytics by, e.g., Norris's employer (Invesco) that provided a valuation for the bonds.  In contrast, for the reasons set forth above, investors were heavily reliant on Litvak's representations of the specific prices at which he bought the bonds subsequently transferred to them.  See, supra, at 10–11 & n.6.

15

It is undisputed here that every buyer of the RMBS bonds at issue in this trial entered the market armed with an analytical report prepared by his/her company which, based on its judgment, set a range of possible purchase prices in relation to their expected yields.  Knowing the lowest yield he would accept, the buyer entered the market with essentially a "ceiling" on the price he would be willing to pay for a bond. However, while there was a "ceiling," there was extensive, undisputed testimony that the buyer would want to purchase a given bond at a price lower than that ceiling, if possible, thus increasing the projected yield on the bond.

Notwithstanding Norris's confusion about agency relationships, the court concludes that there was sufficient evidence to support the jury's finding that the misstatement was material.  First, Litvak's suggestion that Norris's misunderstanding of their relationship renders him an unreasonable investor sweeps too broadly.  Though Litvak offers one plausible evaluation of Norris's status as a reasonable investor—that because Norris received and forwarded legal guidance that flatly stated broker-dealers were acting on their own behalf, yet persisted in the belief that Litvak was his agent, he is per se unreasonable, see Motion at 11—it is by no means one that is mandated by the evidence.  Indeed, the jury was entitled to believe that, despite his mistaken understanding of his relationship with Litvak, Norris attributed the same importance to Litvak's misstatements about price that any reasonable investor would have.

Moreover, even if the jury agreed with Litvak that Norris's testimony as to the "importance" of Litvak's misstatements should be set aside, it would still have sufficient evidence before it to find Litvak's lies material.  As noted above, Norris testified about the way in which broker-dealers were compensated for facilitating BWIC trades.  See

16

supra Part IV.B.1 (quoting Trial Tr. at 750:7–750:14).  The evidence was sufficient for the jury to conclude that the objective investor, without any illusions as to Litvak's status as a principal, would have considered Litvak's lie as "meaningfully affect[ing] [that] reasonable investor's consideration about whether to buy or sell, and at what price," Jury Charge at 47 (emphasis added).  Norris stated that, when broker-dealers bid the purchaser's level in a BWIC trade, that price serves as the starting point for negotiations regarding the additional amount that will be paid to the broker-dealer.  See Trial Tr. at 750:7–750:11.  Notably, there is no reason to believe this description of the RMBS bond market would have been effected in any way by Norris's view of Litvak as an "agent." Thus, there was sufficient evidence for the jury to conclude that Litvak's misrepresentation about the price he bid substantially changed the amount Jefferies received in compensation and the amount Norris paid.  The jury could easily find, as it did find, that such an undisclosed increase in Jefferies's compensation would have been "important [to the reasonable investor] in making an investment decision."

Despite Norris's conceded misunderstanding of his relationship with Litvak, there was sufficient evidence for the jury to conclude that Litvak's lie to Norris was a material misrepresentation.

### 3.    "Meaningfulness" of Litvak's Misrepresentations

Litvak also argues that the evidence as to Count Four was insufficient because there was no evidence that his lies were "meaningful," given that Norris ended up paying a price for the SARM bond that he was "willing to pay . . . to acquire the bond." See Motion at 13.

This attempt to narrow the universe of misrepresentations proscribed by the securities laws is unavailing.  In a portion of Jury Instruction 35 that Litvak quotes, but does not emphasize, see id. at 12, the court instructed the jury that misstatements that "meaningfully affect a reasonable investor's consideration about whether to buy or sell, and at what price" are material, Jury Charge at 47 (emphasis added).  The fact that Norris ultimately bought the SARM bond, and had a range of prices at which he was willing to do so, does not negate the jury's ability to conclude that Litvak's lie—that he "bid [Norris's] level," GX 43B—would affect a "reasonable investor's consideration" about "what price" that investor would pay for that bond, Jury Charge at 47.

