**17-1464-cr**
**United States v. Litvak**

1                UNITED STATES COURT OF APPEALS

2                    FOR THE SECOND CIRCUIT

3                        August Term, 2017

4      (Argued:  December 11, 2017              Decided: May 3, 2018)

5                      Docket No. 17-1464-cr

6      - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

7      UNITED STATES OF AMERICA,

8              <u>Appellee</u>,

9              v.

10     JESSE C. LITVAK,

11             <u>Defendant-Appellant</u>.

12     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

13     B e f o r e:  WINTER, CHIN, <u>Circuit</u> <u>Judges</u>, and KORMAN, <u>Judge</u>.[*]

14             Appeal from a conviction by a jury in the United States District Court for

15     the District of Connecticut (Janet C. Hall, <u>Chief</u> <u>Judge</u>), on one count of securities

_____

[*]Judge Edward R. Korman, of the United States District Court for the Eastern
District of New York, sitting by designation.

1

CERTIFIED COPY ISSUED ON 05/03/2018

1     fraud.  Appellant principally argues that his misstatements were, as a matter of

2     law, immaterial to a reasonable investor in the market for residential mortgage-

3     backed securities.  We hold that his misstatements could be found by a jury to be

4     material.  However, the district court materially erred in admitting evidence that

5     the counterparty representative in the sole transaction underlying the count of

6     conviction mistakenly believed that appellant was his agent.  Accordingly, we

7     vacate the judgment of conviction and remand.

8                                 KANNON K. SHANMUGAM, Williams &

9                                 Connolly LLP (Dane H. Butswinkas, Allison Jones

10                               Rushing, Masha G. Hansford, Meng Jia Yang, on

11                               the brief) Washington, D.C., for Defendant-

12                               Appellant.

13

14                               JONATHAN C. FRANCIS, Assistant United

15                               States Attorney (Heather Cherry, William J.

16                               Nardini, Sandra S. Glover, Assistant United States

17                               Attorneys, on the brief), for John H. Durham,

18                               United States Attorney for the District of

19                               Connecticut, New Haven, Connecticut, for

20                               Appellee.

21

22     WINTER, Circuit Judge:

23         Jesse Litvak appeals from his conviction, after a trial by a jury before Chief

24     Judge Hall, on one count of securities fraud pursuant to 15 U.S.C. §§ 78j(b), 78ff.

25     This is the second time this matter has been before us.  In the first appeal, see

1    United States v. Litvak, 808 F.3d 160 (2d Cir. 2015) ("Litvak I"), appellant

2    challenged his convictions on ten counts of securities fraud and various other

3    counts of fraud and false statements.  We reversed the convictions for fraud and

4    false statements.  We vacated the securities fraud counts and remanded them for

5    a new trial.  Id. at 190.  This appeal follows the second trial on ten counts of

6    securities fraud.  Appellant was acquitted on nine of the ten counts, each

7    involving transactions similar to the one for which he was convicted.

8          He challenges his conviction on the one count principally on the ground

9    that his misstatements were, as a matter of law, immaterial to a reasonable

10    investor in the market for residential mortgage-backed securities ("RMBS").  We

11    reject that argument.  However, the district court erred in admitting evidence

12    that the individual representing the counterparty in the transaction for which

13    appellant was convicted believed appellant to be an agent acting on the

14    counterparty's behalf.  All parties agree that the belief in an agency relationship

15    was erroneous and that appellant acted solely as a principal in the transaction

16    underlying this appeal.  Indeed, the testimony of the counterparty's

17    representative indicated that the counterparty, his employer, had informed him

1    that no agency relationship existed but that the representative disagreed.  The

2    district court instructed the jury that no agency relationship existed.

3         Because the applicable materiality test is an objective one, evidence of the

4    idiosyncratic and erroneous belief of the counterparty's representative was

5    irrelevant.  The belief of the counterparty's representative in an agency

6    relationship was, as discussed <u>infra</u>, the only evidence distinguishing appellant's

7    count of conviction from those of the nine transactions on which he was

8    acquitted.  The evidence was, therefore, prejudicial, as our earlier opinion in this

9    proceeding foreshadowed, <u>id.</u> at 187, and we cannot conclude with fair assurance

10   that the jury would have convicted appellant absent such evidence.  <u>See</u> <u>United</u>

11   <u>States v. Rosemond</u>, 841 F.3d 95, 112 (2d Cir. 2016).  Accordingly, we vacate the

12   judgment of conviction and remand.

13                                   BACKGROUND

14        This case has a lengthy procedural history.  In January 2013, the

15   government filed an indictment charging appellant with eleven counts of

16   securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff (Counts 1-11), one count of

17   fraud against the Troubled Asset Relief Program ("TARP") in violation of 18

1  U.S.C. § 1031 (Count 12), and four counts of making false statements in violation

2  of 18 U.S.C. § 1001 (Counts 13-16).

3      The instruments involved in the alleged fraud were RMBS.  Our decision

4  on the first appeal reversed the TARP fraud and false statements counts

5  involving government agencies.  Litvak I, 808 F.3d at 190.  It vacated the

6  securities fraud counts on the grounds that the district court erroneously

7  excluded evidence relevant to appellant's defense that his misstatements were

8  not material to a reasonable investor in the RMBS market.  Id. at 179-85.

9  a) The RMBS Market

10     Understanding the RMBS market is critical to this appeal.  What follows in

11  this section of the opinion is materially undisputed on this record.

12     Appellant worked as a bond trader at Jefferies & Company ("Jefferies"), an

13  investment banking firm and securities broker-dealer.  Appellant bought and

14  sold RMBS.  RMBS are large and complex aggregations of residential mortgages

15  and home equity loans.  "Typically, an entity (such as a bank) will buy up a large

16  number of mortgages from other banks, assemble those mortgages into pools,

17  securitize the pools (i.e., split them into shares that can be sold off), and then sell

18  them, usually as bonds, to banks or other investors."  City of Pontiac Policemen's

1    & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 177 n.7 (2d Cir. 2014) (quoting

2    Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 710 n.3 (2d Cir. 2011)).  A pool of

3    mortgages may also be divided into tranches, sold as bonds, that have varying

4    risk profiles and returns to investors.  Holders of RMBS receive coupon

5    payments derived from homeowner payments on mortgages.  RMBS are bought

6    and sold at very high prices.  For example, the single bond involved in the sole

7    count of conviction was conveyed for over $23 million.