In fact, Norris's testimony was clear that there was negotiation regarding how much above the 79-24 bid Invesco would pay for the bond as a direct result of, and because of, Litvak's lie.  Litvak's counsel ignores significant portions of Norris's testimony to reach their conclusion that Litvak's lie did not matter to or did not significantly alter the total mix of information available to the reasonable investor.  Norris testified that his eventual, post-lie agreement to pay Litvak 79-30 was based upon Litvak's misrepresentation that he paid 79-24.  Trial Tr. at 750:21–750:24 ("So 6 ticks is my suggestion for the commission for his service as the broker, and then I just added that 6 ticks to the 79-24 and said 79-30 to me, which would be the price that Invesco pays." (emphasis added)).  Had Litvak not lied, Norris made clear he would not have

paid 79-30.  See id. at 751:23–752:20.[10]  As Norris explained, "the most important variable . . . [is] potential yield," id. at 788:8–788:10, and that yield is inversely related to price, id. at 806:12–806:14.  Norris testified that the $73,000 excess paid to Litvak because of Litvak's lie was "significant" to Norris.  Id. at 752:17.  The sections of testimony cited by Litvak at pages 12–13 of his Motion could suggest to someone not present at trial that the misrepresentation did not have a "meaningful effect" upon Norris's decision to buy and at what price.[11]  However, that "suggestion" is belied by the

---

[10] Norris's testimony on this point is as follows:

Q.  Would it have mattered to you if you had known that Jefferies bought the bond for 79-16?

A.  Yes, absolutely it would.

Q.  Why would it have mattered to you?

A.  Because then we could buy the bond cheaper for our clients.

Q.  Would you have knowingly paid 14 ticks of commission on this trade?

A.  It is highly unlikely we would pay that much on this type of transaction.

Q.  Would it be important if you knew that Litvak was making 14 ticks on this trade?

A.  Yes, absolutely it would be important.

Q.  Again, why would it be important?

A.  Because it is significantly more than what we would typically pay for this type of transaction, so it is more money that our clients are paying for the bond.

Q.  If I tell you the difference between 14 and 6 ticks is about $73,000, does that change your answer?

A.  No.  That's significant.

Q.  Why is that?

A.  It is a significant amount of money for our clients that we're paying on the top of what we could have paid.

Trial Tr. at 751:23–752:20.

[11] In arguing that Norris's "negotiating position did not change," Motion at 13, Litvak seems to want to forget that he lied: Norris set his starting "negotiating position" by communicating his bid of 79-24, and Litvak told Norris that he "bid" Norris's level (i.e., 79-24).  Norris thus had no reason to change from his initial position.

entirety of Norris's testimony, based upon which a reasonable jury could find beyond a reasonable doubt that something Litvak said did "significantly alter the total mix of information available" and had a "meaningful effect" upon the investment decision.

Because of Litvak's misrepresentation, Norris did not pay 79-24 for the SARM bond, and Litvak did not receive just eight ticks of compensation. See Trial Tr. 750:12–750:14 (explaining that, when broker-dealers "back up the bid," "they'll actually send a lower price to the seller and their commission will be the difference between that lower price and the price that I sent them" (emphasis added)). Yet, because Litvak misrepresented that he had bid Norris's level, the parties negotiated, albeit very quickly, six ticks of compensation for Jefferies, and Norris paid 79-30 for the SARM bond. See id.; GX 43B. There was therefore sufficient evidence for the jury to reasonably conclude that Litvak's misrepresentation to Norris was "meaningful" and hence "material."

    4.    Harm Suffered by Invesco as a Result of Litvak's Misstatements

Litvak further suggests that the jury's verdict should be set aside in favor of a judgment of acquittal because, "[i]n order to be material, a misstatement must not only have some meaningful effect on the investor, there must also be a 'plausible way that [the investor] could suffer financially' as a result of it." Motion at 13 (quoting Levine v. NL Indus., Inc., 926 F.2d 199, 202–03 (2d Cir. 1991)). This argument rests, again, on Litvak's notion that Norris "had no reasonable expectation of paying any less than the 79-30 he paid." Reply at 9.