8         RMBS are marketed to large, sophisticated financial institutions.  Because

9    RMBS are not homogeneous -- each has unique features affecting its value -- they

10   are not publicly traded on an exchange like NASDAQ or the New York Stock

11   Exchange.  At any given time, therefore, there is no public list of RMBS available

12   for sale or of the financial terms of ongoing transactions.  As a result, investors do

13   not buy and sell RMBS directly.  Instead, when institutional investors are

14   interested in buying or selling RMBS, they contact registered broker-dealers such

15   as Jefferies to find interested buyers or sellers.  Investors may also buy and sell

16   RMBS directly with broker-dealers that hold RMBS in their own accounts.

17        Most, if not all, institutional investor-buyers use computer models to

18   establish the highest amount at which they would be willing to buy or sell a

1   particular RMBS.  These analyses can be quite complex.  Factors considered

2   include the priority level of the bond, the likely number of individuals that will

3   prepay their mortgages, the likely number of mortgage defaults, the potential

4   severity of the loss on a defaulted mortgage, the locations of the real property

5   mortgaged, unemployment rates in those locations, the effectiveness of the home

6   loan servicer in receiving payments, and the credit scores of individual

7   homeowners.

8           RMBS are bought or sold through three methods, styled as:  "inventory

9   trades," "order trades," or "bids-wanted-in-competition trades" ("BWIC trades").

10  In an inventory trade, an investor buys a bond already held in a broker-dealer's

11  account.  In an order trade, a broker-dealer communicates with an interested

12  buyer and seller and, if successful, effectuates a transaction in which a RMBS is

13  transferred.  A RMBS investor may approach a broker-dealer to express interest

14  in buying or selling a RMBS in a certain price range.  Or a broker-dealer may

15  approach an investor to gauge its interest in buying or selling a bond in a certain

16  price range.  The broker-dealer owns the bond, but usually briefly, in

17  consummating the transaction between the two investors.

7

1        A BWIC trade was involved in the sole count on which appellant was

2   convicted.  A BWIC trade is similar to an order trade, except that a BWIC trade

3   involves an auction in which a putative seller sends a bid-list to multiple broker-

4   dealers.  These broker-dealers solicit expressions of interest and price ranges

5   from potential buyers.  The broker-dealer then places a bid in the auction of a

6   particular security.  The bid price is selected by the broker-dealer and may well

7   differ from prices suggested by putative buyers.  If the broker-dealer's bid is

8   successful, the broker-dealer buys the bond and then offers to sell it to the

9   interested investor.  Communications are generally carried out through online

10  instant messages.

11       There are various quirks to how bond prices are quoted among market

12  participants.  First, bond prices are quoted in terms of the price per $100 of face

13  value, not the total price.  Second, bond prices that are not whole numbers are

14  represented in "ticks," 1/32 of a dollar or approximately $0.03.  For example, a

15  bond priced at $79.75 is represented as 79-24.  Further, a broker-dealer is

16  compensated with reference to either the "all-in" or "on-top" price.  An "all-in"

17  price is the total price the investor is (the broker-dealer hopes) to pay a broker-

18  dealer for a bond.  It does not refer to the price at which the broker-dealer

1   purchased the bond.  An "on-top" price refers to the difference between the price

2   the broker-dealer paid for the bond and the price at which the broker-dealer will

3   sell the bond –– the "on-top" price is the broker-dealer's profit.  In "on-top"

4   trades, the broker-dealer's profit is sometimes referred to colloquially as a

5   "commission," "markup," or "spread."  In general, inventory trades are quoted

6   as "all-in" prices.  Negotiations over order or BWIC trades may refer to the

7   broker-dealer's acquisition cost and the "on-top" price.

8        An essential feature of all of these trades, however, is that the broker-

9   dealer acts solely in its own interest as a principal.  The broker-dealer continually

10  tracks potential buyers and sellers, their interests in particular kinds of RMBS,

11  and their ongoing acceptable price ranges.  It seeks to profit from transactions in

12  the securities by buying low and selling high.  The size of the year-end

13  discretionary bonus given to each broker-dealer's trader is largely based on the

14  profitability of the individual's trades.  The broker-dealer assumes the risk of

15  buying the bond, and an institutional investor can refuse to purchase a bond held

16  by the broker-dealer even when the investor caused the broker-dealer to

1   purchase it by an expression of interest, <u>i.e.</u>, in an order or BWIC trade.[1]  Such an

2   investor may also have no investment purpose but may intend to resell the bond

3   immediately, and at a higher price, to another institution it knows to be

4   interested.

5        A broker-dealer is not, therefore, an agent for its counterparties in these

6   trades and owes them no special or fiduciary duty.  In a sale by a counterparty to

7   a broker-dealer, the counterparty has no legitimate expectation that the broker-

8   dealer will resell the bond at the price paid to the counterparty.  Similarly, in a

9   purchase, the counterparty has no legitimate expectation of purchasing a bond at

10  the price paid by the broker-dealer.  Rather, the broker-dealer and counterparty

11  each have their own price ranges in which they will consummate their ends of

12  the transactions.  The final price is determined in an arms-length negotiation and,

13  if agreed upon, will be somewhere in the overlap of price ranges.

14       Market participants protect themselves against behavior that departs from

15  market norms of good faith largely without resort to expensive and

---

[1] The price to be paid by the investor is usually determined by a negotiation with
the broker-dealer only after the broker-dealer has purchased the bond.  Of
course, evidence of an investor's promise to buy a bond at a particular price
might create a contractual liability for breach of contract if the promise was not
kept.