Though Litvak chides the government for "ignor[ing] most of the authorities cited in Mr. Litvak's brief establishing that the potential for financial harm is an essential component of materiality in the Section 10(b) context," Reply at 8, Litvak cites

repeatedly to cases from the Seventh Circuit in this portion of his Motion, see Motion at 13–15.  The only Second Circuit cases Litvak cites are Levine v. NL Industries, Inc., 926 F.2d 199 (2d Cir. 1991), and the Circuit's 2015 opinion in this case, both of which the government addresses, see Opp'n at 15–16.  The court is unconvinced that either of these cases, or Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539 (2d Cir. 1996), see Reply at 8, announced a "plausible financial harm" requirement for the materiality element of securities fraud.  As the government points out, see Opp'n at 15, Levine has never been cited in a criminal case and so is unlikely to have heralded any sea change in securities law.

Moreover, Levine and Feinman are best read as applying the materiality definition developed in this Circuit to the specifics of those cases.  In Levine, the misrepresented information was "immaterial because [the federal government] had agreed to indemnify" the defendant.  926 F.2d at 203.  That being the case, because the shareholder plaintiffs could not plausibly have suffered financially, "a reasonable investor would not consider [defendant's] asserted violation of environmental law important information significantly altering the total mix of information made available to the investor."  Id.  Similarly, in Feinman, the Circuit's opinion rested on its conclusion that "reasonable minds could not find that an individual investing in the stock market would be affected in a decision to purchase or sell a security by knowledge that the broker was pocketing a dollar or two of the fee charged for the transaction."  84 F.3d at 541.  In both cases, the lack of a financial harm was indicative of a lack of materiality, rather than a requirement in and of itself.

Even if there must be a "plausible way that [the investor] could suffer financially" from Litvak's misstatement in order for it to be material, the evidence here was sufficient to support such a finding.  Again, Litvak's contention that "Invesco [s]uffered [n]o [h]arm," see Reply at 8, rests on a mischaracterization of the way in which Litvak and Norris arrived at the price Norris ultimately paid for the bond.  Litvak states that Norris paid "the very same price [he] had decided to pay" when he first discussed the bond with Litvak.  See Motion at 14 (emphasis added).  The correct verb, to accurately describe Norris's testimony, would be "was willing," not "had decided."  As set forth above, Norris's willingness to pay 79-30 was based on Litvak paying 79-24 to acquire the bond.  See Trial Tr. at 750:7–750:14.  The evidence is more than sufficient to support a finding that reasonable investors rely on broker-dealers to honestly communicate whether they have backed up the bid or not.  See, e.g., id. at 454:10–454:15 (Canter) ("In my mind, you know, what we got upset about was him lying on very specific transactions, you know, not general BS or vague commentary.  It was very specific lying on trades that were bid list trades where he had a very simpl[e] task to turn around and give our bids to the dealer.  He didn't do that." (emphasis added)).  Purchasers do not appear to have any way to independently verify the broker-dealer's purchase price, even as that purchase price plays a necessary role in determining the total price the purchaser pays to acquire the bond.  The jury had more than enough evidence to conclude that Litvak's misrepresentation actually caused Invesco harm, in

leading it to pay 79-30 when it would otherwise have paid less.[12]

The government's witnesses—both those who erroneously viewed Litvak as their "agent" and those who did not—repeatedly made clear that they viewed price information conveyed to them by broker-dealers to be "important"; this was true even when misrepresentations related to price caused relatively minor overpayments in relation to the total sum spent to purchase a given bond.  See, e.g., Trial Tr. at 182:10–182:17 (Canter) ($3,120), 762:3–762:20 (Norris) ($276).  The jury could reasonably conclude that Litvak's lies substantially altered the total mix of information available to his counterparties, who were harmed by paying more money or selling for less money than they would have absent his lie.  Indeed, Litvak's expert witness, Phillip "Buck" Burnaman, testified that investment managers' goal is "to buy low and sell high."  See id. at 1279:12–1279:13.  Though not directly related to the pricing information misstated during the trade charged in Count Four, testimony of other witnesses provided relevant information regarding the extent to which reasonable investors would suffer a financial harm by the fraudulent statement charged in Count Four.