1    time-consuming litigation.  Institutional investors simply refuse to do business

2    with perceived bad actors for either a period of time or indefinitely.  This is

3    referred to in the industry as placing an individual or firm in the "penalty box,"

4    Tr. at 174, and is "not out of the ordinary," id.  For example, after

5    AllianceBernstein discovered appellant's misstatements, the firm put Jefferies in

6    the "penalty box" for approximately one month.  There was also testimony that

7    AllianceBernstein "still [doesn't] do business with Jefferies very much at all." Id.

8    at 176.  Jefferies fired appellant shortly after AllianceBernstein's discovery.

9    b) The First Trial and Appeal

10   In the first trial, appellant was convicted on all counts apart from Count

11   Seven, which had been dismissed before trial.  Litvak I, 808 F.3d at 166-69.

12   Appellant appealed, and we reversed the judgment of conviction on the counts

13   alleging fraud against TARP and making false statements.  Id. at 190.

14   Ten transactions were involved in the remaining securities fraud counts.

15   In each count, appellant was accused of lying about the price at which Jefferies

16   had bought or sold the particular RMBS involved.  These misstatements were

17   made to increase Jefferies's profits.  For example, by overstating to a proposed

11

1    counterparty the amount he paid for a bond, appellant sought to increase the all-

2    in price paid by the counterparty and Jefferies's profit on the transaction.

3            We also vacated his convictions on the securities fraud counts but

4    remanded for a new trial on those counts. <u>Id.</u> In both trials, the government

5    sought to prove the element of materiality in the securities fraud counts through

6    the testimony of representatives of appellant's counterparties. They generally

7    testified that they considered appellant's misstatements to be important in

8    deciding whether to sell or buy the RMBS in question. On the first appeal, we

9    held that the district court erred in excluding the testimony of two experts

10    proffered by the defense as to how reasonable investment managers value RMBS,

11    <u>id.</u> at 182-88, and as to how the profit sought by the broker-dealer was so minor

12    compared to the bond price that misstatements regarding that profit were not

13    material to a reasonable investor, <u>id.</u> at 184-85.

14            The excluded experts were also to testify as to the "arm's-length nature of

15    the relationship between a broker-dealer and counterparty." <u>Id.</u> at 186. This

16    testimony was offered by the defense to rebut a purported agency relationship

17    testified to by some representatives of the counterparties. <u>See id.</u> Because the

18    exclusion of the expert testimony on how RMBS are valued required vacaturs of

1    all the securities fraud convictions, id. at 184, we declined to determine whether

2    the exclusion of appellant's proferred expert testimony on agency relationships,

3    while error, was harmless.  Id. at 188.  At the time of our opinion, there was

4    uncertainty as to whether the agency issue would even arise at a second trial

5    because, at the oral argument of the first appeal -- the proverbial eleventh hour --

6    the government abandoned any claim of an agency relationship.  See id. at 187

7    n.32.  With regard to the agency issue, however, we noted that the existence of an

8    agency relationship was of "great import," id. at 187, because, if such a

9    relationship existed, appellant's misstatements would have been more important

10   to a reasonable investor while, if such a relationship was lacking, the

11   misstatements would have been less so.  Id.

12   c) The Second Trial and Appeal

13        Appellant was retried on the ten securities fraud counts in early 2017.  The

14   jury convicted appellant on Count Four and acquitted him on all other counts.

15   The following evidence, viewed in the light most favorable to the government,

16   United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015), is relevant to appellant's

17   conviction on Count Four.

1        Appellant, on behalf of Jefferies, was involved in selling a RMBS in a BWIC

2   trade to Invesco Ltd., an investment management company with nearly $1 trillion

3   of assets under management.  On July 1, 2010, having received a bid-list of bonds

4   from a putative seller, appellant circulated the bid-list to, inter alia, Brian Norris,

5   who represented Invesco.  Invesco's credit research team determined that

6   Invesco would make a worthwhile profit on a particular RMBS on the list, SARM

7   2005-21 7A1, if the purchase price were at, or under, $80 per $100 of face value.

8   Norris then suggested to appellant that he bid 79-24 for the bond, and further

9   told appellant that he had "some room" to bid higher than 79-24.  Tr. at 748, 772.

10        Appellant purchased the bond and informed Norris that Jefferies won the

11  auction, stating in an online chat that "[I] bid your level," Joint App'x at 723, that

12  is, he bid 79-24.  In fact, however, appellant had bid and purchased the bond for

13  79-16.  Norris then proposed to buy the bond from appellant for 79-30, asking "6

14  ticks cool? 79-30 to me?"  Id.  Appellant accepted, saying "6/32s is great."[2]  Id.

---

[2]     The entire conversation read:

        Norris:  we can bid 79-24 on the SARM 05-21 7A1
        Litvak:  using.....brb....
        Norris:  thx, got some room too
        Litvak:  winner bro....he had 2 other guys that were at 79 and trying
                 to improve...but he just sold em to us...i bid your level...so
                 will work for whatever you want big man...

1    The difference between fourteen ticks and six amounts to $73,018.53.  Gov't Br. at

2    11.  The total amount Invesco paid Jefferies for the bond was approximately $23.6

3    million.

4         Before appellant's second trial, appellant made motions in limine to bar

5    counterparty representatives from testifying that they believed appellant was

6    acting as their agent.  Notwithstanding the concession at oral argument on the

7    first appeal, the government proposed to offer such testimony, and the district

8    court allowed it.  The court stated that such testimony was "plausibly . . . part of

9    the government's efforts to establish the materiality of the information

10   [appellant] misrepresented, and could likewise contribute[] to the inference that

11   [appellant] was acting with fraudulent intent."  United States v. Litvak, No. 13-cr-

12   19, Order on Motion in Limine (D. Conn. June 28, 2016), at 4 (internal quotation

13   marks and citation omitted).  Furthermore, the court reasoned that "because

---

        Norris:  wow...that was fast.  nice work.  6 ticks cool?  79-30 to me?
        Litvak:  ure timing was perfect.....3pm bwic and he is good about
                 trading things fast...so we got in there right at the right
                 time.....good teamwork....6/32s is great...thanks BN
        Norris:  thanks.  nice we finally got something done.
        Litvak:  appreciate it...im due for a trip down there....i will talk to
                 defife about that
        Norris:  sounds good.  wait until churchill's fall meet.