Thus, even if satisfaction of the materiality element required finding a "plausible financial harm" to Invesco, there was more than sufficient evidence for the jury to

---

[12] In the Invesco transaction, of course, Litvak's misrepresentations led to Jefferies receiving more than "a dollar or two," see Feinman, 84 F.3d at 541; see also Litvak, 808 F.3d at 176–77 (distinguishing Feinman, 84 F.3d 539 (2d Cir. 1996)).  Indeed, Litvak's firm received $73,000 because of his fraud.  Many witnesses testified that in the RMBS bond market, even small overpayments would have affected decisions to purchase or sell securities and at what price those transactions would take place, see Trial Tr. at 169:16–169:21 (Canter), 498:9–498:23 (Corso), 762:8–762:20 (Norris).

In the proof at trial, the delta was in some cases as large as $602,396.91, see Trial Tr. at 1054:24 (testimony of Special Agent O'Connor regarding trade charged in Count Two), $211,553.20, see Trial Tr. at 1108:19 (testimony of Special Agent O'Connor regarding trade charged in Count Six), or $228,561.45, see Trial Tr. at 1112:5 (testimony of Special Agent O'Connor regarding trade charged in Count Eight).  In Count Four, it was $73,018.53.  See Trial Tr. at 1091:3 (testimony of Special Agent O'Connor regarding trade charged in Count Four).  This was indisputably more than a small overpayment of "a dollar or two."

conclude that Invesco could have and/or did in fact suffer financial harm as a result of Litvak's lies.

        5.     Uncharged Trades

After arguing that the evidence from Norris about Count Four is insufficient as to materiality, Litvak asserts that "none of the uncharged trade evidence is relevant to materiality on Count 4."  Reply at 9; see also Motion at 15–16.  In this court's view, this statement is wrong.  The jury was permitted to draw upon testimony from any of the witnesses in deciding whether "there was a substantial likelihood that the misstated or omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available."  See Jury Charge at 47; cf. United States v. Cassese, 428 F.3d 92, 98–99 (2d Cir. 2005) (requiring that, when ruling on Rule 29 motion, court view evidence "in its totality, as each fact may gain color from others" (quotation marks and citations omitted)).

As the defense pointed out repeatedly before, during, and after trial, "what matters is not Mr. Norris's subjective understanding of his relationship with Mr. Litvak," as "the jury was to evaluate materiality in an objective manner."  See Motion at 10 (quotation marks and citations omitted, emphasis in original).  Clearly, then, the jury could turn to evidence offered by Norris—whether or not related to Count Four—or any other witness that might provide relevant "color" as to what the objective, reasonable investor involved in a BWIC trade would consider a material misstatement.

Nor does the court believe that there is any significant risk of juror confusion about the trades in which Norris was involved.  Despite possible confusion of some who

sat through parts or all of the trial,[13] see Motion at 3 & n.2, there is no indication that the jury was confused or that it discharged its responsibilities with anything but the utmost care.  In its Charge, the court admonished the jury to "consider each count separately," and not to let its findings on one count determine its verdict as to any other count.  See Jury Charge at 33.  By all accounts, the jury heeded this instruction, returning a guilty verdict on one count and a not guilty verdict on nine counts.  Having concluded that the evidence was sufficient for a reasonable jury to return a guilty verdict on Count Four, the court is not at liberty to overturn that verdict based on a news article.