Joint App'x at 723.

1    these witnesses are testifying to their own point of view -- i.e., what they

2    understood their relationship to [appellant] to be, based on the events leading up

3    to these trades as they experienced them -- this testimony is unlikely to confuse

4    the jury or to be unduly prejudicial to [appellant]." Id.

5         Norris then testified that he believed appellant to be his agent, and that

6    broker-dealers "serve as an agent in between [buyers and sellers]." Tr. at 748.

7    Joel Wollman, who worked for a different firm and was a counterparty

8    representative to two transactions on which appellant was acquitted, also

9    testified that appellant was "acting as [his] agent." Id. at 859.

10        Certainly, by the end of the second trial, if not much earlier, it was clear

11   that appellant had never been Norris's (or Wollman's) agent, and an agency

12   relationship did not exist in such transactions. Indeed, Invesco's compliance

13   personnel had informed Norris (before the transaction) that broker-dealers were

14   not agents of bond buyers in BWIC trades. During its summation, the

15   government labeled the agency issue a "red herring." Id. at 1456. It stated that it

16   "never claimed . . . that . . . Litvak was ever acting as an agent," id., and that a

17   "broker-dealer is not acting as someone's agent," id. at 1457. Instead, the

18   prosecution argued that the critical point of this testimony was to show how

16

1    appellant "ch[]ose to establish a relationship of trust to lead them all to think that

2    he was trustworthy." Id.[3]  Finally, the district court instructed the jury that

3    appellant was not an agent of Norris or Invesco.

4           After a motion for a judgment of acquittal or a new trial was denied, the

5    court sentenced appellant to 24 months' imprisonment, three years of supervised

6    release, and a $2 million fine.  This appeal followed.

7                          DISCUSSION

8           Appellant challenges his conviction on two principal grounds.  First, he

9    argues that, as a matter of law, the government did not prove that his

10    misstatements were material.  Because the materiality of a defendant's

11    misstatements to a reasonable investor is an element of the charged crime, our

12    adoption of any variation of this argument would preclude a new trial.  See

13    United States v. Robinson, 545 F.2d 301, 304 n.5 (2d Cir. 1976).  However, we

14    disagree.  Second, he argues that the district court erred in admitting testimony

15    on Norris's erroneous belief that appellant acted as Invesco's agent.  We agree,

16    vacate the conviction, and remand.

17

---

[3]  The government cites no evidence that appellant created Norris's or Wollman's
belief that he was acting as their agent.  See Note 2, supra.

17

1    a) <u>Materiality</u>

2         To prove securities fraud in a civil action under Section 10(b) of the

3    Securities Exchange Act of 1934, codified as 15 U.S.C. § 78j(b),[4] the government

4    must prove that, "in connection with the purchase or sale of a security the

5    defendant, acting with scienter, made a material misrepresentation (or a material

6    omission if the defendant had a duty to speak) or used a fraudulent device.[5]  In

7    order to impose criminal liability, the government must also prove that the

8    defendant willfully violated the law."  <u>United States v. Vilar</u>, 729 F.3d 62, 88 (2d

9    Cir. 2013) (internal quotations and citations omitted).  This appeal focuses largely

10   on the element of materiality.

11        A misstatement in a securities transaction is material so long as there is "a

12   substantial likelihood that a reasonable investor would find the . . .

13   misrepresentation important in making an investment decision."  <u>Id.</u> at 89; <u>see</u>

14   <u>United States v. Contorinis</u>, 692 F.3d 136, 143 (2d Cir. 2012).  A misrepresentation

---

[4]  The other provision under which appellant was convicted, 15 U.S.C. § 78ff, provides penalties for violating the Securities Exchange Act.

[5]  The phrase "fraudulent device" is a term of art inapplicable in this matter, <u>Schreiber v. Burlington N., Inc.</u>, 472 U.S. 1, 6-7 (1985), and the defendant's misstatements are the sole basis of criminal liability.

18

1     is important if there is "a substantial likelihood that the disclosure of the omitted

2     fact would have been viewed by the reasonable investor as having significantly

3     altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485

4     U.S. 224, 231-32 (1988).

5        The standard of a "reasonable investor," like the negligence standard of a

6     "reasonable man," is an objective one. See TSC Indus., Inc. v. Northway, Inc., 426

7     U.S. 438, 445 (1976); Long v. Abbott Mortg. Corp., 459 F. Supp. 108, 116-17 (D.

8     Conn. 1978) (citing cases). The standard may vary, therefore, with the nature of

9     the traders involved in the particular market. See Basic, 485 U.S. at 236; Michaels

10     v. Michaels, 767 F.2d 1185, 1197 (7th Cir. 1985). The reasonable investor in a

11     market in which many individual investors trade will be deemed to be somewhat

12     less schooled and sophisticated than a reasonable investor in a market, like the

13     one now before us, in which only institutions trade with the help of complex

14     computer programs and professional traders. See, e.g., Marini v. Adamo, 995 F.

15     Supp. 2d 155, 184 (E.D.N.Y. 2014), aff'd, 644 F. App'x 33 (2d Cir. 2016); In re

16     Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 377 n.142 (S.D.N.Y. 2003);

17     Lenz v. Associated Inns & Rest. Co. of Am., 833 F. Supp. 362, 375-76 (S.D.N.Y.

18     1993).