There is no non-speculative indication that the jury based its verdict solely on the evidence of the uncharged trade conduct, however, rather than on its findings with regard to Count Four.  The evidence was sufficient to sustain a conviction, even relying only on Norris's testimony about the trade charged in Count Four.  Further, there was additional relevant and probative testimony from Norris on uncharged conduct and from others, see, e.g., Trial Tr. at 454:10–454:15 (Canter), that added to the proof on Count Four.

6.    Other Arguments

Finally, Litvak raises arguments regarding the materiality and scienter elements of securities fraud, see Motion at 16–17, that have already been rejected by this court as contrary to Second Circuit precedent, see Trial Tr. at 1302:17–1304:21.  Specifically, the court has rejected Litvak's "benefit of the bargain" theory, which relies primarily on out-of-circuit wire fraud cases, see Motion at 16 (citing, inter alia, United States v.

---

[13] If this court is correct, the jury can rely on all testimony.  Thus, it is not abjectly wrong for a person to state that evidence unequivocally showing a lie in an altered document "led" to Litvak's conviction.  See Motion at 3 & n.2.

Takhalov, 827 F.3d 1307 (11th Cir. 2016)), and does so again here.  To be clear, these cases are, in relevant part, consistent with the Second Circuit's interpretation of the wire fraud statute,[14] a statute that has often been distinguished from the securities fraud statute, see, e.g., United States v. Litvak, 808 F.3d 160, 178–79 (2d Cir. 2015).

Additionally, the Second Circuit has explicitly rejected Litvak's argument that contemplated harm is a component of the scienter element of securities fraud.  See Litvak, 808 F.3d at 178–79 (discussing, inter alia, United States v. Vilar, 729 F.3d 62 (2d Cir. 2013)).

Finally, the court rejects Litvak's contention that the "omissions" language in the jury instructions should not have remained.  Inclusion of such language was a correct statement of the law, warranted by the facts of this case, and unlikely to have caused juror confusion.  See, e.g., Trial Tr. at 1312:16–1313:2 (rejecting Litvak's request to strike "omission" language from Jury Charge); ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'" (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988))).

In sum, the evidence at trial was sufficient for the jury to return a guilty verdict on Count Four.  Therefore, Litvak's Motion for a Judgment of Acquittal is denied.

---

[14] See, e.g., United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.").

IV.     **MOTION FOR A NEW TRIAL**

A.     Legal Standard

Federal Rule of Criminal Procedure 33 permits the court, if moved by the

defendant, to "vacate any judgment and grant a new trial if the interest of justice so

requires." Fed. R. Crim. P. 33(a). The court "must examine the entire case, tak[ing] into

account all facts and circumstances," but "[t]he ultimate test . . . is whether letting a

guilty verdict stand would be a manifest injustice." United States v. Aguiar, 737 F.3d

251, 264 (2d Cir. 2013) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir.

2001)). While the court has broad discretion to set aside a jury verdict and order a new

trial "to avert a perceived miscarriage of justice," it "must strike a balance between

weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of

the jury." United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 159 (2d Cir. 2008)

(quotation marks and citations omitted). "While courts have 'broader discretion to grant

a new trial under Rule 33 than to grant a motion for acquittal under Rule 29,' they

'nonetheless must exercise Rule 33 authority sparingly and in the most extraordinary

circumstances.'" Id. (quoting Ferguson, 246 F.3d at 134).

B.     Discussion

Litvak makes no argument that this court should grant a new trial, apart from

those addressed and dispensed with above. None of the circumstances Litvak

identifies qualify as "extraordinary," warranting a new trial. Moreover, having examined

the record, this court concludes that no such circumstances are present in this case: the

jury's verdict is sufficiently supported by the evidence, and no manifest injustice would

result from allowing the jury's verdict to stand.  Therefore, Litvak's Motion for a New Trial is denied.

## V.    CONCLUSION

For the reasons set forth in detail above, Litvak's Motion for a Judgment of Acquittal or, in the Alternative, for a New Trial (Doc. No. 516) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 17th day of April, 2017.

_  /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

28