1   The objective nature of the "reasonable investor" standard is of particular

2   importance in this case.  To prove materiality, the government relied heavily on

3   the testimony of counterparty traders -- purported victims -- that they considered

4   appellant's misstatements to be an important factor, among others, in their

5   investment decisions.  The district court believed it important that counterparty

6   traders testify to "their own point of view."  <u>Litvak</u>, No. 13-cr-19, Order on

7   Motion in Limine, at 4.  This approach is permissible in a case like this, but only

8   so long as the testimony about the significance of the content of a defendant's

9   misstatements and each trader's "own point of view" is shown to be within the

10  parameters of the thinking of reasonable investors in the particular market at

11  issue.  In other words, there must be evidence of a nexus between a particular

12  trader's viewpoint and that of the mainstream thinking of investors in that

13  market.  Materiality cannot be proven by the mistaken beliefs of the worst

14  informed trader in a market.

15  A finding of materiality does not require proof of "actual reliance."  <u>Vilar</u>,

16  729 F.3d at 89.  Materiality requires proof only that a reasonable investor would

17  deem the content of a misstatement a substantial factor to be considered in the

18  making of the particular investment decision.  Unlike common law fraud or a

1    civil action for damages where an investor seeks compensatory damages, proof

2    of harm is not necessary in a criminal prosecution under Section 10(b), so long as

3    materiality, intent to defraud, and a connection to a securities transaction are

4    shown.

5    b) <u>Materiality and Value</u>

6            Appellant challenges the government's proof of materiality as legally

7    insufficient.  We review the sufficiency of the evidence <u>de novo</u>.  <u>United States v.</u>

8    <u>Coplan</u>, 703 F.3d 46, 62 (2d Cir. 2012) (citing <u>United States v. Yannotti</u>, 541 F.3d

9    112, 120 (2d Cir. 2008)).  "As a general matter, a defendant challenging the

10   sufficiency of the evidence bears a heavy burden, as the standard of review is

11   exceedingly deferential."  <u>Brock</u>, 789 F.3d at 63 (citing <u>Coplan</u>, 703 F.3d at 62).

12   The evidence must be viewed "in the light most favorable to the [g]overnment,

13   crediting every inference that could have been drawn in the [g]overnment's

14   favor, and deferring to the jury's assessment of witness credibility and its

15   assessment of the weight of the evidence."  <u>Id.</u> (citing <u>Coplan</u>, 703 F.3d at 62).  A

16   conviction will be upheld "if any rational trier of fact could have found the

17   essential elements of the crime beyond a reasonable doubt."  <u>Id.</u> (internal

18   quotation marks and citations omitted).

1        Appellant contends that, as to the count of conviction, the government

2   presented evidence showing only that Norris agreed to a price for the bond that

3   was based on Invesco's internal analysis of value completed before he spoke to

4   appellant.  According to appellant, Norris "was primarily interested in obtaining

5   the bond, not in minimizing Jefferies'[s] profit."  Appellant Br. at 43.

6        However, on Count Four, there was sufficient evidence for a rational jury

7   to find appellant's misstatements material beyond a reasonable doubt, whether

8   or not Norris paid "the price he proposed to pay."  Id. at 44.  As noted, the

9   determination of the materiality of a misstatement or omission "is an objective

10  one, involving the significance of an omitted or misrepresented fact to a

11  reasonable investor."  TSC Indus., 426 U.S. at 445; see Amgen Inc. v. Conn. Ret.

12  Plans & Trust Funds, 568 U.S. 455, 459 (2013) ("materiality is judged according to

13  an objective standard . . .").  A finding of materiality, therefore, requires a

14  showing only of importance, not "actual reliance."  Vilar, 729 F.3d at 89.

15       In Litvak I, we held that the testimony of various counterparty

16  representatives was sufficient to sustain a finding of materiality on the counts of

17  securities fraud.  See 808 F.3d at 175-76 ("The trial record includes testimony

18  from several representatives of Litvak's counterparties that his

1   misrepresentations were important to them in the course of the transactions on

2   which the securities fraud charges were predicated . . .") (internal quotation

3   marks and citations omitted).  In that regard, we also held that exclusion of

4   appellant's experts' testimony was not harmless because the government was

5   relying on the subjective views of "purported victims," id. at 184, and the expert

6   testimony was intended to show that, under an objective materiality test, the

7   misstatements would not have been deemed significant by a reasonable investor,

8   id.

9           In the first trial, the district court excluded expert testimony that minor

10  price variations would be irrelevant to sophisticated investors.  We held that this

11  exclusion was also error, although we did not reach the harmlessness issue.  Id. at

12  185.  Therefore, some misstatements may be so "obviously unimportant" as to be

13  immaterial as a matter of law.[6]  Feinman v. Dean Witter Reynolds, Inc., 84 F.3d

14  539, 540-41 (2d Cir. 1996) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d

15  Cir. 1985)); see also TSC Indus., 426 U.S. at 450 (applying "obvious" standard to

---

[6] According to the government's brief, Gov't Br. at 11, 37, Jefferies's gain in the transaction attributable to the misstatement for which appellant was convicted was $73,000, or about .3% of the purchase price paid by Invesco.  Assuming Norris would have paid only an additional six ticks over appellant's purchase price, the misstatements increased Jefferies' profit by about $73,000 on a security purchased by Invesco for approximately $23.6 million.

1    definition of materiality for purposes of Section 14(a) of the Securities Exchange

2    Act).

3          In Feinman, brokers added transaction fees of a few dollars that may have

4    "exceed[ed] the broker[s'] actual handling charges."  84 F.3d at 541.  However,

5    the brokers "did not mislead their customers as to what portion of the total

6    transaction cost was going toward purchasing securities."  Litvak I, 808 F.3d at

7    176.  Here, unlike the market in Feinman, "competition among the firms in the

8    labeling and pricing of their services," id. at 177 (quoting Feinman, 84 F.3d at

9    541), is not available.  Further, the Feinman transaction occurred in an open

10   market, but a misrepresentation in the RMBS market is "virtually

11   undiscoverable."  Id.[7]

12         Appellant also argues that his misstatements cannot, as a matter of law, be

13   material because they were not relevant to the intrinsic value of the bond, at best

14   affecting only "the negotiation over price."  Appellant Br. at 30.  This argument

---

[7] The government adds that the jury was entitled to find appellant's
misstatements to be material based on his own actions and statements to
counterparties after his misstatements were uncovered.  This evidence primarily
bears on the counts of securities fraud for which appellant was acquitted and is
not considered here because we conclude that there was otherwise legally
sufficient evidence to convict appellant on Count Four.

1    appears to have been considered and rejected in <u>Litvak I</u>.  <u>See</u> <u>Litvak I</u>, 808 F.3d at

2    175-78.  Nothing in the record of the second trial causes us to reach a different

3    result.

4           We cannot agree that, because statements about the price paid by the

5    broker-dealer for a RMBS are not intended, or understood, as relevant to the

6    intrinsic value of the bond, such assertions are not material as a matter of law.[8]

7    When the broker-dealer seeks a profit for its role in procuring and selling a

8    security desired by a buyer, the profit becomes part of the price paid by the

9    buyer.  The value of the security may be the most important factor governing the

10   decision to buy, but the price must be considered in determining whether the

11   purchase is deemed profitable.[9]  The broker-dealer's profit is part of the price and

12   lies about it can be found by a jury to "significantly alter[] the 'total mix' of

13   information . . . available."  <u>Basic</u>, 485 U.S. at 231-32 (internal citation omitted).

_____

[8]  We assume, for purposes of this discussion, that the trier of fact has found that
the misstatements as to the broker-dealer's purchase price would not be deemed
relevant to a reasonable investor's valuation of the bond in question.  In some
circumstances, the amount of that purchase price might cause reconsideration of
the computer's valuation.  The government does not claim that the price actually
paid by Jefferies for the bond at issue would have caused such a reconsideration.

[9]  Norris testified as follows:  "So a higher price means a lower yield and a lower
price means a higher yield.  And yield is the return that we would expect to get
on a particular investment."  Tr. at 806.

1    (c) Evidentiary Rulings

2        Appellant argues that the district court erred by admitting Norris's

3    testimony that appellant was Invesco's agent, and that this evidence may have

4    tipped the balance in favor of the jury's conviction on that count.  We agree.

5        (i) Error

6        "We review a district court's evidentiary rulings under a deferential abuse

7    of discretion standard, and we will disturb an evidentiary ruling only where the

8    decision to admit or exclude evidence was 'manifestly erroneous.'"  United States

9    v. McGinn, 787 F.3d 116, 127 (2d Cir. 2015) (quoting United States v. Samet, 466

10   F.3d 251, 254 (2d Cir. 2006)).  Even if a decision was "manifestly erroneous," we

11   will affirm "if the error was harmless."  Id. (citing United States v. Miller, 626

12   F.3d 682, 688 (2d Cir. 2010)).

13       In the first trial, the issue of whether appellant was acting as a principal or

14   as an agent in the various charged transactions was disputed.  Only at oral

15   argument of the first appeal did the government concede that appellant was

16   acting as a principal.  Nevertheless, in the second trial and at the government's

17   urging, the district court again admitted testimony from Norris that appellant

18   was acting as Invesco's agent during the trade.  The district court held that the

1    testimony was relevant to the materiality of appellant's misstatements and to

2    appellant's fraudulent intent.  The court also noted that the testimony was

3    unlikely to confuse or prejudice the jury because it went only to Norris's "own

4    point of view."[10]  Litvak, No. 13-cr-19, Order on Motion in Limine, at 4.

5         In Litvak I, we noted the importance of an agency relationship to the

6    materiality issue.  We stated that testimony about whether appellant was the

7    buyer's agent was relevant because it might cause a jury to

8         construe [Litvak's misstatements] as having great
9         import to a reasonable investor if coming from the
10        investor's agent.  If, on the other hand, Litvak was
11        acting on his own behalf (i.e., as a principal), and not as
12        the purported victims' agent, a jury may well construe
13        that relationship as providing a distance between Litvak
14        and a reasonable investor, which may tend to show that
15        his statements could not have been reasonably viewed
16        as important in the course of a transaction.
17
18   Litvak I, 808 F.3d at 187 (citation omitted) (emphasis in original).

19        It is now undisputed that appellant never acted as Invesco's or Norris's

20   agent during the trade in question.  Appellant acted as a principal:  Jefferies

21   bought the bond from one party, held it for a brief period of time, and then sold it

---

[10]  We focus on the testimony of Norris since the trade between Norris and
appellant is the basis for appellant's sole count of conviction.  The testimony of
Wollman is addressed with regard to harmlessness infra.

1 to Invesco. The transaction was at arms-length, and appellant owed no fiduciary

2 duties to the buyer. As the owner of the bond, Jefferies did not have to convey

3 the bond to Invesco and assumed the risk that Invesco would walk away from

4 the deal after Jefferies had bought the bond.

5   To repeat, the lack of an agency relationship is undisputed. The district

6 court instructed the jury that Litvak was not Invesco's agent. Indeed, the

7 government argued in summation that the agency issue was a "red herring" and

8 that it had never claimed that Litvak was Invesco's agent. Tr. at 1456.

9   Evidence is relevant if "(a) it has any tendency to make a fact more or less

10 probable than it would be without the evidence; and (b) the fact is of

11 consequence in determining the action." Fed. R. Evid. 401. Relevancy is a "very

12 low standard." United States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting

13 United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008)). "To be relevant,

14 evidence need not be sufficient by itself to prove a fact in issue, much less to

15 prove it beyond a reasonable doubt." United States v. Abu-Jihaad, 630 F.3d 102,

16 132 (2d Cir. 2010).

17   At the government's urging, the district court admitted Norris's testimony

18 as relevant to the materiality issue. It believed that any prejudice was unlikely

1    because Norris would be "testifying to [his] own point of view." <u>Litvak</u>, No. 13-

2    cr-19, Order on Motion in Limine, at 4.  On appeal, the government argues that

3    Norris's belief in an agency relationship was relevant to whether the "victims

4    trusted Litvak."  Gov't Br. at 48.  It adds that "[e]vidence as to whether and why

5    victims trusted Litvak or believed his representations was probative as to what

6    an objectively reasonable investor would have thought, and thus relevant to the

7    disputed issue of materiality."  <u>Id.</u> at 49-50.  If trust exists, the government

8    argues, a jury could interpret misstatements by appellant as more likely to be

9    material.

10          However, the materiality standard is an objective one and centers on the

11    views of a hypothetical, reasonable investor in the market at issue.  <u>See</u> <u>Amgen</u>,

12    568 U.S. at 467 ("[t]he question of materiality . . . is an objective one, involving the

13    significance of an omitted or misrepresented fact to a reasonable investor")

14    (quoting <u>TSC Indus.</u>, 426 U.S. at 445); <u>Chris-Craft Indus., Inc. v. Piper Aircraft</u>

15    <u>Corp.</u>, 480 F.2d 341, 363 (2d Cir. 1973) ("The materiality test is concerned only

16    with whether a prototype reasonable investor would have relied.").  It can hardly

17    be the law that the "point of view," <u>Litvak</u>, No. 13-cr-19, Order on Motion in

18    Limine, at 4, of an investor who is admitted to be wrong -- the government, in

1    putting the best face on it, describes Norris as "confused" and "incorrect" -- is

2    relevant to prove what a reasonable investor, neither confused nor incorrect,

3    would have deemed important.  The agency issue raised by the government's

4    proffer of Norris's testimony was indeed an irrelevant "red herring."  Tr. at 1456.

5         While the individual views of a counterparty trader may usually be

6    relevant to the nature of the market involved and as to the beliefs of a reasonable

7    investor, a reasonable investor would not misperceive the role of a broker-dealer

8    in the RMBS market.  See Litvak I, 808 F.3d at 187 n.32.  In fact, Norris received

9    material from Invesco's legal and compliance department stating that, in

10   transactions such as the one here, broker-dealers act as principals.  His

11   disagreement with that advice was unreasonable.  Norris's indisputably

12   idiosyncratic and unreasonable viewpoint is not, therefore, probative of the

13   views of a reasonable, objective investor in the RMBS market.  Even if Norris's

14   testimony had relevance,[11] the district court abused its discretion under Rule 403.

15   Relevant evidence may be excluded "if its probative value is substantially

16   outweighed by a danger of one or more of the following:  unfair prejudice,

[11] The district court admitted Norris's testimony on an agency relationship partly
on the grounds that it might "contribute[] to the inference that [appellant] was
acting with fraudulent intent."  Litvak, No. 13-cr-19, Order on Motion in Limine,
at 4.  On appeal, the government does not rely on this ground.

30

1    confusing the issues, misleading the jury, undue delay, wasting time, or

2    needlessly presenting cumulative evidence." Fed. R. Evid. 403. At best, Norris's

3    testimony about the supposed agency relationship had a high probability of

4    confusing the jury by asking it to consider as relevant the perception of a

5    counterparty representative that was entirely wrong. At worst, Norris's

6    testimony on an agency relationship would mislead the jury based on the

7    government's argument that a perceived relationship of trust showed materiality.

8    This argument itself is flawed because it equates an indisputably incorrect

9    personal belief with an objective test of materiality.

10           In its summation to the jury, the government sought to cabin the effect of

11   Norris's testimony by emphasizing that it never claimed that appellant acted as

12   an agent.[12] It further labeled the defense's emphasis on the agent-principal

13   distinction a "red herring," a remark that all but concedes irrelevance. Tr. at

14   1456. It argued in summation that appellant created the perception of acting as

15   an agent and that he aimed to establish a "relationship of trust." Id. at 1457. But

---

[12] The government also argues that the testimony of Norris was relevant because his "confusion was bound to be used against them by the defense to show that they were not reasonable investors." Gov't Br. at 50. But it was the government that opposed the defense's motion in limine to preclude evidence of Norris's "confusion."

1    the government points to no evidence that appellant was the source of Norris's

2    mistaken belief in an agency relationship or took steps sufficient to cause Norris

3    to disregard the common knowledge of the market, much less the information

4    provided Norris by Invesco's legal and compliance department.[13]  The

5    government's concept of subjective trust as evidence of materiality became a back

6    door for the jury to apply the heightened expectations of trust that an agency

7    relationship carries.  The government's argument similarly ignores the settled

8    law that those at either end of an arms-length transaction are acting only in their

9    own self-interest.  See In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir.

10   2002) ("[W]hen parties deal at arms length in a commercial transaction, no

11   relation of confidence or trust sufficient to find the existence of a fiduciary

12   relationship will arise absent extraordinary circumstances.") (quoting Pan Am.

13   Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994)) (alteration in

14   original).

15

---

[13]  An investor may be deceived into believing that an arms-length relationship is one of special trust, but the means of deception must be of a character that would deceive an objectively reasonable investor, i.e., more than a salesman's banter. We note, though, that the banter appellant employed with Norris in the transaction did not in any way suggest that an agency relationship existed.  See Note 2, supra.

1    (ii) Harmlessness Analysis

2    The jury's verdict prevents us from viewing the admission of the agency

3    testimony as harmless because we cannot "conclude with fair assurance that the

4    error[] did not substantially influence the jury."  Rosemond, 841 F.3d at 112

5    (internal quotation marks and citations omitted).  The following factors are

6    weighed in determining whether the admission of evidence was harmless:  "(1)

7    the overall strength of the prosecutor's case; (2) the prosecutor's conduct with

8    respect to the improperly admitted evidence; (3) the importance of the wrongly

9    admitted testimony; and (4) whether such evidence was cumulative of

10   other properly admitted evidence."  McGinn, 787 F.3d at 127-28 (quoting United

11   States v. Gomez, 617 F.3d 88, 95 (2d Cir. 2010)).  Applying this test, we conclude

12   that:  (1) the government's case on materiality was not overwhelming and was

13   vigorously contested; (2) the government proffered the testimony in question --

14   although admitting that the testimony was based on factual and legal error and

15   was a "red herring" -- and argued to the jury that a "relationship of trust"

16   existed; (3) the error was of great importance in view of the verdict, as discussed

17   infra; and (4) the testimony was not cumulative of properly admitted testimony.

33

1    Returning to <u>McGinn</u> factor (3), introduction of the evidence was evidently

2    of great importance to the jury.  The acquittals were almost certainly based on the

3    jury's acceptance of the defense's materiality theory that was largely suppressed

4    in the first trial.  On Count Four, Norris's testimony about a perceived agency

5    relationship was the only rational reason for the jury to have convicted appellant

6    on that count of securities fraud while acquitting him on all other counts.

7    The amount of money lost was not a differentiating factor between the

8    counts.  Four counts on which appellant was acquitted involved gains that were

9    much larger than the $73,000 plausibly at issue in Count Four.  Count Two

10   involved a plausible gain of $602,000.  Count Six involved a gain of $212,000.

11   Count Eight involved a gain of $229,000.  Count Ten involved a gain of $180,000.

12   The government's "relationship of trust" argument, based largely on

13   Norris's testimony, contributed to the prejudice on Count Four by stressing the

14   personal view of Norris.  In seven of the charged trades, the counterparty

15   representative either did not testify, or stated that, in general, they viewed

16   statements by broker-dealers with suspicion and did not consider appellant to be

17   their agent.  For example, a counterparty representative, Michael Canter, an

18   employee of AllianceBernstein, stated that information volunteered by traders

34

1    should be viewed with skepticism.  He also noted that he understood that

2    appellant was trading as a representative of a principal.  His testimony as to any

3    trust of appellant was admittedly personal.  Katherine Corso of York Capital

4    abandoned plans to set up an auction to sell a bond in favor of selling it to

5    appellant for what she considered to be an agreeable price, i.e., a better deal than

6    an auction.  Corso further understood that appellant was acting as a

7    representative of a principal in the transaction with all the accompanying risk

8    that status entailed.[14]  Vladimir Lemin, representing Magnetar Capital, testified

9    that information in the market "could be less than truthful."  Tr. at 736.

---

[14]  Corso testified on cross-examination as follows:

> Q. And when Jefferies acquires a bond, it bears the risk of what
>    happens with that bond?
> A. Yes.
> Q. For example, if this other transaction falls through, that's
> Jefferies'[s] problem?
> A. Yes.
> Q. That can happen?
> A. Yes.
> Q. When Jefferies buys a bond, it owns it as a principal?
> A. Yes.
> Q. It can hold it or sell it?
> A. Yes.
> Q. It is entitled to every cent of the profit it earns if it sells it?
> A. Yes.

Tr. at 542.

1    According to him, such negotiations had to be approached with care.  Three

2    other counterparty representatives in charged trades failed to testify.  In

3    acquitting on these counts, the jury appears to have credited the substantial

4    evidence that investment managers view with suspicion statements by broker-

5    dealers in the context of arms-length transactions.

6        The acquittals on Counts Nine and Ten -- which involved two trades in

7    addition to the seven charged trades discussed above -- call for particular

8    scrutiny because they involved trades with Wollman, the only counterparty

9    representative apart from Norris to testify that he believed appellant was acting

10   as his agent.  The government argues that these two acquittals show that the jury

11   was not swayed by the testimony on agency in convicting appellant.  Instead, it

12   argues, if the jury was swayed, "one would have expected convictions on every

13   trade in which either one [Norris or Wollman] was the victim."  Gov't Br. at 52.

14       However, Wollman's credibility in that regard was severely weakened.

15   Wollman admitted that he viewed negotiations with broker-dealers with

16   skepticism.  He also admitted that, in particular, he viewed appellant's

17   statements during one of the transactions with suspicion.  There was also

18   evidence that, during that same transaction, Wollman concealed relevant

1    information from appellant.  Wollman did not tell appellant that he intended to

2    immediately resell half of the bond to Royal Bank of Scotland Securities ("RBS

3    Securities") for a higher price.  While negotiating, Wollman told appellant that

4    the bond would have an acceptable return at one purchase price, yet he had

5    agreed with RBS Securities that the bond would have the same return at a higher

6    purchase price.  On redirect, Wollman admitted that this behavior may have

7    misled appellant:  "If [appellant] knows that I, then, went ahead and sold it to

8    [RBS Securities], he likely misses out on that future transaction.  And he would

9    have reason to be upset about not getting to partake in that future transaction."

10   Tr. at 1007.  This conduct is not consistent with the view that appellant was

11   Wollman's agent.

12          The defense also introduced online chats claiming that Wollman engaged

13   in other deceptive practices -- if true, likely criminal acts under the government's

14   theory of this case -- not involving appellant.  Wollman was said by the defense --

15   Wollman denied the inference -- to have told a broker-dealer to invent a seller --

16   who was presumably interested in selling a bond to Wollman at an attractive

17   price -- to coax an individual into selling a bond.  And Wollman, when trying to

1    sell a bond in a BWIC auction, may have made up a bid to stoke interest in the

2    sale.

3    　　　While Norris acknowledged that transactions in the RMBS market

4    generally had to be approached with skepticism, his credibility was not similarly

5    impeached.  A jury invited by the government's "relationship of trust" argument

6    to consider the subjective views of counterparty representatives might well

7    convict on the count involving Norris while acquitting on the counts involving

8    Wollman.

9    　　　In light of the jury's verdict, therefore, we cannot "conclude with fair

10   assurance," <u>Rosemond</u>, 841 F.3d at 112, that Norris's testimony did not

11   "substantially influence the jury," <u>id.</u>, in convicting appellant.  We conclude that

12   the district court's error in admitting testimony on agency was not harmless and

13   requires a vacatur.

14   　　　　　　　　　　　　　　　　CONCLUSION

15   　　　Accordingly, we vacate and remand the judgment of conviction.  Because

16   appellant is currently incarcerated, we order that he be released on appropriate

17   bond pending further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

*Catherine O'Hagan Wolfe* (signature)

38